**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: _____ -cv- _____**

WILLIAM O. FULLER,
MARTIN PINILLA, II,
THE BARLINGTON GROUP, LLC,
CALLE OCHO MARKETPLACE, LLC,
YO AMO CALLE SIETE, LLC,
LITTLE HAVANA ARTS BUILDING, LLC,
LITTLE HAVANA ARTS BUILDING TOO, LLC,
TOWER HOTEL, LLC,
BRICKELL STATION, LLC,
PIEDRA VILLAS, LLC,
FUTURAMA, LLC,
EL SHOPPING, LLC,
BEATSTIK, LLC,
VIERNES CULTURALES/CULTURAL FRIDAYS, INC.,
LITTLE HAVANA BUNGALOWS, LLC,
LHAB TRES, LLC,

    Plaintiffs,
  v.

THE CITY OF MIAMI,
JOE CAROLLO, in his individual capacity,
ARTHUR NORIEGA, in his individual capacity,
VICTORIA MENDEZ, in her individual capacity,
RACHEL DOOLEY, in her individual capacity,
ASAEL MARRERO, in his individual capacity,
DANIEL S. GOLDBERG, in his individual capacity,
WILLIAM ORTIZ, in his individual capacity,
LUIS TORRES, in his individual capacity,
ADRIAN PLASENCIA, in his individual capacity,
RENE DIAZ, in his individual capacity,
IVONNE BAYONA, in her individual capacity,
JOHN DOES 1-20.

    Defendants.
_____/

## <u>COMPLAINT</u>

   During the trial of Joe Carollo, a large number of current and former City of Miami

employees – including a former City Manager and two former Police Chiefs – testified that, at the

direction of Joe Carollo, the City of Miami adopted formal policies aimed at targeting Plaintiffs,

their businesses, and business associates, and that the City and its employees engaged in a well-known, widespread and pervasive custom of weaponizing City resources to target and harass Plaintiffs, their businesses, and business associates, with the aim of shutting down Plaintiffs' businesses, tearing down Plaintiffs' properties, and destroying Plaintiffs' reputations and their personal wellbeing. The testimony also revealed that the City of Miami demoted or fired those who opposed Carollo's targeting of Plaintiffs, and promoted those who agreed to carry out the targeting.

These Defendants – a government machine mobilized by Carollo – have used unlimited resources of taxpayer money to corrupt City staff members as part of their yearslong effort to drive Plaintiffs and their businesses into bankruptcy.  In addition, the City at the direction of Carollo, Mendez and Noriega, has spent more than $15 million in taxpayer money in an endless effort to exhaust and destroy plaintiffs through a legal minefield by filing bogus and frivolous claims. The businesses owned by Plaintiff Fuller and Pinilla that have been subject to raids, false and unjustified fines, and attempts to demolish and destroy include: 1) The Barlington Group, LLC; 2) Calle Ocho Marketplace, LLC; 3) Yo Amo Calle Siete, LLC;  4) Little Havana Arts Building, LLC; 5) Little Havana Arts Building Too, LLC; 5) Tower Hotel, LLC; 6) Brickell Station, LLC; 7) Piedra Villas, LLC; 8) Futurama, LLC; 9) El Shopping, LLC; 10) Beatstik, LLC; 11) Viernes Culturales/Cultural Fridays, Inc.; 12) Little Havana Bungalows, LLC; and 13) LHAB TRES, LLC.

In addition to the City being liable for the $63.5 million in reputational, emotional, and punitive damages awarded by the jury against Carollo, the City of Miami and the individual Defendants have additionally caused extensive economic damages to Plaintiffs and their companies, well in excess of $60 million. Both the City of Miami and the individuals that knowingly carried out the targeting on Carollo's behalf – all while trying to protect Carollo – are

liable to Plaintiffs for these acts and for punitive damages in their individual capacities. This includes, without limitation, Defendants Noriega, Mendez, Dooley, Marrero, Goldberg, Ortiz, Torres, Plasencia, Diaz, and Bayona.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff William O. Fuller is a resident of Miami-Dade County, Florida.

2.      Plaintiff Martin Pinilla, II is a resident of Miami-Dade County, Florida.

3.      Plaintiff Barlington Group, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

4.      Plaintiff Calle Ocho Marketplace, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

5.      Plaintiff Yo Amo Calle Siete, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

6.      Plaintiff Little Havana Arts Building, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

7.      Plaintiff Piedra Villas, LLC is a Florida Limited Liability Company owned by Fuller, and is headquartered in the City of Miami.

8.      Plaintiff Little Havana Arts Building Too, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

9.      Plaintiff Brickell Station, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

10.     Plaintiff Tower Hotel, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

11.     Plaintiff Futurama, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

12.     Plaintiff El Shopping, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

13.     Plaintiff Beatstik, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

14.     Plaintiff Viernes Culturales/Cultural Fridays, Inc. is a Florida Corporation comprised of community stakeholders who committed thousands of hours for a great community benefit over 20 years, and whose former chairman was Plaintiff Bill Fuller.

15.     Plaintiff Little Havana Bungalows, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

16.     Plaintiff LHAB Tres, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and is headquartered in the City of Miami.

17.     Defendant City of Miami is the municipal governing body for the City of Miami.

18.     Defendant Joe Carollo is and at all relevant times was the City Commissioner for District 3 of the City of Miami.

19.     Defendant Arthur Noriega, in his individual capacity, is and at all relevant times was the City Manager for the City of Miami.

20.     Defendant Victoria Mendez, in her individual capacity, is and at all relevant times was the City Attorney for the City of Miami.

21.     Defendant Rachel Dooley, in her individual capacity, is and at all relevant times was the Assistant City Attorney for the City of Miami.

22.     Defendant Asael Marrero, in his individual capacity, is and at all relevant times was the Building Director for the City of Miami.

23.     Defendant Daniel S. Goldberg, in his individual capacity, is and at all relevant times was the Zoning Director for the City of Miami.

24.     Defendant William Ortiz, in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo carrying out his political targeting of Plaintiffs.

25.     Defendant Luis Torres, in his individual capacity, is the Assistant Director of Building.

26.     Defendant Torres is a good example of how supporters of Carollo earned promotions, as a reward for helping the retaliatory campaign against Plaintiffs, that they otherwise would not have obtained and did not deserve. Torres, for example, was a strong supporter and active campaigner for Carollo.  Below is a photo of Torres wearing a Carollo campaign T-Shirt actively campaigning for Carollo:



27.     Below is a photo of Torres sitting at a polling station on behalf of Carollo:



28.     Defendant Torres is the Building official that closed Plaintiffs' businesses, including Taquerias and Ball & Chain, and caused extensive damage to Plaintiffs' other businesses.

29.     Defendant Adrien Plasencia, in his individual capacity, is the Assistant Fire Chief and at relevant times was the City of Miami Fire Marshall.

30.     Defendant Rene Diaz, in his individual capacity, is and at all relevant times was the Senior Chief of the Unsafe Structures department.

31.     Defendant Ivonne Bayona, in her individual capacity, is and all relevant times was a member of the City of Miami Code Enforcement Board.

32.     John Does 1-20, in their individual capacities, are additional City of Miami employees whose identity is currently unknown but who have knowingly carried out Carollo's targeting of Plaintiffs.

33.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

34.     Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

35.     All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## **FACTS**

36.     Plaintiffs William Fuller ("Fuller") and Martin Pinilla ("Pinilla") are local entrepreneurs operating out of Calle Ocho in Little Havana, who have built a diverse real estate investment business from the ground up, one building at a time, providing hundreds of jobs for local residents and producing hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County, and the State of Florida.

37.     Plaintiffs Fuller and Pinilla have dedicated their professional careers to revitalizing the neighborhood of Little Havana, where they have helped to generate economic activity and breathe new life into the area, while at the same time preserving its historical significance and cultural identity.

38.     Plaintiffs Fuller and Pinilla have been recognized as "a galvanizing force behind the area's cultural resurgence," and renowned Miami historian Dr. Paul George has likewise noted that Fuller and Pinilla "are both very history-minded and are also very civic-minded . . . [They] understand that the neighborhood has a multilayered history."

39.     Plaintiffs Fuller and Pinilla consider their work to be that of curators and caretakers of the neighborhood and, accordingly, they seek out development partners and tenants "who share a similar vision of preserving and protecting the heritage, the culture, and the history"[1] of Little Havana.

---

[1] https://www.nbcnews.com/news/latino/miami-s-little-havana-working-class-neighborhood-global-tourist-hot-n738236

40.     For example, in 2014, Fuller and two of his childhood friends reopened the famous Ball & Chain nightclub.  For decades during the 1930's to 1950's, Ball & Chain was an important music venue, presenting titans of the era such as Billie Holiday and Count Basie. With the vision of restoring the venue to its past glory days, Fuller and his partners made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

41.     Plaintiffs Fuller and Pinilla are also currently working on Little Havana's first boutique hotel through a redevelopment and restoration of the historic Tower Hotel. The Tower Hotel served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[2]

42.     Preserving that history, where the legacies of various cultures converged on Calle Ocho, is central to Plaintiffs' vision for the project. Through these and many other projects in the area, Plaintiffs Fuller and Pinilla have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

43.     Plaintiffs Fuller and Pinilla's efforts in the neighborhood have born significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.  Little Havana is now a major Miami destination for tourists and locals alike, sought after as one of the few authentic Cuban legacy neighborhoods left in Miami.  In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

---

[2] https://www.miamiherald.com/news/business/article204754109.html#storylink=cpy

44.     Throughout all of this, Plaintiffs Fuller and Pinilla have nurtured great relationships with City Commissioners, including Joe Carollo's two predecessors, his brother Frank Carollo and Joe Sanchez, both of whom appointed Fuller and Pinilla to participate in various City boards or trusts, such as the Stars of Calle Ocho and Viernes Culturales.

### THE RACE FOR CITY COMMISSIONER

45.     In the summer of 2017, Joe Carollo ("Carollo") announced his campaign for Commissioner for the City of Miami's for District 3, which includes Little Havana, prompting the Miami Herald to write a story noting Carollo's history of "abusing power, profiting from taxpayers and *using government resources to intimidate his political opponents*."[3]

46.     Because of Carollo's reputation for political vengeance, Plaintiffs sought to keep their support for Carollo's opponent clandestine, becoming key members of the ABC– Anyone But Carollo – group.

47.     Carollo's five-year campaign of retaliation against Plaintiffs stemmed from: a) Plaintiffs hosting rallies for his opponent Alfie Leon and supporting social media advertising for Leon, b) Carollo's false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) Plaintiffs filing an ethics complaint against Carollo, e) Plaintiffs filing a federal lawsuit against Carollo, f) Plaintiffs hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) Plaintiffs promoting African American and Afro Cuban murals in Calle Ocho that

---

3 https://www.miamiherald.com/news/local/community/miami-dade/article179627391.html

Carollo disliked, and h) Plaintiffs generally having a different vision for Calle Ocho and Little Havana that threatened Carollo's desire to dominate the District for his own power and corruption.

## CITY OF MIAMI CHARTER

48.     The City of Miami Charter delineates the powers vested in the various arms of city government including the Mayor, City Manager and the Commissioners.  Section 4(g)(6) gives the Mayor the power to appoint the City Manager and Section 15 of the Charter establishes that the City Manager shall be the head of the administrative branch of the city government.

49.     Section 4(d) of the Charter delineates the division of power between the Mayor, City Manager and Commissioners as follows:

> Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof **shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately**.

> Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be **violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.** Any willful violation of the provisions to this section by the mayor or any city commissioner shall be **grounds for his or her removal from office by an action brought in the Circuit Court by the state attorney of this county**.

50.     The Charter makes clear that neither the Mayor nor the Commissioners can give direct orders to any department that is subordinate to the City Manager.  Instead, they are required to direct all orders to the City Manager who then has the authority to direct the various departments of the city to take action.

51.     Carollo, believing that he was above the law, balked at this requirement and used his position as a commissioner with the power to hire and fire the city manager to convince the City and its individual employees to help carry out his egregious targeting and punishment of Plaintiffs.

## CAROLLO'S RETALIATION AGAINST PLAINTIFFS

52.     Upon taking office, Carollo drew up a list of all Plaintiffs' properties and associated businesses for purposes of targeting those businesses for fines and shutting them down.

53.     Carollo found his first allies in City Attorney Victoria Mendez ("Mendez") and her Assistant City Attorney, Rachel Dooley ("Dooley"), both of whom worked willingly to assist Carollo.

54.     Specifically, Carollo, Mendez and Dooley worked together to shut down the Sanguich business, a tenant of Plaintiff The Barlington Group, LLC,  by revoking prior permits, refusing to grant new permits, and changing existing ordinances and passing new ordinances to prohibit the business' operation, thereby costing the owners the hundreds of thousands of dollars they had invested and destroying their dreams, all to retaliate against Plaintiffs. As a result of Defendants' actions, Sanguich was forced to end its tenancy with Plaintiff Barlington Group, resulting in economic damage to Plaintiff Barlington Group.

55.     Another target on Carollo's hit list was Plaintiff Calle Ocho Marketplace, LLC's property located at 1380 SW 8th Street, known as "Calle Ocho Marketplace."  Calle Ocho Marketplace consists of two (contiguous parcels of land. The first has an existing Mexican restaurant on it and the second consists of an open-air lot where Plaintiffs intended to put a kiosk marketplace.

56.     Plaintiffs had a lawful Farmer's Market Temporary Use Permit ("TUP") and a Building Permit for the kiosks on the property. Nevertheless, on August 31, 2018, City Attorney Mendez filed an Emergency Motion for Injunctive Relief ("Injunction Motion") asking the Court to either force Plaintiffs to remove the kiosks or grant the City the authority to remove ***and destroy*** every kiosk from the property.  The Injunction Motion was denied.

57.     Undeterred, on September 4, 2018, the City (at the direction of Carollo and Mendez) revoked the Farmer's Market TUP.

58.     On September 6, 2018, representatives of Plaintiff appeared at a Code Enforcement Board Hearing to discuss citations issued by the City at Calle Ocho Marketplace. During this hearing, Mendez lied to the Code Enforcement board, claiming the property was less than the 5,000 feet needed for a farmer's market, when the property was over 8,300 square feet. Mendez further claimed that the kiosks were a hurricane risk.

59.     Carollo also personally appeared before the board and lied, claiming Plaintiffs were planning a "flea market" and not a "farmers market." At the conclusion of the hearing and as a result of Mendez and Carollo's intentional misrepresentations, the Code Enforcement Board ordered the kiosks to be immediately removed or they would be destroyed by the City. On September 11, 2018, the City revoked the building permit for the kiosks.  Accordingly, Plaintiffs removed the kiosks.

60.     As a result of the combined efforts of Carollo and Mendez, Plaintiffs suffered extensive economic damages, which continue to this day and will continue into the future as long as Defendants' retaliatory campaign persists.

## CAROLLO'S RETALIATION AGAINST VIERNES CULTURALES

61.     Simply because Fuller was President, Carollo also targeted Plaintiff Viernes Culturales/Cultural Fridays, Inc. ("Viernes Culturales"), a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival, which was held on the last Friday of every month on Calle Ocho since 2000.

62.     Carollo began by having the City Attorneys Mendez and Dooley investigate Viernes Culturales and Fuller's role in it.  Specifically, Carollo wanted to learn whether he could use the City of Miami permitting process to steal the last Friday of every month for his own festival and, with it, the goodwill the organization had created over its 18 years of operation.

63.     During the 18-year history of the Viernes Culturales festival, and right up until October 2018, Viernes Culturales had never applied for or obtained a special events permit in relation to Domino Plaza, where a key part of the festival occured. And, prior to October 2018, despite its heavy involvement in and support of the festival, the City had never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

64.     Carollo started Little Havana Fridays on or about October 2018 to compete with Viernes Culturales.

65.     In fact, he sought and received a permit for the last Friday of the month for an entire year for Little Havana Fridays in order to prevent Viernes Culturales from being able to continue on its normal schedule on the last Friday of each month.

66.     At the time that Carollo started Little Havana Fridays, Noriega was still in his role as head of the Miami Parking Authority.

67.     Noriega provided millions of dollars of sponsorship funds from the Miami Parking Authority to Little Havana Fridays and other events sponsored by Carollo.

68.     Those funds were received via checks, which were personally collected by Richie Blom, ("Blom") Carollo's then Chief of Staff, at Noriega's office on a monthly basis to allegedly pay the performers for Little Havana Fridays.

69.     In February 2020, with Carollo's support, Noriega was appointed as City Manager.

70.     Once appointed, Carollo immediately involved Noriega in his plan to permanently destroy Viernes Culturales.

71.     Both Carollo and Noriega were aware that Bacardi and the Miami Marlins were sponsors that Fuller helped bring to Viernes Culturales.

72.     Carollo and Noriega were also aware that part of the Bacardi sponsorship involved alcohol sampling for patrons of Viernes Culturales that met the proper age and ID requirements.

73.     Carollo was not happy about these sponsorships.

74.     In fact, Carollo worked with Noriega to make sure that Bacardi could not provide samples at Viernes Culturales on May 21, 2021 by having Noriega prohibit the sampling under the false premise that an alcohol permit was required.

75.     Specifically, Noriega sent Viernes Culturales an email on May 21, 2021 revoking its right to serve alcohol that evening specifically because Fuller was involved with Viernes Culturales and he "hadn't earned" Noriega's trust.

76.     Noriega sent the email despite the fact that it is illegal under Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

77.     As if targeting Viernes Culturales because Fuller was its President was not enough, on February 7, 2022, Noriega, at Carollo's behest, discontinued any future permits for Viernes Culturales "indefinitely."

78.     This discontinuance was based on a fabricated narrative that people were walking outside the limits of the festival with alcohol.

79.     After the City successfully shut down Viernes Culturales' access to Domino Park, the festival moved to Futurama, which is Fuller and Pinilla's office building.

80.     Carollo didn't like this either because his true goal was to use the City to shut down Viernes Culturales permanently and completely.

81.     On October 21, 2022, Carollo sent Code Enforcement out to Futurama to cite the Viernes Culturales event with a violation for playing live music without a permit.

82.     Carollo had Code Enforcement issue the citation despite the fact that there is no law that requires private art galleries to get a permit to play live music at their events.

83.     On January 25, 2023 the Board Members of Viernes Culturales and Fuller went before the Code Enforcement Board to appeal the citation.

84.     Carollo knew that the appeal was coming up at the January 25, 2023 meeting and wanted to be sure that it was denied.

85.     To make sure it was denied, Carollo, as he did on other occasions described herein, had his Chief of Staff, Will Ortiz, reach out to all the members of the Code Enforcement Board to tell them that Carollo's political enemy, Fuller, was on the agenda and to vote against him. Carollo did this despite knowing it was wrong because he testified as much before a sitting jury on May 1, 2023, that "it would be absolutely wrong to do.  It would certainly be wrong for it to be done".

86.     As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

**TAQUERIAS**

87.     Plaintiffs' property located at 521 SW 8th Street had a Mexican restaurant on the bottom, named Taquerias El Mexicano ("Taquerias"), and a lounge upstairs, known as Los Altos.

88.     In targeting Taquerias, Carollo sought to get Florida's Department of Alcohol Beverage and Tobacco ("ABT") to repeatedly inspect Taquerias in the hopes of revoking its liquor license.

89.     When the inspections by the ABT, accompanied by Miami Police, did not result in any violations or revocations of the liquor license, Carollo became enraged.

90.     He began issuing voluminous public records requests ("PRRs") for Taquerias and demanded that the police officers who had inspected Taquerias appear before him at the next City of Miami Commission Hearing on February 14, 2019 to explain why they had not issued citations. He also requested the attendance of other City employees to explain why no code violations or other citations had been issued to Plaintiffs' Taquerias.

**VALENTINE'S DAY MASSACRE**

91.     On Thursday, February 14, 2019, Carollo launched a full scale defamatory assault on both the Plaintiffs and various City employees, calling for the Commission to pass a resolution asking the Governor to appoint a special prosecutor to criminally investigate the City employees that did not cite Plaintiffs' properties with violations.

92.     Both then-City Manager Emilio Gonzalez and the Chief of Police Jorge Colina ("Colina") stood before the Commission and told Carollo that they would not bring their employees to be publicly ridiculed by Carollo as part of Carollo's efforts to intimidate the employees into doing Carollo's bidding to target Plaintiffs.

93.     While the Commission rejected Carollo's call for criminal prosecution, it did pass a resolution establishing a task force involving Code Compliance, Fire, Police, and the Building department, to be headed not by the City Manager, but by City Attorney Mendez, aimed at investigating all aspects of Plaintiffs' properties.

94.     Resolution [4-1] stated: "A resolution of the Miami City Commission Directing the City Attorney to Research Properties Described at the February 14, 2019 City Commission Meeting During Discussion item 'D3.1 – Code Enforcement' regarding violations relating to no certificate of use, certificate of use obtained under false pretenses and/or properties with violations that pose life-safety issues, and initiate injunctive proceedings against said properties until the properties are brought into compliance."

95.     The only properties described at the February 14, 2019 Commission Meeting were Plaintiffs' properties, so Resolution [4.1] was passed for the purpose of targeting Plaintiffs' properties.

96.     Commissioner Carollo himself confirmed that Resolution [4.1] became official City policy:

> Q. At this point, Commissioner Carollo, this become city policy, correct?
> A. What becomes city policy?
> Q. This resolution.
> …
> A. Any resolution that is passed by the commission is city policy.

97.     Despite the passage of Resolution [4.1], many of the City's senior staff (most of which would be replaced within a year) objected to this official policy of targeting Plaintiffs' businesses.

98.     Miami's Chief of Police Colina sent a letter to the City Manager regarding Carollo and the City Attorney's unlawful targeting of Plaintiffs:

[T]he item on the agenda was a discussion item, however, the main focus of the discussion was aimed at one particular business owner in the city. The resolution that the city attorney prepared pertains to 'properties describe[d] at the 2/14/2019 city commission meeting.'  However, the addresses forwarded in her email targets the particular business owner [Plaintiffs] which gives the impression that the city is selectively targeting his business for new investigations.  **The concern is that this request, through the city attorney, may amount to an <u>unsanctioned and unlawful exercise of powers</u> beyond the limits of his [Carollo's] legislative power <u>as a city commissioner to intentionally cause harm to a business owner</u>. As such my departments actions under the resolution may be in violation of the code of ethics ordinance**.

**Furthermore this is selective enforcement against the business owner's properties using city ordinance.**

99.    Deputy City Manager Joe Napoli sent Noriega an email stating: "I am concerned that what the City Attorney is directing our staff to do is beyond what was directed by the Commission and can be interpreted as targeting businesses."

100.    Zerry Ihekwaba, another assistant City Manager, echoed Napoli in another email: "We ought to be enforcing the Code citywide and not just targets," he wrote.

101.    City of Miami Mayor Francis Suarez stated Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners."

102.    As former City Manager Gonzalez explained in court: "my deputy city manager, my assistant city manager, the police chief, in writing objected that this was tantamount to targeting a business … It's just wrong. There's just no way that this is right. . . .[W]e're being asked to look at these properties, we're being asked to look at them with the intention of essentially finding a way to shut them down and it's wrong … We need to run a city. We don't need to ruin a business and my staff was adamant that this was going way, way too far."

103.    The fact that the Commission appointed the City Attorney to head the task force, instead of the City Manager, not only violated the City Charter, but it also officially put Carollo's ally, Mendez, in charge of targeting Plaintiffs.

104.    Mendez was not only Carollo's ally in the targeting, but Carollo had assisted Mendez and her husband Carlos Morales' ("Morales") corrupt scheme to cheat the City of permitting fees and fines on remodeling old houses that they fraudulently acquired from unsuspecting, incapacitated and sometimes deceased individuals and their families through the Miami-Dade Guardianship Program.

105.    In fact, when Mendez's husband needed special treatment by the City, he emailed not only Assistant City Attorney Dooley, but also Carollo himself, as well as Carollos' Chief of Staff Blom and his Deputy Chief of Staff Anthony Barcena, despite the fact that the property at issue was not in Carollo's district.

106.    While the rest of the City may not have known about this conspiracy between Carollo and Mendez, once Mendez emailed several top city administrators about the new resolution, those officials immediately protested that Mendez leading this task force violated the city charter and targeted Plaintiffs' businesses illegally.

107.    After the new City policy was put in place in February 2019, Carollo unleashed a flurry of new PRRs for every single city record on all of Plaintiffs' properties (and no other property owner) and then forced Blom to devote the entire weekend of April 19, 2019 to flyspecking these records.  Two months later, this incident was cited in Blom's resignation letter, protesting that he had to examine "various applications, permits and licenses associated with [Plaintiffs] over the weekend … I'm not comfortable doing this type of research for a variety of reasons but find I am being assigned more and more of this type of work focusing on this one individual [Fuller]."

108.    A few short months after Blom resigned, in part due to the targeting of Plaintiffs, Carollo managed to force City Manager Gonzalez out of his position as well.  As Mr. Gonzalez

wrote at the time, and later testified to in court, Carollo "was trying to terminate [him] because [he] would not weaponize city government against Mr. Fuller."

**NORIEGA TARGETS PLAINTIFFS**

109.     Once City Manager Gonzalez was forced out and replaced by Noriega, who as director of the Miami Parking Authority had both supported Carollo's election campaign and donated millions of dollars to Carollo's Little Havana Fridays, the City policy Carollo had created in 2019, but was unable to implement, was prolifically implemented.

110.     Noriega admitted that shortly after he assumed office in February 2020, he met with Carollo, Carollo's staff, and Mendez dozens of times concerning Fuller with no email trail.

111.     Specifically, on May 27, 2020, just two months after Noriega took office, the Director of the City of Miami Building Department, Asael Marrero ("Marrero") wrote: "Just had a lengthy meeting with the manager and almost the entire City Attorney office plus Adele [Valencia] **talking about Bill Fuller.** The **Manager** wants us to revise and **update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down** all structures that don't comply." And, if updating policies was not sufficient, Marrero wrote: "I would like for us to spend the day tomorrow brainstorming about these issues. We need to circle back with Rachel **if we need to update any of our ordinances** as well as I have a follow up meeting with the manager next week to provide an update on these issues."

112.     The next day, on May 28, 2020, City staff circulated an email with a subject line of "**Copy of Fuller Properties**" containing an attachment that had all of Plaintiffs' properties listed along with whether each property had any code violations and the status of any such violations. This list of Plaintiffs' properties then continued to be updated and circulated throughout the

summer of 2020, culminating in an email on October 19, 2020, with the City Staff providing updates on the "**progress of Carollo Investigation**" which was limited to Plaintiffs' properties.

113.    On Oct. 22, 2020, Carollo sponsored a new Ordinance that provided "for inclusion of building violations as a reason for revocation of certificates of use." That morning, at 8 am, the City Manager sent an email to the Building Director and the City Attorney stating: "let's get this done today before noon today." Of course, what the City Manager wanted done before noon was the issuance of a building violation at Ball & Chain, resulting in Ball & Chain being the first ever business to have its Certificate of Use ("CU") revoked in the history of Miami.  Carollo also sponsored a second ordinance on Oct. 22, 2020, which banned outdoor music in any restaurants that did not have a CU as of October 22, 2020, which of course applied only to Ball & Chain, since Ball & Chain was the only restaurant to have its CU revoked that day.

114.    Thus, less than five months after the May 27, 2020 meeting, Carollo, Noriega and Mendez had accomplished their goal of passing new ordinances to shut down one of Fuller's most prominent properties. Examples of some of these Ordinances are below:

ORDINANCE LIST

| Ordinances 13941 | 11-19-20 | Amending Section 36-4 (Noise) | Prohibiting outdoor music b/w hours of 10:00 pm to 8:00 am. |
| Ordinance 13936 | 10-22-20 | Amending Section 2-211 (Certificate of Use) | Mandatory revocation of CU for violations of Chapter 10 (Building Code). |
| Ordinance 14057 | 3-10-22 | Amending Section 2-817(d) (Mitigation) | Capping the amount the code enforcement board could mitigate fines after compliance. |

| Ordinance 14115 | 10-13-22 | Amending Chapter 31 by adopting Section 31.51(Food Trucks) | Establishing Section 31.51, Food Trucks, prohibiting District 3 from Ordinance. |
|---|---|---|---|
| Ordinance 14118 | 10-27-22 | Amending (Historic Preservation) | Providing further penalties and enforcement options for property owners that allow historically designated structures to decay requiring demolition. |
| Policy | | Compliance Agreements | Revoked policy permitting unsafe structures to enter into compliance agreements with property owners. |
| Policy | | Dual Occupancies | Revoked policy permitting dual occupancies within one venue. |

**THE CITY TARGETS PLAINTIFFS' OTHER PROPERTIES**

115.    Plaintiffs Fuller and Pinilla are in the business of buying existing properties and restoring them.

116.    Most of the properties that Plaintiffs purchase are older buildings that are not built to the current Miami Building Code. In addition, many of these properties are purchased with existing code violations from work done by prior owners that in many instances was unpermitted.

117.    Until Carollo and the City came together to target the Plaintiffs, City of Miami policy was to issue citations and work with the property owners, including Plaintiffs, to bring the property into compliance.

118.     As long as the property owner was making progress and communicating with the City, the City policy was not to strictly enforce deadlines.

## BRICKELL STATION
### (Involving Defendants Carollo, Dooley, Mendez, and Diaz)

119.     The above forementioned City policy changed abruptly when the City targeted Plaintiffs' Brickell Station property, held by Plaintiff Brickell Station, LLC.

120.     Plaintiffs were under contract to sell Brickell Station.  To prevent the sale, the City accused Plaintiffs of having done work without a permit, when the City's own microfilm department knew that all the work they accused Plaintiffs of doing without a permit had been done years ago with a permit.

121.     The former City policy would allow the existing tenants to finalize compliance with building violations from past owners, and Plaintiffs asked the Building department to allow the new owners to bring the building into compliance.

122.     Rachel Dooley denied the request and changed the City policy so that going forward the City would not enter into any compliance agreements to allow past violations to be fixed but rather for all matters to be sent to the Unsafe Structure Panel, which was handpicked by the Commissioners, including Carollo, and which was instructed by Carollo to vote against Plaintiffs bringing any of their properties into compliance with current City code.

123.     Thus, once the City placed a building violation on Plaintiffs' properties, it prevented Plaintiffs from fixing the building. And, because Plaintiffs could not fix the building, the City was imposing hundreds of thousands of dollars in fines on buildings, which were unable to generate income and unable to be sold, while the City pursued demolition of Plaintiffs' properties.

124.    This single change in City policy, instituted by Rachel Dooley, at the instruction of or ratified by Vic Mendez and Art Noriega, made it impossible for Plaintiffs to remodel their properties or to sell their properties, and instead provided false grounds for the City to seek to demolish Plaintiffs' properties.

125.    Plaintiffs soon received City Notices of Intent to Demolish for five of their properties owned by Plaintiffs Piedra Villas, Tower Hotel, Yo Amo, Beatstik, Littla Havana Arts II, and El Shopping.

126.    In addition to seeking to demolish Plaintiffs' buildings, Carollo and the City (Mendez, Dooley and Noriega specifically) sought to a) impose outrageous fines on Plaintiffs, b) prevent Plaintiffs' tenants from opening and operating their businesses and paying Plaintiffs rent, and c) prevent Plaintiffs from selling their properties for a profit to third parties.

### PIEDRA VILLAS
**(Involving Defendants Dooley, Mendez, Noriega, and Plasencia)**

127.    Plaintiff Piedra Villas, LLC owns property, which is located at 2614 SW 8th Street (the "Piedra Villas Property"), was originally erected in 1930.

128.    It is comprised of an approximately 17,000 square foot building with twenty-four (24) residential apartments and four (4) retail spaces.

129.    The City has prevented Plaintiffs from renting a retail space and two apartments at the Piedra Villas Property and is currently attempting to demolish the structure.

130.    After Carollo was elected, on May 9, 2019, the City issued the first of two Unsafe Structure Notices relating to the Piedra Villas Property.

131.    On December 2, 2020, the City entered the third Unsafe Structure Notice (BB20200220082614) for failure to obtain the required 40-50-Year Recertification Process.

132.    Thereafter, Fuller hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

133.    On August 6, 2021, Masson submitted the 40 Year Recertification.

134.    On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

135.    At that time, Raul Ramos ("Ramos"), the Chief of Inspection of the Unsafe Structures department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

136.    The Compliance Agreement was a contract of adhesion and the City prevented Fuller from having it reviewed by an attorney.

137.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

138.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating under a focused set of deadlines, the City started moving the target.

139.    By way of example, on October 7, 2021, Alberto Diaz from the City Fire Department requested all of the dimensions for the back staircases of the Piedra Villas Property.

140.    This request was prompted by Defendant Assistant Fire Chief Adrian Plascencia ("Plascencia"), who had clashed on multiple occasions with Fuller.

141.    The subject staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

142.    They had never been deemed unsafe or not in compliance.  Moreover, due to the

passage of time, the staircases had been grandfathered in.

143.  Plascencia's request for the dimensions of the staircases was not unintentional given that he likely knew (or did actually know) that the dimensions of the staircases would not meet the current fire code standards, despite the fact that the dimensions would not need to meet the current fire code standards given that they were grandfathered in.

144.  Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the Unsafe Structure Notice.

145.  Fuller requested that the City provide him with the citation to the City Building Code that required the requested reparation to the staircases. Again, not surprisingly, the City did not provide the citation because there was none.

146.  In addition, at the meeting that proceeded to occur that week between City Fire Department officials and Fuller, neither of the Fire Department officials in attendance at the meeting, Enrique Arango and Plascencia, could identify any section of the Code that would require the requested work on the back staircases.

147.  This type of gamesmanship has resulted in the Fire Department being one of the few departments that has not approved the reparation,  which has caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

148.  From late 2021 until February 2022, Fuller and the team continued to engage in substantial efforts to proceed with the approval process.

149.  All the while, Piedra Villas incurred excessive expenses related to the project delays.  Given the amount of time the City had delayed, Fuller had to enter into a second Compliance Agreement.  Over the next two months Fuller continued working when the City inexplicably cancelled the permit process.

150. Specifically, on April 20, 2022, recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Fuller reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

151. During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Fuller that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

152. Karickhoff took a screenshot of the EPlan and sent it to Fuller.

153. As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

154. As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building.

155. However, because the City had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

156. Separately, Piedras Villas has filed an application with the City's Historic Preservation Division seeking to have the Piedras Villas Property deemed historic.

157. By email dated May 6, 2022, Piedras Villas was advised by the City's Historic Preservation Division that it was "waiting on a determination from the City Attorney if we can move the applications forward with the open code violations. As soon as we get that clarification, we can send you the quick review with the noticing requirements and invoice."

158.    As a path to protect the properties from demolition, Plaintiffs sought historic designation from the City of Miami, a 3-5 month process that requires the City to present the application to the City's Historic and Environmental Board.

159.    Plaintiffs' properties passed the Board's first vote, which immediately put a stay on the Defendants' efforts to demolish Plaintiffs' properties.

160.    Dooley, Mendez and Noriega sought to delay and prevent the City Board from the second and final approval of the historic designation.

161.    Specifically, Mendez and Noriega called Anna Pernas asking to remove final approval from the agenda for that evening, which she refused to do.

162.    At the hearing, the City Attorney's office, at the direction of Mendez and Noriega, lied to the Board claiming that the judge in the state court action had recommended that the Board not make any decision on the properties.

163.    The Board members responded by stating it appeared the City was acting corruptly and abusing its powers and approved the designation over the City's objection.

164.    Even with the historic designation, Mendez threatened ominously that it would only delay, not prevent, the demolition.

### YO AMO CALLE SIETE
**(Involving Defendants Asael Marrero, Rene Diaz, Rachel Dooley, Arthur Noriega)**

165.    At 1568 SW 7th street, owned by Plaintiff Yo Amo Calle Siete, LLC, the City had issued permits, and Plaintiffs were in the process of selling the property with the permits – with an executed purchase and sale agreement for $2.7 million when: (1) the City revoked the building permit it had issued thereby scuttling the sale at a price of $2.7 million; (2) causing a reappraisal

of the value of the property at a lower value; and (3) causing Plaintiffs to lose their construction loan due to the lower value and the City's actions.

166.     As a result, the bank collapsed Plaintiffs' construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000.

167.     Eight months later, however, after the City succeeded in preventing the sale at $2.7 million, Dooley admitted in open court that the City had been wrong to revoke the permits. However, at the time Dooley admitted the City was wrong, she believed the sale of the property had gone through and that the City had failed to scuttle the sale.

168.     As a result of Dooley's misunderstanding, the permit was reinstated. The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City caused Plaintiffs to expend on the permits and impact fees and the litigation with the City.

### BEATSTIK
### (Involving Defendants Dooley,  and Diaz)

169.     Plaintiff Beatstik, LLC owns the real property located at located at 439 NW 4th Avenue.

170.     This property, which dates back to 1946, is a culturally and historically significant structure measuring over 15,000 square feet.

171.     Its historical significance to the Overtown community is immeasurable and, from an architectural perspective, it both meets and exceeds the criteria required for historical designation.

172.     The property was purchased by Plaintiff Beatstik from Carl "Moon" Mullins, the owner of Moon Enterprises since 1962.

173.     Mr. Mullins was distinguished as one of the first Black Metro Transit Authority Bus Drivers to be assigned a route on Miami Beach

174.     The property originally included a grocery store, hotel, liquor store, lounge, pool hall, restaurant, laundry mat, and a rental property.

175.     In 2019, the property  was leased by Plaintiffs to Copper Door Properties for the use of a bed and breakfast that was featured in Vogue magazine and was praised by Mayor Francis Suarez.

176.     Because Plaintiffs had established another culturally significant property, this time in Overtown, the City issued several violations to the property seeking to shut down the business to intentionally harm Plaintiffs without regard to the negative consequences to Copper Door Properties or the Overtown community.

177.     As it has done with the Plaintiffs' other properties, the City again made special rules for Plaintiffs, making it impossible to resolve the citations.  This eventually led to the loss of the tenant and the bed and breakfast.

178.     The property is currently leased to Adrian Sotolongo ("Sotolongo") to continue the hotel operations.

179.     Sotolongo intended to build-out the ground floor of the property for a restaurant/bar.

180.     To that end, Sotolongo first submitted a set of plans for review on December 17, 2021.

181.     These plans were sent to Paola Rodriguez and Taylor Reid ("Reid") at the Unsafe Structure Department with a carbon copy to Defendant Rene Diaz ("Diaz") and Ramos also at the Unsafe Structure Department.

182.     On or about December 20, 2021, Reid responded to Sotolongo, via an email, indicating that the permit application required a scope of work that more specifically addressed the violation for prior work performed without a permit and the closing of an open electrical and remodeling permit, as well as the submission of an approved 40/50 recertification process.

183.     On or about January 12, 2022, the Property received an Unsafe Structure Notice (BB2016017191) for Buildings Or Structures That Are Unsafe, Unsanitary Or Deficient, Constitute A Fire Or Windstorm Hazard.

184.     On February 8, 2022, Sotolongo sent Reid a follow-up email re-submitting the plans with the corrected scope of work as requested by the City.

185.     Reid responded to Sotolongo on the same day requesting further modifications to the plans to include the area the City was requesting be legalized.

186.     On February 16, 2022, per the City's request, Sotolongo uploaded the revised set of plans removing the previously cited areas that were incorrect and making all requested changes.

187.     Under a typical scenario, once a party receives an Unsafe Structure Violation, that party is provided a hearing date.

188.     At the hearing, that party appears before the City's Unsafe Structures Panel and an Order is then issued.

189.     On February 18, 2022, the City's Order of the Unsafe Structures Panel was issued (the "Beatstik Order").

190.     Inherent in the Beatstik Order is the City's obligation to ensure that it is not delaying the reparation efforts and that it is performing those tasks that are within its control and which Beatstik is dependent on in order to meet the deadlines, such as granting timely approval to the

plans that have been submitted. Otherwise, the City would be permitted to refuse to respond to Beatstik's timely-submitted plans and then argue that it has a right to demolish Beatstik's property.

191.    Upon receiving the Beatstik Order, immediate efforts were made to comply by Plaintiffs.

192.    Indeed, the day after the hearing before the Unsafe Structures Panel, Sotolongo sent an email to Ramos stating "we are ready to submit for permit if you think this plan is good to continue. . ." and requested an opportunity to meet Ramos at his office.

193.    Ramos failed to respond to Sotolongo's email for a period of 10 days, and no resolution on the pending issues was reached.

194.    When it became clear that Beatstik would not be able to meet the deadlines in the Order given the City's delays in responding, Sotolongo went to visit Ramos and specifically discussed the delays.

195.    In that meeting, Sotolongo requested an extension of the deadlines in the Beatstik Order (which Ramos possesses the ability to grant pursuant to the language of the Order).

196.    At that meeting, Ramos told Sotolongo that he could not grant an extension until Beatstik's plans were submitted.

197.    This response essentially placed Beatstik in a catch-22 scenario because the City refused to accept the plans and yet, at the same time, was stated that it would not grant extensions to the Beatstik Order until the plans were submitted and accepted.

198.    By the time that Ramos communicated this to Sotolongo, the deadline for Beatstik's opportunity to appeal the Beatstik Order had expired, thereby leaving Beatstik with no administrative remedy.

199.     Separately, in an email dated February 28, 2022, the City informed Sotolongo that while the plans now included everything requested in the prior communications with the City, Sotolongo now needed to submit documents and drawings in order for the City to release the permit application package.

200.     Specifically, the City, for the first time since December 17, 2021, informed Sotolongo that he would need to submit all of the following: a) plans for the second level of the building; b) separate drawings for applicable trade work such as electrical, mechanical and structural, if work under those trades were to be performed; c) permit applications and owner affidavits authorizing the aforementioned work to occur at the property; and d) other required documentation specific to the work proposed- which the City provided no specificity for.

201.     Throughout all of the foregoing communications, despite being copied on each one by Sotolongo, neither Diaz nor Ramos informed Sotolongo of the additional requirements included in the February 28, 2022 email.

202.     This was intentional because the City knew it would not be possible for Sotolongo to meet these requirements by the March 3, 2022 "deadline."

203.     Indeed, that was exactly what played out. On April 21, 2022 Sotolongo went to the Unsafe Structure Department at the City to submit the exhaustive list of items that he was able to accumulate in such a small period of time, where he was told by Ramos and Reid that he had missed the March 3, 2022 deadline and, as a result, was no longer in compliance with the Notice and could not be issued a permit.

204.     More specifically, he was told by Reid that the property would be subject to demolition.

205.     To be clear, the City indicated that it preferred to demolish a 76-year-old historical

structure with deep ties to the Overtown community rather than allow a small business owner working in earnest to meet the City requirements to operate a business.

### EL SHOPPING
### (Involving Defendants Carollo, Mendez, Dooley, Goldberg and Noriega)

206.    Plaintiff El Shopping, LLC owns the real property located at 300 SW 12th Avenue ("the El Shopping Property").

207.    On or about September 30, 2020, the City issued an Unsafe Structure Notice (Process No. BB2020017697) on the property.

208.    On or about May 21, 2021, a hearing was held before the Unsafe Structures Panel and the Final Order was issued.

209.    On October 13, 2021, as a result of the threats made by the City to demolish the El Shopping Property, El Shopping was left with no alternative but to sign a Compliance Agreement, which set forth the same conditions as those imposed in the Compliance Agreement signed by Tower Hotel and Piedra Villas.

210.    The Compliance Agreement required the following: a) All plans within 30 Calendar days of signing agreement; b) permits obtained and paid for within 60 days of the approval of the Plans;  and c) repairs completed within 90 days of the issuance of the Permit.

211.    On October 19, 2021, El Shopping submitted the plans.

212.    On March 2, 2022, the Plans were approved by the City.

213.    On March 3, 2022, the City issued the Permit (Permit #BD21-024430-001-B001), thereby giving El Shopping until at least June 1, 2022 to complete the repairs pursuant to the terms of the Compliance Agreement.

214.    On March 7, 2022, the City issued a Stop Work Order because it requested that El

Shopping obtain a shoring permit, which was not part of the original scope of work.

215.     On March 28, 2022, the City lifted the Stop Work Order and reinstated the Permit.

216.     On April 14, 2022, El Shopping submitted its latest set of corrections based on the City's comments to the work dated March 30, 2022.

217.     By letter dated April 22, 2022, **but not received by El Shopping until May 9, 2022**, Dooley advised that both the Unsafe Structure Panel Order and Compliance Agreement were in default and that "failure to comply [with the Compliance Agreement] or seek timely extension form [*sic*] the Building Official shall result in the City demolishing the structures(a) at issue."

218.     On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, thereby precluding El Shopping from engaging in any further reparation work.

219.     At the time, El Shopping had until June 1, 2022 to complete the repairs.

220.     Rather than allow that to happen, the City revoked the permit and prevented Plaintiffs from completing the work that the City was demanding be performed.

221.     The City refuses to this day to issue any certificates of use for the property, thereby depriving Plaintiffs of the ability to rent the property to generate income, causing losses well in excess of $200,000 in rental income, and preventing Plaintiffs from selling the property for $2.5 million.

### TOWER HOTEL
### (Involving Defendants Carollo, Dooley, Mendez, and Diaz)

222.     The Tower Hotel (the "Tower Hotel Property"), built in 1920, has served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[4]

---

[4]      https://www.miamiherald.com/news/business/article204754109.html

223.    In 2012, the Tower Hotel Property was acquired by Plaintiffs Fuller and Pinilla, through Plaintiff Tower Hotel, LLC.

224.    The Tower Hotel Property consists of 3 structures.

225.    Plaintiff's master plan  included: (a) a 3-story, 50 room hotel, (b) a working space, and (c) an area known as "La Botanica," which includes the pool and restaurant facilities.

226.    After acquiring the Tower Hotel Property, Fuller and Pinilla hired McKenzie Design as the architect to prepare the plans, RCI as the structural engineer, Ortus Engineering ("Ortus") as the private provider, and Globe Services as the permit expediter.

227.    On August 28, 2018, Tower Hotel submitted demolition plans to demolish the interior of La Botanica.

228.    All plans were reviewed, approved, and accepted by Ortus and the City and, upon completion of each stage, were inspected and passed by Ortus at all stages.

229.    On or about December 19, 2018, Tower Hotel submitted plans for addition and remodeling of La Botanica ("2018 Remodeling Plans").

230.    On June 12, 2019, Tower Hotel received comments and submitted corrections for the 2018 Remodeling Plans.

231.    On September 10, 2019, the demolition permit was issued ("Demolition Permit").

232.    On September 26, 2019, Tower Hotel submit free-standing plans for pool permit at La Botanica. (BD19-019681-001) ("Pool Plans").

233.    On October 15, 2019 and on March 16, 2020, Tower Hotel received further comments and submitted corrections for the 2018 Remodeling Plans.

234.    In March 2020, the Covid-19 related shutdown occurred, and the City offices were closed to the public.

235.     This caused obvious delays to the Tower Hotel project.

236.     Despite this, on July 2, 2020 (at the height of the pandemic), Tower Hotel received a Notice of Unsafe Structure (BB2020012200) as a result of work performed without a permit.

237.     The Unsafe Structure Notice references the work done on the pool and the internal demolition of the La Botanica building, which was lawful pursuant to the Demolition Permit.

238.     Tower Hotel requested a hearing before the Unsafe Structure Board and, in the interim, Tower Hotel continued to engage in substantial efforts to get the Pool Plans processed.

239.     On or about November 20, 2020, Tower Hotel received a final Order of the Unsafe Structure Panel (BB2020012200).

240.     The Order required the following:

    a.    Structure A - which is the La Botanica building:

        1.    Repair or demolish within 135 days;

        2.    within 30 days from November 20, 2020, plans must be developed and submitted to Unsafe Structures for approval and then submitted to City of Miami Building Department; and

        3.    obtain permits within 45 days from November 20, 2020 (which Tower Hotel already possessed a demolition permit that was issued on September 10, 2019).

    b.    Structure B – Pool:

        1.    Repair or demolish within 120 days;

        2.    within 30 days from November 20, 2020 plans must be developed and submitted to Unsafe Structures for approval and then submitted to City of Miami Building Department; and

        3.    obtain permits within 30 days from November 20, 2020 (which is essentially impossible given one cannot submit plans and obtain permits on the same day).

241.     On December 14, 2020, DERM and other departments began their respective

review of the Pool Plans.

242.     On two separate occasions, the City stated that certain reviews were not necessary and then abruptly, and without explanation, reversed its position.

243.     Upon reversing its position, the City then required the reviews and refused to close the disciplines out at the time of inspection.

244.     The first discipline where this occurred was in relation to Plumbing.

245.     Namely, on January 14, 2021, subsequent to the November 20, 2020 Order of the Unsafe Structure Panel, the City determined that a plumbing review would not be necessary.

246.     Nevertheless, on April 12, 2022, 10 days before Tower Hotel received the Notice of Default of the Compliance Agreement and Notice of Demolition, the City reversed its decision and indicated that Plumbing was **Denied.**

247.     The second discipline where this occurred was in relation to Gas.

248.     Identical to what transpired with respect to Plumbing, Tower Hotel was advised on January 14, 2021 that a gas review was not necessary, only to then be told on April 12, 2022 that Gas was **Denied.**

249.     On May 7, 2021, the issuance of the permit related to the Pool Plans by the City was held-up by DERM, despite all other trade approvals having been obtained.

250.     Specifically, as a result of the fact that the Pool Plans reference the 2018 Remodeling Plans, DERM stated that it would not sign off on the pool permit until the 2018 Remodeling Plans were approved by the City.

251.     Given the situation with DERM, Tower Hotel focused its efforts on obtaining the permit on the 2018 Remodeling Plans despite the City dragging its feet to grant the necessary approvals.

252.    By way of example, on September 8, 2021, Tower Hotel's contractor, Moises Castillo, wrote to the Ramos and stated:

> I wanted to follow up on my email from last week.  I am wondering if you had a chance to review my responses to your concerns regarding La Botanica Pool. If so, when would the address be unlocked in order to submit the new pool plans. With all due respect Mr. Ramos, I have been trying to submit the pool plan over 4 weeks now. Can you please advise my client if you need anything else from me or my client?

253.    Those types of delays (such as waiting four weeks to simply submit pool plans) plagued Tower Hotel's ability to timely proceed with the project.

254.    In or about early October 2021, the Unsafe Structure Department contacted Fuller and Pinilla and advised them that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool.

255.    As a result of the threats made by the City to demolish the Tower Hotel, on October 12, 2021, Tower Hotel was left with no alternative but to sign a Compliance Agreement, which set forth the same conditions as those imposed in the Compliance Agreement signed by Piedra Villas.

256.    The Compliance Agreement required the following:

    a.     All plans within 30 Calendar days of signing agreement;

    b.     60 Calendar days after plans submitted for permits; and

    c.     all repairs must be completed within 180 days of issuance of the permits.

257.    Given the delay by the City with the 2018 Remodeling Plans and the fact that DERM was not willing to close out and approve the Pool Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

258.    Accordingly, on October 15, 2021, Tower Hotel submitted the new pool plans (the "Second Pool Plans").

259.     After submitting the Second Pool Plans, Tower Hotel has engaged in substantial efforts to finalize all of the required plan approvals and the City has continually thwarted those efforts by not timely acting in response to Tower Hotel's requests for assistance and approval.

260.     For example, on December 7, 2021, Castillo emailed City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans and stated:

> I am following up on the email below. Do we have a schedule meeting time for this week? We're in dire need to get a response to this Zoning comment so we move forward. Please advise.

261.     Presently, the only disciplines that are outstanding for the Second Pool Plans are Public Works, Flood Plain, Structural, and DERM.

262.     Nevertheless, on April 15, 2022, Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off.

263.     Despite Tower Hotel's continuous efforts to engage in the necessary reparations to the building, on April 22, 2022, the City sent a letter to Tower Hotel advising that it was in default of the Compliance Agreement and that the City "shall be moving forward to demolish the structure(s) at issue."

264.     Faced with no other choice, Plaintiffs filed for an Emergency Injunction to stop the demolition.

265.     On May 5, 2022, the day that the parties appeared before the Court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, wherein the City represented that no demolition of the properties that are the subject of the action would occur until the Court ruled on Plaintiffs' Emergency Motion for Temporary Injunction, the City pulled a Demolition Permit for the Tower Hotel Property.

266.     Despite a Historic Designation by the City of Miami for the Tower Hotel, the City is seeking to demolish the restaurant and pool portion of the Tower Hotel, thereby effectively destroying the entire hotel, and thereby causing Plaintiffs millions in additional damages.

267.     The City's actions destroyed the long-term lease Plaintiffs had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed Plaintiffs' ability to monetize and sell the property.

## LITTLE HAVANA BUNGALOWS
### (Involving Defendants Carollo, Dooley, Mendez, Ortiz, and Bayona)

268.     Plaintiff Little Havana Bungalows, LLC was the owner of the property located at 28 NW 10 Avenue.

269.     The property consisted of an older home with citations and fines already accrued under the prior owner.

270.     Fuller worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

271.     Fuller's mitigation was set for April 27, 2022 in front of the Code Enforcement Board.  During that meeting, Fuller, who personally appeared before the Board, was able to reduce the accrued fines.

272.     Due to an oversight however, there remained an outstanding citation that was not addressed during the meeting.

273.     Because one of the violations on Little Havana Bungalows remained open, Fuller had to bifurcate the property for the sale.

274.     Fuller's success during the April 27 Mitigation Hearing infuriated Carollo so much that he, Dooley, and Mendez then worked to draft an Ordinance passed by the Commission to

eliminate the ability of property owners on non-homesteaded properties (such as Fuller) to mitigate their fines.

275.     Due to the sale bifurcation, Fuller had to seek a second mitigation.  This was after Carollo had introduced the Mitigation Ordinance.

276.     Fuller needed expedited action.  Fuller had his attorney send Dooley an email that was nearly identical to one sent by Mendez's husband, Carlos Morales, seeking an expedited mitigation hearing before the Code Enforcement Board.  Despite Dooley granting Morales' request, Dooley denied Fuller an expedited hearing thereby denying Fuller the same treatment she had granted the City Attorney's husband (who succeeded in having the board wipe away more than $300,000 in fines to zero – without having properly permitted any of the work).

277.     Fuller was eventually able to get on a hearing calendar, but two days prior to the Mitigation Hearing, Ortiz, as he had done before, called at least two Code Enforcement officers to tell them that "Carollo's enemy was going to be before the Board and that they needed to vote against him."

278.     As a result of Ortiz's actions, Defendant Ivonne Bayona ("Bayona"), Carollo's appointee to the Code Enforcement Board, argued that Fuller had to pay more than $400,000 in fines on the property, despite the fact that it was only worth approximately $250,000.  In the end, Fuller (who was in the exact same position as Mendez's husband who had his entire fine abated) was ordered to pay a fine of $85,000, which at the time, was unheard of.

## FUTURAMA/BARLINGTON GROUP
### (Involving All Defendants)

279.     The City, Carollo, Noriega, Mendez and Dooley have regularly targeted Plaintiff Futurama, LLC's property.

280.    They have driven away tenants who were celebrated in the community and cost Plaintiffs hundreds of thousands in lost rent.

281.    They have driven away a new museum associated with the Smithsonian that would have celebrated Cuban History, named Museo Little Havana.

282.    Carollo's targeting of the Futurama property continues to this day.  At the last commission meeting, Carollo was trying to make sure that an ordinance for a shared workspace would not allow artists to display their work for show or sale in a shared space or dancers to dance in a shared space, both aimed at Plaintiffs' businesses, including Futurama.

**LITTLE HAVANA ARTS TOO**
**(Involving Defendants Carollo, Noriega, Mendez, Marrero and Diaz)**

283.    Plaintiffs' property known as Little Havana Arts Too, held by Plaintiff Little Havana Arts Too, LLC, and located at 1521 SW 8th Street, adjacent to Ball & Chain, had a Compliance Agreement in place with clear instruction from Marrero and Diaz to open a permit that had expired in order to complete the work to comply with City's requirements.

284.    Once the permit was open, however, Marrero and Diaz reversed their position, refused to allow the work for the open permit to comply with the City's requirements, and are currently  seeking to demolish the property.

285.    This is causing damage to Plaintiffs in excess of $200,000 per year, plus destroying the $4.5 million value of the building.

**LHAB TRES, LLC**
**(Involving Defendants The City, Carollo, Noriega, and Mendez)**

286.    Plaintiff LHAB Tres, LLC is a business Plaintiffs Fuller and Pinilla established to acquire property adjacent to their Ball & Chain property.

287. Plaintiff LHAP Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

288. Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

289. In the middle of these negotiations, however, the seller refused to grant the extension because the City of Miami was seeking to buy the property, which it did for $1 million.

290. The building is now demolished and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

## EFFORTS TO PREVENT PLAINTIFFS FROM PURCHASING ADDITIONAL PROPERTIES

291. Carollo and the City have directed City officials to utilize City resources and funds in an attempt to purchase properties adjacent to Plaintiffs' properties that Plaintiffs had been attempting to purchase, including 711 SW 15th Ave., 1474 SW 7th St., and 200-230 SW 12th Ave.

292. One property in particular, located at 1510 SW 7th Street, was a natural extension of Plaintiffs' properties and businesses because it is adjacent to Plaintiffs' current property.

293. In fact, at least two of the properties targeted were "off market" and were unsolicited offers by the City. In one case, Plaintiffs offered a seller $1 million for his property on 15th Ave, an offer that was already a premium to market valuations, and he scoffed, saying "the city already offered me $1.32 million." The City did not end up buying the property because the actual appraisal came back at $850,000.

294. This harms Plaintiffs' overall business strategy. By doing this, Carollo and the City are artificially inflating the market and boosting the value expectation of these potential sellers, thereby making the properties difficult to acquire.

295.    The mandate by Carollo and the City is clearly to "buy properties around" Plaintiffs and not to "buy 15th Ave properties" because, if it had been the latter, then the City would have clearly offered to buy Plaintiffs' properties at the same premium, which it has not done.

**THE CITY AND ITS ATTORNEYS TARGET WITNESSES FOR PLAINTIFFS**

296.    The City's targeting of Plaintiffs continued right through the trial of Joe Carollo.

297.    After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City sent its investigator to follow Acevedo after his testimony. Acevedo reported the harassment to the police, and, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[5]

298.    It turns out that the City's investigators were not honest in reporting who they work for, as Plaintiffs' former employees are now receiving voice mail messages from this same investigator who now admits he was hired by the City of Miami and its law firm:

> "Hi Victor, this is Brian Blair, private investigator represented by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for Ball and Chain, at Taquitos Mexicanos and Los Altos, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

299.    The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Defendants are employing

---

[5] https://www.miamiherald.com/news/local/community/miami-dade/downtown-miami/article274483971.html

against City Staff and City Residents in their efforts to destroy Plaintiffs mentally, psychologically, and financially.

## SUMMARY OF DAMAGES

300.    Plaintiffs Fuller and Pinilla have suffered through more than five years of emotional distress and mental anguish.

301.    This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

302.    Plaintiffs Fuller and Pinilla have been unable to sleep at night.  They have spent many nights awake.  The little sleep they have gotten has been disturbed.

303.    Plaintiffs Fuller and Pinilla became concerned for their safety and the safety of their families.

304.    On more than one occasion, Plaintiffs Fuller and Pinilla called the police department to report suspicious vehicles parked near their homes or businesses.

305.    Plaintiffs Fuller and Pinilla cannot escape the feeling that the Defendants are seeking to fabricate evidence, complaints, and violations, all with the sole purpose of shutting their businesses and destroying their lives, all because they supported Carollo's political opponent and then continued to speak out against the City.

306.    The City has unlimited funds and resources to try to destroy Plaintiffs, their businesses, and their families and to shut down their livelihood and their ability to provide for their kids.

307.    Plaintiffs Fuller and Pinilla spent a large part of their lives building a great business with a great portfolio of properties and developed a stellar reputation in the community.

308.    The injury has not only been mental or emotional.  Plaintiffs Fuller and Pinilla's physical appearance and well-being has changed and their physical health has suffered.

309.    In addition, Plaintiffs' ability to conduct their daily business has become significantly more difficult due to the Defendants' actions.  Potential business partners are reluctant to do business with Plaintiffs for fear of becoming targets of Defendants.

310.    In fact, one businessman who had committed to a major project with Plaintiffs pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City.  This alone cost Plaintiffs $5 million.

311.    Defendants' attacks on Calle Ocho Marketplace have caused Plaintiffs Fuller and Pinilla and Calle Ocho Marketplace, LLC to suffer monetary damages in excess of $8 million.

312.    Defendants attacks' on Yo Amo Calle Siete have caused Plaintiffs Fuller and Pinilla and Yo Amo Calle Siete, LLC to suffer monetary damages in excess of $3 million.

313.    Defendants' attacks on Little Havana Arts Building have caused Plaintiffs to suffer monetary damages in excess of $3 million.

314.    Defendants' attacks on Little Havana Arts Building Too have caused Plaintiffs to suffer monetary damages in excess of $4 million.

315.    Defendants' attacks on LHAB Tres have caused Plaintiffs to suffer monetary damages in excess of $5 million.

316.    Defendants' attacks on Piedra Villas have caused Plaintiffs Fuller and Pinilla and Piedra Villas to suffer monetary damages in excess of $3 million.

317.    Defendants' attacks on Tower Hotel have caused Plaintiffs Fuller and Pinilla and Tower Hotel, LLC to suffer monetary damages in excess of $7.5 million.

318.    Defendants' attacks on El Shopping have caused Plaintiffs Fuller and Pinilla and El Shopping, LLC to suffer monetary damages in excess of $5.5 million.

319.    Defendants' attacks on Beatstik have caused Plaintiffs Fuller and Pinilla and Beatstik, LLC to suffer monetary damages in excess of $5 million.

320.    Defendants' attacks on Viernes Culturales have caused Plaintiffs Fuller and Pinilla and Viernes Culturales/Cultural Fridays, Inc. to suffer monetary damages in excess of $9.25 million.

321.    Defendants' attacks on Brickell Station have caused Plaintiffs Fuller and Pinilla and Brickell Station, LLC to suffer monetary damages in excess of $1 million.

322.    Defendants' attacks on Little Havana Bungalows have caused Plaintiffs Fuller and Pinilla and Little Havana Bungalows, LLC to suffer monetary damages in excess of $350,000 million.

323.    Defendants' various attacks on Plaintiffs' businesses and tenants in the Futurama building have caused Plaintiffs Fuller and Pinilla and Futurama, LLC to suffer monetary damages in excess of $4.25 million.

324.    All in all, Defendants' targeting of Plaintiffs and their businesses have cost Plaintiffs in excess of $60 million, which is in addition to the more than $15 million in reputational and emotional distress damages that a federal jury has already determined that Carollo caused.

325.    All claims related to monetary damages have been assigned by the relevant business entity to Plaintiffs Fuller and Pinilla in their individual capacities.

**The Individual Defendants Are Liable Because They Knew They Were Using Their**
**Positions as City Personnel To Target Plaintiffs On Carollo's Behalf**

326.   Throughout 2018, and even as early as December 2017, City personnel knew that Carollo was targeting Plaintiffs for political payback.  The City Manager at the time, as well as the Director of Code compliance, told Plaintiffs that Code officers were being sent to their properties because they had supported Carollo's opponent. And, in December 2017, Carollo himself told Plaintiffs' business partners that they could lease anywhere else in Little Havana, but that if they leased from Plaintiffs, their businesses would never be allowed to open.

327.   Throughout 2018, Carollo himself made his targeting of Plaintiffs clear, not only to the entire City staff but also to the residents of the City at large, by repeatedly going on radio shows and maliciously defaming Plaintiffs by falsely stating they were criminals with ties to corrupt South American politicians, mafiosos, leasing to pimps and prostitutes, among other falsehoods.

328.   During the Valentine's Day Massacre in February 2019, the City's most senior policy makers – including Mayor Suarez, City Manager Gonzalez and Police Chief Colina – publicly stated Carollo was targeting Plaintiffs and seeking to close their businesses as political payback.

329.   City employees also knew as early as 2018 and 2019 that if they did not carry out Carollo's political vendetta that they would be fired, demoted, or chased out of office (like Diez, Gonzalez and others), and that they would be rewarded and promoted if they helped Carollo (like Noriega and Torrez).

330.   As Police Chief Art Acevedo testified, the City Manager Noriega "talked very openly about Mr. Fuller" and the fact that the City itself was targeting  "Mr. Fuller and any Fuller related business at the direction of [Carollo] retaliation for Mr. Fuller's simple exercising his

Constitutional rights to have a fundraiser." Chief Acevedo stated: "It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller." Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted."

331.    Defendant Arthur Noriega is liable in his individual capacity because, among other things, he is one of the prime architects behind the City's political retaliation for Carollo.  Noriega, the City's CEO, was out with a measuring tape measuring the distance between Plaintiffs' properties and religious institutions while Carollo hid on the corner, looking for ways to shut down that business.  Noriega was stalking Plaintiffs' businesses at night with the City's police department, hiding around the corner, explaining to Acevedo they were targeting Plaintiffs. Noriega led the attack on Viernes Culturales.  Noriega organized an all-day meeting during COVID in May 2020, with City Department Heads and the entire City Attorney's Office, for the sole purpose of pursuing policies aimed at shutting down Plaintiffs' businesses. He then monitored the timing of those efforts and gave the final orders as to when the City was to act to shut Plaintiffs' properties.  He then lectured the City Staff that when they witnessed wrongdoing by Commissioner Carollo, they should "Be a Goldfish" – meaning they should have a 10 second memory – and thereby be the happiest animal on earth. He even bought them all T-Shirts that said "Be a Goldfish."

332.    City Attorney Victoria Mendez operates as the Black Widow for Carollo, in much the same manner as Griselda Blanco Restrepo operated as the Black Widow for the Medellin Cartel.  Under the guise of attorney client privilege, Mendez develops the City codes, ordinances, resolutions, tasks forces, and policies aimed at accomplishing Carollo's goal of bankrupting

Plaintiffs and Plaintiffs' business partners, advises City personnel to conceal their wrongdoing from Florida's Sunshine laws by not reducing anything to writing, overrules any director of any City department that rules in favor of Plaintiffs, has spent over $15 million in City and taxpayer money in legal fees seeking to bankrupt Plaintiffs, most recently, on the very night Plaintiffs won an award of $63.5 million based upon Carollo and the City's targeting, Mendez filed at 11:54 PM a frivolous CIVIL RICO claim against Plaintiffs.

333.    Defendant Rachel Dooley is Vic Mendez's personal assassin, carrying out all of the City's targeting, making sure Plaintiffs pay the maximum fees without any reduction or waiver, and spearheading the demolition of properties.

334.    Defendant Asael Marrero, the Building Director for the City of Miami, carried out the orders of Carollo, Noriega and Dooley to draft and revise City policies and ordinances in order to shut down Plaintiffs' business and, as a final policy maker, changed the City's policy regarding compliance agreement to prevent Plaintiffs from ever being able to comply with the City code, and applied that new policy in a discriminatory manner so that it mainly impacted Plaintiffs while sparing others.

335.    Defendant Daniel S. Goldberg, the Zoning Director for the City of Miami, is the mentee of Carollo's lawyer, Marc Sarnoff, and was put in place to do the bidding of Carollo and Mendez, his former boss with whom he spends Christmas Eve. Despite reporting directly to the City Manager Art Noriega, Noriega never even bothered to interview Goldberg prior to Carollo and Mendez hiring him for Noriega.

336.    Goldberg created a new City policy holding that a citation for work without a permit results in a revocation of the certificate of use ("CU") and the property and business will be shut down for not having a CU. Dan Goldberg went out of his way to use this new policy against El

Shopping, shutting down parking garage that had been operating for more than 35 years in the same condition. Then, with the parking closed, Goldberg, asserting there was not enough parking for the 30 tenants, revoked the CU's for each of those tenants, costing Plaintiffs $15,000 per month. Remarkably, one tenant was a Miami Charter School with political connections who immediately complained to Joe Carollo, resulting in Goldberg restoring the CU for the one politically connected tenant and continuing to block all others.

337.    Defendant William Ortiz, in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo carrying out his political targeting of Plaintiffs. Among many other things, Ortiz would call the Code Enforcement Board members and demand that they a) vote against any request made by Plaintiffs, and b) apply the maximum penalty for maximum amount of harm to Plaintiffs, resulting in one board member, Bayona, voting to impose fines of more than $400,000 on a property that was worth less than $200,000.

338.    Defendant Ivonne Bayona is and all relevant times was a member of the City of Miami Code Enforcement Board taking direction from Carollo and Ortiz to vote against Plaintiffs.

339.    Defendant Luis Torres, the Assistant Director of Building, was promoted specifically because he campaigned for Carollo and agreed to do Carollo's targeting, replacing the demoted Maurice Pons, who Carollo viewed as not hard enough on Plaintiffs.  Torres proceeded to delay or derail the completion and opening of many properties and businesses, including ,but not limited to, the Tower Hotel.

340.    Defendant Rene Diaz, the Senior Chief of the Unsafe Structures department, was knowingly involved in the use of all of the unsafe structure violations aimed at shutting down Plaintiffs' business, and was the City employee circulating the Excel spreadsheet containing the list of Plaintiffs' properties to target. He was a key part of the plan  to demolish Plaintiffs'

properties, to destroy Plaintiffs' reputation, send Plaintiffs to default on all bank loans, and financially ruin Plaintiffs.

341.    Defendant Adrien Plasencia, the Assistant Fire Chief and City of Miami Fire Marshall, would send fire inspectors with the instruction to manufacture violations at Plaintiffs' properties.

## COUNT I
## VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH AND FREEDOM OF ASSOCIATION UNDER 42 U.S.C. § 1983
### (Against all Defendants)

342.    Plaintiffs reallege paragraphs 1 through 341 above as though fully set forth herein.

343.    The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

344.    The First Amendment rights to freedom of speech and association protects not only the affirmative rights to free speech and association, but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.

345.    Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights.  The Act provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ***.

42 U.S.C. § 1983 (2012).

346.     The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

347.     The United States Constitution's First Amendment guarantee to free speech and free association applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

348.     Plaintiffs exercised their right to free speech and free association by, among other things, supporting Mr. Leon in the run-off election through advertisements and hosting a rally for Mr. Leon on Plaintiffs' property, by filing an ethics complaint against Carollo, by filing a Section 1983 action against Carollo, and by exposing Carollo's hypocrisy with his own unpermitted work and code violations.  In addition, Carollo also believed that Plaintiffs had exercised their First Amendment rights to finance a lawsuit challenging his election and participating in efforts to recall him from office. Once the other Defendants became involved, Plaintiffs continued to exercise their First Amendment rights by filing a lawsuit to stop the demolition of their buildings.

349.     Upon winning office, and after each of Plaintiffs' exercise of their First Amendment rights that were contrary to Defendants, Defendants immediately retaliated against Plaintiffs by instituting a campaign of harassment.

350.     In addition, causation is also established by the testimony of multiple of Carollo's own former staffers, including Steven Miro, Richard Blom, Tanja Quintana, as well as by the former City Manager and two former Police Chiefs, and the current Mayor.

351.     Carollo, City Attorney Mendez, and City Manager Noriega created an official policy of targeting Plaintiffs on Carollo's behalf for political retaliation.

352.     This official policy took many forms, including, but not limited to, the following:

a. The February 14, 2019 resolution that created a task force to target Plaintiffs' businesses on behalf of Carollo, which Carollo himself admitted was official policy;

b. The Mayor stated Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners" and that "**we as a government are being used as an instrument for political vengeance**";

c. The May 27, 2020 meeting between the City Manager, the City Attorney, the City Attorney's entire staff, the Director of Code Enforcement, and the Director of the Building Department, at which the City manager, "**talking about Bill Fuller"** instructed the City to "revise and **update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down** all structures that don't comply";

d. The City's emails that referred to the "Carollo Investigation" of Plaintiffs' properties;

e. And the ordinances sponsored by Carollo directly targeting Plaintiffs properties.

353. Carollo, City Attorney Mendez, and City Manager Noriega also created a pervasive custom of targeting Plaintiffs on Carollo's behalf for political retaliation.

354. A longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.

355. The targeting of Plaintiffs began in December 2017 and grew throughout 2018 with the support of the City Attorney, becoming official City policy through the City Attorney in

February 2019, and becoming widespread and well known through the new City Manager in May 2020.  Not only did the City know about it and failed to stop it, the City executed it on behalf of Carollo from 2020 on.

356.    As Police Chief Art Acevedo testified at trial, City Manager Noriega and the Police Chief who would succeed him, Manny Morales, "talked very openly about Mr. Fuller . . . very openly talked about the disdain [Carollo]  had for Bill Fuller."

357.    Police Chief Aceveo further testified that the City itself was targeting  "Mr. Fuller and any Fuller related business at the direction of [Carollo] retaliation for Mr. Fuller's simple exercising his Constitutional rights to have a fundraiser. It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller."

358.    Acevedo further testified that he would "be very busy and my department will be very busy dealing with Mr. Carollo and his obsession with Mr. Fuller, and it will be basically required to inspect and to be going into his businesses on a regular basis and be ready for that."

359.    Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted.

360.    Given that everyone in the City knew that Carollo's actions against Plaintiffs were political retaliation, and that Mendez and Noriega's actions were also political retaliation, each of the Defendants named here in their individual capacities are liable in their individual capacities for carrying out this vicious and malicious scheme to destroy Plaintiffs and drive all of their businesses and tenants into bankruptcy.

361.    Defendants' actions would "chill a person of ordinary firmness" from continuing to engage in the protected activity.

362.    As a result of Defendants' retaliation, Plaintiffs are reluctant to participate in the political process by supporting candidates for office.

363.    In addition, as a result of Defendants' retaliation, Plaintiffs have suffered out of pocket losses and other monetary harms associated with disruption to their various businesses in an amount to be proven at trial.

364.    A single decision by an official policymaker can establish the existence of an unconstitutional municipal policy.

365.    Here, there were three individuals targeting Plaintiffs with final policymaking authority: Carollo, Noriega, and Mendez.

366.    The City Manager, Art Noriega, had final policymaking authority with respect to the actions he took because, while he was acting at the direction of Carollo, his actions were completely insulated from review by the City Commission.

367.    The same with City Attorney Mendez.  Her actions in targeting Plaintiffs were completely insulated from review by the City Commission.

368.    Carollo could not be reviewed or controlled by anyone, nor were his office meeting and phone calls with Noriega and Mendez reviewed by the Commission or even traceable by the Commission, as Carollo, Noriega and Mendez made sure not to leave any email correspondence or other evidence.

369.    In addition to the monetary losses, Plaintiffs have suffered impairment to their reputation, personal humiliation, emotional distress and mental anguish and suffering.

370.   Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' conspiratorial and reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' conspiracy was reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

371.   Plaintiffs also are entitled to and hereby demand an award of attorneys' fees and costs pursuant to the Civil Rights Attorney's Fee Awards Act of 1976 (42 U.S.C.A. § 1988[b]).

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in the Plaintiffs' favor against Defendants and award damages for business disruption, emotional distress, reputational harm, punitive damages, attorneys' fees and costs, and grant such other relief as this Court deems just and proper.

### COUNT II
### CIVIL CONSPIRACY TO VIOLATE THE CONSTITUTIONAL RIGHT TO FREE SPEECH AND FREEDOM OF ASSOCIATION UNDER 42 U.S.C. § 1983
### (Against all Defendants)

372.   Plaintiffs reallege paragraphs 1- 371 above as though fully set forth herein.

373.   Defendants reached an agreement to deny Plaintiffs their constitutional right to free speech and freedom of association, in retaliation for, amongst other instances of protected conduct,  Plaintiffs' support of Carollo's political opponent during the 2017 election, Plaintiffs' submission of an ethics complaint against Carollo and the City, Plaintiffs' filing of a lawsuit against Carollo and the City, and Plaintiffs' vocal opposition to the retaliatory practices of the City.

374.     Defendants possessed an independent personal stake in conspiring against Plaintiffs and achieving the City's unconstitutional objectives.

375.     The individual Defendants were motivated by their personal animus and desire to harm Plaintiffs' businesses—actions which did not confer any benefit for or constitute a stake to the City.

376.     For example, Defendant Carollo's conspiratorial acts were motivated in part by his personal animus towards Plaintiffs for their support of his political opponent and Plaintiffs' filing of a complaint against him, and a desire to scare and deter Plaintiffs and other political opponents and their donors from challenging his reign as commissioner. Defendant Carollo was also motivated to shut down Plaintiffs' Viernes Culturales festival so that he could put forth his own festival at the same time and location.

377.     By way of another example, Defendant Noriega was not a City employee (rather, he was employed by the Parking Authority) but was promised the position of and eventually became the City Manager when he agreed to engaged in the conspiracy to violate Plaintiffs' constitutional rights.  Defendant Dan Goldberg also was not a City employee but got his job as Director of Zoning without even interviewing with the City Manager in exchange for agreeing to participate in the conspiracy to violate Plaintiffs' constitutional rights.  Similarly, Defendant Victoria Mendez had whereby Carollo would protect the businesses her husband ran for her benefit, through fraudulent use of the code enforcement board, in exchange for agreeing to participate in the conspiracy to violate Plaintiffs' constitutional rights.

378.     In addition to their personal stakes, the Defendants possessed a peculiar power of coercion by virtue of their combination and economic influence, which they did not possess

individually.  Defendants' exercise their peculiar power of coercion with a malicious motive to target Plaintiffs in retaliation for their exercise of their First Amendment rights.

379.    Moreover, Defendants' conspiratorial conduct went beyond a single act of retaliation, and instead involved a long series of retaliatory acts orchestrated by City employees spanning almost five years. Defendants' conspiratorial actions impinged upon Plaintiffs' First Amendment rights.

380.    As a result of Defendants' conspiracy to retaliate and violate Plaintiffs' First Amendment rights, Plaintiffs are reluctant to participate in the political process by supporting candidates for office or by petitioning their local government for the redress of their grievances.

381.    In addition, as a direct and proximate result of Defendants' conspiratorial acts, Plaintiffs have suffered out of pocket losses and other monetary damages associated with disruption to their various businesses in an amount not less than $60 million, said damages to be proven at the time of trial.

382.    In addition to the monetary losses, Plaintiffs have suffered impairment to their reputation, personal humiliation, emotional distress, and mental anguish and suffering.

383.    Plaintiffs are also entitled to punitive damages to punish, penalize, and deter  the future recurrence of Defendants' conspiratorial and reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' conspiracy was reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

384.     Plaintiffs are also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.

Respectfully submitted,

**AXS LAW GROUP PLLC**
2121 NW 2nd Avenue
Miami, FL 33127
Tel: (305) 297-1878

By:   _/s/ Jeffrey W. Gutchess_
**JEFFREY W. GUTCHESS**
Florida Bar No. 702641
Jeff@axslawgroup.com
*Attorney for Plaintiffs*