**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 1:18-cv-24190**

WILLIAM O. FULLER, and
MARTIN PINILLA, II,

        Plaintiffs,

    v.

JOE CAROLLO,

        Defendant.

_____/

## SECOND AMENDED COMPLAINT

William "Bill" O. Fuller ("Fuller") and Martin Pinilla, II ("Pinilla") (collectively "Plaintiffs") sue Joe Carollo ("Carollo") and allege as follows:

## INTRODUCTION

The First Amendment to the United States Constitution guarantees every citizen the absolute and fundamental rights to freedom of speech, to peaceably assemble, and to petition the Government for redress of grievances. For eighteen months, Miami City Commissioner Joe Carollo has obliterated these fundamental rights by using the power and influence of his government office to engage in a campaign of harassment, retribution and retaliation against Plaintiffs. Carollo's actions, designed to destroy Plaintiffs' businesses and reputations, is pure political ***payback***—targeting Plaintiffs simply because they dared to support Carollo's opponent in a run-off election, and because they filed an Ethics Complaint against Carollo.

Unchecked retaliation and political payback on this scale would lead the United States down the path of Cuba and Venezuela today. Carollo's prolonged and multifaceted retaliation has

been in blatant violation of the City of Miami Charter's prohibition on Commissioners providing direct orders to City employees to wrongfully use City resources for their own political means. He has wrongfully employed City resources, including the Police, the Fire Department, Code Enforcement, and the Special Event Department, in his attacks against Plaintiffs to (a) shut down the Christmas Party Plaintiffs hold for their own employees, their tenants and their tenant's employees, and their families, including young children each year (a party previously attended by City Commissioners and employees); (b) prevent Plaintiffs' use of the same shipping containers authorized by the City in the Wynwood Yard and the Wharf on the Miami River to house commercial business, thereby nearly destroying a family business operating a wildly popular restaurant in that spot (Sanguich); (c) shut down Plaintiffs' tenant Union Beer by sending multiple police and code enforcement personnel to raid their anniversary party; (d) permanently shut down construction of the kiosk market Plaintiffs had invested in and already obtained City approval for; (e) disrupt and shut down the wildly popular Viernes Culturales, merely because Plaintiff Fuller is the Chairman of the Board of that nonprofit organization; and (f) trespass on Plaintiffs' properties and conduct illegal searches and government surveillances. Carollo has also made false "anonymous" noise complaints against Plaintiffs' business Ball & Chain; solicited the residents of neighboring buildings to make those same false noise complaints; repeatedly alleged code violations by the company that operates the valet for Ball & Chain; and even defamed and disparaged Plaintiffs on the radio, calling Plaintiff Fuller "*El Padrino*," and falsely stating that Fuller "*operate[s] like a Godfather*" backed by corrupt Venezuelan criminals, thereby destroying Plaintiffs' good name.

Carollo has also managed to amend key provisions of the Miami City Code to target Plaintiffs' businesses in violation of the U.S. Constitution's prohibition on bills of attainder.

Carollo's stated intention is to drive Plaintiffs out of business even if he has to destroy the life savings and work of the businesses who rent from Plaintiffs.

These are not mere allegations. They are confirmed by Carollo's own aid, City of Miami employees, a Miami-Dade Ethics Commission investigative report, and even by another Commissioner of the City of Miami. There are also reams of text messages, emails, photographs and even live video showing Carollo in action lurking around Plaintiffs' properties in alleyways and behind trees in the middle of the night on numerous occasions. In fact, Carollo has himself stated that he is the "new Sheriff in town," and that he "is the law."

Carollo knows that such retaliation for exercising one's right to free speech is not only morally wrong but also illegal as Carollo himself has previously sued the Mayor and City of Doral claiming that they had retaliated against him for exercising his free speech rights. *See Carollo v. Boria*, 833 F. 3d 1322 (11th Cir. 2016). Carollo must be must be held accountable for the emotional distress and mental anguish, as well as the millions of dollars in damages he has caused. An award of punitive damages of at least $10 million dollars must also be entered against Carollo to punish and deter such conduct in the future.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Fuller is a resident of Miami-Dade County, Florida.

2.     Plaintiff Pinilla is a resident of Miami-Dade County, Florida.

3.     Collectively, Plaintiffs own or control real estate investments directly or through various affiliated entities.

4.     Defendant Carollo is a City of Miami Commissioner, two-time former Mayor of Miami, and at all times mentioned herein was a resident of Miami-Dade County, Florida.

5.      This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

6.      Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

7.      All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## ALLEGATIONS

8.      Plaintiffs are local entrepreneurs operating out of the Futurama building in the heart of the Calle Ocho District of Little Havana.

9.      Over the course of the last 15 years, Plaintiffs worked hard to build a diverse real estate investment business from the ground up, one building at a time.

10.     Today, Plaintiffs' businesses provide hundreds of jobs for local residents and produce hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County and the State of Florida.

11.     Plaintiffs have dedicated their professional careers to revitalizing the neighborhood of Little Havana, where they have helped to generate economic activity and new life into the area while at the same time preserving its historical significance and cultural identity.

12.     In this vein, Fuller and Pinilla are "a galvanizing force behind the area's cultural resurgence."[1]

---

[1] https://www.miaminewtimes.com/arts/viernes-culturales-little-havanas-rebirth-begins-6388896

13. Renowned Miami historian Dr. Paul George has likewise noted that Fuller and Pinilla "are both very history-minded and are also very civic-minded . . . [They] understand that the neighborhood has a multilayered history."

14. Plaintiffs consider their work to be that of curators and caretakers of the neighborhood, accordingly, they seek out development partners and tenants "who share a similar vision of preserving and protecting the heritage, the culture, and the history. . ."[2] of Little Havana.

15. For example, in 2014, Fuller and two of his childhood friends reopened the famous Ball & Chain nightclub.

16. For decades during the 1930's to 1950's, Ball & Chain was an important music venue, presenting titans of the era such as Billie Holiday and Count Basie.

17. With the vision of restoring the venue to its past glory days, Fuller and his partners have made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

18. From its opening in 2014 to January 2018, Ball & Chain has served the community and operated without interference from the City, receiving only one noise complaint and zero parking related citations from the City.

19. Fuller and Pinilla are also currently working on Little Havana's first boutique hotel through a redevelopment and restoration of the historic Tower Hotel.

20. The Tower Hotel served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[3]

---

[2]     https://www.nbcnews.com/news/latino/miami-s-little-havana-working-class-neighborhood-global-tourist-hot-n738236
[3] https://www.miamiherald.com/news/business/article204754109.html#storylink=cpy

21.     Preserving that history, in which the legacies of various cultures converged on Calle Ocho, is central to Plaintiffs' vision for the project.

22.     Through these and many other projects in the area, Plaintiffs have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

23.     Plaintiffs' efforts in the neighborhood have born significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.

24.     Little Havana is now a major Miami destination for tourists and locals alike, sought after as one of the few authentic Cuban legacy neighborhoods left in Miami.

25.     In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

26.     Throughout all of this, Plaintiffs have nurtured great relationships with City Commissioners, including Carollo's two predecessors, his brother Frank Carollo and Joe Sanchez, both of whom appointed Fuller and Pinilla to participate in various City boards or trusts, such as the Stars of Calle Ocho and Viernes Culturales.[4]

## THE RACE FOR CITY COMMISSIONER

27.     In the summer of 2017, Carollo, who had previously served as Mayor of Miami, announced his campaign for Commissioner for the City of Miami's for District 3, which includes Little Havana.

---

[4] In addition, Fuller and Pinilla are also active in the Dade Heritage Trust and Live Healthy Little Havana.

28.     At that time, other prominent Miami Mayors expressed concern over Carollo's history of "abusing power, profiting from taxpayers and *using government resources to intimidate his political opponents*."[5]

29.     During the campaign, Fuller met privately with Carollo when Carollo was seeking Fuller's political support.  They discussed ways they could work together to improve Little Havana.

30.     Steve Miro ("Miro"), a top campaign staffer for Carollo, noted that, at that time, Carollo was not "targeting . . . [Fuller], Joe was trying to ally himself with him."[6]

31.     Carollo's main opponents in the election race were Alfie Leon, Tomas Regalado and Zoraida Barreiro.  Plaintiffs made financial contributions to Leon, Regalado and Carollo.

32.     In the general election, held on November 7, 2017, Carollo received 1,818 votes, and Alfonso Leon received 1,221 votes.

33.     On election night, Carollo was seated with Lugo, one of his top campaign advisors.[7]

34.     Because neither candidate received a majority of votes, a run-off election was scheduled for November 21, 2017.

---

5 https://www.miamiherald.com/news/local/community/miami-dade/article179627391.html

[6] *See* Ethics Report, attached herein as Exhibit A, p. 25. As noted herein, on or about March 12, 2018, Fuller filed an Ethics Complaint against Carollo with the Miami-Dade Commission on Ethics and Public Trust (the "Ethics Complaint").  Following the conclusion of the Ethics Commission's investigation, the Commission released its Investigative Report (the "Ethics Report") which includes the testimony of over 14 individuals regarding many of the allegations contained herein. Plaintiffs will refer to said testimony throughout this Complaint.

[7] At the time, Lugo was employed by the City of Miami Code Enforcement division and served as Secretary of the American Federation of State County and Municipal Employees ("**AFSCME**"), the City of Miami employees union. Lugo willingly and materially assisted Carollo in his campaign of harassment, political retribution and First Amendment retaliation directed against Plaintiffs. Lugo is also a former employee of the City of Miami Code Enforcement division.

**CAROLLO SHUTS DOWN ALFIE LEON RALLIES ON PLAINTIFFS' PROPERTIES**

35.     Early voting for the run-off election commenced on November 17, 2017.

36.     Two locations were designated to cast early voting ballots for the run-off, one of which was directly across from one of Plaintiffs' properties.

37.     In fact, the property owned by Plaintiffs, less than 75 feet away from the entrance to that early voting center.

38.     On November 18, 2017, a rally in support of electing Carollo's opponent, Alfie Leon, was held on Plaintiffs' property.

39.     The rally on Plaintiffs' lot was clearly visible to all voters casting ballots at that voting location.  Pictures of the rally can be seen below.

 

40.     There was free food, music and signs supporting Leon, which attracted the attention of most passersby, including voters.

41.     Conversely, Carollo did not put on any such comparable event within view of the early voting center.

42.     Rather than compete fairly, Carollo and others acting at his direction[8] worked their contacts at the City and engineered a shut down of the rally by Code Enforcement Officers and the police, who forced all attendees to leave.

43.     Undeterred, Leon supporters gathered for another rally at the same location the next day, Sunday, November 19, 2017, the last day of early voting.

44.     Like the first rally, this one also had music and food and was highly visible to the public, including potential voters.

45.     And like the first, there was no comparable event for Carollo anywhere nearby.

46.     Miro spotted Pinilla at the rallies, passing along the information to Carollo.

47.     The rallies were a threat to Carollo's chance of winning the run-off election and, consequently, Carollo sought to shut down the second rally.

48.     Miro confronted Fuller by phone and demanded that he shut down the rally, implying that Plaintiffs were responsible for the rallies based on having spotted Pinilla there.

49.     Instead of relying on Fuller to comply with Miro's demand, Carollo and Miro exploited any City contact they could to shut the rally down.

50.     Indeed, based on Carollo's efforts, both rallies were shut down by Code Enforcement or other City agents, and the property received a bogus permitting citation.

51.     Miro later confirmed that Carollo camp was responsible for the shutdown of the rallies.  Miro stated that Carollo actually instructed Lugo on site at the Alfie rally, and that Lugo was leveraging her contacts in the City on behalf of Carollo to get the rally shut down.

---

[8] This included Lugo and Miro, who was Carollo's Chief of Staff at the time.

52.     The run-off election was held on November 21, 2017 and Carollo defeated Leon by a mere 352 votes.

53.     If Carollo had not succeeded in shutting down the Leon rallies, he may indeed have lost the run-off election to Leon.

54.     Instead, on December 2, 2017, Carollo was sworn in and pledged his allegiance to the City of Miami and its Charter.

## RELEVANT CITY OF MIAMI CHARTER PROVISIONS

55.     Among other things, the City of Miami Charter governs the powers vested in the various arms of City government including the Mayor, City Manager and the Commissioners.

56.     Section 4(g)(6) gives the Mayor the power to appoint the City Manager and Section 15 of the Charter establishes that the City Manager shall be the head of the administrative branch of the City government.

57.     Section 4(d) of the Charter delineates the division of power between the Mayor, City Manager and Commissioners as follows:

> Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof **shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately**.
>
> Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be **violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.** Any willful violation of the provisions to this section by the mayor or any city commissioner shall be **grounds for his or her**

**removal from office by an action brought in the Circuit Court by the state attorney of this county**.

58. The Charter makes clear that neither the Mayor nor any Commissioner can give direct orders to any department that is subordinate to the City Manager. Instead, they are required to direct all orders to the City Manager who then has the authority to direct the various departments of the City to take action.

## CAROLLO'S RETALIATION AGAINST PLAINTIFFS

59. Upon taking office, Carollo immediately drew up a list of Plaintiffs' properties and associated businesses in District 3.

60. Miro stated it explicitly: "**when Carollo took office . . . he went after Mr. Fuller, obviously**. You know-he does have a spreadsheet…of all the businesses he [Fuller] has in the district."[9]

61. Likewise, Orlando Diez ("Diez"), who was then the Director of Code Compliance, Construction Manager, Office of Capital Improvements for the City of Miami, testified that Carollo told him: "There's a guy there who owns a lot of businesses, buildings, his name is Bill Fuller."

62. Diez further testified that Carollo said he had a list of addresses for Fuller's properties that he would give to Diez, from which Diez understood Carollo was asking him to selectively target Fuller's properties.

---

[9] On or about August 3, 2018, Plaintiffs took the voluntary sworn testimony of Miro as part of the ethics investigation (the "Miro Statement"). A copy of the Miro Statement is attached hereto as **Exhibit B**. Plaintiffs will also refer to the testimony herein. Exhibit B, p. 7, ll. 5-13. (emphasis added)

63.     Miro testified that Carollo also used the spreadsheet to point out alleged legal violations on Plaintiffs' properties during a walk with the Mayor, the City Manager, the Deputy City Manager and Code Enforcement Director.

64.     As Miro explained: "[w]e walked up and down 8th Street all the way to 6th Avenue [and back]; . . . .  showing the business that have violations and obviously, they were [Fuller's] businesses."[10]  By doing so, Carollo put the City on notice of his intentions to selectively target and harass Plaintiffs as retaliation.

65.     Miro further noted that Carollo was targeting Plaintiffs as political retribution because Fuller went against Carollo in the run-off election by supporting Alfie Leon and allowing Leon to use Plaintiffs' property for the rallies.

66.     Specifically, when asked why Carollo was targeting the Plaintiff, Miro answered: "**obviously, [Fuller] went against him in the commissioners by donations to -- giving him building and what have you.**"[11]  That means that Fuller went against Carollo in the run-off election by supporting his opponent, Alfie Leon, and allowing Leon to use Fuller's property to conduct a rally across from the early voting center.

## CAROLLO ATTACKS PLAINTIFFS' CHRISTMAS PARTY

67.     On December 15, 2017, a few weeks after the run-off election, Plaintiffs held their annual office holiday party at the historic Tower Hotel.

---

[10] *Id*. pp. 7 & 8.
[11] *Id.* at p. 10, ll. 12-25 and p. 11, ll. 1-13. (emphasis added)

68.     The event was hosted by Plaintiffs for the benefit of employees, tenants, and their families, including young children and other guests for five straight years with no issue from the City.  In past years, even City Commissioners attended the Christmas Parties.

69.     Carollo learned of Plaintiffs' Christmas Party, and, after "driving by" to confirm it was taking place, conspired with Lugo to mobilize Code Enforcement officials to disrupt the Christmas Party and shut it down.

70.     Lugo then repeatedly called and texted Diez, the Director of Code Enforcement, insisting that he shut the event down and stating in support that Christmas Party lacked a Special Events Permit.

71.     In response, Diez explained to Lugo that such a permit was required only if more than 100 people were at the party.

72.     Lugo, assured Diez that this was the case (which she knew to be false) and insisted Diez call the police to shut the Christmas Party down.

73.     Diez did not send the police, but he did agree to send a Code Officer, Scarlett Morua ("Morua") to investigate.

74.     Morua arrived at the property soon afterwards, entering the Christmas Party in full uniform and causing guests great unease and concern.

75.     Morua reported to Diez that there were no more than 50 people at the Christmas Party, including children.

76.     Diez told Lugo there were fewer than 100 people and that he would not call the police, to which Lugo responded: "You're wrong . . . You don't know how to read the Code."

77.     Diez then instructed that Morua go back to make sure there were no other guests somewhere in the hotel and she responded back assuring him that was not the case.

78.     Jessica Capo ("Capo"), then Chief of Code Enforcement, and a close friend of Lugo, also contacted Morua and instructed her to go to the Christmas Party.

79.     Morua advised Capo that she already had been to the event, verified that it was an ordinary holiday party and that no violations were evident.  Undeterred, Capo told Morua to return to the hotel and wait outside until the event ended.

80.     Morua returned to the party and spent an extended period of time in plain sight of party guests, intimidating attendees, which included the extended family and young children of Fuller and Pinilla.

81.     Prior to this incident, Morua had never been directed to respond to a party and to stay until the party was concluded.

82.     For the Christmas Party, however, she was told to wait and to call back to advise when the Party was over.  Morua indicated "it was kind of weird."

83.     Diez also received a call regarding the Christmas Party from Assistant City Manager Alberto Parjus ("Parjus"), who directed Diez to go to the event in person because the complaints were "coming from a Commissioner's office" whose people were "driving [him] crazy."  Yet again, through these actions, the City had full notice of Carollo's intent to retaliate and harass Plaintiffs.

84.     Diez then went to the Christmas Party himself with additional code enforcement officers.  By then, there were only 10-15 people left at the party.

85.     At approximately 1:00 AM, Fuller learned that Diez had come to the property looking to speak with him.

86.      Diez told Fuller this was a political target, that there were many people involved in the effort, and that Fuller should meet him in person so that Diez could explain how Carollo and his allies were trying to use Code Enforcement resources for political retribution.

87.      When Fuller met Diez in person, Diez confirmed Plaintiffs' suspicion that Carollo was behind the Code Enforcement interference at the party.  Diez also stated that Lugo instructed him not to reveal that Carollo was the source of the complaints.

88.      Diez later explained that, based on his understanding of the City Charter and Administrative Policy Manual, elected officials are not allowed to give direction to staff and can only raise concerns through the City Manager's Office.  He indicated in the case of Carollo, many of the code-related complaints originated from Carollo's office through Lugo and Miro as well as communication through his direct boss, Parjus.[12]

89.      This was echoed by Parjus who he stated "the right way to communicate a complaint is through the Manager, then it is communicated to him and in turn he contacts Code Enforcement regarding the allegation.  The wrong way is a Commissioner calling the Director of Code Enforcement."[13]

90.      Plaintiffs feared that this harassment at their holiday party might indicate Carollo had plans for future harassment against them and their businesses.

### RETALIATION AGAINST BARLINGTON GROUP AND ITS TENANT "SANGUICH DE MIAMI"

91.      Plaintiffs, along with Barlington Group, LLC ("Barlington Group"), a limited liability company of which they are managing members, also supported the development of

---

[12] Exhibit A, p. 29.
[13] *Id*. p. 19.

AXS Law Group PLLC

Sanguich de Miami ("Sanguich") an innovative restaurant aiming to bring a remodeled shipping container, an architectural concept recognized around the world, to create further retail activation on a part of the street that was a non-descript parking lot.

92.     The success of shipping containers for retail activation was not only a worldwide phenomenon, it had also been established in hugely popular sections of Miami, including in the Wynwood Yard and at The Wharf on the Miami River. These were established pursuant to Temporary Use Permits ("TUPs") under the City Code.

93.     Here is a photo of the Sanguich structure on the property owned by Fuller and Pinilla in December of 2017:



94.     Former District 3 Commissioner Frank Carollo (Joe Carollo's brother), was a "huge proponent" of the Sanguich business and its location in the refurbished shipping container.  Frank Carollo even suggested they partner with Plaintiff Fuller.

95.     Many City officials including former Mayor Tomas Regalado and the Chief of Police attended Sanguich's ribbon-cutting ceremony on Oct. 27, 2017.

96.     Sanguich obtained a business license from the City, known as a "BTR" and a state license for preparing and selling food and worked with a City of Miami Assistant Attorney to get temporary zoning approvals from the City.

97.     Sanguich became a huge success, was overwhelmed with customers, received rave reviews, and would often times sell out of its products.

98.     On November 26, 2017, just one week after Carollo discovered Plaintiffs supporting his competitor Leon, and only 5 days after he won the run-off election against Leon, Sanguich was "raided" by 25-30 City enforcement personnel including police, fire, building and Code Enforcement officers.

99.     Just minutes before the raid, Fuller was contacted by City Manager Daniel Alfonso ("Alfonso"), who advised him that Code Enforcement had been summoned to the property.  When Fuller asked if this was retaliation from the incoming commissioner Carollo, the City Manager responded simply by saying "si."  Again, the City had full knowledge of Carollo's campaign to retaliate against Plaintiffs for their support of Mr. Leon.

100.     After the Sanguich owners, Rosa Romero ("Romero") and Daniel Figueredo ("Figueredo"), also contacted Alfonso, he confirmed to them that **the raid was performed at the direction of Carollo** and that Alfonso had no power to stop it.  Alfonso advised them to meet with Carollo to learn the reason for the raid.

101.     Romero and Figueredo met with Carollo on December 6, 2017.  Carollo expressed that he felt the location of their business (on Plaintiffs' property) was problematic and that they relocate to City-owned property.   Specifically, Carollo stated, "I love it [the business]," just

"maybe not where you are, I think there's a little park that's near there and maybe the City can accommodate you."[14]

102.    Solely to ensure that Plaintiffs could not use the same concept approved and succeeding in Wynwood and the Miami River, within two miles of their location, Carollo managed at the Commission Meeting on December 14, 2017 to remove TUP's solely from District 3.[15] Carollo did so without meeting the proper City procedure.  There was no first hearing on the issue, and there was no public notice on the issue.  He circumvented the proper procedure by inserting it into another commissioner's legislation, on its second reading, depriving Plaintiffs of their due process rights and destroying the opportunity they had built, and were building, with other projects in their pipeline.

103.    Thus, the same shipping containers that are authorized and in use in The Wharf on the Miami River and at Wynwood Yard in Wynwood could no longer be used in Little Havana.

104.    Sanguich reopened on January 6, 2018 with a Temporary Events Permit (TEP).[16] That same day, however, City of Miami Code Enforcement showed up and advised them they were

---

[14] Romero and Figueredo were eventually told that they were raided because they lacked a Certificate of Use (CU), but since they were operating a mobile vending unit and not a permanent structure that made no sense.  After discussing this with the Assistant City Attorney, they were advised that they could operate, at least temporarily, with a Temporary Events Permit (TEP), while they sought to gain zoning approvals.  The Assistant City Attorney further informed them that the City's zoning code is vague and that a great deal of subjectivity is involved. They were advised that as a result of this, the District Commissioner, in this case Carollo, would likely have final say as to whether a building met code regulations.

[15] *See* Ordinance 13733 enacted on January 11, 2018.

[16] Figueredo had been informed that because they were a mobile vendor, having installed axels on the container as requested by the City, no Certificate of Occupancy was required.  Indeed, many other businesses in the City such as The Wharf on North River Drive were operating under TEPs that allowed them to operate for up to two years if they are opened on vacant lands.  However, Carollo had made it clear that he did not want TUPs to be utilized in Little Havana and as a result of that, he directed both the Building and Zoning Departments to make an example out of Sanguich because of its location on Plaintiffs'

not allowed to open.  Code Officer Yacmany Salvatierra ("Salvatierra") told them, **"I'm sorry, this came from above, just know people are watching**."

105.    Sanguich nevertheless opened and, two days later, on January 8th at approximately 11:00 AM, Salvatierra returned with police and stated, "You're not supposed to be open because the TEP had a condition that had not been met," and threatened to arrest them if they did not close the business.  When Figueredo inquired with Building Department Director Jose Camero ("Camero") as to why they were forced to close despite having a BTR and TEP, Camero stated "I got a phone call, but I can't say from who . . .."

106.    In his testimony to the Ethics Commission, Parjus confirmed that the **calls to the Building Department and the City were coming from Carollo personally or from a person acting at Carollo's direction, stating "every time the guy [Figueredo] would open the door to clean up the place or do something we'd get a call . . . 'hey they're open up again,' from the Commissioner's Office or somebody else."**[17]  When receiving these repeated calls from Carollo personally or from a person acting at his direction, the City understood and continued to support Carollo's unconstitutional campaign of harassment against Plaintiffs and their affiliated business continued.

107.    Asked the reason for the harassment, Carollo told Figueredo, **"my problem is not as much with you as it is with your landlord."**

108.    The Sanguich proprietors, Romero and Figueredo are a husband and wife team who had invested their family's entire savings in the concept.  The machinations of Carollo and the City

property.
[17] Exhibit A, p. 19. (emphasis added)

drove them to the verge of bankruptcy and Carollo ultimately succeeded in shutting down Sanguich on property owned and rented by Plaintiffs.

109.    Sanguich has since relocated to a nearby typical retail building:



110.    Since relocating off of Plaintiffs' property, Sanguich has ceased receiving any City code violations or any retaliation by Carollo.

111.    Plaintiffs have suffered monetary damages as a result of Carollo forcing Sanguich to relocate off of Plaintiffs' property including the loss of rental income in excess of $12,000 per year.  All claims related to monetary damages have been assigned by the relevant business entity to Plaintiffs in their individual capacities.

112.    Further, with the realization that Carollo was now relentlessly targeting businesses that rented from Plaintiffs, and in the past had been welcomed by city officials with open arms, Plaintiffs began to experience extreme mental anguish and emotional distress, which manifested through sleeping difficulties and other physical ailments.

**RETALIATION AGAINST PLAINTIFFS AND THEIR TENANT UNION BEER**

113.    Fuller and Pinilla are also the landlords and partners of the Union Beer Store, an oasis for beer lovers in Miami's Little Havana neighborhood with 18 taps, pouring the best beers, local and otherwise, including beers on nitro, cask ales from a beer engine and a growler station.

114.    David Rodriguez and Cecilia Rodriguez are also a husband and wife team who have invested their life savings into creating Union Beer, which is located at 1547 SW 8th Street, a building owned by Plaintiffs.  Union Beer has been a tenant of Plaintiffs since February 2017.

115.    On **February 10, 2018,** Union Beer held its one-year anniversary party in the parking lot behind their business.  Carollo suddenly appeared at the property with several police officers with flashing lights and approximately 15-20 Code Enforcement officers.  Carollo confronted the Rodriguezes and told them "You need a temporary events permit . . . but even if you had applied for one, I would have denied it."  The City Commissioner does not approve special events permits.  They are approved by City administration, not by commissioners.  Therefore, his statements were both false and threatening by nature.

116.    Carollo ordered Code Enforcement to shut the party down and posted a Code Enforcement officer at the door of the business for the next two hours.   In doing so, Carollo, supported by the City, coordinated a well-organized attack by an overwhelming number of police, Code Enforcement and other City employees, and Carollo himself attended to videotape the chaos.

117.    Prior to this event, Union Beer had never been cited for any significant code violations nor had any of its operations shut down.

118.    Carollo was heard bragging to patrons of the El Pub bar that he would do everything possible to shut down Union Beer.

119.     Learning that Carollo was continuing to target businesses that partnered with, or rented from Plaintiffs, with the aim of shutting those businesses, further exacerbated Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

### CAROLLO'S RETALIATION AGAINST BALL & CHAIN'S VALET OPERATIONS

120.     On **February 18, 2018** at approximately 12:30 A.M., Carollo, Lugo, Miro and Miro's wife entered a parking lot located at 1411 SW 11 St., Miami FL 33135.

121.     The lot is attached to St. Peter & Paul Orthodox Christian Church but at night is leased by S.H. Valet, the valet operator for Ball & Chain.  S.H. Valet had leased and used the Church's lot for parking cars for many years without any complaints from the City.

122.     Lugo and Miro's wife began photographing the parked cars.

123.     Initially when approached by the valet employee, Lugo claimed it was a "private" matter and she had a meeting with the priest (at 12:30 AM).

124.     The valet attendant then noticed another woman taking photos (Miro's wife) and asked what she was doing and asked her to stop taking pictures.

125.     Carollo then lowered his car window, flashed his City of Miami identification telling the valet attendant that he was performing an "official investigation" of the valet operation and lot and that he was doing so in his official capacity as a City of Miami Commissioner.

126.     A few minutes after the discussion, the operator of S.H. Valet, Alain Garcia ("Garcia"), arrived at the lot and confronted Carollo.  Garcia explained that the valet operation at the lot had been approved by the Miami Parking Authority and that S.H. Valet had a valid lease with the Church to utilize the lot at night.

127.     Garcia then once again questioned what Carollo was doing there and in response Carollo told Garcia, "**I am the law**."  Miro corroborated this fact during his testimony to the Ethics Commission.[18]

128.     Carollo further went on to tell Garcia that while he may be a hard worker just doing his job, he was "working for a millionaire" (meaning Fuller) which was not acceptable to the Commissioner.

129.     During his testimony to the Ethics Commission, Carollo denied ever having flashed his badge or telling Garcia that he worked for a millionaire. Yet in an article published in the Miami New Times on September 17, 2018,[19] which included video footage of the incident in question taken by Miro's wife,[20] Carollo can clearly be heard saying in Spanish "pero trabajando con un millionario," which in English means, "but you are working for a millionaire" establishing that he lied to the Ethics Commission.

130.     After Garcia once again asked him to leave the private property, Carollo told Garcia he would receive the official results of his "investigation" in the next few days.  He then exited the lot with his associates.

131.     Learning that Carollo was continuing to make midnight raids on businesses that partnered with, or rented from Plaintiffs, with the aim of shutting those businesses, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

---

[18] Exhibit A, p. 26

[19] https://www.miaminewtimes.com/video/video-suggests-commission-joe-carollo-lied-to-ethics-commission-ppu1d8bv

[20] The Ethics Report establishes the fact that Miro's wife was the one filming the incident in question that evening.  *See* Exhibit A, p. 6.

## CAROLLO'S RETALIATORY ACTIONS AT THE GAY 8 FESTIVAL

132.   The Gay 8 Festival took place on Calle Ocho on Sunday, **February 18, 2018,** hours after Carollo had raided Fuller and Ball & Chain's valet operation.

133.   Carollo's target at the Gay 8 Festival was Sanguich, which was still at that time a tenant of Plaintiffs, and had obtained permission to operate as a tent vendor during the festival.

134.   Carollo sent Miro to the festival on his behalf to be the onsight administrator of an orchestration of a barrage of attacks by the Fire Department, the Police Department, the Special Events Department and Code Enforcement, and Miro was telling all of the City employees that Carollo was available to talk by phone.

135.   Carollo asked Miro to speak to Carlos Diaz ("Diaz"), a fire inspector for the City of Miami, to inform him that Carollo was concerned about one vendor whom he alleged was selling contaminated food.

136.   When Diaz arrived, Carollo spoke to him on the phone.  According to Diaz, Carollo identified himself as the Commissioner and made false accusations about spoiled food at "Sanguich" stating he had reason to believe the food had been brought in a day or two ago, had been stored in a hot trailer and might be contaminated.  He also stated that the vendor lacked proper licenses.

137.   Diaz informed Carollo that as fire inspectors, they do not inspect food or licenses, but that he would pass along the information.  Carollo told Diaz that the City had "issues" in the past with the vendor in question and that he wanted the inspectors "to follow up" with the vendor.

138.   Diaz went to the site and conducted the inspection of the kitchen area of Sanguich and determined that "everything was brand new" and "everything had been inspected" and there was no spoiled food: "Nothing smelled bad, nothing was rotten."

139.   The inspection was conducted in both the container and the tent.  Upon concluding the inspections, Diaz notified Miro, the police officers, the "Sanguich" owners and the Gay 8 coordinator that they passed the surprise inspection.  Romero and Figueredo were permitted to continue to operate despite suffering significant embarrassment and despite Carollo costing the City hundreds of dollars in blatant misuse of City resources and employees.

140.   In Diaz's 27-year career as a City Fire Inspector "neither he nor any of the inspectors had ever received such a call from a Commissioner."

141.   Miro confirmed Carollo's direct involvement with the targeted attack on Sanguich and further explained that although Carollo was not physically present, Carollo was in constant contact with City Attorney Victoria Mendez and Parjus about the situation.  Through Carollo's constant contact with the City Attorney and Mr. Parjus during this act of retaliation, the City again had further knowledge of Carollo's retaliation against Plaintiffs, and failed to take any steps to deter this repeated unconstitutional activity.

142.   Because Carollo had sent Miro to work at the festival on a Saturday, a normal day off for most City employees, Carollo arranged for the City to compensate Miro for Miro's actions on Carollo's behalf at the Gay 8 Festival in the form of compensated vacation days.

143.   Carollo did not target any other vendor at the Gay 8 Festival.

144.   Learning that Carollo would continue to target businesses that rented from Plaintiffs during community building festivities added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## CAROLLO ORDERS CODE ENFORCEMENT TO TARGET OTHER PROPERTIES OF PLAINTIFFS

a.      **The March 3, 2018 Carollo Ride Along**

145.    On Saturday, March 3, 2018, Carollo violated the City Charter so egregiously that it was unprecedented.

146.    Carollo called a Code Enforcement supervisor named Michelle Watt and asked her to instruct a Code Enforcement officer to meet him in Little Havana because he had some questions and needed assistance.  Watt instructed Code Enforcement Officer Dennis Uriarte ("Uriarte") to meet Carollo at 1600 SW 8th Street.  Uriarte had been assigned to Coconut Grove, not Little Havana.  Uriarte found the request "very unusual" because Commissioners should "know better" than to call Code Enforcement directly,[21] and he had never before received such a call, saying: "in my 2 ½ years, that was the first time, it's been the only time."[22]

147.    When Uriarte arrived, Carollo said he believed the construction at the property lacked permits.  Uriarte verified online with the City's iBuild website and determined the sight was "legit" and had permits.  Uriarte obtained a copy of the construction site's plans and found they were proceeding legally.

148.    Uriarte thought that would be the extent of his interaction with Carollo, but Carollo then asked if he could ride with him in the City Code Compliance vehicle, in order to point out five additional sites, located elsewhere on SW 8th Street, three of which belonged to Fuller and Pinilla, on which he wanted to search for code violations.

---

[21] Exhibit A, p. 34
[22] *Id*. pp. 34-35.

149. Uriarte stated "I don't think it is part of our job . . . it never happens . . . this was a very unusual task given to me." He continued by stating, "probably the supervisor didn't even know that he wanted to ride with me." Uriarte added that "I had to say yes" and did not want to get in "trouble for saying no to a Commissioner."[23]

150. In fact, because Uriarte and his supervisor Sierra were uncomfortable with the request for the ride-along, they called their former supervisor Diez who suggested that they put something in writing documenting the request.[24]

151. After the ride-along Carollo called Uriarte to follow-up to see if Uriarte had issued citations to the Plaintiffs for the alleged code violations Carollo had claimed existed. Uriarte directed him to Sierra for any code violations on the properties in question.

152. Sierra consequently sent James Bernat ("Bernat"), the new Acting Code Enforcement Director, an email on March 8, 2018 explaining that he "received a phone call . . . yesterday in the evening from Commissioner Carollo requesting updates on the complaints he [Carollo] gave inspector Dennis Uriarte last Saturday during their ride along." Sierra also provided updates for each complaint. A copy of the Sierra March 8 Email is attached hereto as **Exhibit C**.

153. At the time of the ride-along, Bernat was on his first week at the job as the new Acting Code Enforcement Director. Bernat stated that the ride-along was done "without his knowledge or authorization,"[25] and that Commissioners should not be going in cars or doing ride-alongs with inspectors, especially without the approval of their supervisor. Bernat has since directed his officers that they cannot participate in ride-alongs with Commissioners.

---

[23] *Id.*
[24] Exhibit A, p. 31.
[25] *Id.* p 22.

154. On the ride along, three of the five properties Carollo pointed out to Uriarte were owned by Plaintiffs. The fourth was owned by a close friend of Plaintiffs named Marcus Lapuic. When he inquired why he had been targeted, Lapuic learned from a source close to Carollo, that "because you're a friend of Fuller, you're a friend of the enemy, and therefor you're a frenemy" and was on the list of properties to consider targeting.

155. None of this occurred through the proper legal channels of the City Manager as required by the City Charter.

156. Learning that Carollo was now targeting any property associated with Plaintiffs added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

**b.     The March 14, 2018 Park and Walk – Fabricated Noise Complaints**

157. Eleven days later, on March 14, 2018, Carollo arranged for a "park and walk" with numerous City employees, including Bernat, a police officer, two Code Enforcement personnel, Sean Moy, President of the AFSCME Union, Lugo, who was also then an Executive Board Member of the AFSCME Union, and Steve Miro.[26]

---

[26] One might ask why the AFSMCE Union officials would be assisting Carollo, how they benefitted, what they owe Carollo, and why all that is relevant to this case. As Commissioner of District 3, Carollo is also the Chairman of the Bayfront Park Management Trust, a prestigious board that is responsible for the oversight of Bayfront Park. In exchange for assisting in his dirty work, Carollo rewarded Lugo, an Executive Board Member of AFSMCE, with an appointment to the Bayfront Park Management Trust Board. Not coincidentally, upon information and belief, Carollo then colluded with Lugo to have her support his initiative to gift $3 million dollars in "surplus" funds from the Bayfront Trust to the City of Miami to help the city "balance the budget" and ensure that its union workers, including those in the AFSMCE, would not suffer a pay cut. Shortly thereafter, Plaintiffs have learned that, upon information and belief, Carollo convinced the City to replace the current Chief of Code Enforcement, with AFSMCE President Sean Moy. Meaning that Carollo will now have a "friend" running Code Enforcement that will owe him a favor for ensuring his union members did not suffer a salary cut. This favor will surely come in the form of a storm of "legitimate" Code Enforcement actions against Plaintiffs.

158.    This again was done by Carollo as a City Commissioner with City employees outside the knowledge and purview of the City Manager in direct violation of the City Charter.

159.    Prior to the walk, Carollo and Lugo had visited residents in a building located to the rear of Ball & Chain on 7th Street, close to 15th Avenue.  Carollo and Lugo had visited several times and provided the residents with Carollo's cell phone number, instructing them to call him directly in the event they had complaints of any kind.  Carollo explained to the tenants that he would then call Code Enforcement himself to address any issue (which, of course, would violate the Charter).

160.    Lugo then brought Bernat to meet one of the residents who lived behind Ball & Chain, whom Carollo and Lugo had already prepped.  Not surprisingly, the woman complained of loud music after 9:00 pm at the club.

161.    Bernat further stated that he had received calls directly from Carollo's office about Ball & Chain and other businesses throughout 8th Street.  Bernat indicated that Carollo did make allegations of corrupt dealings between the MPA and Ball & Chain and stated that the valet in front of Ball & Chain was illegal and should not be allowed to operate, but he did not provide any tangible evidence.

162.    Prior to Carollo and his team's visits, there had been very few noise complaints about Ball & Chain but after Carollo's team had reached out to the neighbors, the complaints became an onslaught (orchestrated by Carollo).

163.    To assure that it could defend any false reports of noise violations, Fuller and his partners in Ball & Chain spent significant resources to implement high tech noise cancellation equipment and a master switch to control the volume of the music automatically depending on the time of the night.  This master switch could not be changed by staff.

164.    Learning that Carollo was now galvanizing broad City personnel and resources in his targeting of Plaintiffs added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## FULLER'S ETHICS COMPLAINT AGAINST CAROLLO

165.    On or about March 12, 2018, Fuller c/o The Barlington Group filed the Ethics Complaint against Carollo with the Miami-Dade Commission on Ethics and Public Trust.

166.    After the Ethics Complaint was filed, Carollo attempted to tamper with the witnesses and get them to perjure themselves.

167.    In particular, Carollo asked Miro (now his acting senior advisor) how he planned to respond to questions from investigators.  Miro responded that he would answer all questions truthfully.  Carollo was upset by this response, and instructed Miro to tell the investigators that all actions taken against properties owned by or related to the business interests of Bill Fuller/Barlington Group were the result of "anonymous complaints."[27]  Miro stated that Carollo tried to "coerce me into saying something that is totally not true" and he (Miro) would not put himself in that predicament, to lie about anonymous complaints.  "Joe wanted me to say there were anonymous complaints and there were none. I never received any anonymous complaints," said Miro, noting that in his City position, he would have to be aware of citizens' complaints.[28]

168.    From that point forward, Miro's relationship with Carollo soured, ultimately leading to his termination by Carollo on June 4, 2018.

---

[27] Exhibit A, p. 27.
[28] Exhibit A, p. 27.

169.     After Fuller filed the Ethics Complaint, and for the next five months while the investigation was pending, Carollo temporarily ceased his harassment.  There was a noticeable difference, becoming eerily quiet.  It went from a constant barrage of harassment to nothing.

170.     In fact, even the noise complaints against Ball & Chain ceased.

171.     On or about August 6, 2018, Fuller requested permission to withdraw the Ethics Complaint, and it was withdrawn as of August 13, 2018.

172.     Fuller withdrew the Ethics Complaint because it had been too narrowly drafted.

173.     An abundance of information surfaced that had become the basis of filing the Complaint in this action and possible additional filings, including both ethics and possible criminal complaints.

174.     Carollo interpreted the withdrawal of the Ethics Complaint as a sign of weakness and defeat and as a green light to resume and even ramp up his attacks on the Plaintiffs, which is jokingly now called in City circles as "Round 2."

175.     For example, after the withdrawal of the Ethics Complaint, noise complaints against Ball & Chain resumed, with the first one being filed directly by Carollo himself by text message on September 14, 2018, not by any neighbors of Ball & Chain.  (As explained further below, on October 2, 2018, Carollo was again found walking around the Ball & Chain neighborhood trying to find neighbors willing to complain).

**CAROLLO TARGETS PLAINTIFFS' CALLE OCHO MARKETPLACE**

176.     Another target on Carollo's hit list was Plaintiffs' property located at 1380 SW 8th Street, known as Calle Ocho Marketplace.  Calle Ocho Marketplace consists of two (2) contiguous

parcels of land. The first has an existing Mexican restaurant on it and the second consists of an open-air lot where Plaintiffs intended to put a kiosk marketplace.

177. To that end, Fuller and Pinilla had invested over $100,000 dollars to retro-fit containers into smaller kiosks to house the marketplace vendors.

178. On August 20, 2018, a mere seven days after Plaintiffs had withdrawn the Ethics Complaint against Carollo, Plaintiffs received a letter from the City which included notice of a code violation of Section 3.63(g) of Miami 21 at Calle Ocho Marketplace (the "Notice"). Specifically, Section 3.63(g) of Miami 21 relates to "Off-Street Parking Facilities" and states as follows:

> Inoperable vehicles and other inoperable Recreational Watercraft or equipment shall be stored only in storage facilities or other approved places where they are completely concealed from public view.

179. The Notice contended that the kiosks somehow constituted equipment and the marketplace somehow constituted a parking facility and that Plaintiffs therefore either had to fasten down the kiosks or remove them no later than August 22, 2018.

180. Given that the kiosks were actual building structures and not equipment, and further given the fact that Plaintiffs had a lawful Farmer's Market TUP and Building Permit to have the kiosks on the property, the Plaintiffs consulted with their attorney Dombrowski who reached out to Assistant City Attorney to resolve the issue.

181. On August 31, 2018, while the parties were still discussing how to resolve the matter, the City filed an Emergency Motion for Injunctive Relief ("Motion") asking the Court to either force Plaintiffs to remove the kiosks or grant the City the authority to remove ***and destroy*** every kiosk from the property.

182.   On September 4, 2018, Plaintiffs received a letter from the City indicating that it was revoking the Farmer's Market TUP on the property.  Because the TUP formed the basis for the building permit that allowed for the kiosks to be on the property, the City also indicated it would revoke the building permit, which it did 7 days later on September 11, 2018.

183.   On September 6, 2018, Judge Miguel De La O denied the Motion.

184.   That same day, the City dragged Plaintiffs in front of the Code Enforcement Board.

185.   Once again, Carollo attended the meeting.  During that meeting the City Attorney Victoria Mendez told the Code Enforcement Board that the Farmer's Market TUP never should have been issued because the lot was less than 5,000 feet.  This was a blatant lie as the plans submitted for the permit clearly indicated that there was over 8,300 square feet for the market.

186.   To add fuel to the fire, Carollo delivered a defamatory and false speech, lasting more than 10 minutes, attacking the Plaintiffs. Carollo argued that while the Plaintiffs had a Farmer's Market permit, he knew they were not going to sell vegetables but rather would hock goods as they would in a fourth or fifth world market.

187.   The combination of the City Attorney's lie regarding the square footage of the lot and the false and defamatory statements made by Carollo to the Board, resulted in the Board's decision to give Plaintiffs less than 48 hours to remove the kiosks or else start to incur fines of $250 per day.

188.   Believing that they had been significantly wronged and intending to challenge the revocation of their permits, Plaintiffs did not remove the kiosks by the deadline.  Accordingly, the City requested an emergency hearing at the next Code Enforcement Board Meeting on September 12, 2018.

189.   Plaintiffs attended the hearing with their attorney who attempted to explain the errors behind the revocation of the TUP and the false statements made to the Board by Victoria Mendez.  Rather than give the Plaintiffs a chance to argue their case, the Board, who had clearly been prejudiced by the prior statements made by Carollo and Mendez, granted the City permission to enter the property and remove the kiosks.

190.   This whole chain of events added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

### CAROLLO'S RETALIATION AGAINST THE PLAINTIFFS' USE OF THE 7TH STREET PARKING LOT

191.   On the morning of Saturday, September 15, 2018, at approximately 12:30 am, three City of Miami Code Enforcement Officers and a police officer showed up at Ball & Chain to complain about alleged illegal parking on a lot owned by Plaintiffs that was adjacent to Ball & Chain.  According to Code Enforcement, they were there as a result of an "anonymous" complaint about illegal parking.  The lot, which is zoned commercial and therefore may be used for parking, is utilized by the employees of Ball & Chain to park their cars while they are at work.

192.   Fuller was not there but both the valet manager and general manager dealt with the officers. The Code Enforcement officers issued Plaintiffs a citation for illegal parking and failure to have a Certificate of Use on the lot and then, at the direction of the police officer, forced all of the employees to stop working and immediately move their cars.

193.   The problem with that is Code Enforcement is only empowered to issue citations. Citations can then be contested.  Code Enforcement is not empowered to take affirmative action to remove perceived code violations prior to a hearing.

194.    This process took approximately an hour as 25 employees – management, waiters, bartenders, busboys, the disc jockey – all took turns leaving work and moving cars, resulting in a significant disruption of work at Ball & Chain.  The Code Enforcement officers and police remained on the premises essentially intimidating the staff until every car had been moved.

195.    Later that morning, after having learned about the incident, Fuller called a Code Enforcement Officer (the "Officer") to inquire as to why the citations were issued when the parking was legal.

196.    The Officer informed Fuller that he was not aware that Code Enforcement had been sent to Ball & Chain but said he would investigate and get back to Fuller.  Approximately a half hour later, the Officer called Fuller back and said there must have been a mistake because the lot was zoned commercial and could be used for parking and that he would see what he could do about it.

197.    On Monday, September 17, 2018, Fuller made a public records request to try to ascertain the source of the complaint.

198.    On Tuesday, September 18, 2018, just as he was walking into a previously scheduled meeting with the Officer, he received a response to the records request which included a screenshot of a **text message sent by Carollo to the City Manager on September 15, 2018 that said "Mr. manager 1530 sw 7 street still parking illegally and music blaring in violation of city code.**"

199.    Here is a picture of the actual text message:



200.     Neither the Code Enforcement officers nor the police officer mentioned any noise complaints while they were at Ball & Chain and no citation had been issued for excessive noise while they were there.  Fuller, armed with the knowledge that it was Carollo who made the complaint directly, and who was with his attorney Dombrowski at the meeting, again discussed the events of Friday night with the Officer.  The Officer told Fuller "no hard feelings but we received an anonymous complaint."  At that point, Fuller showed the Officer the screenshot of the text message from Carollo and said that there was nothing anonymous about it.  Carollo had

contacted the City directly to send Code Enforcement to cite the bar.  In response, Officer stated, "[h]oly shit!"

201.    The Officer then advised Fuller that Ball & Chain also received a noise citation on Friday night.

202.    When Fuller explained that they had not received any noise violation and that despite being on the property for almost two hours, the Code Enforcement officers never mentioned a noise violation or took any decibel readings, the Officer looked in the computer and confirmed that nothing had been issued.

203.    Approximately an hour after the meeting at 3 pm on Tuesday, September 18th, a violation was posted outside Ball & Chain for excessive noise with a date of September 15, 2018.

204.    In his testimony before the Ethics Commission, Daniel Sierra explained that it was new code enforcement policy that whenever noise complaints were issued, the Code Enforcement officer had to return to the establishment cited every 45 minutes to verify whether they were in violation of the noise ordinance.[29]  Despite this official policy on noise violations, no one said a word to anyone at Ball & Chain on the night of the 15th about a noise violation and no one returned in 45-minute intervals to take decibel readings.  Nonetheless, the notice of the noise violation from that night was posted on the outside of Ball & Chain on September 18th following Fuller's meeting with the Officer, three days after the alleged violation occurred.

205.    This was obviously Carollo manufacturing a false noise violation against Plaintiffs' businesses, and with the City's assistance in pursuing this false and belated noise violation.

---

[29] Exhibit A, p. 34

206.     This false noise complaint is of great significance since, with three such (false) complaints, Carollo may attempt to force Ball & Chain to shut down permanently.

207.     This chain of events, and confirmation of Carollo's continued attacks on Plaintiffs and their associated businesses, with the aim of shutting them down, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.  It also caused significant monetary damage and all claims for monetary damages that have been suffered by entities associated with Plaintiffs have been assigned to Plaintiffs in their individual capacities.

## CAROLLO IS DISCOVERED LURKING BEHIND BALL & CHAIN NEXT TO THE 7TH STREET PARKING LOT AT 9 PM SEARCHING FOR CODE VIOLATIONS

208.     On October 2, 2018 at 9 pm, one of the Ball & Chain managers was returning to his car in the 7th Street parking lot when he noticed three men standing next to the lot in front of some residences discussing Ball & Chain.

209.     One of the men was Carollo.  The second was Saul Cimbler, a Cuban-American attorney who has been suspended by the Florida Bar and who runs a business assisting people to "legally do business in Cuba."[30]  It is not clear why Carollo had Cimbler with him lurking behind Ball & Chain.

210.     The third was Frank Pichel, a current member of the Code Enforcement Board.   It is highly suspicious why Carollo would be with a Code Enforcement Board Member in the dark in the back of Ball & Chain on a Tuesday night. Moreover, Mr. Pichel's participation again

---

[30] http://loramedia.com/blog/team/saul-cimbler/

signifies the City's knowledge and support for Carollo's unconstitutional retaliation against the Plaintiffs.

211.     After discussing the fact that the residences were over 100 feet away from the music playing at the bar, Carollo went over to the apartments and began knocking on doors to ask the residents about the music, to see if he could find any to file a noise complaint against Ball & Chain.

212.     At that point, the General Manager arrived on scene and began filming Carollo. Realizing that he was on film, Carollo became very defensive, took out his phone and started filming the Ball & Chain employees. Here is a photo from that night.



213.     The General Manager subsequently spoke to the people living in the apartments where Carollo had been knocking on doors.  The neighbors stated that they had no issues with the music coming from Ball & Chain and that most times they did not notice it.  They confirmed that no complaints had been made that night and they did not know why the Commissioner was knocking on their doors at 9 pm on a Tuesday night.

214.     While the video clearly shows Carollo at the location, the third man, Pichel, who sits on the Code Enforcement Board and, if he does not recuse himself, would be ruling on any noise complaints, refused to be on video and hid behind a tree.

215.     Carollo's continued stalking of Plaintiffs, bringing along members of the Code Enforcement Board, added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

**CAROLLO'S RETALIATION AGAINST VIERNES CULTURALES**

216.     Fuller is President of the neighborhood organization Viernes Culturales, a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival held on the last Friday of every month on Calle Ocho.   Viernes Culturales is currently in its 18th year.

217.     One of the main areas that the festival utilizes to house its vendors is Domino Plaza. On a typical Friday night, there would be a cultural gathering such as the following:



218.     In August 2018, Carollo ordered that Domino Plaza be shut down and physically barricaded.  No public reason was ever given.

219.     However, when the security guard at Domino Plaza was asked why it was shut down, she said it was at the order of the Commissioner.  Asked how she knew Carollo had closed it, she said he had come to the site on Thursday to make sure it was shut down.

220.     Domino Plaza reopened on August 29, 2018, and on Friday, August 31, 2018, just two hours before Viernes Culturales was set to begin, he ordered it shut again.  The excuse was "pothole repair," but in reality there were only a few tiles that had been removed (probably at the order of Carollo).

221.     Since the Plaza was completed in the mid 2000s, Viernes Culturales has always used the Plaza for the event.  It has never had to relocate for a festival.  Carollo's forced relocation resulted in many people believing that the festival was canceled.

222.     Carollo's closing of Domino Plaza is a direct attempt to target and destroy Viernes Culturales simply because Fuller is the President.

223.     In fact, another City Commissioner has stated explicitly that Carollo is targeting the festival to "fuck with Fuller."

224.     During his sworn statement, Miro explained that Carollo had hired his attorney to form a competing organization to Viernes Culturales that he hoped would replace it.  Miro explained "[s]o he had his attorney, Ben Kuehne open up another corporation of the Que Pasa Little Havana I believe.  You got to check Sunbiz for that, that's what I believe it's called.  To take

-- take over Viernes Culturales."[31]  When Fuller asked Miro why Carollo would want to take over

Viernes Culturales, Miro replied, "Just because it's yours."[32]

## CAROLLO'S RETALIATORY DEFAMATION AGAINST PLAINTIFFS

225.    Carollo has also gone on popular radio shows and defamed Plaintiffs and their

businesses and their tenants.

226.    This defamation is part and parcel of Carollo's retaliation against Plaintiffs and is

aimed specifically to harm their businesses.

227.    On the Raul Martinez show, Carollo, referencing Plaintiffs specifically, said:

> *"There is a large group of people buying property in the historic part of Little Havana to de-Cubanize and de-Latinize Little Havana".*

228.    Carollo further alleged that Plaintiffs were connected to the corrupt socialist

dictatorships in Cuba and Venezuela, claiming that Plaintiffs were:

> "*Being supported by a small group of Venezuelans that have companies in Panama or the father of one of them is a Venezuelan ambassador to Cuba.*"

229.    Carollo then alleged that the corrupt Venezuelans were:

> "*leaving El Padrino [referring to Plaintiff Bill Fuller] to operate like a Godfather buying places full of code violations, buildings and nothing happens.*"

230.    Carollo then claimed that Plaintiff Fuller:

> "*has purchased all of the major commercial properties of Calle Ocho and he says that 'we buy properties from investors funds'*"

231.    Carollo further suggested and implied that Plaintiff Fuller's money for investment

was coming from corrupt Venezuelans:

> *"This guy has been buying properties for 4 years, he had said that he didn't have any money and suddenly he has it.  From where is this money coming?"*

---

[31] Exhibit B, p. 18, ll. 13-25 and p. 19, ll. 1-19.
[32] *Id*.

232.     Carollo next falsely claimed that Fuller was sending City inspectors to pressure property owners to sell their property to Fuller:

> *"Then, I hear stories of merchants even 3rd generation merchants that operate here, Cubans, other no Cubans that are Hispanics that have businesses, that 'they' are sending those city inspectors, another way to pressure them to sell their businesses to them, this is ugly."*

233.     During the Radio Actualidad show, Carollo falsely claimed that Plaintiff Fuller (a) "Operates all of his businesses without permission," (b) was "Robbing money from the City of Miami by not paying valet fees," and (c) that "Ball & Chain has caused prostitution on Calle 8."

234.     Each of Carollo's statements listed above was knowingly false, malicious, published widely to the community, and intended to harm Plaintiff Fuller and his businesses.

235.     Further, Carollo uses his perceived immunity to defamation as a public official to intentionally defame Plaintiffs in order to harm their reputation and cause economic damages.

236.     Carollo's false and defamatory statements have caused Plaintiffs' to suffer mental anguish and emotional distress and have harmed Plaintiffs' reputations.

## CAROLLO'S ATTEMPT TO DESTROY VIERNES CULTURALES AFTER THE FILING OF THE COMPLAINT IN THIS ACTION

237.     Undeterred by the filing of the Complaint in this action, and a stay entered by this Court based on Carollo's attorney's representations that Carollo was busy with upcoming elections, Carollo and the City's retaliatory action towards Fuller, Pinilla and Viernes Culturales has continued.

238.     During the 18-year history of the Viernes Culturales festival, and right up until October 2018, Viernes Culturales had never applied for or obtained a special events permit in relation to Domino Plaza, where a key part of the festival occurs. And despite its heavy

involvement in the festival, prior to October 2018, the City has never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

239.    The first time Viernes Culturales applied for a special events permit for use of Domino Plaza was for the October 2018 event.  The reason Viernes Culturales did so in that month was because Mr. Fuller learned that Carollo was planning to apply for a permit for himself for that same day, in order to block the Viernes Culturales festival.

240.    Accordingly, Pati Vargas, the Director of Viernes Culturales, applied for and was granted a special events permit for the event on the last Friday of October, 2018.

241.    Ms. Vargas had been asked to secure permits for the remaining fourth Fridays of each month as well.  When she submitted the application for the last Friday of November, however, she was informed by the City that Commissioner Carollo had in fact beaten her to the punch and filed his application for use of the Plaza (the same location) for the fourth Friday of each month (the same time period), for the **next year**.

242.    Specifically, the City stated: "Please be advise [sic] that at this time you [sic] application for Viernes Culturales for Domino Plaza can't be process [sic] since the park has been reserve [sic] for those days."

243.    Plaintiffs obtained a copy of the application Carollo submitted, which he did on November 8, 2018. The application was submitted in Commissioner Carollo's own name, and the City Attorney, despite being fully aware of Carollo's retaliatory conduct, has rebuffed complaints from Viernes Culturales, stating that Commissioners have the right to reserve public spaces whenever they want.

244.    Accordingly, not only did the City condone Carollo's unconstitutional retaliation against Plaintiffs and Viernes Culturales, but assisted Carollo in doing so by, for the first time in

18 years, requiring that Viernes Culturales obtain a permit for Domino Plaza and assisting Carollo in reserving that location/time period that had been consistently used by Viernes Culturales.

245.     Commissioner Carollo has not even tried to pretend that his intention is anything other than destroying Viernes Culturales.  In an interview Carollo gave to the Miami Herald for a story entitled *"Joe Carollo wants to force out Viernes Culturales and host his own monthly festival,"* Carollo claimed that Viernes Culturales' festival has become a "tired, lackluster event" that is little more than a "flea market," and he "thinks he can do better with food, merchants and music," and that this would not be a one time affair but rather, "[w]e're going to do that every month, to bring Little Havana back alive again."[33]

246.     Additionally, after Plaintiffs filed a Motion for Temporary Restraining Order in this lawsuit against Carollo, to restrain Carollo from holding his event on the last Friday of each month, Carollo, through the City, began sending out false advertisements about the event to gain further support.

247.     Specifically, Carollo sent out the following advertisement:



---

[33] https://www.miamiherald.com/news/local/community/miami-dade/little-havana/article221762265.html

248.     The text of the advertisement claims that for Carollo's event there would be "a performance by our very own 'Mr. 305' Pitbull."

249.     When contacted by the Miami Herald, Pitbull flatly denied that he would be performing at Carollo's event.

250.     Upon information and belief, Carollo, with the assistance of the City and its Twitter Feed, knowingly published the above false advertisement as part of Carollo's effort to destroy Viernes Culturales and retaliate against Plaintiffs by attempting to gather public support for the event, despite all of the negative press coverage.

251.     Since the Miami Herald story ran noting that Pitbull would not in fact be appearing, the City removed the false advertisement from its Twitter Feed.

252.     Additionally, while Carollo has told the Miami Herald that Viernes Culturales had become a "glorified flea market," Carollo's staff has nevertheless contacted the very same vendors that put on the Viernes Culturales festival to secure their participation in Carollo's proposed festival.

253.     While Plaintiffs have provided in detail many of the unconstitutional actions of Carollo, the City and Lugo above, there are additional instances of retaliation and harassment that are not specifically alleged herein.

254.     Knowing that Carollo would seek to destroy a non-profit organization, created by the City itself and devoted to improving the community, solely because Plaintiff Fuller had become associated with the organization, has added to Plaintiffs' mental anguish and emotional distress, including sleeping difficulties and other physical ailments.

## VALETINE'S DAY COMMISSION MEETING

255.     On Thursday, February 14, 2019, Carollo raised the issue of "code compliance" with the full City commission.

256.     However, the sole focus of the presentation was Carollo's efforts to go after Plaintiffs' properties in Little Havana.

257.     As the Miami Herald reported, "Carollo raised concerns almost exclusively about Fuller-owned properties Thursday."

258.     Carollo had called upon city officials to speak during what at times seemed like a series of depositions.

259.     He presented false and misleading documents and photographs claiming to  show various code violations on Plaintiffs' properties.

260.     To prepare these false accusations, Carollo had shut down the City's microfiche department for two days so his people could scour the past history of Plaintiffs' properties.

261.     Carollo advocated to have the City shut down a number of Plaintiffs' businesses claiming they had "life safety" issues.

262.     Carollo claimed that the fact that Plaintiffs had not received many more code violations was due to "selective protection" by current and past City officials.

263.     Carollo convinced a number of other Commissioners to pass a resolution calling for a "task force" to investigate code compliance issues.

264.     About a week after the meeting, City Attorney Mendez emailed several top city administrators asking them to conduct new site inspections and to review all city records for multiple properties discussed on Feb. 14, 2019.  Of the eleven (11) 11 properties Mendez listed, seven (7) are owned by Fuller and his affiliates or associated with Fuller-owned businesses.

265.    Miami's Chief of Police sent a letter to the City Manager regarding Carollo and the

City Attorney's unlawful targeting of Plaintiffs:

> the item on the agenda was a discussion item, however, the main focus of the discussion was aimed at one particular business owner in the city. The resolution that the city attorney prepared pertains to 'properties describe[d] at the 2/14/2019 city commission meeting.' However, the addresses forwarded in her email targets the particular business owner [Plaintiffs] which gives the impression that the city is selectively targeting his business for new investigations. **The concern is that this request, through the city attorney, may amount to an <u>unsanctioned and unlawful exercise of powers</u> beyond the limits of his [Carollo's] legislative power <u>as a city commissioner to intentionally cause harm to a business owner</u>. As such my departments actions under the resolution may be in violation of the code of ethics ordinance.**
>
> **Furthermore this is selective enforcement against the business owner's properties using city ordinance.**

266.    Deputy City Manager Joe Napoli also voiced his worries to Gonzalez in response

to Mendez's request: "I am concerned that what the City Attorney is directing our staff to do is

beyond what was directed by the Commission and can be interpreted as targeting businesses," he

emailed his boss.

267.    Zerry Ihekwaba, another assistant city manager, echoed Napoli in another email:

"We ought to be enforcing the Code citywide and not just targets," he wrote.

268.    And Miami's Mayor, Frances Suarez, summed it up best, when he said: "**we as a**

**government are being used as an instrument for political vengeance**."

## <u>FIRST AMENDMENT RETALIATION, NOT CODE VIOLATIONS</u>

269.    Evidence that Carollo's targeting of Plaintiffs is based upon political retaliation,

and not concern about code violations, is easily found by looking at Carollo's own long history of

code violations.

270.    A complete microfilm search of Carollo's residence 3230 Morris Lane, a property

that he purchased in January of 2001, revealed the Carollo has engaged in repeated violations of

the same City Code he claims that he is protecting.  Specifically, Carollo, violated City Code in at least the following ways:

- By erecting an illegal and unsafe entrance arch with a mature bougainvillea growing through it without pulling a permit;

- By constructing an illegal and unsafe rooftop deck, that appears  to be in a state of disrepair or in the process of ongoing construction without ever having pulled a permit;

- By erecting (again with no permit) three illegal and unsafe carport structures that anyone with a minimal understanding of the South Florida Building code knows would never qualify for a building permit due to its inability to hold up during a hurricane; and

- By engaging in the the systematic, cutting and eventual killing of a mature, native, old growth, banyan tree on his property-an act that is specifically prohibited by City Code and punishable by fines in the thousands of dollars.

271.    Plaintiffs held a press conference in front of City Hall to make the City aware of Carollo's failure to follow the City Code and resulting violations.

272.    In response to this public exposure, the City initially refused to issue citations for Carollo's code violations.

273.    After additional public pressure, the City did issue citations to Carollo, but the City never followed through to inspect Carollo's properties for additional code violations that were not visible from the outside.

274.    Incredibly, despite being found guilty of violating the Code, Carollo continued with his violations by taking actions to remediate the issues without first pulling permits-additional illegal behavior.

**Carollo's Efforts To Prevent Plaintiffs From Purchasing Additional Properties**

275.     It has recently come to Plaintiff's attention that Carollo, perhaps having been forced to accept that his code violation jig was up, has focused his attentions on a new plan of attack against the Plaintiffs.

276.     Specifically, Plaintiffs have learned that since late 2018, Carollo has engaged in a campaign to direct City officials to utilize City resources and funds.

277.     In an attempt to purchase properties adjacent to Plaintiff's current properties and most of which, Plaintiffs had made prior offers to purchase themselves.the very same properties Plaintiffs had been attempting to purchase.

278.     Those properties, which include 711 SW 15th Ave., 1474 SW 7th St., 1510 SW 7th St., and 200-230 SW 12th Ave., because they are adjacent to Plaintiffs' current properties, are all natural extensions of Plaintiffs' properties and businesses.

279.     In fact, at least 2 of the properties targeted were "off market" and were unsolicited offers by the city.

280.     In one case, Plaintiffs offered a seller $1M for his property on 15th Ave, an offer that was already a premium to market valuations, and he scoffed, saying "the city already offered me $1.32M." The city did not end up buying the property because the actual appraisal came back at $850k.

281.     This harms Plaintiffs overall business strategy.  By doing this, Carollo and the City are artificially inflating the market, and boosting the value expectation of these potential sellers and thereby making the properties difficult to acquire.

282.     The mandate by the Carollo and the City is clearly to "buy properties around" Plaintiffs and not to "buy 15th Ave properties" because, if it had been the latter, then the City

would have clearly offered to buy Plaintiffs' properties at the same premium, which it has not done.

## SUMMARY OF DAMAGES

283.    Plaintiffs have suffered through more than a year and a half of emotional distress and mental anguish.

284.    This emotional distress and mental anguish has been growing and compounding with each retaliatory act by Carollo.

285.    Plaintiffs have been unable to sleep at night.  They have spent many nights awake. The little sleep they have gotten has been disturbed.

286.    Plaintiffs became concerned for their safety and the safety of their families.

287.    On more than one occasion Plaintiffs called the police department to report suspicious vehicles parked near their homes or businesses.

288.    Plaintiffs cannot escape the feeling that Carollo and the City are seeking to fabricate evidence, complaints, and violations, all with the sole purpose of shutting their businesses and destroying their lives, all because they supported Carollo's political opponent.

289.    Carollo has unlimited funds and resources to try to destroy the Plaintiffs and their businesses and their families and to shut down their livelihood and their ability to provide for kids

290.    Plaintiffs spent a large part of their lives building a great business with a great portfolio of properties, and developed a stellar reputation in the community.

291.    The injury has not only been mental or emotional.  Plaintiffs' physical appearance and well-being has changed and their physicalhealth has suffered..

292.     In addition, Plaintiffs' ability to conduct their daily business has become significantly more difficult due to Carollo.  Potential business partners are reluctant to do business with Plaintiffs for fear of becoming targets of Carollo.

293.     In fact, one businessman who had committed to a major project with Plaintiffs pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo.  This alone cost Plaintiffs $5 million.

294.     Carollo's attacks on Plaintiffs' Calle Ocho Marketplace have caused Plaintiffs to suffer monetary damages in excess of $1.8 million.

295.     Carollo's various attacks on Plaintiffs' businesses and tenants in the Futurama building have caused Plaintiffs to suffer monetary damages in excess of $600,000.

296.     Carollo's various attack on Taquerias El Mexicano have caused Plaintiffs to suffer monetary damages in excess of $525,000.

297.     Carollo's various attacks on Ball & Chain have caused Plaintiffs to suffer monetary damages in excess of $370,000.

298.     All claims related to monetary damages have been assigned by the relevant business entity to Plaintiffs in their individual capacities.

## COUNT I
## VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH
## AND FREEDOM OF ASSOCIATION
### (First Amendment Retaliation—Against Carollo)

299.     Plaintiffs reallege paragraphs 1 through 298 above as though fully set forth herein.

300.     The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the

right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

301.    The First Amendment rights to freedom of speech and association protects not only the affirmative rights to free speech and association but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.

302.    Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights.  The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ***.

42 U.S.C. § 1983 (2012).

303.    The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

304.    The United States Constitution's First Amendment guarantee to free speech and free association applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

305.    Plaintiffs exercised their right to free speech and free association by supporting Mr. Leon in the run-off election and hosting a rally for Mr. Leon on Plaintiffs' property.

306.    Carollo discovered the rally for Mr. Leon being held on Plaintiffs' property on November 18 and November 19, 2017, and discovered Plaintiff Pinilla at the rally itself.

307.    Upon winning office, Carollo immediately retaliated against Plaintiffs by instituting a campaign of harassment beginning that very same day.

308.     Carollo's discovery of the Leon rally at Plaintiffs' property on November 18, and Carollo's retaliatory campaign of harassment beginning that same day, and continuing each day thereafter, establishes causation between the exercise of free speech and the retaliation.

309.     In addition, causation is also established by the testimony of Mr. Miro, Carollo's own top advisor.  When asked why Carollo was targeting the Plaintiffs, Miro answered: "**obviously, [Fuller] went against him in the commissioners by donations to -- giving him building and what have you.**"

310.     Causation is also established by the testimony and statements of the many other City employees.

311.     In addition, Carollo's retaliatory actions temporarily ceased upon Plaintiff Fuller's filing of the Ethics Complaint against Carollo in late March 2018. However, within days of Fuller's withdrawal of the Ethics Complaint, Carollo resumed his campaign of harassment, this time in retaliation for both the exercise of their First Amendment rights in supporting of Leon and for the exercise of their First Amendment rights in filing the Ethics Complaint.

312.     Carollo was at all times acting under the color of state law (including when he was criminally violating the City Charter).

313.     Carollo's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity.

314.     As a result of Carollo's retaliation, Plaintiffs are reluctant to participate in the political process by supporting candidates for office.

315.     In addition, as a result of Carollo's retaliation, Plaintiffs have suffered out of pocket losses and other monetary harms associated with disruption to their various businesses in an amount to be proven at trial.

316.   Carollo was not acting within the scope of his discretionary authority as a Miami City Commissioner.  In fact, by directing City employees to target Plaintiffs, Carollo was violating the Miami City Charter.

317.   In addition to the monetary losses, Plaintiffs have suffered impairment to their reputation, personal humiliation, emotional distress and mental anguish and suffering.

318.   Plaintiffs also are entitled to punitive damages to punish Carollo's reprehensible conduct and to deter its future occurrence.  Carollo's conduct was reprehensible in that it was repeatedly violating the Miami City Charter's rules designed to prohibit this type of behavior, designed to preclude commissioners from threatening City employees to get them to carry out the commissioners' personal vendettas.  It was reckless in its disregard for Plaintiffs' free speech rights.  And it was, and is, motivated by an evil intent – to drive Plaintiffs out of business and deprive the residents of Little Havana of all the positives the Plaintiffs have brought to the neighborhood.

319.   Plaintiffs also are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Awards Act of 1976 (42 U.S.C.A. § 1988[b]).

320.   Finally, Plaintiffs also seek a permanent injunction against further retaliation against them and further violations of the Miami City Charter as (a) there is no adequate remedy at law, (b) Plaintiffs will suffer irreparable injury if the injunction is not granted, (c) the injury to Plaintiffs, including the deprivation of their constitutional rights, outweighs any harm that could be caused to Carollo from having to follow the law, and (d) the injunction would benefit, and not be adverse, to the public interest.

321.   Among other things, Carollo should be permanently enjoined from:

a. making any requests to, or providing any instructions or suggestions to, any City employees that target Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs;

b. directly soliciting any complaints and/or demands regarding Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs, including but not limited to, directly contacting, or going door-to-door to the surrounding neighbors of Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs to seek complaints for noise or other violations; and

c. participating in any decision of the Board of Commissioners in relation to any matters that target the Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs, including but not limited to noise violations, permits, zoning, or licenses for Plaintiffs, Plaintiffs' properties, employees, tenants, or any affiliates of Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in the Plaintiffs' favor against Carollo and award damages for business disruption, emotional distress, reputational harm, punitive damages, attorneys' fees, enter a permanent injunction against Carollo enjoining him from further retaliation against Plaintiffs, and grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.

Respectfully submitted,

**AXS LAW GROUP PLLC**
2121 NW 2nd Avenue
Miami, FL 33127
Tel: (305) 297-1878

By: _____/s/ Jeffrey W. Gutchess_____
**JEFFREY W. GUTCHESS**
Florida Bar No. 702641
Jeff@axslawgroup.com

*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the forgoing was served via

CM/ECF on counsel of record in this action on this 28th day of June, 2019:


**Benedict P. Kuehne, Esq.**
Kuehne Davis Law, PA.A.
Miami Tower, Suite 3550
100 SE 2nd Street
Miami, FL 33131-2154
Tel: 305-789-5987
Fax: 305-789-5987
Email: ben.kuehne@kuehnelaw.com
*Counsel for Defendant Carollo*

**Thomas E. Scott, Esq.**
Cole, Scott & Kissane P.A.
Cole, Scott & Kissane Building, Suite 1400
9150 South Dadeland Blvd.
Miami, FL 33156
P: 305-350-5381
F: 305-373-2294
Thomas.scott@csklegal.com
*Counsel for Defendant Carollo*

**Robert Zarco, Esq.**
**Alejandro Brito, Esq.**
Zarco Einhorn Salkowski & Brito, P.A.
One South Biscayne Tower
2 South Biscayne Boulevard, 34th Floor
Miami, FL 33131
rzarco@zarcolaw.com
abrito@zarcolaw.com
apiriou@zarcolaw.com
*Counsel for Viernes Culturales/Cultural Fridays, Inc.*


*/s/ Jeffrey W. Gutchess, Esq.*

# EXHIBIT A



## Miami-Dade Commission on Ethics & Public Trust
## Investigative Report

**Investigators: Nilda Olmo/Karl Ross**

| Case: C18-14-03/ K18-21 | Case Name: Fuller v. Carollo, et. al. | Date Opened: 03/12/18 | |
|---|---|---|---|
| Complainant(s): Bill Fuller c/o Barlington Group | Subject(s): **Joe Carollo** Commissioner, City of Miami, District 3 **Steve Miró**, Former Aide/District Liaison for Commissioner Carollo **Alberto Parjus**, Former Assistant City Manager **Mary Lugo**, Union Rep. AFSME LOCAL 1907 | | |

## Relevant County Ethics Code Ordinance:

Miami-Dade County Conflict of Interest and Code of Ethics Ordinance Sec.2-11.1
(g) *Exploitation of official position prohibited.* No person included in the terms defined in Subsection (b) (1) through (6) and (b) (13) shall use or attempt to use his or her official position to secure privileges or exemptions for himself or herself or others except as may be specifically permitted by other ordinances and resolutions previously ordained or adopted or hereafter to be ordained or adopted by the Board of County Commissioners.

**Allegation(s):**

This investigative report is predicated on a formal complaint filed by Bill Fuller (Fuller), c/o The Barlington Group, on 03/12/18. The complaint was filed against City of Miami District 3 Commissioner Joe Carollo (Carollo), Steve Miró (Miró), former Aide to Carollo, Mary Lugo (Lugo), City of Miami employee and currently Board Member of American Federation of State, County and Municipal Employees LOCAL 1907 (AFSCME) and Alberto Parjus (Parjus), former Assistant City Manager, currently Deputy Director for Miami-Dade County Transportation and Public Works (DTPW). Fuller alleges the aforementioned parties have acted and/or are acting outside the scope of their official duties, and in violation of the Conflict of Interest and Code of Ethics Ordinance, as follows:

**1. Commissioner Carollo's Pre-Election Illicit Interference with Complainant**. On 11/18/17, Fuller alleges that during a rally for Alfie Leon, Carollo's opponent in the runoff elections for District 3, Miro arrived and proceeded to photograph the event, confronting attendees and questioning the nature and legality of the event. The rally was held on a lot owned by Fuller. City of Miami Code Enforcement Inspectors as well as police arrived shortly thereafter, shutting down the event. Fuller learned that Carollo, with the assistance of Miro, Parjus and Lugo, had called City of Miami Special Events Department and Code Enforcement to demand the shutdown. Fuller received a text from Miro the following day confirming that Carollo's camp was responsible for the shutdown.

**2. Commissioner Carollo's post-election unsanctioned and unlawful exercise of powers beyond the limits of his legislative power as a City of Miami Commissioner to intentionally cause harm to complainant.**

**(a) Commissioner Carollo's attempt to shut down the Barlington Group's private Christmas party.** On 12/15/17, the Barlington Group held their holiday party at the Tower Hotel, located at 1450 SW 7th Street, a private property owned by Fuller and his partner Martin Pinilla. At approximately 9:00PM, Fuller stated that Code Enforcement Officer Scarlet Morua (Morua) arrived at the property stating Code Enforcement had received a complaint from a neighbor regarding a potentially unsanctioned party. Fuller indicated Morua spent over 2 hours outside the property, in plain view of the guests, thereby causing a sense of intimidation to the guests that included family members and young children. Morua questioned Fuller regarding the Certificate of Use (CU) and thereafter left the premises stating that she would confirm the information and in the event one was not issued the event would be shut down. Approximately an hour later, Morua returned and advised Fuller he was not in violation. By that time, Fuller stated the guests had left due to the level of discomfort created by the Code Enforcement presence. That same night, at approximately 1:00AM, Fuller received a call from the property manager indicating that a Code Enforcement representative had returned asking to speak with him and provided Fuller with a contact number. Upon contacting the representative, Fuller was informed that Lugo had made several calls and sent photographs of possible illegal drugs at the holiday party, leading to Morua being dispatched to that location.

**(b) Albert Parjus's attempt to target the business operations of Ball & Chain.** Fuller indicates that at least on one prior occasion, Parjus, in his role as Assistant City Manager, contacted a Code Enforcement employee requesting that Code Enforcement cite Ball & Chain (business co-partnered by Fuller) for a code violation. With no apparent basis for citing and no existing complaints at the time, the employee inquired as to the reason for

citing them to which Parjus responded a noise violation for music would be a good generic reason. Stating that would not be ethical, constitute selective enforcement by the department and illegal, the employee refused to participate in the request.

**(c) Commissioner Carollo's unsanctioned "investigation" into Ball & Chain's Valet Operator's Parking Lot leases.**

On 02/18/17, at approximately 1:30 AM, Fuller alleges Carollo in his private vehicle driven by him and accompanied by several unidentified associates entered a parking lot attached to St. Peter & Paul Orthodox Christian Church, located at 1411 SW 11 St. Fuller indicated that at night the lot is leased from the Church by Ball and Chain valet operator S.H. Valet.

On the night in question, the complaint alleges that the valet attendant noticed a female on the premise and when approached, she stated she was there to visit the priest but did not enter the church and proceeded to photograph parked cars. He confronted the female and asked her to stop photographing the area and leave the property. At that point, Carollo flashed his City of Miami identification and told him he was there on an official capacity, as a City of Miami Commissioner, performing an "official investigation" on the valet operations.

Shortly thereafter, valet operator Alain Garcia (Alain) arrived at the location and approached Carollo and indicated that the valet operation leases the lot at night from the Church and that said lot had been approved by Miami Parking Authority. When Garcia questioned Carollo about his presence at the location, he responded, "I am the law" and continued by stating that although he (Garcia) might be a hard worker doing his job, he was "working for a millionaire." At that point Carollo was asked to leave the property and prior to leaving he told Alain he would receive the official result of his "investigation" in the next few days, exiting the lot.

**(d) Commissioner Carollo's continued selective enforcement against Fuller's properties of City of Miami Ordinances.**

**(e) Commissioner Carollo's direct usurpation of the administrative powers of the City Manager to interfere with the operations and procedures of the MPA.**

On 03/03/18, City of Miami Parking Authority (MPA) contacted S.H.Valet revoking their valet permit for Ball & Chain, without prior notification, even though a day earlier, as per complainant, S.H. Valet had been to MPA and the account was in "good-standing." The complaint alleges that Humberto Escandón (Escandón), Senior Manager of Operations, MPA, who contacted S.H.Valet on the above mentioned date, stated the revocation was a result of a complaint received by Carollo's office, indicating the lots utilized by S.H. Valet for Ball & Chain were "not to code." Complainant notes that the same lots had been vetted and approved by the MPA for over 3 years.

3

An agreement was reached and S.H. Valet was permitted to operate with the caveat that they would utilize a storage lot owned by the Complainant, located at 300 SW 12 Ave., until the MPA was able to further investigate the status of the lots herein mentioned. Further alleged, at approximately 11:30 PM, Carollo was seen outside Ball & Chain in his vehicle and proceeded to follow a valet driving a patron's vehicle to the storage lot agreed upon earlier that day. A photograph depicting Carollo inside his vehicle by the storage lot was attached as part of the complaint. As a result of the disruption caused by the lots' revocation and the distance between Ball & Chain and the storage lot, patrons expressed significant dissatisfaction with the valet operations and refunds had to be issued to those patrons, causing significant financial harm and monetary damages to the establishment.

**Investigation:**
*Interviews:*

On April 23, 2018, at the request of Commissioner Carollo, COE Executive Director and Investigator Nilda Olmo met with Carollo at the COE office. Carollo stated that he was in receipt of the complaint and denied the allegations. Carollo was concerned about "corruption" and "illegal activities" occurring on Fuller's properties. Investigator Olmo and Mr. Centorino listened to Carollo's statements and the Commissioner was advised that he would be formally interviewed at a later date.

Carollo indicated that he was introduced to Fuller by Art Noriega in 2017, when campaigning for District 3 Commission. He met Fuller a second time with partner Pinilla where he said Fuller bragged about being close to Noriega. During the election, "Fuller's camp" contacted his office regarding what amount to donate and he later received two checks.

Carollo described Bill Fuller as the "Godfather of Little Havana" adding that Fuller wanted to "Delatinize" Little Havana by creating a "Wynwood in steroids" approach to take over the area. He stated Fuller and his partner are buying properties using strong arm tactics on neighbors and tenants. "They take over the area by sending realtors first." Furthermore, that Fausto Realty takes advantage by buying properties from "3rd generations" in Little Havana. Carollo stated Fuller lives in a 3 million dollar home and not where he says he lives.

Carollo mentioned Fuller's properties have Health Department violations and he also owns several lots where the permits are not valid as well as many music violations, but nothing is done due to his connections in the city with Building & Zoning inspectors, etc. He also mentioned connections with "Lending Institutions."

He indicated that when calls come into the Police Department regarding noise complaints about Ball & Chain, dispatch operators receive the call and tell callers to contact off-duty officers. The police do not respond and citizens have been told it (Ball & Chain) has the right to play music.

Carollo recalled driving by as a Commissioner to three different places in Little Havana: Ball & Chain, Cuba Ocho and Union Beer, the latter selling beer without a license. He said he had received calls regarding "Union people" not being legal. While at "Cuba Ocho" that Saturday night, he was with Detective Wayne Tillman and noticed an off-duty police officer working at Ball & Chain following him with a cell phone, hiding behind a post. The officer approached him and asked what he was doing there and Carollo told him "You can't intimidate me or buy me off."

As to the 11/18/17 Pre-election Event for Alfie León, Carollo stated the rally was held without a permit on a private parking lot, by the library, on a property belonging to Fuller. As a result of not having a permit a fine was issued. Carollo stated that Steve Miró was not the Chief of Staff, as

stated on the complaint. He advised Miró helped him with the campaign. He said he came in approximately in December and assisted him for 2-3 months." He said Fuller called Miró on that day.

Regarding Allegation 2 on 12/15/18, Fuller's Holiday Party, he said he received a call/text from Mary Lugo and added he never told Lugo to call Code Enforcement. Lugo contacted Code Enforcement Director Diez directly. He stated many calls came in by neighbors/tenants that night about a party with loud music. Code Enforcement Officer Scarlet responded. He mentioned that although the Tower Hotel is an unsafe, empty building with all the doors shut down and many violations Fuller's holiday party was held there. Carollo said that Lugo told him, "They had permits" (referring to the Tower Hotel). Carollo said he drove by the place for two hours and saw Scarlet there for 40 minutes and said information can be verified by pulling GPS tracking records for the City cars to show the length of time the inspector spent at the location the night of the Holiday party. On the night in question, Carollo stated he called Herald reporter Brenda Medina to accompany him and be his "witness." At approximately 11:00 PM he saw a Code Inspector City vehicle with no tag drive by the building (Tower).

Regarding Allegation 2b (pertaining to Parjus), he only added that Parjus was the former Assistant City Manager and that there was "bad blood with Diez and Parjus... little contact."

Carollo denied the allegations regarding the 02/18/18 S.H.Valet incident stating that as a Commissioner, he "has to enforce his job" He said that original permits for S.H. Valet were given several years ago to park at another location in SW 8th ST & 16th Ave (1637/1641). That the only valid permit expired 03/02/18. The Church location and 4 other lots (including 1637/1641) were not legal.

He referred to overall City-wide corruption several times. On 2/18 at approximately 12:30AM, he was with three people parked on the street. He entered the parking lot briefly (stayed in the car) "looking for the female." There were 60-70 vehicles, according to Carollo, parked illegally on a residential area with no permits or illegal permits. The lot had no asphalt, drainage, shrubbery, lighting or markings, therefore not valid and that S.H. valet had an illegal lease with the Church. He said there was no confrontation with the valet, although the valet had an attitude. He denied mentioning an "investigation" or telling the valet, "I am the law." The valet was described as a Spanish-speaking "Cuban Military Scumbag", "Not afraid, to the point", "Typical, swarming public officials", "confrontational and demanding", asking him what he was doing there. Carollo denied telling the valet that he (valet) worked for a millionaire. He stated the valet was working knowing they were operating illegally. The valet's runner, as per Carollo, chased the two females one was Lugo, the other one Miró's wife, who was on the street filming. The valet did not ask him not to take pictures or to leave the premises. Furthermore, the parking did not have "No Trespassing" signs. Carollo denied flashing his ID on that day as well as having an "Official Business" placard on the window or pulling it out. 'There was no badge, don't carry it... can get me in trouble", he said.

Carollo stated that a week after the 18th (Church incident,) an outside company hired by MPA found S.H. Valet had under paid the City +/- $83,000. For 3 years, lots were not being checked, therefore, the City was losing money (referring to the 15% surcharge). He mentioned Frank Lazo.

Carollo said he received 3rd party information regarding 4 or 5 valets having bulk of permits without paying dues, stealing from the City. Carollo said things have changed due to his presence. Carollo stated MPA is a semi-independent department of the City, not under purview of the City Manager.

He brought up "selective enforcement" benefitting Fuller and his "group." He said that Alain Garcia is not the owner of S.H. Valet and accused Fuller of perjuring himself several times in the complaint.

A topic brought up by Carollo and not in the complaint was "SideBar", located at 337 SW 8th St and owned by Fuller. He mentioned that police and code enforcement officers, as well as other City personnel were guests at Fuller's 2016 Christmas party. Carollo described it as "not ethical" and added that Fuller's "connections" have expedited the process for SideBar violations and the illegal lots. Carollo provided documents pertaining to SideBar. He mentioned the establishment had several violations and as a result of his presence the establishment was fined. An email from Jose Dacal, Permit Coordinator- In-House Consultant, Florida Department of Transportation (FDOT) regarding Valet parking within FDOT right-of-way was also provided.

He stated he had additional information and documents that he will provide at a later date.

On or about 02/18/18, a production company filmed at Ball & Chain and Carollo stated the following:

- Film crew "Loaded the generators."
- Referred to the filming as a "sex party, free for all, with nudity"
- Questioned permit validity.

With regards to the last allegation in the complaint, Carollo stated that on 03/02/18, an "off-street" parking employee gave the permit for the first time to S.H. Valet. He stated it was impossible to obtain a permit that fast, since the process takes several weeks due to each department having to confirm and approve. Carollo said he never met Escandón but Escandón told him Fuller dealt with Noriega on Saturday, March 3rd regarding the valet permits but he never met with him. There was no correspondence from his office to MPA on 03/03/18.

Carollo mentioned illegal lots located on SW 12th Ave between 4th/5th St and indicated Zoning is aware but nothing is done. Carollo said he would "provide names" at a later date.

Late night on 03/03/18, Carollo stated a Range Rover drove up next to his vehicle and a kid said "Bang-Bang" and took a picture of him (At this time it is unknown if the photographs attached in the complaint is the photograph Carollo is referring to).

Carollo concluded by mentioning a particular property owned by Fuller, 'Futurama', and a possible link between Venezuela and Fuller. He said that a female tenant of Fuller that runs a "cafeteria" has links to Alí Rodríguez, who Carollo mentioned was affiliated with one of the top three known guerrillas in Venezuela, part of the Cuban revolution. A "Cuban Intelligence Agent" whose adopted daughter runs Guayaba & Chocolate, a small business inside Futurama, he said.

Carollo mentioned a left-wing connection to Fuller. He explained that what Guayaba & Chocolate symbolizes Guava being red and Chocolate black, is communism and left wing politics.

On May 8, 2018, COE investigators Nilda Olmo and Karl Ross met at the offices of the Barlington Group, Futurama, at 1637 SW 8th Street, to discuss the pending complaint against Respondent and to interview witnesses who alleged further misconduct by Carollo, City Code Enforcement and police personnel acting on his behalf. Among those present for the meeting were the Complainant Bill Fuller and his business partner, Martin Pinilla.

Fuller stated Carollo continues to make defamatory remarks against him calling him an "anti-Cuban" and "protected class-millionaire," while alleging he was leading a campaign to "de-Cubanize" historic Calle Ocho. Fuller noted that both he and Pinilla are of Cuban ancestry and that the claims are unfounded. Fuller indicated their firm owns approximately 20 properties along the SW 7th and 8th Street Corridor.

Fuller stated that Carollo had recently "defamed" him during a Radio Caracol radio interview on a show hosted by former Hialeah Mayor Raul Martinez, in which he referred to him (Fuller) as the "Padrino" or Godfather of Little Havana, implying a nexus to communist ties and further, that Fuller utilizes ties to left-wing Venezuelan government officials to launder funds from Venezuela into the United States.

Fuller said that since taking office, Carollo has launched harassment campaigns against a number of his tenants, including the owners of "Sanguich de Miami", among others. Asked about the origin of the animosity between himself and Carollo, Fuller pointed out that he contributed to three candidates for the City's District 3 Commission race: Tommy Regalado, Alfie León and Carollo. He stated he gave Carollo and Regalado about $2,500 apiece and that gave perhaps several thousand more to León, using related business entities. However, he did not actively support any candidate.

Regarding the Alfie León campaign rally on his property this past Nov. 28, 2017, Fuller advised that he had not been aware of the nature of the event prior to its shutdown. He said he thought it was a non-partisan "Get Out the Vote" (GOTV) rally organized by Jenny Lee Molina of JLPR.[1] Fuller stated that once he found out it was a GOTV rally for León, he also asked to it shut down. "We didn't want to choose sides, further stating that he even called Carollo's aide, Steve Miró, to congratulate Carollo after his victory. He sought to stay on good terms with Carollo but he soon realized Carollo was out to get them.

Fuller indicated the selective enforcement/harassment extended to his tenants and provided the names of individuals also affected. Given the nature of the allegations in the complaint, alleging exploitation by Carollo and other City officials & personnel, investigators spoke to those tenants regarding instances where they felt targeted by the Commissioner or other City officials.

---

[1] JLPR -Public relations firm.

**Maria Vivas-Mendoza (Vivas-Mendoza), Guayaba & Chocolate**
**1637 SW 8th Street**

Guayaba & Chocolate is located inside Futurama Art Gallery. Vivas-Mendoza stated that she feels "quite scared now," following a radio rant that Carollo made on Radio Caracol with host Raul Martinez, alleging that her common-law step-father, a high-ranking Venezuelan official, was behind a leftist plot to buy up property in Little Havana. She said that the official in question, Alí Rodríguez Araqué, is her mother's domestic partner but that he is in no way involved with her business, which is funded and managed by her and her husband.

Vivas-Mendoza stated Carollo stated on the radio: "How can we allow someone like this to open a business in Miami?" She said she complained to Martinez and that he apologized for allowing Carollo to use his show to attack her, and consequently, allowed her to go on the air and defend herself.

Vivas-Mendoza said she left Venezuela when she was 15 years old and receives no financial support from Rodríguez Araqué. She said she wonders if Carollo is upset with her because she posted an Alfie Leon sign on her business at its previous location. Since the radio broadcast, due to the untrue accusations brought forth by Carollo, she is now in fear for herself, her family and her business.

**Rosa Romero & Daniel Figueredo, Sanguich of Miami**

Rosa Romero (Romero) and Daniel Figueredo (Figueredo) co-owners of "Sanguich de Miami" (Sanguich), a Cuban sandwich shop in a refurbished shipping container, provided the following information:

The "Sanguich"container was located on a property owned by Fuller/ Barlington at 1641 SW 8th Street. They described the business as a "pop-up mobile unit," and stated they had a business license from the City, known as a "BTR" and a state license for preparing and selling food. They said the business had temporary zoning approvals from the City and were "trying to get to permanency," though the issue had been somewhat troublesome since they were considered a mobile unit, similar to many of the businesses in Wynwood and other pop-ups like The Wharf near the Miami Riverside Center (MRC). They said they had been working with the City's building and licensing officials and that everything was fine until "the moment that Joe Carollo came on board."

Prior to that, they noted that former Mayor Tomas Regalado and other City officials, such as the Chief of Police, attended their ribbon-cutting ceremony back on Oct. 27, 2017. They noted that Carollo's younger brother, former City of Miami Commissioner Frank Carollo, was a "huge proponent" of their business even suggesting they partner with Fuller's company. They said they quit their jobs to focus on the business and spent more than $100,000 on fixing up the container to make it suitable as a restaurant and kitchen.

They stated that after Hurricane Irma, they "hit a snag" as the State required additional documentation from the City that they were in compliance with local building codes, even though they were considered a mobile vendor. They said City officials required them to attach axels to their trailer to accomplish this.

The couple advised that on November 26, 2017, two days after their opening, they were "raided" by 25-30 City enforcement personnel including police, fire, building and code enforcement officers. They said City Manager Daniel Alfonso (Alfonso) told them afterward that Carollo was behind the raid and that he was unable to stop it. They said they were advised to approach Carollo and try to find out what his concerns might be with respect to their business.

Subsequently, they met with Carollo on December 6th, 2017, per Romero, "We wanted to work with him. He was pleasant, he said he wanted to help." Carollo told them, 'I want you to know I had nothing to do with it,' (referring to the raid). Carollo told Romero he was walking along 8th Street with Alfonso when Alfonso, not him, pointed to the container as an example of a code violation. Carollo "loved" their business, but felt that the location was problematic and suggested they re-locate to City-owned property: "I love it," he reportedly said. "Maybe not where you are, I think there's a little park that's near there and maybe the City can accommodate you."

They stated that the reason given for the initial raid was that they lacked a Certificate of Use (CU), but added that CU's are only required for permanent structures, not mobile vending units. The couple mentioned they had discussed this with Assistant City Attorney Rachel Dooley (Dooley) and that Dooley was initially very helpful and told them they could operate, at least temporarily, with a Temporary Events Permit (TEP), while they sought to gain zoning approvals. They said Dooley told them that the City's zoning code is vague and that a great deal of subjectivity is involved. They were advised that as a result of this, the District Commissioner often had final say as to whether a building met code regulations.

They said that because they were close to the Christmas holidays, they were unable to get the TEP because key staff was unavailable. On January 2nd, 2018, in the early morning, Figueredo said he went to the office of José Camero (Camero), Director of Building with the City of Miami, to get his permit. At approximately 6:00PM, he was given a permit. They said it was the first TEP of the year and that the license number was #1800.[2] With the TEP finally in hand, the couple said they intended to re-open on January 6th, 2018 but on January 3rd, while prepping food for the opening, Code Enforcement again showed up and advised them they were not allowed to open (even though they were not yet operating, and she told him they had obtained the TEP). They said that Code Officer Yacmany Salvatierra (Salvatierra) told them, "I'm sorry, this came from above, just know people are watching." They said they opened with their TEP on January 6th -7th (Saturday and Sunday), but on Monday the 8th at approximately 11:00AM,

---

[2] City of Miami Office of the City Manager Application for Temporary Event and Occupancy Permit# 18-000 (Approved TEP-January 6, 2018 through February 2, 2018).

Salvatierra returned with police and told them, "You're not supposed to be open because the TEP had a condition that had not been met," and threatened to arrest them if they didn't close the business. The couple indicated they captured this exchange on video.

Figueredo explained, "You gave us a permit," and asked why they had been forced to shut down. As per Figueredo, Dooley was consulted and inquired about the BTR, which they confirmed they had. Camero told them, by way of explanation as to what happened, "I got a phone call, but I can't say from who …"

The couple filed a public records request on Jan. 8, 2018, for emails and phone records of Camero, among other items, and sent it to Dooley. Dooley did not act on it until March 2nd, when she changed her demeanor toward them, no longer allowing them in her office. Dooley only provided them with a copy of legislation for mobile vendors but not the other requested items.

They claimed that the City's permitting issue was unfair and arbitrary. They stated they installed axels on the container, as requested, and because they were considered a mobile vendor no CU was required, as per building officials. The couple indicated that businesses like The Wharf on North River Drive have been issued Temporary Use Permits (TUP) that allow them to operate for up to two years if they are opened on vacant lands. They said Carollo expressed that he didn't want TUP'S to be used in Little Havana.

With regards to the Gay 8 Festival, a police officer by the name of Reyes (described as "heavyset," first name unknown) told them after the "raid" on February 18, 2018, "I want to apologize for everything that happened … There is a lot of squeezing about what happened here today." Similarly, a fire inspector that had been sent to their tent that same day, told them he was "shocked that it was the Commissioner on the phone with me."

They stated they were also approached at a January 19th, 2018 anti-bullying event in which a police officer told them to shut down even though they were only providing free food in exchange for charitable donations to an anti-bullying organization. They said a code officer named Scarlett confirmed Carollo's involvement.

The couple advised they were granted a meeting at City Hall with Carollo and top administrators Emilio Gonzalez-City Manager, Albert Parjus-Assistant City Manager and City Attorney Victoria Mendez. They stated Carollo was antagonistic, saying, "You wanted your meeting, and you've got your meeting." They said that Mendez told them that their business was "illegal" and they got into an argument and the meeting ended badly with Carollo yelling at them, "Get the fuck out of my office … Don't let the door hit you on the way out."

**David Rodriguez and Cecilia Rodriguez, Union Beer Store, 1547 SW 8th Street**

The husband and wife team co-own Union Beer Store and are also tenants of Fuller/ Barlington Group. Fuller indicated that they also had information pertaining to the selective enforcement of Carollo and other City officials against his properties. The couple stated their problems commenced shortly after Carollo was elected. It started when their one-year anniversary party was shut down. The Feb. 10th, 2018 party was held in the parking lot behind their business to celebrate their one year opening. They said Carollo showed up with high police presence and approximately 15-20 Code Enforcement personnel with lights flashing, etc. They said Carollo told them they needed a Special Events Permit and they indicated that they didn't have one so they had to tell their friends and supporters to disburse. A code enforcement and police officer remained by the front door that night for approximately two hours. The couple indicated they discussed the matter that night with Carollo, who allegedly stated: "You need a temporary events permit … but even if you had applied for one, I would have denied it."

The Rodriguez's stated that Carollo spends a lot of time at El Pub, located at 1548 SW 8th Street, across the street from their business, and said Carollo is close with the family. They believed that the business owners see "Sanguich" as competition and wanted them closed. They said their patrons also started to get harassed for having open containers when this was the norm during events such as Cultural Fridays. They said they got a violation notice on or about February 12th, and that Code Enforcement Officer Scarlett told them it was a formality, that a lot was going on 8th Street and mentioned inspecting their grease traps and kitchen. They believe they are being "targeted" because they are tenants of Fuller/ Barlington Group.

**Alain Garcia Martinez, Manager-S.H. Valet - Arnay Garcia, Runner-S.H. Valet**
**S.H. Valet Parking Services Corp.**

Alain Garcia Martinez and his brother, Arnay Garcia, voluntarily agreed to meet with COE Investigators Olmo and Ross.

Alain is the general manager for S.H. Valet Parking Services Corp., and Arnay is a "runner"/ employee of the company, which has been operating in Little Havana for eight years, first at Catarsis Restaurant, which was located at 1644 SW 8th St, and now as the valet service for Ball & Chain for the past four years. Alain indicated, that initially, the firm operated Friday and Saturday adding Wednesdays in late 2016 and approximately 6 to 7 months ago, including Sundays. With respect to the incident in the complaint dated February 18th, 2018, the brothers stated that Arnay had the initial encounter with Carollo. Arnay indicated he felt threatened as he encountered two unidentified individuals in the parking lot.

Arnay advised that on February 18th, 2018, the same night as the Gay 8 festival, he arrived in a customer's vehicle at the church parking lot at 1411 SW 11th Street at around 1:00AM and encountered a blonde woman (later identified as Lugo). Upon approaching her, the woman told him they were there looking for the priest "because we are having a family problem in our home." He then noticed another young man inside the church parking lot, and noted that the man was photographing the vehicles. He indicated that he observed a dark colored (black or dark blue) GMC Terrain vehicle inside the parking lot with the windows up. When he

12

approached the male companion and asked why he was taking photographs of vehicles, both got inside the dark colored SUV.

He approached the vehicle and an individual who lowered the window showed a City parking placard identifying the vehicle as an official City Commission vehicle (the placard was not on the dashboard) and said "I am the Commissioner". Arnay asked him to identify himself and at that point he stated he was Joe Carollo, City Commissioner, and was there taking pictures because they "were doing something illegal." and "violating the law." The conversation was in Spanish. Arnay notified Alain, who showed up shortly thereafter, at which point Carollo had left the lot and was parked on the street.

Alain stated that he showed up in a customer's vehicle and advised that he observed a dark SUV parking on SW 14th Avenue outside the church lot, approximately three blocks from Ball and Chain. He recognized Carollo, although it appeared to him he was trying to conceal his identity by wearing a cap over his eyes. Alain told him: "Good evening, Mr. Joe Carollo and asked, "What happened? What are you doing here taking pictures of the valet, the property?" and Carollo responded, "I am here because I can be here. I am conducting an investigation … You're operating illegally … I am the law and I can do it." Alain told Carollo, "No, you are incorrect, you are not the law, you want to be the law, and you only represent it."


At that point, he said the blonde woman lowered her window and made a comment, referencing the Parkland school shooting, "what would the children think about cars being parked at a church?" to which Alain responded, "what will the children think that at 1:00AM you are taking pictures of vehicles inside a private property instead of discussing school safety."

Carollo intervened and advised that he was conducting an investigation and that he did not need to explain anything to him. Alain responded that in the event of an investigation, he should have proceeded by approaching the valet, identifying himself and making the necessary inquiries instead of going "undercover." Carollo then stated that while he might be a valet company, he was "working for a millionaire" and before leaving, Carollo stated: "You'll see what happens in a week or two weeks."

One or two weeks later, on Saturday morning, March 3rd, "the harassment began" and that evening, the Miami Parking Authority closed the lot at the church on SW 14th Ave. They were advised by Humberto Escandón (Escandón), Chief of Operations for the Miami Parking Authority, in an email sent to the owner of the valet service, Omar Rojas that they could no longer operate.

They were told that none of the lots were legal and that in order to continue to operate, Bill Fuller had to obtain permission from Art Noriega (Noriega), Director of MPA.

At that point, they could not use the three existing lots:

1. St. Peter & Paul Orthodox Church lot, 1411 SW 11th St.
2. 717 SW 15th Street
3. 1637 SW 8th Street (Futurama Gallery and Barlington Group offices)

(The parking lot to the building has been in existence for 20 years and they have been using the lot for four years)

An alternate lot at a shopping center owned by Fuller (approximately 8 to 9 blocks from Ball & Chain), located on SW 12th Ave and 5th Street, had to be used temporarily to park vehicles.

That night (Saturday, March 3rd), Carollo followed a valet operator from Ball & Chain to see where he was parking the vehicles. As Arnay arrived at the location he observed Carollo parked on the street, driving the same GMC Terrain. He approached him and inquired as to why he was taking pictures of the lot. Carollo responded, "I don't have anything to explain to you … I'm doing my job." Arnay contacted Alain at Ball and Chain. Bill Fuller was there at the time and responded to the location, where he saw Carollo and photographed the Commissioner inside his vehicle.

The brothers stated that on or about March 12, 2018, they received a letter from private auditors Complete Consulting Services Group (CCSG)[3] Guillermo Ferrer, Project Manager and Franklin Laso, Director, advising they were being fined $11,281.00 for underreported parking receipts, not including penalties and interest. (Valet operators are required to pay the City 15 percent of all gross revenues). They were told that they were getting a "break" because no penalties or interest were being assessed. They questioned the accuracy of the audit, pointing out that in 2016 they did not operate on Thursdays, therefore, the calculations were inaccurate. They proceeded to the Records Department for the City of Miami and subsequently, an email was sent to CCSG advising the valet was not operating on Thursdays. Alain indicated that at that point they believed the amount would be adjusted to reflect the change. He also indicated that the subcontracted company on behalf of the City had never inspected the valet in eight years and now estimate the retroactive fines using inaccurate figures dating back two years.

On April 4th, 2018, a follow up letter was received advising the amount due had increased to $12,470.70, due to the City of Miami notifying them they were including penalties and interest, contrary to the first letter.

Alain advised that they are the only valet operators in the area and in the eight years in business, they had never been audited. However, shortly after their initial encounter with Carollo, the surcharge department inspected the valet on a weekly basis 36 times in one month (approximately 3 times a night on Thursday, Friday and Saturday), riding in their private vehicles.

Alain stressed that without the valet, Ball and Chain cannot operate. There is nowhere to park and alleged that Carollo was seeking to hurt Ball & Chain financially by going after its valet service and that S.H. Valet was a casualty of this crusade. "He wants to close the valet parking because if he can close the valet then business at Ball & Chain will suffer." He stated that the audit occurred within the two week time frame Carollo gave them.

Alain said the valet service was forced to rent a shopping center parking lot at 1837 SW 8th Street on the following Monday, March 5th in order to continue to operate. He said that Fuller then accompanied them to MPA and they again spoke to Escandón, providing the required

---

[3] CCSG-Complete Consulting Services Group manages the Miami Surcharge Program on behalf of the City of Miami.

documentation for the shopping center. Escandón stated he had to have them approved by the different departments and spoke to "Luis" (Arnay did not recall the last name). At the end of the conversation, Escandon stated that he didn't want any legal problems and that he had been with MPA for 20 years. Consequently, they were authorized to operate the valet. Escandón denied involvement with subsequent inspections on Sundays by an unidentified black, non-Hispanic male, who had been showing up keeping track of keys and tags and photographing the valet with a cell phone because they had ordered him to do so, but did not mention who.

Alain concluded that all these problems appear related to the initial encounter with Carollo on the 18th when Joe Carollo was in the church parking lot, in what he referred to as "his investigation." Prior to that, "we didn't have any problems … what that shows is that he directed all this." "He threatened us and he carried out his threat … He kept his word. His word really is law."

### Arthur Noriega IV, CEO, Miami Parking Authority

Arthur Noriega (Noriega) was interviewed at the COE office. Noriega advised that he has worked for the MPA for the past 18 years, and responds to a five-member Board of Directors. He said he does not report to the City Manager as the MPA is an independent agency. He said that City Commissioners do exercise oversight of the MPA, however, in so much as they approve the operating budget, confirm the appointment of board members, and determine whether to issue bonds on behalf of the authority so the elected officials do have standing. Noriega said it is not uncommon for him to discuss issues of concern with elected officials, though he did say it is "unusual" to have an elected official conduct an independent inquiry of the MPA's operations as Carollo allegedly did as it relates to valet operations on SW 8th Street in Little Havana.

Noriega explained that they get complaints about "valet guys" all the time, therefore, their department constantly cites and enforces on a regular basis. Furthermore, valet permits are very specific in terms of space on right-of-way and they have to give very specific addresses and location to where they will be storing the vehicles… "That all gets vetted through a number of different departments that have to concur that the space they are going to use is legal and 'up to code.'

Noriega stated that prior to the March 2nd and 3rd action against S.H. Valet, he met with Carollo at Miami City Hall to discuss a variety of issues. During that discussion, Carollo voiced concerns about the two valet operations servicing SW 8th Street , S.H. Valet at Ball & Chain, located 1513 SW 8th Street, and DEC Parking at the Guantanamera Café, located at 1465 SW 8th Street. He said Carollo raised concerns about "life-safety issues" resulting from the interruption of traffic along SW 8th Street and concern about "the storage of vehicles," alleging that valet operators were not abiding by their permits. "He thinks it's a liability because of all the traffic, because it's so heavily used." He told Carollo that he would look into it.

After the meeting with Carollo, Noriega called Enforcement Manager Escandón, who went out there and found both valet services were in violation in terms of vehicle storage since they were not using the location on the original permits. He said that following the shut down on the two

valets, the valet operation run by DEC Parking[4] did not re-open but that Ball & Chain did continue to operate its valet service after Bill Fuller called and requested a several-day grace period to come into compliance since the shutdown would be a huge detriment to his business. Noriega stated S.H. Valet had filed a change of location but had not been approved. Therefore, Fuller used an alternative parking lot in the interim. S.H. valet resumed service and no further issues were reported. Noriega said that after Escandón conducted his field inspection, he reported back that S.H. Valet was using a lot without authorization, though he couldn't recall if it was the church lot. Noriega said that despite the complaint, Carollo never asked to shut down valet service at Ball & Chain. "No, he was more generalized, he was not specific ... He asked us just to look into it. He's very careful with respect to his communication, especially with me. He's very general ..." "His direction to me was no different than what I've received from a dozen other elected officials."

He stated he had spoken to Carollo 3-4 times since he was elected. Noriega noted that he has had a working relationship with Carollo stretching back nearly 20 years, much of it adversarial. Noriega said that parking operators pay the City a 15 % surcharge on revenues from valet operations and that the City has a private consultant who handles audits/collections[5]. He advised he has no oversight of the audit function, and is not familiar with the particulars of the audit process.

He said that, with respect to the allegations against S.H. Valet, Carollo was right. He added that S.H. Valet "had submitted a change in location" at about the time of the enforcement, but noted that just because the company had applied for a change in location doesn't mean they have authority to operate at the proposed location without approval from the required agencies.

### Scarlett Morua, Code Compliance Inspector, Miami Code Compliance Office

In a sworn statement, Morua advised she started working with the City on January 9th, 2017, under Director Orlando Diez (Diez) and Chief Jessica Capó (Capó). She worked in the South and Central offices covering the 3:00PM-12:00 midnight shift. Due to staffing changes under the new administration with new Director James Bernat, she was assigned Tuesday-Thursday from 1:00PM-10:00PM and the night shift Friday-Saturday 11:00PM to 8:00AM. In the city-wide coverage on her present shift, mostly handling noise complaints at night. Morua indicated her current supervisor is Frank Marcos.

She said that during regular business hours 8:00AM to 5:00PM, code complaints are logged by the "front ladies" on the 7th floor of the MRC building. With the new administration, she said that after 5:00PM, the complaints are received through a hotline phone and inspectors document the calls. The list turned in at the end of their shifts. The new administration created a log sheet where complaints and calls are logged.

---

[4] DEC Parking Service is a vendor for MPA. Centralized valet parking in Coconut Grove as a pilot program implemented by MPA approximately 6 months ago.
[5] Complete Consulting Services Group (CCSG), 2650 Biscayne Boulevard, Miami, FL. 33137. Franklin Laso, President. CCSGs overseen by the City's Finance Department.

With respect to the incident occurring on December 15th, 2017, she recalled being dispatched to the Tower Hotel at 1450 SW 7th Street, sometime in the early evening. She said a couple of people called to complain and either Inspector Danny Sierra or then Director Diez told her to "report to a particular party...a particular situation" She advised that when she got there, she saw it was a holiday party, where a few people were dancing in the lobby of the hotel and others were outside at a makeshift bar. She said she was told to find out whether the owner of the property had a Certificate of Use (CU).[6]

Morua spoke to Fuller. She apologized for the intrusion and requested the CU. She said Fuller told her they were having a Christmas party and no CU was required, but that he had a copy back at his office. She told him to make sure he could produce it if requested later, but denied threatening to shut down the party if he didn't produce it. She said that Fuller told her it was a Christmas party and would not last much longer.

Morua advised that sometime after she left, she was contacted by Jessica Capó, Chief of Code Enforcement, regarding her whereabouts and to go to the location. She advised she had been there and verified it was a Christmas party and left. She was told to return to the hotel and wait outside until the event ended. She felt this was out of the ordinary, but did as she was told. Morua said that Fuller came out to greet her again and that he told her the party would be breaking up soon. She said she had not been told to look for any drug use or illicit activity and did not have any reason to suspect anything illegal was taking place. She said she had observed children in holiday attire. Prior to this incident, she stated she had never been directed to respond to a party and stay until the party was done. On the night of the Christmas party she was told to wait until everything was clear and to call back to inform the party was done. Morua indicated "it was kind of weird."

Asked about any interactions with Carollo, Morua stated she recalled a call from Danny Sierra, close to midnight (date unknown) to respond to a parking lot across from El Pub on the 1600 block of SW 8th Street, where he stated, "something is going on, like a wrestling ring ...and the Commissioner is there" She said that by the time she got there, however, the wrestling ring had been dismantled, the event canceled. She said she did observe Carollo, City of Miami police, Mary Lugo, a union rep, and a "young man" on the premises (later identified as Miró.)

Morua did not recall the date but indicated it was after the elections and that Carollo was dressed in jeans and introduced himself, saying, "You don't recognize me but I'm Commissioner Carollo." She indicated she told Carollo she was going to issue the establishment a Ticket Warning Letter (TWA). Mary Lugo accompanied her and the police officer across the street. She advised she had no other interactions with Carollo other than the one described above.

---

[6] It was later determined that the permit in question was a Special Event permit and not a CU.

Morua was questioned by the investigators about procedures and how inspectors respond to calls pertaining to complaints, their actions, their findings and process of reporting back. She responded that with the old administration they were sent out on assignment/complaint and the Code Enforcement officers emailed back with findings.

Regarding "Sanguich of Miami", she stated she was called several times to that particular business by her supervisor, Luis Gomez who told her to "pass by the establishment, and to take pictures… to see if they were still there." She was not working on the day of the Gay 8 Festival but recalled another inspector was called to "check up on them" (referring to "Sanguich").

Morua was asked about any conversation she may have had with former Assistant City Manager Albert Parjus (Parjus) concerning Ball & Chain. She said Parjus never asked her to cite the business for a noise violation or for any other reason. Morua said that on one occasion earlier this year, she did respond to a complaint from neighbors (a couple) living in the two-story building behind Ball & Chain after they complained about noise from the club, but said Parjus had nothing to do with that. She said she was told to visit the complainant's apartment and measured the distance to the club. She advised that noise should not be audible beyond 100 feet of the premises. The building was within that limit.

### Alberto Parjus, Deputy Director, Miami-Dade Department of Transportation and Public Works and Former Assistant City Manager, City of Miami.

Parjus, accompanied by Attorney Vivian Reyes, responded to the COE's offices. Also present during the interview were COE investigators Olmo and Ross and Staff Attorney Martha Perez.

Parjus advised he has worked in the public sector or over 30 years, most of that with Miami-Dade County, also serving as Assistant City Manager for the City of Miami from August 9th , 2015 to February 23rd, 2018. He said he returned to the County at the request of Mayor Carlos Gimenez, the Director of the Budget Office and the Deputy Mayor through a waiver unanimously approved by the County Commissioners. Parjus stated he had worked in Transit for 18 years and besides the financial incentive for the move, he had the desire to help fix the transportation problems.

With respect to the first paragraph of the complaint alleging Parjus's involvement with efforts to shut down a political rally supporting former Commission candidate Alfie León on or about Nov. 18, 2017, Parjus stated that he did not have any recollection of said event, making or receiving any calls regarding the rally, speaking to Miro or Lugo and was not involved in responding to the event or directing code officers to take action.

With respect to allegation 2(b) in the complaint, Parjus denied it, adding, "At no time did I tell somebody, go there [Ball & Chain] and sit there until you find something." He added, "I don't allow for selective enforcement.

Parjus said that he has known the Complainant for approximately two years and enjoyed a good relationship with him and even celebrated his birthday once at Ball & Chain. He said he has received at least two noise violations that he could recall against Ball & Chain. On one occasion, he said he received a call from then City Manager Daniel Alfonso regarding noise violations from Ball & Chain and he contacted the former director of Code Compliance to dispatch a code officer. He said he was also aware of two citizens who live near Ball & Chain who have lodged complaints. As for the Commissioner's Office receiving and reporting complaints, Parjus indicated, the right way to communicate a complaint is through the Manager, then it is communicated to him and in turn he contacts Code Enforcement regarding the allegation. "The wrong way is a Commissioner calling the Director of Code Enforcement." He stated he has known Fuller for approximately 1½-2 years and has visited Ball & Chain 4-5 times. He mentioned Fuller owns a lot of properties and "if it wasn't for him (Fuller) that place would not be what it's now"…"He started buying properties and was very engaged in the community," "He was the one that started all this…that's why I'm surprised.."

When questioned about a possible controversy between Fuller and Carollo he stated he didn't know but from what he hears is that they have different management styles and "have their things…have different views on the community and how they should do things and some of them are out there day and night traveling around and stuff like that.." He stated that while employed by the City and overseeing Code Compliance, he became aware of the present complaint.

Parjus said he did recall complaints surrounding the "sandwich" business operating out of a shipping container placed next to one of Fuller's properties, and noted that they were not operating legally. He said complaints came from Carollo's Office and also from some of the local "brick and mortar" businesses that felt that it was unfair to compete against a business that didn't have to pay property taxes and abide by the City's Building Code. He noted that there is a loophole in the Code for properties that have no infrastructure or paving, but said that the property in question was paved and therefore the loophole did not apply in that instance. He continued by stating that, "if you know they are going to be watching you, don't do dumb things …for example you are not supposed to have this thing attached to any electrical in a building…", so the Building Department closed them down. Parjus indicated that "every time the guy would open the door to clean up the place or do something we'd get a call...hey they're open up again", from the Commissioner's Office or somebody else. Parjus did say he has received a number of phone calls from Steve Miró about the "sandwich" shop. He mentioned contacting the City Manager and sent out Code Enforcement. Upon responding, he was notified they were "just cleaning up here."… "That sandwich shop place was a nightmare. We even had meetings about that in my office trying to accommodate them, etc." Parjus mentioned he received "one of those weird calls about the 'sandwichera' … I think it was the Gay parade...they're open again for the Gay parade." He said he instructed the inspectors to go by the establishment to verify and he was told they were not open. The call was from Miró.

Parjus noted that other commissioners besides Carollo make it a practice to "patrol" their districts, noting Commissioner Gort seems especially concerned about cafeterias along NW 36th Street operating as bars at nighttime while Chairman Hardemon frequently complains about illegal bars in the Little Haiti neighborhood. "They'll bring [problems] to my attention," he said, "but nothing improper or out-of-the-ordinary … I've been in public service for 31½ years… and nobody's going to make me do anything improper or unethical."

Parjust mentioned changes were implemented and when the new manager took over, Carollo wanted a task force for "Calle 8." By that time, he indicated he had removed Code Enforcement Director Orlando Diez because "he was not as proactive as I wanted him to be on the directions given to his rank and to use the resources in the most equitable way". He stated he had also removed the Chief, Jessica Capó.

Regarding ride-alongs, Parjus stated, "I think the protocol is to communicate that to the manager and the manager gives the 'OK' to the department director through the Assistant City Manager, tell 'OK' to the department director to ride along", although some don't drive along but like to meet the inspector and walk along with them while they are conducting inspections, 'not uncommon, very common.'

He also indicated the department has two Task Forces independent of the day-to day operations of Code Enforcement. The Bar Check Task Force is composed of fire, police, building department, code compliance and State Alcohol and Tobacco and based on information received by 311, residents or the Commissioners, go out weekly or every other week and respond unannounced to establishments to conduct in-depth checks.

At the conclusion of the interview, Parjus stated he was surprised at what was alleged and indicated he had nothing to do with the allegations and does not get involved in anything unethical: "I don't owe favors to any politician, I don't do politics, I don't do nothing, I just work."

**James Bernat, Executive Officer, Acting Code Enforcement Director**
**City of Miami Code Compliance Office**

Bernat appeared with Attorney Robert Buschel at the COE's offices. Present at the time, were COE investigators Olmo and Ross and COE Staff Attorney Martha Perez.

Formerly the Homeless Coordinator for the City of Miami Police Department for under 4 years, Bernat is currently the acting Director of Code Compliance since March 5, 2018. Since assuming this position, Bernat advised that out of all the elected officials, Carollo has been the most active in alerting Code Compliance to alleged code violations in his Commission District, Little Havana, in particular, the stretch of SW 8th Street between 13th through 15th Avenues. He said Carollo has made numerous allegations about businesses lacking BTRs, licenses and approvals, permits, unsafe conditions, and loud music. He recalled receiving calls from Carollo's office about Ball & Chain and other businesses throughout 8th Street.

Bernat indicated he met with Fuller offering his assistance in trying to resolve some of the issues with Ball & Chain suggesting a community meeting since some of the residents were upset about his establishment. He recalled meeting a lady behind the establishment complaining of loud music.

New to his position, Bernat indicated he was trying to be accessible to the elected officials and sometime in late March or early April, he participated in a "park and walk" with Carollo, with numerous city employees including two inspectors, a police officer, Supervisor Daniel Sierra, Carollo, Mary Lugo and Sean Moy, whom he identified as AFSCME union representatives.[7] Initially, the meeting was scheduled to take place at a City facility but later changed to Little Havana at Carollo's request. They met at EL Pub parking lot, located on SW 8th Street and 16th Avenue. Carollo started pointing out businesses with alleged violations, making general reference to corruption. During this encounter, Bernat stated that Carollo did mention alleged violations at Ball & Chain including its valet operation. Bernat stated that he told his inspectors "to be fair" and as a result, he expanded the scope of their "park and walk" to SW 8th Street between SW 7th and 18th Avenues, approximately 1 ½ miles, noting any violations, "not only that we walk the limited area he [Carollo] was focused on."

He said that, at one point, the exercise became awkward because individuals who appeared to be working for business interests followed them with video cameras and asked questions, prompting a confrontation. He said he attempted to stay out of the fray even though he felt he was being "taunted" at one point. They continued the walk west to 7th Avenue and on the way back, Carollo wanted to go north to an apartment complex behind Ball & Chain.

Bernat said he did find it unusual/awkward that AFSCME representative Mary Lugo accompanied Carollo during the "park-and-walk." He said that Lugo, in particular, seemed fixated/adamant on Ball & Chain and the noise issue and that she and Carollo arranged for him to meet a woman who lived behind Ball & Chain at the conclusion of the activity, and that the woman complained of loud music after 9:00PM at the Club. He said the woman met him in front of the apartment complex. He said that he felt Lugo was overstepping her bounds, especially when she began to question him about personnel moves within the Code Compliance office. "Mary Lugo tried to talk to me … and I told her to write an email," adding that she never did so. He said he has observed her in Carollo's office on at least two other occasions.

He said Carollo is focused on certain properties but he does not know who the owners are. Carollo did make allegations of corrupt dealings between the MPA and Ball & Chain and stated that the valet in front of Ball & Chain was illegal and should not be allowed to operate, but he did not provide any tangible evidence. He said he did not have any more direct encounters with Carollo relating to code compliance matters. He said the only other time he saw Carollo was at a property in his District that had lost power.

Bernat stated that Carollo made large numbers of allegations about illegal businesses and

---

[7] Park & Walk with Carollo was on Wednesday, March 14, 2018.

alleged "corruption" among local officials and business interests. He said, however, that he did not feel that Carollo was attempting to give him direct orders, "He didn't direct me to do anything. He was pointing out that there were complaints or violations of the code and he was bringing them to my attention."

He said that while he was aware that the complaints involved multiple properties, he (Bernat) didn't know who the owners were, and that he had not observed any pattern of selective enforcement by the commissioner.

Regarding the ride-along referenced in the March 8th, 2018 email from Daniel Sierra, Code Compliance Supervisor, Bernat said this happened during the week he began in Code Compliance and that it was done without his knowledge or authorization. Bernat indicated inspectors should not be going in cars or doing ride-alongs with Commissioners, especially without the approval of their supervisor. He further stated that he has since directed his officers/staff not to participate in "ride-alongs" with Commissioners. He said that he has not received any specific complaints from staff regarding undue influence by Carollo.

## Humberto Escandón, Senior Manager of Operation , MPA

Escandón responded to COE's offices for a formal statement regarding any knowledge he may have about the enforcement action against S.H. Valet and its operations at Ball & Chain. He said he has worked for the MPA for over 20 years and as head of the Enforcement Department, presently supervises 33 inspectors (4 shifts), covering 14 zones, city-wide. He said he also oversees valet operations, permits and zoning letters. He said complaints are normally lodged through the dispatch area at (305) 579-4900.

With respect to S.H. Valet, Escandón said he had no prior knowledge about the confrontation on February 18th between Carollo and the valet operators. He said he knows the manager of S.H. Valet by face but not by name and described a man who appears to be Alain Garcia. He said that, from time to time, he receives complaints from the offices of City Commissioners for example, Frank Castañeda might call on behalf of Commissioner Willy Gort to complain about parking at Curtis Park, but he said he has never been contacted by Carollo or anybody else from his office regarding a parking matter, including the issues at Ball & Chain.

Escandón indicated that he received a call from Art Noriega on or about March 2nd -3rd (on a weekend) about possible violations at Ball & Chain. He stated he proceeded to check S.H. valet and another valet operating along SW 8th Street, DEC Parking. He conducted a field inspection on or about March 4th or 5th and found out they were not parking in a legal lot. He noted that the lot they were supposed to be using on SW 15th Avenue between 6th and 7th Streets was not being used and was not up to code. He said it was empty and had construction materials on it, and also lacked proper lighting and was not striped properly. He said the lot could, if compliant, accommodate 50 vehicles. He said that, instead, he found S.H. Valet was using residential area, a church parking lot. "They were parking vehicles all over the place," but not in lots that were code compliant.

He said that up until that time, he assumed S.H.Valet was operating in full compliance with all requirements, though he admitted that he had never fully verified the valet's application. He said applications for valet service must be submitted every six months and that a corresponding review process in which feedback is sought from numerous City departments can take months or longer. Escandón said approvals are required from police, fire, zoning, risk management and NET.

He admitted that in the case of S.H. Valet, he didn't follow through on these approvals and allowed them to operate on a good-faith basis, noting such approvals sometimes "take forever." He said the company had been operating this way for several years, without verification. He did not recall the exact date the permits were provided to S.H., but believes it was in January of 2018, and that every six months permits are updated. "I dropped the ball," Escandón said, noting that he is the only MPA official responsible for overseeing valet permits and that there are roughly 20 valets operating citywide.

Escandón said that, based on the valet's most recent application, the church lot on 14th Avenue and other lots they were using were identified as lots to be used for Ball & Chain patrons' vehicles. However, when he conducted the field inspections, none of these lots were compliant with the requirements under the City's Parking ordinance, i.e., no striping, pot holes, construction materials, and in the case of the church lot, not properly paved. He said the church lot had enough pavement for three vehicles, but that most were parked on the grass. He said the lot at 1637 SW 8th Street (Futurama) was not up to standards either. Although the lots were in the application, they were not up to standards. After contacting S.H.Valet, they complied.

Escandón said he documented this by taking photographs and sending them to Noriega. He said he contacted S.H. Valet and informed them that they were not in compliance and would have to cease operations. He said that, after speaking with Bill Fuller and S.H. Valet representatives at MPA, an agreement was worked out in which they would use the Dollar Store lot in a shopping center at about 1600 SW 8th Street.

Per Escandón, "Bill Fuller talked to me and I explained to him the reasons why those lots were shut down." Escandón felt bad because he recognized they had been operating under the assumption that everything was okay and that they were meeting all requirements. He added that valet operators are given a copy of the applicable City Code when they are issued permits and that it is the operator's responsibility to comply with the requirements. He stated they went in with the application and he failed to check it right away…"If you're going to blame somebody, you can blame me…" Escandón also acknowledged that S.H. Valet had not previously been made aware of any code violations.

### Jessica Capó, Code Compliance Officer, 151 NW 27th Ave. (NET Office)

Capó was interviewed at her workplace, City of Miami Neighborhood Enhancement Team (NET) Administration office by COE investigators Nilda Olmo and Karl Ross. Capó stated she has worked for the City for 29 years, the past 19 in Code Compliance now Code Enforcement.

23

She said she also worked several of those years as an assistant to ASCFME President Charlie Cox, and recently served as Chief of Code Compliance, reporting to Orlando Diez, former Director of Code Compliance. Capó said that both she and Diez, who reported to former Assistant City Manager Alberto Parjus, were reassigned in January as there was a new administration that, as she was told, wanted "to go in another direction." She further stated she is not involved in politics.

Capó reviewed the complaint and with respect to the allegations therein contained, stated she had no knowledge of the intervention by Code Compliance on November 18, 2017, at the site of the Alfie León political rally, where code officers allegedly ordered the León supporters to leave. With respect to the allegation in Section 2b of the complaint regarding the holiday party at the Tower Hotel on December 15th, 2017, Capó stated she received a phone call that evening from Parjus advising her that there was a loud party. "He called me only because he couldn't get Orlando Diez on the phone." She in turn contacted Morua to respond to the location in question because Parjus told her that there was a party and there was loud noise complaints. Capó said she didn't recall asking Morua to request to see a CU or any other business license, and did not recall directing her to stay until the party dispersed. She said she recalled that Morua called her after the inspection and advised that "everybody was leaving." She said she did not recall if she relayed that message to Parjus, and no further action was taken on her part.

She said she was not aware of any effort by Carollo or his staff to "target" Complainant's properties. As to Miró, she said her only contact with him was prior to his employment by the City because he was found to have a code violation on his own property and indicated Miró fixed it. She said she had no knowledge of any issues with the valet service at Ball & Chain. "I got demoted in January," she said. "I don't know what's been going on since then."

She suggested that any alleged interference by Carollo would likely have happened with City personnel at a higher level in the City. She advised she has been close friends with Respondent Mary Lugo, the AFSCME union rep.

### Steven Miró, former District Liaison (District 3), Office of Commissioner Joe Carollo City of Miami

Miró, accompanied by his attorney John Cunill and his associate Ken Damas, appeared for a voluntary statement at the offices of COE. Present for the statement were investigators Olmo and Ross and Staff Attorney Martha Perez.

Miró stated he was introduced to Carollo by a mutual friend sometime in January or February, 2017, and that he later served as his campaign manager, initially working pro-bono and later, after a month and a half, as a paid member of Carollo's campaign staff. He said he had an opportunity to work and applied for the City as part of the Homeless Advocacy program ran by Sergio Torres (Director), but that Carollo urged him to stay with the campaign and told him he would receive a better position once he was elected.

Miró advised that after Carollo took office on December 2nd, 2017, he was the Commissioner's "first hire" on Dec. 4, 2017, then became District Liaison for District 3 and served six months until he was terminated by Carollo on Monday, June 4th, 2018. As District Liaison, he was responsible for fielding constituent complaints, scheduling meetings for the commissioner, and, for a time, preparing agenda items but was removed from these legislative duties about two months ago.

He advised that he used his personal cell phone for City business and that Carollo also used his personal cell phone and did not possess any other City issued phone. He noted there is a $300 monthly City stipend for elected officials. He said that he recently replaced his phone and that many of the photographs and other records with possible relevance to this investigation were lost as a result. As per Carollo's directives, he took photographs and sent them to him.

Miró indicated that he usually communicated with Carollo and his staff by telephone, but not as often by text message or email. He said that Carollo preferred not to communicate by email. Miró stated that early on in the campaign, Carollo met with Fuller and that "he was a supporter, he did give us money also, in the campaign". Later he met with Fuller regarding how to better Little Havana. At the time, Miró stated, "it didn't seem Joe was targeting him at the time, Joe was trying to ally himself with him."

With respect to the initial allegation in the complaint regarding the Alfie Leon campaign rally on Nov. 18, 2017, on a lot owned by Fuller located at SW 1st Street and 13th Avenue, Miró stated that he did receive a call from Carollo telling him, "there was something going on at a parking lot"… food given out and asked him to respond to the rally, take photographs and send them to him. Also, to call "Mary", who responded and took pictures. He indicated that he and Carollo had been circulating around the community at early voting sites. Miró mentioned that Mary was an ASCME rep and an intricate part of the campaign. He said that he recalled just two campaign workers being present, a food truck and a handful of supporters. He said that about 30 minutes to an hour after reporting back to Carollo and sending him the photographs, police and code enforcement arrived on the scene and that a $250 fine was issued for "some type of violation." Miro indicated he did not know if Carollo contacted anybody, but suggested Lugo may have used her City contacts, by virtue of her employment with Code Enforcement. He stated Carollo and Lugo both have regular contact with former Assistant City Manager Parjus, but could not say for certain whether Parjus was involved at that time.

With respect to the holiday party at the Tower Hotel, Miró advised that Carollo notified him of the event after the Commissioner conducted a "drive-by" and mentioned the hotel "is all illegal" and sent Code Enforcement. He said Carollo didn't know a lot about code enforcement but was guided by Lugo as to possible code violations. He said that the construction on the hotel was unfinished and that there were exposed wirings and stated that the building lacked a Certificate of Use… "That's obviously because of Mary." He stated Carollo wouldn't know what to look for and therefore he received all his information through Mary Lugo. He continued by stating, "Now that he knows pretty much code enforcement 101, he is now deputized as a

code enforcement officer himself." Miró said that he did not contact code enforcement and had no further knowledge about what occurred.

Miró said that he did recall Carollo contacting him on February 18th, 2018, to respond to the Gay 8 event and inquire about a sandwich shop that was set up "illegally." Carollo wanted "to shut down the "Sanguich de Miami" shop." He said Carollo was not at the event but was in constant contact with the City Attorney "Vickie" [Victoria Mendez] and City Manager and asked him (Miró) to alert them of the situation. He stated there was also police presence. Miró indicated that he remained at the event for 3-4 hours and left. He was later contacted by Carollo, who asked him to return and find out the final outcome/status, whether they had been properly issued a permit by the Kiwanis Club for the parade. He said that initially they lacked the proper permits but were able to obtain one and remain open at a tent location on the sidewalk.

Asked about possible motivation for Carollo's proactive interest in code enforcement and shutting down "Sanguich de Miami" Miró said that Carollo mentioned they were always in violation and he wanted to put a stop to it. Per Miró, "He (Carollo) wants to make it known, there's a new sheriff in town."

With respect to the February 18th, 2018 incident at St. Peter and Paul Orthodox Church church, Miró advised that he was having dinner with his wife when Carollo called him and asked him to meet him at El Pub. He was present in the vehicle driven by Carollo along with his (Miro's) wife and Mary Lugo. He said they met at El Pub and cruised the area while Carollo was "pointing the same things he has been pointing at beforehand." Miró indicated Carollo was his boss and he had to comply. He said that when they got to the church, Carollo observed cars being parked improperly on the grass. He said that after the parking lot attendant questioned their activity, Carollo took out his official city business decal/placard from the side of the car and showed it to the attendant and stated that he was conducting an investigation. Miró was not aware of any investigation. When questioned about Carollo's statement, as alleged in the complaint, to the valet attendant, "I am the law", Miró confirmed Carollo did tell the attendant something to that effect and also that they were operating illegally.

When questioned regarding Carollo possibly targeting the valet, Miró indicated there was a separate incident in which he was targeting Ball & Chain's valet. He was not present that night but indicated Mary Lugo was. Miró stated that Carollo and Noriega have met several times regarding the Ball and Chain valet and parking issue. He indicated he attended one meeting, called by Carollo, in which Carollo "grilled him" (Noriega).[8] Miró described it as "interrogations." He indicated Carollo wanted a list of all the valet lots that were approved for Ball & Chain, Cubaocho and Guantanamera. Carollo was especially interested in learning about procedures for pulling permits.

Miró said he believed that Carollo was selectively targeting properties owned by Bill Fuller/ Barlington Group, and advised that Carollo once asked him in the early part of 2018 to

---

[8] Meeting was held at City Hall in Carollo's Commission office.

photocopy a list that identified numerous properties owned by Fuller/ Barlington worth over $40+ million. He said he had not received a comparable list for any other property owner in the District.

Miró stated he also recalled a scheduled walk-through of Little Havana with Carollo and a group of City officials, including City Manager Emilio Gonzalez, in which Carollo pointed out alleged code violations, many of which involved Fuller/ Barlington properties. He said the walk extended east to Sidebar, another of Fuller's properties, and that upon returning to the starting point, officials were directed to an apartment building located "diagonal" to the rear of Ball & Chain on 7th Street, close to 15th Avenue where Mary Lugo, Mara and Gisela (from Carollo's staff), had canvassed the building previously, knocking on doors and looking for residents who would complain about loud music emanating from the night club. Miró stated that Carollo had initiated that request. Miró indicated that when the officials arrived, Carollo said "I want you guys to witness this," and proceeded to knock on several doors. Only one female tenant on the corner top apartment answered the door and Carollo brought her outside and told her, "can you please talk". As per Miró, she only spoke because the Commissioner reached out to her not that she voluntarily went up to them.

During the walk-through, Miró mentioned that Fuller's partner, Martin Padilla, was there and Joe "was brushing him off". Padilla wanted to request a meeting with the Commissioner in order to settle the differences.

Miró said Carollo never told him that he was targeting the valet servicing Ball & Chain in order to harm the business financially but in his opinion, Carollo was selectively enforcing/targeting Fuller's properties: "In my opinion, Yes."

He said Carollo did "brag" to him about following valets from Ball & Chain to the new lot they were using, and claimed he observed valets digging through the glove compartment of vehicles they were parking, presumably searching for valuables they could steal. Miró stated Carollo made a comment on the record about this during one of the Commission meetings.

With respect to the allegation in the complaint concerning filming at Ball & Chain, Miró said Carollo asked him to find out whether they had obtained a permit. He said that he contacted "Vinnie" Betancourt in the Special Events office and was told they had been issued a permit. He said he informed Carollo and because they appeared to be doing this legally, he did not contact Code Compliance to disrupt the filming.

Miró noted that after the COE Complaint was filed, naming Miró and others as Respondents, he was approached by Carollo and questioned about how he might respond to questions from investigators. Miró said Carollo expressed surprise that he had retained counsel and pressed him for details after he said he intended to answer all questions truthfully. He said that Carollo was not satisfied with this response and instructed him to tell the investigators that all actions taken against properties owned by or related to the business interests of Bill Fuller/ Barlington Group

were the result of "anonymous complaints." He said that Carollo wanted him and Lugo to get formal statements from neighbors.

Miró said Carollo tried to "coerce me into saying something that is totally not true" and he (Miró) would not put himself in that predicament, to lie about anonymous complaints. "Joe wanted me to say there were anonymous complaints and there were none. I never received any anonymous complaints," said Miro, noting that in his city position, he would have to be aware of citizens' complaints. He suggested that any complaints would be kept in a log for Constituent Complaints and Tanja Quintana would be the employee in Carollo's office maintaining the log.

Miró said that Carollo's Commission Office has an annual operating budget of $514,000, and about 9 or 10 employees. These include his chief of staff Richard Blom, who came a month before his termination; Anthony Barcena, Deputy Chief of Staff; Jose Suarez, Special Assistant; Lizette Palares, Adminstrative Assistance; Tanja Quintana, Receptionist; Mara Roman, District Liaison; Gisela Maestre, Special Aide.

### Orlando Diez, former Director of Code Compliance,
### Construction Manager, Office of Capital Improvements
### City of Miami

Diez appeared at the offices of COE and provided a sworn statement. Diez advised that he has twice served as Code Compliance Director – the first time from about 2011 to 2013, the second time from about December 2016 through late January 2018. He said he had previously served in Capital Improvements and also as director of the Neighborhood Enhancement Team (NET). He said he commenced employment with the City in 2008 as Construction Manager.

He further advised he has a Bachelor's Science Degree in Construction Engineering with an Associate's Degree in Civil Engineering. He said he is a state-licensed General Contractor and Home/Building Inspector, Florida Board of Engineers. He said he is also a certified code enforcement officer through an organization he co-founded in 1988 called FACE. He said the City recently stopped requiring this certification.

Diez said that, as Code Compliance Director, he was responsible for all facets of the office's operations – including staffing, budgeting, scheduling, management, and administration duties, responsible for the creation of operation procedures, reviewing, writing and creating ordinances, special inspections with building department and so forth.

He said his second in command was Assistant Director Jessica Capó. He said the four (4) area supervisors were Daniel Sierra (South, Little Havana, Coconut Grove); Luis Gomez (Southwest, Flagami); Lazaro Orta (Central, Overtown/ Liberty City, Allapattah ); and Michelle Watson (North of Miami River). He indicated the City is broken down into 47 sectors or sub-districts with 50-60 inspectors. He said inspectors worked from 8:00AM to 5:00 PM, but in 2017 an evening shift from 3:00PM to 12:00AM, and weekend shifts for the purpose of inspecting night clubs was created.

Diez said complaints are received in several ways, including the County's 311 hotline, which will pass code complaints along to City inspectors, daily emails and through four operators who intake complaints at the Code Compliance office. He said all complaints are logged into the City View[9] computer program, along with information about inspections, violations and a tracking system for each case. Violations can be heard by the Code Enforcement Board or by a Special Master, if they need to be expedited, meeting twice a month.

Diez said that based on his understanding of the City's Charter and APM[10], elected officials are not allowed to give direction to staff and can only raise concerns through the City Manager's Office. He thinks this may include Assistant City Managers. He indicated in the case of Carollo, many of the code-related complaints originated from Carollo's Office through Miró as well as communication through his direct boss, Assistant City Manager Alberto Parjus.

He said he received calls from Miró, as well as from Mary Lugo, a City union rep. Diez said that many times after receiving calls from Miró and/or Lugo about an alleged code violation, he would also receive calls from Parjus who would complain, "They are driving me crazy" about code issues, inspections, cases going before Special Masters or the Board and why Code Enforcement wasn't resolving the issues about businesses on 8th Street between 12th Avenue and 17th Avenue.

Diez stated Miró was especially insistent about seeking to close down an illegal sandwich shop, telling them, "They don't have a permit. We need to close it down." Diez told him Code Compliance doesn't have the power to do so on its own, but that he did call the police on the sandwich shop on the second occasion code enforcement officers were sent there because it was unlicensed.

Another business was a Market place also on 8th Street around 14th Avenue in which violations had been issued but Miró insisted inquiring about the status for that business and Ball & Chain. Diez said that, with respect to Ball & Chain, he was aware of a single noise complaint his office received from "an old lady" who lived in the corner, on top of Calleocho Havana. He said the same woman complained about a number of nearby businesses, saying they were too noisy even during the day. He said he learned of two or three other alleged complaints about Ball & Chain through Parjus but could not specify their origin.

With respect to the first incident cited in the complaint, the Alfie León campaign rally on November 18th , 2017, Diez stated that he first received a call from Miró and later from Parjus about the rally and that Diez said there was "a party or something going on" at the empty lot. He said Miró wanted code inspectors to find out if they had a special events permit. He said he dispatched a code officer to the scene and that a ticket was issued for lacking a special events permit. Diez indicated that later when Parjus called him he advised that he would send the police.

---

[9] PRR (City View software report) shows 2 Noise Complaints for Ball & Chain on 02/18/18 & 02/20/18.

[10] Administrative Policy Manual (APM), Rules and Regulations of the City.

He said he never spoke directly to Carollo, who was still a candidate for the Commission at that time.

With respect to the second cited incident on December 15th at the Tower Hotel, Diez advised that he was attending the City's holiday party that night. He said that during that event, he had an unsettling encounter with Commissioner Reyes and later Carollo which he would never forget. He said Reyes approached him and, making a play on words using his last name, said, "You may be a 10, but after you come to my office, you're going to be an eight ..." He said that Carollo had joined the conversation by then, and Reyes added, "And after you go his office, you might be a six ..." He said that he "took it as a little intimidation." He said that as the conversation progressed, Carollo told him that he was aware of a large number of violations along Calle 8. He said Carollo told him: "There's a guy there who owns a lot of businesses, buildings, his name is Bill Fuller... they have a lot of violations." He said Carollo told him he had a list of Fuller's properties that he intended to give it to him, saying; "My office has the addresses."

Diez said he assured Carollo that his office would deal with any and all violations and that he never received any list from Carollo, but that he got the message. He said that, based on the Commissioner's remarks, he felt that Carollo was asking him to selectively target Fuller's properties. He said he later provided Carollo's office with a list of all active code violations in Little Havana, numbering 70 to 80 violations. He said he did this to show Carollo that his office was taking action against all code violators in that part of his District.

Regarding the private party by Fullerton/ Barlington Group that same evening at the Tower Hotel and the property next door (west of the hotel), Diez said he started getting calls when he left the City's party around 9:00-9:30 PM , and that he had text messages with photos sent by Mary Lugo. He said he spoke to Lugo on the phone and she told him the party lacked a Special Events Permit and should be shut down. He said that for the party to require such a permit, there would have to be more than 100 people at the party. He said Lugo assured him this was the case, and wanted Diez to call the police to shut the party down. He said that he told her he would send a code officer, and that she was upset with him because he refused to go in person at her request.

Diez said that he called Code Officer Morua (Scarlett) and that she reported back to him that there were no more than 50 people there, including children. He asked her to go back to make sure there were other guests somewhere in the hotel and she responded back assuring there not.

He said he returned Lugo's call to tell her there were fewer than 100 people and that he would not call the police. He said she told him, "You're wrong ... You don't know how to read the Code." He said that about 10 minutes later, he got a call from Parjus asking him to, "Please take care of this" and noting that the complaints were "coming from a Commissioner's office." He said Parjus told him again on that occasion, "They're driving me crazy" and directed him to go there in person. He said he went with a couple of code officers working the late shift and observed only 10-15 people.

Diez said that Parjus warned him Lugo intended to file an ethics complaint against him for disclosing her identity as the complainant for the incident at the Tower Hotel party. He dismissed

her threats, but on one occasion she told him, "the Commissioner was unhappy" about a code-related matter/enforcement. He said he could not recall the matter in question and that she never explicitly stated she was acting on behalf of Carollo.

He said that at about this same time he had received a complaint from Lugo about a storage facility behind a property she owns on or about SW 7th Street and 31st Avenue. He said she was upset when he told her that the contractor was building the structure in accordance with the city permit. Lugo wanted him to remove the final inspection. He stated Lugo remained angry. Shortly thereafter, he received a call from Parjus, "Please take care of it...see what you can do with this guy." He responded, "Sir, "I'm sorry, I am State licensed, I am not going to lose my license because somebody thinks that is wrong" and furthermore, that he reads and checks more plans that maybe she has in her entire life and has a degree. The plans had been approved by Zoning and a permit issued. After that incident involving Lugo and Parjus, problems started for him.

As it related to Ball & Chain's valet service, he said that, at some point, he received a complaint that as many as 15 to 20 cars were lining the north side of the street, but said that once he got there he only found two cars parked in front of the club. He said that unless a code inspector sees the violation in person, no violation can be issued based on third-party hearsay.

Diez said he recalled that earlier this year, after he was re-assigned to Capital Improvements, he received a call from Code officer Daniel Sierra or Dennis Uriarte, concerned about requests from Carollo's office for the Commissioner to go on a "ride along" along SW 8th Street. He said the officers were not comfortable with the idea and that he suggested they put something in writing.

Diez said that prior to his re-assignment, Parjus warned him: "They want your head ... You need to put attention to the violations at Calle 8..." He said Parjus didn't name names. He also indicated he was told by Parjus to keep away from Code Enforcement.

On Friday, July 20, 2018 at 12:07 PM, Diez received a text from Parjus: "Make sure your inspectors and supervisor be on top of violations on District 3 or there will be consequences."

At the conclusion of the interview Diez stated that it was his belief, as far as his re-assignment, that it was due to his strict nature, "follow the law, follow the code", and that he is not too liberal and believes in due process.

### Carlos Diaz, Fire Inspector, City of Miami Fire Department

Inspector Diaz responded to COE's offices to provide a sworn statement. He was accompanied by Christina S. Gornail, an attorney assigned to him through the City's Firefighters Union, the IFF LOCAL 587. Investigators Olmo and Ross along with COE Advocate Michael Murawski were present during the interview.

Diaz stated he has served as a member of the City of Miami Fire Department for 27 years and that he presently serves in the capacity of Fire Inspector. He said that he was acting in that capacity on February 18th, 2018 during the Gay 8 event.

He was hired "over time", working an "off-duty" shift, with a second Inspector, Humberto Garcia.

Diaz said he arrived at about 10:00AM, two to three hours before the event started, and that he and Garcia were tasked with inspecting fire extinguishers to make sure they were not expired and to look for other potential hazards. He said they were going to inspect all vendors located between SW 17th and SW 22nd Avenues participating in the event. He said they started somewhere in the middle and moved east to conduct inspections.

Diaz said that shortly after they began making their rounds, the inspectors were approached by two men. One of whom he subsequently identified as Steven Miró, Carollo's Aide, and a second man, who identified himself as Miró's brother. He said Miró was wearing an orange polo shirt with the Commissioner's insignia on it, and described Miro as a Latin male, with a bald head, and approximately 5'7". Diaz said Miró told him he worked for Commissioner Carollo and that Carollo was concerned about one vendor in particular that was believed to be selling contaminated food and that lacked a license. He indicated Miró seemed anxious. "He kept on following us a little bit…a little close to us", for approximately 20 minutes, while they conducted other inspections, inquiring and insisting they inspect the vendor, "He made it sound like they were definitely in violation, and would have to be shut down.." Diaz said the vendor "Sanguich De Miami" was located at the western end of the event. He said that because of this, he contacted a police officer to assist, but that the officer said he had to remain in his assigned area. He said he was told to contact an officer on the western end.

Diaz said that before they could make it to "Sanguich", he observed that Miró was on the phone and that Miró advised that the Commissioner wanted to speak to him.

Carollo identified himself and "expressed his concern for the citizens" and told him about the spoiled food at "Sanguich" stating he had reason to believe the food had been brought in a day or two ago and being in the hot trailer might be contaminated. Carollo further advised that the vendor lacked proper licenses. He told Carollo that as Fire Inspectors, they don't inspect food or licenses, but that he would pass along the information. He said Carollo told him the City had "issues" in the past with the vendor in question and that he wanted the inspectors "to follow up" with the vendor.

Diaz said that upon arriving at the container "Sanguich of Miami" where the food was being prepared, the vendor seemed "agitated," and that he had to calmly explain the purpose of their visit. He said that once he conducted the inspection of the kitchen area, he determined that "everything was brand new" and "everything had been inspected." He said that he did not observe any spoiled food. "Nothing smelled bad, nothing was rotten." The inspection was conducted in both the container and the tent. Approximately ten police officers congregated outside, as well as Miró. He said the tent was located about 20' from the food prep container for "Sanguich De Miami."

Upon concluding the inspections he notified Miró, the police officers, the "Sanguich" owners and the Gay 8 coordinator that they passed, as far as fire equipment was concerned. Diaz observed Miró on the phone with Betancourt (Special Events) trying to resolve the permit/licensing issue. Betancourt arrived a couple of hours later. As far as he recalls, the vendor was allowed to continue to participate in the event.

With respect to the call from a sitting Commissioner, Diaz said he felt that the call was "unusual" and caught him by surprise. He said he routinely gets tips from police officers, citizens and other city personnel if they have reason to believe there's a safety hazard, but that neither he nor any of the inspectors had ever received such a call from a Commissioner. "Obviously the fact that it came from a phone call from a Commissioner got my attention...I had a sense of urgency because of that."

### Daniel Sierra, Field Supervisor (South East Office)
### Miami Department of Code Compliance

Supervisor Sierra responded to COE to provide a statement. Present were Investigators Olmo and Ross and Staff Attorney Perez. Sierra advised he has worked for the City of Miami for 16 years, presently with Code Compliance since 2008.

He was asked about any interactions with elected officials in recent years. He advised that the only time he was contacted by an elected official was several months ago when he received a telephone call from Commissioner Joe Carollo. Sierra indicated Carollo called him on his cell phone after 5:00PM and stated he had been trying to call the Code Compliance office but didn't get an answer. Carollo wanted an update on his complaints. Sierra told him he'd speak to his director and give him an update. He indicated that at the time Diez had been transferred and Alberto Parjus was the Interim Director. "He just called me about an update. He was very polite. "I wasn't directed to do anything."

Sierra said that, to the best of his knowledge, Carollo made the complaints to Inspector Dennis Uriarte in early March during an impromptu "ride along" with the Commissioner. Sierra indicated those complaints were made on Saturday, March 3rd, and that he responded to the Commissioner, through Director James Bernat in an email several days later.[11] He said the complaint originated with Steve Miró, who contacted Michelle Watt, the supervisor on duty that day, who in turn contacted Inspector Uriarte to meet Carollo.

Sierra said he had no knowledge as to who owned the properties cited in his subsequent "update" email to Bernat. He subsequently learned some of the properties were owned by Fuller. He said it looked like there was some merit to some of the complaints from Carollo.

Asked about any complaints relating to Ball & Chain, Sierra said that he had received a number of noise complaints, including a couple of recent ones, via email from Lorena Ortega. He said

---

[11] Email dated Tuesday, March 8, 2018, from Daniel Sierra to James Bernat, Re: Updates on complaints received from Commissioner Carollo.

Ortega lives across the street from the club in a building overlooking "Azucar." He said she has complained about other business in the area, not just Ball & Chain. He said another resident Ruth, last name unknown, has also made noise complaints about Ball & Chain and inspectors have been dispatched on several occasions and found violations in some instances.

Sierra said that it is the new director's policy to return to establishments cited for possible noise complaints every 45 minutes to verify whether they are in violation of the noise ordinance. He said that this has been done downtown and in other locations besides Little Havana.

Sierra also said he remembered receiving calls from Miró complaining about possible violations at the "Sanguich" shop located in a shipping container.

### Dennis Uriarte, Inspector, Coconut Grove (South) Field Office

Uriarte appeared at COE to provide a sworn statement. Investigators Olmo and Ross were present at the time of the statement.

Uriarte started work with the City of Miami Code Compliance in January 6th, 2016, assigned to the South District, Coconut Grove under supervisor Daniel Sierra. He indicated that complaints come in through 311 or constituents. When questioned about elected officials calling directly, he responded, "they know better." Duarte said that he has been assigned to the same district for the last 2½ years and noted that he has never received a call from his district Commissioner, Ken Russell. Duarte indicated that Russell has never contacted him directly about potential code violations and that complaints go to the Director.

He noted his district does not include SW 8th Street and does not get involved with the rest of the district, but recalled his encounter with Carollo on or about March 3, 2018, in which the Commissioner engaged in a "ride along" with him, pointing out alleged code violations. He said he met with the Commissioner at the request of his supervisor, Michelle Watts. Duarte stated he was working the Saturday shift along with three other inspectors when he received the call from Watts.

He was advised to meet the Commissioner at a small construction site on the 1600 block of SW 8th Street because the Commissioner had a question and needed assistance. Upon his arrival Carollo told him he believed the construction lacked permits. He said he verified online with the City's iBuild website and determined the sight was "legit "and had permits. He also requested a copy of the construction site's plans and found they were proceeding legally.

Uriarte thought that would be the extent of his interaction with the Commissioner, but Carollo then asked if he could ride with him in the City vehicle, in order to point out five sites, located elsewhere on SW 8th Street which he believed had code violations. He wanted Uriarte to "investigate," but he told him he wasn't responsible for that area and would pass the complaints to his supervisor, Danny Sierra. Uriarte indicated, "in my 2½ years, that was the first time, it's

34

been the only time" (referring to an elected official making the request to ride along and investigate)... "It's not usual."

As per the ride-along, he stated he didn't believe it is on the Standard Operation Procedures, "I don't think it is part of our job...it never happens...this was a very unusual task given to me." He continued by stating, "probably the supervisor didn't even know that he wanted to ride with me." He thought Carollo only wanted to check out the initial site but later requested the ride-along to check other sites. Duarte added that being a Commissioner, "I had to say yes" and didn't want to get in trouble for saying no to a Commissioner.

He said some of the complaints seemed to have some basis or merit. "He never said shut down" but wanted him to research possible violations on the sites. Uriarte said that at no time during the ride-along did Carollo mention Bill Fuller or Ball & Chain and he stated he wasn't familiar with Fuller and the first time he heard that name was during this interview.

On Sunday, 03/04/18, Uriarte stated he sent his supervisor an email regarding Carolllo's concerns. Uriarte said he received a follow-up call from Carollo, but he referred him to Sierra for information about any potential code violations on those properties. He confirmed there were the properties cited (March 8th, 2018 email from Daniel Sierra to Director James Bernat).

### Barbara Diaz and Casandra Salazar
### 1520 SW 7th Street

Investigators Olmo and Ross spoke to Barbara Diaz (Diaz) and Casandra Salazar (Salazar), who reside behind Ball and Chain. Diaz is one of the alleged complainants about the noise emanating from Ball & Chain. Diaz indicated she met Carollo when he showed up at the building one night asking "how can the neighbors sleep with all the noise?" She stated they have also spoken to Lugo regarding the noise problem as well the criminal and sexual activity, and recall Lugo reaching out to her introducing herself as Carollo's "secretary."

Salazar indicated that she had also complained about the noise as well as the criminal activity in the area. She said she was personally affected, as her apartment has been vandalized. Nudity, public sex and drug activity is an ongoing occurrence, particularly, in two buildings across the street and a building next door to her apartment complex (the buildings in question are not owned by Fuller). She mentioned she fears for her safety and that of her young children.

Diaz mentioned Ball & Chain built a bandstand outdoors, directly behind their building's parking lot. They contended that other neighbors also complained about the noise (Wednesday through Saturday), and the complaints went unheeded until Carollo's involvement. As per Diaz, the club built a wall alongside their back property, and since then, noise levels have been reduced.

Salazar and Diaz indicated that numerous neighbors have complained to Carollo's office about the ongoing criminal activity and inappropriate behavior including performing sexual acts in the open, nudity and discarding drug paraphernalia, including heroin needles, in the parking lot where neighbors are afraid to allow their children to play outside. Neighbors refer to them as "Puerto Rican drug addicts", "La Maná", and stated drug activity runs rampant in an uninhabitable, condemned building next door. Diaz stated she has lived in the neighborhood for approximately 30 years and the neighborhood has never been so unsafe, forcing some neighbors to move from the area.

With regard to Fuller's property, Diaz conveyed that the owner of Ball & Chain had reached out to them, offering to meet with the neighbors, but she indicated, "there's nothing to talk about," since the noise level has been reduced.

### Angela Roberts, Director, Human Resources, City of Miami

Angela Roberts (Roberts) was contacted regarding the origin of the email dated March 8th, 2018 from Sierra to Bernat and any possible connection to the drive-along two weeks prior.

Roberts indicated she sent out the bulletin as per directive from City Manager Emilio Gonzalez (Gonzalez),[12] but was not aware of the ride-along in question.

She indicated that prior to her sending the Official City Bulletin, Gonzalez sent out a High Importance email regarding communication with the City Administration Service, pursuant to Section 4(d) of the City Charter, and attaching the relevant portion of the section to the Mayor and City Commission requesting "that all communications to the City Administrative service be filtered through the Office of the City Manager and not directly submitted to department directors of other City staff."

She recalled a similar bulletin sent out by former City Manager Daniel Alfonso, advising that direct communication by commissioners not going through the City Manager is a Charter violation. Roberts provided copies of the herein mentioned emails.

_____

On or about August 6th, 2018, the COE Advocate, Michael Murawski, received via email a request by the Complainant to withdraw Complaint # C18-14-03. No additional statements were obtained pending the Ethics Commission ruling.

_____

[12] Email dated 03/16/18 from Angela Roberts to "All City Employees" Pursuant to section 4(d) of the City Charter, the Manager respectfully requests that department heads and all city staff in the administrative service, refer all communication from elected official or their respective staff to the Office of the City Manager...

**E-mails:**

| DATE | FROM | TO | DESCRIPTION |
|------|------|-----|-------------|
| 03/08/18 | Daniel Sierra | James Bernat | Updates on complaints received from Carollo |
| 04/25/18 | Nilda Olmo | Martha Perez | Miro retaining Cunill |
| 05/21/18 | Vivian Reyes | Nilda Olmo | Notice of Appearance on behalf of Parjus |
| 07/20/18 | Alberto Parjus | Orlando Diez | District 3 violations |
| 07/26/18 | Uriarte | Nilda Olmo | Carollo joint inspection-03/03/18 |
| 07/30/18 | Mary Lugo | Martha Perez | Notice of Appearance-Kendall Coffey |
| 07/31/18 | Kendall Coffey | Martha Perez/Michael Murawski | Reschedule Lugo's interview |
| 08/02/18 | Angela Roberts | Nilda Olmo | Communication with the City Administrative Service |
| 08/06/18 | Alex Orlofsky | Michael Murawski | Withdrawal of Complaint |

**Documents/Video Review:**

➢ Any and all documents provided by the City, pertaining to the complainant/respondents, as per the COE PRR, were reviewed by COE staff.
➢ Email dated 03/08/18 from Daniel Sierra to James Bernat re: Updates on complaints received from Commissioner Carollo.
➢ Official City Bulletin dated 03/16/18, from Department of Human Resources Director Angela Roberts to all City employees.
➢ Documents provided by Complainant:
    1. Photographs: Pre-election, Alfredo "Alfie"Leon rally
    2. Photographs: Park & Walk
    3. Video clip: Park & Walk
    4. Video clip: Gay 8 Festival-Sanguich de Miami
➢ Documents provided by Respondent Carollo:
    1. E-mail dated 04/17/18 from Jose Dacal, FDOT
    2. Sunbiz.org, Division of Corporations-DRH Entertainment, LLC (SideBar Miami)
➢ Documents provided by Vivian Reyes:
    1. Miami Herald, 07/05/17, <u>Downtown tower dwellers to Miami dance clubs: Turn down the noise!</u>
    2. <u>Miami Herald, 07/18/17, Downtown nightclub owners want citations for loud music dismissed.</u>
    3. City of Miami Charter and Code, Noise Ordinance, Chapter 36

- ➢ Photographs provided by Diez
- ➢ Documents provided by Escandon:
    1. S.H. Valet Service
- ➢ Documents provided by Uriarte regarding "drive-along" with Carollo
- ➢ Documents provided by Arnay Garcia.
    1. CCSG Letter dated 03/12/18 re: Ball & Chain valet surcharge
    2. CCSG Letter dated 04/04/18 re: Surcharge payment plan
    3. City of Miami Parking Surcharge Assessment, S.H.Valet

# EXHIBIT B

SWORN STATEMENT OF STEVE MIRO

AUGUST 3, 2018
2:30 P.M. TO 3:32 P.M

BARLINGTON GROUP
1637 SOUTHWEST 8TH STREET
SUITE 200
MIAMI, FLORIDA 33135

REPORTED BY:
YENLY CALVO, COURT REPORTER
NOTARY PUBLIC, STATE OF FLORIDA





```
 1                    APPEARANCES OF COUNSEL

 2

 3    ALEXANDER S. ORLOFSKY, ESQUIRE
      ORLOFSKY LAW FIRM, P.L
 4    767 ARTHUR GODFREY ROAD
      MIAMI, FLORIDA, 33140
 5    (305) 538-234
      alex@orlofskylwfirm.com
 6

 7    ALSO PRESENT:

 8    WILLIAM O. FULLER

 9    MICHEAL MICHETTI

10    OSCAR MUSIBAY

11    ANDREW MAXFIELD

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXAMINATION

 2   WITNESS:  STEVE MIRO
                                                   PAGE
 3   DIRECT EXAMINATION
          By William Fuller &
 4        Alexander S. Orlofsky, Esquire              5

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 1:28-cv-24290-RSMD Document 253-5 Entered on FLSD Docket 06/26/2024 Page 102 of 191

```
 1                        INDEX OF EXHIBITS

 2

 3    NO EXHIBITS MARKED

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1              SWORN STATEMENT OF STEVE MIRO

 2                   AUGUST 3, 2018

 3   Thereupon:

 4                   STEVE MIRO,

 5   was called as a witness, and after having been first

 6   duly sworn, testified as follows:

 7         THE WITNESS:  I do.

 8                 DIRECT EXAMINATION

 9   BY MR FULLER AND MR. ORLOFSKY, ESQUIRE:

10         THE COURT REPORTER:  If everyone could please

11      announce themselves on the record.

12         MR: FULLER:  Bill Fuller.

13         MR. ORLOFSKY:  Alexander Orlofsky.

14         MR. MICHETTI:  Michael Michetti.

15         MR. MAXFIELD:  Andrew Maxfield.

16         MR. MUSIBAY:  Oscar Musibay.

17         THE COURT REPORTER:  Thank you.

18      Q    (Mr. Orlofsky)  And good afternoon Mr. Miro,

19   as I explained earlier, you're here today to give a

20   sworn statement.  This statement is being recorded and

21   you have chosen to not -- to be here without an

22   attorney, is that correct?

23      A    Yes.

24      Q    As you can see she's also recording everything

25   we say, so it's very important that when you answer a
```



877.291.3376
www.UCRinc.com

1    question you give a verbal response.  Even though it is

2    recorded, I want the record to reflect the yes or no and

3    not a -- a nod.  And we're not in a deposition here so

4    anyone can ask questions.  So let me start with the

5    beginning; why don't you give us a little bit of

6    background as to why you're here today?

7         A    I got called in and I don't have nothing to

8    hide.

9         Q    Oh.  So briefly before we got started you

10   mentioned you had filed two state ethics complaints.

11        A    Right.

12        Q    Would you mind describing them to me?

13        A    Not right now, they are being investigated by

14   the -- by the State.

15        Q    What is the basis of the two complaints that

16   you filed?

17        A    One is regarding my case and the other one is

18   the targeting of businesses.

19        Q    Tell me what you know about the targeting of

20   businesses by Commissioner Carollo?

21        A    Can you go a little more?

22        Q    Do you have any firsthand knowledge of

23   Commissioner Carollo targeting any specific businesses?

24        A    Yes.

25        Q    Tell me what you know.



```
 1      A    I mean, it's -- it goes into a lot you know.

 2      Q    Start at the beginning.

 3      A    When he took office?

 4      Q    Yes.

 5      A    When he took office, you know, he went after

 6   Mr. Fuller, obviously.  You know, he -- he does have a

 7   spreadsheet; I don't know who did it for him, it wasn't

 8   me that's for sure, of all the businesses he has in the

 9   district.  He's gone with --

10      Q    (By Mr. Fuller)  Business or properties?

11      A    Properties.

12      Q    (By Mr. Fuller)  Okay, properties.

13      A    Properties; all your properties.

14      Q    (By Mr. Fuller)  But everybody's property or

15   like specific list?

16      A    Yours.

17      Q    (By Mr. Fuller)  Okay.

18      A    What -- Whatever --

19      Q    (By Mr. Fuller)  Does it have a name?

20      A    -- company known --

21      Q    (By Mr. Fuller)  Does it have a name?

22      A    There are no names and I know that -- that he

23   has it.  I know that -

24      Q    (By Mr. Fuller)  But do they ever get like a

25   certain -- Like where they referred to as like something
```



```
 1  or there's a list?
 2      A    They're -- they're -- they're, I guess, they
 3  are through the property appraisal website.
 4      Q    (By Mr. Fuller)  Okay.
 5      A    So he does have that list.  I don't -- So --
 6      Q    (By Mr. Fuller)  And how was it -- So the --
 7  How did -- Would he use the list?  How was it --  How
 8  was it -
 9      A    Well, when he went with -- excursions with the
10  mayor, the city manager, the deputy city manager, code
11  enforcement --
12      Q    (By Mr. Fuller)  Mhmm.
13      A    -- director, he showed them all the
14  properties, you know.
15      Q    (By Mr. Fuller)  Mhmm.
16      A    We walked up and down 8th Street all the way
17  to 6th Avenue; believe it or not.  We turned back around
18  you know, and walked back the other way showing the
19  business that have violations and obviously, they were
20  your businesses.
21      Q    (By Mr. Fuller)  Mhmm.
22      A    Martin was in -- walked with us not -- not
23  that long, maybe about 45 minutes.  I was mainly talking
24  to him --
25      Q    (By Mr. Fuller)  Correct.
```



1    A    -- I don't know if he ever spoke to you about

2    it.

3        **Q    (By Mr. Fuller)  Yeah, he did.**

4    A    I tried to get him a meeting but obviously, I

5    told him, "Man, I could only try."

6        **Q    (By Mr. Fuller)  Right.**

7    A    "It might not happen but I'll try, obviously,"

8    and--

9        **Q    (By Mr. Fuller)  Mhmm.**

10   A    -- it didn't occur.

11       **Q    (By Mr. Orlofsky)  When did you first have one**

12   **of these walkthrough up and down 8th street?**

13   A    I'm going to say after the entire court ordeal

14   with him was over, so I'd say maybe end of January,

15   February.

16       **Q    (By Mr. Orlofsky) So the end of January.**

17   A    Now, I wasn't with him for the deputy city

18   manager one nor the city manager one; I was with him for

19   the code enforcement and the mayor.

20       **Q    (By Mr. Fuller)  Right, I saw you guys on the**

21   **-- on the code enforcement one.**

22   A    Yeah.

23       **Q    (By Mr. Orlofsky) And before you had this**

24   **walkthrough did you have any conversations specifically**

25   **with Commissioner Carollo about --**



Miro, Steve   08-03-2018        Page 10 of 70

```
1        A    Before him?

2        Q    (By Mr. Orlofsky) Before the walkthrough.

3        A    No, no; I didn't even know what it happening.

4   He was calling me, "Hey, meet me here at the pub -- by

5   the pub," and I got down and that's when everyone came

6   together.

7        Q    (By Mr. Orlofsky) Do you know if after that

8   walk-through the City of Miami had memorialized that --

9   that walkthrough?  Like do you know of any documentation

10  that would have been created by the city?

11       A    It might be e-mails but I -- I don't know.

12       Q    (By Mr. Fuller)  Why would he target us?  Why

13  would he target us?  Like -- Like myself, my partners,

14  my business; like what -- what was the impulse behind

15  that?

16       A    Well, he could probably get a radio because he

17  said it on the radio on Marta Flores Station.

18            `THE COURT REPORTER:  I'm sorry, can you

19       repeat that?

20            `THE WITNESS:  Marta Flores, and on TV.  Now,

21       I don't -- I don't watch Spanish news so I don't

22       know where.  But I know he's put it out there a

23       couple of times on the record and he's put it also

24       off the record on the City Dias that there is

25       businesses being influenced by Venezuelan dirty
```



877.291.3376
www.UCRinc.com

Case 1:18-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 109 of 191
Case 1:23-cv-24350-PAS Document 25 Entered on FLSD Docket 06/28/2024 Page 120 of 191
191

1    money.  And that's what he thinks that -- where

2    your money comes from.  And he says the one -- the

3    one that sells chocolate and guayaba here is part

4    of the Venezuelan communist government.  So he's

5    really fixated on that; I mean, it's not just you

6    alone, he has a friend of mine that he's targeting

7    also.

8        **Q    (By Mr. Fuller)  But is that -- Was that**

9    **always his impetus?  Was that always even the idea**

10   **behind like -**

11       A    Well, it -- it's that combination obviously,

12   you went against him in the commissionaires by donations

13   to -- giving him building and what have you.  And --

14       **Q    (By Mr. Fuller)  But didn't a lot of people do**

15   **that as well?**

16       A    Yeah, yeah they did.

17       **Q    (By Mr. Fuller)  But do you think he was**

18   **targeting other people as well?**

19       A    I don't know if --

20       **Q    (By Mr. Fuller)  For political -- For**

21   **political reasons?**

22       A    He has or mainly them -- they're lobbyists so

23   they don't have to go to him specific for the vote or to

24   count to three.  But you're obviously in the heart of

25   the district that he quote-unquote, cares so much about.



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

```
 1        Q    (By Mr. Fuller)  What -- What do you know
 2   about the lady behind Ball and Chain that -- that we saw
 3   you guys meet with; the blonde neighbor you and Mary
 4   Lugo that day you did the walk-along?
 5        A    Oh, yeah.  While doing that walk-along she was
 6   like, "Oh, I want to show you to some neighbors."  Well,
 7   those neighbors we started knocking on the doors and
 8   they were saying how bad the music was, that they hear
 9   it or what have you.  But initially, I -- I did a
10   records request on that and they never made any
11   complaints.  My falling out with Joe started when you
12   filed the ethics complaint because I'm not going to lie
13   about it.  And he tried to coarse me into staying which
14   I've told the ethics already that, you know, we got --
15   You know, this is all pie in the sky; it's bullshit.
16   And I said, "Well, some of it is, I mean, at least for
17   me because you know I'm under the directive of you."
18   And I told him, "Look, I've retained an attorney for
19   this and we can't really be talking about it."  And then
20   he's like, "Oh, you did?" You know, he got a little
21   upset there and -- and then he said, "Well, you know, we
22   got anonymous complaints for this."  And I'm like, "Joe,
23   I'm going to say the truth." You know?  And he's like,
24   "What's the truth?"  And I'm like, "Whatever they ask
25   me.  I don't know what they're going to ask me but I'm
```



```
 1   going to say the truth."

 2       Q    (By Mr. Fuller)  Correct.

 3       A    That's it, and that's when it started

 4   deteriorating.

 5       Q    (By Mr. Fuller)  And did he ever express

 6   anything to you about the ethics complaint other than

 7   that; did he ever bring it up again?

 8       A    Only once; maybe once but he did it with me.

 9       Q    (By Mr. Fuller)  We're you guys -- Can you

10   explain the night that you guys went out the lot, the

11   valet lot; how that happened?  Like what time that was

12   at, how -- how the events -- those events took place?

13       A    That was like at night, yeah.

14       Q    (By Mr. Fuller)  And how did that happen?  Who

15   -- Who was in the car that day?

16       A    It was me and my wife, Mary Lugo and -- and

17   Joe.

18       Q    (By Mr. Fuller)  And -- And can you just

19   explain like how that night went down from your side?

20       A    Well, I had dinner with my wife and Joe called

21   me, "Hey, meet me at the pub," it's like -- it's like

22   nine o'clock or so.  I was with my wife, you know, so we

23   go and then he's like -- We had a coffee while we spoke

24   and then Mary Lugo showed up, we got in his car; he was

25   driving and, you know, we started driving around just
```



```
 1   this area various times and my wife kept saying, "You

 2   know, I got to go," she worked the next morning.  And

 3   that's what transpired.

 4        Q    (By Mr. Fuller)  Well, what happened

 5   specifically on that lot?  Like --

 6        A    No, he had it with that lot that it was in a -

 7   - it wasn't paved, there wasn't a sewer, there wasn't

 8   proper lighting so it's not a parking lot.  He's had

 9   various conversations and I know he pretty much

10   interrogated Norieaga for that.

11        Q    (By Mr. Fuller)  What did he --

12        A    You might want to talk to Norieaga.

13        Q    (By Mr. Fuller)  What did he --

14        A    I mean, I was in that meeting also with

15   Noreaga but --

16        Q    (By Mr. Fuller)  So he -- So was that

17   meeting--

18        A    He started asking questions --

19        Q    (By Mr. Fuller)  Was that before --

20        A    -- what's the process to get parking lot

21   approval --

22        Q    (By Mr. Fuller)  Was that before or after that

23   -- that parking lot?

24        A    That was --

25        Q    (By Mr. Fuller)  -- that night.
```



Case 1:23-cv-24251-RAM Document 125-326 Entered on FLSD Docket 06/28/2024 Page 16 of 91
191

1        A    -- after.

2        Q    (By Mr. Fuller)  After that night?

3        A    Yeah, after that night and you know, Norieaga

4    started saying, "This is a process through the city,"

5    and -- and so forth.

6        Q    (By Mr. Fuller)  Mhmm.  And so what happened

7    that night after he -- So he went over there; what was

8    the objective to go there?  What was the objective that

9    night to show up on that lot?

10       A    I don't know, to take pictures and videos?

11       Q    (By Mr. Fuller)  Mhmm, and did he?

12       A    Like -- Yeah.

13       Q    (By Mr. Fuller)  He took pictures and videos?

14       A    I don't know if he did but I know that -- that

15   there is.

16       Q    (By Mr. Fuller)  And what is Mary Lugo to the

17   equation?  How -- What does -- What does -- What's the

18   scope and scale of the Mary Lugo relationship?

19       A    Well, she's -- She works for the union, so she

20   does have -- Joe believes hardcore in access to

21   everything.  So she gets access to everything in the

22   city because she's a union employee.  Well, she works

23   for the union; so she's the --

24       Q    (By Mr. Fuller)  You mean access for like

25   public files --



Case 1:23-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 114 of 191

```
 1        A    For anything, yeah.

 2        Q    (By Mr. Fuller)  So she -- she has access --

 3             THE COURT REPORTER:  One at a time.

 4             MR. FULLER:  I'm sorry.

 5             THE COURT REPORTER:  That's okay.

 6        Q    (By Mr. Fuller)  She has access to everything?

 7        A    She gets everything quick, yes and she gives

 8   it to him.  And at times she gets one of those booklets

 9   within hours, you know, and again hands it to him.

10        Q    (By Mr. Fuller)  And how does she have access

11   -- How does a union employee have access to that?  What

12   -- It's just because she --

13        A    Because she goes to the city, you know to City

14   Hall.

15        Q    (By Mr. Fuller)  She has the right --

16        A    I mean, not City Hall, the MRC Building.

17        Q    (By Mr. Fuller)  She has the right to request

18   that stuff or --

19        A    Well --

20        Q    (By Mr. Fuller)  -- she just has

21   relationships?

22        A    I have no idea how she gets it but she does

23   get it.

24        Q    (By Mr. Fuller)  All right.

25        A    Either, through friendship, you know.  She
```



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

```
 1  does work for the employers in their -- in their

 2  bargaining unit.

 3       Q     (By Mr. Fuller)  Do you know anything about

 4  Mary Lugo's involvement with my Christmas party at the

 5  Tower Hotel?

 6       A     That I -- I didn't even know about it.  They

 7  kept talking and I never put two and two together until

 8  obviously, recently -- Not recently but until I got it.

 9  I'm like, "This is what they were," I had no knowledge

10  of that whatsoever.

11       Q     (By Mr. Fuller)  Are you -- Are you aware of

12  anything that was ever discussed with the idea of Mary

13  Lugo being compensated for a like -- a type of like

14  position or some type of like --

15       A     Well, now is on the Bayfront Park Board.

16       Q     (By Mr. Fuller)  Was there ever like you

17  scratch my back, I scratch your back?  Was there ever

18  like an understanding of how she was like -- You know,

19  if she did -- If you do my -- my special work I'm going

20  to -- I'm going to reward you with - with this --

21       A     Well, just what he said, that he was going to,

22  which he hasn't; I don't know why he was going all out

23  on her that she -- he was going to put their contract --

24  The first thing he was going to do -- Well, obviously,

25  there's a lot of the first thing he was going to do that
```



```
 1   he was going to put their contract on the commission
 2   agenda so that he could renegotiate their contract.
 3        Q    (By Mr. Fuller)  Mhmm.  Is there -- Is Joe
 4   Carollo -- Is he a good business guy?
 5        A    No.
 6        Q    (By Mr. Fuller)  Does he have money like you
 7   think he's like a guy that has wealth?
 8        A    Well, yes, now he does.
 9        Q    (By Mr. Fuller)  How is that?
10        A    He's Coconut Grove house is no longer in the
11   Homestead Exemption.  So he does have about $2 million
12   there in assets.
13        Q    (By Mr. Fuller)  Mhmm.  And do you -- Does he
14   have any like holdings or business interests or
15   relationships like in Little Havana or Calle Ocho that
16   you're aware of?
17        A    Trick -- That's a tricky question and I'll
18   tell you why; because he wanted to eliminate the Bienes
19   Culturales.  So he had his attorney, Ben Kirney
20   (phonetic) open up another corporation of the Que Pasa
21   Little Havana I believe.  You got to check Sunbiz for
22   that, that's what I believe it's called.  And he --
23   Well, he came on the news --
24        Q    Yeah.
25        A    -- on Univision --
```



1       Q    (By Mr. Fuller)  I never heard of it.

2       A    -- and so forth.  So he made a board of all

3   women, that's when he won, to take advantage of Bienes

4   Culturales.  And the initial thing was, you know, he was

5   going to -- through his office budget he was going to

6   donate money to that and then get, obviously, once Alex

7   was going to be like the County Commissioner there was

8   going to be a -- an influx of cash in there through the

9   County Commissioner budget into that fund which is going

10  to be enough for profit.  I don't know what they've done

11  with that, a board or -- or what have you but I don't

12  even know if it exists or not but I know it's still.

13      Q    (By Mr. Fuller)  But why would he want to

14  create that?  What would be the reason?

15      A    To take -- take over Bienes Culturales.

16      Q    (By Mr. Fuller)  Why?

17      A    From you.

18      Q    (By Mr. Fuller)  Just because it's mine?

19      A    Just because it's you.

20      Q    (By Mr. Fuller)  Yeah.  But is there anything

21  like -- Does he have like aspirations to own real

22  estate, to run a mojito business, to -- to, you know,

23  sell Cuban coffee, like does he -- is he -- does he have

24  any business interest --

25      A    No.


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1      Q    (By Mr. Fuller)  Does he have any campaign

2    funders that have significant interest on Calle Ocho;

3    anybody that you think would be meaningful enough to

4    influence or persuade his decision making?

5      A    Well, the Valves (phonetic); the Valves

6    family.

7      Q    (By Mr. Fuller)  Why do you think the Valves?

8      A    I -- I don't know.  He's funder's mainly, you

9    know, the -- his funders really, Manolo Reposo

10    (phonetic) you know, donates a lot --

11      Q    Manolo Reposo Who's that?

12      A    He's a business partner of Felipe, he was a

13    former commissioner, they're very good friends.

14      Q    (By Mr. Fuller)  And what -- Is there anything

15    other than like political or friendship that you could

16    think about that would be -- that they would have an

17    interest in --

18      A    No, I just know that he kept always mentioning

19    though what is it, the 100-pound gorilla statement, he's

20    going to bring them on boards so they could, you know,

21    come and concur Little Havana.

22      Q    (By Mr. Fuller) Who's the 100-pound gorilla?

23      A    Them.

24      Q    (By Mr. Fuller)  The Valves family?

25      A    The Valves family.



1    Q    (By Mr. Fuller)  So you -- You think that he

2    is -- Do you think that -- So when you say he -- I want

3    to explore this more.  So he referred to the Valves as

4    the 100-pound gorilla.  Do you think that he's overall

5    interest is acting on their behalf for their benefit?

6    Like do think that if you were to destroy like Ball and

7    Chain, for example, it could be a -- Like, do you think

8    that Ball and Chain is somehow competition to the

9    Valves?

10   A    My opinion, no.  I don't think -- I don't

11   see --

12   Q    (By Mr. Fuller) But do you think that Carollo

13   might think that?

14   A    I can't put myself in that guy's mind.

15   Q    (By Mr. Fuller) But what were the -- Let's go

16   back to the 100-pound gorilla thing; what does that

17   actually mean?  Like did you think that --

18   A    I never understood it, you know.

19   Q    (By Mr. Fuller) Well, did he -- Explain how he

20   would have used it in context, like --

21   A    He said, "Oh, these people think they have

22   money?  I'm going to bring the 100 pound gorilla here."

23   Q    (By Mr. Fuller) To the street?

24   A    Yeah.  "And they have influence and they think

25   they can do what they want."  Again, it's -- it's been



```
 1  put multiple times on the record.
 2      Q    (By Mr. Fuller) Of course, yeah.  I mean, it's
 3  amazing what he says on the air.  What about other
 4  relationships like Brickle Motors and stuff like that?
 5      A    Mario Murgado (phonetic)?  I don't -- You
 6  know, Mario I think he -- He has mentioned it but I
 7  don't think Mario, he just cared about his dealership.
 8      Q    (By Mr. Fuller) Got it.
 9      A    Mario I don't think he wants to open up a
10  mojito shop or, you know, any of that, that's --
11      Q    (By Mr. Fuller) But -- But did -- But was he a
12  campaign -- Did he --
13      A    Yes.
14      Q    (By Mr. Fuller) -- support the campaign --
15      A    Yeah, he did.
16      Q    (By Mr. Fuller) -- in a big way?
17      A    Yeah.
18      Q    (By Mr. Fuller) Yeah.  But nothing ever came
19  up with regards to, you know, -- You never heard
20  anything about --
21      A    He's had conversations with him but, you know,
22  I don't think Mario is really interested in -- in -- in
23  going outside what he knows, you know, it's just --
24      Q    (By Mr. Fuller) No, I'm not -- I'm not
25  suggesting that -- that the coffee -- like Mario Murgado
```



Case 1:23-cv-24251-FAM Document 25326 Entered on FLSD Docket 06/28/2024 Page 121 of 91
191

1   wants to open a Cuban bar; that's not what I'm saying.

2   But Mario Murgado wants to sell cars and he is on Calle

3   Ocho, and we -- I have had personal issues Mario Murgado

4   about the vision of Calle Ocho.  And therefore, I have

5   often times thought, maybe it's incorrect, that Mario

6   might have had influence in him in creating problems

7   because I want more Cuban culture and Mario wants to

8   sell more cars.  So, I know Mario is -- I consider Mario

9   a 100 pound gorilla equal to the Valves in those

10  statements. And so I -- I'm just exploring all possible

11  angles.  So you -- Do you think that there is any

12  involvement in --

13       A    Well, he has mentioned him as a part of it but

14  I don't -- I don't see Mario even playing it.

15       Q    (By Mr. Fuller) Right.  What happened the day

16  of the walkthrough; like what was the intent?  Like I

17  mean, we videoed the whole thing, we photographed the

18  whole thing, like it's -- it looked very specifically

19  that you guys happened to like other properties more

20  than other properties.

21       A    Yeah.

22       Q    (By Mr. Fuller) Who was there, how were they

23  called, why were there?  Like what --

24       A    Again, everybody knows -- I didn't even know I

25  was going there to do that walk-through.  Luckily, I had



1  my sneakers on that day but I didn't know I was going to

2  be put in that predicament myself also.  I mean, I was

3  just mainly targeting Martin, you know because Joe

4  didn't want anything to do with Martin.  He started

5  talking to me and I started talking to Martin the entire

6  time -- Not the entire time, the majority of the time.

7      Q    (By Mr. Fuller) Right.

8      A    The code enforcement officer was taking notes.

9  I mean, I didn't take any notes because I'm not a code

10 enforcement officer, so I was just along for the ride,

11 you know.  I mean, when your boss says be here, you be

12 here -- you be there.

13     Q    (By Mr. Fuller) What's up with the state

14 attorney investigation?

15     A    No idea.

16     Q    (By Mr. Fuller) What happened?  You met with

17 them, you gave them a statement?

18     A    Right.

19     Q    (By Mr. Fuller) Have they ever called you

20 back?

21     A    We've been in contact but obviously, after the

22 campaign ended, no more contact.  We've spoken a couple

23 of times but --

24     Q    (By Mr. Fuller) Did they --

25     A    -- it's a pending investigation, I don't want



877.291.3376
www.UCRinc.com

```
 1   to get into that.
 2        Q    (By Mr. Fuller) Did they pick up -- Do you
 3   think they're going to pick up the case?
 4        A    I hope so.  I mean, I gave them more
 5   ammunition on what they needed, hopefully, they so
 6   something.
 7            MR. FULLER:  You have some questions?
 8            MR. ORLOFSKY:  I do.
 9        Q    (By Mr. Orlofsky) After the walkthrough did
10   Commissioner Carollo ever tell you to do anything
11   regarding Mr. Fuller's properties?
12        A    What do you mean anything?
13        Q    (By Mr. Orlofsky) Did he ever tell you to
14   follow up with code enforcement afterward; follow up
15   with the parking department --
16        A    I sent -- I sent out an e-mail once, yes.
17        Q    (By Mr. Orlofsky) And what -- To the best of
18   your knowledge what did the e-mail request?
19        A    It -- It was nothing harsh it was just saying
20   which properties are -- are under whatever valet
21   company, I believe.  And I got an e-mail right away, I
22   think it's two or three lots or what have you, and I
23   just gave them to Carollo.  I mean, I never did any
24   really follow through with code enforcement whatsoever.
25        Q    (By Mr. Fuller) Did you ever think like in all
```



1    interactions that you were having and all this stuff,

2    like did you ever say to yourself, "Man, I'm actually

3    being utilized to target these people?"  Like, "I'm

4    actually, like this might not be good or any of that?"

5    Like did that ever cross your mind?

6          A    Of course.

7          Q    (By Mr. Fuller) And so did you ever confront

8    that with him?  Did you ever say to him --

9          A    I confronted Joe all the time, that's why --

10         Q    (By Mr. Fuller) And what did he say?  What was

11   his -- What was his M.O?

12         A    He -- He was just -- You know, every time I --

13   I spoke to him harshly like because, during the campaign

14   that -- that's what I was, yeah, you know, he was just

15   taking it back.  I guess he thought now that he was

16   commissioner he was, you know something else, you know.

17   But I guess he didn't like majority of my tone.  But he

18   never gave me an answer, you know.  He just said, "Look,

19   Steven, this is what I'm doing."

20         Q    (By Mr. Fuller) Well, just specifically, to

21   like, "Hey, why are you targeting these guys?" or like,

22   "Why are you doing this?"  Like --  Would you -- Would

23   you ever be like, "We shouldn't do that?"

24         A    Well, you know, I -- I've always tried to

25   divert to stuff in the -- in the district, you know.



1    Let's do the enhancements we said we were going to do,

2    the housing authority; I always tried to bring that back

3    and try to put it on the agenda.  I was only able to put

4    it once on the agenda, after that it was, you know,

5    nothing else, it was, no more working for the people, we

6    were just you know.  One day it was you, the next day it

7    was the mayor, the next day it was city manager; we were

8    just, you know, it was the flavor of the week.  We were

9    going back and then there was just to go in circles from

10   me coming back to you, coming back to -- Now we're going

11   after the mayor.

12        **Q    (By Mr. Fuller) What is his -- What is his**

13   **reason behind this neighborhood and why he wants to shut**

14   **down the businesses?  Like what -- What -- Like my**

15   **business and the -- like what is, at the end of the day,**

16   **what is his gain, what is his benefit from it?**

17        A    I don't see no benefit, you know.

18        **Q    (By Mr. Fuller) But is that something --**

19        A    That --

20        **Q    (By Mr. Fuller) -- is that just like a --**

21        A    -- That gives him a fiscal impact in the

22   city --

23        **Q    (By Mr. Michetti) Is it an ego thing?  I mean,**

24   **I -- I -- I've seen his videos.**

25        A    It might be an ego thing if you're right.



877.291.3376
www.UCRinc.com

Miro, Steve    08-03-2018          Page 28 of 70

```
 1        Q     (By Mr. Fuller) But what is the ego --

 2        A     Okay.  Look --

 3        Q     (By Mr. Fuller) How does that boost or enhance

 4   his ego?

 5        A     You know, I know -- Look, my -- my godfather

 6   is a magistrate.  I mean, he helped you the last time

 7   which was August 5th day I was -- I was terminated 4th

 8   of June. The 5th it was code enforcement hearing that

 9   Joe showed up to that hearing.  My godfather was the

10   magistrate in that hearing.

11        Q     (By Mr. Fuller) No way.

12        A     Yes.

13        Q     (By Mr. Fuller) Wow.

14        A     And he gave you guys a 30-day extension.

15        Q     (By Mr. Fuller) Right, we heard that in the

16   audio tape.

17        A     He saw -- He saw Carollo walk in and you know,

18   he saw Carollo sitting next to the two people and he

19   didn't think much of it, you know.  After he rendered

20   his decision, Joe Carollo, he's like, "Commissioner

21   Carollo," out of respect he brought him up, "is there

22   anything you want to say or?"  And he's like, "Yeah,

23   absolutely, I came here to take about that case."  But

24   the case was already closed.

25        Q     (By Mr. Fuller) Right.
```



```
 1        A    And he wanted to reopen the case and --

 2        Q    (By Mr. Fuller) Right.

 3        A    -- my godfather, obviously, ethic -- ethically

 4   he can't do that.  He did it to it and now with Joe

 5   Carollo got rid of all magistrates.

 6        Q    (By Mr. Fuller) Correct.

 7        A    --in the city.

 8        Q    (By Mr. Fuller) Unbelievable.  Was that

 9   something -- He -- He's maintained that that's something

10   he was working on for a long time previously.  Is that

11   true or not?

12        A    Never heard of that.

13        Q    (By Mr. Fuller) Do you -- Were you aware that

14   after he got his tail between his legs, an opinion

15   that's what happened, that he started a campaign

16   overnight to get that legislation written?

17        A    Yeah, I mean, that's the first I heard of it,

18   you know.  And then the other magistrates --

19        Q    (By Mr. Fuller) Because the next morning by

20   10:30 --

21        A    It's such a minimal impact on the budget and

22   what they do is so well.  I mean, I think, you know, and

23   when I saw my godfather on Sunday and he told me he gets

24   paid three grand a year, you know.

25        Q    (By Mr. Fuller) Right.
```



Case 1:23-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 128 of 191

1    A    For that's -- You know, it's not a money

2    maker.

3    Q    (By Mr. Fuller) Did you -- What about the

4    marketplace?  Like was there anything specifically that

5    ever came up with the marketplace or working at the shop

6    with the containers and all that stuff?

7    A    Yeah, there -- there's -- He's been going

8    after that for a while.

9    Q    (By Mr. Fuller) But what was his -- What was

10   his?

11   A    I have -- I have no idea.  I wasn't --

12   Q    (By Mr. Fuller) Was there anybody else that he

13   speaks to that like -- is like closer -- was closer to

14   his inner circle -- was there -- Is somebody that he

15   strategizes with and -- and speak --

16   A    Yeah, Portilla gives him -- is like the fuel

17   to his fire.

18   Q    (By Mr. Fuller) He -- He's in the office a

19   lot?

20   A    I don't know if he's in the office after the

21   whole ordeal that occurred but in the beginning --

22   Q    (By Mr. Fuller) Oh, okay.  But I'm -- But I'm

23   saying like in consultation or what not --

24   A    You know, yeah, they -- they used to have

25   outside meetings a lot here in the pub.  CJ is another -



1   - which is junior.

2        Q    (By Mr. Fuller) What about Sornof (phonetic)?

3        A    Sornof is yeah, one of his money guys and also

4   has his ear.

5        Q    (By Mr. Fuller) Who else is a money guy?

6        A    That's -- I mean, besides Sornof, the Valves--

7        Q    (By Mr. Fuller) So you're -- You keep

8   mentioning the Valves; were the Valves close to Carollo?

9        A    No, not -- not really Manolo is the one that -

10  - that has the direct access to him.

11       Q    (By Mr. Fuller) Because I have a relationship

12  with the Valves and I -- I think they've -- Honestly I

13  believe that they're --

14       A    They're more of in their own business.

15       Q    (By Mr. Fuller) They've always been very

16  straight up people.

17       A    Yeah, they know --

18       Q    (By Mr. Fuller) I think that they give to a

19  lot of people.  But I honestly, I've even talked about

20  partnering with them on certain things; I just don't see

21  the Valves.

22       A    I -- I don't either but I do have to mention

23  them because that's who Joe has close to ties to, you

24  know.

25       Q    (By Mr. Fuller) Got it.



Case 1:18-cv-24291-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 33 of 91
191

1    A    Like the -- the day that I was terminated, the

2    next day, I was over there, not in the third floor where

3    they were at but I have a buddy that has an office in

4    the second floor.  And I was in his office all day

5    there, you know, trying to put together some -- some

6    stuff and Carollo was there.  It just so happens, that

7    he was in the same building on the third floor with the

8    Valves all day. You know, that was really trying to

9    raise money for him, for his -- for his pack, for his

10   ECO.

11        **Q    (By Mr. Fuller) What his pack?**

12   A    Miami First.

13        **Q    (By Mr. Fuller) An what is that?**

14   A    The pack; his ECO.

15        **Q    (By Mr. Fuller) What does he use that for?**

16   A    Well, so far which is an ethics violations

17   also, he's paid his attorney Ben Kirney, out of that.

18        **Q    (By Mr. Fuller) His attorney gets paid out of**

19   **his pack?**

20   A    Yes and -- I mean, he could use the ECO for

21   almost, you know, anything but he can't pay attorneys

22   from that.  But that's pretty much the expenses that

23   have occurred, you know, expenditures, that's just been

24   Ben Kirney.

25        **Q    (By Mr. Fuller) What -- If -- If there is**



Case 1:23-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 131 of 191

1   evidence that you think -- Do you have any information

2   that you think could remove him from office?

3       A    I think, you know that ethics complaint you

4   filed should be a removal of office offense.  I mean,

5   again, I filed two ethics complaints which are being

6   investigated --

7       Q    (By Mr. Fuller) But an ethics complaint does

8   not remove somebody from office.

9       A    Well, the state one can, it goes by Florida

10  Statute and -- and the -- and the Attorney General

11  oversees the -- the ethics department there.  They could

12  render a decision against him --

13      Q    (By Mr. Fuller) And they -- Have they

14  officially picked up those cases?

15      A    They're -- They're reviewing that right now.

16      Q    (By Mr. Fuller) Got it.

17      A    -- my case.  I did it at the end of June, you

18  know.  They're very thorough and methodical and they

19  take a while.  I mean, it's nothing overnight, nothing

20  like the Miami-Dade ethics, because they got 60 days to

21  open and shut a case.

22      Q    (By Mr. Fuller) But aside from all the stuff

23  that we know that he was targeting on our businesses, is

24  there anything else that he's ever done that you think

25  raises to illegality or --



877.291.3376
www.UCRinc.com

```
 1        A    Only what I -- You know, my statements I gave

 2   to the State Attorney office, I mean, you're using city

 3   funds to campaign.  I mean, that's -- that's something

 4   criminal.

 5        Q    (By Mr. Fuller) Mhmm.  What about the

 6   relationship with Sornof and some of his other money

 7   people?  What -- Is there anything there that -- Is

 8   there --

 9        A    There -- There --

10        Q    (By Mr. Fuller) I've often heard of --

11        A    I mean --

12        Q    (By Mr. Fuller) -- situations where it's like

13   well, if you've got to -- if you want to work with

14   Carollo you've got to work with Sornof.  Is that true?

15        A    There is that, yes.

16        Q    (By Mr. Fuller) How does that --

17        A    But now you've got to show that -- that trans

18   -- that money transaction.

19        Q    (By Mr. Fuller) And how does that work?

20        A    I mean, that's through almost what is it;

21   forensic investigation or something.  You know, to

22   show --

23        Q    (By Mr. Fuller) How does -- How does -- How in

24   your mind, like how does this work?  Like how -- The

25   concept is; is that --
```



Case 1:23-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 363 of 191

```
1        A    I mean, you've got to show Carollo getting

2    money from Sornof or from CJ or -- or Tanya because now

3    she's a lobbyist as well.

4        Q    (By Mr. Fuller) Mhmm.

5        A    She --

6        Q    (By Mr. Fuller) If you -- If you want

7    something from Carollo is it -- is it common knowledge

8    that you go to one of these guys --

9        A    Absolutely, common knowledge.

10       Q    (By Mr. Fuller) --and you get?

11       A    Any lobbyist would tell you that.

12       Q    (By Mr. Fuller) So do they ever say, "Oh,

13   well, if you start paying me a certain amount a month I

14   can get what you want," is that -- is that the --

15       A    That's mainly probably what the lobbyist is

16   there for.

17       Q    (By Mr. Fuller) The lobbyist, yeah.  Is that

18   an -- Is that like some type of assertion that they

19   would make or to a potential client?

20       A    Might be, I'm never there for that -- for that

21   sit down with, you know, lobbyist and you know, the

22   potential client.

23       Q    (By Mr. Fuller) Are you aware that --

24       A    I know that, you know, CJ's presence in the

25   City of Miami has enhanced with Formula One with now the
```



 1  Super Bowl committee in Bayfront Park, Parrot Jungle and

 2  I can't remember the other one that he just got also.

 3  But, you know, he's enhanced his presence in the city.

 4      Q    (By Mr. Fuller) Do the -- do the lobby --

 5      A    Oh, and the Max brothers also.

 6      Q    (By Mr. Fuller) When you hire a lobbyist do

 7  they meet with Carollo, with the commissioner and their

 8  clients?

 9      A    Yes.  yeah but he's barely never had any

10  interactions in their office, he always has it outside

11  the office.  He had the one with the mass -- And the

12  reason I know I wasn't in the office anymore, I was

13  having a cigar out here in Calle Ocho, he was walking

14  around with mass and CJ the day they had the meeting.

15  Out here that they had the meeting in a pub and they

16  were walking around Domino Park and they went by your

17  place, by the -- place right there; I don't know how

18  what the hell he showed Mass there at you know.

19  Whatever he's trying to influence, you know, something

20  to that effect there.

21      Q    (By Mr. Orlofsky) While you were with

22  Commissioner Carollo, while you were still employed by

23  the City of Miami, did he ever tell you directly help

24  Formula One, help the Super Bowl?  You never got

25  specific directions for anything for anything to the  --


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

Case 1:23-cv-24251-FAM Document 125-26 Entered on FLSD Docket 06/28/2024 Page 335 of 191

```
 1        A     No.

 2        Q     (By Mr. Orlofsky) And did you ever have

 3   contact directly with any of the -- the four issues;

 4   Formula One and the Super Bowl committee?

 5        A     Formula One, I mean, we had meeting with -

 6   from Bayfront Park because he was the chairman there.

 7   Formula One, it was -- it was CJ, you know, the majority

 8   that Joe tried to be a hard ass with him trying to get,

 9   you know, trying to get $2 million right up front from

10   the -- to do their presentation at Bayfront Park.  But

11   that could also be a squeeze.

12        Q     (By Mr. Orlofsky) And you never had any

13   control of the bank accounts of Miami First?

14        A     No, he's -- he's the chairman of the ECO.

15        Q     (By Mr. Fuller) Does he -- is this guy that

16   you would describe as somebody who has a lot of friends?

17        A     No.

18        Q     (By Mr. Fuller) Like real friends?

19        A     No.

20        Q     (By Mr. Fuller) Are there any other people

21   that you're aware of that he would speak to regularly or

22   not speak to?

23        A     Well, Joe's M.O which he thinks -- He almost -

24   - What he tries to do is almost what he did in Doral.

25   You know, he went to the State Attorney's Office before
```



```
1   his firing and so that's how he did that whistleblower

2   suit. I know it has nothing to do with this but I'm --

3   where I'm getting at with this is, when he took office

4   he went -- I -- I know of it because I drove him to FDLE

5   and he had a packet.  I don't know what he had in the

6   packet but I know it was directed at you or he turned it

7   into FDLE.

8      Q    (By Mr. Fuller) What is the FDLE?

9           MR. ORLOFSKY:  Florida Department of Law

10      Enforcement.

11      A    And then he's had several interactions with

12   the FBI during his time in office.

13      Q    (By Mr. Fuller) With regards to?

14      A    That I don't know, I just know one meeting

15   that occurred at someone's house and the other one I

16   know he just went to Miramar because he told me he was

17   going to Miramar.  And that's where there were the

18   headquarters is at.

19      Q    (By Mr. Fuller) And -- And going --

20      A    So he tried -- You know, so this is going to

21   be his -- his play.  He's going to -- You know, if

22   something does implicate him, he's going to go back to

23   FDLE but this why they went after me because I went to

24   FDLE and I went to the FBI regarding this.  That --

25   That's his play, that's --
```



877.291.3376
www.UCRinc.com

Case 1:18-cv-24251-FAM Document 125-6 Entered on FLSD Docket 06/28/2024 Page 137 of 191

1     Q     (By Mr. Fuller) How do you know --

2     A     -- how he tries to protect himself.

3     Q     (By Mr. Fuller) How do you know specifically

4  the package he took to FDLE was related to me?

5     A     Because it said your name on it.

6     Q     (By Mr. Fuller) So like a like -- like a

7  manila folder?

8     A     It was manila folder, yeah.

9     Q     (By Mr. Fuller) And where would he have

10 gathered information from?

11    A     Well, some information I know that he had --

12 Now, I don't know what else was in that package but I

13 know it was like regarding your voter history, your

14 dad's voter history, your mother's voter history, your

15 sister's voter history and -- and that was just election

16 stuff on you.

17    Q     (By Mr. Fuller) Why would that be -- Why would

18 the FDLE care about voter history?

19    A     I don't know.

20    Q     (By Mr. Fuller) What -- Who -- Who would

21 compile information like that?  Who -- Who would be

22 able --

23    A     Well, he -- he's horrible at doing any type of

24 investigation, he just prints out documents like he

25 always does, and just turns them in; hasi a lo loco.



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Q    (By Mr. Fuller) So you think that's something

2   he has at his house?

3    A    That it is probably nothing, you know; yeah.

4   And, you know, his house is a mess, he has papers all

5   over the place and -- But he never has like a thorough,

6   you know, package that he gives, and he says, "Okay,

7   Bill Fuller, you know 47 years of age what have you."

8   He never has a concrete package.  You know, he just gets

9   paper from all over the place, puts them together,

10  compiles it and -- and that's his investigation.

11    Q    (By Mr. Fuller)  What would happen --  I know

12  on a couple of occasions we wrote e-mails trying to meet

13  like on behalf of the Bienes Culturales.  What was the

14  procedure in the office for e-mails that were coming in

15  where there were no responses?  What was -- What was the

16  procedure?

17    A    They -- It was just ignore it.

18    Q    (By Mr. Fuller) Yeah, but I'm saying was there

19  protocol where it would be like -- Was -- Did anybody

20  ever say, "Hey --

21    A    No.

22    Q    (By Mr. Fuller) -- Bienes  Culturales is

23  writing an e-mail --

24    A    Well, I -- You know, at the time --

25    Q    (By Mr. Fuller) Like who was filled in e-mails


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1   or phone calls in the office?

2        A    Well, it was various people at the office.

3        Q    (By Mr. Fuller) But was it ever said, "Hey,

4   these people are writing an e-mail and you haven't

5   responded to them on the second, third and fourth

6   notice?"

7        A    You know, they always print out all the e-

8   mails that he gets, he, you know, deciphers them as he

9   pleases and, you know.

10       Q    (By Mr. Fuller) So it was ultimately his

11  decision to --

12       A    Yeah, that's right.

13       Q    (By Mr. Fuller) -- to -- to not respond, or to

14  never do anything.

15       Q    (By Mr. Orlofsky) Do you know if he's ever

16  visited the FDLE or the FBI regarding anyone else?

17       A    No.

18       Q    (By Mr. Orlofsky) And before he visited the

19  FDLE, did you -- did he ever ask you to put together a

20  packet?

21       A    No.

22       Q    (By Mr. Orlofsky) So he already had the packet

23  prepared --

24       A    Yes.

25       Q    -- you just drove him to FDLE.



```
 1        Q     (By Mr. Fuller) Did you ever hear him discuss

 2   my religious -- my religion or religious beliefs?

 3        A     No.

 4        Q     (By Mr. Fuller) Did you ever hear him ask

 5   people whether or not I was Cuban or not Cuban?

 6        A     Yeah.

 7        Q     (By Mr. Fuller) Why would he do that?

 8        A     No idea.

 9        Q     (By Mr. Fuller) Why would he ask that?

10        A     No idea.

11        Q     (By Mr. Fuller) Does he know the answer of

12   whether I'm Cuban or not Cuban?

13        A     I don't know if he knows the answer, I -- I

14   know he's always asked.  You know, someone brought him a

15   picture, I don't know what relation he is to you, the

16   firefighter that retired, and he tried to inquire

17   through the fire department who he was.

18        Q     (By Mr. Fuller) Who that person was?

19        A     Yeah.

20        Q     (By Mr. Michetti)  When you -- You said you

21   went to the FDLE, did you go to the FDLE building or?

22        A     Building.

23        Q     (By Mr. Michetti) Where was that building at?

24        A     107th.

25        Q     (By Mr. Michetti) Okay.  And what was your
```



877.291.3376
www.UCRinc.com

```
 1    official title when you were with -- before you were

 2    terminated on the 4th?

 3         A    A district liaison.

 4         Q    (By Mr. Fuller) But you were chief of staff

 5    for some time, right?

 6         A    Yeah, I was acting chief of staff.

 7         Q    (By Mr. Fuller) For how long was that?

 8         A    Till this court case was over.  I had never

 9    wanted it, I turned it down.

10         Q    (By Mr. Michetti) And does Joe -- Does he work

11    off of multiple cell phones or does he just --

12         A    Just that one cell phone.

13         Q    (By Mr. Michetti) Is that a county or is that

14    -- is that provided for?

15         A    It is the city phone now because he does get

16    stipend payment which is $300.00 a month.  So he accepts

17    that still by default it becomes a -- a public record.

18         Q    (By Mr. Michetti) No other phone besides the

19    one that --

20         A    No.

21         Q    (By Mr. Fuller) Are you aware if anybody has

22    ever asked for a public record request on that cell

23    phone?

24         A    I think my attorneys are going after it.

25         Q    (By Mr. Fuller) Do you know --
```



```
 1      A    And I'll say it again because they're
 2  obviously weren't of his case.
 3      Q    (By Mr. Fuller) But do you -- Oh yeah, that's
 4  right.  I've already heard that.  Did you -- Is there
 5  any -- Do you have anything -- reason to believe that
 6  there's something on his cell phone that is meaningful?
 7      A    There should be.
 8      Q    (By Mr. Orolosfsky) Did he typically text you
 9  or he would call you?
10      A    He did a lot of phone calls.  So again, I've,
11  you know, I've always said whatever date coincides with
12  anything, there's always multiple phone calls with Joe
13  on that.
14      Q    (By Mr. Fuller) Does he have a private
15  investigator firm that works for him?
16      A    No.
17      Q    (By Mr. Fuller) You never heard of that?
18      A    He -- He -- No, he's tried to go after -- to
19  retain some investigators.  But it just so happens
20  almost -- Now, I don't know if he's got one but a couple
21  of them know me so they're not going to do any work for
22  him.  But I know he's actively seeking.
23      Q    (By Mr. Fuller) Yeah, I mean, I can tell you
24  guys that I have gotten two phone calls in the last
25  month of people actively telling me that he's reached
```



```
 1   out to private investigators on his behalf.

 2       A    Yeah.

 3       Q    (By Mr. Fuller) People that I haven't spoken

 4   to in over -- in one case, over eight years.

 5       A    Yeah.  But what they tell me is, you know, out

 6   of respect for me they say it's a conflict, I can't do

 7   work because he's trying to go after me too.

 8       Q    (By Mr. Fuller) But certainly, I mean there's

 9   certainly someone that will take -- will do that.

10       A    Oh, absolutely yeah.

11       Q    (By Mr. Fuller) Have you guys heard anything

12   or no?

13            MR. MICHETTI:  No, we -- And very similar

14       Joe's got a stigma around him that a lot of people

15       do not want to pallet.  So I know -- I know that

16       that's a concern or would be a concern with --

17            THE WITNESS:  And payment's also a big thing

18       when it comes to Joe.

19            MR. MICHETTI:  Like how you'd be -- You know -

20       - That whole corruption thing --

21            THE WITNESS:  He's very --

22            MR. MICHETTI:  -- is a bad -- is a big

23       problem --

24            THE WITNESS:  -- frugal even though it's --

25       it'll probably come out of the ECO, I don't think
```



1    he'll pay out of his own pocket.  He's very frugal

2    with money and, you know, I don't think, you know,

3    someone that gives a good and ask for a good

4    retainer.

5       **Q    (By Mr. Fuller)  Has anybody -- But do you**

6    **think there's any business --**

7       A    If he's desperate enough yeah he will but --

8       **Q    (By Mr. Fuller) Do you think there's anybody**

9    **that is given him any type of financial benefit,**

10   **whatsoever for anything?**

11      A    All speculation?  I --

12      **Q    (By Mr. Fuller) No but even -- Speculation.**

13      A    I don't know, I mean, unless I have something

14   concrete I can't tell you yes or no.

15      **Q    (By Mr. Fuller) Do you think he's ever voted**

16   **for either like a city commissioner that's been**

17   **influenced one way or another?**

18      A    I can't answer that Bill, you know.

19      **Q    (By Mr. Fuller) No.  But that you would be**

20   **aware of not -- I'm not just talking about your**

21   **opinion --**

22      A    Aware of, I -- No.

23      **Q    (By Mr. Fuller) Are you aware of anybody that**

24   **was seeking a certain type of privilege or a certain**

25   **vote or anything like that?**



877.291.3376
www.UCRinc.com

```
 1        A    No, I -- No, he - he always tries to go for

 2    anything of housing, he tries to say you know, donate to

 3    the housing trust fund but there's no housing trust.  So

 4    there's -- And that's not even -- That doesn't even

 5    belong to him, so, you know, I say no right now; I don't

 6    have anything further.

 7        Q    (By Mr. Orlofsky) Well, what's your

 8    relationship with Commissioner Carollo during the

 9    campaign?

10        A    I was his right hand man.

11        Q    (By Mr. Orlofsky) Now, did you do anything, I

12    mean, have any contact with the City of Miami regarding

13    a political rally that happened at Little Havanna for

14    Alfie?

15        A    What political -- The -- The parking lot?

16        Q    (By Mr. Orlofsky) The parking lot.

17        A    Well, yeah, Joe called me and told me that

18    something was going on so I showed up there but I didn't

19    have any contact with --

20        Q    (By Mr. Fuller) But how did -- On that day how

21    did code enforcement get to that site?

22        A    It wasn't through me.

23        Q    (By Mr. Fuller) How do you think it happened?

24        A    My personal opinion?  Through Mary Lugo.

25        Q    (By Mr. Fuller) So Joe would have called Mary
```



```
 1   Lugo --

 2       A    Well, she was there that day.

 3       Q    -- that day.

 4       A    She was just there that day.

 5       Q    (By Mr. Fuller) Oh, she was there that day?  I

 6   never realized she was there that day.

 7       Q    (By Mr. Michetti)  Is there -- Is there a

 8   logging procedure that -- that goes through when how

 9   those housing complaints come in and how they get

10   handled in the field or is there -- isn't there some

11   type of log or you know, was it a call-in, was it walk

12   in, did somebody give an e-mail?

13       A    There should be something, yeah.  There should

14   be --

15       Q    (By Mr. Michetti) There should be some trail

16   of how that call -- how that came in.

17       A    Yeah, absolutely.  Yeah, that I could see that

18   closed-eye report because he knows how to initiate.

19       Q    (By Mr. Fuller) Did you ever hear of a

20   situation where he bad-mouthed us to like other

21   commissioners or to other people --

22       A    Yeah, Manolo Reposo because that's his ally.

23       Q    (By Mr. Fuller) You saw him talking about us?

24       A    Yeah.

25       Q    (By Mr. Fuller) Negatively.
```



Miro, Steve  08-03-2018          Page 49 of 70

```
 1       A     Yeah.
 2       Q     (By Mr. Fuller) And how did Manolo --
 3       A     Manolo was always on the same page with him on
 4    that.
 5       Q     (By Mr. Fuller) And how --And what --
 6       A     Because again, it's only one side goes to
 7    Manolo.
 8       Q     (By Mr. Fuller) Right.
 9       A     I don't know -- I don't know if you guys have
10    a shot to him or not.
11       Q     (By Mr. Fuller) Right.
12       A     But it's -- it's just --
13       Q     (By Mr. Fuller) So basically, Manolo is like
14    going with what he hears because it's a one-way
15    street --
16       A     Yeah.
17       Q     (By Mr. Fuller) -- actually.  He was very
18    receptive, let's call it.
19       A     Yes.
20       Q     (By Mr. Orlofsky) Now, besides the political
21    rally which we just talked about which is under the
22    14th, are you aware of any other political rallies that
23    commissioner Carollo tried to, I'm going use the word
24    squash?  Did -- Did he target any other Alfie events
25    besides that one?
```



```
 1        A    Not to my knowledge.

 2        Q    (By Mr. Fuller) as there any impropriety that

 3   happened in the campaign itself that you're aware of?

 4   Like picking up voters or paying voters or anything like

 5   that?  Did you ever hear of a situation where there was

 6   anything to coarse a voter or entice a voter or

 7   otherwise to consider --

 8        A    No, I mean, besides the eye candy that we had

 9   the Venezuelan girls picking him up.

10        Q    (By Mr. Fuller) Oh.

11        A    No, none of that.  I mean, I drove people to

12   the polls also.  But Alfie had the same thing.  I don't

13   think there was any, you know, I don't think there was

14   any --

15        Q    (By Mr. Fuller) Do you know anything about --

16        A    -- hidden play there.

17        Q    (By Mr. Fuller) Do you know anything about him

18   terminating the free parking behind Domino Park?  Do you

19   know about how that happened?

20        A    No.  But that was -- that was mainly Art's

21   doing.

22        Q    (By Mr. Fuller) But there was never a

23   conversation with Carollo and Art about that?

24        A    No, Carollo was as shocked as anybody when

25   they put up those signs there.
```



1      Q     (By Mr. Orlofsky) Did Carollo ever direct you

2   call code enforcement regarding any of Bill's

3   properties?

4      A     Yes.

5      Q     (By Mr. Orlofsky) Do you remember which

6   properties he asked you to call about?

7      A     No, I don't recall right now.

8      Q     (By Mr. Orlofsky) Do you remember generally

9   what -- what he asked you to do?

10      A     Yeah, just find out if there are permits, I --

11   I mean, I know on a weekend, one weekend in specific, he

12   called me but I was -- I wasn't in town about some

13   construction going on back here.  The code enforcement

14   officer there wasn't -- none working in this area.

15   Somehow he got it, the code enforcement officer from

16   Coconut Grove which is in the Nicaraguan guy came here.

17   And Joe pointed out some illegalities of construction

18   going on, and then he got in the car with --

19      Q     (By Mr. Fuller) That's Lubrillante (phonetic)

20   that's the guy with the name Lubrillante.

21      A     And then he drove him through all of the

22   properties.  The reason I know is because Joe bragged

23   about it, I was never here for that part.

24      Q     (By Mr. Fuller)  What did he say?

25      A     That this guy was going to do -- This guy is



877.291.3376
www.UCRinc.com

Case 1:23-cv-24251-RS AMD Document 125-26 Entered on FLSD Docket 06/28/2024 Page 150 of 191

```
 1   going to do the work, he's going to -- He's going to
 2   follow through and Joe was really upset when they told
 3   him you know, "That's not your area, go back to, you
 4   know, your zone and --"
 5        Q    (By Mr. Fuller) Follow up through and do what
 6   though?
 7        A    You know, fine him, I don't know, shut him
 8   down. Not the code enforcement officer, I don't know
 9   what the procedure are after, you know, getting a
10   citation.
11        Q    (By Mr. Orlofsky)  Do you know the timeframe
12   for the weekend you were away?  Was it in December; was
13   it before Christmas, after Christmas?
14        A    Just a weekend trip that I took to Orlando.
15        Q    (By Mr. Fuller)  Did --
16        A    To be --
17        Q    (By Mr. Orlofsky)  Do you remember if it was
18   it last year or this year?
19        A    No, this year.
20        Q    (By Mr. Orlofsky) This year.
21        A    This year.
22        Q    (By Mr. Fuller)  Did he -- Is he somebody that
23   was ever seeking media attention?
24        A    He loves the media.
25        Q    (By Mr. Fuller) Positive news, negative news;
```



```
 1    all of it?

 2        A    It doesn't matter.  Well, obviously, positive

 3    towards him, absolutely; he's the savior.  You know, if

 4    sees a cockroach they'll do a press release on it.

 5        Q    (By Mr. Fuller)  How did that events

 6    materialize with regards to rats in Little Havana; was

 7    there rats in the building?

 8        A    Nothing -- You know, like the news, they don't

 9    follow through with anything.  So nothing -- The

10    buildings are still there, rat infested.

11        Q    (By Mr. Fuller)  No but I'm saying how did

12    that even come to be; was that his doing or was that

13    somebody else's doing?  Like how did that -- How did he

14    become aware of that situation?

15        A    I don't remember, I don't recall but I know

16    that he's the one that got all the press there; that I

17    do know.

18        Q    (By Mr. Fuller)  What would he say about

19    people calling him Crazy Joe; did he ever discuss that

20    with you?

21        A    No, he never did.

22        Q    (By Mr. Fuller) Never had a con -- Never --

23        A    Never arose.

24        Q    (By Mr. Fuller) Did ever -- Did anybody ever

25    bring up the situation with him and his like domestic
```



```
 1    abuse filing back in -- Was that ever discussed?

 2        A    No, I mean, who would bring it up?  I mean,

 3    again, I was -- His inner circle at the time was just me

 4    and then all of a sudden Portilla came in the picture,

 5    Tanya.  So it was -- it was like four cats; that's it.

 6    You know, he doesn't have an entourage --

 7        Q    (By Mr. Fuller)  So basically, his inner

 8    circle --

 9        A    Now his entourage is you know, his entire

10    office.  Wherever he goes he's with -- his entire office

11    is with him, you know.

12        Q    (By Mr. Fuller)  Mhmm.  Any other situations

13    regarding like any of the targets like Union Beer, St.

14    Widge, Side Bar?  Any -- Anything ever like of those

15    situations that you're aware of?

16        A    What about them?

17        Q    (By Mr. Fuller) I'm just saying in general;

18    like any information that -- where those -- any of those

19    businesses were mentioned or like --

20        A    Target, yeah, absolutely.

21        Q    (By Mr. Fuller) Like for example the -- How

22    did the -- How did the day of the Gay Festival play out?

23    Like did they --

24        A    I don't know, I -- I left, I wasn't --

25        Q    (By Mr. Fuller) No but I'm saying like how did
```



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1   that even happen that you showed up to the street?

2        A    Well, he told me to come, you know, and he was

3   going to count me for my time; I was count for my time.

4        Q    (By Mr. Fuller) He told you to go out to do

5   what; what was the purpose of it?

6        A    To shut them down.

7        Q    (By Mr. Fuller) How?  How were you --

8        A    I don't -- I don't --

9        Q    (By Mr. Fuller) How would he expect you to

10  shut them down?

11       A    Well, call --- You know, I was always on the

12  phone with him regularly.  If you do a records request

13  you'll see that I was on the phone with him majority of

14  the time that day.  Fire, code --

15       Q    (By Mr. Fuller) Did he --

16       A    -- police.

17       Q    (By Mr. Fuller) Did he try to call --

18       A    For not having the proper permits.

19       Q    (By Mr. Fuller) Did he try to call any of

20  those departments to shut them -- to have them shut

21  down --

22       A    Yeah, he was talking to Vicky, he was taking

23  to the Emilio during that time.

24       Q    (By Mr. Fuller) And did --

25       A    But I was talking to them also.



```
 1        Q    (By Mr. Fuller) Then how come they weren't
 2   able to get him down -- to shut them down?
 3        A    I don't know but you know, I was very tired; I
 4   was there almost all day.
 5        Q    (By Mr. Fuller) Was he pissed.
 6        A    Yeah, he was; yeah.
 7        Q    (By Mr. Orlofsky)  Did he give you he give you
 8   comp time for the earlier -- the weekend visit that we
 9   talked about where you were with -- where you were
10   eating dinner with your wife and you did your drive-
11   along --
12        A    That also yes because I did go to Punta Cana
13   and I didn't use vacation time for that; he comped me.
14        Q    (By Mr. Orlofsky) So he gave you comp time.
15        Q    (By Mr. Fuller)  What does that mean; comp
16   time?
17             MR. ORLOFSKY:  It's time --
18        A    It's in lieu of vacation -- using vacation.
19   He just, you know, used that.  Totally like another
20   vacation day.
21             MR. ORLOFSKY:  It's like extra time.
22             MR. FULLER:  Oh right.
23             MR. MICHETTI:  Extra sitting --
24             THE WITNESS:  That doesn't go against --
25             MR. MICHETTI:  So they pay you overtime.
```



```
 1            MR. FULLER:  Oh, right.

 2            MR. MICHETTI:  Instead of working on your day

 3       off so --

 4            MR. FULLER: You get an extra -- You get more

 5       time if because you've already worked --

 6            MR. MICHETTI:  Right.  You worked on a

 7       Saturday, it's outside your normal day, will give

 8       that to you later on in the year for a comp date.

 9       Q    (By Mr. Fuller)  I mean, listen, what are

10  you --

11            MR. FULLER:  Let -- Do you mind if we go off

12       the record for a little bit?

13            THE COURT REPORTER:  One second.

14            (Off the record.)

15            (Deposition resumed.)

16       Q    (By Mr. Fuller)  Okay. We're just -- We just

17  took a little break and you're -- basically you were

18  just saying that this is something you've told the

19  ethics department.  Can you explain everything you know

20  about the building behind Ball and Chain and the

21  neighbors and what Mary Lugo -- how Mary Lugo was

22  involved?

23       A    Yeah, well, Mary Lugo went there and she, you

24  know, knocked on all the doors, she got like a group of

25  them -- Not -- Not a big group; maybe four or five of
```



```
 1  them.  Went in to talk, she called Carollo to show up

 2  there.  Carollo has visited them several times, he's

 3  also sent myself, Mara (phonetic) and Gisela over there

 4  also. I just stayed in the car, they spoke to the

 5  neighbors trying to, you know, ascertain more

 6  information as to the noise and -- and what have you on

 7  that place.  But --

 8      Q    (By Mr. Fuller)  And --

 9      A    -- there was never any complaints beforehand,

10  you're absolutely right.

11      Q    (By Mr. Fuller) And how -- And how would it be

12  - - How would it have been that one lady started calling

13  him?  How do you think that that materialized?

14      A    Joe gave her his cell phone -- his cell phone

15  number to call her for anything.  So that's what she was

16  doing; she was calling directly to reach out.  If she

17  did make any phone calls, you know, who knows?

18      Q    (By Mr. Fuller) But then all -- we started

19  getting code complaints, so it would have gone through

20  Joe and then Joe would have sent it on to --

21      A    Right.

22      Q    (By Mr. Fuller) - to whoever to come out and--

23      A    Correct.

24      Q    (By Mr. Fuller) -- file a violation.

25      Q    (By Mr. Orlofsky)  Did Joe contact the city
```



```
 1   manager first when he had to -- when he obviously first

 2   sent you the code or would he call code directly?

 3        A    He was calling code directly.

 4        Q    (By Mr. Orlofsky)  Now, besides the incident

 5   we just spoke about behind Ball and Chain, are you aware

 6   of Mary Lugo going anywhere else on behalf of -- of the

 7   Commissioner Carollo?

 8        A    I don't know her -- her whereabouts; she

 9   worked for the union so she does what she wants as she

10   pleases.

11        Q    (By Mr. Orlofsky)  Did you ever -- Explain to

12   me how -- Would Joe call Mary Lugo directly or did you

13   contact her on behalf of Joe?

14        A    Well, sometimes I'll call her but I'll just

15   say, "Look, call Joe because he's looking for you."  But

16   they - - they just talked amongst themselves.

17        Q    (By Mr. Fuller)  Was there ever a moment that

18   you felt that Joe felt that he got us, that -- Like he

19   was able to secure a fine on us or get something where

20   he like -- like displayed like emotions or like got

21   elated where he was excited to be like, "I got these

22   guys," or like, "Fuck them?"

23        A    You know, I'm surprised he the ink didn't stop

24   that he ran out of ink when other code enforcement

25   officers they were just taking noted vividly during our
```



```
 1   -- our walk throughout.  I mean, these guys, the pages
 2   just like we're -- we're doing today, you know.  Of, you
 3   know, violations or potential violations, right?
 4   Alleged violations, you would say.
 5        Q    (By Mr. Michetti) Is there any other business
 6   that you know that -- Assume a scenario took place where
 7   there was a complaint or there were residents that were
 8   gathered together just to talk about a potential
 9   complaint and then --
10        A    No, this is it, the Ball and Chain one.  I
11   don't know if he's done it also to the building by where
12   Side Bar is, there's a building parallel.  I know -- he
13   said he was going to reach out to them but I don't know
14   when that was going to happen.
15        Q    (By Mr. Fuller) Does he think Side Bar is
16   mine?
17        A    Yes.
18        Q    (By Mr. Fuller) He knows that?
19        A    I think so, yeah.
20        Q    (By Mr. Orlofsky) Now, besides Bill's
21   properties are you aware of anyone else in the street
22   that is targeted?
23        A    This street?
24        Q    Yes.
25        A    Well, my friend Moto, he's -- he -- He says
```



```
1   that his father is a lieutenant cornel in Cuba, so --
2        Q    (By Mr. Fuller)  Who's Moto?
3        A    The guy that owns Old Havana.
4        Q    (By Mr. Fuller) Oh, wow.
5        A    Yeah, I think the restaurant.  And how he
6   targets them is, you know, saying that there's drugs
7   back there and they're selling -- that there's drug
8   dealing back there.  I don't know if that's why now
9   there's a surveillance camera there or not but --
10       Q    (By Mr. Fuller) And what about his
11  relationship with Alpu (phonetic) --
12       A    What about it?
13       Q    (By Mr. Fuller) What -- What do you know about
14  it?
15       A    It's a good relationship.
16       Q    (By Mr. Fuller) Is there any reason to believe
17  that the Alpu restaurant owners benefited from this --
18  from the shut down of St. Widge?
19       A    I don't know if there was any financial --
20       Q    (By Mr. Fuller) But did he ever say to you --
21       A    -- benefits with it.
22       Q    (By Mr. Fuller) Did he ever say that -- that
23  St. Widge presented a com -- Or did you ever hear that
24  St. Widge presented competition to --
25       A    No.
```



```
 1      Q    (By Mr. Fuller) -- to them?

 2      A    Never.

 3      Q    (By Mr. Fuller) He never felt that way?

 4   Because he did tell me that the reason that he was

 5   shutting down St. Widge and moving -- from the

 6   neighborhood was because it affected the other

 7   businesses on the street.

 8      A    No, none of that.  I don't know but I -- I

 9   mean, he's doing almost -- From what I hear he's doing

10   the same thing what he was going to do in that plaza at

11   Domino Park, he's going to remove the benches and he's

12   his going to put up a little kiosk and those kiosks are

13   going to compete pretty much with the businesses around

14   here.

15      Q    (By Mr. Fuller) Does -- Have you ever heard

16   him make racist marks -- racist remarks?

17      A    Oh, tons of times.

18      Q    (By Mr. Fuller) In what way?

19      A    I mean, I can't give you examples right now, I

20   don't recall them but --

21      Q    (By Mr. Fuller) But I'm saying like were they

22   to like Hispanics, were they to African Americans, were

23   they to Chinese, like?

24      A    Oh yeah, to --

25      Q    (By Mr. Fuller) Like what type of remarks?
```



Miro, Steve  08-03-2018          Page 63 of 70

```
1        A    To Chinese, to Blacks --
2        Q    (By Mr. Fuller) To -- What he say -- Would he
3    say this -- Would he say this to -- to them, would he
4    say this behind their back?
5        A    No, no, behind their back, you know, behind
6    closed doors with us, you know.
7        Q    (By Mr. Fuller) But like what -- What type of
8    language was he using?
9        A    Curse words you know.
10        Q    (By Mr. Fuller) Like what?
11        A    Like negro, nigger.
12        Q    (By Mr. Fuller) But it was --
13        A    But it wasn't with the black everyone, it was
14    with --
15        Q    (By Mr. Fuller) Oh, white --
16        A    He calls them, them you know, Chino, Japanese,
17    Korean; whatever he is today.
18        Q    (By Mr. Fuller) Mhmm.  Would he like -- So --
19    So an African American would meet with him and then, you
20    know, he would come behind closed doors and -- and use--
21        A    You know, he --
22        Q    (By Mr. Fuller) -- the N word?
23        A    -- Joe -- Joe talked shit about almost about
24    everyone, you know.  Even though it was his friend,
25    he'll talk shit about him behind their back.
```



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

1    Q    (By Mr. Fuller) What about sexist remarks;

2  would he ever make a sexist remark?

3    A    Yeah.

4    Q    (By Mr. Fuller) Against women?

5    A    Not in their face but behind, yes.

6    Q    (By Mr. Fuller) Like what?

7    A    You know, like if she's pretty he'll say,

8  "Yeah, she looks good," but more to it, you know.

9    Q    (By Mr. Fuller) Well, like what?

10   A    Can't -- I can't give you an example now

11 because this doesn't come up.

12   Q    (By Mr. Fuller) What about anti-Semitic

13 remarks; did he ever say anything against Jewish people

14 or anything like that?  You never heard if that?

15        MR. MICHETTI:  Sorry.

16        THE COURT REPORTER:  I'm fine, I'm fine.

17   Q    (By Mr. Fuller)  But racist remarks like did

18 he -- Were they racist remarks against any of the

19 commissioners other than -- other than --

20   A    Ken Russell?

21   Q    (By Mr. Fuller) Yeah.

22   A    No.

23   Q    (By Mr. Orlofsky) Now, besides the two walk-

24 alongs that we've discussed are you aware of any other

25 times that Joe directed code were in your city employees



1  to selectively enforce the ordinances on Bill's

2  properties?

3       A    Can you repeat it again?

4       Q    (By Mr. Orlofsky) Besides the two walk-alongs

5  that we talked about, the one that he picked you --

6       A    There's been more than two of those; there's

7  been four.

8       Q    (By Mr. Orlofsky) There's been four.  Now,

9  were there any before Joe took office?

10      A    Before, no.

11      Q    (By Mr. Orlofsky) How frequently were the --

12      A    At least, not to my knowledge.

13      Q    (By Mr. Orlofsky) Were there -- How frequently

14  were four walk-throughs?  We know of one which I believe

15  was in March.

16      A    He did -- City Manager, assistants, whatever

17  deputy manager, Napoli -- Napoli, the mayor.  The mayor

18  was the drive-through, it was -- it was quick but we did

19  stop by Side Bar for a good amount of time.  We stopped

20  by the container place and, you know, there's a lot of

21  other places that I can't remember it now.  But it was

22  like a 30-minute hiatus that we had with the mayor

23  because he had another meeting; it wasn't just a drive-

24  through. The city manager, Napoli, the mayor and then

25  code enforcement.



UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

1    Q    (By Mr. Fuller)  Did you ever hear him make

2    remarks against like gay people or any other type of

3    group?

4    A    Yeah, he -- he doesn't like gay people.

5    Q    (By Mr. Fuller) Did -- Would he ever say

6    anything like specifically like use any words?

7    A    Yeah, behind closed doors.

8    Q    (By Mr. Fuller) But like what though?  Like

9    what would he say?

10    A    Maricon.

11    Q    (By Mr. Fuller) Yeah.

12    A    Or Maletrin is his favorite word; I don't know

13    what the hell that means.  I don't know.

14    Q    (By Mr. Fuller) And is that -- Like he would

15    say it if he thought somebody was --

16    A    Yeah.

17    Q    (By Mr. Fuller) -- was homosexual?

18    Q    (By Mr. Orlofsky)  And were you present or do

19    you know if he actually told anyone else besides you

20    that he wanted to target Bill because he thought that he

21    was Venezuelan?

22    A    No, not that he's Venezuelan he's got

23    Venezuelan money.  And that the lady he had down here is

24    La Primera Dama.  I don't know what the hell he says but

25    Primera Dama of I don't know what --


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
1        Q    (By Mr. Fuller) Do you know he did an

2   investigation to my financial dealings?

3        A    I don't know that.

4        Q    (By Mr. Fuller)Did -- You never -- You guys

5   never met with like a private investigator --

6        A    No.

7        Q    -- or like reach out to anybody to like --

8        A    At least I -- I wasn't with him with that

9        Q    (By Mr. Michetti)  And have you  seen in any

10  other occasions where city officials use private

11  investigator to -- to target a citizen that was in his

12  district or area for --

13       A    Never.

14       Q    (By Mr. Michetti)-- for any other reason?

15       A    No.

16       Q    (By Mr. Fuller)  Had your uncle -- You said it

17  was your uncle --

18       A    Godfather.

19       Q    (By Mr. Fuller) Had he ever -- Godfather, had

20  he ever seen a commissioner walk into a special

21  magistrate board?

22       A    I never asked him that, I don't remember -- I

23  don't have the answer to that.

24       Q    (By Mr. Fuller)  Is there anything else?

25            MR. Orlofsky:  That's all I got right now.
```



1          THE COURT REPORTER:  Off the record?

2          MR. FULLER:  Yeah.

3          THE COURT REPORTER:  Okay.

4          (Sworn statement concluded at 3:32 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

```
 1              CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA

 3   COUNTY OF DADE

 4

 5        I, YENLY CALVO, Court Reporter and Notary Public

 6   for the State of Florida, do hereby certify that I was

 7   authorized to and did digitally report and transcribe

 8   the foregoing proceedings, and that the transcript is a

 9   true and complete record of my notes.

10

11        I further certify that I am not a relative,

     employee, attorney or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorneys or counsel connected with the action, nor am

14   I financially interested in the action.

15

16   Witness my hand this the 21ST day of August, 2018.

17

18

19

20   _____
     YENLY CALVO, COURT REPORTER
21   NOTARY PUBLIC, STATE OF FLORIDA

22

23

24

25
```



1                    CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF DADE

4

5          I, YENLY CALVO, the undersigned authority, certify

6     that STEVE MIRO, personally appeared before me and was

7     duly sworn on the 3rd day of August, 2018.

8

      Witness my hand this 21st day of August, 2018.

9

10

11

12     _____
      YENLY CALVO, COURT REPORTER
13    NOTARY PUBLIC, STATE OF FLORIDA
      Commission No.:  FF 168078
14    Commission Exp:  10/12/18

15

16

17

18

19

20

21

22

23

24

25



| | | | |
|---|---|---|---|

**$**

**$2** 18:11 37:9

**$300.00** 43:16

**`**

**`THE** 10:18,20

**1**

**10/12/18** 70:14

**10:30** 29:20

**100** 21:22 23:9

**100-pound** 20:19,22 21:4,16

**107th** 42:24

**14th** 49:22

**1637** 1:13

**168078** 70:13

**2**

**2:30** 1:11

**200** 1:13

**2018** 1:11 5:2 69:16 70:7,8

**21st** 69:16 70:8

**3**

**3** 1:11 5:2

**3:32** 1:11 68:4

**305** 2:5

**30-day** 28:14

**30-minute** 65:22

**33135** 1:14

**33140** 2:4

**3rd** 70:7

**4**

**45** 8:23

**47** 40:7

---

**4th** 28:7 43:2

**5**

**5** 3:4

**538-234** 2:5

**5th** 28:7,8

**6**

**60** 33:20

**6th** 8:17

**7**

**767** 2:4

**8**

**8th** 1:13 8:16 9:12

**A**

**able** 27:3 39:22 56:2 59:19

**about** 6:19 8:23 9:1,25 11:25 12:2,13,19 13:6 17:3,6 18:11 20:16 22:3,7,20 23:4 28:23 30:3 31:2,19 34:5 39:18 46:20 48:23 49:21 50:15,17,19,23 51:6,12,23 53:18 54:16 56:9 57:20 59:5 60:8 61:10,12,13 63:23,25 64:1,12 65:5

**absolutely** 28:23 35:9 45:10 48:17 53:3 54:20 58:10

**abuse** 54:1

**accepts** 43:16

**access** 15:20,21,24

---

16:2,6,10,11 31:10

**accounts** 37:13

**acting** 21:5 43:6

**action** 69:13,14

**actively** 44:22,25

**actually** 21:17 26:2,4 49:17 66:19

**advantage** 19:3

**affected** 62:6

**African** 62:22 63:19

**after** 5:5 7:5 9:13 10:7 14:22 15:1,2,3,7 24:21 25:9 27:4,11 28:19 29:14 30:8,20 38:23 43:24 44:18 45:7 52:9,13

**afternoon** 5:18

**afterward** 25:14

**again** 13:7 16:9 21:25 23:24 33:5 44:1,10 49:6 54:3 65:3

**against** 11:12 33:12 56:24 64:4,13,18 66:2

**age** 40:7

**agenda** 18:2 27:3,4

**air** 22:3

**Alex** 19:6

**alex@orlofskylwfir m.com** 2:5

**Alexander** 2:3 3:4 5:13

**Alfie** 47:14 49:24

---

50:12

**all** 7:8,13 8:13,16 12:15 16:24 17:22 19:2 23:10 25:25 26:1,9 29:5 30:6 32:4,8 33:22 40:4,9 41:7 46:11 51:21 53:1,16 54:4 56:4 57:24 58:18 67:25

**Alleged** 60:4

**ally** 48:22

**almost** 32:21 34:20 37:23,24 44:20 56:4 62:9 63:23

**alone** 11:6

**along** 24:10 56:11

**alongs** 64:24

**Alpu** 61:11,17

**already** 12:14 28:18 41:22 44:4 57:5

**also** 2:7 5:24 10:23 11:7 14:14 24:2 31:3 32:17 36:2,5 37:11 45:17 50:12 55:25 56:12 58:3,4 60:11

**always** 11:9 20:18 26:24 27:2 31:15 36:10 39:25 41:7 42:14 44:11,12 47:1 49:3 55:11

**am** 69:10,12,13

**amazing** 22:3

**American** 63:19

**Americans** 62:22

**ammunition** 25:5

**amongst** 59:16

**amount** 35:13 65:19

---



**Andrew** 2:11 5:15

**angles** 23:11

**announce** 5:11

**anonymous** 12:22

**another** 18:20 30:25 46:17 56:19 65:23

**answer** 5:25 26:18 42:11,13 46:18 67:23

**anti-Semitic** 64:12

**any** 6:22,23 9:24 10:9 12:10 18:14 19:24 20:1 22:10 23:11 24:9 25:23 26:4 33:1 35:11 36:9 37:3,12,20 39:23 44:5,21 46:6,9 47:12,19 49:22,24 50:2,13,14 51:2 54:12,13,14,18 55:19 58:9,17 60:5 61:16,19 64:18,24 65:9 66:2,6 67:9,14 69:11,12

**anybody** 20:3 30:12 40:19 43:21 46:5,8,23 50:24 53:24 67:7

**anymore** 36:12

**anyone** 6:4 41:16 60:21 66:19

**anything** 13:6 16:1 17:3,12 19:20 20:14 22:20 24:4 25:10,12 28:22 30:4 32:21 33:24 34:7 36:25 41:14 44:5,12 45:11 46:10,25 47:2,6,11

**anywhere** 59:6

**APPEARANCES** 2:1

**appeared** 70:6

**appraisal** 8:3

**approval** 14:21

**area** 14:1 51:14 52:3 67:12

**arose** 53:23

**around** 8:17 13:25 36:14,16 45:14 62:13

**Art** 50:23

**ARTHUR** 2:4

**Art's** 50:20

**ascertain** 58:5

**aside** 33:22

**ask** 6:4 12:24,25 41:19 42:4,9 46:3

**asked** 42:14 43:22 51:6,9 67:22

**asking** 14:18

**aspirations** 19:21

**ass** 37:8

**assertion** 35:18

**assets** 18:12

**assistants** 65:16

**Assume** 60:6

**attention** 52:23

**attorney** 5:22 12:18 18:19 24:14 32:17,18 33:10 34:2 69:11

**attorneys** 32:21

43:24 69:13

**Attorney's** 37:25

**audio** 28:16

**August** 1:11 5:2 28:7 69:16 70:7,8

**authority** 27:2 70:5

**authorized** 69:7

**Avenue** 8:17

**aware** 17:11 18:16 29:13 35:23 37:21 43:21 46:20,22,23 49:22 50:3 53:14 54:15 59:5 60:21 64:24

**away** 25:21 52:12

---

**B**

**back** 8:17,18 17:17 21:16 24:20 26:15 27:2,9,10 38:22 51:13 52:3 54:1 61:7,8 63:4,5,25

**background** 6:6

**bad** 12:8 45:22

**bad-mouthed** 48:20

**Ball** 12:2 21:6,8 57:20 59:5 60:10

**bank** 37:13

**bar** 23:1 54:14 60:12,15 65:19

**barely** 36:9

**bargaining** 17:2

**BARLINGTON** 1:12

**basically** 49:13 54:7 57:17

**basis** 6:15

**Bayfront** 17:15 36:1 37:6,10

**because** 10:16 12:12,17 15:22 16:12,13 18:18 19:18,19 23:7 24:3,9 26:13 29:19 31:11,23 33:20 35:2 37:6 38:4,16,23 39:5 43:15 44:1 45:7 48:18,22 49:6,14 51:22 56:12 57:5 59:15 62:4,6 64:11 65:23 66:20

**become** 53:14

**becomes** 43:17

**Beer** 54:13

**before** 6:9 9:23 10:1,2 14:19,22 37:25 41:18 43:1 52:13 65:9,10 70:6

**beforehand** 58:9

**beginning** 6:5 7:2 30:21

**behalf** 21:5 40:13 45:1 59:6,13

**behind** 10:14 11:10 12:2 27:13 50:18 57:20 59:5 63:4,5,20,25 64:5 66:7

**beliefs** 42:2

**believe** 8:17 18:21,22 25:21 31:13 44:5 61:16 65:14

**believes** 15:20

**belong** 47:5

**Ben** 18:19 32:17,24

**benches** 62:11

**benefit** 21:5



27:16,17 46:9

**benefited** 61:17

**benefits** 61:21

**besides** 31:6 43:18 49:20,25 50:8 59:4 60:20 64:23 65:4 66:19

**best** 25:17

**between** 29:14

**Bienes** 18:18 19:3,15 40:13,22

**big** 22:16 45:17,22 57:25

**Bill** 5:12 40:7 46:18 66:20

**Bill's** 51:2 60:20 65:1

**bit** 6:5 57:12

**black** 63:13

**Blacks** 63:1

**blonde** 12:3

**board** 17:15 19:2,11 67:21

**boards** 20:20

**booklets** 16:8

**boost** 28:3

**boss** 24:11

**Bowl** 36:1,24 37:4

**bragged** 51:22

**break** 57:17

**Brickle** 22:4

**briefly** 6:9

**bring** 13:7 20:20 21:22 27:2 53:25 54:2

**brothers** 36:5

**brought** 28:21

42:14

**buddy** 32:3

**budget** 19:5,9 29:21

**building** 11:13 16:16 32:7 42:21,22,23 53:7 57:20 60:11,12

**buildings** 53:10

**bullshit** 12:15

**business** 7:10 8:19 10:14 18:4,14 19:22,24 20:12 27:15 31:14 46:6 60:5

**businesses** 6:18,20,23 7:8 8:20 10:25 27:14 33:23 54:19 62:7,13

---
**C**

**call** 44:9 48:16 49:18 51:2,6 55:11,17,19 58:15 59:2,12,14,15

**Calle** 18:15 20:2 23:2,4 36:13

**called** 5:5 6:7 13:20 18:22 23:23 24:19 47:17,25 51:12 58:1

**call-in** 48:11

**calling** 10:4 53:19 58:12,16 59:3

**calls** 41:1 44:10,12,24 58:17 63:16

**CALVO** 1:24 69:5,20 70:5,12

**came** 10:5 18:23 22:18 28:23 30:5

48:16 51:16 54:4

**camera** 61:9

**campaign** 20:1 22:12,14 24:22 26:13 29:15 34:3 47:9 50:3

**can** 5:24 6:4,21 10:18 13:9,18 21:25 33:9 35:14 44:23 57:19 65:3

**Cana** 56:12

**candy** 50:8

**can't** 12:19 21:14 29:4 32:21 36:2 45:6 46:14,18 62:19 64:10 65:21

**car** 13:15,24 51:18 58:4

**care** 39:18

**cared** 22:7

**cares** 11:25

**Carollo** 6:20,23 9:25 18:4 21:12 25:10,23 28:17,18,20,21 29:5 31:8 32:6 34:14 35:1,7 36:7,22 47:8 49:23 50:23,24 51:1 58:1,2 59:7

**cars** 23:2,8

**case** 6:17 25:3 28:23,24 29:1 33:17,21 43:8 44:2 45:4

**cases** 33:14

**cash** 19:8

**cats** 54:5

**cell** 43:11,12,22 44:6 58:14

**certain** 7:25 31:20 35:13 46:24

**certainly** 45:8,9

**CERTIFICATE** 69:1 70:1

**certify** 69:6,10 70:5

**Chain** 12:2 21:7,8 57:20 59:5 60:10

**chairman** 37:6,14

**check** 18:21

**chief** 43:4,6

**Chinese** 62:23 63:1

**Chino** 63:16

**chocolate** 11:3

**chosen** 5:21

**Christmas** 17:4 52:13

**cigar** 36:13

**circle** 30:14 54:3,8

**circles** 27:9

**citation** 52:10

**citizen** 67:11

**city** 8:10 9:17,18 10:8,10,24 15:4,22 16:13,16 27:7,22 29:7 34:2 35:25 36:3,23 43:15 46:16 47:12 58:25 64:25 65:16,24 67:10

**CJ** 30:25 35:2 36:14 37:7

**CJ's** 35:24

**client** 35:19,22

**clients** 36:8

**close** 31:8,23

**closed** 28:24 63:6,20 66:7



closed-eye 48:18

closer 30:13

coarse 12:13 50:6

cockroach 53:4

Coconut 18:10
  51:16

code 8:10 9:19,21
  24:8,9 25:14,24
  28:8 47:21
  51:2,13,15 52:8
  55:14 58:19
  59:2,3,24 64:25
  65:25

coffee 13:23 19:23
  22:25

coincides 44:11

com 61:23

combination 11:11

come 20:21 45:25
  48:9 53:12 55:2
  56:1 58:22 63:20
  64:11

comes 11:2 45:18

coming 27:10 40:14

commission 18:1
  70:13,14

commissionaires
  11:12

commissioner
  6:20,23 9:25
  19:7,9 20:13
  25:10 26:16 28:20
  36:7,22 46:16
  47:8 49:23 59:7
  67:20

commissioners
  48:21 64:19

committee 36:1
  37:4

common 35:7,9

communist 11:4

comp 56:8,14,15
  57:8

company 7:20
  25:21

comped 56:13

compensated 17:13

compete 62:13

competition 21:8
  61:24

compile 39:21

compiles 40:10

complaint 12:12
  13:6 33:3,7 60:7,9

complaints 6:10,15
  12:11,22 33:5
  48:9 58:9,19

complete 69:9

con 53:22

concept 34:25

concern 45:16

concluded 68:4

concrete 40:8 46:14

concur 20:21

conflict 45:6

confront 26:7

confronted 26:9

connected 69:13

consider 23:8 50:7

construction
  51:13,17

consultation 30:23

contact 24:21,22
  37:3 47:12,19
  58:25 59:13

container 65:20

containers 30:6

context 21:20

contract 17:23
  18:1,2

control 37:13

conversation 50:23

conversations 9:24
  14:9 22:21

cornel 61:1

corporation 18:20

correct 5:22 8:25
  13:2 29:6 58:23

corruption 45:20

could 5:10 9:5
  10:16 18:2
  20:15,20 21:7
  32:20 33:2,11
  37:11 48:17

counsel 2:1
  69:11,13

count 11:24 55:3

county 19:7,9 43:13
  69:3 70:3

couple 10:23 24:22
  40:12 44:20

course 22:2 26:6

court 1:24 5:10,17
  9:13 10:18 16:3,5
  43:8 57:13 64:16
  68:1,3 69:5,20
  70:12

Crazy 53:19

create 19:14

created 10:10

creating 23:6

criminal 34:4

cross 26:5

Cuba 61:1

Cuban 19:23 23:1,7

42:5,12

Culturales 18:19
  19:4,15 40:13,22

culture 23:7

Curse 63:9

_____

D

DADE 69:3 70:3

dad's 39:14

Dama 66:24,25

date 44:11 57:8

day 12:4 13:15
  23:15 24:1
  27:6,7,15 28:7
  32:1,2,4,8 36:14
  47:20 48:2,3,4,5,6
  54:22 55:14
  56:4,20 57:2,7
  69:16 70:7,8

days 33:20

dealership 22:7

dealing 61:8

dealings 67:2

December 52:12

deciphers 41:8

decision 20:4 28:20
  33:12 41:11

default 43:17

department 25:15
  33:11 38:9 42:17
  57:19

departments 55:20

deposition 6:3
  57:15

deputy 8:10 9:17
  65:17

describe 37:16

describing 6:12



desperate 46:7

destroy 21:6

deteriorating 13:4

Dias 10:24

didn't 9:10 10:3
11:14 17:6 23:24
24:1,4,9 26:17
28:19 47:18 56:13
59:23

digitally 69:7

dinner 13:20 56:10

direct 3:3 5:8 31:10
51:1

directed 38:6 64:25

directions 36:25

directive 12:17

directly 36:23 37:3
58:16 59:2,3,12

director 8:13

dirty 10:25

discuss 42:1 53:19

discussed 17:12
54:1 64:24

displayed 59:20

district 7:9 11:25
26:25 43:3 67:12

divert 26:25

documentation
10:9

documents 39:24

doesn't 47:4 53:2
54:6 56:24 64:11
66:4

domestic 53:25

Domino 36:16
50:18 62:11

donate 19:6 47:2

donates 20:10

donations 11:12

done 19:10 33:24
60:11

don't 6:5,7 7:7 8:5
9:1 10:11,21
11:19,23 12:25
15:10,14 17:22
19:10,11 20:8
21:10 22:5,7,9,22
23:14 24:25 27:17
30:20 31:20,22
36:17 38:5,14
39:12,19 42:13,15
44:20 45:25
46:2,13 47:5 49:9
50:12,13 51:7
52:7,8 53:8,15
54:24 55:8 56:3
59:8 60:11,13
61:8,19 62:8,20
66:12,13,24,25
67:3,22,23

doors 12:7 57:24
63:6,20 66:7

Doral 37:24

down 8:16 9:12
10:5 13:19 27:14
35:21 43:9 52:8
55:6,10,21 56:2
61:18 62:5 66:23

drive 56:10 65:23

drive-through
65:18

driving 13:25

drove 38:4 41:25
50:11 51:21

drug 61:7

drugs 61:6

duly 5:6 70:7

during 26:13 38:12
47:8 55:23 59:25

---
E
---

ear 31:4

earlier 5:19 56:8

eating 56:10

ECO 32:10,14,20
37:14 45:25

effect 36:20

ego 27:23,25 28:1,4

eight 45:4

either 16:25 31:22
46:16

elated 59:21

election 39:15

eliminate 18:18

else 26:16 27:5
30:12 31:5 33:24
39:12 41:16 59:6
60:21 66:19 67:24

else's 53:13

e-mail 25:16,18,21
40:23 41:4 48:12

e-mails 10:11
40:12,14,25

Emilio 55:23

emotions 59:20

employed 36:22

employee 15:22
16:11 69:11,12

employees 64:25

employers 17:1

end 9:14,16 27:15
33:17

ended 24:22

enforce 65:1

enforcement 8:11
9:19,21 24:8,10
25:14,24 28:8

38:10 47:21
51:2,13,15 52:8
59:24 65:25

enhance 28:3

enhanced 35:25
36:3

enhancements 27:1

enough 19:10 20:3
46:7

entice 50:6

entire 9:13 24:5,6
54:9,10

entourage 54:6,9

equal 23:9

equation 15:17

Esquire 2:3 3:4 5:9

estate 19:22

ethic 29:3

ethically 29:3

ethics 6:10 12:12,14
13:6 32:16
33:3,5,7,11,20
57:19

events 13:12 49:24
53:5

every 26:12

everybody 23:24

everybody's 7:14

everyone 5:10 10:5
63:13,24

everything 5:24
15:21 16:6,7
57:19

evidence 33:1

EXAMINATION
3:1,3 5:8

example 21:7 54:21
64:10



examples 62:19

excited 59:21

excursions 8:9

Exemption 18:11

EXHIBITS 4:1,3

exists 19:12

Exp 70:14

expect 55:9

expenditures 32:23

expenses 32:22

explain 13:10,19
21:19 57:19 59:11

explained 5:19

explore 21:3

exploring 23:10

express 13:5

extension 28:14

extra 56:21,23 57:4

eye 50:8

—————

F

face 64:5

falling 12:11

family 20:6,24,25

far 32:16

father 61:1

favorite 66:12

FBI 38:12,24 41:16

FDLE
38:4,7,8,23,24
39:4,18
41:16,19,25 42:21

February 9:15

Felipe 20:12

felt 59:18 62:3

Festival 54:22

FF 70:13

field 48:10

file 58:24

filed 6:10,16 12:12
33:4,5

files 15:25

filing 54:1

filled 40:25

financial 46:9 61:19
67:2

financially 69:14

find 51:10

fine 52:7 59:19
64:16

fire 30:17 42:17
55:14

firefighter 42:16

firing 38:1

firm 2:3 44:15

first 5:5 9:11
17:24,25 29:17
32:12 37:13 59:1

firsthand 6:22

fiscal 27:21

five 57:25

fixated 11:5

flavor 27:8

floor 32:2,4,7

Flores 10:17,20

Florida 1:14,25 2:4
33:9 38:9
69:2,6,21 70:2,13

folder 39:7,8

follow 25:14,24
52:2,5 53:9

follows 5:6

foregoing 69:8

forensic 34:21

former 20:13

Formula 35:25
36:24 37:4,5,7

forth 15:5 19:2

four 37:3 54:5
57:25 65:7,8,14

fourth 41:5

free 50:18

frequently 65:11,13

friend 11:6 60:25
63:24

friends 20:13
37:16,18

friendship 16:25
20:15

from 11:2 13:19
19:17 27:9,16
32:22 33:2,8,22
35:2,7 37:6,9
39:10 40:9 51:15
61:17,18 62:5,9

front 37:9

frugal 45:24 46:1

Fuck 59:22

fuel 30:16

Fuller 2:8 3:3
5:9,12
7:6,10,12,14,17,1
9,21,24
8:4,6,12,15,21,25
9:3,6,9,20 10:12
11:8,14,17,20
12:1
13:2,5,9,14,18
14:4,11,13,16,19,
22,25
15:2,6,11,13,16,2
4
16:2,4,6,10,15,17,
20,24 17:3,11,16

18:3,6,9,13
19:1,13,16,18,20
20:1,7,14,22,24
21:1,12,15,19,23
22:2,8,11,14,16,1
8,24 23:15,22
24:7,13,16,19,24
25:2,7,25
26:7,10,20
27:12,18,20
28:1,3,11,13,15,2
5
29:2,6,8,13,19,25
30:3,9,12,18,22
31:2,5,7,11,15,18,
25
32:11,13,15,18,25
33:7,13,16,22
34:5,10,12,16,19,
23
35:4,6,10,12,17,2
3 36:4,6
37:15,18,20
38:8,13,19
39:1,3,6,9,17,20
40:1,7,11,18,22,2
5 41:3,10,13
42:1,4,7,9,11,18
43:4,7,21,25
44:3,14,17,23
45:3,8,11
46:5,8,12,15,19,2
3 47:20,23,25
48:5,19,23,25
49:2,5,8,11,13,17
50:2,10,15,17,22
51:19,24
52:5,15,22,25
53:5,11,18,22,24
54:7,12,17,21,25
55:4,7,9,15,17,19,
24 56:1,5,15,22
57:1,4,9,11,16
58:8,11,18,22,24
59:17 60:15,18
61:2,4,10,13,16,2
0,22



62:1,3,15,18,21,2
5
63:2,7,10,12,15,1
8,22
64:1,4,6,9,12,17,2
1
66:1,5,8,11,14,17
67:1,16,19,24
68:2

**Fuller)Did** 67:4

**Fuller's** 25:11

**fund** 19:9 47:3

**funders** 20:2,9

**funder's** 20:8

**funds** 34:3

**further** 47:6 69:10

---

### G

**gain** 27:16

**gathered** 39:10
60:8

**gave** 24:17 25:4,23
26:18 28:14 34:1
56:14 58:14

**gay** 54:22 66:2,4

**general** 33:10 54:17

**generally** 51:8

**get** 7:24 9:4 10:16
14:20 16:23 19:6
25:1 29:16
35:10,14 37:8,9
43:15 47:21 48:9
56:2 57:4 59:19

**gets** 15:21 16:7,8,22
29:23 32:18 40:8
41:8

**getting** 35:1 38:3
52:9 58:19

**girls** 50:9

**Gisela** 58:3

**give** 5:19 6:1,5
31:18 48:12 56:7
57:7 62:19 64:10

**given** 46:9

**gives** 16:7 27:21
30:16 40:6 46:3

**giving** 11:13

**go** 6:21 11:23 13:23
14:2 15:8 21:15
27:9 35:8 38:22
42:21 44:18 45:7
47:1 52:3 55:4
56:12,24 57:11

**godfather** 28:5,9
29:3,23 67:18,19

**GODFREY** 2:4

**goes** 7:1 16:13 33:9
48:8 49:6 54:10

**going** 9:13
12:12,23,25 13:1
17:19,20,21,22,23
,24,25 18:1
19:5,7,8,9 20:20
21:22 22:23 23:25
24:1 25:3
27:1,9,10 30:7
38:17,19,20,21,22
43:24 44:21 47:18
49:14,23
51:13,18,25 52:1
55:3 59:6
60:13,14
62:10,11,12,13

**gone** 7:9 58:19

**good** 5:18 18:4
20:13 26:4 46:3
61:15 64:8 65:19

**gorilla** 20:19,22
21:4,16,22 23:9

**gotten** 44:24

**government** 11:4

**grand** 29:24

**group** 1:12
57:24,25 66:3

**Grove** 18:10 51:16

**guayaba** 11:3

**guess** 8:2 26:15,17

**guy** 18:4,7 31:5
37:15 51:16,20,25
61:3

**guys** 9:20 12:3
13:9,10 23:19
26:21 28:14 31:3
35:8 44:24 45:11
49:9 59:22 60:1
67:4

**guy's** 21:14

---

### H

**had** 6:10 9:23 10:8
13:20,23 14:6,8
17:9 18:19 22:21
23:3,6,25
36:9,11,14,15
37:5,12 38:5,11
39:11 41:22 43:8
50:8,12 53:22
59:1 65:22,23
66:23 67:16,19

**Hall** 16:14,16

**hand** 47:10 69:16
70:8

**handled** 48:10

**hands** 16:9

**happen** 9:7 13:14
40:11 55:1 60:14

**happened** 13:11
14:4 15:6
23:15,19 24:16
29:15 47:13,23
50:3,19

**happening** 10:3

**happens** 32:6 44:19

**hard** 37:8

**hardcore** 15:20

**harsh** 25:19

**harshly** 26:13

**has** 7:8,23 11:6,22
16:2,6,15,17,20
18:7 22:6 23:13
31:4,10,23 32:3
35:25 36:10 37:16
38:2 40:2,4,5,8
43:21 46:5 58:2

**hasi** 39:25

**hasn't** 17:22

**Havana** 18:15,21
20:21 53:6 61:3

**Havanna** 47:13

**have** 5:21 6:7,22
7:6,19,21 8:5,19
9:11,24 10:10
11:13,23 12:9
15:20 16:10,11,22
18:6,11,14
19:11,21,23
20:1,2,16
21:20,21,24
23:3,4,6 24:19
25:7,22 30:11,24
31:11,22 32:3,23
33:1,13 37:2 39:9
40:7 44:5,14,24
45:11 46:13
47:6,12,19,25
49:9 54:6 55:20
58:6,12,19,20
62:15 67:9,23

**haven't** 41:4 45:3

**having** 5:5 26:1
36:13 55:18

**he** 7:3,5,6,8,22
8:5,7,9,13 9:1,3
10:4,12,13,16
11:1,2,6,17,22,25
12:13,20,21



**UNIVERSAL**
**COURT REPORTING**

877.291.3376
www.UCRinc.com

13:5,7,8,24
14:6,9,11,13,16,1
8 15:7,11,13,14
17:21,22,23,24,25
18:1,2,4,6,8,11,13
,18,19,22,23
19:2,3,4,5,13,21,2
3 20:1,12,18
21:1,2,3,19,21
22:3,6,7,9,11,12,1
5,23 23:2,13 24:4
25:13
26:10,12,14,15,16
,17,18 27:13
28:6,14,17,18,19,
21
29:1,4,9,10,14,15,
23 30:12,14,18
32:7,15,20,21
33:23
36:2,10,11,13,18,
23
37:6,15,21,23,24,
25
38:1,3,4,5,6,16,20
39:2,4,9,11,23,24
40:2,4,5,6,8
41:8,18,19,22
42:7,9,11,13,15,1
6,17
43:10,11,15,16
44:8,9,10,14,18
46:7 47:1,2
48:18,20
49:14,17,24
51:6,9,11,15,18,2
1,24 52:22,24
53:13,18,19,21
54:6,10
55:2,4,9,15,17,19,
22
56:5,6,7,13,14,19
59:1,2,3,18,20,21,
23,24
60:12,13,15,18,25
61:5,20,22
62:3,4,10

63:2,3,8,16,17,18,
20,21 64:2,13,18
65:5,16,23
66:4,5,9,14,15,19,
20,23,24
67:1,19,20

**headquarters** 38:18

**hear** 12:8 42:1,4
48:19 50:5 61:23
62:9 66:1

**heard** 19:1 22:19
28:15 29:12,17
34:10 44:4,17
45:11 62:15 64:14

**hearing** 28:8,9,10

**hears** 49:14

**heart** 11:24

**hell** 36:18 66:13,24

**he'll** 46:1 63:25
64:7

**help** 36:23,24

**helped** 28:6

**her** 17:23 58:14,15
59:8,13,14

**here** 5:19,21 6:3,6
10:4 11:3 21:22
24:11,12 28:23
30:25 36:13,15
51:13,16,23 62:14
66:23

**hereby** 69:6

**he's** 7:9 10:22,23
11:4,6 12:20,23
13:23 14:8
18:7,10
20:8,12,19 21:4
22:21 28:20,22
29:9 30:7,18,20
32:17 33:24
36:3,9,19 37:14
38:11,21,22 39:23
41:15 42:14

44:18,20,22,25
45:7,21 46:1,7,15
52:1 53:3,16
54:10 58:2 59:15
60:11,25 62:9,11
66:22

**Hey** 10:4 13:21
26:21 40:20 41:3

**hiatus** 65:22

**hidden** 50:16

**hide** 6:8

**him** 7:7 8:24
9:4,5,14,17,18
10:1 11:12,13,23
12:18 16:8,9
22:21 23:6,13
26:8,13 27:21
28:21 30:16 31:10
32:9 33:2,12 37:8
38:4,22 41:25
42:1,4,14
44:15,22 45:14
46:9 47:5 48:23
49:3,10 50:9,17
51:21 52:3,7
53:3,19,25 54:11
55:12,13 56:2
58:13 62:16
63:19,25 66:1
67:8,22

**himself** 39:2

**hire** 36:6

**his** 11:9 13:24
18:19 19:5 20:4,9
22:7 26:11
27:12,16,24
28:4,20 29:14
30:9,10,14,17
31:3,4
32:4,9,11,14,17,1
8,19 34:6 36:3
38:1,12,21,25
40:2,4,10 41:10
44:2,6 45:1 46:1

47:10 48:22
53:12,25
54:3,7,9,10 58:14
61:1,10 62:12
63:24 66:12 67:11

**Hispanics** 62:22

**history**
39:13,14,15,18

**holdings** 18:14

**Homestead** 18:11

**homosexual** 66:17

**honestly** 31:12,19

**hope** 25:4

**hopefully** 25:5

**horrible** 39:23

**Hotel** 17:5

**hours** 16:9

**house** 18:10 38:15
40:2,4

**housing** 27:2 47:2,3
48:9

---

I

**I'd** 9:14

**idea** 11:9 16:22
17:12 24:15 30:11
42:8,10

**ignore** 40:17

**I'll** 9:7 18:17 44:1
59:14

**illegalities** 51:17

**illegality** 33:25

**I'm** 9:13 10:18
12:12,17,22,23,24
,25 16:4
17:9,19,20 21:22
22:24 23:1,10
24:9 26:2,3,19
30:22 35:20
38:2,3 40:18



42:12 46:20 49:23 53:11 54:17,25 59:23 62:21 64:16

**impact** 27:21 29:21

**impetus** 11:9

**implicate** 38:22

**important** 5:25

**impropriety** 50:2

**impulse** 10:14

**incident** 59:4

**incorrect** 23:5

**INDEX** 3:1 4:1

**infested** 53:10

**influence** 20:4 21:24 23:6 36:19

**influenced** 10:25 46:17

**influx** 19:8

**information** 33:1 39:10,11,21 54:18 58:6

**initial** 19:4

**initially** 12:9

**initiate** 48:18

**ink** 59:23,24

**inner** 30:14 54:3,7

**inquire** 42:16

**Instead** 57:2

**intent** 23:16

**interactions** 26:1 36:10 38:11

**interest** 19:24 20:2,17 21:5

**interested** 22:22 69:14

**interests** 18:14

**interrogated** 14:10

**into** 7:1 12:13 19:9 25:1 38:7 67:20

**investigated** 6:13 33:6

**investigation** 24:14,25 34:21 39:24 40:10 67:2

**investigator** 44:15 67:5,11

**investigators** 44:19 45:1

**involved** 57:22

**involvement** 17:4 23:12

**isn't** 48:10

**issues** 23:3 37:3

**it'll** 45:25

**it's** 5:25 7:1 11:5,11 12:15 13:21 14:8 16:12 18:22 19:12,18,19 21:25 22:2,23 23:5,18 24:25 25:22 29:21 30:1 33:19 34:12 45:6,24 49:6,12,14 56:17,18,21 57:7 61:15

**itself** 50:3

**I've** 12:14,18 26:24 27:24 31:19 34:10 44:4,10,11

---
**J**

**January** 9:14,16

**Japanese** 63:16

**Jewish** 64:13

**Joe** 12:11,22 13:17,20 15:20 18:3 24:3 26:9 28:9,20 29:4

31:23 37:8 43:10 44:12 45:18 47:17,25 51:17,22 52:2 53:19 58:14,20,25 59:12,13,15,18 63:23 64:25 65:9

**Joe's** 37:23 45:14

**June** 28:8 33:17

**Jungle** 36:1

**junior** 31:1

**just** 11:5 13:18,25 16:12,20 17:21 19:18,19 20:18 22:7,23 23:10 24:3,10 25:19,23 26:12,14,18,20 27:6,8,9,20 31:20 32:6,23 36:2 38:14,16 39:15,24,25 40:8,17 41:25 43:11,12 44:19 46:20 48:4 49:12,21 51:10 52:14 54:3,17 56:19 57:16,18 58:4 59:5,14,16,25 60:2,8 65:23

---
**K**

**keep** 31:7

**Ken** 64:20

**kept** 14:1 17:7 20:18

**kiosk** 62:12

**kiosks** 62:12

**Kirney** 18:19 32:17,24

**knocked** 57:24

**knocking** 12:7

**know** 6:19,25 7:1,5,6,7,22,23 8:14,18 9:1 10:3,7,9,11,22 11:19 12:1,14,15,17,20, 21,23,25 13:22,25 14:2,9 15:3,10,14 16:9,13,25 17:3,6,18,22 19:4,10,12,22 20:8,9,10,18,20 21:18 22:6,10,19,21,23 23:8,24 24:1,3,11 26:12,14,16,18,24 ,25 27:4,6,8,17 28:5,17,19 29:18,22,24 30:1,20,24 31:17,24 32:5,8,21,23 33:3,18,23 34:1,21 35:21,24 36:3,12,17,18,19 37:7,9,25 38:2,4,5,6,14,16,2 0,21 39:1,3,11,12,13,1 9 40:3,4,6,7,8,11,24 41:7,8,9,15 42:11,13,14,15 43:25 44:11,20,21,22 45:5,15,19 46:2,13,18 47:2,5 48:11 49:9 50:13,15,17,19 51:11,22 52:3,4,7,8,9,11 53:3,8,15,17 54:6,9,11,24 55:2,11 56:3,19 57:19,24 58:5,17 59:8,23 60:2,3,6,11,12,13



61:6,8,13,19 62:8
63:5,6,9,16,20,21,
24 64:7,8
65:14,20
66:12,13,19,24,25
67:1,3

**knowledge** 6:22
17:9 25:18 35:7,9
50:1 65:12

**known** 7:20

**knows** 22:23 23:24
42:13 48:18 58:17
60:18

**Korean** 63:17

---

**L**

**La** 66:24

**lady** 12:2 58:12
66:23

**language** 63:8

**last** 28:6 44:24
52:18

**later** 57:8

**Law** 2:3 38:9

**least** 12:16 65:12
67:8

**left** 54:24

**legislation** 29:16

**legs** 29:14

**let's** 21:15 27:1
49:18

**liaison** 43:3

**lie** 12:12

**lieu** 56:18

**lieutenant** 61:1

**lighting** 14:8

**list** 7:15 8:1,5,7

**listen** 57:9

**little** 6:5,21 12:20

18:15,21 20:21
47:13 53:6
57:12,17 62:12

**lo** 39:25

**lobby** 36:4

**lobbyist**
35:3,11,15,17,21
36:6

**lobbyists** 11:22

**loco** 39:25

**log** 48:11

**logging** 48:8

**long** 8:23 29:10
43:7

**longer** 18:10

**Look** 12:18 26:18
28:2,5 59:15

**looked** 23:18

**looking** 59:15

**looks** 64:8

**lot** 7:1 11:14
13:10,11
14:5,6,8,20,23
15:9 17:25 20:10
30:19,25 31:19
37:16 44:10 45:14
47:15,16 65:20

**lots** 25:22

**loves** 52:24

**Lubrillante**
51:19,20

**Luckily** 23:25

**Lugo** 12:4 13:16,24
15:16,18 17:13
47:24 48:1
57:21,23 59:6,12

**Lugo's** 17:4

---

**M**

**M.O** 26:11 37:23

**made** 12:10 19:2

**magistrate** 28:6,10
67:21

**magistrates** 29:5,18

**mails** 41:8

**mainly** 8:23 11:22
20:8 24:3 35:15
50:20

**maintained** 29:9

**majority** 24:6 26:17
37:7 55:13

**make** 35:19 58:17
62:16 64:2 66:1

**maker** 30:2

**making** 20:4

**Maletrin** 66:12

**man** 9:5 26:2 47:10

**manager** 8:10 9:18
27:7 59:1
65:16,17,24

**manila** 39:7,8

**Manolo** 20:9,11
31:9 48:22
49:2,3,7,13

**Mara** 58:3

**March** 65:15

**Maricon** 66:10

**Mario**
22:5,6,7,9,22,25
23:2,3,5,7,8,14

**MARKED** 4:3

**marketplace** 30:4,5

**marks** 62:16

**Marta** 10:17,20

**Martin** 8:22
24:3,4,5

**Mary** 12:3 13:16,24

15:16,18 17:4,12
47:24,25 57:21,23
59:6,12

**mass** 36:11,14,18

**materialize** 53:6

**materialized** 58:13

**matter** 53:2

**Max** 36:5

**Maxfield** 2:11 5:15

**maybe** 8:23 9:14
13:8 23:5 57:25

**mayor** 8:10 9:19
27:7,11
65:17,22,24

**me** 6:4,12,19,25 7:8
10:4 12:13,17,25
13:8,16,21 24:5
26:18 27:10 29:23
35:13 38:16,23
39:4 44:21,25
45:5,6,7 47:17,22
51:12 54:3 55:2,3
56:13 59:12 62:4
70:6

**mean** 7:1 11:5
12:16 14:14 15:24
16:16 21:17 22:2
23:17 24:2,9,11
25:4,12,23 27:23
28:6 29:17,22
31:6 32:20
33:4,19
34:2,3,11,20 35:1
37:5 44:23 45:8
46:13 47:12
50:8,11 51:11
54:2 56:15 57:9
60:1 62:9,19

**meaningful** 20:3
44:6

**means** 66:13

**media** 52:23,24



meet 10:4 12:3
13:21 36:7 40:12
63:19
meeting 9:4
14:14,17 36:14,15
37:5 38:14 65:23
meetings 30:25
memorialized 10:8
mention 31:22
mentioned 6:10
22:6 23:13 54:19
mentioning 20:18
31:8
mess 40:4
met 24:16 67:5
methodical 33:18
Mhmm 8:12,15,21
9:9 15:6,11
18:3,13 34:5 35:4
54:12 63:18
Miami 1:14 2:4
10:8 32:12 35:25
36:23 37:13 47:12
Miami-Dade 33:20
Michael 5:14
MICHEAL 2:9
Michetti 2:9 5:14
27:23 42:20,23,25
43:10,13,18
45:13,19,22
48:7,15 56:23,25
57:2,6 60:5 64:15
67:9,14
might 9:7 10:11
14:12 21:13 23:6
26:4 27:25 35:20
million 18:11 37:9
mind 6:12 21:14
26:5 34:24 57:11
mine 11:6 19:18

60:16
minimal 29:21
minutes 8:23
Miramar 38:16,17
Miro 1:10 3:2
5:1,4,18 70:6
mojito 19:22 22:10
moment 59:17
money 11:1,2 18:6
19:6 21:22 30:1
31:3,5 32:9
34:6,18 35:2 46:2
66:23
month 35:13 43:16
44:25
more 6:21 21:3
23:7,8,19 24:22
25:4 27:5 31:14
57:4 58:5 64:8
65:6
morning 14:2 29:19
mother's 39:14
Moto 60:25 61:2
Motors 22:4
moving 62:5
MRC 16:16
much 11:25 14:9
28:19 32:22 62:13
multiple 22:1 43:11
44:12
Murgado 22:5,25
23:2,3
Musibay 2:10 5:16
music 12:8
my 6:17 10:13,14
12:11 13:16,20,22
14:1 17:4,17,19
21:10 24:1 26:17
27:14 28:5,9

29:3,23 33:17
34:1 42:2 43:24
47:24 50:1 55:3
60:25 65:12 67:2
69:9,16 70:8
myself 10:13 21:14
24:2 58:3

_____

N

name 7:19,21 39:5
51:20
names 7:22
Napoli 65:17,24
needed 25:5
negative 52:25
Negatively 48:25
negro 63:11
neighbor 12:3
neighborhood
27:13 62:6
neighbors 12:6,7
57:21 58:5
never 12:10 17:7
19:1 21:18 22:19
25:23 26:18 29:12
35:20 36:9,24
37:12 40:5,8
41:14 43:8 44:17
48:6 50:22 51:23
53:21,22,23 58:9
62:2,3 64:14
67:4,5,13,22
news 10:21 18:23
52:25 53:8
next 14:2 27:6,7
28:18 29:19 32:2
Nicaraguan 51:16
nigger 63:11
night 13:10,13,19
14:25 15:2,3,7,9

nine 13:22
no 4:3 6:2 7:22 10:3
14:6 16:22 17:9
18:5,10 19:25
20:18 21:10 22:24
24:15,22 27:5,17
28:11 30:11 31:9
37:1,14,17,19
40:15,21 41:17,21
42:3,8,10
43:18,20 44:16,18
45:12,13
46:12,14,19,22
47:1,3,5
50:8,11,20,24
51:7 52:19
53:11,21 54:2,25
60:10 61:25 62:8
63:5 64:22 65:10
66:22 67:6,15
70:13
nod 6:3
noise 58:6
none 50:11 51:14
62:8
nor 9:18 69:12,13
Noreaga 14:15
Norieaga 14:10,12
15:3
normal 57:7
not 5:21 6:3,13
8:17,22 9:7 11:5
12:12 14:8 16:16
17:8 19:12 22:24
23:1 24:6,9 26:4
29:11 30:1,23
31:9 32:2 33:8
37:22 41:13
42:5,12 44:21
45:15 46:20 47:4
49:10 50:1 52:3,8
55:18 57:25 61:9
64:5 65:12 66:22



69:10

Notary 1:25 69:5,21
70:13

noted 59:25

notes 24:8,9 69:9

nothing 6:7 22:18
25:19 27:5 33:19
38:2 40:3 53:8,9

notice 41:6

now 6:13 9:17
10:20 17:15 18:8
26:15 27:10 29:4
33:15 34:17
35:2,25 39:12
43:15 44:20
47:5,11 49:20
51:7 54:9 59:4
60:20 61:8 62:19
64:10,23 65:8,21
67:25

number 58:15

_____

O

OATH 70:1

objective 15:8

obviously 7:6 8:19
9:4,7 11:11,24
17:8,24 19:6
24:21 29:3 44:2
53:2 59:1

occasions 40:12
67:10

occur 9:10

occurred 30:21
32:23 38:15

Ocho 18:15 20:2
23:3,4 36:13

o'clock 13:22

off 10:24 43:11
57:3,11,14 68:1

offense 33:4

office 7:3,5 19:5
30:18,20 32:3,4
33:2,4,8 34:2
36:10,11,12 37:25
38:3,12 40:14
41:1,2 54:10 65:9

officer 24:8,10
51:14,15 52:8

officers 59:25

official 43:1

officially 33:14

officials 67:10

often 23:5 34:10

Oh 6:9 12:5,6,20
21:21 30:22 35:12
36:5 44:3 45:10
48:5 50:10 56:22
57:1 61:4
62:17,24 63:15

okay 7:12,17 8:4
16:5 28:2 30:22
40:6 42:25 57:16
68:3

Old 61:3

on 5:11 9:20,21
10:17,20,23,24
11:5 12:7,10 14:5
15:9 17:15,23
18:1,23,25
20:2,20 21:5
22:1,3 23:2 24:1
25:5 27:3,4
29:10,21,23 31:20
32:7 33:23
39:5,16 40:12,13
41:5 43:2,22
44:6,13 45:1
47:18,20 49:3
51:11,13,18 53:4
55:11,13
57:2,6,8,24
58:6,20
59:6,13,19 62:7

65:1 70:7

once 13:8 19:6
25:16 27:4

one 6:17 9:11,18,21
11:2,3 16:3,8 27:6
31:3,9 33:9
35:8,25
36:2,11,24
37:4,5,7 38:14,15
43:12,19 44:20
45:4 46:17
49:6,25 51:11
53:16 57:13 58:12
60:10 65:5,14

one-way 49:14

only 9:5 13:8 27:3
34:1 49:6

open 18:20 22:9
23:1 33:21

opinion 21:10 29:14
46:21 47:24

ordeal 9:13 30:21

ordinances 65:1

Orlando 52:14

Orlofsky 2:3 3:4
5:9,13,18
9:11,16,23 10:2,7
25:8,9,13,17
36:21 37:2,12
38:9 41:15,18,22
47:7,11,16 49:20
51:1,5,8
52:11,17,20
56:7,14,17,21
58:25 59:4,11
60:20 64:23
65:4,8,11,13
66:18 67:25

Orolosfsky 44:8

Oscar 2:10 5:16

other 6:17 8:18
11:18 13:6 20:15

22:3 23:19,20
29:18 34:6 36:2
37:20 38:15 43:18
48:20,21 49:22,24
54:12 59:24 60:5
62:6 64:19,24
65:21 66:2
67:10,14

otherwise 50:7

our 33:23 59:25
60:1

out 10:22 12:11
13:10 17:22 25:16
28:21 32:17,18
36:13,15 39:24
41:7 45:1,5,25
46:1 51:10,17
54:22 55:4
58:16,22 59:24
60:13 67:7

outside 22:23 30:25
36:10 57:7

over 9:14 15:7
19:15 32:2 40:5,9
43:8 45:4 58:3

overall 21:4

overnight 29:16
33:19

oversees 33:11

overtime 56:25

own 19:21 31:14
46:1

owners 61:17

owns 61:3

_____

P

P.L 2:3

p.m 1:11 68:4

pack 32:9,11,14,19

package 39:4,12
40:6,8



packet 38:5,6
41:20,22

page 3:2 49:3

pages 60:1

paid 29:24 32:17,18

pallet 45:15

paper 40:9

papers 40:4

parallel 60:12

Park 17:15 36:1,16
37:6,10 50:18
62:11

parking 14:8,20,23
25:15 47:15,16
50:18

Parrot 36:1

part 11:3 23:13
51:23

parties 69:11,12

partner 20:12

partnering 31:20

partners 10:13

party 17:4

Pasa 18:20

paved 14:7

pay 32:21 46:1
56:25

paying 35:13 50:4

payment 43:16

payment's 45:17

pending 24:25

people 11:14,18
21:21 26:3 27:5
28:18 31:16,19
34:7 37:20 41:2,4
42:5 44:25
45:3,14 48:21
50:11 53:19 64:13

66:2,4

permits 51:10
55:18

person 42:18

personal 23:3 47:24

personally 70:6

persuade 20:4

phone 41:1
43:12,15,18,23
44:6,10,12,24
55:12,13 58:14,17

phones 43:11

phonetic 18:20
20:5,10 22:5 31:2
51:19 58:3 61:11

photographed
23:17

pick 25:2,3

picked 33:14 65:5

picking 50:4,9

picture 42:15 54:4

pictures 15:10,13

pie 12:15

pissed 56:5

place 13:12 36:17
40:5,9 58:7 60:6
65:20

places 65:21

play 38:21,25 50:16
54:22

playing 23:14

plaza 62:10

please 5:10

pleases 41:9 59:10

pocket 46:1

pointed 51:17

police 55:16

political 11:20,21
20:15 47:13,15
49:20,22

polls 50:12

Portilla 30:16 54:4

position 17:14

positive 52:25 53:2

possible 23:10

potential 35:19,22
60:3,8

pound 21:22 23:9

predicament 24:2

prepared 41:23

presence 35:24 36:3

present 2:7 66:18

presentation 37:10

presented 61:23,24

press 53:4,16

pretty 14:9 32:22
62:13 64:7

previously 29:10

Primera 66:24,25

print 41:7

prints 39:24

private 44:14 45:1
67:5,10

privilege 46:24

probably 10:16
35:15 40:3 45:25

problem 45:23

problems 23:6

procedure 40:14,16
48:8 52:9

proceedings 69:8

process 14:20 15:4

profit 19:10

proper 14:8 55:18

properties
7:10,11,12,13
8:14 23:19,20
25:11,20
51:3,6,22 60:21
65:2

property 7:14 8:3

protect 39:2

protocol 40:19

provided 43:14

pub 10:4,5 13:21
30:25 36:15

public 1:25 15:25
43:17,22 69:5,21
70:13

Punta 56:12

purpose 55:5

put 10:22,23
17:7,23 18:1
21:14 22:1 24:2
27:3 32:5 41:19
50:25 62:12

puts 40:9

---

**Q**

Que 18:20

question 6:1 18:17

questions 6:4 14:18
25:7

quick 16:7 65:18

quote-unquote
11:25

---

**R**

racist 62:16
64:17,18

radio 10:16,17

raise 32:9


UNIVERSAL
COURT REPORTING

877.291.3376
www.UCRinc.com

raises 33:25

rallies 49:22

rally 47:13 49:21

ran 59:24

rat 53:10

rats 53:6,7

reach 58:16 60:13
    67:7

reached 44:25

real 19:21 37:18

realized 48:6

really 11:5 12:19
    20:9 22:22 25:24
    31:9 32:8 52:2

reason 19:14 27:13
    36:12 44:5 51:22
    61:16 62:4 67:14

reasons 11:21

recall 51:7 53:15
    62:20

recently 17:8

receptive 49:18

record 5:11 6:2
    10:23,24 22:1
    43:17,22 57:12,14
    68:1 69:9

recorded 5:20 6:2

recording 5:24

records 12:10 55:12

referred 7:25 21:3

reflect 6:2

regarding 6:17
    25:11 38:24 39:13
    41:16 47:12 51:2
    54:13

regards 22:19
    38:13 53:6

regularly 37:21

55:12

related 39:4

relation 42:15

relationship 15:18
    31:11 34:6 47:8
    61:11,15

relationships 16:21
    18:15 22:4

relative 69:10,12

release 53:4

religion 42:2

religious 42:2

remark 64:2

remarks 62:16,25
    64:1,13,17,18
    66:2

remember 36:2
    51:5,8 52:17
    53:15 65:21 67:22

removal 33:4

remove 33:2,8
    62:11

render 33:12

rendered 28:19

renegotiate 18:2

reopen 29:1

repeat 10:19 65:3

report 48:18 69:7

REPORTED 1:24

Reporter 1:24
    5:10,17 10:18
    16:3,5 57:13
    64:16 68:1,3
    69:1,5,20 70:12

Reposo 20:9,11
    48:22

request 12:10 16:17
    25:18 43:22 55:12

residents 60:7

respect 28:21 45:6

respond 41:13

responded 41:5

response 6:1

responses 40:15

restaurant 61:5,17

resumed 57:15

retain 44:19

retained 12:18

retainer 46:4

retired 42:16

reviewing 33:15

reward 17:20

rid 29:5

ride 24:10

right 6:11,13 9:6,20
    16:15,17,24 23:15
    24:7,18 25:21
    27:25 28:15,25
    29:2,25 33:15
    36:17 37:9 41:12
    43:5 44:4 47:5,10
    49:8,11 51:7
    56:22 57:1,6
    58:10,21 60:3
    62:19 67:25

ROAD 2:4

run 19:22

Russell 64:20

─────────
        S
─────────

said 10:17 12:16,21
    17:21 21:21 26:18
    27:1 39:5 41:3
    42:20 44:11 60:13
    67:16

same 32:7 49:3
    50:12 62:10

Saturday 57:7

savior 53:3

saw 9:20 12:2
    28:17,18 29:23
    48:23

say 5:25 9:13,14
    12:23 13:1 21:2
    26:2,8,10 28:22
    35:12 40:20 44:1
    45:6 47:2,5 51:24
    53:18 59:15 60:4
    61:20,22 63:2,3,4
    64:7,13 66:5,9,15

saying 12:8 14:1
    15:4 23:1 25:19
    30:23 40:18 53:11
    54:17,25 57:18
    61:6 62:21

says 11:2 22:3
    24:11 40:6 60:25
    66:24

scale 15:18

scenario 60:6

scope 15:18

scratch 17:17

second 32:4 41:5
    57:13

secure 59:19

see 5:24 21:11
    23:14 27:17 31:20
    48:17 55:13

seeking 44:22 46:24
    52:23

seen 27:24 67:9,20

sees 53:4

selectively 65:1

sell 19:23 23:2,8

selling 61:7

sells 11:3

sent 25:16 58:3,20



59:2

**several** 38:11 58:2

**sewer** 14:7

**sexist** 64:1,2

**she** 12:5 14:2 15:19,21,22 16:2,6,7,8,10,12,13,15,17,20,22,25 17:18,19,23 35:5 48:2,4,5,6 57:23,24 58:1,15,16 59:8,9 64:8

**she's** 5:24 15:19,22,23 35:3 64:7

**shit** 63:23,25

**shocked** 50:24

**shop** 22:10 30:5

**shot** 49:10

**should** 33:4 44:7 48:13,15

**shouldn't** 26:23

**show** 12:6 15:9 34:17,22 35:1 58:1

**showed** 8:13 13:24 28:9 36:18 47:18 55:1

**showing** 8:18

**shut** 27:13 33:21 52:7 55:6,10,20 56:2 61:18

**shutting** 62:5

**side** 13:19 49:6 54:14 60:12,15 65:19

**significant** 20:2

**signs** 50:25

**similar** 45:13

**sister's** 39:15

**sit** 35:21

**site** 47:21

**sitting** 28:18 56:23

**situation** 48:20 50:5 53:14,25

**situations** 34:12 54:12,15

**sky** 12:15

**sneakers** 24:1

**some** 12:6,16 17:14 25:7 32:5 34:6 35:18 39:11 43:5 44:19 48:10,15 51:12,17

**somebody** 30:14 33:8 37:16 48:12 52:22 53:13 66:15

**somehow** 21:8 51:15

**someone** 42:14 45:9 46:3

**someone's** 38:15

**something** 7:25 25:6 26:16 27:18 29:9 34:3,21 35:7 36:19 38:22 40:1 44:6 46:13 47:18 48:13 57:18 59:19

**sometimes** 59:14

**Sornof** 31:2,3,6 34:6,14 35:2

**sorry** 10:18 16:4 64:15

**SOUTHWEST** 1:13

**Spanish** 10:21

**speak** 30:15

37:21,22

**speaks** 30:13

**special** 17:19 67:20

**specific** 6:23 7:15 11:23 36:25 51:11

**specifically** 9:24 14:5 23:18 26:20 30:4 39:3 66:6

**speculation** 46:11,12

**spoke** 9:1 13:23 26:13 58:4 59:5

**spoken** 24:22 45:3

**spreadsheet** 7:7

**squash** 49:24

**squeeze** 37:11

**St** 54:13 61:18,23,24 62:5

**staff** 43:4,6

**start** 6:4 7:2 35:13

**started** 6:9 12:7,11 13:3,25 14:18 15:4 24:4,5 29:15 58:12,18

**state** 1:25 6:10,14 24:13 33:9 34:2 37:25 69:2,6,21 70:2,13

**statement** 1:10 5:1,20 20:19 24:17 68:4

**statements** 23:10 34:1

**Station** 10:17

**Statute** 33:10

**stayed** 58:4

**staying** 12:13

**STEVE** 1:10 3:2 5:1,4 70:6

**Steven** 26:19

**stigma** 45:14

**still** 19:12 36:22 43:17 53:10

**stipend** 43:16

**stop** 59:23 65:19

**stopped** 65:19

**straight** 31:16

**strategizes** 30:15

**street** 1:13 8:16 9:12 21:23 49:15 55:1 60:21,23 62:7

**stuff** 16:18 22:4 26:1,25 30:6 32:6 33:22 39:16

**sudden** 54:4

**suggesting** 22:25

**suit** 38:2

**SUITE** 1:13

**Sunbiz** 18:21

**Sunday** 29:23

**Super** 36:1,24 37:4

**support** 22:14

**sure** 7:8

**surprised** 59:23

**surveillance** 61:9

**sworn** 1:10 5:1,6,20 68:4 70:7

——————

T

**tail** 29:14

**take** 15:10 19:3,15 24:9 28:23 33:19 45:9

**taking** 24:8 26:15 55:22 59:25

**talk** 14:12 58:1 60:8



63:25

**talked** 31:19 49:21
56:9 59:16 63:23
65:5

**talking** 8:23 12:19
17:7 24:5 46:20
48:23 55:22,25

**Tanya** 35:2 54:5

**tape** 28:16

**target** 10:12,13
26:3 49:24 54:20
66:20 67:11

**targeted** 60:22

**targeting**
6:18,19,23
11:6,18 24:3
26:21 33:23

**targets** 54:13 61:6

**tell** 6:19,25 18:18
25:10,13 35:11
36:23 44:23 45:5
46:14 62:4

**telling** 44:25

**terminated** 28:7
32:1 43:2

**terminating** 50:18

**testified** 5:6

**text** 44:8

**than** 13:6 20:15
23:20 64:19 65:6

**Thank** 5:17

**that** 5:22,25 6:15
7:22,23 8:5,19,23
10:7,8,9,10,15,19,
24
11:1,3,5,6,8,9,11,
15,25
12:2,4,5,8,10,14
13:7,10,11,13,14,
15,19
14:5,6,10,14,16,1

9,22,23,24,25
15:2,3,7,8,9,14
16:11,18
17:6,10,12,21,23,
25 18:2,7,9,15,22
19:6,9,11,14
20:2,3,11,15,16,1
8
21:1,2,4,6,8,12,13
,14,16,17
22:4,10,25
23:5,11,19,25
24:1,2 25:1
26:1,4,5,8,14,15,2
3
27:2,4,18,19,20,2
1
28:3,8,9,10,15,23
29:4,8,9,10,12,13,
15,16
30:4,6,8,12,13,14,
21 31:9,10,13,18
32:1,3,6,8,13,15,1
7,22
33:1,2,3,15,23,24
34:7,14,15,16,17,
18,19,25
35:8,11,14,17,18,
20,23,24
36:2,15,20
37:8,11,15,21
38:1,14,15,24
39:11,12,15,17,21
40:3,6,14 41:8
42:7,9,16,18,23
43:7,12,13,14,17,
19,22
44:4,5,6,13,15,17,
24,25
45:3,9,14,15,20
46:3,9,18,19,23,2
5
47:4,13,17,20,21
48:2,3,4,5,6,8,16,
17 49:4,22,25
50:2,3,5,8,11,19,2
0,23 51:23,25

52:14,22
53:5,12,13,14,16,
19 54:1,15,18
55:1,13,14,23
56:8,12,13,15,19,
24 57:8,18
58:7,12,13
59:17,18,24
60:6,7,14,18,22
61:1,3,6,7,17,22,2
3 62:3,4,8,10
64:14,24,25
65:5,21,22
66:13,14,20,22,23
67:3,8,11,22,23
69:6,8,10 70:6

**that's** 7:8 10:5 11:1
13:3 14:3 16:5
18:17,22 19:3
22:10 23:1
26:9,14
29:9,15,17 30:1
31:6,23 32:22,23
34:3,20 35:15
38:1,17,25
40:1,10 41:12
44:3 45:16 46:16
47:4 48:22
51:19,20 52:3
54:5 58:15 61:8
67:25

**their** 17:1,23 18:1,2
21:5 31:14
36:7,10 37:10
63:4,5,25 64:5

**them** 6:12 8:13
11:22 20:20,23
24:17 25:4,23
31:20,23 39:25
40:9 41:5,8 44:21
54:16
55:6,10,20,25
56:2 57:25 58:1,2
59:22 60:13 61:6
62:1,20 63:3,16

**themselves** 5:11
59:16

**then** 12:19,21
13:23,24 19:6
27:9 29:18 38:11
51:18,21 54:4
56:1 58:18,20
60:9 63:19 65:24

**there** 7:22 10:22,24
12:21 14:7
15:7,8,15
17:16,17 18:3,12
19:7,8,20 20:14
23:11,22,23,25
24:12 27:9 28:21
30:4,7,12,14
32:2,5,6,25
33:11,24
34:7,8,9,15
35:16,20
36:17,18,20
37:6,20 38:17
40:15,18 44:4,7
47:18
48:2,4,5,6,7,10,13
,15
50:2,5,13,16,22,2
5 51:10,14
53:7,10,16 56:4
57:23 58:2,3,9
59:17 60:5,7
61:7,8,9,16,19
65:9,13 67:24

**therefore** 23:4

**there's** 8:1 17:25
30:7 44:6,12 45:8
46:6,8 47:3,4
60:12 61:6,7,9
65:6,8,20

**Thereupon** 5:3

**these** 9:12 21:21
26:3,21 35:8 41:4
59:21 60:1

**they** 6:13 7:24,25



8:2,19 11:16,23
12:8,10,24 17:6,9
20:16,20
21:21,24,25 23:22
24:19,24 25:2,5
29:22 30:24
31:17,18 32:3
33:11,13,18,20
35:12,18
36:7,14,15,16
38:23 40:17 41:7
45:5,6 48:9 50:25
52:2 53:8 54:23
56:1,25 58:4
59:16,25
62:21,22,23 64:18

**they'll** 53:4

**they're** 8:2 11:22
12:25 20:13 25:3
31:13,14 33:15,18
44:1,21 61:7

**they've** 19:10
31:12,15

**thing** 17:24,25 19:4
21:16 23:17,18
27:23,25 45:17,20
50:12 62:10

**things** 31:20

**think** 11:17 18:7
20:3,7,16
21:1,2,4,6,7,10,12
,13,17,21,24
22:6,7,9,22 23:11
25:3,22,25 28:19
29:22 31:12,18
33:1,2,3,24 40:1
43:24 45:25
46:2,6,8,15 47:23
50:13 58:13
60:15,19 61:5

**thinks** 11:1 37:23

**third** 32:2,7 41:5

**this** 5:20 9:23
12:15,19,22 14:1

15:4 17:9,20 21:3
26:1,4,19,22
27:13 34:24 37:15
38:2,3,20,23,24
43:8 51:14,25
52:18,19,20,21
57:18 60:10,23
61:17 63:3,4
64:11 69:16 70:8

**thorough** 33:18
40:5

**those** 12:7 13:12
16:8 23:9 33:14
48:9 50:25
54:14,18 55:20
62:12 65:6

**though** 6:1 20:19
45:24 52:6 63:24
66:8

**thought** 23:5 26:15
66:15,20

**three** 11:24 25:22
29:24

**through** 8:3 15:4
16:25 19:5,8
25:24 34:20 42:17
47:22,24 48:8
51:21 52:2,5 53:9
58:19 65:24

**throughout** 60:1

**ties** 31:23

**Till** 43:8

**time** 13:11 16:3
24:6 26:9,12 28:6
29:10 38:12 40:24
43:5 54:3
55:3,14,23
56:8,13,14,16,17,
21 57:5 65:19

**timeframe** 52:11

**times** 10:23 14:1
16:8 22:1 23:5
24:23 58:2 62:17

64:25

**tired** 56:3

**title** 43:1

**today** 5:19 6:6 60:2
63:17

**together** 10:6 17:7
32:5 40:9 41:19
60:8

**told** 9:5 12:14,18
29:23 38:16 47:17
52:2 55:2,4 57:18
66:19

**tone** 26:17

**tons** 62:17

**took** 7:3,5 13:12
15:13 38:3 39:4
52:14 57:17 60:6
65:9

**Totally** 56:19

**towards** 53:3

**Tower** 17:5

**town** 51:12

**trail** 48:15

**trans** 34:17

**transaction** 34:18

**transcribe** 69:7

**transcript** 69:8

**transpired** 14:3

**Trick** 18:17

**tricky** 18:17

**tried** 9:4 12:13
26:24 27:2 37:8
38:20 42:16 44:18
49:23

**tries** 37:24 39:2
47:1,2

**trip** 52:14

**true** 29:11 34:14

69:9

**trust** 47:3

**truth** 12:23,24 13:1

**try** 9:5,7 27:3
55:17,19

**trying** 32:5,8 36:19
37:8,9 40:12 45:7
58:5

**turned** 8:17 38:6
43:9

**turns** 39:25

**TV** 10:20

**two** 6:10,15 17:7
25:22 28:18 33:14
44:24 64:23
65:4,6

**type** 17:13,14 35:18
39:23 46:9,24
48:11 62:25 63:7
66:2

**typically** 44:8

——————————
U
——————————

**ultimately** 41:10

**Unbelievable** 29:8

**uncle** 67:16,17

**under** 12:17 25:20
49:21

**undersigned** 70:5

**understanding**
17:18

**understood** 21:18

**union** 15:19,22,23
16:11 54:13 59:9

**unit** 17:2

**Univision** 18:25

**unless** 46:13

**until** 17:7,8

**up** 8:16 9:12



13:7,24 15:9
18:20 22:9,19
24:13 25:2,3,14
28:9,21 30:5
31:16 33:14 37:9
47:18 50:4,9,25
52:5 53:25 54:2
55:1 58:1 62:12
64:11

**upset** 12:21 52:2

**us** 6:5 8:22 10:12,13
48:20,23 59:18,19
63:6

**use** 8:7 32:15,20
49:23 56:13 63:20
66:6 67:10

**used** 21:20 30:24
56:19

**using** 34:2 56:18
63:8

**utilized** 26:3

───────────

V

**vacation**
56:13,18,20

**valet** 13:11 25:20

**Valves** 20:5,7,24,25
21:3,9 23:9
31:6,8,12,21 32:8

**various** 14:1,9 41:2

**Venezuelan** 10:25
11:4 50:9
66:21,22,23

**verbal** 6:1

**Vicky** 55:22

**videoed** 23:17

**videos** 15:10,13
27:24

**violation** 58:24

**violations** 8:19
32:16 60:3,4

**vision** 23:4

**visit** 56:8

**visited** 41:16,18
58:2

**vividly** 59:25

**vote** 11:23 46:25

**voted** 46:15

**voter**
39:13,14,15,18
50:6

**voters** 50:4

───────────

W

**walk** 28:17 48:11
60:1 64:23 67:20

**walk-along** 12:4,5

**walk-alongs** 65:4

**walked** 8:16,18,22

**walking** 36:13,16

**walkthrough**
9:12,24 10:2,9
23:16 25:9

**walk-through** 10:8
23:25

**walk-throughs**
65:14

**want** 6:2 12:6 14:12
19:13 21:2,25
23:7 24:4,25
28:22 34:13
35:6,14 45:15

**wanted** 18:18 29:1
43:9 66:20

**wants** 22:9 23:1,2,7
27:13 59:9

**wasn't** 7:7 9:17
14:7 30:11 36:12
47:22 51:12,14
54:24 63:13 65:23
67:8

**watch** 10:21

**way** 8:16,18 22:16
28:11 46:17
62:3,18

**we** 5:25 6:9 8:16,17
12:2,7,14,19,21
13:22,23,24,25
23:3,17 26:23
27:1,5,7,8 28:15
33:23 37:5 40:12
45:13 49:21 50:8
56:8 57:11,16
58:18 59:5
65:5,14,18,19,22

**wealth** 18:7

**website** 8:3

**week** 27:8

**weekend** 51:11
52:12,14 56:8

**went** 7:5 8:9 11:12
13:10,19 15:7
36:16 37:25
38:4,16,23,24
42:21 57:23 58:1

**were** 8:19 12:8 17:9
21:6,15 23:22,23
26:1 27:1,6,7,8
31:8 32:3
36:16,21,22 38:17
40:14,15 43:1,4
52:12 54:19 55:7
56:9 57:17 59:25
60:7 62:21,22
64:25 65:9,11,14
66:18

**we're** 6:3 27:10
60:2

**Were** 29:13 64:18
65:13

**We're** 13:9 57:16

**weren't** 44:2 56:1

**we've** 24:21,22

64:24

**what** 6:15,19,25
7:18 10:3,14
11:1,13 12:1,9,25
13:11
14:3,4,11,13
15:6,7,8,16,17
16:11 17:9,21
18:22 19:10,11,14
20:14,19
21:15,16,25
22:3,23
23:1,15,16,23
24:16
25:5,12,17,18,22
26:10,11,14,19
27:12,14,15,16
28:1 29:15,22
30:3,9,23 31:2
32:11,13,15,25
34:1,5,7,20
35:14,15 36:18
37:24 38:5,8
39:12,20
40:7,11,13,15
42:15,25 45:5
47:15 49:5,14
51:9,24 52:5,9
53:18 54:16 55:5
56:15 57:9,21
58:6,15 59:9
61:10,12,13
62:9,10,18,25
63:2,7,10
64:1,6,9,12
66:8,9,13,24,25

**whatever** 7:18
12:24 25:20 36:19
44:11 63:17 65:16

**what's** 12:24 14:20
15:17 24:13 47:7

**whatsoever** 17:10
25:24 46:10

**when** 5:25 7:3,5 8:9
9:11 10:5 12:11



13:3 19:3 21:2
24:11 29:23 36:6
38:3 42:20 43:1
45:18 48:8 50:24
52:2 59:1,24
60:14

**where** 7:25 10:22
11:1 32:2 34:12
38:3,17 39:9
40:15,19 42:23
48:20 50:5 54:18
56:9 59:19,21
60:6,11 67:10

**whereabouts** 59:8

**Wherever** 54:10

**whether** 42:5,12

**which** 12:13 17:22
19:9 25:20 28:7
31:1 32:16 33:5
37:23 43:16 49:21
51:5,16 65:14

**while** 12:5 13:23
30:8 33:19
36:21,22

**whistleblower** 38:1

**white** 63:15

**who** 7:7 13:14,15
23:22 31:5,23
37:16 39:20,21
40:25 42:17,18
54:2 58:17

**whoever** 58:22

**whole** 23:17,18
30:21 45:20

**Who's** 20:11,22
61:2

**why** 6:5,6 10:12
17:22 18:18
19:13,16 20:7
23:23 26:9,21,22
27:13 38:23 39:17
42:7,9 61:8

**Widge** 54:14
61:18,23,24 62:5

**wife** 13:16,20,22
14:1 56:10

**will** 45:9 46:7 57:7

**William** 2:8 3:3

**with** 6:4 7:9 8:9,22
9:14,17,18,25
12:3,11
13:8,20,22
14:6,14
17:4,12,20 19:11
22:19,21
24:4,13,16
25:14,15,24 26:8
29:4 30:5,6,15
31:12,20 32:7
34:6,13,14
35:21,25
36:7,11,14,21
37:3,5,8
38:2,3,11,13 43:1
44:11,12 45:16
46:2 47:8,12,19
49:3,14 50:23
51:18,20
53:6,9,20,25
54:10,11 55:12,13
56:9,10 61:11,21
62:13
63:6,13,14,19
65:22 67:5,8
69:13

**within** 16:9

**without** 5:21

**witness** 3:2 5:5,7
10:20 45:17,21,24
56:24 69:16 70:8

**women** 19:3 64:4

**won** 19:3

**word** 49:23 63:22
66:12

**words** 63:9 66:6

**work** 17:1,19
34:13,14,19,24
43:10 44:21 45:7
52:1

**worked** 14:2 57:5,6
59:9

**working** 27:5 29:10
30:5 51:14 57:2

**works** 15:19,22
44:15

**would** 6:12 8:7
10:10,12,13
19:13,14 20:3,16
21:20 26:22
35:11,19 37:16,21
39:9,17,20,21
40:11,19 42:7,9
44:9 45:16 46:19
47:25 53:18 54:2
55:9
58:11,12,19,20
59:2,12 60:4
63:2,3,18,19,20
64:2 66:5,9,14

**wow** 28:13 61:4

**writing** 40:23 41:4

**written** 29:16

**wrote** 40:12

———————
Y
———————

**yeah** 9:3,22 11:16
12:5 13:13
15:3,12 16:1
18:24 19:20 21:24
22:2,15,17,18
23:21 26:14 28:22
29:17 30:7,16,24
31:3,17 35:17
36:9 39:8 40:3,18
41:12 42:6,19
43:6 44:3,23
45:2,5,10 46:7
47:17
48:13,17,22,24

49:1,16 51:10
54:20 55:22 56:6
57:23 60:19 61:5
62:24 64:3,8,21
66:4,7,11,16 68:2

**year** 29:24
52:18,19,20,21
57:8

**years** 40:7 45:4

**YENLY** 1:24
69:5,20 70:5,12

**yes** 5:23 6:2,24 7:4
16:7 18:8 22:13
25:16 28:12 32:20
34:15 36:9 41:24
46:14 49:19 51:4
56:12 60:17,24
64:5

**you** 5:17,21,24,25
6:1,5,9,10,12,16,1
9,21,22,25 7:1,5,6
8:14,18
9:1,11,20,23,24
10:7,9,18
11:5,12,13,17
12:1,3,4,6,9,11,14
,15,17,20,21,23
13:6,9,10,18,22,2
5 14:1,12 15:3,24
16:9,13,25
17:3,11,16,18,19,
20 18:6,13,18,21
19:4,11,17,19,22
20:3,7,8,10,15,20
21:1,2,4,6,7,12,17
,18
22:5,10,19,21,23
23:11,19
24:3,11,12,16,17,
19
25:2,7,10,12,13,2
2,25
26:1,2,7,8,12,14,1
6,18,21,22,23,24,
25 27:4,6,8,10,17



28:5,6,14,17,19,2
2 29:13,18,22,24
30:1,3,24 31:7,23
32:5,8,21,23
33:1,2,3,17,24
34:1,13,21
35:6,8,10,11,13,1
4,21,23,24
36:3,6,18,19,21,2
2,23,24
37:2,7,9,12,16,25
38:6,20,21
39:1,3,16
40:1,3,4,6,7,8,24
41:4,7,8,9,15,19,2
5
42:1,4,14,15,20,2
1 43:1,4,21,25
44:3,4,5,8,9,11,17
,23 45:5,11,19
46:2,5,8,14,15,18,
19,23
47:2,5,11,23
48:11,19,23
49:9,22
50:5,13,15,17,18
51:1,5,6,8,9
52:3,7,9,11,12,17
53:3,8,20
54:6,9,11
55:1,2,4,7,9,11,12
56:3,7,9,10,14,19,
25
57:4,6,8,10,11,17,
19,23
58:5,6,13,17
59:2,5,11,12,15,1
8,23 60:2,4,6,21
61:6,13,20,23
62:15,19
63:5,6,9,16,19,21,
24
64:7,8,10,14,24
65:3,5,20
66:1,18,19
67:1,4,9,16

**you'd** 45:19

**you'll** 55:13

**your** 7:13 8:20 11:2
   13:19 17:17 24:11
   25:18 26:5 34:24
   36:16 39:5,13,14
   42:25 46:20 47:7
   52:3,4 56:10
   57:2,7 64:25
   67:16,17

**you're** 5:19 6:6
   11:24 18:16 27:25
   31:7 34:2 37:21
   50:3 54:15 57:17
   58:10

**Yours** 7:16

**yourself** 26:2

**you've** 34:13,14,17
   35:1 57:5,18

_____

Z
_____

**zone** 52:4



# EXHIBIT C

| | |
|---|---|
| From: | Sierra, Daniel |
| Sent: | Tuesday, March 13, 2018 11:26 AM |
| To: | ▓▓▓▓▓ |
| Subject: | Fwd: Updates on complaints received from Commissioner Carollo |
| Attachments: | Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #5; Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #4; Fwd: COMMISSIONER CAROLLO JOINT INSPECTION # 3; Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #2; Fwd: COMMISSIONER CAROLLO JOINT INSPECTION #1 |

As requested.

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

——— Original message ———

From: "Sierra, Daniel" <dsierra@miamigov.com>

Date: 3/8/18 8:51 AM (GMT-05:00)

To: "Bernat, James (Sr Exec Asst)" <28410@miami-police.org>

Cc: "Gomez Jr., Luis" <LGomez@miamigov.com>, "Uriarte, Dennis" <duriarte@miamigov.com>, "Franqui, Ricardo" <RFranqui@miamigov.com>, "Meregildo, Gustavo" <gmeregildo@miamigov.com>, "Salvatierra, Yacmany" Salvatierra@miamigov.com>, "Morua, Scarlet" <SMorua@miamigov.com>

Subject: Updates on complaints received from Commissioner Carollo

Good morning Director Bernat,

I received a phone call on my cell phone yesterday in the evening from Commissioner Carollo requesting updates on the complaints he gave Inspector Dennis Uriarte last Saturday during their ride along. Attached please find the complaints received. Below please see the updates for each complaint.

1.  **1380 SW 8 st. – El Taquito Restaurant** (Complaint regarding outside seating for restaurant in an alley/easement between 2 properties under electrical wires)
    (Field Supervisor- Daniel Sierra) Inspector Ricardo Franqui sent email to Public Works for clarification on the area. Per Public Works the area was an alley converted into a utility easement. Inspector Franqui Cited the property for the following violations:
    Case# CE2018004156 opened by Inspector Franqui and Notice of Violation issued to the property. In order to have Outside seating a Warrant would need to be obtained. However, I am not sure if one would be issued for a utility easement. **Inspector will need to follow up with Planning and Zoning and proceed accordingly.**

2.  **821 SW 8 st. – Taquerias el Mexicano** (Complaint regarding Junk in Yard, trash, and debris in the back.) (Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo inspected the property and the junk and trash was removed at time of inspection.

3.  **337 SW 8 st. – Side Bar –** (Complaint regarding CU and BTR, state liquor license, outside storage of food truck/ container and illegal valet parking at night.)
    (Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo opened case # CE2018004209 opened an NOV

1



issued for failure to have a valid BTR (pending payment) and Outside storage of miscellaneous materials, equipment, and/or debris. As far as the liquor license that needs to be addressed by state (ABT under DBPR). I would suggest the night inspector check the business for the valet parking complaint.

4. **427 SW 8 st.** – (Complaint regarding a food truck parked on this empty lot which operates in the evening.) (Field Supervisor- Daniel Sierra) Inspector Gustavo Meregildo opened case # CE2018004206 opened and NOV issued for Outside storage of miscellaneous materials, equipment, and/or debris, and Failure to obtain a special permit/ TUP for the food truck.

5. **1227 SW 8 st.** – (Complaint regarding unauthorized construction and that the property is working outside of the scope of the permits) (Field Supervisor- Luis Gomez) Supervisor Gomez forward complaint to the Building Department since this is an ongoing construction. Building's response: The plans show the entire property that is composed of 1221, 1225, 1233, 1229 SW 8 St and all the structures within the same folio number. Permits and plans show a comprehensive remodeling valued at $1,369,026.00 that includes structural, storefronts, interior remodeling and M.E.P's. Building will have and inspector check the plans and the ongoing permitted work.

Thank you sir,

*Daniel Sierra*
*Field Supervisor (South District)*
*City of Miami Code Compliance*
444 S.W. 2nd Avenue - 7th Floor
305-416-1964
dsierra@miamigov.com

Tell us how we're doing. CLICK HERE to complete our Customer Satisfaction Survey.