# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 1:23-cv-24251-FAM

WILLIAM O. FULLER,
MARTIN PINILLA, II,
THE BARLINGTON GROUP, LLC,
CALLE OCHO MARKETPLACE, LLC,
YO AMO CALLE SIETE, LLC,
LITTLE HAVANA ARTS BUILDING, LLC,
LITTLE HAVANA ARTS BUILDING TOO, LLC,
TOWER HOTEL, LLC,
BRICKELL STATION, LLC,
PIEDRA VILLAS, LLC,
FUTURAMA, LLC,
EL SHOPPING, LLC,
BEATSTIK, LLC,
VIERNES CULTURALES/CULTURAL FRIDAYS, INC.,
LITTLE HAVANA BUNGALOWS, LLC,
LHAB TRES, LLC,
LA GRAN FIESTA, LLC.

        Plaintiffs,

    v.

THE CITY OF MIAMI,
JOE CAROLLO, in his individual capacity,
ARTHUR NORIEGA, in his individual capacity,
VICTORIA MENDEZ, in her individual capacity,
RACHEL DOOLEY, in her individual capacity,
ASAEL MARRERO, in his individual capacity,
DANIEL S. GOLDBERG, in his individual capacity,
WILLIAM ORTIZ, in his individual capacity,
LUIS TORRES, in his individual capacity,
ADRIAN PLASENCIA, in his individual capacity,
RENE DIAZ, in his individual capacity,
YVONNE BAYONA, in her individual capacity.

        Defendants.

_____/

## **PLAINITFFS' FIRST AMENDED COMPLAINT**

During the trial of Joe Carollo, a large number of current and former City of Miami employees – including a former City Manager and two former Police Chiefs – testified that, at the direction of Joe Carollo, the City of Miami adopted formal policies and informal customs aimed at targeting Plaintiffs, their businesses, and business associates, and that the City and its employees engaged in a well-known, widespread and pervasive custom of weaponizing City resources to harass Plaintiffs, their businesses, and business associates, with the aim of shutting down Plaintiffs' businesses, tearing down Plaintiffs' properties, and destroying Plaintiffs' reputations and their personal wellbeing. The testimony also revealed that the City of Miami demoted or fired those who opposed Carollo's targeting of Plaintiffs, and promoted those who agreed to carry out the targeting.

These Defendants – a government machine mobilized by Carollo – have used untold resources derived from taxpayer funds to corrupt City staff members as part of their yearslong effort to drive Plaintiffs and their businesses into bankruptcy. In addition, the City at the direction of Carollo, Mendez and Noriega, has spent more than $15 million in taxpayer money in an endless effort to exhaust and destroy plaintiffs through a legal minefield by filing bogus and frivolous claims. The businesses owned by Plaintiff Fuller and Pinilla that have been subject to raids, false and unjustified fines, and attempts to demolish and destroy include: 1) The Barlington Group, LLC; 2) Calle Ocho Marketplace, LLC; 3) Yo Amo Calle Siete, LLC;  4) Little Havana Arts Building, LLC; 5) Little Havana Arts Building Too, LLC; 5) Tower Hotel, LLC; 6) Brickell Station, LLC; 7) Piedra Villas, LLC; 8) Futurama, LLC; 9) El Shopping, LLC; 10) Beatstik, LLC; 11) Viernes Culturales/Cultural Fridays, Inc.; 12) Little Havana Bungalows, LLC; 13) LHAB TRES, LLC; and 14) La Gran Fiesta LLC.

In addition to the City's shared responsibility for causing the $63.5 million in reputational, emotional, and punitive damages awarded by the jury against Carollo, the City of Miami and the individual Defendants have additionally caused extensive economic damages to Plaintiffs and their companies, well in excess of $60 million. Both the City of Miami and the individuals that knowingly carried out the targeting on Carollo's behalf – all while trying to protect Carollo – are liable to Plaintiffs for these acts and for punitive damages in their individual capacities. This includes, without limitation, Defendants Carollo, Noriega, Mendez, Dooley, Marrero, Goldberg, Ortiz, Torres, Plasencia, Diaz, and Bayona.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff William O. Fuller is a resident of Miami-Dade County, Florida.

2.      Plaintiff Martin Pinilla, II is a resident of Miami-Dade County, Florida.

3.      Plaintiff Barlington Group, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

4.      Plaintiff Calle Ocho Marketplace, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

5.      Plaintiff Yo Amo Calle Siete, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

6.      Plaintiff Little Havana Arts Building, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

7.      Plaintiff Piedra Villas, LLC is a Florida Limited Liability Company owned by Fuller, and is headquartered in the City of Miami.

8.      Plaintiff Little Havana Arts Building Too, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

9.      Plaintiff Brickell Station, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

10.     Plaintiff Tower Hotel, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

11.     Plaintiff Futurama, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

12.     Plaintiff El Shopping, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

13.     Plaintiff Beatstik, LLC is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla, and is headquartered in the City of Miami.

14.     Plaintiff Viernes Culturales/Cultural Fridays, Inc. is a Florida Corporation comprised of community stakeholders who committed thousands of hours for a great community benefit over 20 years, and whose former chairman was Plaintiff Bill Fuller.

15.     Plaintiff Little Havana Bungalows, LLC is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

16.     Plaintiff LHAB Tres, LLC is a Florida Limited Liability Company owned by Plaintiff Fuller and is headquartered in the City of Miami.

17.     Plaintiff La Gran Fiesta, LLC is a Florida Limited Liability Company owned by Plaintiff Fuller and is headquartered in the City of Miami.

18.     Defendant City of Miami is the municipal governing body for the City of Miami.

19.     Defendant Joe Carollo is and at all relevant times was the City Commissioner for District 3 of the City of Miami.

20.     Defendant Arthur Noriega, in his individual capacity, is and at all relevant times was the City Manager for the City of Miami.

21.     Defendant Victoria Mendez, in her individual capacity, is and at all relevant times was the City Attorney for the City of Miami.

22.     Defendant Rachel Dooley, in her individual capacity, is and at all relevant times was the Assistant City Attorney for the City of Miami.

23.     Defendant Asael Marrero, in his individual capacity, is and at all relevant times was the Building Director for the City of Miami.

24.     Defendant Daniel S. Goldberg, in his individual capacity, is and at all relevant times was the Zoning Director for the City of Miami.

25.     Defendant William Ortiz, in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo carrying out his political targeting of Plaintiffs.

26.     Defendant Luis Torres, in his individual capacity, is the Assistant Director of Building.

27.     Defendant Torres is a prime example of how supporters of Carollo earned promotions as a reward for helping the retaliatory campaign against Plaintiffs that they otherwise would not have obtained and did not deserve. Torres, for example, was a strong supporter and active campaigner for Carollo, reflected in the following photographs of Torres wearing a Carollo campaign T-Shirt, actively campaigning for Carollo, and sitting at a polling station on behalf of Carollo, before ultimately becoming the building official who closed Plaintiffs' businesses, including Taquerias and Ball & Chain, and caused extensive damage to Plaintiffs' other businesses:





28.     Defendant Adrien Plasencia, in his individual capacity, is the Assistant Fire Chief and at relevant times was the City of Miami Fire Marshall.

29.     Defendant Rene Diaz, in his individual capacity, is and at all relevant times was the Senior Chief of the Unsafe Structures department.

30.     Defendant Yvonne Bayona, in her individual capacity, is and all relevant times was a member of the City of Miami Code Enforcement Board.

31.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

32.     Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

33.     All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## FACTS

34.     Plaintiffs William Fuller ("Fuller") and Martin Pinilla ("Pinilla") are local entrepreneurs operating out of Calle Ocho in Little Havana, who have built a diverse real estate investment business from the ground up, one building at a time, providing hundreds of jobs for local residents and producing hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County, and the State of Florida.

35.     Plaintiffs Fuller and Pinilla have dedicated their professional careers to revitalizing the neighborhood of Little Havana, where they have helped to generate economic activity and breathe new life into the area, while at the same time preserving its historical significance and cultural identity.

36.     Plaintiffs Fuller and Pinilla have been recognized as "a galvanizing force behind the area's cultural resurgence," and renowned Miami historian Dr. Paul George has likewise noted that Fuller and Pinilla "are both very history-minded and are also very civic-minded . . . [They] understand that the neighborhood has a multilayered history."

37.     Plaintiffs Fuller and Pinilla consider their work to be that of curators and caretakers of the neighborhood and, accordingly, they seek out development partners and tenants "who share a similar vision of preserving and protecting the heritage, the culture, and the history" of Little Havana.[1]

---

[1] Carmen Sesin and Marissa Armas, *Miami's Little Havana: From Working Class Neighborhood to Global Tourist Hot Spot*, NBC NEWS, Mar. 27, 2017, http://tinyurl.com/4usny6y4 (last accessed Feb. 22, 2024).

38.     For example, in 2014, Fuller and two of his childhood friends reopened the famous Ball & Chain nightclub.  For decades during the 1930's to 1950's, Ball & Chain was an important music venue, presenting titans of the era such as Billie Holiday and Count Basie. With the vision of restoring the venue to its past glory days, Fuller and his partners made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

39.     Plaintiffs Fuller and Pinilla are also currently working on Little Havana's first boutique hotel through a redevelopment and restoration of the historic Tower Hotel. The Tower Hotel served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[2]

40.     Preserving that history, where the legacies of various cultures converged on Calle Ocho, is central to Plaintiffs' vision for the project. Through these and many other projects in the area, Plaintiffs Fuller and Pinilla have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

41.     Plaintiffs Fuller and Pinilla's efforts in the neighborhood have borne significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.  Little Havana is now a major Miami destination for tourists and locals alike, sought after as one of the few authentic Cuban legacy neighborhoods left in Miami.  In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

---

[2] Chabeli Herrera, *This Little Havana hotel once housed Billie Holiday. Soon you could stay there, too*, MIAMI HERALD, Mar. 13, 2018, http://tinyurl.com/yc5jxpma (last accessed Feb. 22, 2024).

42.     Throughout all of this, Plaintiffs Fuller and Pinilla have nurtured genuine and productive relationships with City Commissioners, including Joe Carollo's two predecessors, his brother Frank Carollo and Joe Sanchez, both of whom appointed Fuller and Pinilla to participate in various City boards or trusts, such as the Stars of Calle Ocho and Viernes Culturales.

### THE RACE FOR CITY COMMISSIONER AND THE STARTING GUN OF DEFENDANTS' RETALIAITON AGAINST PLAINTIFFS

43.     In the summer of 2017, Joe Carollo ("Carollo") announced his campaign for Commissioner for the City of Miami's for District 3, which includes Little Havana, prompting the Miami Herald to write a story noting Carollo's history of "abusing power, profiting from taxpayers and *using government resources to intimidate his political opponents*."[3]

44.     Because of Carollo's reputation for political vengeance, Plaintiffs sought to keep their support for Carollo's opponent clandestine, becoming key members of the ABC– Anyone But Carollo – group.

45.     Carollo's five-year campaign of retaliation against Plaintiffs stemmed from: a) Plaintiffs hosting rallies for his opponent Alfie Leon and supporting social media advertising for Leon, b) Carollo's false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) Plaintiffs filing an ethics complaint against Carollo, e) Plaintiffs filing a federal lawsuit against Carollo, f) Plaintiffs hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) Plaintiffs promoting African American and Afro Cuban murals in Calle Ocho that

---

[3] David Smiley, *Lies, Chavista ties and red light cameras: A Miami election so ugly the parents jumped in*, MIAMI HERALD, Oct. 19, 2017 http://tinyurl.com/bdeb7k99 (last accessed Feb. 22, 2024).

Carollo disliked, and h) Plaintiffs generally having a different vision for Calle Ocho and Little Havana that threatened Carollo's desire to dominate the District for his own power and corruption.

## CITY OF MIAMI CHARTER

46.     The City of Miami Charter delineates the powers vested in the various arms of city government including the Mayor, City Manager and the Commissioners.  Section 4(g)(6) gives the Mayor the power to appoint the City Manager and Section 15 of the Charter establishes that the City Manager shall be the head of the administrative branch of the city government.

47.     Section 4(d) of the Charter delineates the division of power between the Mayor, City Manager and Commissioners as follows:

> Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof **shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately**.

> Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be **violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.** Any willful violation of the provisions to this section by the mayor or any city commissioner shall be **grounds for his or her removal from office by an action brought in the Circuit Court by the state attorney of this county**.

48.     The Charter makes clear that neither the Mayor nor the Commissioners can give direct orders to any department that is subordinate to the City Manager.  Instead, they are required to direct all orders to the City Manager who then has the authority to direct the various departments of the City to take action.

AXS Law Group PLLC

49.     Carollo, believing that he was above the law, balked at this requirement to issue orders only through the City Manager, and instead used his position as a Commissioner to convince the City and its individual employees to help carry out his egregious targeting and punishment of Plaintiffs.

### THE CABAL FORMS AND FINDS ITS FAVORITE TOOL FOR TARGETING PLANTIFFS BY CRAFTING SELECTIVE ORDINANCES AND UNIQUELY ENFORCING THEM AGAINST PLAINTIFFS

50.     Upon taking office, Carollo drew up a list of all Plaintiffs' properties and associated businesses for purposes of targeting those businesses for fines and shutting them down.

51.     Carollo found his first allies in City Attorney **Mendez** and her Assistant City Attorney, **Dooley**, both of whom worked willingly to assist Carollo in shutting down the Sanguich business, a tenant of Plaintiff Futurama, LLC, by revoking prior permits, refusing to grant new permits, and changing existing ordinances and passing new ordinances to prohibit the business' operation, thereby costing the owners the hundreds of thousands of dollars they had invested and destroying their dreams, all to retaliate against Plaintiffs. As a result of Defendants' actions, Sanguich was forced to end its tenancy with Plaintiff, resulting in economic damages.

52.     At one point in his scheme, Carollo elevated a complaint on Plaintiff La Gran Fiesta's, LLC, property named Taquerias to Florida's Department of Alcohol Beverage and Tobacco ("ABT") and had ABT repeatedly inspect Taquerias in the hopes of revoking its liquor license. When after each inspection, ABT accompanied by Miami Police failed to find any violations and revoke the liquor license—Carollo became enraged, enraged but not discouraged.

53.     Carollo began issuing voluminous public records requests ("PRRs") for Taquerias and demanded that the police officers who had inspected Taquerias appear before him at the next City of Miami Commission Hearing on February 14, 2019 to explain why they had not issued

citations. He also requested the attendance of other City employees to explain why no code violations or other citations had been issued to Plaintiff's Taquerias.

## VALENTINE'S DAY MASSACRE

54.     On Thursday, February 14, 2019, Carollo launched a full-scale defamatory assault on both the Plaintiffs and various City employees, calling for the Commission to pass a resolution asking the Governor to appoint a special prosecutor to criminally investigate the City employees that did not cite Plaintiffs' properties with violations.

55.     Both then-City Manager Emilio Gonzalez and the Chief of Police Jorge Colina ("Colina") stood before the Commission and told Carollo that they would not bring their employees to be publicly ridiculed by Carollo as part of Carollo's efforts to intimidate the employees into doing Carollo's bidding to target Plaintiffs.

56.     While the Commission rejected Carollo's call for criminal prosecution, it did pass a resolution establishing a task force involving the Code Compliance, Fire, Police, and Building Departments, to be headed not by the City Manager, but by **City Attorney Mendez**, aimed at investigating all aspects of Plaintiffs' properties.

57.     Resolution [4-1] stated: "A resolution of the Miami City Commission Directing the City Attorney to Research Properties Described at the February 14, 2019 City Commission Meeting During Discussion item 'D3.1 – Code Enforcement' regarding violations relating to no certificate of use, certificate of use obtained under false pretenses and/or properties with violations that pose life-safety issues, and initiate injunctive proceedings against said properties until the properties are brought into compliance."

58.     The only properties described at the February 14, 2019 Commission Meeting were Plaintiffs' properties, so Resolution [4.1] was passed for the purpose of targeting Plaintiffs' properties.

59.     Commissioner Carollo himself confirmed that Resolution [4.1] became official City policy:

> Q. At this point, Commissioner Carollo, this become city policy, correct?
> A. What becomes city policy?
> Q. This resolution.
> …
> A. Any resolution that is passed by the commission is city policy.

60.     Despite the passage of Resolution [4.1], many of the City's senior staff (most of which would be replaced within a year) objected to this official policy of targeting Plaintiffs' businesses.

61.     Miami's Chief of Police Colina sent a letter to the City Manager regarding Carollo and Mendez's unlawful targeting of Plaintiffs:

> [T]he item on the agenda was a discussion item, however, the main focus of the discussion was aimed at one particular business owner in the city. The resolution that the city attorney prepared pertains to 'properties describe[d] at the 2/14/2019 city commission meeting.'  However, the addresses forwarded in her email targets the particular business owner [Plaintiffs] which gives the impression that the city is selectively targeting his business for new investigations.  **The concern is that this request, through the city attorney, may amount to an <u>unsanctioned and unlawful exercise of powers</u> beyond the limits of his [Carollo's] legislative power <u>as a city commissioner to intentionally cause harm to a business owner</u>.  As such my departments actions under the resolution may be in violation of the code of ethics ordinance**.
>
> **Furthermore this is selective enforcement against the business owner's properties using city ordinance.**

62.     Deputy City Manager Joe Napoli sent the City Manager an email stating: "I am concerned that what the City Attorney is directing our staff to do is beyond what was directed by the Commission and can be interpreted as targeting businesses."

63.     Zerry Ihekwaba, another assistant City Manager, echoed Napoli in another email: "We ought to be enforcing the Code citywide and not just targets," he wrote.

64.     City of Miami Mayor Francis Suarez stated Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners."

65.     As former City Manager Gonzalez explained in court: "my deputy city manager, my assistant city manager, the police chief, in writing objected that this was tantamount to targeting a business …  It's just wrong. There's just no way that this is right.  [W]e're being asked to look at these properties, we're being asked to look at them with the intention of essentially finding a way to shut them down and it's wrong … We need to run a city. **We don't need to ruin a business** and my staff was adamant that this was going way, way too far."

66.     The fact that the Commission appointed the City Attorney to head the task force, instead of the City Manager, not only violated the City Charter, but it also officially put Carollo's ally, Mendez, in charge of targeting Plaintiffs.

67.     Mendez was not only Carollo's ally in the targeting, but Carollo had assisted Mendez and her husband Carlos Morales' ("Morales") corrupt scheme to cheat the City of permitting fees and fines on remodeling old houses that they fraudulently acquired from unsuspecting, incapacitated and sometimes deceased individuals and their families through the Miami-Dade Guardianship Program.

68.     In fact, when Mendez's husband needed special treatment by the City, he emailed not only Assistant City Attorney Dooley, but also Carollo himself, as well as Carollo's Chief of

Staff Blom and his Deputy Chief of Staff Anthony Barcena, despite the fact that the property at issue was not in Carollo's district.

69.     While the rest of the City may not have known about this conspiracy between Carollo and Mendez, once Mendez emailed several top city administrators about the new resolution, those officials immediately protested that Mendez leading this task force violated the City Charter and targeted Plaintiffs' businesses illegally.

70.     After the new City policy was put in place in February 2019, Carollo unleashed a flurry of new PRRs for every single city record on all of Plaintiffs' properties (and no other property owner) and then forced his Chief of Staff Blom to devote the entire weekend of April 19, 2019 to flyspecking these records.  Two months later, this incident was cited in Blom's resignation letter, protesting that he had to examine "various applications, permits and licenses associated with [Plaintiffs] over the weekend … I'm not comfortable doing this type of research for a variety of reasons but find I am being assigned more and more of this type of work focusing on this one individual [Fuller]."

71.     A few short months after Blom resigned, in part due to the targeting of Plaintiffs, Carollo managed to force City Manager Gonzalez out of his position as well.  As Mr. Gonzalez wrote at the time, and later testified to in court, Carollo "was trying to terminate [him] because [he] would not weaponize city government against Mr. Fuller."

**DEFENDANTS THE CITY OF MIAMI, CAROLLO, MARRERO AND DIAZ ROUTINELY CREATED LISTS OF PLAITNIFFS' PROPERTIES TO DIRECT THEIR RETALIATION**

72.     Multiple times throughout Carollo's reign of terror, which continues today, Defendants created hit lists of Plaintiffs' properties for the sole purpose of their retaliation.

73.     For example, on December 19, 2017, Carollo and his office compiled and circulated a list of Properties belonging to Plaintiff Fuller, his sister, and his mother. This list included informational fuel for Defendants' harassment including: the address, building size, lot size, folio number, zoning, sale price, and date acquired. The list promulgated by Defendants the City of Miami and Carollo can be seen in the image below.



74.     This list eventually transformed as Carollo relied upon it.  A picture of one of the final lists directly promulgated can be seen in the image below.



75.     On February 20, 2019, City Attorney Victoria Mendez  circulated her own list of Properties instructing employees to carry out the "Valentine's Day Massacre's" harassment, with seven of the eleven properties associated with Plaintiffs Fuller and Pinilla. This list can be seen in in the image below.



76.     In another email exchange from Carollo's then Chief of Staff, who retired because of ethical concerns with Carollo's campaign of retaliation, Blom sent Joe Napoli a list of eleven properties with six properties owned by Plaintiffs.

77.     And yet another list targeting Plaintiffs emerged in on May 28, 2020, in an email from **Rene Diaz to Asael Marrero** targeting Plaintiffs Little Havana Bungalows LLC, Fuller, "Futurama c/o William Fuller," Tower Hotel LLC, Little Havana Arts Building, Little Havana Arts Too, Calle Ocho Marketplace LLC, La Gran Fiesta LLC, and Beatstik LLC. This list can be seen in the image below.



78.     These emails and their continuous circulations served as a map or rather a hit list for Defendants' harassment.

**DEFENDANTS THE CITY OF MIAMI, NORIEGA, MENDEZ, DOOLEY, MARRERO, AND DIAZ MEET TO STRATEGIZE CRAFTING POLICIES AGAINST PLAINTIFFS**

79.     In February 2020, Defendants Noriega and Marrero were elevated to positions of power, giving the syndicate additional power and influence over the City Manager's Office and Building Department, respectively.

80.     Once City Manager Gonzalez was forced out and replaced by Noriega, who as director of the Miami Parking Authority had both supported Carollo's election campaign and donated millions of dollars to Carollo's Little Havana Fridays, the City policy Carollo had created in 2019 was finally implemented without obstruction by ethical public servants.

81.     Noriega admitted that shortly after he assumed office in February 2020, he met with Carollo, Carollo's staff, and Mendez dozens of times concerning Fuller with no email trail.

82.     For example, on May 27, 2020, just two months after **Noriega** took office, the Director of the City of Miami Building Department, **Asael Marrero** wrote: "Just had a lengthy meeting with **the manager** and **almost the entire City Attorney** office plus Adele [Valencia] **talking about Bill Fuller.** The **Manager** wants us to revise and **update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down** all structures that don't comply. . . . I just had a conversation with **Rene [Diaz]** and asked him to stop by the office tomorrow." (Emphases added).

83.     And, the group would continue to meet to revise policies so that they specifically target Plaintiffs. **Marrero** continued: "I would like for us to spend the day tomorrow brainstorming about these issues. We need to **circle back** with Rachel [Dooley] **if we need to update any of our ordinances** as well as I have a follow up meeting with the manager next week to provide an update on these issues." (Emphases added).

84.     The next day, on May 28, 2020, City staff circulated an email with a subject line of "**Copy of Fuller Properties**" containing an attachment that had all of Plaintiffs' properties listed along with whether each property had any code violations and the status of any such violations. This list of Plaintiffs' properties then continued to be updated and circulated throughout the

summer of 2020, culminating in an email on October 19, 2020, with the City Staff providing updates on the "**progress of Carollo Investigation**" which was limited to Plaintiffs' properties.

85.     On Oct. 22, 2020, Carollo sponsored a new Ordinance that provided "for inclusion of building violations as a reason for revocation of certificates of use." That morning, at 8 am, the City Manager sent an email to the Building Director and the City Attorney stating: "let's get this done today before noon today." Of course, what the City Manager wanted done before noon was the issuance of a building violation at Ball & Chain, resulting in **Ball & Chain being the first ever business to have its Certificate of Use ("CU") revoked in the history of Miami**. Carollo also sponsored a second ordinance on Oct. 22, 2020, which banned outdoor music in any restaurants that did not have a CU as of October 22, 2020, which of course applied **only to Ball & Chain**, since Ball & Chain was the only restaurant to have its CU revoked that day.

86.     Thus, less than five months after the May 27, 2020 meeting, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz had accomplished their goal of passing new ordinances to shut down one of Fuller's most prominent properties. Examples of some of these Ordinances are below:

| Ordinances 13941 | 11-19-20 | Amending Section 36-4 (Noise) | Prohibiting outdoor music b/w hours of 10:00 pm to 8:00 am. |
|---|---|---|---|
| Ordinance 13936 | 10-22-20 | Amending Section 2-211 (Certificate of Use) | Mandatory revocation of CU for violations of Chapter 10 (Building Code). |
| Ordinance 14057 | 3-10-22 | Amending Section 2-817(d) (Mitigation) | Capping the amount the code enforcement board could mitigate fines after compliance. |

| Ordinance 14115 | 10-13-22 | Amending Chapter 31 by adopting Section 31.51(Food Trucks) | Establishing Section 31.51, Food Trucks, prohibiting District 3 from Ordinance. |
|---|---|---|---|
| Ordinance 14118 | 10-27-22 | Amending (Historic Preservation) | Providing further penalties and enforcement options for property owners that allow historically designated structures to decay requiring demolition. |
| Policy | | Compliance Agreements | Revoked policy permitting unsafe structures to enter into compliance agreements with property owners. |
| Policy | | Dual Occupancies | Revoked policy permitting dual occupancies within one venue. |

**DEFENDANTS USED THESE SPECIFICALLY TAILORED POLICIES AND SELECTIVELY ENFORCED THEM AGAINST PLAINTIFFS**

87.    Defendants would selectively enforce these policies against Plaintiffs merely because Plaintiffs were related to Plaintiffs Fuller and Pinilla who were "Carollo's political enemies."

88.    Plaintiffs Fuller and Pinilla are in the business of buying existing properties and restoring them.

89.    Some properties Plaintiffs purchase are older buildings that are not built to the current Miami Building Code. In addition, many of these properties are purchased with existing code violations from work done by prior owners that in many instances was unpermitted.

90.     Until Carollo and the City came together to target the Plaintiffs, the longstanding City of Miami policy was to issue citations and work with the property owners, including Plaintiffs, to bring the property into compliance—in an agreement coined a "Compliance Agreement."

91.     And originally, the City worked with property owners to bring buildings into compliance. However, Defendants changed this policy to effectuate the retaliation against Plaintiffs for their association with Plaintiffs Fuller and Pinilla.

92.     First, the City changed its administrative policy on how property owners can enter into a Compliance Agreement. Previously, either a Building Department Official or the Unsafe Structure Panel could create a Compliance Agreement. The City changed this to allow only the Unsafe Structure Panel to enter into compliance agreements, limiting Plaintiffs' ability to negotiate these Agreements that were commonplace before the commencement of the retaliation campaign against them.

93.     This change was used as a pretext for the City to create arbitrary and infeasible compliance deadlines. And the City did just that for Plaintiffs Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, and LHAB TOO.

94.     Historically, the Compliance Agreements term "deadlines" was a misnomer as it was routinely subject to change. And, as long as the property owner was making progress and actively communicating with the City on their progress, the City policy was not to strictly enforce deadlines.

95.     Plaintiffs made good faith efforts to comply with the compliance agreements by their original deadlines. But when Defendants realized Plaintiffs were meeting their deadlines they imposed another administrative policy change and to further eliminate any leniency in order to target Plaintiffs.

96.     For example, Defendants the City, Diaz, Torres, and Marrero would, in bad faith, obstruct Plaintiffs' ability to meet the compliance agreement deadlines, either by searching out new violations on the property requiring Plaintiffs pull a different permit; arbitrarily requiring Plaintiffs to pull an obscure permit; or wasting Plaintiffs' time and resources by insisting—only after Plaintiffs' performed substantial work aligned with prior permits and agreements—that the end product would not satisfy certain Code requirements.

97.     And, when Defendants, including Defendants Marrero and Diaz, were dismayed that Plaintiffs moved mountains and worked in good faith to meet their compliance agreements, the City, on February 22, 2022, unilaterally collapsed all of Plaintiffs' compliance agreements and began threatening to demolish Plaintiffs' properties.

98.     The City collapsed the agreements, directly without regard to the Agreement's Section 5, which provided extensions of the timelines were allowed with the express written consent of the Building Official.

99.     Equally appalling, the City even "by mistake" upended Plaintiffs' businesses by baselessly claiming Plaintiffs "failed" to meet the compliance agreement. For example, Plaintiff Calle Siete had no violation, but that did not stop the City from targeting the property and citing it and issuing a hold—forcing Plaintiff to take the City to court—before the City, after all the disruption and expense, "review[ed] all of the internal filings that occurred, along with that Compliance Agreement, and . . . determined that [Calle Siete] was in compliance."

100.    Another showcase of the selectiveness of the City's enforcement occurred when Plaintiff Piedra Villas—alongside others non-affiliated with Fuller or Pinilla but also at risk of demolition—challenged the City's demolition attempts. Ultimately, **every person who challenged the demolition received a path to avoid demolition** without seeking judicial

assistance—except for businesses associated with Fuller and Pinilla, including Plaintiff Piedra Villas.

101.    The weaponization of policy was also exemplified when Defendants the City, Carollo, Noriega, Mendez, Dooley, and Marrero changed existing City policy so any building with an Unsafe Structure violation automatically had its Certificate of Use ("CU") revoked, without which a business could not operate. This policy was devised by Carollo, Noriega, Mendez, Dooley, and Marrero and favored in their retaliation campaign because it would allow Defendants to arbitrarily issue Unsafe Structure Violations that in turn would cause the businesses associated with Plaintiffs to have their CU revoked and prevent them from operating.

102.    Accordingly, this policy was specifically used to selectively revoke the CU for the tenants of Plaintiffs LHAB, Gran Fiesta, and El Shopping. Moreover, this policy was specifically used so the City can justify it not issuing CU's to Plaintiffs Piedra Villas and Beatstik's tenants. In both instances, it was Plaintiffs that suffered.

103.    Yet another example of Defendants' weaponization and selective enforcement related to the capping of the amount that code enforcement was permitted to mitigate fines, under Ordinance 14057. This policy change was directly enacted by Defendants because of Carollo's frustration that Plaintiffs Beatstik and Fuller were able to mitigate any fines the City imposed.

104.    Therefore, not only did Defendants' change the policy regarding mitigation of fines but they also changed the procedure so as to try to force Plaintiffs Fuller and Beatstik to appear before the Commission so they can be directly harassed by Carollo.

**DEFENDANTS ROUTINELY DISREGARDED THE CORPORATE FORM OF ENTITIES AFFILIATED WITH PLAINTIFFS FULLER AND PINILLA**

105.    Florida law provides business entities rights which serve to legally separate them from their owners or managers. In order to collapse the distinction, a court must find facts which justify piercing the corporate veil.

106.    Here, Defendants unilaterally and without authority pierced the corporate veil of Plaintiffs because of their association to Fuller and Pinilla and the City on numerous occasions completely disregarded the Plaintiffs' corporate form and labeled the many Plaintiffs as "repeat violators" without justification.

107.    For instance, the City on September 9, 2022, continuously disregarded Plaintiff Beatstik and Plaintiff Futurama's corporate structures, instead labeling them as "repeat violators" based solely on their association with Plaintiff Fuller.

108.    And in an email which included Noriega, and Dooley, Assistant Attorney Dooley ratified the disregard of the corporate form and labelling of Fuller as a repeat violator.

109.    The significance of this label, not only defamatory and damaging to Plaintiffs' reputations, but emboldened Defendants to impose escalating fines and punishments to Plaintiffs—regardless of property ownership.

**DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, DOOLEY, AND MENDEZ ATTEMPTED TO ARBITRARILY DERAIL HISTORIC DESIGNATIONS**

110.    Plaintiffs Piedras Villas, Beatstik, and Tower Hotel all filed applications with the City's Historic Preservation Division seeking to have their properties deemed historic.

111.    But Defendants the City of Miami, Dooley, Noriega, Mendez, and Carollo sought to change the legal protections afforded to historic properties because their focus on retaliating against Plaintiffs led them to seek the demolition of Plaintiffs' properties.

112.    Therefore, Defendants worked to derail, improperly influence, and disrupt the

historic designation process.

113.    The historic designation process involves properties creating a prima facie case and when met, the City—not the property seeking the designation—applies for historic designation from the City's Historic and Environmental Board. The Board votes twice on whether to extend the designation and the typical process takes 3-5 months.

114.    By email dated May 6, 2022, Plaintiff Piedras Villas was advised by the City's Historic Preservation Division that it was "waiting on a determination from the City Attorney if we can move the applications forward with the open code violations. As soon as we get that clarification, we can send you the quick review with the noticing requirements and invoice."

115.    And on May 10,  the legal department confirmed that the evaluations could move forward.

116.    Plaintiffs' properties passed the Board's first vote, which immediately put a stay on the Defendants' efforts to demolish Plaintiffs' properties.

117.    The second vote was scheduled for September. And, a mere two hours before the vote—with absolutely no justification—Defendants Dooley, Mendez, and Noriega tried to postpone and cancel the final and most important hearing of the process. Specifically, Mendez and Noriega spoke with one of the board members trying to force them to delay their ruling.

118.    And, at the hearing, the City Attorney's office, at the direction of Mendez and Noriega, lied to the Board claiming that the judge in the state court action had recommended that the Board not make any decision on the properties.

119.    The Board members responded by stating it appeared the City was acting fraudulently and corruptly and abusing its powers and approved the designation over the City's objection.

120.    Even with the historic designation, Mendez threatened ominously that it would only delay, not prevent, the demolition. Indeed, Mendez was foreshadowing that the syndicate will change City policy to allow demolitions of even historic properties.

121.    And on October 27, 2022, Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero and Diaz did in fact pass an ordinance to allow for demolition of historic buildings, Ordinance 14118.

122.    Currently, Plaintiffs Piedra Villas, Beatstik, and Tower Hotel's properties are at risk of demolition because of Defendants' intent of harming Plaintiffs because of their association to Plaintiffs Fuller and Pinilla.

## THE CITY AND ITS ATTORNEYS TARGET WITNESSES FOR PLAINTIFFS

123.    The City's targeting of Plaintiffs for exercising their First Amendment rights continued through the trial of Joe Carollo.

124.    After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[4]

---

[4] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

125.    And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> "Hi Victor, this is Brian Blair, private investigator represented by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

126.    The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Defendants are employing against City Staff and City Residents in their efforts to destroy Plaintiffs mentally, psychologically, and financially.

### THE ROLES OF THE MEMBERS OF THE CABAL

127.    Starting as early as December 2017, and throughout 2018, City personnel were repeatedly made aware that Carollo was targeting Plaintiffs for political payback. For instance, the City Manager at the time, as well as the Director of Code compliance, told Plaintiffs that Code officers were being sent to their properties because they had supported Carollo's opponent. And, in December 2017, Carollo himself told Plaintiffs' business partners that they could lease anywhere else in Little Havana, but that if they leased from Plaintiffs, their businesses would never be allowed to open.

128.    Throughout 2018, Carollo himself made his targeting of Plaintiffs clear, not only to the entire City staff but also to the residents of the City at large, by repeatedly going on radio shows and maliciously defaming Plaintiffs by falsely stating they were criminals

with ties to corrupt South American politicians, mafiosos, leasing to pimps and prostitutes, among other falsehoods.

129.     During the Valentine's Day Massacre in February 2019, the City's most senior policy makers – including Mayor Suarez, City Manager Gonzalez and Police Chief Colina – publicly stated Carollo was targeting Plaintiffs and seeking to close their businesses as political payback.

130.     City employees also knew as early as 2018 and 2019 that if they did not carry out Carollo's political vendetta that they would be fired, demoted, or chased out of office (like Diez, Gonzalez and others), and that they would be rewarded and promoted if they helped Carollo (like Noriega and Torrez).

131.     As Police Chief Art Acevedo testified, City Manager Noriega "talked very openly about Mr. Fuller" and the fact that the City itself was targeting "Mr. Fuller and any Fuller related business at the direction of [Carollo] retaliation for Mr. Fuller's simple exercising his Constitutional rights to have a fundraiser." Chief Acevedo stated: "It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller." Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted."

132.     The City Manager's Office, the city's executive branch, which "oversees various departments and functions, including 4,381 employees and The City's operating budget of $1.165 billion," became complicit in this corruption under Defendant and co-conspirator Noriega.

133.     Defendant Arthur Noriega is liable in his individual capacity because, among other things, he is one of the prime architects behind the City's political retaliation for Carollo. Noriega,

the City's CEO, was out with a measuring tape measuring the distance between Plaintiffs' properties and religious institutions while Carollo hid on the corner, looking for ways to shut down that business. Noriega was stalking Plaintiffs' businesses at night with the City's police department, hiding around the corner, explaining to Acevedo they were targeting Plaintiffs. Noriega led the attack on Viernes Culturales. Noriega organized an all-day meeting during COVID in May 2020, with City Department Heads and the entire City Attorney's Office, for the sole purpose of pursuing policies aimed at shutting down Plaintiffs' businesses. He then monitored the timing of those efforts and gave the final orders as to when the City was to act to shut Plaintiffs' properties. He then lectured the City Staff that when they witnessed wrongdoing by Commissioner Carollo, they should "Be a Goldfish" – meaning they should have a 10 second memory – and thereby be the happiest animal on earth. He even bought them all t-shirts that said "Be a Goldfish."

134.     The Office of the City Attorney, which "provides legal advice and serves as counsel" to the City, "recognized for their excellent knowledge in the area of local government . . . and ethics . . . [with] unparalleled opportunities to take a leadership role in promoting honesty and integrity in the City[,]" **took on an unparalleled leadership role in Carollo's corruption and scheme** against Plaintiffs under the direction of Defendants, and co-conspirators, City Attorney Victoria Mendez and Assistant City Attorney Rachel Dooley.

135.     City Attorney Victoria Mendez operates as the Black Widow for Carollo, in much the same manner as Griselda Blanco Restrepo operated as the Black Widow for the Medellin Cartel. Under the guise of attorney-client privilege, Mendez develops the City codes, ordinances, resolutions, tasks forces, and policies aimed at accomplishing Carollo's goal of bankrupting Plaintiffs and Plaintiffs' business partners; advises City personnel to conceal their wrongdoing from Florida's Sunshine laws by not reducing anything to writing; overrules any director of any

City department that rules in favor of Plaintiffs; and has spent over $15 million in City and taxpayer money for legal fees seeking to bankrupt Plaintiffs—including most recently, by authorizing the filing of a frivolous CIVIL RICO claim against Plaintiffs at 11:54 PM on the very night the jury awarded Plaintiffs an award of $63.5 million based upon Carollo and the City's targeting.

136.    Defendant Rachel Dooley is Vic Mendez's personal assassin, carrying out all of the City's targeting, making sure Plaintiffs pay the maximum fees without any reduction or waiver, and spearheading the demolition of properties.

137.    The City's Building Department, established to "enforce[ ] codes and regulations . . . governing the construction, alteration, and maintenance of buildings and structures within the City of Miami" became complicit under the direction of Director Asael Marrero.

138.    Defendant Asael Marrero, the Building Director for the City of Miami, carried out the orders of Carollo, Noriega and Dooley to draft and revise City policies and ordinances in order to shut down Plaintiffs' business and, as a final policy maker, changed the City's policy regarding compliance agreement to prevent Plaintiffs from ever being able to comply with the City code, and applied that new policy in a discriminatory manner so that it mainly impacted Plaintiffs while sparing others.

139.    Defendant Rene Diaz, the Senior Chief of the Unsafe Structures department, was knowingly involved in the use of all of the unsafe structure violations aimed at shutting down Plaintiffs' business, and was the City employee circulating the Excel spreadsheet containing the list of Plaintiffs' properties to target. He was a key part of the plan to demolish Plaintiffs' properties, to destroy Plaintiffs' reputation, send Plaintiffs to default on all bank loans, and financially ruin Plaintiffs.

140.     Defendant Luis Torres, the Assistant Director of Building, was promoted specifically because he campaigned for Carollo and agreed to do Carollo's targeting, replacing the demoted Maurice Pons, who Carollo viewed as not hard enough on Plaintiffs. Torres proceeded to delay or derail the completion and opening of many properties and businesses, including, but not limited to, the Tower Hotel.

141.     The Zoning Department, which "provides policy guidance for the development of the City of Miami by interpreting and administering the Zoning Ordinance and other relevant governmental regulations" became complicit in this scheme—not only providing policy guidance for development of policy against Plaintiffs but also discriminately implemented these policies against Plaintiffs—under the direction of Daniel S. Goldberg.

142.     Defendant Daniel S. Goldberg, the Zoning Director for the City of Miami, is the mentee of Carollo's lawyer, Marc Sarnoff, and was put in place to do the bidding of Carollo and Mendez, his former boss with whom he spends Christmas Eve. Despite reporting directly to the City Manager Art Noriega, Noriega never even bothered to interview Goldberg prior to Carollo and Mendez hiring him for Noriega.

143.     Goldberg created a new City policy holding that a citation for work without a permit results in a revocation of the certificate of use ("CU") and the property and business will be shut down for not having a CU. Dan Goldberg went out of his way to use this new policy against El Shopping, shutting down parking garage that had been operating for more than 35 years in the same condition. Then, with the parking closed, Goldberg, asserting there was not enough parking for the 30 tenants, revoked the CU's for each of those tenants, costing Plaintiffs $15,000 per month. Remarkably, one tenant was a Miami Charter School with political connections who immediately

complained to Joe Carollo, resulting in Goldberg restoring the CU for the one politically connected tenant and continuing to block all others.

144.    Defendant William Ortiz, in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo carrying out his political targeting of Plaintiffs. Among many other things, Ortiz would call the Code Enforcement Board members and demand that they a) vote against any request made by Plaintiffs, and b) apply the maximum penalty for maximum amount of harm to Plaintiffs, resulting in one board member, Bayona, voting to impose fines of more than $400,000 on a property that was worth less than $200,000.

145.    The Code Enforcement Board, a group created to assist "to bring a Code violation into compliance" became involved in the corruption through Board Member Yvonne Bayona.

146.    Defendant Yvonne Bayona was at all relevant times a member of the City of Miami Code Enforcement Board taking direction from Carollo and Ortiz to vote against Plaintiffs, and propose disproportionate, draconian action against Plaintiffs merely because of Carollo's vendetta.

147.    Even the City's Fire Department, a department typically honored and respected which "serves the community with the highest level of professionalism, customer service, and responsiveness[,]" became involved in Carollo's corruption through Adrien Plasencia.

148.    Defendant Adrien Plasencia, the Assistant Fire Chief and City of Miami Fire Marshall, would send fire inspectors with the instruction to manufacture violations at Plaintiffs' properties.

149.    The individual Defendants are liable because they knew they were using their positions as City personnel to target Plaintiffs on Carollo's behalf to retaliate against them for their protected political activity and chill their political opposition of Carollo, in violation of their First Amendment rights.

150.     Defendants worked together to effectuate the harassment campaign against Plaintiffs.

151.     Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz worked to craft policies that can be selectively enforced against Plaintiffs, proceeded to selectively enforce those policies against Plaintiffs, worked extensively to cause the maximum amount of disruption for Plaintiffs, and worked to corrupt other City employees and personnel against Plaintiffs.

152.     Defendants the City of Miami, Marrero, Goldberg, Torres, Diaz, and Plasencia knowingly worked in furtherance of the retaliation, to find, manufacture, or falsely claim violations on Plaintiffs' properties, intentionally cause delays and hardships, and selectively implemented and enforced City Policies against Plaintiffs.

153.      Defendants the City of Miami, Dooley, Ortiz, and Bayona knowingly worked in furtherance of the retaliation by tainting and undermining Plaintiffs' abilities to appeal, and used their positions to intentionally target and discriminate against Plaintiffs.

154.     All Defendants worked to target and attack Plaintiffs solely because of Plaintiffs' association and relation to Plaintiffs Fuller and Pinilla, who were Joe Carollo's enemies.

155.     All Defendants would have, and did, act differently to persons, entities, and properties not related to Plaintiffs Fuller and Pinilla.

156.     An organization chart of the syndicate can be found on the next page, showing the cabal of corrupt City officials, their network and commanding positions, and documenting the channels of inappropriate communications and unauthorized sending of orders between them.



**ALL DEFENDANTS VIOLATED PLAINTIFFS' RIGHTS TO FREE SPEECH, ASSOCIATION AND ASSEMBLY, AND TO PETITION THE GOVERNMENT FOR REDRESS OF GRIEVANCES UNDER 42 USC § 1983**

157.    The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

158.    The First Amendment rights to freedom of speech and association protects not only the affirmative rights to free speech and association, but also the right to be free from retaliation perpetrated by the government upon the exercise of that right.

159.    Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights.  The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ***.

42 U.S.C. § 1983 (2012).

160.    The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

161.    The United States Constitution's First Amendment guarantee to free speech and free association applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

162.    Plaintiffs exercised their right to free speech and free association by, among other things, supporting Mr. Leon in the run-off election through advertisements and hosting a rally for Mr. Leon on Plaintiffs' property, by filing an ethics complaint against Carollo, by filing a Section 1983 action against Carollo, and by exposing Carollo's hypocrisy with his own unpermitted work and code violations.  In addition, Carollo also believed that Plaintiffs had exercised their First Amendment rights to finance a lawsuit challenging his election and participating in efforts to recall him from office. Once the other Defendants became involved, Plaintiffs continued to exercise their First Amendment rights by filing lawsuits, including to stop the demolition of their buildings.

163.    Carollo, upon winning office, worked with Mendez and Dooley to immediately retaliate against Plaintiffs. And, after each of Plaintiffs' exercise of their First Amendment rights that were contrary to Defendants, Defendants continued to retaliate.

164.    Plaintiffs were targeted for their affiliation to Plaintiffs Fuller and Pinilla.

165.    In addition, causation is also established by the testimony of multiple of  Carollo's own former staffers, including Steven Miro, Richard Blom, Tanja Quintana, as well as by the former City Manager and two former Police Chiefs, and the current Mayor.

### THE CITY'S CREATION OF OFFICIAL POLICY TO HARASS PLAINTIFFS TOOK ON MANY FORMS

166.    Carollo, City Attorney Mendez, and Assistant City Attorney Dooley began creating an official policy of targeting Plaintiffs on Carollo's behalf for political retaliation. The February 14, 2019 resolution that created a task force to target Plaintiffs' businesses on behalf of Carollo, which Carollo himself admitted was official policy.

167.   The Mayor stated Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners" and that "**we as a government are being used as an instrument for political vengeance.**"

168.   The architects of the corruption of City policy grew to include, not only Defendants Carollo, Mendez, and Dooley, but also Defendants Noriega, Marrero, and Diaz.

169.   The May 27, 2020 meeting between Noriega, the City Manager; Victoria Mendez, the City Attorney; Rachel Dooley and **almost the entire** City Attorney's Office; the Director of Code Enforcement; Asael Marrero, the Director of the Building Department; and Rene Diaz, a Building Department Official, at which the City manager, "**talking about Bill Fuller**" instructed the City to "revise and **update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down** all structures that don't comply";

170.   In sum, the City's official policies targeting Plaintiffs took the forms of a) administrative policy changes; b) The City's emails that referred to the "Carollo Investigation" of Plaintiffs' properties; and c) the ordinances sponsored by Carollo directly targeting Plaintiffs properties.

171.   The policy changes were narrowly and selectively crafted so as to arm Defendants to attack Plaintiffs.

172.   Carollo, City Attorney Mendez, and City Manager Noriega also created a pervasive custom of targeting Plaintiffs on Carollo's behalf for political retaliation.

173.   A longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.

174.   The targeting of Plaintiffs began in December 2017 and grew throughout 2018 with the support of the City Attorney, becoming official City policy through the City Attorney in

February 2019, and becoming widespread and well known through the new City Manager in May 2020. Not only did the City know about it and failed to stop it, the City executed it on behalf of Carollo from 2020 on.

175.     As Police Chief Art Acevedo testified at trial, City Manager Noriega and the Police Chief who would succeed him, Manny Morales, "talked very openly about Mr. Fuller . . . very openly talked about the disdain [Carollo]  had for Bill Fuller."

176.     Police Chief Acevedo further testified that the City itself was targeting  "Mr. Fuller and any Fuller related business at the direction of [Carollo] retaliation for Mr. Fuller's simple exercising his Constitutional rights to have a fundraiser. It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller."

177.     Acevedo further testified that he would "be very busy and my department will be very busy dealing with Mr. Carollo and his obsession with Mr. Fuller, and it will be basically required to inspect and to be going into his businesses on a regular basis and be ready for that."

178.     Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted.

179.     Given that everyone in the City knew that Carollo's actions against Plaintiffs were political retaliation, and that Mendez and Noriega's actions were also political retaliation, each of the Defendants named here in their individual capacities are liable in their individual capacities for carrying out this vicious and malicious scheme to destroy Plaintiffs and drive all of their businesses and tenants into bankruptcy.

180.    Defendants' actions would "chill a person of ordinary firmness" from continuing to engage in the protected activity.

181.    As a result of Defendants' retaliation, Plaintiffs are reluctant to participate in the political process by supporting candidates for office.

182.    In addition, as a result of Defendants' retaliation, Plaintiffs have suffered out of pocket losses and other monetary harms associated with disruption to their various businesses in an amount to be proven at trial.

183.    A single decision by an official policymaker can establish the existence of an unconstitutional municipal policy.

184.    Here, there were three individuals targeting Plaintiffs with final policymaking authority: Carollo, Noriega, and Mendez.

185.    The City Manager, Art Noriega, had final policymaking authority with respect to the actions he took because, while he was acting at the direction of Carollo, his actions were completely insulated from review by the City Commission.

186.    The same with City Attorney Mendez. Her actions in targeting Plaintiffs were completely insulated from review by the City Commission.

187.    Carollo could not be reviewed or controlled by anyone, nor were his office meeting and phone calls with Noriega and Mendez reviewed by the Commission or even traceable by the Commission, as Carollo, Noriega and Mendez made sure not to leave any email correspondence or other evidence.

188.    In total, Plaintiffs suffered economic damages in excess of $107,115,655.00 because of Defendants' retaliation and conspiracy.

**COUNT I**
**PLAINTIFF LITTLE HAVANA ARTS BUILDING'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CAROLLO, NORIEGA, MENDEZ, DOOLEY, DIAZ, TORRES, MARRERO AND PLASENCIA**

189.    Plaintiff Little Havana Arts Building, LLC, ("LHAB") realleges paragraphs 1 through 188 as if fully set forth herein.

190.    LHAB was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

191.    Defendants the City of Miami, Carollo, Noriega, Mendez, Marrero, and Diaz are liable for violating Plaintiff LHAB's First Amendment rights by architecting City policies to target Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff simply because of Plaintiff's relationship to Plaintiffs Fuller and Pinilla.

192.    Defendants the City of Miami, Diaz, Marrero, and Plasencia are liable for violating Plaintiff LHAB's First Amendment rights for knowingly and willingly participating in the scheme of harassment and selective enforcement; seeking, manufacturing, or fabricating violations against Plaintiff; and dealing in bad faith to intentionally disrupt Plaintiff's business and permits.

193.    Together, Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Diaz, Torres, Plasencia, and Goldberg corruptly attacked and selectively enforced city policies against Plaintiff LHAB.

194.    LHAB owns the property at 1513 SW 8th Street with three buildings—Ball & Chain, Azucar, and a Cigar Shop.

195.    The syndicate's retaliation against LHAB began on February 18, 2018, when Carollo and City personnel harassed the Valet and took photographs of parked cars. Defendants, the City of Miami and Carollo used their official positions and Carollo told the operator that he, Carollo, was "the law" and that he found LHAB and its Valet Operator's relationship with Plaintiffs Fuller and Pinilla unacceptable.

196.    Carollo then lied to the Ethics Commission about his involvement and use of his position. Despite being caught lying to the ethics commission, and being caught abusing his official position, the City did not hold Carollo or its personnel accountable.

197.    Defendants' attacks continued until the City improperly shut the business down.

198.    On March 14, 2018, Defendants handed out cell-phone numbers to residents near Ball & Chain and instructed them to call them should they hear any loud music. On July 6, 2018, the Fire Department issued an erroneous Notice of Violation despite Plaintiff having been instructed by the City to black out "exit" signs. On August 28, 2018, another City Fire inspection found no violation. On August 31, 2018 a Code inspection found no violation. On September 14, 2018 another Code inspection found no violation.

199.    Yet, on September 15, 2018, Defendants attacked again, when three City of Miami Code Enforcement Officers and a police officer went to Ball & Chain to improperly shut its parking operation down. Code Enforcement issued a citation and then, with assistance of the police officer, forced all employees to remedy the violation, which is a gross overstep of Code Enforcement's power and procedure. Code enforcement is only empowered to issue citations, which can be contested. However, Code is not empowered to force an action to remedy or remove an alleged violation without a hearing.

200.     Plaintiff contacted Code Enforcement to inquire as to the September 15th citation as its parking was legal and the **Code Enforcement Officer stated Code must have made a mistake** because the lot was zoned commercial meaning it could be used for parking and no violation should have been issued.

201.     Upon further investigation, it was revealed Carollo fabricated the complaint which sent Code and Police to harass Plaintiff.

202.     The attacks continued. On September 27, 2018, another Code Enforcement and Police inspection but found no violation. And on October 2, 2018,  Carollo and a Member of Code Enforcement Board knocked on doors to search for people to file complaints.

203.     It was on this October 2nd attack that Carollo's infamous photo was taken, depicting Carollo lurking in back of Ball & Chain at 9 pm on a Tuesday night. Pictured below:



204.     On October 17, 2018, Code Enforcement issued an unwarranted noise violation. On October 18, 2018, Carollo repeatedly circled Ball & Chain in a City vehicle. Again, on November 16, 2018, Carollo was spotted loitering Ball & Chain, with Police Officers.

205.     On February 20, 2019, the City sent Department of Solid Waste to inspect Ball & Chain and they found no wrongdoing. On March 26, 2019, Code issued a violation for structure repairs and Plaintiff immediately began hiring contractors and initiated a new permit. On

March 27, 2019, Code issued a citation for failure to obtain a building permit and Plaintiff began working to pull an after-the-fact permit but the City intentionally delayed and did not issue the permit until March 11, 2020—a year after their application was filed.

206.    On September 12, 2019, another City investigation of Ball & Chain finding no violation.

207.    On October 15, 2019, Plaintiff filed a warrant application for Outdoor Dining, meeting all requirements. The City **delayed a year then informed Plaintiff** it would need to file for a separate alcohol warrant application and continued its harassment by stating the Outdoor Dining Warrant cannot be approved separately from the warrant for outdoor liquor consumption—despite being at odds with its own City Code.

208.    On January 7, 2020, Police entered Ball & Chain but found no violation. On January 8, 2020, Code conducted a health inspection and found no violation. On March 7, 2020, the Fire Department inspected but found no violation. On April 21, 2020, City Police found no violation for Covid restrictions. And on May 16, 2020, Police found no violation with the Certificate of Use.

209.    On May 27, 2020, Governor DeSantis was set to pass Executive Order 20-11 Section 3(b) to open restaurants and Ball & Chain spent over $30,000 on food products, labor costs and safety precaution in preparation. But at 9 pm on May 26, Noriega enacted Amendment No. 1 to Order 20-11 which specifically excluded a "tavern" from being able to open, with the sole purpose of signaling out Ball & Chain.

210.    It is not a coincidence that Plaintiff LHAB was subjected to constant raids and inspections and that Defendants wanted to harass Plaintiffs Fuller and Pinilla. Defendants were targeting LHAB because of its association with Plaintiffs.

211.     During these raids, Plascencia, and Diaz, directly or indirectly by ordering subordinates, would arbitrarily search for, create, or manufacture violations for LHAB's property.

212.     Unsatisfied with the level of harassment achieved against Plaintiff thus far, Defendants the City of Miami, Carollo, Mendez, Dooley, and Marrero prepared for the "end game" to shut down Plaintiff.

### Background Information

213.     As stated above, on March 27, 2019, Ball & Chain was cited for failing to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)." Despite disagreeing with the merits underlying the supposed violation, Plaintiffs nevertheless worked diligently with the City to develop and submit a plan to cure the purported "issues." Ball & Chain's only goal was to work with the City to alleviate all of its concerns and keep Ball & Chain's doors open, so it filed for a new building permit on April 15, 2019.

214.     Going the extra mile, on or about May 2019, Plaintiff hired Ortus to assist in curing the four alleged issues regarding the construction work performed and assisting with the new permit process.

215.     Under Florida's private provider statute, Section 553.791, companies like Ortus offer services to the public to "stand in" for the local building and code enforcement division. In essence, a company like Ball & Chain pays Ortus to review plans and applications, and other documents, and certify that those documents comply with the applicable codes, rules, and regulations of the municipality. Despite the fact that the private provider charges the customer— here, Ball & Chain—a fee for providing these services, at all times the private provider is acting as an agent of and extension of the municipality in reviewing the documents for approval. Ortus

then submits the documents and their approval directly to the City, which issues the appropriate permits, etc., based upon Ortus'—and only Ortus'—representations.

216.    Plaintiff worked tirelessly with the City and Ortus for almost a full year to finalize a very specific scope of work included in the plans and the building permit, which the City **eventually** approved on March 11, 2020.

217.    Ball & Chain then hired licensed professionals to complete work in accordance with the approved building permit plans. The work was conducted during the City's forced shut down. From around June 10, 2020 to August 28, 2020, Ortus, on behalf of Ball & Chain, filed all required affidavits (i.e. plumbing, electric, storm shutters) mandated by the City and Section 553.791.

218.    Plaintiff employed counsel to work with the City to have an all-department inspection of Ball & Chain, ensuring compliance with all applicable regulations. The City was aware of the work being done and approved the completion of all the improvements completed. In fact, the City identified for Ball & Chain the improvements that needed to be completed to bring Ball & Chain into compliance with the City Building Code. At no point did the City object to the work that was done at the request of the City – after many meetings and pertinent analysis – in order to ensure compliance with the City and Florida Building Code.

219.    Based on these submissions and after a thorough walkthrough with the appropriate City departments, on or about September 11, 2020, the City's Building Department had no choice but to issue Ball & Chain its CO, as required under the law.

220.    Yet, upon learning that a CO had to be issued under the Code, the City had to find another way to try to shut Ball & Chain down.

**Defendants' Endgame: An Unprecedented Audit and Weaponized Policies**

221.     At 8 am, the syndicate's architects including Noriega, Mendez, and Marrero corresponded via email. Noriega emailed Marrero and Mendez stating: "let's get this done today before noon today." And on October 22, 2020, Defendants Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz passed Ordinance 13936 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use." Defendants also sponsored a second ordinance on Oct. 22, 2020, which banned outdoor music in any restaurants that did not have a CU as of October 22, 2020, which of course applied **only to Ball & Chain**, since Ball & Chain was the only restaurant that would have its CU revoked that day.

222.     Unsurprisingly, that very same October 22nd day, **Defendant Marrero**, the head of Building, notified Ball & Chain that its CO was suspended because as the City claimed, the CO was "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

223.     But when Plaintiff inquired further, it was apparent that the City made this arbitrary decision without having any calculations to justify the revocation.

224.     Ultimately, to justify Marrero's suspension, the City contrived an **unprecedented** "audit" of its Private Provider Ortus, pursuant to Florida Statutes § 553.791(18)—even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the **City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU**. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits

by the Private Provider were filed and that inspections were completed. Yet, despite this limited scope, the City illegally maneuvered a way to shut down Ball & Chain.

225.    During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. The other top private providers in the City during the relevant period are: MDCI, Universal/Pacifica, ARC, NV5 and NTCI. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City. The City's Quality Control Manager is responsible for conducting private provider audits in the City. The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

226.    Of all of the private providers in the City during the relevant period, the Quality Control Manager has never audited any, except for the audit of Ortus in connection with the Ball & Chain audit. Of the hundreds of projects for which Ortus was the private provider, the City has never audited any other project except for the Ball & Chain audit. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review; by contrast, the City audited Ortus/Ball & Chain with no cause whatsoever.

227.    There were **only two businesses for which the City chose to "audit"** any private provider's work and submission to the City: Ball & Chain and the Tower Hotel, **both of which**

**are associated with Plaintiff Fuller**—and notwithstanding that the City had already approved and issued Ball & Chain's certificate of occupancy approximately one month prior. Indeed, as the City concedes, in its five years of doing business with the City, even dealing with complex, high-rise properties, Ortus had never been audited. It was only after Ortus began working on the Fuller-owned businesses, and after pressure from Commissioner Carollo, that the City saw the need to do so. Even then, the City did not audit Ortus, as the statute provides. Instead, the City audited only Ortus' work in connection with Fuller-affiliated businesses, in violation of the private provider statute.

228.     On October 22, 2020, Ball & Chain received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4." This provision of the Code states, in relevant part, that a "building official is authorized to, in writing, suspend [ ] a certificate of occupancy [ ] issued under the provisions of this code whenever the certificate is issued in error or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this code."

229.     According to the City, the City's audit revealed that the "Certificate of Occupancy was based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the Americans with Disabilities Act ['ADA']." The suspension took place immediately and the City ordered Ball & Chain closed.

230.     In the end, the Defendants shut down the property because of a fire safety issue, stating the property needed a sprinkler system installed. However, Defendant Plasencia, who made

the determination of the necessity, relied on plans which either "mysteriously disappeared" or never existed.

231.     When most property owners are instructed to install a sprinkler system, they are given the option to pay for a "fire watcher." A fire watcher is essentially a fireman that serve as an on-duty risk manager while the property owner renovates. However, Defendants **Plasencia and Mendez** determined that, because Plaintiff LHAB was associated with Plaintiffs Fuller and Pinilla, Plaintiff LHAB was not entitled to the benefit of a firewatcher.

232.     Contemporaneously with the suspension of the CO, and as a result of the City's pretextual audit of Ortus, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami" because "[t]he Building Certificate of Occupancy, issued on September 11, 2020, [had] been suspended resulting in the revocation" of the CU.

233.     The Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was Ball & Chain's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

234.     The City's unwarranted revocation of Ball & Chain's CU was the key to shutting down the business, as Ball & Chain could not operate without it. Defendants the City, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz implemented their malicious plan not only by manufacturing a baseless audit but also by taking the extreme measure of passing a law—

Ordinance No. 13936, which was (not coincidentally) passed on the same day that the City suspended Ball & Chain's CO and revoked its CU—in order to purportedly justify its ability to strip Plaintiffs of both of its certificates without any warning or ability to remedy the ruthless measure.

235.    Defendants' audit constituted another baseless and frivolous retaliatory attack for three reasons.

236.    *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[5] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for Ball & Chain's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with Ball & Chain's requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further

---

[5] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements). Importantly, the private provider did not submit any documents related to fire safety.

237.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

238.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain

causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

239.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – **not the CU**. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

240.    Defendants' attacks on Little Havana Arts Building have caused Plaintiff to suffer monetary damages in excess of $4.36 million. The damage calculation can be seen below.

- Liens: $83,994
- Legal fees: $27,453
- Lost of Revenue: $4.26M
- **Total: $ 4.36M\***
  * Additional losses (opportunity to reinvest capital) - <u>uncalculated damages</u>
  * Reputational damage to LLC - <u>uncalculated damages</u>

241.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

242.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT II**
**PLAINTIFF LA GRAN FIESTA'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO, TORRES, MARRERO, DIAZ, BAYONA, AND ORTIZ**

243.    Plaintiff La Gran Fiesta, LLC ("Gran Fiesta") realleges paragraphs 1 through 188 as if fully set forth herein.

244.     Gran Fiesta was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

245.     Defendants Carollo, Noriega, Mendez, Dooley Marrero, and Diaz are liable for violating Plaintiff Gran Fiesta's First Amendment Rights by architecting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm because of its association with Plaintiffs Fuller and Pinilla.

246.     Defendant Torres is complicit in the harassment of Plaintiff Gran Fiesta, knowingly and willingly participating in the harassment, seeking, manufacturing, or fabricating violations against Plaintiff and by dealing in bad faith to intentionally disrupt Plaintiff's permits and ability to bring the property into compliance.

247.     Plaintiff Gran Fiesta owns a two-story property located at 521 SW 8th Street with a Mexican restaurant on the bottom named Taquerias El Mexicano and a lounge upstairs known as Los Altos (hereinafter referenced together as "Taquerias.").

248.     The property is a hub in Calle Ocho, a meeting place for locals, tourists, international personalities and dignitaries who are looking for a true Mexican Experience.

249.     For 36 years, Taquerias has been operating as a cherished addition to the neighborhood and without any City harassment or interference. However, this changed when Carollo and his syndicate took power, after which Taquerias became subject to severe harassment.

250.     Taquerias became collateral in the City's retaliation, subjected to constant inspections and "walk-throughs," usually consisting of **10 or more armed officers** wearing bulletproof vests, and multiple code enforcement raids, consisting of dozens of code enforcement,

police, fire department officers and inspectors with Florida's Department of Alcohol Beverage and Tobacco ("ABT"). These raids were deliberately conducted on Friday and Saturday nights with the sole purpose of causing substantial business disruption and monetary harm to Plaintiff during peak business hours.

251.    In another episode of Defendants' retaliation, the City placed a hold on Taquerias' Outdoor Dining Warrant—which pursuant to Article 6.3 of Miami 21 allowed Taquerias to operate as an Alcohol Service establishment because of restraint use and exemptions. Defendants claimed that because Taquerias was allegedly within 300-feet of an alleged "religious" facility (Ministerio de Juan) Taquerias' pursuance of the Outdoor Dining Warrant was placed on hold.

252.    Showcasing Defendants' selective enforcement of policies against Plaintiff, Ministerio de Juan actually shares a wall with and is in the same building as a local liquor store "El Gato Tuerto," located at 476 SW 8th Street. As with Taquerias, the CU for Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store. This is also the case for thirteen (13) other 4COP licensed establishments operating within 300 ft. of a "religious facility." In other words, the City had no issue in allowing a liquor store to operate next to other "religious facilities," but revoked Taquerias' liquor reservation on the arbitrary basis it needed to review its "compliance with the 300' distance separation from a Religious Facility."

253.    Outrageously but not surprising, as pictured below, **Carollo and Noriega** were spotted on April 2, 2021, on Good Friday, measuring the distance between Taquerias and Ministerio de Juan, notwithstanding a) that there is no requirement for distance of separation, and b) that the City Manager is not tasked with conducting such measurements.



254.    And in an email correspondence, Noriega confirmed that it was in fact him, in this photo, on that day measuring the distance between Plaintiff's property and the alleged religious facility.

255.    In targeting Taquerias, Carollo sought to have the City or ABT to repeatedly inspect Taquerias in the hopes of revoking its liquor license.

256.    Importantly, the incessant and damaging raids have not resulted in a single liquor license violation by Taquerias. Indeed, ABT confirmed Taquerias fully complied with its alcohol license. However, that did not deter the City from further attacking Plaintiff.

257.    When the inspections by the ABT, accompanied by Miami Police, did not result in any violations or revocations of the liquor license, Carollo became enraged.

258.    He began issuing voluminous public records requests ("PRRs") for Taquerias and demanded that the police officers who had inspected Taquerias appear before him at the next City of Miami Commission Hearing on February 14, 2019 to explain why they had not issued citations.

He also requested the attendance of other City employees to explain why no code violations or other citations had been issued to Plaintiffs' Taquerias.

259.    The City undertook numerous but warrantless Dry Hour raids of Taquerias, occurring on multiple days. For instance, on April 3, 2021 (a day after Taquerias staff identified Commissioner Carollo, Noriega and other personnel lurking outside Taquerias), multiple Police and Code Officers were dispatched to Taquerias.

260.    Again, on May 1, the City including Police, Code, ABT officers and Building Inspectors entered Taquerias without a warrant and gave a written warning for an alleged violation who sought to inspect the upstairs venue without a warrant.

261.    Again, on May 5, 2021, the City raided Taquerias knowing that it was Cinco De Mayo. In fact, Taquerias was one of the only two Mexican restaurants raided in the City on Cinco De Mayo—both were associated with Plaintiff Fuller.

262.    Again, on June 19, 2021, Police, Fire and Code Officers raided Taquerias without reason—in violation of Florida Statute § 933.29.

263.    Again, on August 20, 2021.

264.    When Defendants realized that the liquor license was not a fruitful avenue to cause Plaintiff the ultimate harm—a shutdown—Defendants turned to its tried-and-true playbook strategy of manipulating City code, issuing violations for work performed many years ago, and relying on a technicality about an outdoor staircase despite the City's previous approval.

265.    The City began repeatedly citing Plaintiff for "violations" for work previously approved by the City and then moved the goalpost on improvements every time Plaintiff fixed the most recent "violation."

266.     A glaring example of how the City's malfeasance hurts Taquerias' business, on May 6-12, 2021, a production company wanted to rent Taquerias for the cite of a music video. Because of the City's fabricated violations, the **City Attorneys' Office, under Mendez,** in an unprecedented move, **called the Event Director to have them refuse to issue a film permit** to the production company, causing Plaintiff yet another lost business opportunity, profit, and goodwill. Defendants had no legal basis to deny a film permit due to outstanding violations, much less fabricated violations, particularly given that Taquerias was working with the City to correct them.

267.     On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Plaintiff's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration" of a demolition permit which was closed for four years. When the Plaintiff requested they return later due to the holiday, they refused and the City said it was not an option to refuse entry to the inspectors—despite not citing any law or authority.

268.     Plaintiff, for the year prior, was participating in weekly calls with the Building Department but not once did the City raise the demolition permit issue and instead showed up unannounced on the September 15th religious holiday to disrupt the business.

269.     When questioned about the conduct, the **City Attorneys' Office prohibited Plaintiff** from exercising their constitutional rights to speak with City staff to remedy these issues.

270.     Six Days later, on September 21, 2021, **without prior notice**, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300

businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

271.    Taquerias' CU was revoked based on a mere technicality regarding an outdoor staircase. The City's sole basis for shutting Taquerias down was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

272.    This mere technicality resulted in the automatic revocation of Taquerias' CU solely due to Defendants Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz's passing City Ordinance 13936, which was tailored at targeting Plaintiff.

273.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001) on which Taquerias had been working with the City for years to ensure it met all applicable Codes, up until the City abruptly shut down Taquerias. Indeed, Taquerias spent the last two years and many tens of thousands of dollars making changes to the staircase at the behest of the City, including replacing the concrete landing at the bottom of the stairs and closing the risers. During the entire period in which Taquerias was working with the City on the staircase, the City never once raised the issue of the location of the stairs. Moreover, at no point did the City ever mention that Taquerias could or would be shut down for this technical violation.

274.    Taquerias never received a Notice of Violation regarding its outside staircase. Instead, on July 21, 2021, after Taquerias had finished spending considerable time and money improving the stairs in accordance with the City's comments, a Building Department inspector noted in his comments to a field check that the staircase was less than 10 feet from the adjacent lot line.

275.    Attorneys for Plaintiff reached out to the Defendants regarding its closure of Taquerias and how the staircase at issue possessed no imminent risk to life or safety which would permit closure of the business.

276.    In response to Taquerias' counsel's requests that the City explain why it was shut down, the **City Attorney brazenly admitted the City's unlawful retaliation, stating "If your clients would have ... treated City staff with respect**, they would not be in the precarious situations they find themselves in today."** (Emphasis added).

277.    Defendants continued to conspire to keep Plaintiff's property shut down while seeking to increase Plaintiffs' costs. For instance, Defendant Torres during the eleventh hour of Plaintiff's repairs decided Plaintiff would have to replace the staircase as the previous staircase plan was no longer up to code.

278.    And when Plaintiff Gran Fiesta appeared before the Code Enforcement Board, not only did Defendant Bayona vote according to Carollo and Ortiz's instructions—but Bayona even recited to the Board Ortiz's exact words, that "Carollo's enemy is here today and that we have to vote against them."

279.    Defendants' attacks on Gran Fiesta have caused Plaintiff to suffer monetary damages in excess of $778,344.00. A breakdown of these damages can be seen in the image below.



280.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

281.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT III**
**PLAINTIFF BRICKELL STATION PARTNERS' 42 USC § 1983 CLAIM AGAINST DEFENDANTS CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO, AND DIAZ**

282.    Plaintiff Brickell Station, LLC, ("Brickell Station") realleges paragraphs 1 through 188 as if fully set forth herein.

283.     Brickell Station was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

284.     Defendants City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz, colluded to conjure fictitious building violations on Plaintiff Brickell Station's property; and additionally, to immediately altered longstanding City practices and policies in the building and legal departments specifically to adversely impact the sale of Brickell Station.

285.     The effective City policy allowed the task of bringing properties into compliance to be placed on the property buyers in a trilateral agreement between the City, the buyer, and the seller. However, Defendants refused to extend this policy to Plaintiff Brickell Station because of its association with Plaintiffs Fuller and Pinilla .

286.     Plaintiff Brickell Station was under contract to sell the property. However, Defendants the City, Diaz, and Marrero baselessly accused Plaintiff of having done work without a permit, when the City's own microfilm department **knew** that all the work they accused Plaintiffs of doing without a permit had been done years ago with a permit.

287.     And, Defendants' meritless violation attached to Plaintiff Brickell Station's property.

288.     Plaintiff asked the City to utilize the existing City policy to allow the buyer to enter into a trilateral agreement to bring the building into compliance. And, as little as one week before Plaintiff's would-be-sale of Brickell Station—another property owner utilized this very type of agreement.

289.    But, because of Plaintiff's relation to Plaintiffs Fuller and Pinilla, **Defendants Dooley, Diaz, and Marrero** each refused to extend this policy to Plaintiff Brickell Station—stating such a favorable policy "was not available to them."

290.    Then, Defendants conspired to not extend this policy to Plaintiff—not create hurdles—but to completely upend Plaintiff's ability to sell the property.

291.    Defendants' attacks on Brickell Station have caused Brickell Station, LLC to suffer monetary damages in excess of $3.8 million. A breakdown of this amount can be seen in the image below.

- Opportunity to reinvest capital: $ 1.16M
- Disruption of Property Sale: Sale of property for 20 Million was put in jeopardy due to City of Miami policy change. Forcing the plaintiff to post 1 million in escrow until bogus violations were cured.
- Legal fees: $ 147,512
- Lost of Revenue: $2.49M
- Due to lost rent and lost sale the value destruction to the property in excess
- **Total: $3.80million\***
  \* Additional losses (opportunity to reinvest capital) - <u>uncalculated damages</u>
  \* Reputational damage to LLC - <u>uncalculated damages</u>

292.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

293.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT IV**
**PLAINITIFF PIEDRA VILLAS 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO, DIAZ AND PLASENCIA**

294.     Plaintiff Piedra Villas, LLC, ("Piedra Villas") realleges paragraphs 1 through 188 as if fully set forth herein.

295.     Piedra Villas was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

296.     Defendants the City of Miami, Carollo, Noriega, Mendez, and Marrero are liable for violating Plaintiff Piedra Villas' First Amendment rights by crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm because of its association with Plaintiffs Fuller and Pinilla.

297.     Defendants the City of Miami, Marrero, Diaz, and Plasencia are liable for the undue harassment of Plaintiff Piedra Villas, intentionally seeking, manufacturing, or fabricating violations against Piedra Villas and by dealing in bad faith to intentionally disrupt Piedra Villas' permits and ability to bring the property into compliance.

298.     Plaintiff Piedra Villas owns property located at 2614 SW 8th Street (the "Piedra Villas Property"), which was originally erected in 1930. It is comprised of an approximately 17,000 square foot building with twenty-four (24) residential apartments and four (4) retail spaces.

299.   The City prevented Plaintiff from renting a retail space and two apartments at the Piedra Villas Property and is currently attempting to demolish the structure.

300.   After Carollo was elected, on May 9, 2019, the City issued the first of two Unsafe Structure Notices relating to the Piedra Villas Property.

301.   On December 2, 2020, Defendants, including Marrero and Diaz entered a third Unsafe Structure Notice (BB20200220082614) for failure to obtain the required 40-50-Year Recertification Process.

302.   Thereafter, Plaintiff hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

303.   On August 6, 2021, Masson submitted the 40 Year Recertification.

304.   On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

305.   At that time, the Unsafe Structures department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

306.   The Compliance Agreement was a contract of adhesion and the City prevented Fuller from having it reviewed by an attorney.

307.   The City would not allow Plaintiff to repair any work or submit any plans until the property had a compliance agreement. And, faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement. Of course, this is the same Compliance Agreement that the Defendants, including the City, Marrero, and Diaz, would later in eventually in bad faith, intentionally work to collapse.

308.   Shortly after signing the Compliance Agreement and realizing that Piedra Villas

was operating responsibly to meet those deadlines, the City, in bad faith, sought to interfere with Plaintiff's ability to comply.

309.   For example, **Defendant Plascencia**, the Assistant Fire Chief, instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

310.   And, on October 7, 2021, Alberto Diaz from the City Fire Department requested all of the dimensions for the back staircases of the Piedra Villas Property.

311.   The subject staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

312.   They had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

313.   Plascencia's request for the dimensions of the staircases was not unintentional given that he likely knew (or did actually know) that the dimensions of the staircases would not meet the current fire code standards, despite the fact that the dimensions would not need to meet the current fire code standards given that they were grandfathered in.

314.   Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the Unsafe Structure Notice.

315.   Plaintiff requested that the City provide him with the citation to the City Building Code that required the requested reparation to the staircases. Again, not surprisingly, the City did not provide the citation because there was none.

316.   In addition, at the meeting that proceeded to occur that week between City Fire Department officials and Plaintiff, neither of the Fire Department officials in attendance at the

meeting, Enrique Arango and **Plascencia**, could identify any section of the Code that would require the requested work on the back staircases.

317. This type of gamesmanship has resulted in the Fire Department being one of the few departments that has not approved the reparation, which has caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

318. From late 2021 until February 2022, Fuller and the team continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City's issued violations.

319. All the while, Piedra Villas incurred excessive expenses related to the project delays. Given the amount of time the City had delayed, Plaintiff had to enter into a second Compliance Agreement. Over the next two months Plaintiff continued working when the City inexplicably **cancelled the permit process.**

320. Specifically, on April 20, 2022, recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Fuller reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

321. During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Fuller that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

322. Karickhoff took a screenshot of the EPlan and sent it to Fuller.

323. As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE

STRUCTURES PANEL."

324.   As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building.

325.   And of course, because of Defendants the City, Carollo, Noriega, Mendez, Dooley, and Marrero's passing of Ordinance 11936 which calls for a mandatory revocation of CU's for building violations—this policy has been used to justify the City's non-issuance of a CU, resulting in damages to Plaintiff.

326.   However, because the City had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

327.   Defendants' attacks on Piedra Villas have caused Piedra Villas to suffer monetary damages in excess of $4.7 million. A breakdown of this damage amount can be seen in the image below.



- Lost rent: $844,251
- Lost sale of rear land: $2.05M
- Lost of Revenue: $1.64M
- Legal fees: $157,465
- Due to lost rent and lost sale the value destruction to the property in excess
- **Total: $ 4.70million\***
  \* Additional losses (opportunity to reinvest capital) - **uncalculated damages**
  \* Reputational damage to LLC - **uncalculated damages**

328.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

329.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT V
### PLAINTIFF YO AMO CALLE SIETE'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO, AND DIAZ

330.     Plaintiff Yo Amo Calle Siete, LLC, ("Calle Siete") realleges paragraphs 1 through 194 as if fully set forth herein.

331.     Calle Siete was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and petition the government for redress of grievances.

332.     Defendants the City of Miami, Carollo, Noriega, Mendez, Marrero, and Diaz are liable for violating Plaintiff Calle Siete's First Amendment rights by crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm because of its association with Plaintiffs Fuller and Pinilla.

333.    Defendants the City of Miami, Diaz, and Marrero are liable for the harassment of Plaintiff Calle Siete, intentionally seeking, manufacturing, or fabricating violations against Plaintiff and by dealing in bad faith to intentionally disrupt Plaintiff's permits and ability to bring the property into compliance.

334.    Plaintiff owns a property at 1568 SW 7th street, which the City had issued permits, and Plaintiffs were in the process of selling the property with the permits – with an executed purchase and sale agreement for $2.7 million when: (1) the City revoked the building permit it had issued thereby scuttling the sale at a price of $2.7 million; (2) causing a reappraisal of the value of the property at a lower value; and (3) causing Plaintiffs to lose their construction loan due to the lower value and the City's actions.

335.    Defendant Noriega instructed the building department, including **Marrero, and Diaz** to improperly impose an unsafe structure violation on Calle Siete. The building department willingly complied.

336.    Defendants imposed a violation and Plaintiff pulled a permit to fix the alleged violation—however the **City, Dooley, Marrero, and Diaz** then improperly withdrew Plaintiff's permit alleging the property was not in compliance with the permit.

337.    And, only after the City was taken to Court and despite the negative impact such alleged violations had, the City admitted violations should have never been imposed on Calle Siete.

338.    Eight months later, however, after the City succeeded in preventing the sale at $2.7 million, Dooley admitted in open court that the City had been wrong to revoke the permits as "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [ ] it was determined that [Calle Siete was] in compliance." However, at the time

Dooley admitted the City was wrong, she believed the sale of the property had gone through and that the City had failed to scuttle the sale.

339.    As a result of this erroneously issued violation as part of Defendants' conspiracy against Plaintiffs, the bank collapsed Plaintiffs' construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000.

340.    And, as a result of Dooley's admission of the property's compliance, the permit was reinstated. The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City caused Plaintiffs to expend on the permits and impact fees and the litigation with the City.

341.    However, even after Defendant Dooley's admission of the property's compliance, the City has continued to harass Plaintiff. For instance, as pictured below, Defendant **Diaz recently** instructed their personnel to trespass onto Calle Siete, ignoring not one but two property fences, to search for violations.



342.    Defendants' attacks on Yo Amo Calle Siete have caused Plaintiff to suffer monetary damages in excess of $7.97 million. A breakdown of the damages can be seen in the image below.

343.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

344.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT VI**
**PLAINITIFF BEATSIK'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO AND DIAZ**

345.     Plaintiff Beatstik, LLC, ("Beatstik") realleges paragraphs 1 through 188 as if fully set forth herein.

346.     Beatstik was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

347.     Defendants the City of Miami, Carollo, Noriega, Mendez, and Marrero are liable for the harassment of Plaintiff Beatstik by crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm because of its relationship with Plaintiffs Fuller and Pinilla.

348.     Defendants the City of Miami, Diaz, and Marrero are complicit in the harassment of Plaintiff Beatstik by intentionally seeking, manufacturing, or fabricating violations against Plaintiff and by dealing in bad faith and intentionally disrupting Plaintiff's permits.

349.     Plaintiff Beatstik owns the real property located at located at 439 NW 4th Avenue.

350.     This property, which dates back to 1946, is a culturally and historically significant structure measuring over 15,000 square feet.

351.     Its historical significance to the Overtown community is immeasurable and, from an architectural perspective, it both meets and exceeds the criteria required for historical designation.

352.     The property was purchased by Plaintiff Beatstik from Carl "Moon" Mullins, the owner of Moon Enterprises since 1962. Mr. Mullins was distinguished as one of the first Black Metro Transit Authority Bus Drivers to be assigned a route on Miami Beach

353.     The property originally included a grocery store, hotel, liquor store, lounge, pool hall, restaurant, laundry mat, and a rental property.

354.     In 2019, the property was leased by Plaintiffs to Copper Door Properties for the use of a bed and breakfast that was featured in Vogue magazine and was praised by Mayor Francis Suarez.

355.     Because Plaintiffs had established another culturally significant property, this time in Overtown, the City issued several violations to the property seeking to shut down the business to intentionally harm Plaintiffs without regard to the negative consequences to Copper Door Properties or the Overtown community.

356.     As the City has done with the other Plaintiffs, the City again made special rules for Plaintiff, making it impossible to resolve the citations. This eventually led to the loss of the tenant and the bed and breakfast.

357.     This includes the property being subjected to Defendants the City, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz's passing of the targeted Ordinance 13936 mandating the automatic revocation of CU's for businesses with building violations, which Defendants have used to justify non-issuance of CU.

358.     The property is currently leased to Adrian Sotolongo ("Sotolongo") to continue the hotel operations.

359.     Sotolongo intended to build-out the ground floor of the property for a restaurant/bar. To that end, Sotolongo first submitted a set of plans for review on December 17, 2021.

360.     These plans were sent to Paola Rodriguez and Taylor Reid ("Reid") at the Unsafe Structure Department with a carbon copy to Defendant **Diaz** also at the Unsafe Structure Department.

361.     On or about December 20, 2021, Reid responded to Sotolongo, via an email, indicating that the permit application required a scope of work that more specifically addressed the violation for prior work performed without a permit and the closing of an open electrical and remodeling permit, as well as the submission of an approved 40/50 recertification process.

362.     On or about January 12, 2022, the Property received an Unsafe Structure Notice (BB2016017191) for Buildings Or Structures That Are Unsafe, Unsanitary Or Deficient, Constitute A Fire Or Windstorm Hazard.

363.     On February 8, 2022, Sotolongo sent Reid a follow-up email re-submitting the plans with the corrected scope of work as requested by the City.

364.     Reid responded to Sotolongo on the same day requesting further modifications to the plans to include the area the City was requesting be legalized.

365.     On February 16, 2022, per the City's request, Sotolongo uploaded the revised set of plans removing the previously cited areas that were incorrect and making all requested changes.

366.     Under a typical scenario, once a party receives an Unsafe Structure Violation, that party is provided a hearing date.

367.     At the hearing, that party appears before the City's Unsafe Structures Panel and an Order is then issued.

368.     On February 18, 2022, the City's Order of the Unsafe Structures Panel was issued (the "Beatstik Order") without a hearing.

369.     Inherent in the Beatstik Order is the City's obligation to ensure that it is not delaying the reparation efforts and that it is performing those tasks that are within its control and which Beatstik is dependent on in order to meet the deadlines, such as granting timely approval to the plans that have been submitted. Otherwise, the City would be permitted to refuse to respond to Beatstik's timely-submitted plans and then argue that it has a right to demolish Beatstik's property.

370.     Upon receiving the Beatstik Order, immediate efforts were made to comply by Plaintiff.

371.    Indeed, the day after the hearing before the Unsafe Structures Panel, Sotolongo sent an email to the City stating "we are ready to submit for permit if you think this plan is good to continue. . ." and requested an opportunity to meet at the City's office.

372.    The City failed to respond to Sotolongo's email for a period of 10 days, and no resolution on the pending issues was reached.

373.    When it became clear that Beatstik would not be able to meet the deadlines in the Order given the City's delays in responding, Sotolongo went to visit the City and specifically discussed the delays.

374.    In that meeting, Sotolongo requested an extension of the deadlines in the Beatstik Order (which the City possesses the ability to grant pursuant to the language of the Order).

375.    At that meeting, **the City told Sotolongo that he could not grant an extension until Beatstik's plans were submitted**.

376.    This response essentially placed Beatstik in a catch-22 scenario because **the City refused to accept the plans and yet, at the same time, was stated that it would not grant extensions to the Beatstik Order until the plans were submitted and accepted.**

377.    By the time that the City communicated this to Sotolongo, the deadline for Beatstik's opportunity to appeal the Beatstik Order had expired, thereby **leaving Beatstik with no administrative remedy**.

378.    Separately, in an email dated February 28, 2022, the City informed Sotolongo that while the plans now included everything requested in the prior communications with the City, Sotolongo now needed to submit documents and drawings in order for the City to release the permit application package.

379.     Specifically, the City, for the first time since December 17, 2021, informed Sotolongo that he would need to submit all of the following: a) plans for the second level of the building; b) separate drawings for applicable trade work such as electrical, mechanical and structural, if work under those trades were to be performed; c) permit applications and owner affidavits authorizing the aforementioned work to occur at the property; and d) other required documentation specific to the work proposed- which the City provided no specificity for.

380.     Throughout all of the foregoing communications, despite being copied on each one by Sotolongo, Defendant Diaz did not informed Sotolongo of the additional requirements included in the February 28, 2022 email.

381.     This was intentional because the City knew it would not be possible for Sotolongo to meet these requirements by the March 3, 2022 "deadline."

382.     Indeed, that was exactly what played out. On April 21, 2022 Sotolongo went to the Unsafe Structure Department at the City to submit the exhaustive list of items that he was able to accumulate in such a small period of time, where he was told by Reid that he had missed the March 3, 2022 deadline and, as a result, was no longer in compliance with the Notice and could not be issued a permit.

383.     More specifically, he was told by Reid that the property would be subject to demolition.

384.     To be clear, the City indicated that it preferred to demolish a 76-year-old historical structure with deep ties to the Overtown community rather than allow a small business owner working in earnest to meet the City requirements to operate a business.

385.     And, even the Historic Designation on the property is no longer enough to stop the City's vengeance since Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, and

Marrero's passing of Ordinance 14118 allowing for its demolition.

386.     Regarding fines imposed on the property by the City, Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, and Marrero have also targeted Plaintiff Beatstik through the passage of Ordinance 14057 limiting mitigation of fines, passed for the reason of furthering the syndicates' retaliatory agenda.

387.     Defendants' attacks on Beatstik have caused Beatstik, LLC to suffer monetary damages in excess of $8.34 million. A breakdown of these damages can be seen in the image below.



388.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

389.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT VII**
**PLAINITIFF EL SHOPPING'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE
CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARRERO, DIAZ,
BAYONA, AND GOLDBERG**

390.    Plaintiff El Shopping, LLC, ("El Shopping") realleges paragraphs 1 through 188 as if fully set forth herein.

391.    El Shopping was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

392.    Defendants the City of Miami, Carollo, Noriega, Mendez, Marrero, and Diaz are liable for violating Plaintiff's First Amendment Rights by crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm so as to cause harm to Plaintiffs Fuller and Pinilla.

393.    Defendants the City of Miami, Diaz, Marrero, Goldberg, and Bayona are complicit in the harassment of Plaintiff, knowingly and willingly participating in the harassment, seeking, manufacturing, or fabricating violations against Plaintiff and by dealing in bad faith to intentionally disrupt Plaintiff's permits and ability to bring the property into compliance.

394.    Plaintiff owns a property at 1568 SW 7th street, which the City had issued permits, Plaintiff El Shopping, LLC owns the building located at 300 SW 12th Avenue and its adjacent parking garage ("the El Shopping Property").

395.    After Joe Carollo's retaliation and manipulations to shut down parking at Ball & Chain, Plaintiff LHAB began using El Shopping's parking facility for Ball & Chain valet operations. Carollo, enraged that Plaintiffs withstood his attack followed Plaintiffs movements

and, alongside Defendants, began targeting El Shopping.

396.    At Carollo's insistence, Code issued violations which were quickly resolved by Plaintiff.

397.    In September of 2020, Defendants the City, Marrero, and Diaz issued an Unsafe Structure Notice (Process No. BB2020017697) on the property. The adjacent parking garage was built in the 1980s with rebar intentionally exposed to allow for future construction. This building style was common trade practice and Plaintiff confirmed with engineers that it had had no detrimental affect on the building's safety and structural integrity. Yet Defendants still issued this citation.

398.    The building violation, despite not imposing any danger, caused El Shopping's parking garage to have its CU automatically revoked because of Defendants the City, Carollo, Noriega, Mendez, Dooley, Marrero and Diaz's policy change, Ordinance 13936.

399.    This did not automatically revoke the CU for the other building on Plaintiff's property.

400.    On or about May 21, 2021, a hearing was held before the Unsafe Structures Panel and the Final Order was issued.

401.    On October 13, 2021, as a result of the threats made by the City to demolish the El Shopping Property, El Shopping was left with no alternative but to sign a Compliance Agreement, which set forth the same conditions as those imposed in the Compliance Agreement signed by Tower Hotel and Piedra Villas.

402.    The Compliance Agreement required the following: a) All plans within 30 Calendar days of signing agreement; b) permits obtained and paid for within 60 days of the approval of the Plans;  and c) repairs completed within 90 days of the issuance of the Permit.

403.    On October 19, 2021, El Shopping submitted the plans.

404.    On March 2, 2022, the Plans were approved by the City.

405.    On March 3, 2022, the City issued the Permit (Permit #BD21-024430-001-B001), thereby giving El Shopping until at least June 1, 2022 to complete the repairs pursuant to the terms of the Compliance Agreement.

406.    On March 7, 2022, the City issued a Stop Work Order because it requested that El Shopping obtain a Shoring Permit. The Shoring Permit involve nor affect any of the work Plaintiff needed to perform to bring the property into compliance. However, Defendants issued the requirement to cause Plaintiff costs and delays.

407.    On March 28, 2022, the City lifted the Stop Work Order and reinstated the Permit.

408.    On April 14, 2022, El Shopping submitted its latest set of corrections based on the City's comments to the work dated March 30, 2022.

409.    By letter dated April 22, 2022, but not received by El Shopping until May 9, 2022, **Defendant Dooley** advised that both the Unsafe Structure Panel Order and Compliance Agreement were in default and that "failure to comply [with the Compliance Agreement] or seek timely extension form [*sic*] the Building Official shall result in the City demolishing the structures(a) at issue."

410.    On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, thereby precluding El Shopping from engaging in any further reparation work.

411.    At the time, El Shopping had until June 1, 2022 to complete the repairs.

412.    Rather than allow that to happen, the City, including Defendants Marrero and Diaz, collapsed the compliance agreement, revoked the permit, and prevented Plaintiff from completing the work that the City was demanding be performed.

413.     Also in 2022, the Code Department participated in the harassment by during the same interaction, issuing the same exact violation three different times for Plaintiff's property.

414.     As a technicality, El Shopping's parking garage sits on top of "three different," contiguous parcels of land. **All owned by El Shopping**. Even so, the parking garage only extends onto the two additional parcels a minute amount.

415.     However, because of this technicality, Defendants, on the same day and for the same reason, **issued three different citations** for each parcel.

416.     Plaintiff went before Defendant Bayona and the Code Compliance Board to address and resolve the issue. And the issue was addressed but the Board, with Bayona's influence, only resolved one of the citation—leaving the other two citations open and accruing fines daily.

417.     After El Shopping's parking garage had its CU automatically revoked, Plaintiff was further harassed by Defendant **Goldberg**, who, at Carollo's behest and with the intention of causing Plaintiff the most amount of harm, revoked the CU of every tenant for El Shopping simply because "there was not enough parking" to accommodate all the tenants of El Shopping.

418.     Goldberg revoked **every certificate of use for El Shopping's tenants**—including a Miami Dade Sanctioned Charter School.

419.     Showcasing the collusion between Carollo and Goldberg, El Shopping's tenant, the Charter School, went directly to Carollo and informed him that the reconvocation of their Certificate of Use not only constituted a political firestorm but was also in violation of the requirements that the Miami Dade County Public Schools must be informed before any revocation of a school. Carollo then had Goldberg to issue a temporary permit to the school.

420.     Thereafter, Goldberg acting in furtherance of Carollo's scheme, bottlenecked Plaintiff's tenants by having the tenants come one by one to apply for temporary permits.

421.    However, the City refuses to this day to issue any certificates of use for the property, thereby depriving Plaintiffs of the ability to rent the property to generate income, causing losses well in excess of $200,000 in rental income, and preventing Plaintiffs from selling the property for $2.5 million.

422.    Regarding fines imposed on the property by the City, Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz have also targeted Plaintiff El Shopping through the passage of Ordinance 14057 limiting mitigation of fines, passed for the reason of furthering the syndicates' retaliatory agenda.

423.    Defendants' attacks on El Shopping have caused El Shopping, LLC to suffer monetary damages in excess of $8.19 million. A breakdown of these damages can be seen in the picture below.

- Liens: $1.13M
- Lost rent: $347,569
- Lost sale of rear land: $3.42M
- Legal fees: $250,425
- Lost of Revenue: $3.04M
- Due to lost rent and lost sale the value destruction to the property in excess
- **Total: $8.19 million***
  * Additional losses (opportunity to reinvest capital) - **uncalculated damages**
  * Reputational damage to LLC - **uncalculated damages**

424.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for

Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

425.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT VIII**
**PLAINITIFF TOWER HOTEL'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, MARREROR, DIAZ, AND TORRES**

426.    Plaintiff Tower Hotel, LLC ("Tower Hotel") realleges paragraphs 1 through 188 as if fully set forth herein.

427.    Plaintiff Tower Hotel was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

428.    Defendants the City of Miami, Carollo, Noriega, Mendez, Marrero, and Diaz are liable for violating Plaintiff Tower Hotel's First Amendment rights by crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm because of its relationship with Plaintiffs Fuller and Pinilla.

429.    Defendants the City of Miami, Diaz, and Marrero are complicit in the harassment of Plaintiff Tower Hotel for knowingly and willingly participating in the harassment, seeking, manufacturing, or fabricating violations against Plaintiff and by dealing in bad faith to intentionally disrupt Plaintiff's permits and ability to bring the property into compliance.

430.     And, **Defendant Torres** specifically worked to intentionally delay Plaintiff's ability to meet its compliance agreements. For example, for three years, Plaintiff Tower Hotel tried to get permits and Defendant Torres imposed arbitrary and atypical requirements for permits. On one occasion, Defendant Torres unilaterally sought to require Plaintiff to provide a "shop drawing" for an oven hood—which is usually resolved later under a sub permit. On another occasion, Torres repeatedly forestalled the procedure to obtain a pool permit stating the permit needed processing.

431.     Plaintiff owns a property at 1568 SW 7th street, which the City had issued permits,

432.     The Tower Hotel (the "Tower Hotel Property"), built in 1920, has served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[6]

433.     In 2012, the Tower Hotel Property was acquired by Plaintiffs Fuller and Pinilla, through Plaintiff Tower Hotel, LLC.

434.     The Tower Hotel Property consists of 3 structures.

435.     Plaintiff's master plan included: (a) a 3-story, 50 room hotel, (b) a working space, and (c) an area known as "La Botanica," which includes the pool and restaurant facilities.

436.     After acquiring the Tower Hotel Property, Fuller and Pinilla hired McKenzie Design as the architect to prepare the plans, RCI as the structural engineer, Ortus Engineering ("Ortus") as the private provider, and Globe Services as the permit expediter.

437.     On August 28, 2018, Tower Hotel submitted demolition plans to demolish the interior of La Botanica.

438.     All plans were reviewed, approved, and accepted by Ortus and the City and, upon completion of each stage, were inspected and passed by Ortus at all stages.

---

[6] Chabeli Herrera, *This Little Havana hotel once housed Billie Holiday. Soon you could stay there, too*, MIAMI HERALD, Mar. 13, 2018, http://tinyurl.com/yc5jxpma (last accessed Feb. 22, 2024).

439.    On or about December 19, 2018, Tower Hotel submitted plans for addition and remodeling of La Botanica ("2018 Remodeling Plans").

440.    On June 12, 2019, Tower Hotel received comments and submitted corrections for the 2018 Remodeling Plans.

441.    On September 10, 2019, the demolition permit was issued ("Demolition Permit").

442.    On September 26, 2019, Tower Hotel submit free-standing plans for pool permit at La Botanica. (BD19-019681-001) ("Pool Plans").

443.    On October 15, 2019 and on March 16, 2020, Tower Hotel received further comments and submitted corrections for the 2018 Remodeling Plans.

444.    In March 2020, the Covid-19 related shutdown occurred, and the City offices were closed to the public.

445.    This caused obvious delays to the Tower Hotel project.

446.    Despite this, on July 2, 2020 (at the height of the pandemic), Tower Hotel received a Notice of Unsafe Structure (BB2020012200) as a result of work performed without a permit.

447.    The Unsafe Structure Notice references the work done on the pool and the internal demolition of the La Botanica building, which was lawful pursuant to the Demolition Permit.

448.    Tower Hotel requested a hearing before the Unsafe Structure Board and, in the interim, Tower Hotel continued to engage in substantial efforts to get the Pool Plans processed.

449.    On or about November 20, 2020, Tower Hotel received a final Order of the Unsafe Structure Panel (BB2020012200).

450.    The Order required the following:

     a.    Structure A – which is the La Botanica building:

         1.    Repair or demolish within 135 days;

2.      within 30 days from November 20, 2020, plans must be developed and submitted to Unsafe Structures for approval and then submitted to City of Miami Building Department; and

1.   obtain permits within 45 days from November 20, 2020 (which Tower Hotel already possessed a demolition permit that was issued on September 10, 2019).

b.      Structure B – Pool:

1.      Repair or demolish within 120 days;

2.      within 30 days from November 20, 2020 plans must be developed and submitted to Unsafe Structures for approval and then submitted to City of Miami Building Department; and

2.   obtain permits within 30 days from November 20, 2020 (which is essentially impossible given one cannot submit plans and obtain permits on the same day).

451.    On December 14, 2020, DERM and other departments began their respective review of the Pool Plans.

452.    On two separate occasions, the City stated that certain reviews were not necessary and then abruptly, and without explanation, reversed its position.

453.    Upon reversing its position, the City then required the reviews and refused to close the disciplines out at the time of inspection.

454.    The first discipline where this occurred was in relation to Plumbing.

455.    Namely, on January 14, 2021, subsequent to the November 20, 2020 Order of the Unsafe Structure Panel, the City determined that a plumbing review would not be necessary.

456.    Nevertheless, on April 12, 2022, 10 days before Tower Hotel received the Notice of Default of the Compliance Agreement and Notice of Demolition, the City reversed its decision and indicated that Plumbing was **Denied.**

457.    The second discipline where this occurred was in relation to Gas.

458.    Identical to what transpired with respect to Plumbing, Tower Hotel was advised on January 14, 2021 that a gas review was not necessary, only to then be told on April 12, 2022 that Gas was **Denied.**

459.    On May 7, 2021, the issuance of the permit related to the Pool Plans by the City was held-up by DERM, despite all other trade approvals having been obtained.

460.    Specifically, as a result of the fact that the Pool Plans reference the 2018 Remodeling Plans, DERM stated that it would not sign off on the pool permit until the 2018 Remodeling Plans were approved by the City.

461.    Given the situation with DERM, Tower Hotel focused its efforts on obtaining the permit on the 2018 Remodeling Plans despite the City dragging its feet to grant the necessary approvals.

462.    By way of example, on September 8, 2021, Tower Hotel's contractor, Moises Castillo, wrote to the City and stated:

> I wanted to follow up on my email from last week.  I am wondering if you had a chance to review my responses to your concerns regarding La Botanica Pool. If so, when would the address be unlocked in order to submit the new pool plans. With all due respect **Mr. Ramos, I have been trying to submit the pool plan over 4 weeks now.** Can you please advise my client if you need anything else from me or my client?

463.    Those types of delays (such as waiting four weeks to simply submit pool plans) plagued Tower Hotel's ability to timely proceed with the project.

464.    In or about early October 2021, the Building Department, under Defendant Marrero, contacted Fuller and Pinilla and advised them that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool.

465.     As a result of the threats made by the City to demolish the Tower Hotel, on October 12, 2021, Tower Hotel was left with no alternative but to sign a Compliance Agreement, which set forth the same conditions as those imposed in the Compliance Agreement signed by Piedra Villas.

466.     The Compliance Agreement required the following:

        a.     All plans within 30 Calendar days of signing agreement;

        b.     60 Calendar days after plans submitted for permits; and

        c.     all repairs must be completed within 180 days of issuance of the permits.

467.     Given the delay by the City with the 2018 Remodeling Plans and the fact that DERM was not willing to close out and approve the Pool Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

468.     Accordingly, on October 15, 2021, Tower Hotel submitted the new pool plans (the "Second Pool Plans").

469.     After submitting the Second Pool Plans, Tower Hotel has engaged in substantial efforts to finalize all of the required plan approvals and the City has continually thwarted those efforts by not timely acting in response to Tower Hotel's requests for assistance and approval.

470.     For example, on December 7, 2021, Castillo emailed City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans and stated:

> I am following up on the email below. Do we have a schedule meeting time for this week? We're in dire need to get a response to this Zoning comment so we move forward.  Please advise.

471.     Presently, the only disciplines that are outstanding for the Second Pool Plans are Public Works, Flood Plain, Structural, and DERM.

472.     Nevertheless, on April 15, 2022, Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off.

473.     Despite Tower Hotel's continuous efforts to engage in the necessary reparations to the building, on April 22, 2022, the City sent a letter to Tower Hotel advising that it was in default of the Compliance Agreement and that the City "shall be moving forward to demolish the structure(s) at issue."

474.     Faced with no other choice, Plaintiffs filed for an Emergency Injunction to stop the demolition.

475.     On May 5, 2022, the day that the parties appeared before the Court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, wherein the City represented that no demolition of the properties that are the subject of the action would occur until the Court ruled on Plaintiffs' Emergency Motion for Temporary Injunction, the City pulled a Demolition Permit for the Tower Hotel Property.

476.     And, even the Historic Designation on the property is no longer enough to stop the City's vengeance since Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, and Marrero's passing of Ordinance 14118 allowing for its demolition.

477.     Regarding fines imposed on the property by the City, Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz also targeted Plaintiff Tower Hotel through the passage of Ordinance 14057 limiting mitigation of fines, passed for the reason of furthering the syndicates' retaliatory agenda.

478.     The City's actions destroyed the long-term lease Plaintiff had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed Plaintiff's ability to monetize and sell the property.

479.     Defendants' attacks on Tower Hotel have caused Plaintiff Tower Hotel, LLC to suffer monetary damages in excess of $18.29 million. A breakdown of these damages can be seen

in the image below.



- Historic Little Havana Hotel
- City obstructed and delayed opening as far back as January, 2018.
- Lost of Revenue: $14.24M
- Fines: $352,314 and accruing daily
- Additional Financing costs: $2.88M
- Costs for lease termination: $813,469
- **Total: $18.29 million\*** (as of 1/31/2024)
  \* Additional losses (opportunity to reinvest capital) - **uncalculated damages**
  \* Reputational damage to LLC - **uncalculated damages**

480.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

481.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT VII
### PLAINTIFF VIERNES CULTURALES' 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, JOE CAROLLO, NORIEGA, DOOLEY, MENDEZ, ORTIZ AND BAYONA

482.     Plaintiff Viernes Culturales/Cultural Fridays, Inc., ("Viernes Culturales") realleges paragraphs 1 through 188 as if fully set forth herein.

483.    Plaintiff Viernes Culturales was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

484.    Defendants the City of Miami, Carollo, Noriega, Mendez, and Dooley are liable for in the harassment of Viernes Culturales by way of crafting City policies specifically against Plaintiff, influencing other departments to selectively enforce policies against Plaintiff, and mobilizing City resources intentionally against Plaintiff for the purpose of causing Plaintiff financial and reputational harm so as to cause harm to Plaintiffs Fuller and Pinilla.

485.    Defendants the City of Miami, Ortiz, and Bayona are complicit in the harassment of Plaintiff Viernes Culturales for knowingly and willingly participating in the harassment, seeking, manufacturing, or fabricating violations against Plaintiff, imposing erroneous fines and violations, and by dealing in bad faith to attack Plaintiff .

486.    Simply because Fuller was President, Defendants—the City of Miami, Carollo, Noriega, Dooley, Mendez, Ortiz, and Bayona targeted Plaintiff Viernes Culturales/Cultural Fridays, Inc. ("Viernes Culturales"), a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival, which was held on the last Friday of every month on Calle Ocho since 2000.

487.    Defendants the City of Miami, **Carollo, Mendez, and Dooley** began orchestrating the usurpation and intentional damaging of Viernes Culturales. Carollo began by having the City Attorneys Mendez and Dooley investigate Viernes Culturales and Fuller's role in it.  Specifically, Carollo wanted to learn whether he could use the City of Miami permitting process to steal the last Friday of every month for his own festival and, with it, the goodwill the organization had created over its 18 years of operation. Mendez and Dooley dutifully complied.

488.     During the 18-year history of the Viernes Culturales festival, and right up until October 2018, Viernes Culturales had never applied for or obtained a special events permit in relation to Domino Plaza, where a key part of the festival occurred. And, prior to October 2018, despite its heavy involvement in and support of the festival, the City had never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

489.     Defendants Carollo and the City of Miami started Little Havana Fridays on or about October 2018 to compete with Viernes Culturales. In fact, Defendants Carollo and the City promulgated false advertisement about the event to gain support.

490.     Defendants Carollo and the City of Miami sought and received a permit for the last Friday of the month for an entire year for Little Havana Fridays in order to prevent Viernes Culturales from being able to continue on its normal schedule on the last Friday of each month.

491.     At the time that Carollo started Little Havana Fridays, Noriega was still in his role as head of the Miami Parking Authority. Noriega provided millions of dollars of sponsorship funds from the Miami Parking Authority to Little Havana Fridays and other events sponsored by Carollo.Those funds were received via checks, which were personally collected by Richie Blom, ("Blom") Carollo's then Chief of Staff, at Noriega's office on a monthly basis to allegedly pay the performers for Little Havana Fridays.

492.     After Carollo determined Noriega would dutifully harass Plaintiffs Fuller and Pinilla, and Plaintiffs affiliated with them—including Plaintiff Viernes Culturales—in February 2020, Carollo pushed the City to appoint Noriega as City Manager.

493.     Once appointed, Carollo and Noriega immediately colluded to utilize the City of Miami to bleed Viernes Culturales.

494.     For instance, both Carollo and Noriega were aware that Bacardi and the Miami Marlins were sponsors that Fuller helped bring to Viernes Culturales. Carollo and Noriega were also aware that part of the Bacardi sponsorship involved alcohol sampling for patrons of Viernes Culturales that met the proper age and ID requirements.

495.     Carollo was not happy about these sponsorships and the goodwill Viernes Culturales attained from such sponsors.

496.     And so, Carollo and Noriega worked to ensure that Bacardi could not provide samples at Viernes Culturales on May 21, 2021 by having Noriega prohibit the sampling under the false premise that an alcohol permit was required.

497.     Specifically, Noriega sent Viernes Culturales an email on May 21, 2021 revoking its right to serve alcohol that evening specifically because Fuller was involved with Viernes Culturales and it "hadn't earned" Noriega's trust.

498.     Noriega sent the email despite the fact that it is illegal under Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

499.     As if targeting Viernes Culturales because Fuller was its President was not enough, on February 7, 2022, Noriega, at Carollo's behest, discontinued any future permits for Viernes Culturales "indefinitely."

500.     This discontinuance was based on a fabricated narrative that people were walking outside the limits of the festival with alcohol.

501.     After the City successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to Futurama, a building owned by Plaintiff Futurama LLC and affiliated with Plaintiffs Fuller and Pinilla.

502.     Carollo didn't like this either because his true goal was to use the City to shut down Viernes Culturales permanently and completely.

503.     On October 21, 2022, Defendants Carollo sent Code Enforcement out to Futurama to cite the Viernes Culturales event with a violation for playing live music without a permit.

504.     Defendants the City and Carollo had Code Enforcement issue the citation on Plaintiff Futurama despite the fact that no law requires private art galleries to get a permit to play live music at their events.

505.     On January 25, 2023 the Board Members of Viernes Culturales and Fuller went before the Code Enforcement Board to appeal the citation.

506.     Carollo knew that the appeal was coming up at the January 25, 2023 meeting and wanted to be sure that it was denied.

507.     To make sure it was denied, Carollo, as he did on other occasions described herein, had his Chief of Staff, **Will Ortiz**, reach out to all the members of the Code Enforcement Board to tell them that Carollo's political enemy, Fuller, was on the agenda and to vote against him. Carollo and Ortiz did this despite knowing it was wrong because Carollo testified as much before a sitting jury on May 1, 2023, that "it would be absolutely wrong to do.  It would certainly be wrong for it to be done."

508.     Defendants **Carollo and Ortiz instructed Defendant Bayona** on how to vote and Bayona dutifully followed Carollo's improper instructions and upheld a baseless and improper violation on Futurama—improperly damaging and interfering with Viernes Culturales' ability to host events there.

509.     Carollo targeted Viernes Culturales merely because of its association with Plaintiff Fuller. In fact, another City Commissioner stated explicitly that Carollo targeted the festival to

"fuck with Fuller." And, in a sworn statement from Steven Miro, Miro explained Carollo hired

Ben Kuehne to take over Viernes Culturales just because of its relationship with Fuller.

510.    As a result of the destruction of Viernes Culturales, Plaintiff Viernes

Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10

million, which continue to this day.

511.    Defendants' attacks on Viernes Culturales have caused Viernes Culturales/Cultural

Fridays, Inc. to suffer monetary damages in excess of $9.39 million. A breakdown of these

damages can be seen in the image below.



512.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future

recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount

to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of

Miami Charter and the United States Constitution. Defendants were reckless in their disregard for

Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent

to drive Plaintiff out of business and deprive them of their constitutional rights.

513.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT X
## PLAINTIFF FUTURAMA'S AGAINST DEFENDANTS CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, DIAZ, ORTIZ, BAYONA

514.     Plaintiff Futurama, LLC, ("Futurama") realleges paragraphs 1 through 188 and paragraphs 482 through 513 as if fully set forth herein.

515.     Futurama was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

516.     Defendants the City of Miami, Carollo, Noriega, Mendez, and Dooley are complicit in the harassment of Plaintiff Futurama by way of mobilizing the City's resources against Plaintiff, and stemming from their harassment of Viernes Culturales.

517.     Defendants the City of Miami, Ortiz, and Bayona are complicit in the harassment of Plaintiff Futurama, effectuating the harassment, by dealing in bad faith, intentionally and baselessly citing Futurama for issues which did not exist and upholding these violations.

518.     The City, Carollo, Noriega, Mendez and Dooley have regularly targeted Plaintiff Futurama's property.

519.     For starters, Defendants worked to harass Futurama's tenant—Sanguich de Miami ("Sanguich")—to the point that it left Futurama's property to escape the City's undue harassment.

520.     Sanguich was an innovative restaurant aimed to bring remodeled shipping container, an architectural concept recognized around the world, to create further retail activation on a part of the street that was a non-descript parking lot.

521.     The success of shipping containers for retail activation is not only worldwide but is also hugely popular in sections of Miami, including Wynwood Yard and the Wharf—established pursuant to TUPs under City Code.

522.     Even former District 3 Commissioner Frank Carollo (Joe Carollo's brother) was a "huge proponent" of the business and its location in the refurbished shipping container. In fact, Frank Carollo even suggested Sanguich partner with the Barlington Group, the management company for Plaintiff Futurama.

523.     Sanguich obtained a business license from the city and state license for preparing and selling food—working with a City of Miami Assistant Attorney for City approvals. And Sanguich became a huge success.

524.     That is until one week after Carollo discovered Plaintiffs Fuller and Pinilla supported his competitor and five days after Carollo won the run off election, when Sanguich was "radided" by 25-30 City personnel including police, fire, building and code enforcement officers.

525.     Just minutes before the raid, Plaintiff called City Manager Daniel Alfonso  and asked if the Sanguich raid was Carollo's retaliation. The City Manager responded with "si."

526.     The Sanguich owners, Rosa Romero and Daniel Figueredo also contacted Alfonso, who confirmed the raid was at the direction of Carollo. When Romero and Figueredo went to discuss with Carollo—Carollo specifically said "I love it [the business," just "maybe not where you are" at Futurama.

527.     So as to harm Plaintiff Futurama, Carollo, Mendez, and Dooley managed to remove TUPs solely for District 3, in violation of proper procedure and with no first hearing or public notice on the issue—depriving Plaintiff's right to due process and to destroy Plaintiff's business.

528.     Sanguich reopened with a Temporary Events Permit ("TEP") on January 6, 2018 and that same day, City Code Enforcement showed up to shut them down. Code Officer Yacmany Salvatierra stating "**I'm sorry, this came from above, just know people are watching.**" Those people being Carollo, Mendez, and Dooley.

529.     In a testimony to the Ethics Commission Parjus confirmed Carollo and people at Carollo's direction were calling to close down Sanguich.

530.     When Sanguich asked Carollo why he was so bent on harassing them, Carollo told Figueredo, "**my problem is not as much with you as it is with your landlord**[,]" Plaintiff Futurama .

531.     While Sanguich still rented from Plaintiff, the City, Mendez and Carollo's retaliation followed Sanguich even outside of their store, at the Gay 8 Festival. While Sanguich was still a tenant, Carollo orchestrated for the City's Fire Department, Police Department, and the Special Events Department to investigate and harass Sanguich.

532.     One of the Fire Department Inspectors, admitted, in their 27 year career—"he nor any of the inspectors had ever received such [orders] from a Commissioner."

533.     Steven Miro, who Carollo ordered to target Sanguich at the Gay 8 Festival, confirmed Carollo was in constant contact with **City Attorney Mendez** during the retaliation and the City and Mendez had further knowledge of the retaliation and failed to properly advise against the activity.

534.     Sanguich relocated and since relocating off of Plaintiff's property, Sanguich has not received any retaliation from Carollo or the City.

535.     Carollo, Mendez and Dooley worked together to shut down the Sanguich business, a tenant of Plaintiff,  by revoking prior permits, refusing to grant new permits, and changing

existing ordinances and passing new ordinances to prohibit the business' operation, thereby costing the owners the hundreds of thousands of dollars they had invested and destroying their dreams, all to retaliate against Plaintiffs. As a result of Defendants' actions, Sanguich was forced to end its tenancy with Plaintiff Barlington Group, resulting in economic damage to Plaintiff Barlington Group.

536.    Plaintiff has suffered monetary damages as a result of Carollo, Mendez, and Dooley, forcing Sanguich to relocate off of Plaintiff's property including the loss of rental income in excess of $12,000 per year.

537.    Overall, Defendants have driven away tenants who were celebrated in the community and cost Plaintiffs hundreds of thousands in lost rent.

538.    Long before Carollo took office, Plaintiffs Fuller and Pinilla were celebrated as prominent and impactful property owners, developers, and community activists in Little Havana, recognized and praised for their commitment to the heritage, culture, and history.

539.    Along the lines of celebrating Little Havana, Plaintiff Futurama formed a partnership with History Miami, and The Smithsonian Institute to develop "El Museo," a first of a kind museum in Little Havana to celebrate the community's culture and history.

540.    As the Miami New Times wrote in 2017 in an article headlined "Little Havana's First Museum, El Museo de Little Havana, Is Coming to Calle Ocho[,]"

> El Museo de Little Havana wants people to know there is more to Calle Ocho . . .
>
> Little Havana's first-ever museum, El Museo de Little Havana, is set to open and tell the rich story of the area, through its Cuban history and Beyond.
>
> Located next to the popular Ball and Chain bar, El Museo de Little Havana will be a permanent time capsule on the alle, preserving tales and artifacts

of the three-square-mile-neighborhood, which is home not only to Cuban exiles but also immigrants from Central and South America. The museum will aim to showcase the social, cultural, and political importance that the area brings to South Florida. . . .

Resident historian of HistoryMiami Museum Dr. Paul George credits Fuller and Pinilla for bringing the museum to life.[7]

541.    However, because of Defendants' relentless retaliatory, harassment, and defamation campaigns, the project was never realized, solely because Futurama's partners were deterred by Defendants egregious conduct.

542.    And, when Defendants erroneously issued the code violation for Viernes Culturales, they issued the citation to Futurama.

543.    At the Code Board meeting on that violation, Ortiz improperly instructed Bayona on how to rule regarding Plaintiff Futurama's appeal.

544.    The group's targeting of the Futurama property continues to this day. At the last commission meeting, Carollo was trying to make sure that an ordinance for a shared workspace would not allow artists to display their work for show or sale in a shared space or dancers to dance in a shared space, both aimed at Plaintiffs' businesses, including Futurama.

545.    Defendants' various attacks on Plaintiffs' businesses and tenants in the Futurama building have caused Futurama, LLC to suffer monetary damages in excess of $7.87 million. A breakdown of these damages can be seen in the image below.

---

[7] Nicole Lopez-Alvar, *Little Havana's First Museum, El Museo de Little Havana, Is Coming to Calle Ocho*, Miami New Times, May 16, 2017 http://tinyurl.com/4k4ph547 (last accessed Feb. 22, 2024).

- City worked aggressively to remove land mark tenants: Sanguich, and Guayaba y Chocolate.
- Lost Rental Income: $607,851
- Lost of Revenue: $ 5.12M
- Lost El Museo of Little Havana: $2.04M
- Legal Costs to defend bogus violations: $103,562
- **Total: $7.87 million**
  * Additional losses (opportunity to reinvest capital) - **uncalculated damages**
  * Reputational damage to LLC - **uncalculated damages**

546.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

547.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT XI**
**PLAINITIFF LITTLE HAVANA BUNGALOWS' 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO,  NORIEGA, MENDEZ, DOOLEY, ORTIZ, BAYONA, MARRERO AND DIAZ**

548.     Plaintiff Little Havana Bungalows, LLC, ("Bungalows") realleges paragraphs 1 through 188 as if fully set forth herein.

549.    Plaintiff Bungalows was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

550.    Defendants the City of Miami, Carollo, Noriega, Mendez, and Dooley are complicit in the harassment of Plaintiff Bungalows by way of corrupting other departments and boards to selectively enforcing policies against Plaintiff Bungalows; and attempting change city policies to reroute Plaintiff's appeal to Carollo.

551.    Defendants the City of Miami, Ortiz, Dooley, and Bayona are liable for dealing in bad faith and knowingly and intentionally using their positions to participate in the scheme of harassment, improperly influencing the board so as to justify imposition of a cruel fine and punishment.

552.    Plaintiff Little Havana Bungalows, LLC was the owner of the property located at 28 NW 10 Avenue.

553.    The property consisted of an older home with citations and fines already accrued under the prior owner.

554.    Plaintiff worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

555.    Plaintiff's mitigation hearing was set in front of the Code Enforcement Board.

556.    And Fuller, who personally appeared on behalf of Plaintiff before the Board, was able to reduce the accrued fines. However, due to an oversight, there remained an outstanding citation that was not addressed during the meeting.

557.    Because one of the violations on Little Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

558.    Plaintiff's ability to mitigate fines at the first hearing infuriated Carollo and so **Carollo, Dooley, Mendez, Noriega, Marrero, and Diaz** attempted to derail Plaintiff's ability to mitigate fines by passing Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines; and moreover, to forcefully reroute Fuller on behalf of Plaintiff to appeal an outstanding fine before the Commission instead of the Code Enforcement Board.

559.    The latter policy change was to empower Carollo to directly attack Plaintiffs Bungalows and Fuller. However, luckily, the policy was not yet in effect.

560.    Plaintiff managed to make the last hearing before the syndicate's policy change took effect.

561.     Even so, two days prior to the Mitigation Hearing, **Defendant Ortiz**, as he had done before, called at least two Code Enforcement officers to tell them that "Carollo's enemy was going to be before the Board and that they needed to vote against him."

562.    And, moreover, at the hearing, Dooley improperly sought to influence the Code Enforcement Board's vote.

563.    Dooley was not the assigned city attorney yet spoke to the Board to justify imposing the greatest possible harm on Plaintiff.

564.    Shockingly, **Defendant Dooley** spoke on a matter she had no knowledge of—unaware of the date of the compliance agreement or Plaintiff's closing on the property—with the sole intention of attempting to justify a ludicrous fine suggested by Defendant Bayona against Plaintiff because of its association with Plaintiffs Fuller and Pinilla.

565.    Defendant Dooley interjected to baselessly allege Plaintiff was in violation of the Compliance agreement, Stating she "wanted to clarify" the "mitigation is from April 2018" that

the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which allowed for six months . . . after the order."

566. However, Plaintiff informed Defendant Dooley the agreement clearly stated the property needed to be "demolished six months from the closing."

567. To which, Defendant Dooley—despite her call for exponential fines against Plaintiff—asked "when was the closing . . . what date, that is what we don't know . . ."

568. Similarly, the City also tried to influence the Code Board by attempting to impose the new policy—which was not in effect—solely upon Plaintiff. Further, the City attempted to breach the corporate veil by opposing any mitigation by claiming Fuller as a "repeat offender" despite the property's ownership by Bungalow.

569. Pictured below, Defendants Dooley and Bayona making eye contact while speaking during that April 27 hearing. Defendant Bayona sitting on the far left. And Defendant Dooley sitting on the far right.



570. As a result of **Carollo, Ortiz, Dooley's influence, Defendant Bayona**, Carollo's appointee to the Code Enforcement Board, followed the prior board member's motion to impose a $7,500 dollar fine proposing Plaintiff pay **more than $400,000 in fines on the property**, despite

the fact that it was only worth approximately $250,000.  In the end, Fuller was ordered to pay a fine of $85,000, which at the time, was unheard of.

571.    An important comparison is that during this appeal, Plaintiff and Plaintiff's attorney were interrogated by Defendants for **nearly fifteen minutes** and forced to justify mitigation against Defendants' gross hostility.

572.    This is in direct contrast to the Code Enforcement Board's treatment of an average appellant as described by Defendant Victoria Mendez and her husband, where it is routine that Mendez's husband, who spoke to the Code Enforcement Board for **a mere minute** was able to wipe away more than $300,000 in fines to zero – **without having properly permitted any of the work**.

573.    Defendants' attacks on Little Havana Bungalows have caused Little Havana Bungalows, LLC to suffer monetary damages in excess of $376,595.00. A breakdown of this damage can be seen in the image below.



574.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of

Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

575.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT XII
### PLAINTIFF LITTLE HAVANA ARTS TOO'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, DOOLEY, DIAZ, AND MARRERO

576.    Plaintiff Little Havana Arts Building Too, LLC, ("LHAB TOO") realleges paragraphs 1 through 188 as if fully set forth herein.

577.    LHAB TOO was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

578.    Defendants the City of Miami, Carollo, Noriega, Mendez, and Marrero are complicit in the harassment of Plaintiff LHAB TOO by way of crafting, and influencing other departments to selectively enforce, selective policies against Plaintiff LHAB TOO.

579.    Defendants the City of Miami, Diaz, and Marrero are complicit in the harassment of Plaintiff LHAB TOO, effectuating the harassment, by dealing in bad faith, intentionally disrupting LHAB TOO's permits and ability to bring the property into compliance.

580.    Plaintiff LHAB TOO owns the property known as Little Havana Arts Too, located at 1521 SW 8th Street, adjacent to Ball & Chain, had a Compliance Agreement in place with clear

instruction from **Defendants Marrero and Diaz** to open a permit that had expired in order to complete the work to comply with City's requirements.

581.    Once the permit was open, however, **Marrero and Diaz reversed their position**, refused to allow the work for the open permit to comply with the City's requirements, and are currently seeking to demolish the property.

582.    And so, Marrero and Diaz collapsed the compliance agreement, discriminating against Plaintiff because of its association with Plaintiffs Fuller and Pinilla.

583.    This is causing damage to Plaintiffs in excess of $200,000 per year, plus destroying the $4.5 million value of the building.

584.    Defendants' attacks on Little Havana Arts Building Too have caused Plaintiff to suffer monetary damages in excess of $12.72 million. A breakdown of these damages can be seen in the image below.



585.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for

Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

586.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT XIII**
**PLAINTIFF CALLE OCHO MARKETPLACE'S 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, MENDEZ, DOOLEY, AND DIAZ**

587.     Plaintiff Calle Ocho Marketplace, LLC, ("Ocho Market") realleges paragraphs 1 through 188 as if fully set forth herein.

588.     Ocho Market was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

589.     Defendants the City of Miami, Carollo, Mendez, and Dooley are complicit in the harassment of Plaintiff Ocho Market by way of crafting, and influencing other departments to selectively enforcing policies against Plaintiff Ocho Market.

590.     Defendants the City of Miami and Diaz are complicit in the harassment of Plaintiff Ocho Market, effectuating the harassment, by dealing in bad faith, intentionally disrupting Ocho Market' permits.

591.     In fact, as pictured below, Defendants Carollo and Diaz can be seen at Plaintiff's property, looking for violations.



592.    Ocho Market owned was the property which suffered the undue harassment and eventual demolition by the corrupt apparatus.

593.    Another target on Carollo's hit list was Plaintiff Calle Ocho Marketplace, LLC's property located at 1380 SW 8th Street, known as "Calle Ocho Marketplace."  Calle Ocho Marketplace consists of two (contiguous parcels of land. The first has an existing Mexican restaurant on it and the second consists of an open-air lot where Plaintiff intended to put a kiosk marketplace.

594.    Plaintiff had a lawful Farmer's Market Temporary Use Permit ("TUP") and a Building Permit for the kiosks on the property.

595.    In response to the Kiosks, on August 20, 2018, Plaintiff received a letter from the City which included notice of a code violation of Section 3.63(g) which applied to "[i]noperable vehicles and other inoperable Recreational Watercraft or equipment."

596.    The City contended the kiosks somehow constituted equipment and the marketplace was somehow a parking facility and gave Plaintiff less than two days to fasten down or remove the kiosks.

597.   While Plaintiff was consulting its attorney who reached out to the Assistant City Attorney, on August 31, 2018, City Attorney Mendez filed an Emergency Motion for Injunctive Relief ("Injunction Motion") asking the Court to either force Plaintiff to remove the kiosks or grant the City the authority to remove ***and destroy*** every kiosk from the property.  The Injunction Motion was denied.

598.   Undeterred, on September 4, 2018, the City (at the direction of Carollo and Mendez) revoked the Farmer's Market TUP.

599.   On September 6, 2018, representatives of Plaintiff appeared at a Code Enforcement Board Hearing to discuss citations issued by the City at Calle Ocho Marketplace. During this hearing, **Mendez lied** to the Code Enforcement board, claiming the property was less than the 5,000 feet needed for a farmer's market, when the property was over 8,300 square feet. Mendez further claimed that the kiosks were a hurricane risk.

600.   Carollo also personally appeared before the board and lied, claiming Plaintiffs were planning a "flea market" and not a "farmers market." At the conclusion of the hearing and as a result of Mendez and Carollo's intentional misrepresentations, the Code Enforcement Board ordered the kiosks to be immediately removed or they would be destroyed by the City. On September 11, 2018, the City revoked the building permit for the kiosks.  Accordingly, Plaintiffs removed the kiosks.

601.   As a result of the combined efforts of **Carollo, Mendez, Dooley, and Diaz,** Plaintiff suffered extensive economic damages, which continue to this day and will continue into the future as long as Defendants' retaliatory campaign persists.

602.   Defendants' attacks on Calle Ocho Marketplace have caused Plaintiff Calle Ocho Marketplace, LLC to suffer monetary damages in excess of $14.48 million. A breakdown of these damages can be seen in the image below.



603.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

604.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT XIV**
**PLAINTIFF LHAB TRES' 42 USC § 1983 CLAIM AGAINST DEFENDANTS THE CITY OF MIAMI, CAROLLO, NORIEGA, MENDEZ, AND DOOLEY**

605.   Plaintiff LHAB Tres, LLC, ("LHAB Tres") realleges paragraphs 1 through 188 as if fully set forth herein.

606.     Lhab Tres was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

607.     Defendants the City of Miami, Carollo, Noriega, Mendez, and Dooley are complicit in the harassment of Plaintiff Lhab Tres by way of usurping the City's budget and functions in order to intentionally compete and harm against Plaintiff.

608.     Plaintiff LHAB Tres, LLC is a business Plaintiffs Fuller and Pinilla established to acquire property adjacent to their Ball & Chain property.

609.     Plaintiff LHAP Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

610.     Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

611.     In the middle of these negotiations, however, the seller refused to grant the extension because the City of Miami was seeking to buy the property, which it did for $1 million.

612.     The building is now demolished and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

613.     Defendants' attacks on Lhab Tres have caused it to suffer monetary damages in excess of $5.79 million. A breakdown of these damages can be seen in the image below.

- Lost of business income: $5.65M
- Legal fees & costs: $142,364
- Due to lost rent and lost sale the value destruction to the property in excess
- **Total: $5.79million***
  * Additional losses (opportunity to reinvest capital) - _uncalculated damages_
  * Reputational damage to LLC - _uncalculated damages_

614.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

615.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT XV**
**PLAINTIFF THE BARLINGTON GROUP'S 42 USC § 1983 CLAIM AGAINST ALL DEFENDANTS**

616.     Plaintiff The Barlington Group, LLC, ("Barlington Group") realleges paragraphs 1 through 615 as if fully set forth herein.

617.     Barlington Group was targeted for its association with Plaintiffs Fuller and Pinilla, by which Defendants violated its rights to free speech, association and assembly, and to petition the government for redress of grievances.

618.     Plaintiff Barlington Group, LLC is the master head and umbrella company responsible in managing all Plaintiff companies.

619.     All Defendants through their knowing and willing actions, have improperly caused Plaintiffs reputational damages.

620.     Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

621.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT XVI
## PLAINTIFFS FULLER AND PINILLA'S 42 USC § 1983 CLAIM AGAINST ALL DEFENDANTS

622.     Plaintiffs Fuller and Pinilla  realleges paragraphs 1 through 621 as if fully set forth herein.

623.     Defendants the City of Miami, Carollo, Noriega, Mendez, Marrero and Diaz are complicit in the harassment of Plaintiff Piedra Villas by way of crafting, and influencing other departments to selectively enforcing policies against Plaintiff Piedra Villas specifically because of its association with Plaintiffs Fuller and Pinilla.

624.    Defendants the City of Miami, Diaz, and Marrero are complicit in the harassment of Plaintiff Piedra Villas, effectuating the harassment, by dealing in bad faith, intentionally disrupting Piedra Villas' permits and ability to bring the property into compliance.

625.    Plaintiffs Fuller and Pinilla had rights protected by the first amendment of the United States Constitution, including the rights to free speech, association, and to redress the government from grievances.

626.    All Defendants willingly and knowingly, under the color of law, deprived Plaintiffs Fuller and Pinilla of their rights to free speech.

627.    All Defendants willingly and knowingly, under the color of law, deprived Plaintiffs Fuller and Pinilla of their rights to association and assembly.

628.    All Defendants willingly and knowingly, under the color of law, deprived Plaintiffs Fuller and Pinilla of their rights to seek redress of grievances from the Government.

629.    Plaintiffs Fuller and Pinilla have suffered through more than five years of emotional distress and mental anguish.

630.    This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

631.    Plaintiffs Fuller and Pinilla have been unable to sleep at night.  They have spent many nights awake.  The little sleep they have gotten has been disturbed.

632.    Plaintiffs Fuller and Pinilla became concerned for their safety and the safety of their families.

633.    On more than one occasion, Plaintiffs Fuller and Pinilla called the police department to report suspicious vehicles parked near their homes or businesses.

634.     Plaintiffs Fuller and Pinilla cannot escape the feeling that the Defendants are seeking to fabricate evidence, complaints, and violations, all with the sole purpose of shutting their businesses and destroying their lives, all because they supported Carollo's political opponent and then continued to speak out against the City.

635.     The City has unlimited funds and resources to try to destroy Plaintiffs, their businesses, and their families and to shut down their livelihood and their ability to provide for their kids.

636.     Plaintiffs Fuller and Pinilla spent a large part of their lives building a great business with a great portfolio of properties and developed a stellar reputation in the community.

637.     The injury has not only been mental or emotional.  Plaintiffs Fuller and Pinilla's physical appearance and well-being has changed and their physical health has suffered.

638.     In addition, Plaintiffs' ability to conduct their daily business has become significantly more difficult due to the Defendants' actions.  Potential business partners are reluctant to do business with Plaintiffs for fear of becoming targets of Defendants.

639.     In fact, one businessman who had committed to a major project with Plaintiffs pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. This alone cost Plaintiffs $5 million.

640.     Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' acts are reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiffs' First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

641. Plaintiffs are also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT XVII
## ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY TO VIOLATE THEIR CONSTITUTIONAL RIGHTS AGAINST ALL DEFENDANTS

642. All Plaintiffs reallege paragraphs 1 through 641 above as though fully set forth herein.

643. Each and every Defendant, the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, Goldberg, Ortiz, Torres, Plasencia, Diaz, and Bayona, knowingly and willingly agreed to and played a major role in Carollo's retaliation against Plaintiffs.

644. Moreover, each Defendant benefited from their loyalty to Carollo and disloyalty to the protections afforded by the United States Constitution.

645. First and foremost, each Defendant was afforded job security by Carollo and his corrupt network and practice of ousting anyone who did not violate Plaintiffs' First Amendment Rights, as he had done to former City Manager Emilio Gonzalez, former Police Chief Colina, former Police Chief Acevedo,  and Maurice Pons.

646. But Defendants even benefited more from their involvement.

647. The City of Miami benefited from its involvement by imposing gross and outrageous fines and fees, as well as by usurping Viernes Culturales' event and goodwill.

648. Defendant Carollo benefited by having his personal animus against Plaintiffs Fuller and Pinilla injected throughout the City Government like a disease.

649. Defendant Noriega was given the City Manager job because he supported Carollo's harassment against Plaintiff Viernes Culturales and agreed to assist Carollo's targeting, replacing

the prior City Manager Emilio Gonzalez, who expressed views that the City was beginning to specifically target Plaintiffs Fuller and Pinilla at Carollo's direction.

650.     Defendant Mendez benefited by having Carollo's protection on her husband's fraudulent house flipping scheme.

651.     Defendant Dooley was promoted for her involvement.

652.     Defendant Marrero was promoted for his involvement.

653.     Defendant Dan Goldberg got his job as Director of Zoning in exchange for agreeing to participate in the conspiracy to violate Plaintiffs' constitutional rights.

654.     Defendant Ortiz was eventually promoted and not terminated as Carollo's Chief of Staff.

655.     Defendant Torres was promoted to Assistant Director of Building specifically because he campaigned for Carollo and agreed to do Carollo's targeting, replacing the demoted Maurice Pons, who Carollo viewed as not hard enough on Plaintiffs.

656.     Defendant Plasencia was promoted from Fire Marshal to Assistant Fire Chief.

657.     Defendant Diaz, upon information and belief, received a raise for his involvement, and protected his house from violations.

658.     Defendant Bayona, upon information and belief, protected her house from violations, and for not pulling permits including for renovations including new windows and removed interior walls.

659.     In fact, upon information and belief, some of Defendant Bayona's permitless work is visible on Google Maps' view. Where in February of 2019, Defendant Bayona's windows are pictured below.



And in February 2021, Defendant Bayona's windows are pictured below, with exposed concrete showing from the renovations.



660.   Also on information and belief, Defendant Bayona also benefited from the City destroying an easement adjacent to her property which added land to her property.

661.   Defendants reached an agreement to deny Plaintiffs their constitutional right to free speech and freedom of association, in retaliation for, amongst other instances of protected conduct, Plaintiffs' support of Carollo's political opponent during the 2017 election, Plaintiffs'

submission of an ethics complaint against Carollo and the City, Plaintiffs' filing of a lawsuit against Carollo and the City, and Plaintiffs' vocal opposition to the retaliatory practices of the City.

662.    Defendants possessed an independent personal stake in conspiring against Plaintiffs and achieving the City's unconstitutional objectives.

663.    The individual Defendants were motivated by their personal animus and desire to harm Plaintiffs' businesses—actions which did not confer any benefit for or constitute a stake to the City.

664.    For example, Defendant Carollo's conspiratorial acts were motivated in part by his personal animus towards Plaintiffs for their support of his political opponent and Plaintiffs' filing of a complaint against him, and a desire to scare and deter Plaintiffs and other political opponents and their donors from challenging his reign as commissioner. Defendant Carollo was also motivated to shut down Plaintiffs' Viernes Culturales festival so that he could put forth his own festival at the same time and location.

665.    By way of another example, Defendant Noriega was not a City employee (rather, he was employed by the Parking Authority) but was promised the position of and eventually became the City Manager when he agreed to engaged in the conspiracy to violate Plaintiffs' constitutional rights.

666.    In addition to their personal stakes, the Defendants possessed a peculiar power of coercion by virtue of their combination and economic influence, which they did not possess individually.  Defendants exercised their peculiar power of coercion with a malicious motive to target Plaintiffs in retaliation for their exercise of their First Amendment rights.

667.    Moreover, Defendants' conspiratorial conduct went beyond a single act of retaliation, and instead involved a long series of retaliatory acts orchestrated by City employees

spanning almost five years. Defendants' conspiratorial actions impinged upon Plaintiffs' First Amendment rights.

668.    As a result of Defendants' conspiracy to retaliate and violate Plaintiffs' First Amendment rights, Plaintiffs are reluctant to participate in the political process by supporting candidates for office or by petitioning their local government for the redress of their grievances.

669.    In addition, as a direct and proximate result of Defendants' conspiratorial acts, Plaintiffs have suffered out of pocket losses and other monetary damages associated with disruption to their various businesses in an amount not less than $60 million which is in addition of the compensatory damages awarded at *Fuller I*, said damages to be proven at the time of trial.

670.    In addition to the monetary losses, Plaintiffs have suffered impairment to their reputation, personal humiliation, emotional distress, and mental anguish and suffering.

671.    Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Defendants' conspiratorial and reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Defendants' conspiracy was reprehensible in that it repeatedly violated the City of Miami Charter and the United States Constitution. Defendants were reckless in their disregard for Plaintiff's First Amendment rights. And Defendants were, and still are, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial of all claims so triable.

Respectfully submitted,

**AXS LAW GROUP PLLC**
2121 NW 2nd Avenue
Miami, FL 33127
Tel: (305) 297-1878

By: */s/ Samuel Jacob Etkin Kramer*
**JEFFREY W. GUTCHESS**
Florida Bar No. 702641
Jeff@axslawgroup.com
Samuel Jacob Etkin Kramer
Florida Bar No. 1059581
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2024, a true and correct copy of the foregoing was served on all counsel of records via the CM-ECF.

*/s/ Samuel Jacob Etkin Kramer*
Samuel Jacob Etkin Kramer, Esq.