# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 1:23-cv-24251-FAM

WILLIAM O. FULLER,
MARTIN PINILLA, II,
BARLINGTON GROUP, LLC,
CALLE OCHO MARKETPLACE, LLC,
YO AMO CALLE SIETE, LLC,
LITTLE HAVANA ARTS BUILDING, LLC,
LITTLE HAVANA ARTS BUILDING TOO, LLC,
TOWER HOTEL, LLC,
BRICKELL STATION PARTNERS, LLC,
PIEDRA VILLAS, LLC,
FUTURAMA, LLC,
EL SHOPPING, LLC,
BEATSTIK, LLC,
VIERNES CULTURALES/CULTURAL FRIDAYS, INC.,
LITTLE HAVANA BUNGALOWS, LLC,
LHAB TRES, LLC,
LA GRAN FIESTA, LLC.

       *Plaintiffs*,

   v.

THE CITY OF MIAMI,
JOE CAROLLO, in his individual capacity,
ARTHUR NORIEGA, in his individual capacity,
VICTORIA MENDEZ, in her individual capacity,
RACHEL DOOLEY, in her individual capacity,
ASAEL MARRERO, in his individual capacity,
DANIEL S. GOLDBERG, in his individual capacity,
WILLIAM ORTIZ, in his individual capacity,
ADRIAN PLASENCIA, in his individual capacity,
RENE DIAZ, in his individual capacity,
YVONNE BAYONA, in her individual capacity.

       *Defendants*.

_____/

## PLAINTIFFS' SECOND AMENDED COMPLAINT

1.     In upholding as reasonable an award of $15 million for emotional distress and reputational harm, and more than $47 million in punitive damages, for Plaintiffs William Fuller

and Martin Pinilla, II, in their individual capacities, Judge Rodney Smith noted that **Messrs. Fuller and Pinilla had "primarily suffered economic harm" because Miami City Commissioner Joe Carollo's "actions specifically targeted [their]  financial vulnerabilities by attempting to shut down their, or their tenants', businesses,"** based on actions that "continued long after Plaintiffs filed suit" and effectively "weaponiz[ed] the City government" against them. *Fuller, et al. v. Carollo*, No. 18-24190-CIV, DE 631 at 7-8 (S.D. Fla. Feb. 21, 2024) (describing Carollo's "actions [as] continuous and unrelenting"; as well as "intentional and malicious") (emphasis added).

2.      Because the relevant actions of the City and Carollo occurred, in the words of Judge Smith, "long after Plaintiffs filed suit" against Carollo, the new plaintiffs in this action—Barlington Group, LLC, Calle Ocho Marketplace, LLC, Yo Amo Calle Siete, LLC, Little Havana Arts Building, LLC, Little Havana Arts Building Too, LLC, Tower Hotel, LLC, Brickell Station Partners, LLC, Piedra Villas, LLC, Futurama, LLC, EL Shopping, LLC, Beatstik, LLC, Viernes Culturales/Cultural Fridays, Inc., Little Havana Bungalows, LLC, LHAB Tres, LLC, La Gran Fiesta, LLC—are the businesses that Carollo and the City of Miami has shut down or otherwise destroyed over the past four years, causing them to suffer more than $100 million dollars in economic harm. Plaintiffs Fuller and Pinilla also seek to recover the emotional and reputational damages from the City of Miami based on their involvement in the misconduct that occurred after Plaintiffs filed suit against Carollo.

3.      The new individual defendants in this action—Arthur Noriega, Victoria Mendez, Rachel Dooley,  Asael Marrero, Daniel S. Goldberg, William Ortiz, Adrian Plasencia, Rene Diaz, Yvonne Bayona—are the City employees, final policy makers, and the non-employee board member who participated, and accepted direct leading roles, in destroying Plaintiffs' businesses, livelihoods, and reputations.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff William O. Fuller ("Fuller") is a resident of Miami-Dade County, Florida.

5.      Plaintiff Martin Pinilla, II ("Pinilla") is a resident of Miami-Dade County, Florida.

6.      Plaintiff Barlington Group, LLC ("Barlington") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

7.      Plaintiff Calle Ocho Marketplace, LLC ("Calle Ocho") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

8.      Plaintiff Yo Amo Calle Siete, LLC ("Calle Siete") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

9.      Plaintiff Little Havana Arts Building, LLC ("LHAB") is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami. LHAB owns the property at 1513 SW 8th Street with three buildings—Ball & Chain, Azucar, and a Cigar Shop.

10.     Plaintiff Piedra Villas, LLC ("Piedra Villas") is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

11.     Plaintiff Little Havana Arts Building Too, LLC ("LHAB TOO") is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

12.     Plaintiff Brickell Station Partners, LLC ("Brickell Station") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

13.     Plaintiff Tower Hotel, LLC ("Tower Hotel") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

14.     Plaintiff Futurama, LLC ("Futurama") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

15.     Plaintiff El Shopping, LLC ("El Shopping") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

16.     Plaintiff Beatstik, LLC ("Beatstik") is a Florida Limited Liability Company owned by Plaintiffs Fuller and Pinilla and is headquartered in the City of Miami.

17.     Plaintiff Viernes Culturales/Cultural Fridays, Inc. ("Viernes Culturales") is a Florida Corporation comprised of community stakeholders who committed thousands of hours for a great community benefit over 20 years, and whose former chairman was Fuller.

18.     Plaintiff Little Havana Bungalows, LLC ("Havana Bungalows") is a Florida Limited Liability Company owned by Fuller and is headquartered in the City of Miami.

19.     Plaintiff LHAB Tres, LLC ("LHAB Tres") is a Florida Limited Liability Company owned by Fuller and Pinilla and is headquartered in the City of Miami.

20.     Plaintiff La Gran Fiesta, LLC ("Gran Fiesta") is a Florida Limited Liability Company owned by Fuller and Pinilla and is headquartered in the City of Miami.

21.     Defendant City of Miami is the municipal governing body for the City of Miami.

22.     Defendant Joe Carollo ("Carollo"), in his individual capacity, is and at all relevant times was the City Commissioner for District 3 of the City of Miami.

23.     Defendant Arthur Noriega ("Noriega"), in his individual capacity, is and at all relevant times was the City Manager for the City of Miami.

24.     Defendant Victoria Mendez ("Mendez"), in her individual capacity, is and at all relevant times was the City Attorney for the City of Miami.

25.     Defendant Rachel Dooley ("Dooley"), in her individual capacity, is and at all relevant times was the Assistant City Attorney for the City of Miami.

26.     Defendant Asael Marrero ("Marrero"), in his individual capacity, is and at all relevant times was the Building Director for the City of Miami.

27.     Defendant Daniel S. Goldberg ("Goldberg"), in his individual capacity, is and at all relevant times was the Zoning Director for the City of Miami.

28.     Defendant William Ortiz ("Ortiz"), in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo carrying out his political targeting of Plaintiffs.

29.     Defendant Adrien Plasencia ("Plasencia"), in his individual capacity, is the Assistant Fire Chief and at relevant times was the City of Miami Fire Marshall.

30.     Defendant Rene Diaz ("Diaz"), in his individual capacity, is and at all relevant times was the Senior Chief of the Unsafe Structures department.

31.     Defendant Yvonne Bayona ("Bayona"), in her individual capacity, is and all relevant times was a member of the City of Miami Code Enforcement Board.

32.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

33.     Venue lies in the Southern District of Florida because the cause of action accrued, and the parties are located within this district.

34.     All conditions precedent to the filing of this lawsuit have been performed, satisfied and/or waived.

## FACTS[1]

35.     Fuller and Pinilla are local entrepreneurs operating out of Calle Ocho in Little Havana, who built a diverse real estate investment business from the ground up, one building at a time, thereby providing hundreds of jobs for local residents and producing hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County, and the State of Florida.

36.     Fuller and Pinilla have dedicated their professional careers to revitalizing the neighborhood of Little Havana, where they have helped to generate economic activity and breathe new life into the area, while at the same time preserving its historical significance and cultural identity.

37.     Fuller and Pinilla have been recognized as "a galvanizing force behind the area's cultural resurgence," and renowned Miami historian Dr. Paul George has likewise noted that Fuller and Pinilla "are both very history-minded and are also very civic-minded . . . [They] understand that the neighborhood has a multilayered history."

38.     Fuller and Pinilla consider their work to be that of curators and caretakers of the neighborhood and, accordingly, they seek out development partners and tenants "who share a

---

[1] Plaintiffs file this Second Amended Complaint in strict compliance with this Court's Order, mandating, among other things, that "each Plaintiff separate his or its own claims against each Defendant separately in a separate count," and specifically barring Plaintiffs from using "incorporation by reference language." (DE 123 at 2, 4). And, in the absence of such an express prohibition, Plaintiffs would have incorporated by reference the dismissed allegations in their prior complaint to avoid the argument raised by the City in a pending appeal that filing an amended complaint that drops allegations in compliance with a partial order of dismissal without "standing on" the already-dismissed allegations in defiance of that order can somehow operate as a prejudicial waiver or bar of a right to appeal the dismissal of those allegations upon the entry of final judgment as to the non-dismissed allegations. *Fuller, et al. v. Carollo, et al.*, No. 23-12321, DE 28-1 at 10 (11th Cir. Mar. 14, 2024).

similar vision of preserving and protecting the heritage, the culture, and the history" of Little Havana.[2]

39.     For example, in 2014, Fuller and two of his childhood friends reopened the famous Ball & Chain nightclub.  For decades during the 1930's to 1950's, Ball & Chain was an important music venue, presenting titans of the era such as Billie Holiday and Count Basie. With the vision of restoring the venue to its past glory days, Fuller and his partners made Ball & Chain, once again, a premier entertainment destination for people of all ages, races, and nationalities.

40.     Fuller and Pinilla are also currently working on Little Havana's first boutique hotel through a redevelopment and restoration of the historic Tower Hotel. The Tower Hotel served as a World War II hospital and famously hosted African-American jazz greats during the era of segregation.[3]

41.     Preserving that history, where the legacies of various cultures converged on Calle Ocho, is central to Plaintiffs' vision for the project. Through these and many other projects in the area, Fuller and Pinilla have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

42.     Fuller and Pinilla's efforts in the neighborhood have borne significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment, and a vibrant arts scene to enjoy—much of which retains or reflects the cultural distinction, rich history, and atmosphere that make Little Havana special.  Little Havana is now a major Miami destination

---

[2] Carmen Sesin and Marissa Armas, *Miami's Little Havana: From Working Class Neighborhood to Global Tourist Hot Spot*, NBC NEWS, at http://tinyurl.com/4usny6y4 (Mar. 27, 2017).

[3] Chabeli Herrera, *This Little Havana hotel once housed Billie Holiday. Soon you could stay there, too*, MIAMI HERALD, at http://tinyurl.com/yc5jxpma (Mar. 13, 2018).

for tourists and locals alike, sought after as one of the few authentic Cuban legacy neighborhoods left in Miami. In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

43.     Throughout all of this, Fuller and Pinilla have nurtured genuine and productive relationships with City Commissioners, including Joe Carollo's two predecessors, his brother Frank Carollo, and Joe Sanchez, both of whom appointed Fuller and Pinilla to participate in various City boards or trusts, such as the Stars of Calle Ocho and Viernes Culturales.

## CAROLLO'S INDIVIDUAL CAMPAIGN OF RETALIATION IN 2017-2019

44.     In the summer of 2017, Joe Carollo announced his campaign for Commissioner for the City of Miami's for District 3, which includes Little Havana, prompting the Miami Herald to write a story noting Carollo's history of "abusing power, profiting from taxpayers and *using government resources to intimidate his political opponents*."[4]

45.     Because of Carollo's reputation for political vengeance, Fuller and Pinilla sought to keep their support for Carollo's opponent clandestine, becoming key members of the A.B.C. – i.e., the "Anyone But Carollo" – group.

46.     However, Carollo discovered Fuller and Pinilla supported his political opponent, Alfie Leon, in the 2017 race for City Commission, when Carollo's employee spotted a political rally for Alfie Leon being hosted on a Saturday on one of their properties. Carollo immediately sought to shut down—and succeeded in shutting down—that rally.

---

[4] David Smiley, *Lies, Chavista ties and red light cameras: A Miami election so ugly the parents jumped in*, MIAMI HERALD, http://tinyurl.com/bdeb7k99 (Oct. 19, 2017) (emphasis added).

47.     The next day, Sunday, Carollo again learned that a political rally was being held on the same property owned by Fuller and Pinilla, and this time that Pinilla was at the rally too. Carollo again sought to shut down—and succeeded in shutting down—the rally.

48.     Fuller and Pinilla also hosted social media video advertising for Alfie Leon inside and outside of some of their signature properties.

49.     On election night, Carollo approached Fuller at the voting precinct and asked Fuller why he was not wearing a blue and yellow shirt to publicly show his support for Carollo's opponent, Leon.

50.     When Alfie Leon sued Carollo challenging the election, Carollo believed that Fuller and Pinilla were financing that lawsuit.

51.     Carollo's political retaliation against Fuller and Pinilla for their support of his opponent began immediately upon his taking office in December 2017.

52.     For example, beginning in December 2017, Carollo directed Miami's Code Compliance personnel to Fuller and Pinilla's business, Futurama, to shut down or otherwise interfere with its tenants' operations.

53.     Also in December 2017, Carollo sent Miami's Code Compliance Department to shut down the Christmas Party being held for all of Plaintiffs' employees at their Tower Hotel Property. The Code Compliance Director at the time said that there was no basis for this action and that it was pure political retaliation by Carollo.

54.     Former Director of Code Compliance, Orlando Diez, testified that, as early as December 2017, Carollo "wanted [him] to issue, or [his] inspectors [to] issue, violations," and to "shut down the business" associated with Plaintiffs. Mr. Diez explained that he was afraid he would lose his job if he did not comply with Carollo's demand "to target Mr. Fuller's businesses."

55.     Also immediately upon taking office in December 2017, Carollo used his position as an elected official to pressure a state law enforcement agency—in particular the Florida Department of Law Enforcement—to investigate Plaintiffs.

56.     Carollo first went to the FDLE to accuse Plaintiff Fuller of voter fraud.

57.     Carollo next went to the FDLE to accuse Fuller of money laundering.

58.     Carollo also told the FDLE that Fuller was "engaged in a protracted pattern of criminal conduct," and the "head of a cabal of Venezuelan investors," to "fund and control local elections in Miami; and ultimately they want to control the planning, zoning, and permitting in the City to enable their unobstructed expansion."

59.     Also in December 2017, Carollo created his first list of all properties and property owners related to Fuller and Pinilla to target.

60.     This original list of property owners, other than Fuller, included Plaintiffs Piedra Villas and Calle Ocho, as well as Fuller's sister and mother—and the properties' addresses, building size, lot size, folio number, zoning, sale price, and date acquired.

61.     Carollo's next list of properties to target based on their association with Fuller and Pinilla was much more extensive, including practically all of the Plaintiffs herein, and Carollo would carry a copy of the list with him at all times.

62.     Throughout 2017 and 2018, Carollo continued to retaliate against Fuller and Pinilla, including by targeting their business interests.

63.     For instance, Carollo enlisted the City Attorney (Mendez) and the Assistant City Attorney (Dooley) to assist him in revoking prior permits, refusing to grant new permits, changing existing ordinances and passing new ordinances to prohibit the operation of Futurama's tenant—

a popular restaurant named "Sanguich de Miami"—forcing Sanguich to end its tenancy with Futurama.

64.     Similarly, beginning in December of 2018, Carollo escalated a complaint on a business named "Taquerias," which operated on Gran Fiesta's property, to Florida's Department of Alcohol Beverage and Tobacco ("ABT"), in the hopes of revoking its liquor license. Carollo would later demand that ABT investigate Gran Fiesta again in March of 2019.

65.     An ABT Captain stated he "witnessed the specific targeting of" Gran Fiesta "through various City officials and employees" and numerous ABT "investigation[s] would not have been conducted if Commissioner Carollo had not requested" them.

66.     Carollo issued voluminous public records requests ("PRRs") for Taquerias and demanded that the police officers who had inspected Taquerias appear before him at the next City of Miami Commission Hearing on February 14, 2019, to explain why they had not issued citations. He also requested the attendance of other City employees to explain why no code violations or other citations had been issued to Taquerias.

67.     In the midst of these retaliatory acts, Fuller and Pinilla were forced to pursue litigation. They initiated a federal lawsuit naming Carollo and the City as defendants in October 2018. In June 2019, however, the court dismissed Fuller and Pinilla's claims against the City on the grounds that, although Fuller and Pinilla might establish a "custom of indifference" necessary to vitiate the City's sovereign immunity based on misconduct "spann[ing] a period of three years," they could not do so based on "allege[d] misconduct" in their case, because it had merely occurred "over the span of ten months." *Fuller I*, DE 99 at 24 (R&R); *accord id.*, DE 118 (order adopting R&R). The court directed any amended complaint to be filed within two weeks of its dismissal order, precluding any amendment as to the City that would not be futile under the

rationale stated in that order. *Id.*, DE 118. Accordingly, Fuller and Pinilla were only permitted to proceed on their claims against Carollo.

### THE 2019 VALENTINE'S DAY MASSACRE

68.     On Thursday, February 14, 2019, in what Carollo himself admitted was referred to as the "Valentine's Day Massacre," Carollo rampantly defamed Fuller and Pinilla and various City employees, calling for the Commission to pass a resolution asking the Governor to appoint a special prosecutor to criminally investigate City employees that did not cite Plaintiffs' properties with violations.

69.     Both then-City Manager Emilio Gonzalez and then-Chief of Police Jorge Colina stood before the Commission and told Carollo that they would not bring their employees to be publicly ridiculed by Carollo as part of Carollo's efforts to intimidate the employees into targeting Plaintiffs.

70.     Although the Commission rejected Carollo's call for criminal prosecution, it passed a resolution establishing a task force involving the Code Compliance, Fire, Police, and Building Departments, to be headed not by the City Manager, but by City Attorney Mendez, aimed at investigating all aspects of Plaintiffs' properties.

71.     Resolution [4-1] stated: "A resolution of the Miami City Commission Directing the City Attorney to Research Properties Described at the February 14, 2019, City Commission Meeting During Discussion item 'D3.1 – Code Enforcement' regarding violations relating to no certificate of use, certificate of use obtained under false pretenses and/or properties with violations that pose life-safety issues, and initiate injunctive proceedings against said properties until the properties are brought into compliance."

72.     The only properties described at the February 14, 2019, Commission Meeting were properties related to Fuller and Pinilla, leading Carollo himself to opine that Resolution [4.1] reflected official City policy:

> Q. At this point, Commissioner Carollo, this become city policy, correct?
>
> A. What becomes city policy?
>
> Q. This resolution.
> …
> A.  Any resolution that is passed by the commission is city policy.

73.     Nevertheless, many of the City's senior staff objected to this official policy of targeting businesses related to Fuller and Pinilla, and were initially successful in their efforts to resist the implementation of such an unlawful official City policy.

74.     Thus, despite his efforts, Carollo's unconstitutional harassment remained inconsistent with official City policies. For example, as the Director of Code Compliance and the City Manager at the time stated, virtually all of the aging buildings in Little Havana technically suffered from code violations, but the official City policy was: (a) not to invade people's properties seeking to harm them; and (b) if a code violation came to light, to assist the property owners in coming into compliance.

75.     Carollo, however, sought to reverse this City policy for Fuller and Pinilla based on their disfavored political expression. Over time, Carollo eventually succeeded in causing most of the City's senior staff who objected to Carollo's retaliation campaign and opposed his efforts to create an official City policy of First Amendment retaliation to be forced out of their jobs. And, in their places, Carollo managed to install other less-qualified employees who were more willing to bend to his demands. As City Manager Gonzalez wrote in December 2019, and later testified to in

court, Carollo "was trying to terminate [him] because [he] would not weaponize city government against Mr. Fuller."

76.     In short, City Manager Gonzalez (who no longer works for the City) summarized in his testimony under oath in court: "There's just no way that this is right.  [W]e're being asked to look at these properties . . . with the intention of essentially finding a way to shut them down and it's wrong . . . . We need to run a city. **We don't need to ruin a business** and my staff was adamant that this was going way, way too far."

77.     Likewise, Chief of Police Colina (who no longer works for the City) sent a letter to the City Manager regarding Carollo's unlawful targeting of Plaintiffs:

> [T]he item on the agenda was a discussion item, however, the main focus of the discussion was aimed at one particular business owner in the city. The resolution that the city attorney prepared pertains to 'properties describe[d] at the 2/14/2019 city commission meeting.'  However, the addresses forwarded in her email targets the particular business owner [i.e., Plaintiff Fuller] which gives the impression that the city is selectively targeting his business for new investigations.  **The concern is that this request, through the city attorney, may amount to an <u>unsanctioned and unlawful exercise of powers</u> beyond the limits of [Carollo's] legislative power <u>as a city commissioner to intentionally cause harm to a business owner</u>.  As such my departments actions under the resolution may be in violation of the code of ethics ordinance**.
> **Furthermore this is selective enforcement against the business owner's properties using city ordinance.**

78.     In addition, Deputy City Manager Joe Napoli (who no longer works for the City) sent the City Manager an email stating: "I am concerned that what the City Attorney is directing our staff to do is beyond what was directed by the Commission and can be interpreted as targeting businesses."

79.     Similarly, Assistant City Manager Zerry Ihekwaba (who no longer works for the City), echoed Napoli in another email: "We ought to be enforcing the Code citywide and not just targets," he wrote.

80.     Even City of Miami Mayor Francis Suarez stated Carollo was "selectively enforcing or weaponizing code enforcement against particular property owners."

81.     In all events, by February 2019, through the operation of Resolution [4.1], City Attorney Mendez—rather than the City Manager—had been appointed in violation of the City Charter to lead the joint task force in accordance with Carollo's wishes.

82.     And, on February 20, 2019, the City Attorney exercised her new role by creating her own list of properties related to Fuller and Pinilla.

83.     Also in February 2019, Carollo unleashed a flurry of new public records requests for extensive City records on the properties associated with Fuller and Pinilla (and no other property owner), and then forced his Chief of Staff, Blom, to devote the entire weekend of April 19, 2019, to flyspecking these records.

84.     Within two months, like other senior staff who objected to Carollo's misconduct, Blom (who no longer works for the City) submitted his resignation letter, protesting that he had been ordered to examine "various applications, permits and licenses associated with [Plaintiffs] over the weekend … I'm not comfortable doing this type of research for a variety of reasons but find I am being assigned more and more of this type of work focusing on this one individual [Fuller]."

85.     Carollo's directives were intended to identify any possible issues—including possible code violations on the properties that had resulted from prior owners, or even from just the passage of time and the changes in the City Code—that could be selectively enforced against Fuller and Pinilla to cause them harm in retaliation for exercising their First Amendment rights.

### IN 2020, THE NEW CITY MANAGER LEADS THE CHARGE IN CHANGING CITY POLICIES TO TARGET PLAINTIFFS FOR CAROLLO

86.    By February 2020, Carollo's two-year effort to transform his retaliation campaign into an official City policy finally began to take hold. Because this Court's Order requires the unnatural separation of necessarily intertwined allegations, Plaintiffs provide the following summary overview to provide necessary context to the concerted action of similarly-situated Defendants who worked together to target similarly-situated Plaintiffs based on their close affiliation with one another, as alleged in more detail in the individual counts below.

**A.    City Officials Lay the Groundwork to Implement Retaliatory Policies and Customs**

87.    In February of 2020, the new City Manager (Noriega) immediately met with Carollo and City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla without leaving any paper trail.

88.    On May 27, 2020—the City Manager (Noriega), Building Director (Marrero), and "almost the entire City Attorney Office" met to "talk[ ] about Fuller" and Pinilla.

89.    As a result of those meetings, the City Manager instructed the employees to "revise and **update our policies to be more stringent** when it comes to work without permit, clearly define what are unsafe conditions, **and shut down** all structures that don't comply[.]"

90.    That day, the Chief of Unsafe Structures (Diaz) had a conversation with the Building Director (Marrero) concerning Plaintiffs.

91.    The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

92.    On the Chief of Unsafe Structure's list were only property owners related to Fuller and Pinilla, including:

        a.    Havana Bungalows – noted as having no unsafe structures;

    b.      Futurama – noted as payment pending;

    c.      Tower Hotel – noted as being remodeled under permit;

    d.      Calle Ocho – noted as no unsafe violations and property remaining secure;

    e.      LHAB – noted as having no unsafe violations;

    f.      LHAB Too – noted as having work that has been stopped;

    g.      Gran Fiesta – noted as having no unsafe violations; and

    h.      Beatstik –noted as having permits being processed.

93.     The goal of the May 27, 2020, meeting – and of the lists of Plaintiffs' properties that were circulated on a weekly basis thereafter – was to create a framework for crafting City ordinances and changing internal City policies to cause significant economic harm to Fuller, Pinilla, and their associated businesses and properties. And the reason for doing so was to shut down and discourage others from conducting business with Fuller, Pinilla, and their associated businesses in order to punish them for engaging in protected political activity, and to chill similar protected political activity.

**B.**     **City Officials Create and Selectively Enforce Retaliatory Ordinances and Policies**

94.     Over the course of the summer of 2020, when the rest of the City was dealing with COVID, Defendants (including Carollo, Noriega, Mendez, Marrero, Diaz and Dooley), were conspiring to create City ordinances aimed solely at targeting Fuller, Pinilla, and their businesses.

95.     For example, on October 22, 2020, Carollo sponsored and the City passed Ordinance 13936, to allow for revocation of the a Business's Certificate of Use ("CU") at any building with an Unsafe Structure Violation.

96.     Despite its nomenclature, an Unsafe Structure Violation does not necessarily indicate that a structure is in fact "unsafe," but rather can be imposed arbitrarily by the Building

Department or Unsafe Structures Department for reasons that do not implicate any genuine safety concerns. Essentially an unsafe structure violation is the same as a "building violation" and may be issued for something as simple as changing a toilet or light fixture without a permit.

97.     On October 22, 2020, the very same day Ordinance 13936 was passed, the City Manager (Noriega), City Attorney (Mendez) and Building Director (Marrero) coordinated to impose a so-called Unsafe Structure Violation on LHAB's property to revoke the Certificate of Use for the business operating on the property "before noon[.]"

98.     The City Manager instructed staff to issue the violation and revoke the CU before any audit was conducted or justification was provided; and to immediately act without attempting to work with LHAB to remain open.

99.     On August 18, 2021, Ordinance 13936 was used to revoke the CU of El Shopping's Parking Garage because of the property's design—which engineers confirmed had absolutely no effect on the building's structural integrity. And this revocation snowballed into revocation of every business in the adjacent building simply because "there was not enough parking" for every tenant.

100.    In September of 2021, Ordinance 13936 was used to revoke the CU of the business at Gran Fiesta—not because of a safety violation—but because of a technicality that the second, outside staircase was too close to the property line, which despite Gran Fiesta's diligent work with the City for the year prior on other issues, the City never raised it as an issue until using it to shut down the property.

101.    Ordinance 13936 was also used to justify the non-issuance of CUs for other properties related to Fuller and Pinilla, including Piedra Villas and Beatstik.

102.    This process was replicated through the use of other ordinances, including Ordinance 14057, which was enacted on March 10, 2022, and allowed Defendants to target Plaintiffs and expose them to direct harassment by Carollo by forcing property owners to appear before the City Commission to mitigate fines; and Ordinance 14118, which was enacted on October 27, 2022, to enable the Defendants (namely, Noriega, Mendez, and Dooley) to complete their plan to demolish buildings with historic designations that are owned by or associated with Plaintiffs (including Piedra Villas, Beatstik, and Tower Hotel).

103.    In addition to targeting Plaintiffs through discriminatory ordinances, the City and its officials and employees also updated their internal policies to facilitate the unconstitutional retaliation campaign through selective enforcement against Fuller, Pinilla, and their businesses.

104.    For example, the meetings among the Defendants to target Plaintiffs which commenced with the May 27, 2020 meeting between Noriega, Carollo, and Mendez generated a reversal of existing City policy with respect to code violations. Specifically, given the age of the buildings in Little Havana, both City Managers and Directors of Code Compliance explained that virtually all structures could be cited with technical violations. Accordingly, City policy was to not seek out code violations and not to harass new owners of buildings for existing code violations, but rather to work with property owners to bring properties into compliance—by an agreement coined a "Compliance Agreement."

105.    Previously, either a Building Department Official or the Unsafe Structure Panel could create a Compliance Agreement and extend the deadlines of the Agreements. But, in February 2022, the City changed this policy to more effectively target Plaintiffs by limiting the discretion of City employees who were not involved in the targeting of Plaintiffs to negotiate these

agreements, and instead providing that only the Unsafe Structure Panel would be permitted to enter these agreements.

106.    Previously, City policy dictated that the "deadlines" in Compliance Agreements were flexible and routinely subject to change so long as the property owner was making progress and actively communicating with the City on their progress. But, as a result of changed policies, Defendants (including the City, Noriega, Mendez, and Dooley), collapsed prior Compliance Agreements relating to Plaintiffs (including Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, and LHAB TOO); created arbitrary and infeasible compliance deadlines; and prohibited the leniency and deadline extensions that Building Officials had routinely afforded.

107.    In a departure from all past practice, Defendants not only immediately began threatening to demolish properties associated with Plaintiffs—including properties with historic designations—but they also actively searched for new violations and intentionally attempted to disrupt their ability to come into compliance, including by arbitrarily requiring Plaintiffs to pull an obscure permit; or wasting Plaintiffs' time and resources by insisting on changes only after Plaintiffs performed substantial work aligned with prior permits and agreements.

108.    Showcasing the selective nature of Defendants' enforcement actions, Plaintiff Piedra Villas challenged the City's demolition notice alongside similarly situated properties that are not affiliated with Fuller or Pinilla. Every property owner who challenged the demolition received a path to avoid demolition. That is, every property other than other than Piedra Villas, which was singled out because of its relationship with Fuller and Pinilla, and the property remains under threat of demolition despite its historic designation.

C.    **City Officials Pervert Municipal Operations for Retaliatory Purposes**

109.   The unconstitutional retaliation campaign resulted in a realignment of existing separation of powers, resulting in unofficial customs in which Carollo effectively ruled the City, and a restructuring of the historical operation of the City Charter, the City Manager's Office, the City Attorney's Office, the Building Department, the Zoning Department, the Code Enforcement Board, the Fire Department, and even the activities of ordinary City personnel.

110.   For example, **the City of Miami Charter** is the municipal Constitution, which delineates the powers vested in the various arms of city government including the Mayor, City Manager, and the Commissioners. Section 4(g)(6) gives the Mayor the power to appoint the City Manager and Section 15 of the Charter establishes that the City Manager shall be the head of the administrative branch of the city government.

111.   Section 4(d) of the Charter delineates the division of power between the Mayor, City Manager, and Commissioners as follows:

> Except for the purpose of inquiry and as may be necessary as provided in section 14, the mayor, the city commission, any committees and members thereof **shall deal with the administrative service solely through the city manager, and neither the mayor nor the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately**.

> Any such dictation, prevention, orders or other interference or violation of this section on the part of the mayor or a member of the city commission or committees shall be deemed to be **violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office.** Any willful violation of the provisions to this section by the mayor or any city commissioner shall be **grounds for his or her removal from office by an action brought in the Circuit Court by the state attorney of this county**.

112.    Thus, the Charter makes clear that neither the Mayor nor the Commissioners can give direct orders to any department that is subordinate to the City Manager. Instead, they are required to direct all orders to the City Manager who then has the authority to direct the various departments of the City to take action.

113.    Carollo balked at this requirement, issuing orders himself and installing City Officials aligned with his desire of carrying out retaliation.

114.    Whereas prior City Managers (and other past senior City officials) resisted Carollo's efforts to encroach on their authority in violation of the City Charter, Noreiga (and other Carollo allies who were appointed to replace those who resisted his retaliation campaign) tolerated and embraced it as a matter of official City policy.

115.    **The City Manager's Office** is the city's executive branch, which "oversees various departments and functions, including 4,381 employees and The City's operating budget of $1.165 billion," became complicit in this retaliation under Defendant and co-conspirator Noriega.

116.    Noriega oversees the City's daily operations and ensures that the City's policies, directives, resolutions, and ordinances are implemented and enforced.

117.    Defendant Noriega is liable in his individual capacity because, among other things, he is one of the prime architects directly behind the City's political retaliation for Carollo despite knowing it was unconstitutional harassment. Noriega, the City's CEO, was out with a measuring tape measuring the distance between Gran Fiesta's property and religious institutions while Carollo hid on the corner. Noriega was stalking Plaintiffs' businesses at night with the City's police department, hiding around the corner, explaining to Acevedo they were targeting Plaintiffs. Noriega led the attack on Viernes Culturales. Noriega organized an all-day meeting during COVID in May 2020, with City Department Heads and the entire City Attorney's Office, for the sole

purpose of pursuing policies aimed at shutting down Plaintiffs' businesses. He then monitored the timing of those efforts and gave the final orders as to when the City was to act to shut down Plaintiffs' properties.

118. He then lectured the City Staff that, when they witnessed wrongdoing by Commissioner Carollo, they should "Be a Goldfish" – meaning they should have a 10 second memory – and thereby be the happiest animal on earth. He even bought them all t-shirts that said, "Be a Goldfish."

119. **The Office of the City Attorney** "provides legal advice and serves as counsel" to the City. But despite previously being "recognized for their excellent knowledge in the area of local government . . . and ethics . . . [with] unparalleled opportunities to take a leadership role in promoting honesty and integrity in the City[,]" City Attorney personnel took on an unparalleled leadership role in Carollo's retaliation against Plaintiffs under the direction of City Attorney Mendez and Assistant City Attorney Dooley.

120. City Attorney Mendez, as a Final Policy Maker, under the guise of attorney-client privilege, directly developed the City codes, ordinances, resolutions, tasks forces, and policies aimed at accomplishing Carollo's goal of bankrupting Fuller, Pinilla, and their business partners; advised City personnel to conceal their wrongdoing from Florida's Sunshine laws by not reducing anything to writing; overruled any director of any City department that ruled in favor of Plaintiffs; and has spent over $15 million in City and taxpayer money for legal fees seeking to bankrupt Plaintiffs—including most recently, by authorizing the filing of a frivolous civil RICO claim against Plaintiffs at 11:54 PM on the very night the jury awarded Plaintiffs an award of $63.5 million based upon Carollo and the City's targeting of them. Mendez, as an attorney, participated knowing that her acts and all Defendants acts constituted unconstitutional retaliation.

121.    Assistant City Attorney Dooley was the official in charge of assisting the Building Department and City Manager after the May 27, 2020, meeting to target properties and owners related to Fuller and Pinilla; she has also personally appeared before the Code Enforcement Board to seek inordinate penalties against Fuller, Pinilla, and their interests; and spearheaded the demolition efforts of properties associated with Plaintiffs. Dooley, as an attorney, participated knowing that her acts and all Defendants acts constituted unconstitutional retaliation.

122.    **The City's Building Department**, established to "enforce[ ] codes and regulations . . . governing the construction, alteration, and maintenance of buildings and structures within the City of Miami," helped retaliate against property and owners related to Fuller and Pinilla under Director Marrero.

123.    Marrero, the Building Director for the City of Miami, directly helped Noriega, Mendez, and Dooley draft and revise City policies and ordinances in order to shut down Plaintiffs' business and, as a final policy maker, changed the City's policy regarding compliance agreement to prevent Plaintiffs from ever being able to comply with the City code, and applied that new policy in a discriminatory manner so that it mainly impacted Plaintiffs while sparing others. Marrero participated in the planning to create policies, which he knew would be used to selectively target Plaintiffs.

124.    Rene Diaz, the Chief of the Unsafe Structures department, directly worked with Marrero, Noriega, Dooley, Mendez, to update policies to target properties and property owners related to Fuller and Pinilla—even circulating his own list of such properties. Diaz knowingly issued wrongful unsafe structure violations to shut down Plaintiffs' business and was a key part of the plan to demolish Plaintiffs' properties, to destroy Plaintiffs' reputation, to send Plaintiffs into default on all bank loans, and to financially ruin Plaintiffs.

125.   **The City's Zoning Department**, which "provides policy guidance for the development of the City of Miami by interpreting and administering the Zoning Ordinance and other relevant governmental regulations" became complicit in this scheme—not only by providing policy guidance for development of policy against Plaintiffs but also by discriminately implementing these policies against Plaintiffs—under the direction of Daniel S. Goldberg.

126.   Defendant Daniel S. Goldberg, the Zoning Director for the City of Miami, worked to revoke the Certificate of Use of every tenant in El Shopping simply because there was not enough parking for each tenant; and then proceeded to bottleneck the tenant's ability to seek reprieve by requiring them to meet with him one by one.

127.   **The City Code Enforcement Board**, a group created to assist "to bring a Code violation into compliance" selectively targeted property owners related to Fuller and Pinilla through Board Member Yvonne Bayona.

128.   Defendant Yvonne Bayona was, at all relevant times, a member of the City of Miami Code Enforcement Board taking direction from Carollo and Ortiz to vote against Plaintiffs, and propose disproportionate, draconian action against Plaintiffs merely because of Carollo's vendetta.

129.   Further, Bayona sought to instruct other Board members to vote against Carollo's political enemies.

130.   **The City Fire Department**, a department typically honored and respected which "serves the community with the highest level of professionalism, customer service, and responsiveness[,]" became involved in Carollo's harassment campaign through Adrien Plasencia.

131.    Defendant Adrien Plasencia, the Assistant Fire Chief and City of Miami Fire Marshall, would send fire inspectors with the instruction to manufacture violations at Plaintiffs' properties.

132.    Specifically, Plasencia fabricated needs and requirements on LHAB—relying on plans which either never existed, or mysteriously disappeared; and on Piedra Villas—asserting a requirement which was not supported by Code.

133.    Other **City personnel**, including Defendant William Ortiz, in his individual capacity, is and at all relevant times was a key staffer of Joe Carollo, carrying out his political targeting of Plaintiffs. Among many other things, Ortiz would personally call the Code Enforcement Board members and directly demand that they a) vote against any request made by Plaintiffs, and b) apply the maximum penalty for maximum amount of harm to Plaintiffs.

134.    Former Code Board Members stated that Ortiz's instructions intimidated them into imposing harsh penalties and treating businesses related to Fuller and Pinilla differently.

## FULLER AND PINILLA'S FIRST AMENDMENT RIGHTS

135.    The retaliatory acts that are the subject of this lawsuit stem from a variety of protected political activity that Fuller and Pinilla expressed on their own behalf and on behalf of the businesses and properties associated with them, including: a) Plaintiffs' hosting of rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) Carollo and other Defendants' false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) Carollo and other Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) Plaintiffs' filing of an ethics complaint against Carollo, e) Plaintiffs' filing of other lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo,

f) Plaintiffs' hosting of a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) Plaintiffs' promotion of African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) Plaintiffs' vocal support of a different vision for Calle Ocho and Little Havana that threatened the political platform favored by Carollo and the other Defendants in this action.

136.     The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

137.     The First Amendment rights to freedom of speech and association protects not only the affirmative rights to free speech and association, but also provide for the right to be free from retaliation perpetrated by the government upon the exercise of that right.

138.     Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights.  The Act provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ***.

42 U.S.C. § 1983 (2012).

139.     The aim of Section 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

140.     The United States Constitution's First Amendment guarantee to free speech and free association applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

141.     But, as Police Chief Art Acevedo testified at trial, the Police Chief who would succeed him, Manny Morales, along with City Manager Noriega, "talked very openly about Mr. Fuller . . . very openly talked about the disdain [Carollo] had for Bill Fuller."

142.     Police Chief Acevedo further testified that the City itself was targeting  "Mr. Fuller and any Fuller related business" in "retaliation for Mr. Fuller's simple exercising his Constitutional rights to have a fundraiser. It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller."

143.     Acevedo further testified that he would "be very busy and my department will be very busy dealing with Mr. Carollo and his obsession with Mr. Fuller, and it will be basically required to inspect and to be going into his businesses on a regular basis and be ready for that."

144.     Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted.

145.     In short, all of the Plaintiffs were targeted based on their affiliation with Fuller and Pinilla and their association with Fuller and Pinilla's political activities that contravened Defendants' political objectives.

146.     Although Carollo began the retaliation campaign independently, it became widely known throughout the City—including the officials and employees employed by the City—that the retaliation campaign was eventually adopted by top City officials, including Noriega, Mendez, and Dooley. Accordingly, all of the Defendants had actual knowledge that their actions facilitated

a vicious and malicious scheme to destroy Plaintiffs and drive all of their businesses and tenants into bankruptcy as a form of First Amendment retaliation.

147.    Several of Carollo's own former staffers, including Steven Miro, Richard Blom, Tanja Quintana, as well as by the former City Manager, two former Police Chiefs, and the current Mayor, explained and even testified under oath that Carollo's misconduct—which was eventually expanded and adopted as an official City policy—was intended to punish and chill the exercise of First Amendment activity of Fuller and Pinilla.

148.    Not only did the City know about, and fail to stop, Carollo's retaliation, it executed it on behalf of Carollo from February 2020 onward.

149.    Defendants' actions would "chill a person of ordinary firmness" from continuing to engage in the protected activity.

150.    As a result of Defendants' retaliation, Plaintiffs are reluctant to participate in the political process by supporting candidates for office.

151.    In addition, as a result of Defendants' retaliation, Plaintiffs have suffered out of pocket losses and other monetary harms associated with disruption to their various businesses in an amount to be proven at trial.

152.    A single decision by an official policymaker can establish the existence of an unconstitutional municipal policy.

153.    Here, there were three individuals targeting Plaintiffs with final policymaking authority: Carollo, Noriega, and Mendez.

154.    The City Manager, Art Noriega, had final policymaking authority with respect to the actions he took because, while he was acting at the direction of Carollo, his actions were completely insulated from review by the City Commission.

155.    The same is true of City Attorney Mendez. Her actions in targeting Plaintiffs were completely insulated from review by the City Commission.

156.    Carollo could not be reviewed or controlled by anyone, nor were his office meetings and phone calls with Noriega and Mendez reviewed by the Commission or even traceable by the Commission, as Carollo, Noriega and Mendez made sure not to leave any email correspondence or other evidence.

157.    In total, Plaintiffs suffered economic damages in excess of $107,115,655.00 because of Defendants' retaliation and conspiracy.

<div align="center">

**SCOPE OF DEFENDANTS' LIABILITY**

</div>

158.    Defendants were made aware that Carollo was targeting Plaintiffs for political payback. For instance, the City Manager at the time, as well as the Director of Code Compliance, told Plaintiffs that Code officers were being sent to their properties based on their election activities and support for Carollo's election opponent.

159.    Carollo himself made his targeting of Plaintiffs clear through his prior conduct, which was known to the other Defendants. For instance, in 2018, Carollo repeatedly appeared on radio shows to maliciously defame Plaintiffs by falsely stating they were criminals with ties to corrupt South American politicians, mafiosos, and leasing to pimps and prostitutes, among other falsehoods. And, during the Valentine's Day Massacre in February 2019, the City's most senior policy makers – including Mayor Suarez, City Manager Gonzalez, and Police Chief Colina – publicly stated Carollo was targeting Plaintiffs and seeking to close their businesses as political payback. Likewise, in 2018 and 2019, Carollo threatened City employees that they would be fired, demoted, or chased out of office if they opposed his

political vendetta (like Diez, Gonzalez and others), but that they would be rewarded and promoted if they facilitated his political vendetta (like Noriega and Marrero).

160.    As Police Chief Art Acevedo testified, City Manager Noriega "talked very openly about Mr. Fuller" and the fact that the City itself was targeting "Mr. Fuller and any Fuller related business at the direction of [Carollo's] retaliation for Mr. Fuller's simple exercising his Constitutional rights to have a fundraiser." Chief Acevedo stated: "It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolutely disdain for Mr. Fuller." Acevedo further testified that this "was openly known throughout the city, I mean, down in the park people talk about it, the community talks about it, it was in wide open knowledge in Miami that he was being targeted."

161.    Thus, the individual Defendants are liable because they knew they were using their positions as City personnel to target Plaintiffs on Carollo's behalf to retaliate against them for their protected political activity and to chill their political opposition of Carollo, in violation of their First Amendment rights.

162.    Defendants worked together to directly effectuate the harassment campaign against Plaintiffs.

163.    Defendants the City of Miami, Carollo, Noriega, Mendez, Dooley, Marrero, and Diaz worked to craft policies designed to be selectively enforced against Plaintiffs, proceeded to selectively enforce those policies against Plaintiffs, worked extensively to cause the maximum amount of disruption for Plaintiffs, and worked to corrupt other City employees and personnel against Plaintiffs.

164.    All Defendants worked to target and attack Plaintiffs solely because of Plaintiffs' association and relation to Plaintiffs Fuller and Pinilla, who were Joe Carollo's enemies.

165.    All Defendants would have, and did, act differently to persons, entities, and properties not related to Plaintiffs Fuller and Pinilla.

**COUNT 1**
**PLAINTIFF LHAB'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

166.    LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

167.    On one hand, Fuller and Plaintiff engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

168.    On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8.

169.    Beginning in 2017, Carollo began circulating lists of properties and property owners associated with Fuller and Pinilla, including LHAB.

170.    And, beginning in 2018, Carollo began harassing LHAB's valet operations, photographing LHAB's parking lot, asserting he was "the law" and that he found the valet's relationship with Fuller and Pinilla unacceptable.

171.    Beginning in 2019, Carollo directed the Code Department to inspect LHAB and issue baseless violations.

172.    On February 14, 2019—under Carollo's pressure and with the help of the City Attorney (Mendez)—the City created a multi-department task force under Mendez to target properties and property owners related to Fuller and Pinilla.

173.    Thereafter, on or about March 27, 2019, LHAB was cited for failing to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)."

174.   Despite disagreeing with the merits underlying the supposed violation, LHAB nevertheless worked diligently with the City to develop and submit a plan to cure the purported "issues."

175.   LHAB's only goal was to work with the City to alleviate all of its concerns and keep Ball & Chain's doors open, so it filed for a new building permit on April 15, 2019.

176.   In May of 2019, LHAB hired Ortus to assist in curing the four alleged issues regarding the construction work performed and assisting with the new permit process.

177.   Pursuant to Florida Statute § 553.791, Ortus offers services to the public to "stand in" for local building and code enforcement departments. Ortus reviews plans and applications, and other documents, and certifies that those documents comply with the applicable codes, rules, and regulations of the municipality. At all times the private provider is acting as an agent of and extension of the municipality in reviewing the documents for approval.

178.   Ortus then submits the documents and their approval directly to the City, which issues the appropriate permits, etc., based upon Ortus'—and only Ortus'—representations.

179.   LHAB had worked with the City and Ortus for almost a full year to finalize a specific scope of work and the building permit necessary to alleviate the City's "concerns" of a baseless, contested issue.

180.   In February of 2020, Carollo met with the City Manager (Noriega) and City Attorney (Mendez) dozens of times to discuss Fuller.

181.   Ortus' plans were approved on March 11, 2020. Work was then done by licensed professionals according to the approved plans.

182.   All the while, throughout 2020, Carollo continued to direct City resources to harass LHAB's property to upend its business. For instance:

A.      on January 7, 2020, City Police entered LHAB's property but found no violation;

B.      on January 8, 2020, City Code inspected the property but found no violation;

C.      on March 7, 2020, the City Fire Department inspected but found no violation;

D.      on April 21, 2020, City Police inspected but found no violation; and

E.      on May 16, 2020, City Police again inspected but found no violation.

183.    On or about May 27, 2020, the City Manager met with the City Building Director and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla and to update policies to shut properties down.

184.    The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners associated with Fuller and Pinilla.

185.    LHAB was on this list and listed as having "no unsafe violations[.]"

186.    Throughout which, LHAB continued to work in good faith to address any of the City's concerns.

187.    From around June 10, 2020, to August 28, 2020, Ortus, on behalf of LHAB, filed all required affidavits (i.e. plumbing, electric, storm shutters) mandated by the City and Section 553.791. LHAB even employed counsel to work with the City to have an all-department inspection of the property to ensure compliance with all applicable regulations.

188.    Based on these submissions and after a thorough walkthrough with the appropriate City departments, on or about September 11, 2020, the City's Building Department issued Ball & Chain its CO.

189.    Upon learning that a CO had to be issued under the Code, and after the May 27, 2020, meeting to update ordinances to target Fuller and Pinilla, Carollo sponsored Ordinances to shut business at LHAB down.

190.    Ordinance 13936, which was sponsored solely by Carollo was passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

191.    The very same day Ordinance 13936 was passed, it was used to revoke the Certificate of Use ("CU") at LHAB.

192.    Carollo also architected a second ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020.

193.    This would only apply to LHAB, since its property was the only restaurant that would have its CU revoked that day.

194.    And, that day on October 22, 2020, LHAB received a letter from the City Building Department informing LHAB that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO was allegedly "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

195.    And, because the CO was suspended, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

196.    LHAB inquired further, and it is apparent that its CO and CU were revoked prior to any "review" and justification.

197.     Post hoc, to justify the revocation, the City conducted an unprecedented audit of Ortus, even though it had worked with Ortus for more than a year in the process, and had reviewed its plans and already issued the CO according to those plans.

198.     Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing LHAB its new CO and the CU for the business at LHAB.

199.     And under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

200.     Moreover, this audit could not justify the revocation.

201.     *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[5] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspended Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only

---

[5] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order, which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements).

202.    Importantly, the private provider did not submit any documents related to fire safety.

203.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending LHAB's CO and revoking the business operating at LHAB's CU.

204.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent

such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

205.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – **not the CU**. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

206.    During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

207.    The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

208.    Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting LHAB down.

209.    In the end, the City relied on plans which either "mysteriously disappeared" or never existed, to state that LHAB had a fire safety issue and needed a sprinkler system installed.

210.    However, the Zoning Administrator who revoked LHAB's CU testified that the only CU he had ever revoked was LHAB's and that **no imminent life safety issue** existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was

the **first and only time** he was ever informed by Building, or any other department at the City, that a CO was being suspended and the **first and only time** he ever revoked a CU.

211.    LHAB would not have been selectively targeted by the City without Carollo's insistence.

212.    Carollo's attack on LHAB, mobilizing the City government and resources against LHAB's business and crafting City ordinances to target LHAB caused LHAB to suffer monetary damages in excess of $4.36 million.

213.    LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

214.    LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 2
## PLAINTIFF LHAB'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

215.    LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

216.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

217.     On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

218.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

219.     Upon taking office in February of 2020, Noriega met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla but left no paper trail.

220.     When Governor DeSantis was set to pass Executive Order 20-11 Section 3(b) on May 27, 2020, to open restaurants, LHAB spent over $30,000 on food products, labor costs and safety precaution in preparation.

221.     But at 9 pm on May 26, 2020, Noriega enacted Amendment No. 1 to Order 20-11 which specifically excluded a "tavern" from being able to open, with the sole purpose of signaling out LHAB's property.

222.     On May 27, 2020, Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Pinilla and to update policies and ordinances to target them.

223.     Should any ordinances needed to be updated, the meeting-goers were instructed to "circle back" with the Assistant City Attorney (Dooley).

224.     The very next day on May 28, the Chief of Unsafe Structures (Diaz) sent the Building Director a list of properties and property owners associated with Fuller and Pinilla.

225.     LHAB was on this list and noted as having "no unsafe violations[.]"

226.     Noriega was an architect in the planning, drafting, and enactment of Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to

provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

227.    The very same day Ordinance 13936 was passed it was used to revoke the Certificate of Use ("CU") at LHAB.

228.    Specifically, at 8 am on October 22, 2020, Noriega emailed the City Attorney (Mendez) and Building Director (Marrero), "let's get this done today before noon today[.]"

229.    What Noriega wanted to get done was to revoke LHAB's CU so the City can pass a second Ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020, which would only apply to LHAB, since its property was the only restaurant that would have its CU revoked that day.

230.    Noriega instructed to issue the violation and revoke the CU before any audit was conducted or justification was provided; and to immediately act without attempting to work with LHAB to remain open.

231.    LHAB received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO allegedly was "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

232.    And, because the CO was suspended, the City informed Ball & Chain that its CU "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

233.    LHAB inquired further, and it became apparent that its CO and CU were revoked prior to such "review" and justification.

234.    Post hoc, to justify the revocation, the City conducted an unprecedented audit of Ortus, even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

235.    Moreover, this audit could not justify the revocation.

236.    *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[6] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the

---

[6] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements).

237.    Importantly, the private provider did not submit any documents related to fire safety.

238.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

239.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes.

Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

240.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – **not the CU**. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

241.    During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most

prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

242.    The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

243.    Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting LHAB down.

244.    In the end, relying on plans which either "mysteriously disappeared," or never existed, LHAB's property was shut down because of a fire safety issue, stating the property needed a sprinkler system installed.

245.    However, the Zoning Administrator who revoked LHAB's CU testified that the only CU he had ever revoked was LHAB's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

246.     In all, Noriega's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

247.     LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

248.     Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

249.     LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 3**
**PLAINTIFF LHAB 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

250.     LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

251.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a

politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

252.    On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

253.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

254. Mendez abused her position as City Attorney to knowingly and intentionally retaliate against LHAB for Fuller and Pinilla's political support of Carollo's political opponent, Alfie Leon.

255. On February 14, 2019, Mendez directly worked with Carollo to create a multi-department task force to target properties related to Fuller and Pinilla.

256. In February 2020, Mendez met with the City Manager (Noriega) and Carollo dozens of times concerning Fuller and Pinilla.

257. And on or about May 27, 2020—almost the "entire City Attorney" Office met with City Manager Noriega and Building Director Asael Marrero to "talk[ ] about Bill Fuller" and Pinilla and to update policies and ordinances to target property and property owners related to them.

258. And if any ordinances needed to be updated, the meeting-goers were instructed to "circle back" with the Assistant City Attorney (Dooley).

259. The very next day, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners associated with Fuller and Pinilla.

260. LHAB was on this list—and listed as "no unsafe violations[.]"

261. Mendez helped architect Ordinance 13936, which was solely sponsored by Carollo and ultimately passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

262. The very day Ordinance 13936 was passed, it was used to revoke the Certificate of Use ("CU") at LHAB.

263. Specifically, Mendez worked with City Manager (Noriega) and Building Director (Marrero) to make sure LHAB's CU was revoked on October 22, 2020, "before noon" so a second

ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020, would apply.

264.    This would only apply to LHAB, since its property was the only restaurant that would have its CU revoked that day.

265.    And, that day on October 22, Mendez, the Building Director and City Manager got it done. LHAB received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO allegedly was "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

266.    And, because the CO was suspended, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

267.    LHAB inquired further, and it became apparent that its CO and CU were revoked prior to such "review" and justification.

268.    Post hoc, to justify the revocation, the City conducted an unprecedented audit Ortus, even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

269.    This audit could not justify the revocation.

270. *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[7] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements).

271. Importantly, the private provider did not submit any documents related to fire safety.

---

[7] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

272.     Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

273.     *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

274.     *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – not the CU. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

275.     During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

276.    The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

277.    Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting LHAB's property down.

278.    In the end, relying on plans which either "mysteriously disappeared" or never existed, LHAB's property was shut down because of a fire safety issue, stating the property needed a sprinkler system installed.

279.    However, the Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was LHAB's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

280.    More egregious, LHAB could have stayed open despite the post hoc justification. When properties are instructed to install sprinkler systems, they are given the option to pay for a "fire watcher," which is essentially a fireman serving as an on-duty risk manager while the property renovates. However, Mendez denied this option to LHAB specifically because of its relationship with Fuller and Pinilla.

281.     In all, Mendez's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

282.     LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

283.     Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

284.     LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 4**
**PLAINTIFF LHAB'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

285.     LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

286.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a

politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

287.    On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

288.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

289.   On or about May 27, 2020, almost the "entire City Attorney" Office met with City Manager Noriega and Building Director Asael Marrero to "talk[ ] about Bill Fuller" and Pinilla and to update policies to shut properties down.

290.   And on May 27, 2020, those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances[.]"

291.   The very next day, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners associated with Fuller and Pinilla.

292.   LHAB was on this list—and listed as "no unsafe violations[.]"

293.   Yet Dooley was an architect of a multi-step plan to retaliate against LHAB, first through the enactment of Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

294.   The very same day Ordinance 13936 was passed it was used to revoke the Certificate of Use ("CU") at LHAB.

295.   Dooley then helped by helping to create a second ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020, which would only apply to Ball & Chain, since its property was the only restaurant that would have its CU revoked that day.

296.   And, that day on October 22, LHAB received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO allegedly was "provided based on incomplete, misleading, and/or

erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

297.     And, because the CO was suspended, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

298.     LHAB inquired further, and it became apparent that its CO and CU were revoked prior to such "review" and justification.

299.     Post hoc, to justify the revocation, the City conducted an unprecedented audit Ortus, even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

300.     This audit constituted another baseless and frivolous retaliatory attack for three reasons.

301.     *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[8] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely*

---

[8] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

*nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements).

302.    Importantly, the private provider did not submit any documents related to fire safety.

303.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

304.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section

19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

305.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's

CO – **not the CU**. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

306.    During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

307.    The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

308.    Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting the property down.

309.    In the end, relying on plans which either "mysteriously disappeared," or never existed, LHAB's property was shut down because of a fire safety issue, stating the property needed a sprinkler system installed.

310.    However, the Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was LHAB's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

311.    In all, Dooley's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

312.    LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

313.    Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

314.    LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 5
## PLAINTIFF LHAB'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT DIAZ

315.     LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

316.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

317.     On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of

Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

318.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

319.    Defendant Diaz, Chief of Unsafe Structures, abused his position to intentionally target properties and property owners related to Fuller and Pinilla.

320.    On or about May 27, 2020, Diaz had a conversation with Building Director Marrero—following Marrero's meeting with the City Manager (Noriega) and "almost the entire City Attorney Office[.]"

321.    The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners associated with Fuller and Pinilla.

322.    LHAB was on this list and listed as having "no unsafe violations[.]"

323.    Diaz was one of the architects involved in the creation and enforcement of Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use," and designed as a pretext to single out LHAB for harm.

324.    The very same day Ordinance 13936 was passed it was used to revoke the Certificate of Use ("CU") at LHAB.

325.    Diaz also helped architect a second ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020, which would only apply to Ball & Chain, since its property was the only restaurant that would have its CU revoked that day.

326.    And, that day on October 22, LHAB received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," the City was "hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO allegedly was "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

327.    Because the CO was suspended, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

328.    LHAB inquired further, and it became apparent that its CO and Ball & Chain's CU were revoked prior to such "review" and justification.

329.    Post hoc, to justify the revocation, the City conducted an unprecedented audit Ortus, even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

330.    This audit constituted another baseless and frivolous retaliatory attack for three reasons.

331.    *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[9] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the

---

[9] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

completion of the Improvements). Importantly, the private provider did not submit any documents related to fire safety.

332.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

333.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue.

Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

334.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – not the CU. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

335.    During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus, is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus

identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

336. The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

337. Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting the property down.

338. In the end, relying on plans which either "mysteriously disappeared" or never existed, LHAB's property was shut down because of a fire safety issue, stating the property needed a sprinkler system installed.

339. However, the Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was LHAB's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

340. In all, Diaz's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

341.    LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

342.    Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business.

343.    LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 6**</u>
<u>**PLAINTIFF LHAB'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT MARRERO**</u>

344.    LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

345.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed

against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

346.    On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

347.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

348.    Marrero, as the Building Director, abused his position to create and selectively enforce policies against properties and property owners related to Fuller and Pinilla.

349.     On May 27, 2020, Marrero wrote, "Just had a lengthy meeting with the manager [Noriega] and almost the entire City Attorney office plus Adele [Valencia] talking about Bill Fuller [and Martin Pinilla]. The Manager wants us to revise and update our policies to be more stringent when it comes to work without permit, clearly define what are unsafe conditions, and shut down all structures that don't comply. . . . I just had a conversation with Rene [Diaz] and asked him to stop by the office tomorrow."

350.     Marrero continued, "I would like for us to spend the day tomorrow brainstorming about these issues. We need to circle back with Rachel [Dooley] if we need to update any of our ordinances as well as I have a follow up meeting with the manager next week to provide an update on these issues."

351.     Of course, the following day, on May 28, 2020, the Chief of Unsafe Structures (Diaz) sent Marrero a list of properties and property owners associated with Fuller and Pinilla.

352.     LHAB was on this list—and listed as "no unsafe violations[.]"

353.     Marrero directly helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

354.     The very same day Ordinance 13936 was passed it was used to revoke the Certificate of Use ("CU") at LHAB.

355.     Specifically, Marrero worked directly with the City Manager (Noriega) and City Attorney (Mendez) to make sure Ball & Chain's CU was revoked on October 22, 2020 "before noon" so the second ordinance would apply to LHAB.

356.    Marrero also helped architect this second ordinance to ban outdoor music in any restaurants that did not have a CU as of October 22, 2020, which would only apply to LHAB, since its property was the only restaurant that would have its CU revoked that day.

357.    And, that day on October 22, Marrero—the Head of the Building Department—notified LHAB that based on the City's "review of permitting by private providers," the City was "hereby suspending [its] Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4" because the CO allegedly was "provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

358.    And, because the CO was suspended, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami[.]"

359.    LHAB inquired further, and it became apparent that its CO and CU were revoked prior to such "review" and justification.

360.    Post hoc, to justify the revocation, the City conducted an unprecedented audit Ortus, even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.

361.    This audit constituted another baseless and frivolous retaliatory attack for three reasons.

362.     *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[10] Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for LHAB's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)." Ortus' work had *absolutely nothing to do* with LHAB requirement for fire safety or the ADA. This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider. Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and in turn revoke its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues. Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO. The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements). Importantly, the private provider did not submit any documents related to fire safety.

---

[10] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

363.     Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code could not have emanated from the Ortus audit or scope of work. The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020. Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

364.     *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO. (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation." The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27. Either way, the City has violated its own processes. Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard. Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue. Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

365.     *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations. While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7). However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is. Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain. In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – not the CU. In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus. Thus, Ortus' application could have in no way ever affected Ball & Chain's CU. Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

366.     During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.

367.    The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

368.    Ortus was the private provider for hundreds of projects, and the City never audited any of their other projects. For all other private providers in the City, the City initiated an audit only after first having had cause—i.e., notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review. By contrast, the City audited Ortus/LHAB with no cause whatsoever, solely to justify shutting the property down.

369.    In the end, relying on plans which either "mysteriously disappeared" or never existed, LHAB's property was shut down because of a fire safety issue, stating the property needed a sprinkler system installed.

370.    However, the Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was LHAB's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and that a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU.

371.    In all, Marrero's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

372.    LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to

be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

373.     Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

374.     LHAB is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 7**
**PLAINTIFF LHAB'S 42 U.S.C § 1983 CLAIM**
**AGAINST DEFENDANT PLASENCIA**

375.     LHAB is an entity that owns the property occupied by three separate businesses, including the historic Ball & Chain nightclub, which is widely recognized as the crown jewel of Calle Ocho and the Little Havana neighborhood, after Fuller and his business partners rehabilitated to its former glory as a venue for African-American jazz legends, and now serves as the focal point of Defendants' political vendetta.

376.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, LHAB and its tenants like Ball & Chain, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Plasencia; b) causing Plasencia to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Plasencia's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an

ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Plasencia's political preferences.

377.     On the other hand, Plasencia knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against LHAB in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, LHAB suffered economic harm. *Id.* at 8

378.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Plasencia to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm LHAB.

379.     Plasencia abused his position as a Fire Marshall to fabricate issues on properties and for property owners related to Fuller and Pinilla. And Plasencia worked to deny LHAB any reprieve and mitigation of damages.

380.   For example, Plasencia is the official who made the determination to shut down LHAB because of the alleged fire safety issue, stating the property needed a sprinkler system installed.

381.   However, who determined this was necessary relied on plans which either "mysteriously disappeared" or never existed.

382.   Plasencia, with the City Attorney (Mendez), denied LHAB the use of a "fire watcher" because of LHAB's association with Fuller and Pinilla.

383.   When most property owners are instructed to install a sprinkler system, they are given the option to pay for a "fire watcher." A fire watcher is essentially a fireman that serve as an on-duty risk manager while the property owner renovates.

384.   Plasencia was aware of his role within a larger conspiracy among government officials to single out LHAB for disparate treatment based on its association with Fuller and Pinilla and their First Amendment activities, and knowingly treated LHAB differently than other similarly situated entities for the purpose of punishing and deterring Fuller, Pinilla and LHAB based on their protected First Amendment activities.

385.   In all, Plasencia's conduct contributed to LHAB suffering economic damages in excess of $4.36 million.

386.   LHAB is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

387.   Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's

Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

388.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 8**
**PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

389.     Gran Fiesta is another entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

390.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and

h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

391.    On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

392.    Based solely on its affiliation with Carollo's political enemies, Gran Fiesta appeared on "hit lists" created by and circulated among City officials like Carollo, and in turn targeted for constant unwarranted inspections and "walk-throughs," usually consisting of 10 or more armed officers wearing bulletproof vests, and multiple code enforcement raids, consisting of dozens of code enforcement, police, fire department officers and inspectors with Florida's Department of Alcohol Beverage and Tobacco ("ABT"). These raids were deliberately conducted on Friday and Saturday nights with the sole purpose of causing substantial business disruption and monetary harm to Plaintiff during peak business hours.

393.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

394.    Then on May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Pinilla and to update policies and ordinances to target them and properties and property owners related to them.

395.    The following day, on May 28, 2020—the Chief of Unsafe Structures (Diaz) sent the Building Director a list of properties and owners associated with Fuller and Pinilla.

396.    Gran Fiesta's property was on this list and noted as "no unsafe violations."

397.    Then on October 22, 2020, Carollo successfully sponsored the passage of Ordinance 13936, which was used to target properties related to Fuller and Pinilla—including Gran Fiesta.

398.    In April 2021, Carollo sought to revoke Taquerias' Outdoor Dining Warrant—which pursuant to Article 6.3 of Miami 21 allowed Taquerias to operate as an Alcohol Service.

399.    Carollo attempted to do so by claiming that Taquerias was allegedly located within 300 feet of an "religious" facility (Ministerio de Juan) in an effort to threaten Taquerias' Outdoor Dining Warrant, and placing it on hold.

400.    On Good Friday, April 2, 2021, Carollo and the City Manager (Noriega) were personally spotted measuring the distance between Taquerias and Ministerio de Juan, notwithstanding a) that there is no requirement for distance of separation, and b) that the City Commissioner is not tasked with conducting such measurements.

401.    Carollo's attempt to enforce this alleged policy showcases the selective enforcement of policies against Gran Fiesta.

402.    For example, Ministerio de Juan actually shares a wall with, and is in the same building as, a local liquor store "El Gato Tuerto," located at 476 SW 8th Street, which was not

singled out for such targeting despite being similarly situated to Taquerias for all relevant purposes, including the fact that the CU for Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store.

403.     Indeed, thirteen (13) other 4COP licensed establishments operating within 300 feet of a "religious facility" do not appear to have been the focus of the persistent enforcement efforts that the City imposed on Taquerias, allowing those establishments that sell and serve liquor to continue operating next to other "religious facilities," while revoked only Taquerias' liquor reservation on the arbitrary basis it needed to review its "compliance with the 300' distance separation from a Religious Facility."

404.     On April 3, 2021, the day after Carollo was seen personally investigating Taquerias, Police and Code raided Gran Fiesta.

405.     On March 24, 2021, when Gran Fiesta appeared before the Code Enforcement Board, Carollo instructed Code Enforcement Board Members to vote against his political enemies, despite later testifying that applying such pressure on independent officials would be absolutely wrong to do.

406.     Yet, Carollo's improper directive led to Code Enforcement Board Member Bayona to parrot his words and sway the entire Board against Gran Fiesta, stating "Carollo's enemy is here today and that we have to vote against them."

407.     On May 5, 2021, at Carollo's direction, officers again raided Gran Fiesta's property to drive away business on the Cinco De Mayo holiday.

408.     In fact, Taquerias was one of the only two Mexican restaurants raided in the City on Cinco De Mayo—and both of those restaurants were associated with Plaintiff Fuller.

409.    At Carollo's insistence, raids by Police, Fire, and Code Officers continued in June and August of 2021.

410.    And on September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

411.    Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing, with the exclusive exception being for entities associated with Plaintiff Fuller and Pinilla.

412.    And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

413.    And because of Ordinance 13936—which Carollo architected to harass other Fuller and Pinilla related properties—this alleged technicality resulted in the revocation of Taquerias' CU.

414.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

415.    In all, Defendant Carollo's attacks on Gran Fiesta have caused it to suffer economic damages in excess of $778,344.00.

416.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

417.    Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

418.    Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 9
## PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

419.    Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

420.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a

politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noreiga's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

421.    On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

422.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

423.    Noriega abused his position as City Manager to intentionally retaliate against Gran Fiesta for Fuller and Pinilla's support of Carollo's political opponent.

424.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

425.    Then on May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Pinilla and to update policies and ordinances to target them and properties and property owners related to them.

426.    Those updating ordinances were instructed to "circle back" with the assistant City Attorney, Rachel Dooley.

427.    The following day, on May 28, 2020—the Chief of Unsafe Structures (Diaz) sent the Building Director a list of properties and owners associated with Fuller and Pinilla.

428.    Gran Fiesta's property was on this list and noted as "no unsafe violations."

429.    On October 22, 2020, with Noriega's direct contribution, the City passed Ordinance 13936, which was sponsored by Carollo "to provide for the inclusion of building code violations as a reason for revocation of certificates of use," with the intention of selectively enforcing that ordinance against businesses associated with Fuller and Pinilla.

430.    Ordinance 13936 was used to selectively target properties and property owners related to Fuller and Pinilla.

431.    In April of 2021, Noriega sought to revoke Taquerias' Outdoor Dining Warrant— which pursuant to Article 6.3 of Miami 21 allowed Taquerias to operate as an Alcohol Service.

432.    Noriega attempted to do so by claiming Taquerias was allegedly within 300-feet of an alleged "religious" facility (Ministerio de Juan) Taquerias' pursuance of the Outdoor Dining Warrant was placed on hold.

433.    On Good Friday, April 2, 2021, Noriega and Carollo were personally spotted measuring the distance between Taquerias and Ministerio de Juan, notwithstanding a) that there is no requirement for distance of separation, and b) that the City Manager is not tasked with conducting such measurements.

434.    Noriega's attempt to enforce this policy showcases the selective enforcement of policies against Gran Fiesta, Ministerio de Juan actually shares a wall with and is in the same building as a local liquor store "El Gato Tuerto," located at 476 SW 8th Street.

435.    As with Taquerias, the CU for Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store. This is also the case for thirteen (13) other 4COP licensed establishments operating within 300 ft. of a "religious facility." In other words, the City had no issue in allowing a liquor store to operate next to other "religious facilities," but revoked Taquerias' liquor reservation on the arbitrary basis it needed to review its "compliance with the 300' distance separation from a Religious Facility."

436.    Noriega, as the City Manager, is responsible for the City Departments, including Police, Fire, and Code—which repeatedly raided Gran Fiesta's property to search the property with the goal of issuing violations. These raids, occurring throughout May, June, and August of 2021, caused substantial business disruption for Gran Fiesta.

437.    On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

438.    Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

439.    And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

440.    And because of Ordinance 13936—which Noriega helped architect to harass other Fuller and Pinilla related properties—this alleged technicality resulted in the revocation of Taquerias' CU.

441.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

442.    In all, Noriega's attacks have contributed to Gran Fiesta having suffered monetary damages in excess of $778,344.00.

443.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

444.     Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

445.     Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 10**
**PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

446.     Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign directed at Fuller, Pinilla, and the businesses affiliated with them.

447.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's

history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

448.    On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

449.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

450.    Mendez abused her position as City Attorney and intentionally retaliated against Gran Fiesta for Fuller and Pinilla political support of Carollo's political opponent, Alfie Leon.

451.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

452.     On May 27, 2020— "almost the entire City Attorney office" met with the City Manager (Noriega) and  the Building Director (Marrero) to "talk[ ] about Bill Fuller" and update policies and ordinances to shut properties down.

453.     Those updating ordinances were instructed to "circle back" with the assistant City Attorney (Dooley).

454.     The following day, on May 28, 2020—the Chief of Unsafe Structures (Diaz) sent the Building Director a list of properties and owners associated with Fuller and Pinilla.

455.     Gran Fiesta's property was on this list and noted as "no unsafe violations."

456.     Mendez helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

457.     Ordinance 13936 was used to specifically target properties and property owners related to Fuller and Pinilla, including Gran Fiesta.

458.     On or about May 6, 2021, a production company wanted to rent Taquerias for the cite of a music video. However, because fabricated violations, the City Attorneys' Office, under Mendez, in an unprecedented move, called the Event Director to have them refuse to issue a film permit to the production company, causing Plaintiff yet another lost business opportunity, profit, and goodwill.

459.     Mendez had no legal basis to deny a film permit due to outstanding violations, much less fabricated violations, and particularly given that Taquerias was working with the City to correct any shortcomings and ensure its compliance with all City requirements.

460.     On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

461.     Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

462.     And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

463.     Because of Ordinance 13936—which Mendez helped architect to harass other Fuller and Pinilla related properties—this alleged technicality resulted in the revocation of the CU at Gran Fiesta's property.

464.     However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

465.     Attorneys for Gran Fiesta reached out to the City Officials, including the City Attorney's Office, under the direction of Mendez,  regarding its closure of Taquerias and how the staircase at issue possessed no imminent risk to life or safety which would permit closure of the business.

466.     In response to Gran Fiesta's requests that the City explain why it was shut down, the City Attorney Mendez brazenly admitted the City's unlawful retaliation, stating "If your clients would have ... treated City staff with respect, they would not be in the precarious situations they find themselves in today." (Emphasis added).

467.     In all, Mendez's attacks contributed to Gran Fiesta suffering economic damages in excess of $778,344.00.

468.     Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

469.     Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

470.     Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 11
## PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT DOOLEY

471.     Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

472.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

473.     On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

474.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

475.    Dooley abused her position as assistant City Attorney to intentionally retaliate against Gran Fiesta for Fuller and Pinilla political support of Carollo's political opponent, Alfie Leon.

476.    On May 27, 2020—almost the "entire City Attorney" Office met with City Manager Noriega and Building Director Asael Marrero to "talk[ ] about Bill Fuller" and Martin Pinilla and update policies and ordinances to target them and properties and property owners related to them.

477.    Those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

478.    The following day, on May 28, 2020—the Chief of Unsafe Structures (Diaz) sent the Building Director a list of properties associated with Fuller and Pinilla.

479.    Gran Fiesta's property was on this list and noted as "no unsafe violations."

480.    Dooley helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

481.    Eventually, Gran Fiesta's property was shut down because of Ordinance 13936, which Dooley helped create.

482.    On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

483.    Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

484.    And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

485.    Because of Ordinance 13936—which Dooley helped architect to harass other Fuller and Pinilla related properties—this alleged technicality resulted in the revocation of the CU on Gran Fiesta's property.

486.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

487.    In all, Dooley's attacks contributed to Gran Fiesta suffering monetary damages in excess of $778,344.00.

488.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

489.    Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

490.    Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 12**
**PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

491.    Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

492.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's

history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

493.    On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

494.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

495.    On May 27, 2020—Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update policies and ordinances to target them and properties and property owners related to them, as well as a related "conversation" with the Chief of Unsafe Structures (Diaz).

496.    Marrero sought to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances[.]"

497.    The following day, on May 28, 2020—the Chief of Unsafe Structures (Diaz) sent the Marrero a list of properties and property owners associated with Fuller and Pinilla.

498.    Gran Fiesta's property was on this list and noted as "no unsafe violations."

499.    Marrero helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

500.    Eventually, Gran Fiesta's property was shut down because of Ordinance 13936, which Marrero helped create.

501.    On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

502.    Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

503.    And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

504.    And because of Ordinance 13936—this alleged technicality resulted in the revocation of Taquerias' CU.

505.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

506.    In all, Marrero's attacks contributed to Gran Fiesta suffering monetary damages in excess of $778,344.00.

507.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

508.    Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

509.    Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 13**
**PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

510.    Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign.

511.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

512.    On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

513.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

514.     On May 27, 2020, Diaz had a conversation with Building Director Marrero—following a meeting with the City Manager (Noriega) and "almost the entire City Attorney Office" to "talk[ ] about Bill Fuller" and Martin Pinilla to target them and properties and property owners related to them.

515.     On May 28, 2020 email, Diaz compiled a list of properties and owners related to Fuller and Pinilla.

516.     Gran Fiesta's property was on this list and listed as "no unsafe violation."

517.     Diaz helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

518.     Gran Fiesta's property was shut down because of Ordinance 13936.

519.     On September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Gran Fiesta's principals and employees observe), three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by the "City Administration."

520.     Six Days later, on September 21, 2021, without prior notice, the City revoked Taquerias' CU under Sections 2-211(b)(5) and (7) of the Code and deployed City Police to shut down the property. In the past five years, the City has revoked the CUs for more than 300 businesses but never without prior notice and a hearing unless for entities associated with Plaintiff Fuller and Pinilla.

521.    And Taquerias' CU was revoked based on a technicality regarding an outdoor staircase. The City's sole basis for shutting down the whole property was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5.

522.    And because of Ordinance 13936—which Diaz helped architect to harass other Fuller and Pinilla related properties—this alleged technicality resulted in the revocation of Taquerias' CU.

523.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001), which Gran Fiesta spent years and tens of thousands of dollars on according to the City's requests. Not once, when the City was working with Gran Fiesta, did the City raise the issue of the location of the stairs nor mention this mere technicality could shut down the whole business.

524.    Diaz's attacks on Gran Fiesta have caused it to suffer monetary damages in excess of $778,344.00.

525.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

526.    Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

527.    Gran Fiesta is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 14**</u>
<u>**PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT ORTIZ**</u>

528.     Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

529.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Ortiz; b) causing Ortiz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Ortiz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Ortiz's political preferences.

530.     On the other hand, Ortiz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of

Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8

531.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Ortiz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

532.     On March 24, 2021, Gran Fiesta was to appear before the Code Enforcement Board.

533.     Ortiz called members of the Code Enforcement Board to instruct them on how to vote.

534.     Ortiz called Maritza Vazquez described Fuller by stating in Spanish that Carollo's "**enemigo que voto en contra Carollo**" (i.e., the enemy who voted against Carollo) was coming up and to vote against him and Taquerias with the maximum penalty without giving any extension to comply.

535.     Other members of the Board, including Bayona, were also given those directives, which Carollo later admitted under oath "would be absolutely wrong to do.  It would certainly be wrong for it to be done."

536. And, during the Code meeting, another Bayona not only voted pursuant to Ortiz's instructions, but Bayona repeated Ortiz's exact words, that "Carollo's enemy is here today and that we have to vote against them."

537. Under Ortiz's pressure, members of the code enforcement board felt compelled to vote for immediate compliance—not extending or granting Gran Fiesta any leniency, as it would do under established policy and custom for similarly situated entities that were not associated with Fuller and Pinilla's disfavored First Amendment activities.

538. Defendant Ortiz's attacks on Gran Fiesta have contributed to it suffering monetary damages in excess of $778,344.00.

539. Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

540. Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran Fiesta's Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

541. Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 15
### PLAINTIFF GRAN FIESTA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT BAYONA

542. Gran Fiesta is an entity associated with Fuller and Pinilla that has been central to the vibrancy and growth of the Little Havana neighborhood, with a cornerstone local business

named "Taquerias" that operates on the property it owns. Based on the success of that business, Gran Fiesta has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses associated with them.

543.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Gran Fiesta and its tenants like Taquerias, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Bayona; b) causing Bayona to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Bayona's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Bayona's political preferences.

544.    On the other hand, Bayona knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Gran Fiesta in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their

tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Gran Fiesta suffered economic harm. *Id.* at 8.

545.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Bayona to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Gran Fiesta.

546.    On March 24, 2021, Gran Fiesta appeared before the Code Enforcement Board.

547.    Defendant Bayona took directions on how to vote from Carollo and Ortiz, which was a departure from the established policies and customs applicable to other businesses that lacked Gran Fiesta's association to Fuller and Pinilla's disfavored First Amendment activities.

548.    Further, Bayona even tried to sway other Board Members to vote against Gran Fiesta, indicating "Carollo's enemy is here today and that we have to vote against them," which even Carollo later admitted under oath "would be absolutely wrong to do.  It would certainly be wrong for it to be done."

549.    In all, Defendant Bayona's attacks contributed to Gran Fiesta suffering monetary damages in excess of $778,344.00.

550.    Gran Fiesta is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they knowingly violated the City of Miami Charter and the United States Constitution.

551.    Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Gran

Fiesta's Rights of Free Association. And Bayona was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

552.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 16**
**PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

</div>

553.     Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

554.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

555.    On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

556.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities

557.    And on May 27, 2020—the City Manager met with the Building Director and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

558.    On or about January 6, 2022, the City of Miami baselessly accused Brickell Station of having done work without a permit.

559.    This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

560.    On January 14, 2022, Brickell Station went under contract to sell the property.

561.     Even if the January 6 violation were not plainly meritless, it still should not have affected the sale of the property because the City had a policy allowing for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

562.     These trilateral agreements were standard practice under existing City policy applicable to other individuals and entities that lacked Brickell Station's association with Fuller and Pinilla's disfavored First Amendment activities.

563.     As little as one week before Brickell Station's would-be-sale of its property, another property owner was able to use this type of agreement.

564.     However, the City of Miami refused to extend this policy to Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla's political expression.

565.     The City stated such a favorable policy "was not available to them."

566.     On February 22, 2022, the City altered its longstanding City practices and policies in the Building and Legal Departments to justify its denial of allowing Brickell Station to enter into the trilateral agreement.

567.     The City of Miami's attacks on Brickell Station have caused Brickell Station, LLC to suffer monetary damages in excess of $3.8 million.

568.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 17
## PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT CAROLLO

569.     Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the

location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

570.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

571.    On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long

after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

572.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

573.    On May 27, 2020—the City Manager met with the Building Director and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

574.    On or about January 6, 2022, the City of Miami—consistent with the official policies and widespread customs implemented by Carollo—baselessly accused Brickell Station of having done work without a permit.

575.    This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

576.    On January 14, 2022, Brickell Station went under contract to sell the property.

577.    Even if the January 6 violation were not plainly meritless, it should not have affected the sale of the property because the City allowed for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

578.    These trilateral agreements were standard practice under existing City policies applicable to individuals and entities that lacked Brickell Station's affiliation with Fuller and Pinilla's disfavored First Amendment activities.

579.     And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

580.     However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

581.     The City stated such a favorable policy "was not available to them."

582.     On February 22, 2022, the City altered its longstanding City practices and policies in the Building and Legal Departments to justify its denial of allowing Brickell Station to enter into the trilateral agreement.

583.     Carollo's attacks on Brickell Station have caused it to suffer monetary damages in excess of $3.8 million.

584.     Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

585.     Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Brickell Station in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell Station's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

586.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 18
## PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

587.    Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

588.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noreiga's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

589.    On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against

Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

590.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Brickell Station.

591.    Noriega abused his position as City Manager to intentionally retaliate against Brickell Station because of Fuller and Pinilla's protected political expression.

592.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

593.    On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

594.    The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega—targeted Brickell Station to punish and deter First Amendment expression as follows.

595.     On or about January 6, 2022, the City baselessly accused Brickell Station of having done work without a permit.

596.     This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

597.     On January 14, 2022, Brickell Station went under contract to sell the property.

598.     Even if the January 6 violation were not plainly meritless, it should not have affected the sale of the property because the City allowed for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

599.     These trilateral agreements were standard practice under existing City policies applicable to individuals and entities that lacked Brickell Station's association with Fuller and Pinilla's disfavored First Amendment activities.

600.     And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

601.     However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

602.     The City stated such a favorable policy "was not available to them."

603.     On February 22, 2022, the City altered its longstanding City practices and policies in the Building and Legal Departments to justify its denial of allowing Brickell Station to enter into the trilateral agreement.

604.     In all, Noriega's attacks contributed to Brickell Station suffering economic damages in excess of $3.8 million.

605.     Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

606.     Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Gran Fiesta in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell Station's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

607.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 19**
**PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

608.     Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

609.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing

or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

610.    On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

611.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Brickell Station.

612.    Mendez abused her position as City Attorney, head of the City's legal department, to intentionally retaliate against Brickell Station based on their association with Fuller and Pinilla's political activities.

613.     In February of 2020, Carollo met with the City Manager (Noriega) and the City

Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First

Amendment activities.

614.     On or about May 27, 2020— "almost the entire City Attorney office" met with the

Building Director (Marrero) and the City Manager (Noriega) to "talk[ ] about Bill Fuller" and

Martin Pinilla to update ordinances and policies to target them and properties and property owners

related to them.

615.     The City of Miami—in accordance with the official policies and widespread

customs implemented by Mendez—targeted Brickell Station to punish and deter First Amendment

expression as follows.

616.     On or about January 6, 2022, the City of Miami baselessly accused Brickell Station

of having done work without a permit.

617.     This accusation was baseless as the City of Miami's own microfilm department

**knew** that all of the work it accused Brickell Station of doing without a permit had in fact been

done years ago, with a permit.

618.     On January 14, 2022, Brickell Station went under contract to sell the property.

619.     Even if the January 6 violation were not plainly meritless, it should not have

affected the sale of the property because the City allowed for "trilateral agreements" to place the

burden of bringing a property under sale into compliance on the buyer.

620.     These trilateral agreements were standard practice under existing City policies

applicable to individuals and entities that lacked Brickell Station's association with Fuller and

Pinilla's disfavored First Amendment activities.

621.    And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

622.    However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

623.    The City stated such a favorable policy "was not available to them."

624.    On February 22, 2022, the City altered its longstanding City practices and policies in the Building and Legal Departments to justify its denial of allowing Brickell Station to enter into the trilateral agreement.

625.    In all, Mendez's attacks on Brickell Station contributed to it suffering monetary damages in excess of $3.8 million.

626.    Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

627.    Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Brickell Station in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell Station's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

628.    Brickell Station is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 20**
**PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

629.    Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

630.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

631.    On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against

Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

632.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Brickell Station.

633.    On or about May 27, 2020— "almost the entire City Attorney office" met with the Building Director (Marrero) and the City Manager (Noriega) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

634.    Those updating City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

635.    The City of Miami—in accordance with the official policies and widespread customs implemented by Dooley—targeted Brickell Station to punish and deter First Amendment expression as follows.

636.    On or about January 6, 2022, the City of Miami baselessly accused Brickell Station of having done work without a permit.

637.     This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

638.     On January 14, 2022, Brickell Station went under contract to sell the property.

639.     Even if the January 6 violation were not plainly meritless, it should not have affected the sale of the property because the City allowed for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

640.     These trilateral agreements were standard practice under existing City policies applicable to individuals and entities that lacked Brickell Station's association with Fuller and Pinilla's disfavored First Amendment activity.

641.     And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

642.     However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

643.     Specifically, the Building Director and Chief of Unsafe Structures, after consulting the assistant City Attorney Dooley, stated such a favorable policy "was not available to [Brickell Station]."

644.     On February 22, 2022, the City altered its longstanding City practices and policies in the Building and Legal Departments to justify its denial of allowing Brickell Station to enter into the trilateral agreement.

645.     In all, Dooley's attacks contributed to Brickell Station suffering monetary damages in excess of $3.8 million.

646.     Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

647.     Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Brickell Station in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell Station's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

648.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 21**
**PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

649.     Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses associated with them.

650.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing

or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

651.     On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

652.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Brickell Station.

653.     On May 27, 2020— Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

654.    Marrero instructed Building Department staff to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

655.    The City of Miami—in accordance with the official policies and widespread customs implemented by Marrero—targeted Brickell Station to punish and deter First Amendment expression as follows

656.    On or about January 6, 2022, the City of Miami baselessly accused Brickell Station of having done work without a permit.

657.    This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

658.    On January 14, 2022, Brickell Station went under contract to sell the property.

659.    Even if the January 6 violation were not plainly meritless, it should not have affected the sale of the property because the City allowed for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

660.    These trilateral agreements were standard practice under existing City policy applicable to individuals and entities that lacked Brickell Station's association with Fuller and Pinilla's disfavored First Amendment activities.

661.    And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

662.    However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

663.    Specifically, Marrero and Diaz, after speaking with Dooley, stated such a favorable policy "was not available to [Brickell Station]."

664.     On February 22, 2022, despite the policy being used to assist another property purchaser not a week before, Marrero altered its longstanding City practices and policies in the Building and Legal Departments to specifically have adverse impacts on Brickell Station.

665.     Brickell Station would not have been subject to baseless accusations and unfavorable policy treatment had Marrero not mobilized the City government against it.

666.     In all, Marrero's attacks contributed to Brickell Station suffering monetary damages in excess of $3.8 million.

667.     Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

668.     Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Brickell Station in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell Station's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

669.     Brickell Station is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 22**
**PLAINTIFF BRICKELL STATION'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

670.     Brickell Station is an entity associated with Fuller and Pinilla that owned prime and coveted real estate near the heart of Brickell, with high development potential. Based on the location and potential of the land it owned, Brickell Station has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

671.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Brickell Station, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

672.     On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Brickell Station in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Brickell Station suffered economic harm. *Id.* at 8.

673.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Brickell Station.

674.     On May 27, 2020, after Marrero (the Building Director) met with "almost the entire City Attorney office" and the City Manager to discuss Fuller and Pinilla to update ordinances and policies to target them and properties and property owners related to them. And, Marrero asked "Rene [Diaz] . . . to stop by the office" the next day.

675.     On May 28, 2020, the following day, Diaz sent a list of properties and property owners related to Fuller and Pinilla.

676.     The City of Miami—in accordance with the official policies and widespread customs implemented by Diaz—targeted Brickell Station to punish and deter First Amendment expression as follows.

677.     On or about January 6, 2022, the City of Miami baselessly accused Brickell Station of having done work without a permit.

678.     This accusation was baseless as the City of Miami's own microfilm department knew that all of the work it accused Brickell Station of doing without a permit had in fact been done years ago, with a permit.

679.     On January 14, 2022, Brickell Station went under contract to sell the property.

680.     Even if the January 6 violation were not plainly meritless, it should not have affected the sale of the property because the City allowed for "trilateral agreements" to place the burden of bringing a property under sale into compliance on the buyer.

681.     These trilateral agreements were standard practice under existing City policies applicable to similarly situated individuals and entities that lacked Brickell Station's association with Fuller and Pinilla's disfavored First Amendment activities.

682.     And, as little as one week before Brickell Station's would-be-sale of its property another property owner was able to use this type of agreement.

683.     However, the City of Miami refused to extend this policy to Plaintiff Brickell Station simply because of its association with Plaintiffs Fuller and Pinilla.

684.     Specifically, Diaz and the Building Director, after speaking with the assistant City Attorney, stated such a favorable policy "was not available to [Brickell Station]."

685.     On February 22, 2022, despite the policy being used to assist another property purchaser not a week before, Diaz altered its longstanding City practices and policies in the Building and Legal Departments to specifically have adverse impacts on Brickell Station.

686.     Brickell Station would not have been subject to baseless accusations and unfavorable policy treatment had Diaz not intentionally and directly participated in mobilizing the City government against it.

687.     In all, Diaz's attacks on Brickell Station contributed to it suffering monetary damages in excess of $3.8 million.

688.     Brickell Station is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

689.     Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Brickell Station in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Brickell

Station's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

690.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 23**</u>
<u>**PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT THE CITY OF MIAMI**</u>

691.    Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

692.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

693.     On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8

694.     While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials and employees to mobilize the City government to implement official City policies and widespread City customs designed to harm Piedras Villas.

695.     The City retaliated against Piedra Villas through the intentional and direct participation of Carollo (City Commissioner); Noriega (City Manager); Mendez (City Attorney); Dooley (Assistant City Attorney); Marrero (Building Director); Diaz (Chief of Unsafe Structures); and Plasencia (Assistant Fire Marshal).

696.     In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

697.     And on May 27, 2020—the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them. As the Building Director wrote, the City staff was to circle back with Dooley, an assistant City Attorney, to revise and update policies.

698.     On October 22, 2020, Carollo's sponsored Ordinance 13936 was passed "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[,]" which was later used in the harassment of Piedra Villas.

699.     On December 2, 2020, the City of Miami entered a third Unsafe Structure Notice (BB20200220082614) for failure to obtain the required 40-50-Year Recertification Process.

700.     Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

701.     On August 6, 2021, Masson submitted the 40 Year Recertification.

702.     On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

703.     At that time, the City's Unsafe Structures Department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

704.     The City cornered Piedra Villas into the compliance agreement by (1) preventing Piedra Villas from having the agreement reviewed by an attorney; and (2) preventing Piedra Villas from repairing any work or submitting any plans until the agreement was signed.

705.     Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

706.     On September 1, 2021, after signing the Compliance Agreement, Piedra Villas was operating responsibly to meet its deadlines but the City of Miami began to intentionally interfere.

707.     The Assistant Fire Chief (Plasencia) instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property in an effort to derail its progress.

708.     On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

709.     The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

710.     The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

711.     Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

712.     Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

713.     Not surprisingly, the City of Miami did not provide the citation because there was none.

714.     In October of 2021, at a meeting between City Fire Department officials (including Plasencia) and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

715.    This gamesmanship by the City caused Piedras Villas to expend a substantial amount of time and incur substantial amounts of costs related to the design work on the project.

716.    From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

717.    All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

718.    On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

719.    The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

720.    But on or about February 22, 2022, the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

721.    Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

722.    On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 Compliance Agreement in default.

723.    Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file and signed off on the plans.

724.    During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

725.    As Karickhoff had explained, the status stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

726.    As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

727.    Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

728.    Ordinance 11936, which was specifically created to target property and property owners related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, the City "justified" the its non-issuance of Piedra Villas' CU.

729.    In June of 2022, Piedra Villas received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

730.    Piedra Villas' property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

731.    The second vote was scheduled for September of 2022.

732.     A mere two hours before the second vote—with absolutely no justification—the City Manager (Noriega), City Attorney (Mendez), and assistant City Attorney (Dooley), tried to postpone and cancel the final and most important hearing of the process.

733.     Specifically, the City Manager and City Attorney spoke with one of the board members trying to force them to delay their ruling.

734.     Nevertheless, on October 27, 2022, the City of Miami passed Ordinance 14118 an ordinance to gut the protections of historic designation and allow for demolition of historic buildings.

735.     Ordinance 14118 was specifically passed to target Piedra Villas, among other properties and property owners related to Fuller and Pinilla.

736.     And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

737.     The City of Miami's attacks on Piedra Villas have caused it to suffer monetary damages in excess of $4.7 million.

738.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 24**
**PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

739.     Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

740.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

741.    On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

742.    In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

743. Stemming from the February 2020 meetings, on May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

744. As Marrero wrote, the City staff was to circle back with Dooley, an assistant City Attorney, to revise and update policies.

745. The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo—targeted Piedra Villas to punish and deter First Amendment expression as follows.

746. And on October 22, 2020, Ordinance 13936, an Ordinance solely sponsored by Carollo was passed "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[,]" which was later used to justify the non-issuance of Piedra Villas' CU.

747. On December 2, 2020, the City of Miami entered a third Unsafe Structure Notice (BB20200220082614) for failure to obtain the required 40-50-Year Recertification Process.

748. Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

749. On August 6, 2021, Masson submitted the 40 Year Recertification.

750. On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

751.    At that time, the City's Unsafe Structures Department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

752.    The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

753.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

754.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

755.    For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

756.    On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

757.    The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

758.    The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

759.    Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

760.    Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

761.    Not surprisingly, the City of Miami did not provide the citation because there was none.

762.    In October of 2021, at a meeting between City Fire Department officials and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

763.    This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

764.    From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

765.    All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

766.    On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

767.    The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

768.     But on or about February 22, 2022, the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

769.     Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

770.     On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

771.     Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

772.     During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

773.     Karickhoff took a screenshot of the EPlan and sent it to Fuller.

774.     As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

775.     As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

776.    Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

777.    And because of a policy Carollo specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, the City cited Ordinance 11936 to "justify" it's non-issuance of Piedra Villas' CU.

778.    In June of 2022, Piedra Villas received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

779.    Piedra Villas' property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

780.    The second vote was scheduled for September.

781.    But a mere two hours before the vote—with absolutely no justification—the City Manager (Noriega), City Attorney (Mendez), and assistant City Attorney (Dooley), tried to postpone and cancel the final and most important hearing of the process.

782.    Specifically, the City Manager and City Attorney spoke with one of the board members trying to force them to delay their ruling.

783.    Nevertheless, on October 27, 2022, Carollo passed Ordinance 14118 to allow for demolition of historic buildings, specifically to target Piedra Villas.

784.    And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

785.    In all, Carollo's attacks on Piedra Villas have caused it to suffer monetary damages in excess of $4.7 million.

786.    Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

787.    Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

788.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 25**
**PLAINTIFF PIEDRA VILLAS 42 U.S.C § 1983 CLAIM**
**AGAINST DEFENDANT NORIEGA**

789.    Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

790.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief

that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

791.    On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

792.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

793.     In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

794.     On or about May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

795.     The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega—targeted Piedra Villas to punish and deter First Amendment expression as follows.

796.     Noriega architected Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

797.     Ordinance 13936 was specifically used to target properties and property owners related to Fuller and Pinilla and used to justify the non-issuance of Piedra Villas' CU.

798.     On December 2, 2020, the City of Miami entered a third Unsafe Structure Notice (BB20200220082614) for failure to obtain the required 40-50-Year Recertification Process.

799.     Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

800.     On August 6, 2021, Masson submitted the 40 Year Recertification.

801.     On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

802.    At that time, the City's Unsafe Structures Department stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

803.    The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

804.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

805.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

806.    For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

807.    On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

808.    The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

809.    The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

810.    Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

811.    Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

812.    Not surprisingly, the City of Miami did not provide the citation because there was none.

813.    In October of 2021, at a meeting between City Fire Department officials and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

814.    This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

815.    From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

816.    All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

817.    On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

818.    The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

819.    But on or about February 22, 2022**,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

820.    Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

821.    On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

822.    Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

823.    During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

824.    Karickhoff took a screenshot of the EPlan and sent it to Fuller.

825.    As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

826.    As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

827.    Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

828.    The City abused Ordinance 11936, a policy specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, to justify the City's non-issuance of Piedra Villas' CU.

829.    In June of 2022, Piedra Villas received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

830.    Piedra Villas' property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

831.    The second vote was scheduled for September.

832.    But a mere two hours before the vote—with absolutely no justification—Noriega, City Attorney (Mendez), and assistant City Attorney (Dooley), tried to postpone and cancel the final and most important hearing of the process.

833.    Specifically, Noriega and City Attorney spoke with one of the board members trying to force them to delay their ruling.

834.    Nevertheless, Noriega helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

835.    And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

836.     Noriega's attacks on Piedra Villas have caused Piedra Villas to suffer monetary damages in excess of $4.7 million.

837.     Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

838.     Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

839.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 26
## PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT MENDEZ

840.     Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

841.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief

that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

842.    On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

843.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

844.     In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

845.     On or about May 27, 2020—"almost the entire City Attorney office" met with City Manager Noriega and the Building Director Marrero to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

846.     Those helping to update ordinances were instructed to "circle back" with Rachel Dooley, an assistant City Attorney.

847.     Mendez helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

848.     The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Piedra Villas to punish and deter First Amendment expression as follows.

849.     Ordinance 13936 was created to target Fuller and Pinilla and properties and owners related to them and used to justify the non-issuance of Piedra Villas' CU.

850.     On December 2, 2020, the City of Miami entered a third Unsafe Structure Notice (BB20200220082614) on Piedra Villas for failure to obtain the required 40-50-Year Recertification Process.

851.    Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

852.    On August 6, 2021, Masson submitted the 40 Year Recertification.

853.    On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

854.    At that time, the City's Unsafe Structures Department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

855.    The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

856.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

857.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

858.    For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

859.    On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

860. The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

861. The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

862. Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

863. Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

864. Not surprisingly, the City of Miami did not provide the citation because there was none.

865. In October 2021, in a meeting between City Fire Department officials and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

866. This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

867. From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

868. All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

869.    On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

870.    The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

871.    But on or about February 22, 2022, the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

872.    Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

873.    On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

874.    Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

875.    During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

876.    Karickhoff took a screenshot of the EPlan and sent it to Fuller.

877.    As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

878.    As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

879.    Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

880.    The City abused Ordinance 11936, a policy specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, to justify the City's non-issuance of Piedra Villas' CU.

881.    In June of 2022, Piedra Villas received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

882.    Piedra Villas' property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

883.    The second vote was scheduled for September.

884.    But a mere two hours before the vote—with absolutely no justification—Mendez, the City Manager (Noriega), and assistant City Attorney (Dooley), tried to postpone and cancel the final and most important hearing of the process.

885.    Specifically, Mendez and the City Manager spoke with one of the board members trying to force them to delay their ruling.

886.     Nevertheless, Mendez helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

887.     And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

888.     Mendez's attacks on Piedra Villas have caused Piedra Villas to suffer monetary damages in excess of $4.7 million.

889.     Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

890.     Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

891.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 27**</u>
<u>**PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT DOOLEY**</u>

892.     Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite,

and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

893.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

894.    On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and

malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

895.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

896.    On or about May 27, 2020—"almost the entire City Attorney office" met with City Manager Noriega and the Building Director Marrero to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

897.    Following that meeting, as Marrero wrote—City staff should "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

898.    Dooley helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

899.    This Ordinance was used to selectively target properties and owners related to Fuller and Pinilla, and used to justify non-issuance of Piedra Villas' CU.

900.    The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Piedra Villas to punish and deter First Amendment expression as follows.

901.    On December 2, 2020, the City of Miami entered a third Unsafe Structure Notice (BB20200220082614) on Piedra Villas for failure to obtain the required 40-50-Year Recertification Process.

902.    Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

903.    On August 6, 2021, Masson submitted the 40 Year Recertification.

904.    On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

905.    At that time, the City's Unsafe Structures Department, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

906.    The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

907.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

908.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

909.    For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

910.    On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

911.    The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

912.    The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

913.    Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

914.    Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

915.    Not surprisingly, the City of Miami did not provide the citation because there was none.

916.    In October of 2021, at a meeting between City Fire Department officials and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

917.    This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

918.    From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

919.    All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

920.     On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

921.     The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

922.     But on or about February 22, 2022, the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

923.     Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

924.     On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

925.     Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

926.     During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

927.     Karickhoff took a screenshot of the EPlan and sent it to Fuller.

928.     As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

929.     As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

930.     Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

931.     The City used Ordinance 11936, a policy specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, to justify the City's non-issuance of Piedra Villas' CU.

932.     In June of 2022, Piedra Villas received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

933.     Piedra Villas' property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

934.     The second vote was scheduled for September.

935.     But a mere two hours before the vote—with absolutely no justification—Dooley, the City Manager, and City Attorney tried to postpone and cancel the final and most important hearing of the process.

936.     Nevertheless, Dooley helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

937.    And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

938.    Dooley's attacks on Piedra Villas have caused Piedra Villas to suffer monetary damages in excess of $4.7 million.

939.    Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

940.    Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

941.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 28**</u>
<u>**PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT MARRERO**</u>

942.    Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

943.    On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces

similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

944.    On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

945.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to

knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

946.    On or about May 27, 2020—Marrero met with the City Manager and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

947.    Following that meeting, as Marrero wrote—City staff should "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

948.    Marrero helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

949.    Ordinance 13936 was created to selectively target properties and owners related to Fuller and Pinilla and later used to justify non-issuance of Piedra Villas' CU.

950.    The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Piedra Villas to punish and deter First Amendment expression as follows.

951.    On December 2, 2020, Marrero entered a third Unsafe Structure Notice (BB20200220082614) on Piedra Villas for failure to obtain the required 40-50-Year Recertification Process.

952.    Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

953.    On August 6, 2021, Masson submitted the 40 Year Recertification.

954.    On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

955.    At that time, the City's Unsafe Structures Department under Marrero, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

956.    The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

957.    Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

958.    Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

959.    For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

960.    On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

961.    The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

962.    The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

963.    Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

964.    Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

965.    Not surprisingly, the City of Miami did not provide the citation because there was none.

966.    At a meeting in October of 2021 between City Fire Department officials and Piedra Villas, neither of the Fire Department officials in attendance at the meeting could identify any section of the Code that would require the requested work on the back staircases.

967.    This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

968.    From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

969.    All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

970.    On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

971.    The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

972.     But on or about February 22, 2022**,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

973.     Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

974.     On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

975.     Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

976.     During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

977.     Karickhoff took a screenshot of the EPlan and sent it to Fuller.

978.     As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

979.     As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

980.     Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

981.     The City abused Ordinance 11936, a policy specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, to justify the City's non-issuance of Piedra Villas' CU.

982.     Marrero also helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

983.     And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

984.     In all, Marrero's attacks have contributed to Piedra Villas suffering monetary damages in excess of $4.7 million.

985.     Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

986.     Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

987.     Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 29**
**PLAINTIFF PIEDRA VILLAS 42 U.S.C § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

</div>

988.     Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

989.     On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

990.     On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order oppose and

<div align="center">177</div>

silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

991.    While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

992.    On or about May 27, 2020—Diaz had a conversation with the Building Director after a meeting to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

993.    The very next day, Diaz sent the Building Director a list of properties related to Fuller and Pinilla.

994.    Diaz helped architect behind Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

995.    Ordinance 13936 was used to target properties and owners related to Fuller and Pinilla and used to justify non-issuance of Piedra Villas' CU.

996.    The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Piedra Villas to punish and deter First Amendment expression as follows.

997.    On December 2, 2020, Diaz entered a third Unsafe Structure Notice (BB20200220082614) on Piedra Villas for failure to obtain the required 40-50-Year Recertification Process.

998.    Thereafter, Piedra Villas hired: (a) JCD Architect, Inc. to prepare the plans, (b) Roman Engineering & Associates as the structural engineer, and (c) Fritz Masson as the permit expeditor.

999.    On August 6, 2021, Masson submitted the 40 Year Recertification.

1000.   On September 1, 2021, JCD Architect attempted to submit plans to address the issues identified in the 40 Year Certification.

1001.   At that time, the City's Unsafe Structures Department under Marrero, stated that it would not be possible for Fuller to submit plans until his mother, Miriam Fuller, who is a partner in the Piedra Villas Property, entered into a Compliance Agreement.

1002.   The Compliance Agreement was a contract of adhesion and the City of Miami prevented Piedra Villas from having it reviewed by an attorney and the City of Miami would not allow Piedra Villas to repair any work or submit any plans until the property had a compliance agreement.

1003.   Faced with the potential demolition of the property and left with no other choice, Miriam Fuller signed the Compliance Agreement.

1004.   Shortly after signing the Compliance Agreement and realizing that Piedra Villas was operating responsibly to meet those deadlines, the City of Miami worked to interfere with Piedra Villas' ability to comply.

1005.   For example, the Assistant Fire Chief instructed his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

1006.   On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

1007.   The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

1008.   The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

1009.   From late 2021 until February 2022, Piedra Villas continued to engage in good faith and substantial efforts to proceed with the approval process and to resolve the City of Miami's issued violations.

1010.   All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

1011.   On February 9, 2022, Piedra Villas had to enter into a second Compliance Agreement.

1012.   The Building Department instructed Piedra Villas that the timelines would be malleable as long as Piedra Villas was progressing.

1013.   But on or about February 22, 2022, the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

1014.   Over the next two months Piedra Villas continued working when the City of Miami inexplicably cancelled the permit process.

1015.   On April 20, 2022, despite the permit having been closed, the Public Works for some reason was not showing the work as approved and the City claimed the February 9 compliance agreement in default.

1016.   Recognizing that Public Works for some reason was not showing as approved despite the permit having been closed, Piedra Villas reached out to the reviewer on the file to confirm that he had updated the file to show that Public Works had also signed off on the plans.

1017.   During this call, the reviewer, Owen Karickhoff ("Karickhoff") informed Piedra Villas that he was unable to update the Public Works status to "approved" because the EPlan was showing the plan status had been changed to "cancelled."

1018.   Karickhoff took a screenshot of the EPlan and sent it to Fuller.

1019.   As Karickhoff had explained, the screenshot stated the following: "Manual Plan Status Changed to Cancelled- Process has been canceled by Administration: PROPERTY IS IN DEFAULT OF THE COMPLIANCE AGREEMENT ISSUED BY THE UNSAFE STRUCTURES PANEL."

1020.   As of April 27, 2022, aside from Public Works (which had been approved) there were only two remaining departments that needed to sign off: Fire and Building. Fire, which had been intentionally trying to delay progress through the Fire Marshal (Plasencia) and building which needed Fire to be completed.

1021.   Nevertheless, despite having nearly 80 percent of City departments approving of Piedra Villas' property, the City collapsed the Compliance agreement and designated the property subject to demolition.

1022.   The City abused Ordinance 11936, a policy specifically created to target businesses related to Fuller and Pinilla and cause mandatory revocation of CU's for building violations, to justify the City's non-issuance of Piedra Villas' CU.

1023.   Diaz also helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1024.   And, because the City of Miami had canceled the permitting process, Piedras Villas could not proceed and faces the imminent demolition of its unique, historical, and valuable Property.

1025.   In total, Diaz's attacks contributed to Piedra Villas suffering monetary damages in excess of $4.7 million.

1026.   Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1027.   Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra Villas' Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1028.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 30**
**PLAINTIFF PIEDRA VILLAS 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT PLASENCIA**

</div>

1029.   Piedra Villas is an entity associated with Fuller and Pinilla that owns a beautiful and historic property, which brought elegance to its neighborhood for well over 80 years. Despite, and because of, its historic significance, Piedra Villas has served as another target of the retaliation campaign against Fuller, Pinilla, and the businesses affiliated with them.

1030.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Piedra Villas, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Plasencia; b) causing Plasencia to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Plasencia's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Plasencia's political preferences.

1031.   On the other hand, Plasencia knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Piedra Villas in order to oppose and

silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Piedra Villas suffered economic harm. *Id.* at 8.

1032.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Plasencia to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Piedra Villas.

1033.   Plasencia abused his position as Fire Marshal to selectively target and harass properties related to Fuller and Pinilla, including by instructing his subordinates to go out and find, or rather manufacture, violations on the Piedra Villas property to derail its ability to comply with the compliance agreement.

1034.   On October 7, 2021, the City's Fire Department requested all of the dimensions for the back staircases of Piedra Villas' Property.

1035.   The back staircases had existed on the Piedra Villas Property for more than 80 years and had been reviewed and approved by the City Fire Department during the Fire Department's annual review.

1036.   The back staircases had never been deemed unsafe or not in compliance. Moreover, due to the passage of time, the staircases had been grandfathered in.

1037.   Not surprisingly, thereafter, Piedra Villas received new comments related to the back staircases on the building, which were ***not*** part of the scope of the original Unsafe Structure Notice.

1038.   Piedra Villas requested that the City of Miami provide it with the citation to the City Building Code that required the requested repair to the staircases.

1039.   Not surprisingly, the City of Miami did not provide the citation because there was none.

1040.   In October of 2021, at a meeting between City Fire Department officials and Piedra Villas, Plasencia could not identify any section of the Code that would require the requested work on the back staircases.

1041.   This gamesmanship by the City caused Piedras Villas to incur a substantial amount of time and money related to the design work on the project.

1042.   All the while, Piedra Villas was subjected to excessive delays and expenses related to the City's interference.

1043.   Plasencia's attacks on Piedra Villas have caused Piedra Villas to suffer monetary damages in excess of $4.7 million.

1044.   Piedra Villas is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1045.   Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Piedra Villas in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Piedra

Villas' Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1046.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 31**
**PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

</div>

1047.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1048.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

1049.  On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8

1050.  While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials and employees to mobilize the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1051.  Through the intentional and direct participation of the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), assistant City Attorney (Dooley), Building Director (Marrero), and Chief of Unsafe Structures (Diaz), the City of Miami retaliated against Calle Siete.

1052.  In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1053.  Then on May 27, 2020—the City Manager (Noriega)  met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" Martin

Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1054.   On in March of 2022, the City imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1055.   However on May 10, 2022 the City then improperly placed Calle Siete's permit on hold alleging the property was not in compliance with the permit.

1056.   Calle Siete sued the City for the wrongful withdrawal of its permit.

1057.   And only then, after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1058.   Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1059.   However, the assistant City Attorney only made the admission (1) believing the sale had gone through so it was no longer Calle Siete's property and thus no longer related to Fuller; and (2) under the court's scrutiny.

1060.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1061.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1062.   Even after the assistant City Attorney admitted to having blundered, the City continued to harass Plaintiff.

1063.   For example, on March 13, 2023, City personnel trespassed onto Calle Siete, ignoring not one but two property fences, to search for violations.

1064.   The City of Miami's attacks on Calle Siete have caused it to suffer monetary damages in excess of $7.97 million.

1065.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 32**
**PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

1066.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1067.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's

history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

1068.   On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1069.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1070.   And because of Carollo's animus, on May 27, 2020—the City Attorney (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1071.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo—targeted Calle Siete to punish and deter First Amendment expression as follows.

1072.   In March of 2022, the City imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1073.   However, on May 10, 2022 the Legal Department then improperly placed Calle Siete's permit on hold alleging the property was not in compliance with the permit.

1074.   Calle Siete sued the City for the wrongful withdrawal of its permit.

1075.   And only then, after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1076.   Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1077.   The assistant City Attorney only made the admission (1) believing the sale had gone through so it was no longer Calle Siete's property and thus no longer related to Fuller; and (2) under the court's scrutiny.

1078.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1079.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1080.   Even after the assistant City Attorney admitted to having blundered, the Building Department continued to harass Plaintiff.

1081.   For example, on March 13, 2023, City personnel trespassed onto Calle Siete, ignoring not one but two property fences, to search for violations.

1082.   Calle Siete would not have been subject to the "mistake" of being determined not in compliance; and City personnel would not have trespassed on its property without Carollo's insistence, pressure, and mobilization.

1083.   Carollo's attacks on Calle Siete have caused Plaintiff to suffer monetary damages in excess of $7.97 million.

1084.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1085.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle Siete's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1086.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 33
## PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

1087.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1088.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

1089.   On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1090.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1091.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1092.   And on May 27, 2020—Noriega met with the Building Director (Marrero), and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1093.   Under Noriega's instruction, ordinances were updated to specifically target Calle Siete among other properties related to Fuller and circulated lists of Fuller related properties.

1094.   The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega—targeted Calle Siete to punish and deter First Amendment expression as follows.

1095.   In March 2022 the City imposed a violation and Calle Siete pulled a permit to fix the alleged violation.

1096.   However, on May 10, 2022, the Legal Department then improperly placed Plaintiff's permit on hold alleging the property was not in compliance with the permit.

1097.   Calle Siete sued the City for the wrongful withdrawal of its permit.

1098.   And only then, after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1099.   Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1100.   However, the assistant City Attorney only made the admission (1) believing the sale had gone through so it was no longer Calle Siete's property and thus no longer related to Fuller; and (2) under the court's scrutiny.

1101.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1102.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1103.   Even after the assistant City Attorney admitted to having blundered, the Building Department continued to harass Plaintiff.

1104.   For example, on March 13, 2023, City personnel trespassed onto Calle Siete, ignoring not one but two property fences, to search for violations.

1105.   Calle Siete would not have been subject to the "mistake" of being determined not in compliance; and City personnel would not have trespassed on its property without Noriega's assistance in and insistence of carrying out the First Amendment retaliatory scheme.

1106.   Noriega's attacks on Calle Siete have caused and contributed to it suffering monetary damages in excess of $7.97 million.

1107.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1108.   Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle Siete's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1109.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 34**
**PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

1110.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1111.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing

or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

1112.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1113.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1114.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1115. And because of Mendez's animus, on May 27, 2020—"almost the entire City Attorney office" met with the City Manager (Noriega) and the Building Director (Marrero) and to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1116. The Building Director noted to "circle back" with the assistant City Attorney (Dooley).

1117. The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Calle Siete to punish and deter First Amendment expression as follows.

1118. In March of 2022, the City imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1119. However on May 10, 2022 the legal department improperly placed Calle Siete's permit on hold alleging the property was not in compliance with the permit.

1120. Calle Siete had to take the City of Miami to Court, which the City of Miami's Attorney Office defended.

1121. However the City's stance as to Calle Siete ended up being frivolous as after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1122. Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the

internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1123.   The assistant City Attorney only made the admission (1) believing the sale had gone through so it was no longer Calle Siete's property and thus no longer related to Fuller; and (2) under the court's scrutiny.

1124.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1125.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1126.   Calle Siete would not have been subject to the "mistake" of being determined not in compliance; and City personnel would not have trespassed on its property without Mendez's insistence, pressure, and mobilization.

1127.   Mendez's attacks on Calle Siete have caused Plaintiff to suffer monetary damages in excess of $7.97 million.

1128.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1129.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle

Siete's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1130.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 35
### PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT DOOLEY

1131.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1132.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

1133.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1134.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1135.   On May 27, 2020—"almost the entire City Attorney office" met with Noriega and Asael Marrero, the Building Director, to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1136.   And on May 27, 2020, those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

1137.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo—targeted Calle Siete to punish and deter First Amendment expression as follows.

1138.   In March of 2022, the City imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1139.   However on May 10, 2022, the City then improperly withdrew Plaintiff's permit alleging the property was not in compliance with the permit.

1140.   Calle Siete had to take the City of Miami to Court, which the City of Miami's Attorney Office defended.

1141.   However the City's stance as to Calle Siete ended up being frivolous as after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1142.   Specifically, Dooley admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1143.    Dooley only made the admission (1) believing the sale had gone through so it was no longer Calle Siete's property and thus no longer related to Fuller; and (2) under the court's scrutiny.

1144.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1145.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1146.   Dooley's attacks on Calle Siete have contributed to it suffering monetary damages in excess of $7.97 million.

1147.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1148.   Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle Siete's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1149.   Calle Siete is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 36**
**PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

</div>

1150.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1151.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing

or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

1152.   On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1153.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1154.   On May 27, 2020—Marrero met with "almost the entire City Attorney office" and with the City Manager (Noriega) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1155.   Marrero noted to "circle back with Rachel [Dooley] if [anyone] need to update any of [the City] ordinances" to shut down properties.

1156.   The City of Miami—in accordance with the official policies and widespread customs implemented by Marrero—targeted Calle Siete to punish and deter First Amendment expression as follows.

1157.   In March of 2022, the Building Department under Marrero's direction imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1158.   But on May 10, 2022, the Legal Department then improperly withdrew Plaintiff's permit alleging the property was not in compliance with the permit.

1159.   Calle Siete sued the City for the wrongful withdrawal of its permit.

1160.   And only then, after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1161.   Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1162.   Because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1163.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1164.   Even after the assistant City Attorney admitted to having blundered, the Building Department under Marrero continued to harass Plaintiff.

1165.   For example, on March 13, 2023, City personnel from the Building Department trespassed onto Calle Siete, ignoring not one but two property fences, to search for violations.

1166.   Calle Siete would not have been subject to the "mistake" of being determined not in compliance; and City personnel would not have trespassed on its property without Marrero's assistance in and insistence of carrying out Carollo's retaliatory scheme.

1167.   Marrero's attacks on Calle Siete have contributed to it suffering monetary damages in excess of $7.97 million.

1168.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1169.   Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle Siete's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1170.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 37**
**PLAINTIFF CALLE SIETE'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

</div>

1171.   Calle Siete is an entity associated with Fuller and Pinilla that had a tremendous development opportunity with its land. Instead, the entity was targeted in the retaliation campaign

and forced to seek judicial assistance which the City frivolously defended only to admit months later that the City had wrongfully barred the entity's development.

1172.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Calle Siete, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

1173.   On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Calle Siete in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious"

misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Calle Siete suffered economic harm. *Id.* at 8.

1174.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Calle Siete.

1175.   The City of Miami—in accordance with the official policies and widespread customs implemented by Diaz—targeted Calle Siete to punish and deter First Amendment expression as follows.

1176.   On May 27, 2020—the Building Director (Marrero) met with "almost the entire City Attorney office" and the City Manager (Noriega) to "**talk[ ] about Bill Fuller**" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1177.   That day, the Building Director also had a conversation with Diaz, the Chief of Unsafe Structures.

1178.   The very next day, Diaz sent the Building Director a list of properties related to Fuller and Pinilla.

1179.   In March of 2022 Building Department imposed a violation and Plaintiff pulled a permit to fix the alleged violation.

1180.   But on May 10, 2022, the Legal Department then improperly placed Plaintiff's permit on hold alleging the property was not in compliance with the permit.

1181.   Calle Siete sued the City for the wrongful withdrawal of its permit.

1182.   And only then, after the negative impacts of withdrawal and forcing Calle Siete to take legal action, the City of Miami admitted it erred.

1183.   Specifically, the assistant City Attorney (Dooley) admitted in court that the City had been wrong to revoke the permits as only then, "the City had a chance to review all of the internal filings that occurred, along with that Compliance Agreement, [and] it was determined that [Calle Siete was] in compliance."

1184.   However, because of this erroneously issued but intentional violation, the bank collapsed Calle Siete's construction loan facility, forcing Plaintiffs to pay down the existing loan by $400,000; and the City prevented Calle Siete's sale at $2.7 million.

1185.   The property is now being actively marketed for sale for $2.3 million, causing an additional loss of at least $400,000 on the sale price alone, plus all of the money the City of Miami caused Plaintiffs to expend on the permits and impact fees and the litigation with the City of Miami.

1186.   Even after the assistant City Attorney admitted to having blundered, the Building Department continued to harass Plaintiff.

1187.   For example, on March 13, 2023, City personnel from the Building Department—at Diaz's direction—trespassed onto Calle Siete, ignoring not one but two property fences, to search for violations.

1188.   Calle Siete would not have been subject to the "mistake" of being determined not in compliance; and City personnel would not have trespassed on its property without Diaz's assistance in and insistence of carrying out Carollo's retaliatory scheme.

1189.   Diaz's attacks on Calle Siete have caused Plaintiff to suffer monetary damages in excess of $7.97 million.

1190.   Calle Siete is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1191.   Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Calle Siete in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Calle Siete's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1192.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 38**
**PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

1193.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1194.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar

businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

1195.   On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1196.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials and

employees to mobilize the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1197.   Through the City Commissioner (Carollo), the City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), and Chief of Unsafe Structures (Diaz), the City retaliated against Beatstik.

1198.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1199.   Then, on May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1200.   And that day, on May 27, 2020, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz)—asking Diaz to stop by the next day.

1201.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1202.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1203.   Eventually on October 22, 2020, the City passed Ordinance 13936, which was solely sponsored by Carollo "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[,]"

1204.   Ordinance 13936 was used to justify non-issuance of Beatstik's CU.

1205.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1206.   The plans were sent to the Unsafe Structures Department.

1207.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1208.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191).

1209.   On February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1210.   The Unsafe Structures Department again requested further modifications.

1211.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1212.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1213.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1214.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1215.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1216.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1217.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1218.   For ten days, the City did not respond and no resolution was reached.

1219.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1220.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1221.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1222.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1223.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1224.   Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1225.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1226.   The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1227.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1228.   Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1229.   In June of 2022, Beatstik received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

1230.   Beatstik's property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

1231.   The second vote was scheduled for September.

1232.   But a mere two hours before the vote—with absolutely no justification—the City Manager (Noriega), City Attorney (Mendez), and assistant City Attorney (Dooley) tried to postpone and cancel the final and most important hearing of the process.

1233.   Specifically, the City Attorney and City Manager spoke with one of the board members trying to force them to delay their ruling.

1234.   And on October 27, 2022, the City passed Ordinance 14118 to allow for demolition of historic buildings to specifically target and demolish Beatstik's property because it was related to Fuller and Pinilla.

1235.   To be clear, the City would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1236.   And through Ordinance 14057, the City sought to limit Beatstik's ability to mitigate any fines.

1237.   The City of Miami's attacks on Beatstik caused it to suffer monetary damages in excess of $8.34 million.

1238.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 39
### PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT CAROLLO

1239.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1240.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their

buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

1241. On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1242. Through Carollo's conduct, pressure, and insistence, Beatstik was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

1243. In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1244. Then, on May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1245.   And that day, on May 27, 2020, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz)—asking Diaz to stop by the next day.

1246.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1247.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1248.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1249.   On October 22, 2020, Carollo solely sponsored Ordinance 13936 which passed "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1250.   Ordinance 13936 was used to justify non-issuance of Beatstik's CU.

1251.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1252.   The plans were sent to the Unsafe Structures Department.

1253.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1254.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1255.   The Unsafe Structures Department again requested further modifications.

1256.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1257.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1258.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1259.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1260.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1261.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1262.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1263.   For ten days, the City did not respond and no resolution was reached.

1264.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1265.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1266.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1267.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1268.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1269.   Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1270.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1271.   The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1272.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1273.   Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1274.   In June of 2022, Beatstik received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

1275.   Beatstik's property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

1276.   The second vote was scheduled for September.

1277.   But a mere two hours before the vote—with absolutely no justification—the City Manager (Noriega), City Attorney (Mendez), and assistant City Attorney (Dooley) tried to postpone and cancel the final and most important hearing of the process.

1278.   Specifically, the City Attorney and City Manager spoke with one of the board members trying to force them to delay their ruling.

1279.   Nevertheless, Carollo helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1280.   To be clear, Carollo would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1281.   And through Ordinance 14057, Carollo sought to limit Beatstik's ability to mitigate any fines.

1282.   Without Carollo's insistence, mobilization, and pressure to retaliate against Fuller and Pinilla, Beatstik would not have been subject to the City's harassment.

1283.   Carollo's attacks on Beatstik have caused Beatstik, LLC to suffer monetary damages in excess of $8.34 million.

1284.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1285.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's

Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1286.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 40
### PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT NORIEGA

1287.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1288.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing

lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

1289.   On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Beatstik in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1290.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1291.   Noriega abused his position as City Manager to intentionally retaliate against Beatstik for Fuller and Pinilla political support of Carollo's political opponent, Alfie Leon.

1292.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1293.   On May 27, 2020—Noriega met with the Building Director (Marrero)  and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1294.   And that day, on May 27, 2020, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1295.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1296.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1297.   The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows

1298.   Noriega helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1299.   Ordinance 13936 was used as it was specifically intended—to harass properties and property owners related to Fuller and Pinilla.

1300.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1301.   The plans were sent to the Unsafe Structures Department.

1302.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1303.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1304.   The Unsafe Structures Department again requested further modifications.

1305.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1306.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1307.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1308.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1309.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1310.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1311.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1312.   For ten days, the City did not respond and no resolution was reached.

1313.    When the intentional delay became clear, Beatstik's tenant went to visit the City.

1314.    Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1315.    Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1316.    However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1317.    By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1318.    Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1319.    Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1320.    The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1321.    By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1322.    Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1323.   In June of 2022, Beatstik received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

1324.   Beatstik's property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

1325.   The second vote was scheduled for September.

1326.   But a mere two hours before the vote—with absolutely no justification—Noriega, the City Attorney (Mendez), and the assistant City Attorney (Dooley) tried to postpone and cancel the final and most important hearing of the process.

1327.   Specifically, Noreiga and the City Attorney (Mendez) spoke with one of the board members trying to force them to delay their ruling.

1328.   Nevertheless, Noriega helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1329.   To be clear, Noriega would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1330.   And through Ordinance 14057, Noriega sought to limit Beatstik's ability to mitigate any fines.

1331.   Noriega's attacks on Beatstik have contributed to it suffering monetary damages in excess of $8.34 million.

1332.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1333.   Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1334.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 41**
**PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

1335.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1336.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right

to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

1337.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1338.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1339.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1340.   On May 27, 2020— "almost the entire City Attorney office" met with the City Manager and Building Department Director to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1341.   Specifically, the Building Director noted that they should "circle back with Rachel [Dooley] if we need to update any of our ordinances."

1342.   Rachel Dooley of course, as assistant City Attorney, works under the direction of the City Attorney.

1343.   And that day, on May 27, 2020, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1344.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1345.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1346.   The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1347.   Mendez helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1348.   Ordinance 13936 was used as it was specifically intended—to harass properties and property owners related to Fuller and Pinilla.

1349.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1350.   The plans were sent to the Unsafe Structures Department.

1351.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1352.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1353.   The Unsafe Structures Department again requested further modifications.

1354.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1355.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1356.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1357.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1358.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1359.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1360.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1361.   For ten days, the City did not respond and no resolution was reached.

1362.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1363.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1364.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1365.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1366.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1367.   Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1368.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1369.   The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1370.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1371.   Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1372.   In June of 2022, Beatstik received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

1373.   Beatstik's property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

1374.   The second vote was scheduled for September.

1375.   But a mere two hours before the vote—with absolutely no justification—Mendez, the City Manager (Noriega) and the assistant City Attorney (Dooley) tried to postpone and cancel the final and most important hearing of the process.

1376.   Specifically, Mendez and City Manager spoke with one of the board members trying to force them to delay their ruling.

1377.   Nevertheless, Mendez helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1378.   To be clear, the Mendez would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1379.   And through Ordinance 14057, Mendez sought to limit Beatstik's ability to mitigate any fines.

1380.   Mendez's attacks on Beatstik have caused Beatstik, LLC to suffer monetary damages in excess of $8.34 million.

1381.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1382.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1383.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 42**
**PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

</div>

1384.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1385.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

1386.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1387.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1388.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities

1389.   On or about May 27, 2020— "almost the entire City Attorney office" met with the City Manager and Building Department Director to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1390.   Specifically, the Building Director noted that they should "circle back with Rachel [Dooley] if we need to update any of our ordinances."

1391.   And that day, on May 27, 2020, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1392.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1393.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1394.   The City of Miami—in accordance with the official policies and widespread customs implemented by Dooley that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First

Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1395.   Dooley helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1396.   Ordinance 13936 was used as it was specifically intended—to harass properties and property owners related to Fuller and Pinilla.

1397.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1398.   The plans were sent to the Unsafe Structures Department.

1399.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1400.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1401.   The Unsafe Structures Department again requested further modifications.

1402.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1403.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1404.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1405.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1406.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1407.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1408.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1409.   For ten days, the City did not respond and no resolution was reached.

1410.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1411.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1412.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1413.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1414.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1415.   Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade

work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1416.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1417.   The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1418.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1419.   Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1420.   In June of 2022, Beatstik received preliminary historic designation status, a process which two votes on whether to extend the designation and the typical process takes 3-5 months.

1421.   Beatstik's property passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties.

1422.   The second vote was scheduled for September.

1423.   But a mere two hours before the vote—with absolutely no justification—Dooley, the City Attorney (Mendez) and the City Manager (Noriega) a tried to postpone and cancel the final and most important hearing of the process.

1424.   Nevertheless, Dooley helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1425.   To be clear, the Dooley would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1426.   And through Ordinance 14057, Dooley sought to limit Beatstik's ability to mitigate any fines.

1427.   Dooley's attacks on Beatstik have contributed to it suffering monetary damages in excess of $8.34 million.

1428.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1429.   Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1430.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 43**
**PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM AGAINST
DEFENDANT MARRERO**

</div>

1431.  Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband

and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1432. On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

1433. On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically

targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1434.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1435.   On or about May 27, 2020, Marrero met with "almost the entire City Attorney office" and the City Manager to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1436.   Marrero noted that they should "circle back with Rachel [Dooley] if we need to update any of our ordinances."

1437.   And that day, on May 27, 2020, Marrero had a conversation with the Chief of Unsafe Structures (Diaz).

1438.   On May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1439.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1440.   And Marrero worked to update official and internal policies to specifically target Beatstik among other properties related to Fuller and Pinilla.

1441.   The City of Miami—in accordance with the official policies and widespread customs implemented by Marrero that departed from the policies and customs applicable to

individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1442.   Marrero helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1443.   Ordinance 13936 was used as it was specifically intended—to harass properties and property owners related to Fuller and Pinilla.

1444.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1445.   The plans were sent to the Unsafe Structures Department.

1446.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1447.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1448.   The Unsafe Structures Department again requested further modifications.

1449.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the City's requested changes.

1450.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1451.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1452.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1453.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1454.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1455.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1456.   For ten days, the City did not respond and no resolution was reached.

1457.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1458.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1459.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1460.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1461.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1462.   Again on February 28, 2022, the City informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade

work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1463.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, the City waited until February 28, 2022 to do so.

1464.   The City waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1465.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1466.   Specifically, Marrero informed Beatstik's tenant that the property would be subject to demolition.

1467.   Despite the property's historic designation, Marrero helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1468.   To be clear, Marrero would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1469.   And through Ordinance 14057, Marrero sought to limit Beatstik's ability to mitigate any fines.

1470.   Marrero's attacks on Beatstik have caused Beatstik, LLC to suffer monetary damages in excess of $8.34 million.

1471.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to

be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1472.   Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1473.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 44**
**PLAINTIFF BEATSIK'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

</div>

1474.   Plaintiff Beatstik represents a piece of Miami history. Plaintiffs identified the potential for growth in a neighborhood on the border of Miami River and Overtown, which was at one time a thriving African-American community that had been devastated by highway construction. Plaintiffs invested significant funds to inject new life into this historic area, restoring the hotel lobby and all of the rooms of the property and selecting an African-American husband and wife team, Proper Door Bed & Breakfast, to operate the hotel and restaurant. Until the business was forced to shutter as a result of the City's attacks, manufactured violations, efforts to prevent compliance with the bogus violations, and attempts to demolish the property, it had been the subject of accolades in Vogue Magazine and other prominent publications.

1475.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Beatstik, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo

and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

1476.   On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Beatstik in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Beatstik suffered economic harm. *Id.* at 8.

1477. While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Beatstik.

1478.   On or about May 27, 2020— Marrero met with "almost the entire City Attorney office" and the City Manager to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, noting that they should "circle back with Rachel [Dooley] if we need to update any of our ordinances," before having a meeting with Diaz on those same subjects on the same date.

1479.   On May 28, 2020, Diaz sent the Building Director a list of property and property owners associated with Fuller and Pinilla.

1480.   Beatstik was on this list, stating the property had permits being processed and a permit obtained.

1481.   And Diaz worked to update official and internal policies to specifically target Beatstik among other properties related to Fuller and Pinilla.

1482.   The City of Miami—in accordance with the official policies and widespread customs implemented by Diaz that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1483.   Diaz helped architect behind Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, "to provide for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1484.   Ordinance 13936 was used as it was specifically intended—to harass properties and property owners related to Fuller and Pinilla.

1485.   Beatstik's tenant intended to build out the ground floor of the property and submitted plans for review on December 17, 2021.

1486.   The plans were sent to the Unsafe Structures Department with Diaz carbon copied.

1487.   On December 20, 2021, the Unsafe Structures Department indicated the permit required a more specific scope of work permit and submission of a recertification process.

1488.   On or about January 12, 2022, Beatstik received an Unsafe Structure Notice (BB2016017191) and on February 8, 2022, Beatstik's tenant resubmitted plans with a corrected scope of work permit to the Unsafe Structures Department as previously requested.

1489.   The Unsafe Structures Department again requested further modifications.

1490.   On February 16, 2022, Beatstik's tenant again submitted revised plans and making the changes Diaz requested.

1491.   On February 18, 2022, the City's Order of the Unsafe Structure Panel was issued ("the Beatstik Order") without a hearing.

1492.   Typically, a party receiving an Unsafe Structure Violation is given a hearing date to appear before the Unsafe Structures Panel.

1493.   Inherent in the Beatstik Order is the City's obligation to operate in good faith and not seeking to interfere in bad faith with Beatstik's ability to comply with the deadlines of the Order.

1494.   To act in good faith, the City would not delay and grant timely approvals to submitted plans. Otherwise, the City would be allowed to refuse to timely respond to plans then argue the City has a right to demolish the property.

1495.   After receiving the Beatstik Order, Beatstik immediately sought to comply.

1496.   The day after the Order, Plaintiff's tenant sent an email stating "we are ready to submit for permit if you think this plan is good to continue" and requested a meeting with the City.

1497.   For ten days, the City did not respond and no resolution was reached.

1498.   When the intentional delay became clear, Beatstik's tenant went to visit the City.

1499.   Beatstik's tenant requested an extension of the Beatstik Order deadlines because of the delays.

1500.   Pursuant to the language of the Order, the City had the ability to extend the deadlines.

1501.   However the City told Beatstik's tenant that the City could not extend the deadlines until after he submitted the plans and the plans were accepted. However, the City refused to accept the plans.

1502.   By the time the City informed Beatstik's tenant of this, the deadline to appeal the Beatstik Order had passed, leaving no administrative remedy.

1503.   On February 28, 2022, Diaz informed Beatstik's tenant that he would need to submit (a) plans for the second level of the building; (b) separate drawings for applicable trade work; (c) permit applications and Beatstik's affidavits; and (d) other required documents—which the City did not specify.

1504.   Despite every prior opportunity to inform Beatstik's tenant of these requirements, Diaz waited until February 28, 2022 to do so.

1505.   Diaz waited to request these requirements intentionally so Beatstik's tenant could not meet the March 3, 2022 deadline.

1506.   By the time that Beatstik's tenant compiled all the items instructed to accumulate, the City informed him that he missed the deadline and was no longer in compliance and therefore could not be given a permit.

1507.   Specifically, the City informed Beatstik's tenant that the property would be subject to demolition.

1508.   Despite its historic designation, Diaz helped architect another Ordinance passed on October 27, 2022, Ordinance 14118 to allow for demolition of historic buildings, specifically so it can target Piedra Villas.

1509.   To be clear, Diaz would rather demolish a 76 year old historical building with deep ties to the Overtown community than allow Beatstik's tenant to meet City requirements.

1510.   And through Ordinance 14057, Diaz sought to limit Beatstik's ability to mitigate any fines.

1511.   Diaz's attacks on Beatstik have caused Beatstik, LLC to suffer monetary damages in excess of $8.34 million.

1512.   Beatstik is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1513.   Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Beatstik in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Beatstik's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1514.   Beatstik is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 45
### PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT THE CITY OF MIAMI

1515.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of

destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1516.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

1517.   On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's

"financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8

1518.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials and employees to mobilize the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1519.   Through the conduct of the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), assistant City Attorney (Dooley), Building Director (Marrero), the Zoning Director (Goldberg), Chief of Unsafe Structures (Diaz), City Staff (Ortiz), and Code Enforcement Board (Bayona), the City retaliated against El Shopping for Fuller and Pinilla's support of Carollo's political opponent, Alfie Leon.

1520.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1521.   On May 27, 2020—the City Manager, almost the "entire City Attorney" Office and Building Director (Marrero) met to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1522.   The Building Director then talked to the Chief of Unsafe Structures (Diaz), who on May 28, 2020, forwarded the Building Director a list of properties and property owners related to Fuller and Pinilla.

1523.   In September of 2020, the Building Director and Chief of Unsafe Structures  issued

an Unsafe Structure Notice (Process No. BB2020017697) on El Shopping's property.

1524.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1525.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1526.   On October 22, 2020, the City passed Ordinance 13936, which was solely sponsored by Carollo and specifically created and used to target properties and property owners related to Fuller and Pinilla.

1527.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1528.   And because El Shopping's Parking Garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1529.   On May 13, 2021, the Code Department cited El Shopping three separate times for the same alleged issue—merely because of a technicality.

1530.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1531.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1532.   At this hearing, City Personnel (Ortiz) at Carollo's direction sought to instruct the Code Enforcement Board on how to vote.

1533.   Of course, as Carollo would testify at trial in Fuller I, doing so would be absolutely wrong to do.

1534.   And rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1535.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1536.   One of El Shopping's tenants—a Miami Dade Sanctioned Charter School—which had its CU revoked informed Carollo that revocation of their CU was not only a political blunder but also a violation of the requirement that the Miami Dade Public School System must be informed prior to revocation of any school's CU.

1537.   Carollo then had the Zoning Director issue a temporary Certificate of Use to the charter school.

1538.   But the Zoning Director intentionally worked to drag out the harm to El Shopping by requiring El Shopping's tenants meet with him one by one.

1539.   On October 13, 2021, after the City of Miami threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1540.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1541.   On October 19, 2021, El Shopping timely submitted the plans.

1542.   On March 2, 2022, the Plans were approved by the City of Miami.

1543.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1544.   However, on March 7, 2022, the Building Department issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1545.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1546.   The City only made the request to cause El Shopping costs and delays.

1547.   On March 28, 2022, the City lifted the Stop Work Order and reinstated the Permit.

1548.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1549.   On May 2, 2022, the Building Department issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1550.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1551.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1552.   Nonetheless, the City collapsed El Shopping's compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1553.   And because the City passed Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1554.   The City of Miami's attacks on El Shopping have caused El Shopping, LLC to

suffer monetary damages in excess of $8.19 million.

1555.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 46**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

1556.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1557.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

1558.   On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1559.   Through Carollo's conduct, pressure, and insistence, El Shopping was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

1560.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1561.   On May 27, 2020—the City Manager, almost the "entire City Attorney" Office and Building Director (Marrero) met to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them

1562.   The Building Director also talked to the Chief of Unsafe Structures (Diaz), who on May 28, 2020, forwarded the Building Director a list of properties and property owners related to Fuller and Pinilla.

1563.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo that departed from the policies and customs applicable to individuals and entities lacking El Shopping's association with Fuller and Pinilla's disfavored First

Amendment activities—targeted El Shopping to punish and deter protected political expression as follows

1564.   In September of 2020, the City issued an Unsafe Structure Notice (Process No. BB2020017697) on El Shopping's property.

1565.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1566.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1567.   On October 22, 2020, the City passed Ordinance 13936, which was solely sponsored by Carollo and used to target properties related to Fuller and Pinilla.

1568.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1569.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1570.   On May 13, 2021, the Code Department cited El Shopping three separate times for the same alleged issue—merely because of a technicality.

1571.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1572.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1573.   At this hearing, City Personnel (Ortiz) at Carollo's direction sought to instruct the Code Enforcement Board on how to vote.

1574.  However rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1575.  In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1576.  One of El Shopping's tenants—a Miami Dade Sanctioned Charter School—which had its CU revoked informed Carollo that revocation of their CU was not only a political blunder but also a violation of the requirement that the Miami Dade Public School System must be informed prior to revocation of any school's CU.

1577.  Carollo then had the Zoning Director issue a temporary Certificate of Use to the charter school.

1578.  Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1579.  On October 13, 2021, after the City of Miami threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1580.  The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1581.  On October 19, 2021, El Shopping timely submitted the plans.

1582.  On March 2, 2022, the Plans were approved by the City of Miami.

1583.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1584.   However, on March 7, 2022, the Building Department issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1585.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1586.   The City only made the request to cause El Shopping costs and delays.

1587.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1588.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1589.   On May 2, 2022, the Building Department issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1590.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1591.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1592.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1593.   And because Carollo architected Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1594.   Carollo's attacks on El Shopping have caused El Shopping, LLC to suffer monetary damages in excess of $8.19 million.

1595.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1596.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1597.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 47**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT NORIEGA**

1598.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1599.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies

for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noriega's political preferences.

1600.   On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1601.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to

knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1602.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1603.   On or about May 27, 2020—Noriega met with the Building Director (Marrero), and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1604.   The Building Director then talked to the Chief of Unsafe Structures (Diaz), who on May 28, 2020, forwarded the Building Director a list of properties and property owners related to Fuller and Pinilla.

1605.   The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega that departed from the policies and customs applicable to individuals and entities lacking El Shopping's association with Fuller and Pinilla's disfavored First Amendment activities—targeted El Shopping to punish and deter protected political expression as follows

1606.   In September of 2020, the Building Director and Chief of Unsafe Structures issued an Unsafe Structure Notice (Process No. BB2020017697) on El Shopping's property.

1607.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1608.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural

integrity, the City still cited the property.

1609.   Noriega helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, specifically to target properties related to Fuller and Pinilla.

1610.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1611.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1612.   On May 13, 2021, the Code Department cited El Shopping three separate times for the same alleged issue—merely because of a technicality.

1613.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1614.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1615.   At this hearing, City Personnel (Ortiz) at Carollo's direction sought to instruct the Code Enforcement Board on how to vote.

1616.   However rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1617.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1618.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1619.   On October 13, 2021, after the City of Miami threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1620.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1621.   On October 19, 2021, El Shopping timely submitted the plans.

1622.   On March 2, 2022, the Plans were approved by the City of Miami.

1623.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1624.   However, on March 7, 2022, the Building Department issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1625.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1626.   The City only made the request to cause El Shopping costs and delays.

1627.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1628.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1629.   On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1630.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El

Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1631.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1632.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1633.   And because Noriega architected Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1634.   Noriega's attacks have contributed to El Shopping suffering monetary damages in excess of $8.19 million.

1635.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1636.   Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1637.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 48**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

1638.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1639.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

1640.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and

silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1641.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1642.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

1643.   And on May 27, 2020—"almost the entire City Attorney office" met with the City Manager (Noriega) and Building Director (Marrero) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1644.   Those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

1645.   Dooley, as assistant City Attorney, is under the direction of Mendez, the City Attorney.

1646.   The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted El Shopping to punish and deter First Amendment expression as follows.

1647.   In September of 2020, the City issued an Unsafe Structure Notice (Process No. BB2020017697) on the property.

1648.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1649.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1650.   Mendez helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, to target properties related to Fuller and Pinilla.

1651.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1652.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1653.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1654.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1655.   On October 13, 2021, after the City of Miami threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1656.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1657.   On October 19, 2021, El Shopping timely submitted the plans.

1658.   On March 2, 2022, the Plans were approved by the City of Miami.

1659.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1660.   However, on March 7, 2022, the Building Department issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1661.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1662.   The City only made the request to cause El Shopping costs and delays.

1663.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1664.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1665.   On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1666.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El

Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1667.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1668.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1669.   To this day, the City refuses to provide certificates of use for the property— depriving El Shopping of income, causing losses, and burdening any potential sale.

1670.   And because Mendez helped architect **Ordinance 14057** to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1671.   Mendez's attacks on El Shopping have contributed to it suffering monetary damages in excess of $8.19 million.

1672.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1673.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1674.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 49**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

1675.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1676.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

1677.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order to oppose and

silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1678.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1679.   On May 27, 2020—"almost the entire City Attorney office" met with the City Manager (Noriega) and Building Director (Marrero) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1680.   Those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

1681.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo that departed from the policies and customs applicable to individuals and entities lacking Beatstik's association with Fuller and Pinilla's disfavored First Amendment activities—targeted Beatstik to punish and deter protected political expression as follows.

1682.   In September of 2020, the City issued an Unsafe Structure Notice (Process No. BB2020017697) on the property.

1683.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1684.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1685.   Dooley helped architect Ordinance 13936, which was solely sponsored by Carollo and passed on October 22, 2020, to specifically target properties related to Fuller and Pinilla.

1686.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1687.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1688.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1689.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1690.   On October 13, 2021, after the City of Miami threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1691.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1692.   On October 19, 2021, El Shopping timely submitted the plans.

1693.   On March 2, 2022, the Plans were approved by the City of Miami.

1694.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1695.   However, on March 7, 2022, the Building Department issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1696.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1697.   The City only made the request to cause El Shopping costs and delays.

1698.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1699.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1700.   On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1701.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1702.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1703.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and

prevented El Shopping from doing the work it claimed needed to be performed.

1704.   To this day, the City refuses to provide certificates of use for the property—depriving El Shopping of income, causing losses, and burdening any potential sale.

1705.   And Dooley helped architect Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1706.   Dooley's attacks on El Shopping have contributed to it suffering monetary damages in excess of $8.19 million.

1707.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1708.   Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1709.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 50**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

1710.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it,

Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1711.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

1712.   On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down

278

their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1713.  While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping. Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

1714.  On May 27, 2020—Marrero met with "almost the entire City Attorney office" and the City Manager (Noriega) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1715.  Then, that day, Marrero had a conversation with the Chief of Unsafe Structures.

1716.  The very next day, on Mary 28, 2020, the Chief of Unsafe Structures sent Marrero a list of properties and property owners related to Fuller and Pinilla.

1717.  Those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

1718.  The City of Miami—in accordance with the official policies and widespread customs implemented by Marrero that departed from the policies and customs applicable to individuals and entities lacking El Shopping's association with Fuller and Pinilla's disfavored First Amendment activities—targeted El Shopping to punish and deter protected political expression as follows.

1719.  In September of 2020, the Building Department led by Marrero issued an Unsafe Structure Notice (Process No. BB2020017697) on the property.

1720.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1721.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1722.   On October 22, 2020, the City passed Ordinance 13936, which specifically created and used to target properties related to Fuller and Pinilla.

1723.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1724.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1725.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1726.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1727.   On October 13, 2021, after Marrero threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1728.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1729.   On October 19, 2021, El Shopping timely submitted the plans.

1730.   On March 2, 2022, the Plans were approved by the City of Miami.

1731.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1732.   However, on March 7, 2022, Marrero issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1733.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1734.   Marrero only made the request to cause El Shopping costs and delays.

1735.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1736.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1737.   On May 2, 2022, Marrero issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1738.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1739.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1740.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1741.   To this day, the City refuses to provide certificates of use for the property—

depriving El Shopping of income, causing losses, and burdening any potential sale.

1742.   And because Marrero helped architect **Ordinance 14057** to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1743.   Marrero's attacks on El Shopping contributed to it suffering monetary damages in excess of $8.19 million.

1744.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1745.   Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1746.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 51**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

</div>

1747.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from

having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1748.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

1749.   On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and

malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1750.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1751.   On May 27, 2020— the Building Director (Marrero) met with "almost the entire City Attorney office" and the City Manager (Noriega) to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1752.   That day, on May 27, 2020, Diaz had a conversation with the Building Director (Marrero).

1753.   And, the very next day, on Mary 28, 2020, Diaz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

1754.   Those updating the City policies were instructed to "circle back with Rachel [Dooley] if [they] need to update any of [the City] ordinances" to shut down properties.

1755.   The City of Miami—in accordance with the official policies and widespread customs implemented by Diaz that departed from the policies and customs applicable to individuals and entities lacking El Shopping's association with Fuller and Pinilla's disfavored First Amendment activities—targeted El Shopping to punish and deter protected political expression as follows.

1756.   In September of 2020, Diaz issued an Unsafe Structure Notice (Process No. BB2020017697) on the property.

1757.   The alleged issue was that the adjacent parking garage was built in the 1980s with rebar intentionally exposed for future construction.

1758.   Although this building style was common trade practice and El Shopping confirmed with engineers that it had no detrimental impact on the building's safety and structural integrity, the City still cited the property.

1759.   On October 22, 2020, the City passed Ordinance 13936, which specifically created and used to target properties related to Fuller and Pinilla.

1760.   The Ordinance "provide[d] for the inclusion of building code violations as a reason for revocation of certificates of use[.]"

1761.   And because El Shopping's Parking Garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1762.   In September of 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1763.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1764.   On October 13, 2021, after Diaz threatened to demolish El Shopping's Property, El Shopping signed a Compliance Agreement.

1765.   The Compliance Agreement imposed the following deadlines:

a)      All plans submitted within 30 Calendar days of signing the compliance agreement;

b)      permits obtained and paid for within 60 days of the approval of the Plans;

c)      repairs completed within 90 days of the issuance of the Permit.

1766.   On October 19, 2021, El Shopping timely submitted the plans.

1767.   On March 2, 2022, the Plans were approved by the City of Miami.

1768.   On March 3, 2022, the City of Miami issued the Permits (Permit #BD21-024430-001-B001), and El Shopping had until at least June 1, 2022 to complete the repairs.

1769.   However, on March 7, 2022, the City issued a Stop Work Order alleging El Shopping needed to obtain a Shoring Permit.

1770.   In reality, the Shoring Permit was unnecessary as it did not involve any of the work El Shopping needed to perform to bring the property into compliance.

1771.   The City only made the request to cause El Shopping costs and delays.

1772.   On March 28, 2022, the City of Miami lifted the Stop Work Order and reinstated the Permit.

1773.   On April 14, 2022, El Shopping submitted its latest set of corrections based on the City of Miami's comments to work dated March 30, 2022.

1774.   On May 2, 2022, the City issued a second Stop Work Order on the El Shopping Property, precluding El Shopping from engaging in any further reparation work.

1775.   On May 9, 2022, El Shopping received a letter dated April 22, 2022, stating El Shopping was in default of the Unsafe Structure Panel Order and Compliance Agreement; and threatening El Shopping with demolition.

1776.   However, pursuant to the compliance agreement, El Shopping had until June 1, 2022 to timely complete repairs.

1777.   Nonetheless, the City collapsed the compliance agreement, revoked the permit, and prevented El Shopping from doing the work it claimed needed to be performed.

1778.   To this day, the City refuses to provide certificates of use for the property—

depriving El Shopping of income, causing losses, and burdening any potential sale.

1779.   And because the City passed **Ordinance 14057** to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1780.   Diaz's attacks on El Shopping have contributed to it suffering monetary damages in excess of $8.19 million.

1781.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1782.   Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1783.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 52**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT BAYONA**

</div>

1784.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from

having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1785.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Bayona; b) causing Bayona to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Bayona's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Bayona's political preferences.

1786.   On the other hand, Bayona knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and

malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1787.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Bayona to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1788.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

1789.   On May 13, 2021, the Code Department cited El Shopping three separate times for the same alleged issue.

1790.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1791.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1792.   At this hearing, Bayona took direction from Ortiz on how to vote.

1793.   And, rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1794.   And because the City passed Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1795.   Bayona's attacks on El Shopping have contributed to it suffering monetary damages in excess of $8.19 million.

1796.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1797.   Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Bayona was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1798.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 53**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT ORTIZ**

</div>

1799.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1800.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Ortiz; b) causing Ortiz to harbor the false belief that

Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Ortiz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

1801.   On the other hand, Ortiz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1802.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Ortiz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1803.   On May 13, 2021, the Code Department cited El Shopping three separate times for

the same alleged issue—merely because of a technicality.

1804.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1805.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1806.   At this hearing, Ortiz sought to instruct the Code Enforcement Board on how to vote.

1807.   And rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1808.   And because the City passed Ordinance 14057 to target properties and property owners related to Fuller and Pinilla, and limit mitigation of fines—El Shopping is faced with the fines from the two wrongfully "outstanding" citations.

1809.   Ortiz's attacks on El Shopping contributed to it suffering monetary damages in excess of $8.19 million.

1810.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1811.   Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1812.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 54**
**PLAINTIFF EL SHOPPING'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT GOLDBERG**

</div>

1813.   Plaintiff El Shopping became a target of Carollo and his allies in City Hall because it was acting as a parking lot for Plaintiffs' Ball & Chain property. To advance the goal of destroying the parking lot, which had been operating for 40 years prior to Plaintiffs purchasing it, Defendants engineered a demolition order on the rear parking space, preventing the property from having sufficient parking to sell the property, and also revoking over 25 of the tenants' Certificate of Uses, including a 40 year old non-profit, and a 400 student K-5 Miami Charter School.

1814.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, El Shopping, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Goldberg; b) causing Goldberg to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Goldberg's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Goldberg's political preferences.

1815.   On the other hand, Goldberg knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against El Shopping in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, El Shopping suffered economic harm. *Id.* at 8.

1816.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Goldberg to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm El Shopping.

1817.   In September 2021, once the Parking Garage's CU was revoked, the Zoning Director (Goldberg) then revoked the CU of every tenant in El Shopping's building—adjacent to the parking garage—simply because "there was not enough parking" to accommodate all tenants.

1818.   One of El Shopping's tenants—a Miami Dade Sanctioned Charter School—which had its CU revoked informed Carollo that revocation of their CU was not only a political blunder but also a violation of the requirement that the Miami Dade Public School System must be informed prior to revocation of any school's CU.

1819.   Carollo then had the Zoning Director issue a temporary Certificate of Use to the charter school.

1820.   Thereafter, the Zoning Director intentionally worked to drag out the harm to El Shopping and Goldberg required El Shopping's tenants to meet with him one by one.

1821.   **On May 13, 2021,** Goldberg cited El Shopping three separate times for the same alleged issue—merely because of a technicality.

1822.   El Shopping's garage sits on three different abutting parcels—all owned by El Shopping.

1823.   When El Shopping sought redress from the Code Enforcement Board and the Board resolved the issue.

1824.   At this hearing, Ortiz sought to instruct the Code Enforcement Board on how to vote.

1825.   And rather than allow the then resolved issue to be resolved as to all three citations (issued on the same day for the same alleged reasons), the Board allowed two citations to remain open and accrue daily fines.

1826.   And because El Shopping's parking garage was cited, the City automatically revoked the Parking Garage's CU through Ordinance 13936.

1827.   To this day, the City refuses to provide certificates of use for the property— depriving El Shopping of income, causing losses, and burdening any potential sale.

1828.   Goldberg's attacks on El Shopping have contributed to it suffering monetary damages in excess of $8.19 million.

1829.   El Shopping is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Goldberg's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Goldberg's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1830.   Goldberg, in retaliation against Plaintiffs' Fuller and Pinilla, targeted El Shopping in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and El Shopping's Rights of Free Association. And Goldberg was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1831.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 55**
**PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

</div>

1832.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1833.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants; b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits,

including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

1834.   On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1835.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm the Tower Hotel.

1836.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.  Instead, the

City, through the unconstitutional misconduct of its officials and employees, caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1837.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1838.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1839.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1840.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1841.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla.

1842.   Tower Hotel was also on the Chief of Unsafe Structure's list, which noted it was being remodeled under permit.

1843.   However, on July 2, 2020, the City issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1844.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1845.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1846.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1847.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

1848.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

1849.   In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

1850.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the

"Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

1851.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

1852.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

1853.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

1854.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

1855.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

1856.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley)

intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

1857.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—specifically, the Tower Hotel—despite their historic designations.

1858.   Likewise, the City targeted Fuller, Pinilla, and the Tower Hotel through the passage and selective enforcement of Ordinance 14057 to limit the mitigation of fines for the specific purpose of ensuring the maximum penalties for Tower Hotel and other properties related to Fuller and Pinilla.

1859.   Through this unprecedented series of actions, the City destroyed the long-term lease Tower Hotel had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

1860.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 56**</u>
<u>**PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT CAROLLO**</u>

1861.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up

bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1862.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon; b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

1863.   On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by using "his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1864.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.  Instead, Carollo caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1865.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1866.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1867.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1868.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1869.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

1870.   But, as a result of Carollo's machinations, and consistent with the official policies and widespread custom of retaliation that Carollo implemented as City Commissioner, the Tower

Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

1871.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1872.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1873.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1874.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1875.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

1876.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

1877.   In approximately October 2021, the Building Department contacted Tower Hotel

and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

1878.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

1879.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

1880.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

1881.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

1882.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

1883.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

1884.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

1885.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—specifically, the Tower Hotel—despite their historic designations.

1886.   Likewise, Carollo targeted Fuller, Pinilla, and the Tower Hotel by participating in the drafting, passage, and selective enforcement of Ordinance 14057 to limit the mitigation of fines for the specific purpose of ensuring the maximum penalties for Tower Hotel and other properties related to Fuller and Pinilla.

1887.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Carollo convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their businesses including the Tower Hotel.

1888.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

1889.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1890.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1891.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 57
### PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT NORIEGA

1892.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1893.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo

and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noreiga's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Noreiga's political preferences.

1894. On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1895. In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year. Instead,

Noriega caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1896.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1897.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1898.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1899.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1900.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

1901.   But, as a result of Noreiga's machinations, and consistent with the official policies and widespread custom of retaliation that he implemented as City Manager, the Tower Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

1902.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work

done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1903.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1904.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1905.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1906.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

1907.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

1908.   In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018

Remodeling Plans.

1909.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

1910.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

1911.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

1912.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

1913.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

1914.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

1915.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

1916.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties— specifically, the Tower Hotel—despite their historic designations.

1917.   Likewise, Noriega targeted Fuller, Pinilla, and the Tower Hotel by participating in the drafting, passage, and selective enforcement of Ordinance 14057 to limit the mitigation of fines for the specific purpose of ensuring the maximum penalties for Tower Hotel and other properties related to Fuller and Pinilla.

1918.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Noreiga convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their businesses including the Tower Hotel.

1919.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

1920.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1921.   Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1922.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 58**
**PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

1923.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1924.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing

lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Mendez's political preferences.

1925.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1926.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.  Instead, Mendez caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1927.  In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and

policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1928.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1929.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1930.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1931.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

1932.   But, as a result of Mendez's machinations, and consistent with the official policies and widespread custom of retaliation that she implemented as City Attorney, the Tower Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

1933.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1934.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1935.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1936.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1937.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

1938.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

1939.   In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

1940.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the

Tower Hotel plans.

1941.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

1942.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

1943.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

1944.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

1945.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

1946.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

1947.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—specifically, the Tower Hotel—despite their historic designations.

1948.   Likewise, Mendez targeted Fuller, Pinilla, and the Tower Hotel by participating in the drafting, passage, and selective enforcement of Ordinance 14057 to limit the mitigation of fines for the specific purpose of ensuring the maximum penalties for Tower Hotel and other properties related to Fuller and Pinilla.

1949.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Mendez convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their businesses including the Tower Hotel.

1950.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

1951.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1952.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1953.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 59**
**PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

</div>

1954.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1955.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle

<div align="center">319</div>

Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Dooley's political preferences.

1956.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1957.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.  Instead, Dooley caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1958.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1959.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1960.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1961.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1962.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

1963.   But, as a result of Dooley's machinations, and consistent with the official policies and widespread custom of retaliation that she implemented as an Assistant City Attorney, the Tower Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

1964.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1965.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1966.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures

for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1967.  In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1968.  Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

1969.  Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

1970.  In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

1971.  Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

1972.  By April 2022, the only disciplines remaining to approve the Second Pool Plans

were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

1973.  Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

1974.  On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

1975.  Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

1976.  In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

1977.  A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

1978.  The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—

specifically, the Tower Hotel—despite their historic designations.

1979.   Likewise, Dooley targeted Fuller, Pinilla, and the Tower Hotel by participating in the drafting, passage, and selective enforcement of Ordinance 14057 to limit the mitigation of fines for the specific purpose of ensuring the maximum penalties for Tower Hotel and other properties related to Fuller and Pinilla.

1980.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Dooley convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their businesses including the Tower Hotel.

1981.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

1982.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

1983.   Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

1984.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 60
## PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT MARRERO

1985.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

1986.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero ; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Marrero's political preferences.

1987.   On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

1988.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.  Instead, Marrero caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

1989.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

1990.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

1991.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

1992.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

1993.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

1994.   But, as a result of Marrero's machinations, and consistent with the official policies and widespread custom of retaliation that she implemented as Building Director, the Tower Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

1995.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012001), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

1996.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

1997.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

1998.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for

approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

1999.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

2000.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was subsequently reversed without explanation.

2001.   In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

2002.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

2003.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

2004.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

2005.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

2006.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

2007.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

2008.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

2009.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—specifically, the Tower Hotel—despite their historic designations.

2010.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Marrero convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their

businesses including the Tower Hotel.

2011.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

2012.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2013.   Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2014.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 61**</u>
<u>**PLAINTIFF TOWER HOTEL'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT DIAZ**</u>

2015.   But for Defendants' unconstitutional retaliation, the Tower Hotel was destined to be the only historic hotel located on Calle Ocho, serving as the centerpiece of a revitalization project breathing new life into the Little Havana neighborhood. Rather than welcome new jobs, tourists, and opportunities that promised to benefit the City as a whole, Defendants engaged in unprecedented efforts to derail the project by threatening to fire inspectors who did not drum up

bogus violations, by delaying reviews, by instigating fake audits, by engaging in a pattern of delay, and by persistently threatening to demolish the entire historic structure.

2016.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Tower Hotel, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Diaz's political preferences.

2017.   On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long

after" Fuller and Pinilla "filed suit" against Carollo, the Tower Hotel suffered economic harm. *Id.* at 8.

2018.   In short, but for the Tower Hotel's association with Fuller and Pinilla, and their disfavored political speech, it would have obtained permits to build a small pool in its courtyard, and to refurbish the building to provide restaurant and healing services, within a year.   Instead, Diaz caused an inordinate four-year delay, causing Tower Hotel to suffer more than $18 million in damages.

2019.   In February of 2020, the City Manager (Noriega) met with the City Attorney (Mendez) and Carollo dozens of times to plan and carry out a campaign of political retaliation against Fuller, Pinilla, and their associated businesses by implementing City ordinances and policies to target them for selective enforcement designed to punish them for, and discourage them from, expressing a disfavored political viewpoint.

2020.   On May 27, 2020— the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2021.   That day, on May 27, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz).

2022.   Further, City staff were instructed to circle back with Rachel Dooley, an Assistant City Attorney to discuss updating ordinances.

2023.   And the following day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and owners related to Fuller and Pinilla, including the Tower Hotel, which noted that it was being remodeled under permit.

2024.   But, as a result of Diaz's machinations, and consistent with the official policies and widespread custom of retaliation that he implemented as Chief of Unsafe Structures, the Tower Hotel was the victim of a series of unprecedented and selectively enforced directives., including the following.

2025.   On July 2, 2020, the City inexplicably issued a bogus Notice of Unsafe Structure (BB2020012200), falsely claiming Tower Hotel did work without a permit, when in fact the work done on the pool and the internal demolition of the La Botanica building was performed lawfully pursuant to a Demolition Permit.

2026.   Then, on approximately November 20, 2020, the City issued a materially false and nonsensical final order of the Unsafe Structure Panel (BB2020012200).

2027.   For instance, the final order not only required the Tower Hotel to repair or demolish the La Botanica within 135 days, and to submit the La Botanica building plans to Unsafe Structures for approval and then to the Building Department within 30 days, but also required the Tower Hotel to obtain permits that it had already obtained.

2028.   In addition, the final order also not only required the Tower Hotel to repair or demolish the pool within 120 days, but also to both **submit** the pool plans to Unsafe Structures for approval and then to the Building Department within 30 days and **obtain** the permits within the same 30-day deadline, which creates the impossible burden of submitting plans and obtaining permits on the same day.

2029.   Throughout the review process, the City purposefully dragged its feet to delay granting the necessary approvals.

2030.   Later, on January 14, 2021, the City determined that plumbing and gas reviews (separate reviews) would not be necessary, which was a favorable determination that was

subsequently reversed without explanation.

2031.   In approximately October 2021, the Building Department contacted Tower Hotel and advised it that they had to enter into a new Compliance Agreement for La Botanica or face demolition of both the structure and the pool, imposing a series of deadlines that would be impossible to meet due to the City's own delay in reviewing the 2018 Remodeling Plans, the only solution was for Tower Hotel to resubmit a new pool permit that did not reference the 2018 Remodeling Plans.

2032.   Thus, the Tower Hotel was left with no choice but to submit new pool plans (the "Second Pool Plans"), which the City continued to intentionally delay, requiring the Tower Hotel's contractor to email City officials to inquire as to the status of the City's efforts to approve the Tower Hotel plans.

2033.   By April 2022, the only disciplines remaining to approve the Second Pool Plans were Public Works, Flood Plain, Structural, and DERM. But, just as the Tower Hotel received a letter from the Florida Department of Health that would have allowed for DERM and Flood Plain to sign off, the City inexplicably reversed its prior decision from almost a year earlier, and indicated that plumbing and gas review were not only necessary, but that they had been denied.

2034.   Thus, inconsistent with past practices and policies, the City disregarded the Tower Hotel's ongoing efforts to comply with the City's ever-shifting requirements, declared the Tower Hotel to be in default of the Compliance Agreement, and stated that the City "shall be moving forward to demolish the structure(s) at issue."

2035.   On May 5, 2022, the parties appeared before the court for a hearing on Plaintiffs' Emergency Motion for Temporary Injunction, and the City of Miami represented that no demolition of the properties subject of the action would occur until the Court ruled.

2036.   Despite such representation, that very day, the City of Miami pulled a Demolition Permit for the Tower Hotel Property.

2037.   In June of 2022, Tower Hotel received preliminary historic designation status, a process typically takes 3-5 months, and passed the Board's first vote, which immediately put a stay on the City's efforts to demolish Plaintiffs' properties, until a second vote could take place which was scheduled for September 2022.

2038.   A mere two hours before the vote, however, and with absolutely no justification, the City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley) intervened to postpone and cancel the final and most important hearing of the process by strong-arming at least one of the Board members to delay their ruling.

2039.   The reason for pressing for such a delay was to allow the City time to pass Ordinance 14118 in October 2022, which would allow the City to demolish properties—specifically, the Tower Hotel—despite their historic designations.

2040.   This unprecedented series of actions cannot be explained by any legitimate purpose, and instead stem from the meetings that Diaz convened for the express purpose of crafting City policies and customs to punish and chill the First Amendment rights of Fuller, Pinilla, and their businesses including the Tower Hotel.

2041.   As a result, the Tower Hotel lost the lease it had on the property for $6 million for 10 years, caused an additional $800,000 in damages related thereto, and has destroyed the Tower Hotel's ability to monetize and sell the property, resulting in monetary damages in excess of $18.29 million.

2042.   Tower Hotel is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount

to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2043.   Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Tower Hotel in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Tower Hotel's Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2044.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 62**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

</div>

2045.   Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2046.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants; b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for

District 3 Commissioner; c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

2047.  On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2048.  While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2049.   Viernes Culturales is a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival, which was held on the last Friday of every month on Calle Ocho since 2000.

2050.   Prior to October 2018,  despite the City's heavy involvement in and support of the festival, the City never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

2051.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2052.   And on May 27, 2020—the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2053.   On May 21, 2021, the City handicapped Viernes Culturales by having the City Manager (Noriega) prohibit sampling of alcohol by falsely claiming that Viernes Culturales was required to submit an operation plan.

2054.   The City Manager (Noriega) sent Viernes Culturales an email revoking its right to serve alcohol that evening specifically because Viernes Culturales "hadn't earned" the City Manager's trust.

2055.   Of course, doing so violates Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

2056.   On February 7, 2022, the City Manager and City Attorney discontinued any future permits for Viernes Culturales "indefinitely" by fabricating a complaint of alcohol being consumed outside of the festival.

2057.   After the City successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama, which is also affiliated to Fuller and Pinilla.

2058.   On October 21, 2022, the City went to Futurama to issue a violation for Viernes Culturales' event for playing live music without a permit.

2059.   However, no law requires private art galleries to get a permit to play live music at their events.

2060.   On January 25, 2023 the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2061.   However, the City Commissioner (Carollo) instructed a Board Member on how to vote and the appeal was denied.

2062.   As a result of the destruction of Viernes Culturales, Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2063.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 63**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

2064.   Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of

Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2065.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Carollo; b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Carollo's political preferences.

2066.   On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against the Tower Hotel in order oppose and silence such political expression, including by using "his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and

Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2067.   As one City Commissioner stated explicitly, Carollo targeted the festival to "fuck with Fuller." And, in a sworn statement from Steven Miro, Miro explained that Carollo hired Ben Kuehne to take over Viernes Culturales just because of its relationship with Fuller.

2068.   Viernes Culturales is a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival, which was held on the last Friday of every month on Calle Ocho since 2000.

2069.   Prior to October 2018, despite its heavy involvement in and support of the festival, the City of Miami had never requested or required Viernes Culturales in its 18 years of existence to pull any type of events permit.

2070.   The City of Miami—in accordance with the official policies and widespread customs implemented by Carollo—targeted Viernes Culturales to punish and deter protected political expression as follows

2071.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2072.   And on May 27, 2020—the City Manager met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2073.   On May 21, 2021, Carollo sought to handicap Viernes Culturales by having the City Manager (Noriega) prohibit sampling of alcohol under the false premise that it needed to submit an operation plan.

2074.   The City Manager (Noriega) sent Viernes Culturales an email revoking its right to serve alcohol that evening specifically because Viernes Culturales "hadn't earned" the City Manager's trust.

2075.   Of course, doing so violates Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

2076.   On February 7, 2022, Carollo had the City Manager (Noriega) and City Attorney (Mendez) then discontinued any future permits for Viernes Culturales "indefinitely" by fabricating a complaint of alcohol being consumed outside of the festival.

2077.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama and affiliated with Plaintiffs Fuller and Pinilla.

2078.   On October 21, 2022, the City went to Futurama to issue a violation for Viernes Culturales' event for playing live music without a permit.

2079.   However, no law requires private art galleries to get a permit to play live music at their events.

2080.   On January 25, 2023 the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2081.   However, Carollo, through Ortiz, instructed a Board Member on how to vote and the appeal was denied.

2082.   Carollo did this despite knowing it was wrong because Carollo testified as much before a sitting jury on May 1, 2023, that "it would be absolutely wrong to do.  It would certainly be wrong for it to be done."

2083.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2084.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2085.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2086.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 64
### PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT NORIEGA

2087.   Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on Noriega's instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes

Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2088.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noreiga's political preferences.

2089.   On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and

malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2090.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2091.   The City of Miami—in accordance with the official policies and widespread customs implemented by Noriega—targeted Viernes Culturales to punish and deter protected political expression as follows.

2092.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2093.   On or about May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2094.   On May 21, 2021, Noriega prohibited Viernes Culturales from sampling alcohol under the false premise that an operational plan was required.

2095.   That day, Noriega sent Viernes Culturales an email revoking its right to serve alcohol that evening specifically because Viernes Culturales "hadn't earned" Noriega's trust.

2096.   Of course, doing so violates Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

2097.   On February 7, 2022, Noriega then discontinued any future permits for Viernes Culturales "indefinitely" by fabricating a complaint of alcohol being consumed outside of the festival.

2098.   After Noriega successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama and affiliated with Fuller and Pinilla.

2099.   On October 21, 2022, the City at Noriega's instruction, went to Futurama to issue a violation for the event for playing live music without a permit.

2100.   However, no law requires private art galleries to get a permit to play live music at their events.

2101.   On January 25, 2023, the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2102.   However, Carollo's Assistant Ortiz instructed Board Members to vote against Viernes and the appeal was denied.

2103.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2104.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence

in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2105. Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2106. Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 65**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

2107. Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on Mendez's instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2108. On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo

challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

2109.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2110.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2111.   The City of Miami—in accordance with the official policies and widespread customs implemented by Mendez—targeted Viernes Culturales to punish and deter protected political expression as follows

2112.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2113.   Viernes Culturales is a nonprofit organization which coordinates the popular Viernes Culturales/Cultural Fridays art, music and culture festival, which was held on the last Friday of every month on Calle Ocho since 2000.

2114.   However, at Carollo's request, Mendez researched Viernes Culturales to determine its association with Bill Fuller and whether there was any way, through the City's permitting process, that Carollo could take over the Friday event and destroy Viernes Culturales.

2115.   On or about May 27, 2020— "almost the entire City Attorney office" met with the City Manager and Building Department to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2116.   Those updating the City policies were instructed to "circle back with Rachel [Dooley]**"** who, as an Assistant City Attorney, worked within Mendez's Department.

2117.   On May 21, 2021, Carollo sought to handicap Viernes Culturales by having the City Manager (Noriega) prohibit sampling of alcohol under the false premise that an operation plan was required.

2118.   That day, the City Manager (Noriega) sent Viernes Culturales an email revoking its right to serve alcohol that evening specifically because Viernes Culturales "hadn't earned" Noriega's trust.

2119.   Of course, doing so violates Section 54-6.3 of the City of Miami Code that an "applicant of a permit be given less favorable treatment … on account of the identity or associational relationships of the applicant."

2120.   On February 7, 2022, Mendez then discontinued any future permits for Viernes Culturales "indefinitely" by fabricating a complaint of alcohol being consumed outside of the festival.

2121.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama and affiliated with Plaintiffs Fuller and Pinilla.

2122.   On October 21, 2022, the City went to Futurama to issue a violation for Viernes Culturales' event for playing live music without a permit.

2123.   However, no law requires private art galleries to get a permit to play live music at their events.

2124.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2125.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2126.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2127.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 66**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

</div>

2128.   Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on Mendez's instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2129.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint

against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

2130.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2131.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2132.   The City of Miami—in accordance with the official policies and widespread customs implemented by Dooley—targeted Viernes Culturales to punish and deter protected political expression as follows.

2133.   Beginning in October of 2018, Dooley researched Viernes Culturales and due to Carollo's insistence, the City created "Little Havana Fridays" to compete with Viernes Culturales.

2134.   On May 27, 2020— "almost the entire City Attorney office" met with the City Manager and Building Department to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2135.   Those updating the City policies were instructed to "circle back with Rachel [Dooley]" who, as an Assistant City Attorney, worked within Mendez's Department.

2136.   On February 7, 2022, the City Attorney (Mendez) then discontinued any future permits for Viernes Culturales "indefinitely" by fabricating a complaint of alcohol being consumed outside of the festival.

2137.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama and affiliated with Fuller and Pinilla.

2138.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2139.   However, no law requires private art galleries to get a permit to play live music at their events.

2140.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2141.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in

an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2142. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2143. Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 67**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT ORTIZ**

</div>

2144. Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on Mendez's instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2145. On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Ortiz; b) causing Ortiz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging

<div align="center">354</div>

his right to run for District 3 Commissioner; c) causing Ortiz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Ortiz's political preferences.

2146.   On the other hand, Ortiz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2147.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Ortiz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2148.   The City of Miami—in accordance with the official policies and widespread customs implemented by Ortiz—targeted Viernes Culturales to punish and deter protected political expression as follows.

2149.   On October 21, 2022, the City went to Futurama to issue a violation for Viernes Culturales' event for playing live music without a permit.

2150.   However, no law requires private art galleries to get a permit to play live music at their events.

2151.   On January 25, 2023 the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2152.   However, Will Ortiz, reached out to all the members of the Code Enforcement Board to tell them that a City Official's political enemy, Fuller, was on the agenda and to vote against him.

2153.   Former Code Enforcement Board Member, Maritza Vazquez stated that during this hearing, "the City was again pressuring [the Code Board] to impose harsh penalties" simply because the entity was related to Fuller and Pinilla.

2154.   Not surprisingly, the violation was not removed.

2155.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2156.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2157.   Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2158.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 68**
**PLAINTIFF VIERNES CULTURALES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT BAYONA**

</div>

2159.   Plaintiff Viernes Culturales should have been able to continue operating its monthly festivals as it has done for nearly 18 years, even with the City's involvement. Instead, the City of Miami, acting on Mendez's instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, created a competitor to Viernes Culturales, imposed nonexistent requirements on Viernes Culturales' ability to get a permit, blocked and revoked Viernes Culturales' ability to get a permit, followed Viernes Culturales to a private property to continue to drive it out of Miami, causing Viernes Culturales to suffer more than $10 million in damages.

2160.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Viernes Culturales, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Bayona; b) causing Bayona to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Bayona's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint

<div align="center">357</div>

against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Bayona's political preferences.

2161.   On the other hand, Bayona knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Viernes Culturales in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Viernes Culturales suffered economic harm. *Id.* at 8.

2162.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Bayona to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Viernes Culturales.

2163.   The City of Miami—in accordance with the official policies and widespread customs implemented by Bayona—targeted Viernes Culturales to punish and deter protected political expression as follows

2164.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2165.   However, no law requires private art galleries to get a permit to play live music at their events.

2166.   On January 25, 2023 the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2167.   However, Bayona was instructed that a Carollo's political enemy, Fuller, was on the agenda and to vote against him.

2168.   Bayona dutifully followed their improper instructions and upheld a baseless and improper violation on Futurama—improperly damaging and interfering with Viernes Culturales' ability to host events there.

2169.   As a result of the destruction of Viernes Culturales, Plaintiff Viernes Culturales/Cultural Fridays, Inc. has sustained extensive economic damages in excess of $10 million, which continue to this day.

2170.   Viernes Culturales is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2171.   Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Viernes Culturales in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Viernes Culturales' Rights of Free Association. And Bayona was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2172.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant

to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 69
## PLAINTIFF FUTURAMA'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT CITY OF MIAMI

2173.  Plaintiff Futurama owns a creative workspace in the heart of Little Havana, which houses 12 artist studios and five offices; monthly events including art openings, music productions, and business and networking. The innovative space seeks to advance contemporary visual arts and culture in Little Havana through education, exhibition and public outreach, and to provide affordable work-space. However Futurama was also targeted in the retaliation campaign.

2174.  On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Futurama, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants, b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Defendants' false belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho, and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

2175.  On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Futurama in order oppose

and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Futurama suffered economic harm. *Id.* at 8.

2176.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials and employees to mobilize the City government to implement official City policies and widespread City customs designed to harm Futurama.

2177.   In short, but for Futurama's association with Fuller and Pinilla, and their disfavored political speech, it would not have lost its actual and prospective tenants, would have been able to realize its project in partnership with History Miami, and The Smithsonian Institute, and would not have been issued a baseless permit.  Instead, the City, through the unconstitutional misconduct of its officials and employees, interfered with Futurama's business and projects, causing Futurama to suffer damages in excess of $7.87 million.

2178.   Through the City Commissioner (Carollo), City Manager (Noriega), the City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), Chief of Unsafe Structures (Diaz), City Staff (Ortiz), and Code Enforcement Board Member (Bayona), the City retaliated against Futurama.

2179.   The City Commissioner (Carollo) created lists of properties and property owners associated with Fuller and Pinilla.

2180.   Futurama was on this list.

2181.   Beginning in December of 2017, the City began harassing Futurama's tenants—including Sanguich de Miami ("Sanguich").

2182.   Sanguich had a business license from the City and a state license for preparing and selling food—after having worked with the Assistant City Attorney for City approvals.

2183.   After Carollo won the run-off election, when Sanguich was "raided" by 25-30 City of Miami personnel including police, fire, building and code enforcement officers.

2184.   Futurama called City Manager Daniel Alfonso and asked if the Sanguich raid was the result of a Carollo's retaliation. The City Manager responded with "si."

2185.   When Sanguich's owners went to discuss with the Carollo—he specifically said "I love it [the business]," just "maybe not where you are" at Futurama.

2186.   Accordingly, to harm Futurama and drive its tenant away, the City removed TUPs solely for District 3.

2187.   Of course, the City did so in violation of proper procedure, with no first hearing or public notice on the issue—depriving Futurama's right to due process.

2188.   On January 6, 2018, Sanguich reopened with a Temporary Events Permit ("TEP") and that same day, City Code Enforcement showed up to shut them down. Code Officer Yacmany Salvatierra stating "I'm sorry, this came from above, just know people are watching."

2189.   Again, Sanguich's went to discuss the harassment and the City Commissioner (Carollo) stated "my problem is not as much with you as it is with your landlord[,]" Futurama.

2190.   The City's retaliation has also driven away prospective tenants.

2191.   In 2017, Futurama formed a partnership with History Miami, and The Smithsonian Institute to develop "El Museo," a first of a kind museum in Little Havana to celebrate the community's culture and history.

2192.   However, because of the City of Miami and City Officials' relentless retaliatory harassment, and defamation campaigns, the project was never realized, solely because Futurama's partners were deterred by the City's harassment.

2193.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

2194.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them

2195.   That day, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz) and the following day, Diaz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2196.   Futurama was on the Chief of Unsafe Structure's list.

2197.   After the City of Miami successfully shut down Viernes Culturales' (an event organized by a non-profit) access to Domino Park, Viernes Culturales moved to Futurama's private property.

2198.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2199.   However, no law requires private art galleries to get a permit to play live music at their events.

2200.   On January 25, 2023, the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation, which had attached to Futurama's property.

2201.   However, the City Commissioner instructed the board on how to vote.

2202.   Former Code Enforcement Board Member, Maritza Vazquez stated that during this hearing, "the City was again pressuring [the Code Board] to impose harsh penalties" simply because the entity was related to Fuller and Pinilla.

2203.   The City of Miami's attacks on Futurama have caused it to suffer monetary damages in excess of $7.87 million.

2204.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 70
### PLAINTIFF FUTURAMA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT CAROLLO

2205.   Plaintiff Futurama owns a creative workspace in the heart of Little Havana, which houses 12 artist studios and five offices; monthly events including art openings, music productions, and business and networking. The innovative space seeks to advance contemporary visual arts and culture in Little Havana through education, exhibition and public outreach, and to provide affordable work-space. However Futurama was also targeted in the retaliation campaign.

2206.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Futurama, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Carollo's opponent Alfie Leon and supporting social media advertising for Leon, b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner, c) causing Carollo's false

belief that Plaintiffs were organizing or participating in efforts to recall Carollo, d) filing an ethics complaint against Carollo, e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo, f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove, g) promoting African-American and Afro-Cuban murals in Calle Ocho that Carollo disliked, and h) generally expressing a different vision for Calle Ocho and Little Havana that threatened Carollo's desires.

2207.   On the other hand, Carollo spearheaded a campaign of selective enforcement that was designed to retaliate against Futurama in order oppose and silence such political expression, including by "using his position and power to weaponize the City government" against those who "chose to exercise their First Amendment rights" in opposition to him. *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Futurama suffered economic harm. *Id.* at 8.

2208.   In short, but for Futurama's association with Fuller and Pinilla, and their disfavored political speech, it would not have lost its actual and prospective tenants, would have been able to realize its project in partnership with History Miami, and The Smithsonian Institute, and would not have been issued a baseless permit.  Instead, Carollo retaliated against and interfered with Futurama's business and projects for Fuller and Pinilla's exercise of constitutional rights, causing Futurama to suffer damages in excess of $7.87 million.

2209.   In 2017, Carollo created lists of properties and property owners associated with Fuller and Pinilla.

2210.   Futurama was on this list.

2211.   In December of 2017, at Carollo's direction, the City began harassing Futurama's tenants—including Sanguich de Miami ("Sanguich").

2212.   Sanguich had a business license from the City and state license for preparing and selling food—after having worked with the Assistant City Attorney for City approvals.

2213.   A mere five days after Carollo won the run off election, when Sanguich was "raided" by 25-30 City of Miami personnel including police, fire, building and code enforcement officers.

2214.   Futurama called City Manager Daniel Alfonso and asked if the Sanguich raid was the result of a Carollo's retaliation. The City Manager responded with "si."

2215.   When Sanguich's owners went to discuss with the Carollo—he specifically said "I love it [the business]," just "maybe not where you are" at Futurama.

2216.   Accordingly, to harm Futurama and drive its tenant away, Carollo removed Temporary Use Permits solely for District 3.

2217.   Of course, the City did so in violation of proper procedure, with no first hearing or public notice on the issue—depriving Futurama's right to due process.

2218.   On January 6, 2018, Sanguich reopened with a Temporary Events Permit ("TEP") and that same day, City Code Enforcement showed up to shut them down. Code Officer Yacmany Salvatierra stating "I'm sorry, this came from above, just know people are watching."

2219.   Again, Sanguich's went to discuss the harassment and Carollo stated "my problem is not as much with you as it is with your landlord[,]" Futurama.

2220.   The City's retaliation also has driven away prospective tenants.

2221.   Futurama formed a partnership with History Miami, and The Smithsonian Institute to develop "El Museo," a first of a kind museum in Little Havana to celebrate the community's culture and history.

2222.   However, because of the City of Miami and City Officials' relentless retaliatory harassment, and defamation campaigns, the project was never realized, solely because Futurama's partners were deterred by the City's harassment.

2223.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

2224.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2225.   That day, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz) and the following day, Diaz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2226.   Futurama was on the Chief of Unsafe Structure's list.

2227.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property—Futurama, a building owned by Futurama LLC and affiliated with Plaintiffs Fuller and Pinilla.

2228.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2229.   However, no law requires private art galleries to get a permit to play live music at their events.

2230.   On January 25, 2023 the Board Members of Viernes Culturales went before the Code Enforcement Board to appeal the violation.

2231.   However, Carollo instructed the Code Enforcement Board on how to vote.

2232.   Former Code Enforcement Board Member, Maritza Vazquez stated that during this hearing, "the City was again pressuring [the Code Board] to impose harsh penalties" simply because the entity was related to Fuller and Pinilla.

2233.   Due to Carollo's pressure, Futurama's appeal was denied.

2234.   Carollo's attacks on Futurama have caused it to suffer monetary damages in excess of $7.87 million.

2235.   Futurama is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2236.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Futurama in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Futurama's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2237.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 71
### PLAINTIFF FUTURAMA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT MENDEZ

2238.   Plaintiff Futurama owns a creative workspace in the heart of Little Havana, which houses 12 artist studios and five offices; monthly events including art openings, music productions,

368

and business and networking. The innovative space seeks to advance contemporary visual arts and culture in Little Havana through education, exhibition and public outreach, and to provide affordable work-space. However Futurama was also targeted in the retaliation campaign.

2239.  On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Futurama, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

2240.  On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Futurama in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down

their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Futurama suffered economic harm. *Id.* at 8.

2241.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Futurama.

2242.   In short, but for Futurama's association with Fuller and Pinilla, and their disfavored political speech, it would not have lost its actual and prospective tenants, would have been able to realize its project in partnership with History Miami, and The Smithsonian Institute, and would not have been issued a baseless permit.  Instead, Mendez retaliated against and interfered with Futurama's business and projects for Fuller and Pinilla's exercise of constitutional rights, causing Futurama to suffer damages in excess of $7.87 million

2243.   In December of 2017, the City began harassing Futurama's tenants—including Sanguich de Miami ("Sanguich").

2244.   Sanguich had a business license from the City and state license for preparing and selling food—after having worked with the Assistant City Attorney for City approvals.

2245.   A mere five days after Carollo won the run off election, when Sanguich was "raided" by 25-30 City of Miami personnel including police, fire, building and code enforcement officers.

2246.   Futurama called City Manager Daniel Alfonso and asked if the Sanguich raid was the result of a Carollo's retaliation. The City Manager responded with "si."

2247.   When Sanguich's owners went to discuss with the Carollo—he specifically said "I love it [the business]," just "maybe not where you are" at Futurama.

2248.   Accordingly, to harm Futurama and drive its tenant away, Carollo worked with Mendez to remove Temporary Use Permits solely for District 3.

2249.   Of course, the City did so in violation of proper procedure, with no first hearing or public notice on the issue—depriving Futurama's right to due process.

2250.   On January 6, 2018, Sanguich reopened with a Temporary Events Permit ("TEP") and that same day, City Code Enforcement showed up to shut them down. Code Officer Yacmany Salvatierra stating "I'm sorry, this came from above, just know people are watching."

2251.   Again, Sanguich's went to discuss the harassment and Carollo stated "my problem is not as much with you as it is with your landlord[,]" Futurama.

2252.   The City's retaliation also has driven away prospective tenants.

2253.   Futurama formed a partnership with History Miami, and The Smithsonian Institute to develop "El Museo," a first of a kind museum in Little Havana to celebrate the community's culture and history.

2254.   However, because of the City of Miami and City Officials' relentless retaliatory harassment, and defamation campaigns, the project was never realized, solely because Futurama's partners were deterred by the City's harassment.

2255.   In February of 2020, Mendez met with the City Manager (Noriega) and Carollo dozens of times concerning Plaintiff Fuller

2256.   On May 27, 2020—"almost the entire City Attorney office" met with the City Manager (Noriega) and the Building Director (Marrero) "talk[ ] about Bill Fuller" and Martin Pinilla to update policies to shut properties down.

2257.   That day, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz) and the following day, Diaz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2258.   Futurama was on the Chief of Unsafe Structure's list.

2259.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property owned by Futurama and affiliated with Plaintiffs Fuller and Pinilla.

2260.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2261.   However, no law requires private art galleries to get a permit to play live music at their events.

2262.   Mendez's attacks on Futurama have contributed to it suffering monetary damages in excess of $7.87 million.

2263.   Futurama is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2264.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Futurama in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Futurama's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2265.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 72**
**PLAINTIFF FUTURAMA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

2266.   Plaintiff Futurama owns a creative workspace in the heart of Little Havana, which houses 12 artist studios and five offices; monthly events including art openings, music productions, and business and networking. The innovative space seeks to advance contemporary visual arts and culture in Little Havana through education, exhibition and public outreach, and to provide affordable work-space. However Futurama was also targeted in the retaliation campaign.

2267.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Futurama, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

2268.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Futurama in order oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of

Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Futurama suffered economic harm. *Id.* at 8.

2269.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Futurama.

2270.   In short, but for Futurama's association with Fuller and Pinilla, and their disfavored political speech, it would not have lost its actual and prospective tenants, would have been able to realize its project in partnership with History Miami, and The Smithsonian Institute, and would not have been issued a baseless permit.   Instead, Dooley retaliated against and interfered with Futurama's business and projects for Fuller and Pinilla's exercise of constitutional rights, causing Futurama to suffer damages in excess of $7.87 million

2271.   Beginning in December 2017, the City began harassing Futurama's tenants—including Sanguich de Miami ("Sanguich").

2272.   Sanguich had a business license from the City and state license for preparing and selling food—after having worked with the Assistant City Attorney for City approvals.

2273.   A mere five days after Carollo won the run off election, when Sanguich was "raided" by 25-30 City of Miami personnel including police, fire, building and code enforcement officers.

2274.   Futurama called City Manager Daniel Alfonso and asked if the Sanguich raid was the result of a Carollo's retaliation. The City Manager responded with "si."

2275.   When Sanguich's owners went to discuss with the Carollo—he specifically said "I love it [the business]," just "maybe not where you are" at Futurama.

2276.   Accordingly, to harm Futurama and drive its tenant away, Carollo worked with Dooley to remove Temporary Use Permits solely for District 3.

2277.   Of course, the City did so in violation of proper procedure, with no first hearing or public notice on the issue—depriving Futurama's right to due process.

2278.   On January 6, 2018, Sanguich reopened with a Temporary Events Permit ("TEP") and that same day, City Code Enforcement showed up to shut them down. Code Officer Yacmany Salvatierra stating "I'm sorry, this came from above, just know people are watching."

2279.   Again, Sanguich's went to discuss the harassment and Carollo stated "my problem is not as much with you as it is with your landlord[,]" Futurama.

2280.   The City's retaliation also has driven away prospective tenants.

2281.   In 2017, Futurama formed a partnership with History Miami, and The Smithsonian Institute to develop "El Museo," a first of a kind museum in Little Havana to celebrate the community's culture and history.

2282.   However, because of the City of Miami and City Officials' relentless retaliatory harassment, and defamation campaigns, the project was never realized, solely because Futurama's partners were deterred by the City's harassment.

2283.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2284.   Those updating policies were instructed to "circle back" with Rachel Dooley.

2285.   That day, the Building Director had a conversation with the Chief of Unsafe Structures (Diaz) and the following day, Diaz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2286.   Futurama was on the Chief of Unsafe Structure's list.

2287.   After the City of Miami successfully shut down Viernes Culturales' access to Domino Park, Viernes Culturales moved to a private property—Futurama, a building owned by Futurama LLC and affiliated with Plaintiffs Fuller and Pinilla.

2288.   On October 21, 2022, the City went to Futurama to issue a violation for the event for playing live music without a permit.

2289.   However, no law requires private art galleries to get a permit to play live music at their events.

2290.   Dooley's attacks on Futurama contributed to it suffering monetary damages in excess of $7.87 million.

2291.   Futurama is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2292. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Futurama in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Futurama's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2293. Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 73
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT THE CITY OF MIAMI

2294. Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2295. On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrated and embraced similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a prominent political opponent of Defendants; b) causing Defendants to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Defendants' false belief that Plaintiffs were organizing or

participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against the City and Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana that contravened Defendants' political preferences.

2296.   On the other hand, the City, through its officials and employees, engaged in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government" to retaliate against those who "chose to exercise their First Amendment rights." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2297.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other City officials to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2298.   Through the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), Chief of Unsafe

Structures (Diaz), City Staff (Ortiz), and Code Enforcement Board Member (Bayona), the City government retaliated against Havana Bungalows.

2299.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2300.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them. City staff were instructed to circle back with Rachel Dooley, and the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics on the same day.

2301.   The following day, on May 28, 2020—the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2302.   Havana Bungalows was on this list.

2303.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2304.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2305.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2306.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2307.   Because one of the violations on Havana Bungalows remained open, Havana

Bungalows had to bifurcate the property for the sale and seek a second mitigation hearing.

2308.   Havana Bungalows' ability to mitigate fines at the first hearing infuriated Carollo.

2309.   In March of 2022, the City attempted to derail Havana Bungalows' ability to mitigate fines by passing Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines.

2310.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2311.   Luckily, the policy was not yet in effect and Havana Bungalows managed to make the last hearing before Ordinance 14057 took effect.

2312.   And on April 27, 2022, Havana Bungalows appeared before the board.

2313.   Even though Ordinance 14057 was not in effect, the City tried to influence the Board so it was in effect to mitigate any reduction Havana Bungalows could get; and reroute it to appear before Carollo.

2314.   At the hearing, the Assistant City Attorney (Dooley) improperly sought to influence the Code Enforcement Board's vote.

2315.   Although the Assistant City Attorney was not the assigned to the case, she attempted to justify imposition of draconian measures by shockingly speaking on a matter she was without knowledge of.

2316.   Specifically, the Assistant City Attorney was unaware of (1) the date of the compliance agreement and (2) the date of Havana Bungalows' closing on the property.

2317.   The Assistant City Attorney alleged Havana Bungalows was in violation of its compliance agreement, claiming "mitigation [was in] April 2018" and the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which [called

for the permit to be demolished] six months . . . after the order."

2318.   However, the Assistant City Attorney was wrong.

2319.   And, Havana Bungalows informed the Assistant City Attorney the compliance agreement clearly stated the property needed to be "demolished six months from the closing"— not six months from that order.

2320.   Which the Assistant City Attorney noted "that is what [she does not] know" when the closing was.

2321.   The City's Code Compliance Director also tried to influence the Code Board by attempting to impose the not yet effective new policy.

2322.   Additionally, the City's Code Compliance Director sought to breach the corporate veil calling Havana Bungalows a "repeat offender" because it was associated with Fuller and Pinilla.

2323.   Even then, the City Commissioner (Carollo) also sought to influence the Board through his staff instructing a Code Board Member to vote against his "political enemies[.]"

2324.   Of course as that City Commissioner would testify, doing so would be absolutely wrong to do.

2325.   As a result, the Code Board Member that received instructions from City staff followed a prior member's motion to impose a $7,500 dollar fine with a motion to impose more than $400,000 in fines on the property, despite the fact that the property was only worth approximately $250,000.

2326.   In the end, Havana Bungalows after being interrogated for nearly fifteen minutes and forced to justify mitigation to three different persons, was ordered to pay a fine of $85,000, which at the time, was unheard of.

2327.   In important contrast, the City Attorney's husband, who the city claims did not receive any special treatment, was able to mitigate $300,000 dollars in fines after appearing before the board for a mere minute and doing work without having a permit.

2328.   The City of Miami's attacks on Havana Bungalows have caused it to suffer monetary damages in excess of $376,595.00.

2329.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 74
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT CAROLLO

2330.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2331.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo; b) causing Carollo to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3

Commissioner; c) causing Carollo's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Carollo's political preferences.

2332.   On the other hand, Carollo knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by "using his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2333.   Through Carollo's conduct, pressure, and insistence, the City developed and selectively enforced policies and customs to target Havana Bungalows for retaliation.

2334.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2335.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them.

2336.   City staff were instructed to circle back with Rachel Dooley.

2337.   And that day, the Building Director discussed with the Chief of Unsafe Structures (Diaz).

2338.   The following day, on May 28, 2020—the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2339.   Havana Bungalows was on this list.

2340.   The Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2341.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2342.   Havana Bungalows'  mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2343.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2344.   Because one of the violations on Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

2345.   Havana Bungalows' ability to mitigate fines at the first hearing infuriated Carollo.

2346.   In March of 2022, Carollo attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-

homesteaded properties (such as Plaintiff) to mitigate fines.

2347.   The Ordinance also sought to reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2348.   Luckily, the policy was not yet in effect and Havana Bungalows managed to make the last hearing before Ordinance 14057 took effect.

2349.   And on April 27, 2022, Havana Bungalows appeared before the board.

2350.   Even though Ordinance 14057 was not in effect, the City tried to influence the Board so it was in effect to mitigate any reduction Havana Bungalows could get; and reroute it to appear before Carollo.

2351.   At the hearing, the Assistant City Attorney (Dooley) improperly sought to influence the Code Enforcement Board's vote.

2352.   Although the Assistant City Attorney was not the assigned to the case, she attempted to justify imposition of draconian measures by shockingly speaking on a matter she was without knowledge of.

2353.   Specifically, the Assistant City Attorney was unaware of (1) the date of the compliance agreement and (2) the date of Havana Bungalows' closing on the property.

2354.   The Assistant City Attorney alleged Havana Bungalows was in violation of its compliance agreement, claiming "mitigation [was in] April 2018" and the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which [called for the permit to be demolished] six months . . . after the order."

2355.   However, the Assistant City Attorney was wrong.

2356.   And, Havana Bungalows informed the Assistant City Attorney the compliance agreement clearly stated the property needed to be "demolished six months from the **closing**"—

not six months from that order.

2357.   The Assistant City Attorney did not know the compliance agreement she cited to the Board, nor did she know "when was the closing[.]"

2358.   The City's Code Compliance Director also tried to influence the Code Board by attempting to impose the not yet effective new policy.

2359.   Additionally, the City's Code Compliance Director sought to breach the corporate veil calling Havana Bungalows a "repeat offender" because it was associated with Fuller and Pinilla.

2360.   Even then, the City Commissioner (Carollo) also sought to influence the Board through his staff instructing a Code Board Member to vote against his "political enemies[.]"

2361.   Of course as that City Commissioner would testify, doing so would be absolutely wrong to do.

2362.   As a result, the Code Board Member that received instructions from Carollo through City Staff followed a prior member's motion to impose a $7,500 dollar fine with a motion to impose more than $400,000 in fines on the property, despite the fact that the property was only worth approximately $250,000.

2363.   In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2364.   An important comparison is that during this appeal, Havana Bungalows  was interrogated by City Officials for nearly fifteen minutes and forced to justify mitigation against three City persons.

2365.   This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2366.   For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2367.   Carollo's attacks on Havana Bungalows have caused it to suffer monetary damages in excess of $376,595.00.

2368.   Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2369.   Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2370.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 75
## PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

2371.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without

giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2372.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Noriega; b) causing Noriega to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Noriega's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Noreiga's political preferences.

2373.   On the other hand, Noriega knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and

malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2374.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Noriega to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2375.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2376.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2377.   The following day, on May 28, 2020—the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2378.   Havana Bungalows was on this list.

2379.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2380.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2381.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2382.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2383.   Because one of the violations on Havana Bungalows remained open, Havana Bungalows had to bifurcate the property for the sale and seek a second mitigation hearing.

2384.   Havana Bungalows' ability to mitigate fines at the first hearing infuriated Carollo.

2385.   Thus, the City of Miami—in accordance with the official policies and widespread customs implemented by Noriega that departed from the policies and customs applicable to individuals and entities lacking Havana Bungalows' association with Fuller and Pinilla's disfavored First Amendment activities—targeted Havana Bungalows to punish and deter protected political expression as follows.

2386.   In March of 2022, Noriega attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines.

2387.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2388.   Luckily, the policy was not yet in effect and Havana Bungalows managed to make the last hearing before Ordinance 14057 took effect.

2389.   And on April 27, 2022, Havana Bungalows appeared before the board.

2390.   Even though Ordinance 14057 was not in effect, the City tried to influence the Board so it was in effect to mitigate any reduction Havana Bungalows could get; and reroute it to appear before Carollo.

2391.   At the hearing, the Assistant City Attorney (Dooley) improperly sought to influence the Code Enforcement Board's vote.

2392.   Although the Assistant City Attorney was not the assigned to the case, She attempted to justify imposition of draconian measures by shockingly speaking on a matter she was without knowledge of.

2393.   Specifically, the Assistant City Attorney was unaware of (1) the date of the compliance agreement and (2) the date of Havana Bungalows' closing on the property.

2394.   The Assistant City Attorney alleged Havana Bungalows was in violation of its compliance agreement, claiming "mitigation [was in] April 2018" and the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which [called for the permit to be demolished] six months . . . after the order."

2395.   However, the Assistant City Attorney was wrong.

2396.   And, Havana Bungalows informed the Assistant City Attorney the compliance agreement clearly stated the property needed to be "demolished six months from the closing" — not six months from that order.

2397.   The Assistant City Attorney did not know the compliance agreement she cited to the Board, nor did she know "when was the closing[.]"

2398.   The City's Code Compliance Director also tried to influence the Code Board by attempting to impose the not yet effective new policy.

2399.   Additionally, the City's Code Compliance Director sought to breach the corporate veil calling Havana Bungalows a "repeat offender" because it was associated with Fuller and Pinilla.

2400.   Even then, the City Commissioner (Carollo) also sought to influence the Board

through his staff instructing a Code Board Member to vote against his "political enemies[.]"

2401.   Of course as that City Commissioner would testify, doing so would be absolutely wrong to do.

2402.   As a result, the Code Board Member that received instructions from the Commissioner through City staff followed a prior member's motion to impose a $7,500 dollar fine with a motion to impose more than $400,000 in fines on the property, despite the fact that the property was only worth approximately $250,000.

2403.   In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2404.   During this appeal, Havana Bungalows was interrogated for nearly fifteen minutes and forced to justify mitigation to three City officials.

2405.   This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2406.   For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2407.   Noriega's attacks on Havana Bungalows have contributed to it suffering monetary damages in excess of $376,595.00.

2408.   Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2409.   Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2410.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 76**
**PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

2411.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2412.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Mendez; b) causing Mendez to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Mendez's false belief that

Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Mendez's political preferences.

2413.   On the other hand, Mendez knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2414.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Mendez to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2415.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller, Pinilla, and the businesses associated with

them, with the intention of deliberately crafting City policy to punish and deter their First Amendment activities.

2416.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2417.   The following day, on May 28, 2020—the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2418.   Havana Bungalows was on this list.

2419.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2420.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2421.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2422.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2423.   Because one of the violations on Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

2424.   Havana Bungalows' ability to mitigate fines infuriated Carollo.

2425.   Thus, the City of Miami—in accordance with the official policies and widespread customs implemented by Mendez that departed from the policies and customs applicable to

individuals and entities lacking Havana Bungalows' association with Fuller and Pinilla's disfavored First Amendment activities—targeted Havana Bungalows to punish and deter protected political expression as follows.

2426.   In March of 2022, Mendez attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines.

2427.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2428.   Luckily, the policy was not yet in effect and Havana Bungalows managed to make the last hearing before Ordinance 14057 took effect.

2429.   And on April 27, 2022, Havana Bungalows appeared before the board.

2430.   Even though Ordinance 14057 was not in effect, the City tried to influence the Board so it was in effect to mitigate any reduction Havana Bungalows could get; and reroute it to appear before Carollo.

2431.   At the hearing, the Assistant City Attorney (Dooley) improperly sought to influence the Code Enforcement Board's vote.

2432.   Of course, the Assistant City Attorney acts pursuant to Mendez's control.

2433.   Although the Assistant City Attorney was not assigned to the case, she attempted to justify imposition of draconian measures by shockingly speaking on a matter she was without knowledge of.

2434.   Specifically, the Assistant City Attorney was unaware of (1) the date of the compliance agreement and (2) the date of Havana Bungalows' closing on the property.

2435.   The Assistant City Attorney alleged Havana Bungalows was in violation of its

compliance agreement, claiming "mitigation [was in] April 2018" and the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which [called for the permit to be demolished] six months . . . after the order."

2436.  However, the Assistant City Attorney was wrong.

2437.  And, Havana Bungalows informed the Assistant City Attorney the compliance agreement clearly stated the property needed to be "demolished six months from the **closing**" — not six months from that order.

2438.  The Assistant City Attorney did not know the compliance agreement she cited to the Board, nor did she know "when was the closing[.]"

2439.  In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2440.  An important comparison is that during this appeal, Havana Bungalows was interrogated by City Officials for nearly fifteen minutes and forced to justify mitigation against three City Officials.

2441.  This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2442.  For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2443.  Mendez's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2444.  Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence

in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2445.   Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2446.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 77
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT DOOLEY

2447.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2448.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Dooley; b) causing Dooley to harbor

the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Dooley's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Dooley's political preferences.

2449.   On the other hand, Dooley knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2450.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Dooley to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2451.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2452.   The following day, on May 28, 2020—the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2453.   Havana Bungalows was on this list.

2454.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2455.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2456.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2457.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2458.   Because one of the violations on Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

2459.   Havana Bungalows' ability to mitigate fines infuriated Carollo.

2460.   Thus, the City of Miami—in accordance with the official policies and widespread customs implemented by Dooley that departed from the policies and customs applicable to individuals and entities lacking Havana Bungalows' association with Fuller and Pinilla's

disfavored First Amendment activities—targeted Havana Bungalows to punish and deter protected political expression as follows.

2461.   In March 2022, Dooley attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines.

2462.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2463.   Luckily, the policy was not yet in effect and Havana Bungalows managed to make the last hearing before **Ordinance 14057** took effect.

2464.   And on April 27, 2022, Havana Bungalows appeared before the board.

2465.   At the hearing, the Dooley improperly sought to influence the Code Enforcement Board's vote.

2466.   Although Dooley was not assigned to the case, she attempted to justify imposition of draconian measures by shockingly speaking on a matter she was without knowledge of.

2467.   Specifically, Dooley was unaware of (1) the date of the compliance agreement and (2) the date of Havana Bungalows' closing on the property.

2468.   Dooley falsely claimed Havana Bungalows was in violation of its compliance agreement, claiming "mitigation [was in] April 2018" and the City pulled the demolition permit in "July 2019, more than a year after the conditional mitigation which [called for the permit to be demolished] six months . . . after the order."

2469.   However, Dooley was wrong.

2470.   And, Havana Bungalows informed Dooley the compliance agreement clearly stated the property needed to be "demolished six months from the **closing**" —not six months from that

order.

2471.   Dooley did not know the compliance agreement she cited to the Board, nor did she know "when was the closing[.]"

2472.   In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2473.   An important comparison is that during this appeal, Havana Bungalows was interrogated by City Officials for nearly fifteen minutes and forced to justify mitigation against three City Officials.

2474.   This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2475.   For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2476.   Dooley's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2477.   Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2478.   Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2479.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 78
## PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT ORTIZ

2480.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2481.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Ortiz; b) causing Ortiz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Ortiz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho;

and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Ortiz's political preferences.

2482.   On the other hand, Ortiz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2483.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Ortiz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2484.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2485.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2486.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2487.   On April 27, 2022, prior to the Mitigation Hearing, Ortiz, as he had done before, called at least two Code Enforcement Board Members to tell them that "Carollo's enemy was going before the Board" and to vote against him again.

2488.   Of course, as Carollo would testify, doing so would be absolutely wrong to do.

2489.   As a result, the Code Board Member that received instructions from Ortiz followed a prior member's motion to impose a $7,500 with a motion to impose more than $400,000 in fines on the property, despite the fact that the property was only worth approximately $250,000.

2490.   In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2491.   An important comparison is that during this appeal, Havana Bungalows was interrogated by City Officials for nearly fifteen minutes and forced to justify mitigation against three City persons.

2492.   This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2493.   For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2494.   Ortiz's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2495.   Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2496.   Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2497.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 79
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT BAYONA

2498.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2499.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a)

hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Bayona; b) causing Bayona to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Bayona's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Bayona political preferences.

2500.   On the other hand, Bayona knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2501.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Bayona to knowingly and directly participate in his misconduct by mobilizing the City government to

implement official City policies and widespread City customs designed to harm Havana Bungalows.

2502.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2503.   Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2504.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2505.   On April 27, 2022, when the Code Enforcement Board arrived, Bayona went up to fellow board members—pointing out that properties related to Fuller were on the agenda and stating to remember the directives to vote against him.

2506.   Of course, as Carollo would testify—instructing code enforcement board members on how to vote would be absolutely wrong to do.

2507.   And Bayona followed a prior member's motion to impose a $7,500 dollar fine with a motion to impose more than $400,000 in fines on the property, despite the fact that the property was only worth approximately $250,000.

2508.   In the end, Havana Bungalows was ordered to pay a fine of $85,000, which at the time, was unheard of.

2509.   An important comparison is that during this appeal, Havana Bungalows was

interrogated by City Officials for nearly fifteen minutes and forced to justify mitigation against three City persons.

2510.   This is in direct contrast to the Code Enforcement Board's treatment towards what the City claims is an average appellant.

2511.   For example, when the City Attorney's husband sought to mitigate a fine, he spoke to the Board for a mere minute and was able to wipe away more than $300,000 in fines– without having properly permitted any of the work.

2512.   Bayona's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2513.   Havana Bungalows is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution.

2514.   Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Havana Bungalows in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Havana Bungalows' Rights of Free Association. And Bayona was, and still is, motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights.

2515.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 80
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT MARRERO

2516.   Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further

Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2517.   On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Marrero; b) causing Marrero to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Marrero's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Marrero's political preferences.

2518.   On the other hand, Marrero knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against

Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2519.  While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Marrero to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2520.  On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics.

2521.  And the following day, on May 28, 2020—the Chief of Unsafe Structures sent the Marrero a list of properties and property owners related to Fuller and Pinilla.

2522.  Havana Bungalows was on this list.

2523.  The Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2524.  Havana Bungalows worked to bring the property into compliance and, due to an

impending sale, sought to mitigate the accrued fines.

2525.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2526.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2527.   Because one of the violations on Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

2528.   Havana Bungalows' ability to mitigate fines infuriated Carollo.

2529.   Thus, the City of Miami—in accordance with the official policies and widespread customs implemented by Marrero that departed from the policies and customs applicable to individuals and entities lacking Havana Bungalows' association with Fuller and Pinilla's disfavored First Amendment activities—targeted Havana Bungalows to punish and deter protected political expression as follows.

2530.   In March 2022, Marrero attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-homesteaded properties (such as Plaintiff) to mitigate fines.

2531.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2532.   Marrero's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2533.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami

Charter and the United States Constitution. Marrero was reckless in his disregard for Fuller and Pinilla's First Amendment rights.

2534.  Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 81
### PLAINTIFF HAVANA BUNGALOWS' 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT DIAZ

2535.  Plaintiff Havana Bungalows should have been able to mitigate the citations on its property without improper influence. Instead, the City of Miami, acting on instructions to further Carollo's retaliation against Fuller and Pinilla and shut down their businesses, improperly instructed the Code Enforcement Board on how to vote –telling them to vote against "enemigo que voto en contra Carollo" (i.e., the enemy who voted against Carollo—referring to Mr. Fuller) was coming up and they had to vote against him and give his business the maximum penalty without giving him any extension to comply, and cited facts to the Board without knowledge, causing Havana Bungalows more than $375,000 in damages.

2536.  On one hand, Fuller and Pinilla engaged in political expression on behalf of, and in support of, Havana Bungalows, as well as their shared vision for the City that celebrates and embraces similar businesses and the individuals responsible for its operation, including by: a) hosting rallies for Alfie Leon and supporting social media advertising for Leon, a politician who opposed Carollo and, by extension, his political allies like Diaz; b) causing Diaz to harbor the false belief that Plaintiffs were financing a lawsuit that Alfie Leon filed against Carollo challenging his right to run for District 3 Commissioner; c) causing Diaz's false belief that Plaintiffs were organizing or participating in efforts to recall Carollo; d) filing an ethics complaint against Carollo; e) filing lawsuits, including lawsuits to stop the demolition of their buildings, and a federal lawsuit

against Carollo; f) hosting a press conference to expose Carollo's history of code violations at his home in Coconut Grove; g) promoting African-American and Afro-Cuban murals in Calle Ocho; and h) generally expressing a different vision for Calle Ocho and Little Havana in opposition to Diaz's political preferences.

2537.   On the other hand, Diaz knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate against Havana Bungalows in order to oppose and silence such political expression, including by following the lead of Carollo who, to borrow the words of Judge Smith, "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 at 7. As the result of the retaliatory actions that "specifically targeted" Fuller and Pinilla's "financial vulnerabilities by attempting to shut down their, or their tenants', businesses," through "continuous and unrelenting," and "intentional and malicious" misconduct that "continued long after" Fuller and Pinilla "filed suit" against Carollo, Havana Bungalows suffered economic harm. *Id.* at 8.

2538.   While Carollo was the motivating force in instigating the unconstitutional retaliation against Fuller, Pinilla, and their businesses, he relied on other officials like Diaz to knowingly and directly participate in his misconduct by mobilizing the City government to implement official City policies and widespread City customs designed to harm Havana Bungalows.

2539.   On May 27, 2020—Noriega met with the Building Director (Marrero) and "almost the entire City Attorney office" to "talk[ ] about Bill Fuller" and Martin Pinilla to update ordinances and policies to target them and properties and property owners related to them, and instructed City staff to circle back with the Assistant City Attorney, Rachel Dooley. That same

day, the Building Director met with the Chief of Unsafe Structures (Diaz) to discuss the same topics

2540.   And the following day, on May 28, 2020—Daiz sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2541.   Havana Bungalows was on this list.

2542.   The Havana Bungalows' property consisted of an older home with citations and fines accrued under the prior owner.

2543.   Havana Bungalows worked to bring the property into compliance and, due to an impending sale, sought to mitigate the accrued fines.

2544.   Havana Bungalows' mitigation hearing was set in front of the Code Enforcement Board ("the Board").

2545.   Havana Bungalows was able to reduce all but one of the accrued fines, which due to an oversight was not addressed during the meeting.

2546.   Because one of the violations on Havana Bungalows remained open, Plaintiff had to bifurcate the property for the sale and seek a second mitigation hearing.

2547.   Havana Bungalows' ability to mitigate fines infuriated Carollo.

2548.   Thus, the City of Miami—in accordance with the official policies and widespread customs implemented by Diaz that departed from the policies and customs applicable to individuals and entities lacking Havana Bungalows' association with Fuller and Pinilla's disfavored First Amendment activities—targeted Havana Bungalows to punish and deter protected political expression as follows.

2549.   In March 2022, Diaz attempted to derail Havana Bungalows' ability to mitigate fines by architecting Ordinance 14057 to eliminate the ability of property owners on non-

homesteaded properties (such as Plaintiff) to mitigate fines.

2550.   The Ordinance also sought reroute Havana Bungalows to appear before the Commission (including Carollo) to appeal its outstanding fine.

2551.   Diaz's attacks on Havana Bungalows contributed to it suffering monetary damages in excess of $376,595.00.

2552.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz was reckless in his disregard for Fuller and Pinilla's First Amendment rights.

2553.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 82**
**PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

</div>

2554.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2555.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2556.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2557.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2558.   Through the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), and Chief of Unsafe Structures (Diaz), LHAB TOO was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2559.   Starting in 2017, the City Commissioner created a list of properties and property owners related to Fuller and Pinilla.

2560.   LHAB TOO was on this list.

2561.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla.

2562.   On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney Office" to discuss Fuller and Pinilla and update policies and ordinances to shut down their properties and properties related to them.

2563.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2564.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2565.   **LHAB TOO was also on the Chief of Unsafe Structure's list.**

2566.   In January of 2022 LHAB TOO had a Compliance Agreement in place with clear instruction from Diaz and another City Official to open a permit that had expired in order to complete the work while complying with City's requirements.

2567.   However, in about May of 2022, once the permit was open, however, the City **reversed their position**, refused to allow the work for the open permit to comply with the City's requirements, and are currently seeking to demolish the property.

2568.   Recently, in late October of 2023, the City Manager (Noriega) instructed the Code Enforcement Department to research placing a violation on LHAB TOO for removal of trees.

2569.   The City's attack on LHAB TOO caused it to suffer monetary damages in excess of $12.72 million.

2570.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 83**</u>
<u>**PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT CAROLLO**</u>

2571.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2572.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2573.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2574.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2575.   Through Carollo's conduct, pressure, and insistence, LHAB TOO was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2576.   Starting in 2017, the City Commissioner created a list of properties and property owners related to Fuller and Pinilla.

2577.   LHAB TOO was on this list.

2578.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla.

2579.   On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney Office" to discuss Fuller and Pinilla and update policies and ordinances to shut their properties and properties related to them down.

2580.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2581.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2582.   LHAB TOO was also on the Chief of Unsafe Structure's list.

2583.   In **January of 2022**, LHAB TOO had a Compliance Agreement in place with clear instruction from Diaz and another City Official to open a permit that had expired in order to complete the work while complying with City's requirements.

2584.   In **about May of 2022**, once the permit was open, however, the City **reversed their position**, refused to allow the work for the open permit to comply with the City's requirements, and are currently seeking to demolish the property.

2585.   Recently, in late October of 2023, the City Manager (Noriega) instructed the Code Enforcement Department to research placing a violation on LHAB TOO for removal of trees.

2586.   Carollo's attack on LHAB TOO caused it to suffer monetary damages in excess of $12.72 million.

2587.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo was reckless in his disregard for Fuller and Pinilla of their First Amendment rights. And Carollo was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights.

2588.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 84
### PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT NORIEGA

2589.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2590.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2591.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2592.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2593.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2594.   Starting in 2017, the City Commissioner created a list of properties and property owners related to Fuller and Pinilla.

2595.   LHAB TOO was on this list.

2596.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla.

2597.   On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney Office" to discuss Fuller and Pinilla and update policies and ordinances to shut their properties and properties related to them down.

2598.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2599.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2600.   LHAB TOO was also on the Chief of Unsafe Structure's list.

2601.   In **January of 2022,** LHAB TOO had a Compliance Agreement in place with clear instruction from Diaz and another City Official to open a permit that had expired in order to complete the work while complying with City's requirements.

2602.   In about **May of 2022,** once the permit was open, however, the City **reversed their position**, refused to allow the work for the open permit to comply with the City's requirements, and are currently seeking to demolish the property.

2603.   Recently, in late October of 2023, Noriega instructed the Code Enforcement Department to research placing a violation on LHAB TOO for removal of trees.

2604.   Noriega's attack on LHAB TOO contributed to it suffering monetary damages in excess of $12.72 million.

2605.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega was reckless in his disregard for Plaintiff's First Amendment rights. And Carollo was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights

2606.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 85
### PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT MENDEZ

2607.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2608.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2609.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2610.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2611.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2612.   In February of 2020, Mendez met with the City Manager (Noriega) and Carollo and dozens of times to discuss Fuller and Pinilla.

2613.   On May 27, 2020, "almost the entire City Attorney Office" met with the City Manager (Noriega) and the Building Director (Marrero) to discuss Fuller and Pinilla and update policies and ordinances to shut properties down.

2614.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2615.   Of course, Dooley as an Assistant City Attorney, works under the umbrella of the City Attorney, Mendez.

2616.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2617.   LHAB TOO was also on the Chief of Unsafe Structure's list.

2618.   Mendez's attack on LHAB TOO contributed to it suffering monetary damages in

excess of $12.72 million.

2619.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez was reckless in her disregard for Plaintiff's First Amendment rights. And Mendez was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights

2620.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 86**</u>
<u>**PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT DOOLEY**</u>

2621.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2622.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2623.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2624.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2625.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2626.   Starting in 2017, the City Commissioner created a list of properties and property owners related to Fuller and Pinilla.

2627.   LHAB TOO was on this list.

2628.   On May 27, 2020, "almost the entire City Attorney Office" met with the City Manager (Noriega) and the Building Director (Marrero) to discuss Fuller and Pinilla and update policies and ordinances to shut properties down.

2629.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2630.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2631.   LHAB TOO was also on the Chief of Unsafe Structure's list.

2632.   Dooley's attack on LHAB TOO contributed to it suffering monetary damages in excess of $12.72 million.

2633.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley was reckless in her disregard for Plaintiff's First Amendment rights. And Dooley was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights

2634.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant

to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 87**
**PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

2635.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2636.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2637.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2638.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2639.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2640.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla.

2641.   On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney Office" to discuss Fuller and Pinilla and update policies and ordinances to shut properties down.

2642.   The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2643.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2644.   LHAB TOO was on the Chief of Unsafe Structure's list.

2645.   **In January of 2022**, LHAB TOO had a Compliance Agreement in place with clear instruction from **Diaz** and another City Official to open a permit that had expired in order to complete the work while complying with City's requirements.

2646.   **In May of 2022,** once the permit was open, however, the City **reversed their position**, refused to allow the work for the open permit to comply with the City's requirements, and are currently seeking to demolish the property.

2647.   Diaz's attack on LHAB TOO contributed to it suffering monetary damages in excess of $12.72 million.

2648.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz was reckless in his disregard for Plaintiff's First Amendment rights. And Diaz was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights.

2649.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 88
## PLAINTIFF LHAB TOO'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT MARRERO

2650.  In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2651.  Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2652.  Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2653.  Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2654.  However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2655.  In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times to discuss Fuller and Pinilla.

2656.  On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney Office" to discuss Fuller and Pinilla and update policies and ordinances to shut properties down.

2657.  The Building Director also had a conversation with the Chief of Unsafe Structures (Diaz) and instructed City staff to "circle back" with the Assistant City Attorney (Dooley) if they need to update ordinances.

2658.   The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

2659.   LHAB TOO was on the Chief of Unsafe Structure's list.

2660.   In January of 2022, LHAB TOO had a Compliance Agreement in place with clear instruction from Diaz and another City Official to open a permit that had expired in order to complete the work while complying with City's requirements.

2661.   In about May of 2022, once the permit was open, however, the City **reversed their position**, refused to allow the work for the open permit to comply with the City's requirements.

2662.   The Building Department is currently seeking to demolish the property.

2663.   Marrero's attack on LHAB TOO contributed to it suffering monetary damages in excess of $12.72 million.

2664.   LHAB TOO is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero was reckless in his disregard for Plaintiff's First Amendment rights. And Marrero was, and still is, motivated by an evil intent to drive LHAB TOO out of business and deprive Fuller and Pinilla of their constitutional rights

2665.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 89
### PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT THE CITY OF MIAMI

2666.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2667.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2668.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2669.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2670.   Through the Commissioner (Carollo), the City Attorney (Mendez), the Assistant City Attorney (Dooley), Chief of Unsafe Structures (Diaz), the City retaliated against Calle Ocho.

2671.   Beginning in 2017, Carollo circulated lists of properties and property owners related to Fuller and Pinilla.

2672.   Calle Ocho was on the Commissioner's list.

2673.   On August 20, 2018, the City sent Calle Ocho a letter claiming its Kiosks were "[i]noperable vehicles" constituting equipment and gave Calle Ocho less than two days to fasten the kiosks down or remove them.

2674.   Despite Calle Ocho consulting with the Assistant City Attorney (Dooley)—on August 31, 2018, the City Attorney filed for an injunction to grant the City authority to destroy the kiosks. This injunction was denied.

2675.   On September 4, 2018, the City revoked Calle Ocho's Temporary Use Permit.

2676.   At a September 6, 2018 hearing, the City mislead the Code Enforcement Board, claiming the property was less than 5,000 feet when it was in fact over 8,300.

2677.   On September 11, 2018, the City revoked the building permit and Calle Ocho removed the kiosks.

2678.   On February 20, 2019, The City Attorney (Mendez) circulated a list of properties and property owners related to Fuller and Pinilla.

2679.   Calle Ocho was on the City Attorney's list.

2680.   In February 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Plaintiff Fuller.

2681.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies and Ordinances to shut their and related properties down.

2682.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2683.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2684.   Calle Ocho was on the Chief of Unsafe Structure's list.

2685.   In **December of 2021**—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2686.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2687.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2688.   This was done specifically to target properties related to Fuller and Pinilla.

2689.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2690.   However, because of the retaliatory campaign, the plans were never approved by the City.

2691.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2692.   The City's attacks on Calle Ocho caused it to suffer monetary damages in excess of $14.48 million.

2693.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 90**</u>
<u>**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT CAROLLO**</u>

2694.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2695.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2696.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2697.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2698.   Through Carollo's conduct, pressure, and insistence, Calle Ocho was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2699.   Beginning in 2017, Carollo circulated lists of properties and property owners related to Fuller and Pinilla.

2700.   Calle Ocho was on the Commissioner's list.

2701.   On August 20, 2018, the City sent Calle Ocho a letter claiming its Kiosks were "[i]noperable vehicles" constituting equipment and gave Calle Ocho less than two days to fasten the kiosks down or remove them.

2702.   Despite Calle Ocho consulting with the Assistant City Attorney (Dooley)—on August 31, 2018, the City Attorney filed for an injunction to grant the City authority to destroy the kiosks. This injunction was denied.

2703.   On September 4, 2018, the City revoked Calle Ocho's TUP.

2704.   At a September 6, 2018 hearing, the City mislead the Code Enforcement Board, claiming the property was less than 5,000 feet when it was in fact over 8,300.

2705.   On September 11, 2018, the City revoked the building permit and Calle Ocho removed the kiosks.

2706.   On February 20, 2019, The City Attorney (Mendez) circulated a list of properties and property owners related to Fuller and Pinilla.

2707.   Calle Ocho was on the City Attorney's list.

2708.   In February 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

2709.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla to update policies to shut their and related properties down.

2710.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2711.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2712.   Calle Ocho was on the Chief of Unsafe Structure's list.

2713.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2714.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2715.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2716.   This was done specifically to target properties related to Fuller and Pinilla.

2717.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2718.   However, because of the retaliatory campaign, the plans were never approved by the City.

2719.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2720.    Carollo's attacks on Calle Ocho caused it to suffer monetary damages in excess of $14.48 million.

2721.    Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo was reckless in his disregard for Fuller and Pinilla's First Amendment rights. And Carollo was, and still is, motivated by an evil intent to drive Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2722.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 91**
**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

2723.    In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2724.    Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2725.    Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2726.    Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2727.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2728.   Beginning in 2017, Carollo circulated lists of properties and property owners related to Fuller and Pinilla.

2729.   Calle Ocho was on the Commissioner's list.

2730.   On August 20, 2018, the City sent Calle Ocho a letter claiming its Kiosks were "[i]noperable vehicles" constituting equipment and gave Calle Ocho less than two days to fasten the kiosks down or remove them.

2731.   Despite Calle Ocho consulting with the Assistant City Attorney (Dooley)—on August 31, 2018, the City Attorney filed for an injunction to grant the City authority to destroy the kiosks. This injunction was denied.

2732.   On September 4, 2018, the City revoked Calle Ocho's TUP.

2733.   At a September 6, 2018 hearing, the City mislead the Code Enforcement Board, claiming the property was less than 5,000 feet when it was in fact over 8,300.

2734.   On September 11, 2018, the City revoked the building permit and Calle Ocho removed the kiosks.

2735.   On February 20, 2019, The City Attorney (Mendez) circulated a list of properties and property owners related to Fuller and Pinilla.

2736.   Calle Ocho was on the City Attorney's list.

2737.   In February 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Plaintiff Fuller and Pinilla.

2738.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut their and related properties down.

2739.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2740.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2741.   Calle Ocho was on the Chief of Unsafe Structure's list.

2742.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2743.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2744.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2745.   This was done specifically to target properties related to Fuller and Pinilla.

2746.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2747.   However, because of the retaliatory campaign, the plans were never approved by the City.

2748.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2749.   Mendez's attacks on Calle Ocho contributed to it suffering monetary damages in excess of $14.48 million.

2750.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future

recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez was reckless in her disregard for Fuller and Pinilla's First Amendment rights. And Mendez was, and still is, motivated by an evil intent to drive Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2751.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 92**
**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

</div>

2752.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2753.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2754.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2755.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2756.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2757.   Beginning in 2017, Carollo circulated lists of properties and property owners related to Fuller and Pinilla.

2758.   Calle Ocho was on the Commissioner's list.

2759.   On August 20, 2018, the City sent Calle Ocho a letter claiming its Kiosks were "[i]noperable vehicles" constituting equipment and gave Calle Ocho less than two days to fasten the kiosks down or remove them.

2760.   Despite Calle Ocho consulting with the Assistant City Attorney (Dooley)—on August 31, 2018, the City Attorney filed for an injunction to grant the City authority to destroy the kiosks. This injunction was denied.

2761.   On September 4, 2018, the City revoked Calle Ocho's TUP.

2762.   At a September 6, 2018 hearing, the City mislead the Code Enforcment Board, claiming the property was less than 5,000 feet when it was in fact over 8,300.

2763.   On September 11, 2018, the City revoked the building permit and Calle Ocho removed the kiosks.

2764.   On February 20, 2019, The City Attorney (Mendez) circulated a list of properties and property owners related to Fuller and Pinilla.

2765.   Calle Ocho was on the City Attorney's list.

2766.   In February 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

2767.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2768.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2769.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2770.   Calle Ocho was on the Chief of Unsafe Structure's list.

2771.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2772.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2773.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2774.   This was done specifically to target properties related to Fuller and Pinilla.

2775.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2776.   However, because of the retaliatory campaign, the plans were never approved by the City.

2777.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2778.   Dooley's attacks on Calle Ocho contributed to it suffering monetary damages in excess of $14.48 million.

2779.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley was reckless in her disregard for Fuller and Pinilla's First Amendment rights. And Dooley was, and still is, motivated by an evil intent to drive

Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2780.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 93**
**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DIAZ**

</div>

2781.    In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2782.    Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2783.    Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2784.    Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2785.    However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2786.    In February 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Plaintiff Fuller.

2787.    On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and to update policies to shut properties down.

2788.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2789.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2790.   Calle Ocho was on the Chief of Unsafe Structure's list.

2791.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2792.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2793.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2794.   This was done specifically to target properties related to Fuller and Pinilla.

2795.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2796.   However, because of the retaliatory campaign, the plans were never approved by the City.

2797.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2798.   Diaz's attacks on Calle Ocho contributed to it suffering monetary damages in excess of $14.48 million.

2799.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz was reckless in his disregard for Fuller and

Pinilla's First Amendment rights. And Diaz was, and still is, motivated by an evil intent to drive Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2800.    Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 94**
**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT NORIEGA**

</div>

2801.    In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2802.    Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2803.    Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2804.    Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2805.    Through the conduct of the City Commissioner (Carollo), the City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Chief of Unsafe Structures (Diaz) and Building Director (Marrero), Calle Ocho was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2806.    In February 2020, Noriega met with Carollo and the City Attorney (Mendez) dozens of times concerning Plaintiff Fuller and Pinilla.

2807.   On May 27, 2020—Noriega met with the Building Director (Marrero) "almost the entire City Attorney office" to **talk[ ] about Bill Fuller**" and to update policies to shut properties down.

2808.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2809.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2810.   Calle Ocho was on the Chief of Unsafe Structure's list.

2811.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2812.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2813.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2814.   This was done specifically to target properties related to Fuller and Pinilla.

2815.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2816.   However, because of the retaliatory campaign, the plans were never approved by the City.

2817.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2818.   Noriega's attacks on Calle Ocho contributed to it suffering monetary damages in excess of $14.48 million.

2819.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future

recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega was reckless in his disregard for Fuller and Pinilla's First Amendment rights. And Noriega was, and still is, motivated by an evil intent to drive Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2820.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 95**
**PLAINTIFF CALLE OCHO'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

</div>

2821.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2822.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2823.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2824.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2825.   Through Carollo's conduct, pressure, and insistence, Calle Ocho was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2826.   On May 27, 2020—Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and to update policies to shut properties down.

2827.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2828.   The following day, on May 28, 2020, the Chief of Unsafe Structures sent a list of properties and property owners related to Fuller and Pinilla.

2829.   Calle Ocho was on the Chief of Unsafe Structure's list.

2830.   In December of 2021—Calle Ocho's tenant was informed that the City would assist him in securing the required approval to run a rum distillery at any property other than Calle Ocho.

2831.   This tenant was supposed to be Calle Ocho's "anchor" property but the City sought to run them off of the property.

2832.   In **February of 2022,** the City, in bad faith, changed its policy on compliance agreements, barring the Building Department Officials from entering compliance agreements and their working with property owners to extend deadlines.

2833.   This was done specifically to target properties related to Fuller and Pinilla.

2834.   Calle Ocho had plans to remodel a building on its property and had submitted these plans to the City.

2835.   However, because of the retaliatory campaign, the plans were never approved by the City.

2836.   **On May 13, 2022, the City demolished the building at Calle Ocho's property.**

2837.   Marrero's attacks on Calle Ocho contributed to it suffering monetary damages in excess of $14.48 million.

2838.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future

recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero was reckless in his disregard for Fuller and Pinilla's First Amendment rights. And Marrero was, and still is, motivated by an evil intent to drive Calle Ocho out of business and deprive Fuller and Pinilla of their constitutional rights.

2839.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 96
### PLAINTIFF LHAB TRES' 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT THE CITY OF MIAMI

2840.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2841.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2842.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2843.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2844.   Through the conduct of the Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), and Assistant City Attorney (Dooley), the City retaliated against LHAB Tres.

2845.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney dozens of times to discuss Fuller and Pinilla.

2846.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2847.   Near June of 2022, LHAB Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

2848.   Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

2849.   However, in June of 2022,  in the middle of these negotiations, the seller refused to continue negotiating because the City of Miami was seeking to buy the property, which it did for $1 million on June 30, 2022.

2850.   The building is now demolished, and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

2851.   The City's attacks on LHAB Tres have caused it to suffer monetary damages in excess of $5.79 million.

2852.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 97**
**PLAINTIFF LHAB TRES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

2853.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2854.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2855.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2856.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2857.   Through Carollo's conduct, pressure, and insistence, LHAB Tres was retaliated against for Fuller and Pinilla's exercise of constitutional rights.

2858.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney dozens of times to discuss Fuller and Pinilla.

2859.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2860.   Near June of 2022, LHAB Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

2861.   Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

2862.   However, in June of 2022, in the middle of these negotiations, the seller refused to continue negotiating because the City of Miami was seeking to buy the property, which it did for $1 million on June 30, 2022.

2863.   The building is now demolished, and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

2864.   Carollo's attacks on LHAB Tres have caused it to suffer monetary damages in excess of $5.79 million.

2865.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo was reckless in his disregard for Fuller and Pinilla's First Amendment rights. And Carollo was, and still is, motivated by an evil intent to drive LHAB Tres out of business and deprive Fuller and Pinilla of their constitutional rights.

2866.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 98
## PLAINTIFF LHAB TRES' 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

2867.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2868.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2869.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2870.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2871.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2872.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney dozens of times to discuss Fuller and Pinilla.

2873.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2874.   Near June of 2022, LHAB Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

2875.   Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

2876.   However in June of 2022, in the middle of these negotiations, the seller refused to continue negotiating because the City of Miami was seeking to buy the property, which it did for $1 million on June 30, 2022.

2877.   The building is now demolished, and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

2878.   Noriega's attacks on LHAB Tres contributed to it suffering monetary damages in excess of $5.79 million.

2879.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of

Miami Charter and the United States Constitution. Noriega was reckless in his disregard for Plaintiff's First Amendment rights. And Noriega was, and still is, motivated by an evil intent to drive LHAB Tres out of business and deprive Fuller and Pinilla of their constitutional rights.

2880.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 99**
**PLAINTIFF LHAB TRES' 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

2881.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2882.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2883.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2884.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2885.   However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2886.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney dozens of times to discuss Fuller and Pinilla.

2887.  On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2888.  Near June of 2022, LHAB Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

2889.  Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

2890.  However, in June of 2022, in the middle of these negotiations, the seller refused to continue negotiating because the City of Miami was seeking to buy the property, which it did for $1 million on June 30, 2022.

2891.  The building is now demolished, and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

2892.  Mendez's attacks on LHAB Tres contributed to it suffering monetary damages in excess of $5.79 million.

2893.  Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez was reckless in her disregard for Fuller and Pinilla's First Amendment rights. And Mendez was, and still is, motivated by an evil intent to drive LHAB Tres out of business and deprive Fuller and Pinilla of their constitutional rights.

2894.  Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 100
## PLAINTIFF LHAB TRES' 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT DOOLEY

2895.  In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2896.  Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2897.  Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2898.  Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2899.  However, Carollo was not, and could not have been, the sole actor in mobilizing an entire City government against Plaintiffs.

2900.  On May 27, 2020—"almost the entire City Attorney office" met with the City Manager (Noriega) and the Building Director (Marrero) to "**talk[ ] about Bill Fuller**" and to update policies to shut properties down.

2901.  Near June of 2022, LHAB Tres entered into a contract to acquire the property located at 1510 SW 7th St – immediately adjacent to Ball & Chain on the rear side.

2902.  Plaintiffs were negotiating an extension of time on the contract due to entitlements that were necessary to improve the property on acquisition.

2903.   However in June of 2022, in the middle of these negotiations, the seller refused to continue negotiating because the City of Miami was seeking to buy the property, which it did for $1 million on June 30, 2022.

2904.   The building is now demolished, and the lot is empty, bringing no income to the City but depriving Plaintiffs of their ability to generate income from this property.

2905.   Dooley's attacks on LHAB Tres have contributed to it suffering monetary damages in excess of $5.79 million.

2906.   Plaintiff is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley was reckless in her disregard for Fuller and Pinilla's First Amendment rights. And Dooley was, and still is, motivated by an evil intent to drive LHAB Tres out of business and deprive Fuller and Pinilla of their constitutional rights.

2907.   Plaintiff is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 101**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

2908.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

2909.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[11]

2910.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2911.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2912.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2913.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2914.   Through the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), and Code Enforcement Board Member (Bayona), the City retaliated against the properties which Barlington sponsors, causing significant reputational harm.

2915.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

---

[11] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

2916.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to target properties related to them.

2917.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2918.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

2919.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

2920.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

2921.   For instance, on **October 22, 2020,** the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

2922.   **Ordinance 13936** was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik. **The very day Ordinance 13936 was passed**, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

2923.   Ordinance 14057 was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

2924.   Ordinance 14118 was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

2925.   The City revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

2926.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

2927.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

2928.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

2929.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

2930.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

2931.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

2932.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

2933.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

2934.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

2935.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

2936.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

2937.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

2938.   The City reversed its positions regarding LHAB TOO's permits.

2939.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

2940.   The City's harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

2941.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 102**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

2942.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

2943.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[12]

2944.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2945.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2946.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

2947.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2948.   Through Carollo's insistence, pressure, and conduct, Barlington suffered significant reputational damages because of Carollo's retaliation against properties which Barlington sponsors.

2949.   In February of 2020, Carollo met with the City Manager (Noriega) and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

---

[12] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

2950.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Matin Pinilla to update policies to target properties retalted to them.

2951.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2952.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

2953.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

2954.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

2955.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

2956.   **Ordinance 13936** was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

2957.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

2958.   **Ordinance 14118** was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

2959.   The City revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

2960.   Gran Fiesta was listed on the Chief of Unsafe Structure's  May 28, 2020, list as having no unsafe violations.

2961.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

2962.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

2963.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

2964.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

2965.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

2966.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

2967.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

2968.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

2969.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

2970.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

2971.   Carollo worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations—providing the Board with instructions to vote against his political enemies.

2972.   The City reversed its positions regarding LHAB TOO's permits.

2973.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

2974.   Carollo's harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

2975.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of

Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Barlington out of business and deprive Fuller and Pinilla of their constitutional rights.

2976.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 103**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT NORIEGA**

</div>

2977.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

2978.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[13]

2979.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

2980.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

2981.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

---

[13] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

2982.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

2983.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

2984.   In February of 2020, Noriega met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

2985.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

2986.   Following Noriega's instructions, that day, the Building Director met with the Chief of Unsafe Structures (Diaz).

2987.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

2988.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

2989.   Thereon, as instructed by Noriega to further Carollo's retaliation, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

2990.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

2991.   Ordinance 13936 was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

2992.   Ordinance 14057 was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

2993.   Ordinance 14118 was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

2994.   Noriega worked to revoke the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

2995.   Gran Fiesta was listed on the Chief of Unsafe Structure's  May 28, 2020, list as having no unsafe violations.

2996.   Nevertheless—following Noriega's instructions, the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

2997.   In fact, the **City Attorney (Mendez) blatantly admitted to the harassment** stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

2998.   Moreover, Noriega personally went to measure the distance between Gran Fiesta and a purported religious facility to impede on Gran Fiesta's ability serve alcohol.

2999.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3000.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3001.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3002.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3003.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3004.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3005.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3006.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3007.   The City reversed its positions regarding LHAB TOO's permits.

3008.   And, **Noriega used City funds** to purchase a property LHAB Tres was negotiating on.

3009.   Noriega's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3010.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Barlington out of business and deprive Fuller and Pinilla of their constitutional rights.

3011.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 104**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MENDEZ**

</div>

3012.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3013.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[14]

3014.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3015.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3016.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3017.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3018.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

3019.   In February of 2020, Mendez met with Carollo and the City Manager (Noriega) dozens of times concerning Fuller.

3020.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) **"almost the entire City Attorney office"** to "**talk[ ] about Bill Fuller**" and to update policies to shut properties down.

3021.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

---

[14] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3022.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3023.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3024.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3025.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

3026.   Mendez architected Ordinance 13936 to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3027.   **The very day Ordinance 13936 was passed on October 22, 2020**, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3028.   Ordinance 14057 was created to target Havana Bungalows, Futurama, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3029.   After failing to derail the properties historic designation, Mendez architected Ordinance 14118 to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3030.   Mendez helped revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3031.   Gran Fiesta was listed on the Chief of Unsafe Structure's  May 28, 2020, list as having no unsafe violations.

3032.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3033.   In fact, Mendez blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

3034.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3035.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3036.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3037.   **Mendez allowed an erroneously issued a violation for Calle Siete to be defended by months of expensive, frivolous litigation**.

3038.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3039.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3040.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3041.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3042.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3043.   The City reversed its positions regarding LHAB TOO's permits.

3044.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

3045.   Barlington suffered substantial reputational harm by City's harassment and treatment of properties it manages.

3046.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First

Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Barlington out of business and deprive Fuller and Pinilla of their constitutional rights.

3047.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 105**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

3048.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3049.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[15]

3050.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3051.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3052.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3053.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

---

[15] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3054.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

3055.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and to update policies to shut properties down.

3056.   **Those updating policies were given specific instructions to "circle back" with Rachel Dooley.**

3057.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3058.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3059.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3060.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3061.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

3062.   Ordinance 13936 was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3063.   Ordinance 14057 was created to target Havana Bungalows, Futurama, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3064.   Ordinance 14118 was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3065.   The City used Ordinance 13936 to revoke the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3066.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3067.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3068.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

3069.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3070.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3071.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3072.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3073.   Defendant Dooley was the attorney who defended the City's frivolous position.

3074.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3075.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3076.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3077.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3078.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3079.   Dooley appeared before the Code Enforcement Board Hearing for Havana Bungalows and attempted mislead them into imposing extreme penalties.

3080.   The City reversed its positions regarding LHAB TOO's permits.

3081.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

3082.   Dooley's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3083.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3084.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 106
## PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT MARRERO

3085.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3086.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[16]

3087.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3088.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3089.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3090.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id.* at 8.

3091.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

3092.   On May 27, 2020—Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

---

[16] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3093.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3094.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3095.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3096.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3097.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

3098.   Marrero architected Ordinance 13936 to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3099.   The very day Ordinance 13936 was passed, Marrero, the City Manger, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3100.   Ordinance 14057 was created to target Havana Bungalows, Futurama, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3101.   Marrero helped architect Ordinance 14118 to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3102.   Marrero revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3103.   Gran Fiesta was listed on the Chief of Unsafe Structure's  May 28, 2020, list as having no unsafe violations.

3104.   Nevertheless—Marrero claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3105.   Marrero imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3106.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3107.   Marrero erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3108.   Marrero worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3109.   Marrero issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3110.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3111.   And without explanation, Marrero reversed its positions regarding LHAB TOO's permits.

3112.   Marrero's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3113.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3114.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 107
### PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT DIAZ

3115.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3116.  The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[17]

3117.  In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3118.  Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3119.  Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3120.  Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3121.  However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

3122.  On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3123.  That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3124.  The very next day, on May 28, 2020, **Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla**.

---

[17] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3125.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3126.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3127.   For instance, on October 22, 2020, the City passed Ordinance 13936 to specifically target properties and property owners affiliated with Plaintiff.

3128.   Diaz helped architect Ordinance 13936 to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik. The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3129.   Ordinance 14057 was created to target Havana Bungalows, Futurama, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3130.   Ordinance 14118 was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3131.   The City revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3132.   Gran Fiesta was listed on the Chief of Unsafe Structure's  May 28, 2020, list as having no unsafe violations.

3133.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3134.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

3135.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3136.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3137.   The City delayed Piedra Villas' opening by, *inter alia*, stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3138.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3139.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3140.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3141.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit, and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3142.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3143.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3144.   The City reversed its positions regarding LHAB TOO's permits.

3145.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

3146.   Diaz's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3147.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3148.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 108**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT PLASENCIA**

3149.Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3150.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[18]

3151.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3152.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3153.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3154.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id.* at 8.

---

[18] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3155.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

3156.   The City revoked the CU for LHAB's property before having cause.

3157.   Plasencia, subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared when making a determination that the property needed fire sprinklers.

3158.   Moreover, Plasencia denied LHAB the right to a "fire watcher" to enable the business to stay open while installation of the sprinklers.

3159.   Similarly, Plasencia determined that Piedra Villas' staircase was not compliant with code—yet was unable to articulate what code it was not compliant with.

3160.   Plasencia's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3161.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3162.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 109**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT ORTIZ**

3163.    Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3164.    The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[19]

3165.    In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3166.    Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3167.    Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3168.    Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3169.    However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

---

[19] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3170.   When Gran Fiesta appeared before the Code Enforcement Board, Ortiz instructed the Board to vote against Carollo's enemies.

3171.   When Futurama appeared before the Code Enforcement Board, Ortiz instructed the Board to vote against Carollo's enemies.

3172.   When Havana Bungalows appeared before the Code Enforcement Board, Ortiz instructed the Board to vote against Carollo's enemies.

3173.   Because of Ortiz's statements, one board member admitted to feeling intimidated into imposing unfair and extreme penalties against properties related to Fuller and Pinilla—solely because they were Carollo's political enemies.

3174.   Ortiz's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3175.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3176.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 110**
**PLAINTIFF BARLINGTON'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT BAYONA**

3177.   Barlington is the real estate "sponsor" behind LHAB, Gran Fiesta, Brickell Station, Piedra Villas, Calle Siete, Beatstik, El Shopping, Tower Hotel, Futurama, Havana Bungalows, LHAB Too, Calle Ocho, and LHAB Tres.

3178.   The "sponsor" is the entity which "brings financial & legal support, a proven track record, and experience, day-to-day management, and execution" of real estate projects.[20]

3179.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3180.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician.

3181.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3182.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3183.   However, Carollo was not, nor could he have been, the sole actor in mobilizing a City against Plaintiffs.

---

[20] Daniel Di Cerbo, *Real Estate Sponsor – Responsibilities EXPLAINED*, WILLOWDALE EQUITY, https://tinyurl.com/2wvtnan5 (last updated Dec. 12, 2023).

3184.   When Gran Fiesta appeared before the Code Enforcement Board, Bayona took her directions on how to vote from Ortiz and voted against Carollo's enemies.

3185.   When Futurama appeared before the Code Enforcement Board, Bayona took her directions on how to vote from Ortiz and voted against Carollo's enemies.

3186.   When Havana Bungalows appeared before the Code Enforcement Board, Bayona took her directions on how to vote from Ortiz and voted against Carollo's enemies.

3187.   Bayona even sought to influence other Board Members to vote against these properties—stating "remember the directives to vote against" Carollo's enemies.

3188.   Bayona's contribution to the harassment campaign has caused significant damage to Barlington's reputation as a sponsor which it would not have incurred had the City not operated in retaliation of Fuller and Pinilla's support for Carollo's political opponent.

3189.   Barlington is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Barlington in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and Barlington's Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Barlington out of business and deprive them of their constitutional rights.

3190.   Barlington is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 111**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT THE CITY OF MIAMI**

3191.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3192.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3193.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3194.   Fuller suffered extensively as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3195.   Through the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), and Code Enforcement Board Member (Bayona), the City retaliated against Fuller.

3196.   Fuller has rights protected by the First Amendment of the United States Constitution, including the rights to free speech, association, and to redress from the government for grievances.

3197.   The City willingly and knowingly, under the color of law, attacked Fuller for his support of Carollo's political opponent, Alfie Leon.

3198.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

3199.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3200.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3201.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3202.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3203.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla. However, the harassment was not confined to those properties listed and extended to all properties and organizations Fuller was a part of, including, amongst others, El Shopping, and Piedra Villas.

3204.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3205.   **Ordinance 13936** was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3206.   The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

493

3207.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3208.   **Ordinance 14118** was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3209.   **Every business Fuller was engaged in was attacked and uprooted as part of Carollo's vendetta—which the City enabled, empowered, and took part of.**

3210.   The City revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or "mysteriously disappeared" and exceeded its authority in "auditing" Ortus and the property.

3211.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3212.   Nevertheless—the City claimed that the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3213.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating, "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3214.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3215.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one, and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3216.   The City delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3217.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3218.   The City worked to delay Beatstik's ability to conduct renovations within the scope of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3219.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3220.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3221.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation, and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote and seeking to pass ordinances to specifically target its shared workspaces.

3222.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3223.   The City reversed its positions regarding LHAB TOO's permits.

3224.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

3225.   Even during the *Fuller I* trial, the City used its resources to target Fuller.

3226.   After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[21]

3227.   And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented  by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take  longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3228.   The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Fuller mentally, psychologically, and financially.

---

[21] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

3229.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3230.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3231.   Fuller has been unable to sleep at night.   He has spent many nights awake.   The little sleep he has gotten has been disturbed.

3232.   Fuller became concerned for his safety and the safety of his family.

3233.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his  businesses.

3234.   Fuller cannot escape the knowledge that the City is willing and able to fabricate evidence, complaints, and violations, with the sole purpose of shutting down his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3235.   The City has unlimited funds and resources to try to destroy Fuller, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3236.   Fuller spent a large part of his life building a great business with a great portfolio of properties and has developed a stellar reputation in the community.

3237.   The injury has not only been mental or emotional.   Fuller's physical appearance and well-being has changed and his physical health has suffered.

3238.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3239.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute, specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. This alone cost Fuller $5 million.

3240.   The City abused the its resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3241.   The City has acted intentionally and outrageously.

3242.   The City's harassment campaign has caused severe emotional distress to Fuller.

3243.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 112
### PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT CAROLLO

3244.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3245.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3246.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3247.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3248.   During trial, Carollo continued to attack Fuller.

3249.   After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[22]

3250.   And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented  by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take  longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3251.   The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Fuller mentally, psychologically, and financially.

3252.   On June 1, 2023, a jury found Carollo liable for targeting Fuller in retaliation.

---

[22] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

3253.   However, despite a $63.5 million judgment against Carollo, he has remained undeterred.

3254.   As the Miami Herald reported, Carollo is "unfazed by [the] $63M beating" and that Carollo promises to be the "last man standing" in his "next fight" with Plaintiffs, which is his false accusation implying that Plaintiffs obtained fraudulent loans from the federal government's Paycheck Protection Program ("PPP") to support their businesses through the COVID pandemic, saying: "I'll make a deal. If Mr. Fuller can prove the $6.5 million of federal PPP relief they got was spent appropriately and their employees were paid, I'll resign."[23]

3255.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3256.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3257.   Fuller continues to be unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3258.   Fuller became concerned for his safety and the safety of his family.

3259.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3260.   Fuller cannot escape the knowledge that Carollo is willing and able to fabricate evidence, complaints, and violations, all with the sole purpose of shutting down his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

---

[23] *See* Linda Robertson, MIAMI HERALD, Miami's political godfather Joe Carollo, unfazed by $63M beating, can't wait for next fight, at http://tinyurl.com/mscs88fv (Dec.20, 2023).

3261.   Carollo abuses the City's unlimited funds and resources to try to destroy Fuller, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3262.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3263.   The injury has not only been mental or emotional. Fuller's physical appearance and well-being has changed and his physical health has suffered.

3264.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3265.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute, specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. This alone cost Fuller $5 million.

3266.   Carollo continues to act intentionally and outrageously.

3267.   Carollo's harassment campaign continues to cause severe emotional distress to Fuller.

3268.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3269.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 113**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT NORIEGA**

</div>

3270.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3271.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3272.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3273.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3274.   However, Carollo would not, nor could he, have been able to weaponize a whole City without Noriega's assistance.

3275.   In February of 2020, Noriega met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

3276.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3277.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3278.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3279.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3280.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3281.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3282.   **Noriega architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3283.   The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3284.   Ordinance 14057 was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3285.   After his attempt to derail their historic designation failed, **Noriega architected Ordinance 14118** to demolish Tower Hotel, Beatstik, and Piedra Villas, despite their designations.

3286.   **Every business Fuller was engaged in was attacked and uprooted as part of Noriega's willingness, enabling, and empowerment of Carollo's political vendetta.**

3287.   Noriega moved to revoke the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3288.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3289.   Nevertheless—the Building Department used **Noriega's Ordinance, Ordinance 13936** and claimed that the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3290.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3291.   Moreover, the Noriega sought to impede on Gran Fiesta through his position as City Manager and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3292.   The Building Department imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3293.   The Building Department delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3294.   The Building Department erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3295.   The Building Department worked to delay Beatstik's ability to conduct renovations within the scope of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3296.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3297.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3298.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3299.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3300.   And, Noriega allowed City funds to purchase a property LHAB Tres was negotiating on.

3301.   **Noriega helped weaponize the City's resources to close in on Fuller**—targeting any business or non-profit Fuller appeared in—closing in on everything he worked to create, all because he supported Carollo's political opponent—Alfie Leon.

3302.   Even during the *Fuller I* trial, the City used its resources to target Fuller.

3303. After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[24]

3304. And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3305. The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Fuller mentally, psychologically, and financially.

3306. Fuller has suffered through more than five years of emotional distress and mental anguish.

---

[24] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

3307.   This emotional distress and mental anguish have been growing and compounding with each retaliatory act by the Defendants.

3308.   Fuller has been unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3309.   Fuller became concerned for his safety and the safety of his family.

3310.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3311.   Fuller cannot escape the knowledge that Noriega is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3312.   Noriega has abused the City's unlimited funds and resources to try to destroy Fuller, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3313.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3314.   The injury has not only been mental or emotional. Fuller's physical appearance and well-being has changed and his physical health has suffered.

3315.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3316.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute, specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. This alone cost Fuller $5 million.

3317.   **Noriega has abused the City's resources to close in on Fuller**—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3318.   Noriega has acted intentionally and outrageously.

3319.   Noriega's involvement in the harassment campaign has caused severe emotional distress to Fuller.

3320.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3321.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 114
### PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT MENDEZ

3322.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3323.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3324.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3325.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3326.   However, Carollo would not and could not weaponize the City government against Fuller without Mendez's willing assistance.

3327.   Mendez—a licensed attorney admitted to the Florida Bar—bound by an ethical code, abused her position to spearhead frivolous litigation and City policy changes to target Fuller.

3328.   In February of 2020, Mendez met with Carollo and the City Manager (Noriega) dozens of times concerning Fuller and Pinilla but leaving no paper trail.

3329.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "**almost the entire City Attorney office**" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3330.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3331.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3332.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho

- Gran Fiesta
- Beatstik

3333.   Thereon, Mendez helped architect ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3334.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3335.   **Mendez architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3336.   The very day Ordinance 13936 was passed, Mendez, the City Manger, and the Building Director intentionally used it to revoke LHAB's CU by fabricating a violation before even having any justification.

3337.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3338.   After her attempt to disrupt the historic designation failed, **Mendez architected Ordinance 14118** to demolish Tower Hotel, Beatstik, and Piedra Villas despite their historic designations.

3339.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3340.   Nevertheless—the City used **Mendez's Ordinance, Ordinance 13936**, to claim the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3341.  In fact, **Mendez** blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today.**"

3342.  Mendez defended an erroneously issued a violation for Calle Siete and only admitted it was **baselessly cited after months of expensive, frivolous litigation**.

3343.  Mendez enabled the City to revoke El Shopping's CU for a mere aesthetics issue pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3344.  On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3345.  Mendez worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3346.  **Mendez helped weaponize the City's resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent**.

3347.  Fuller has suffered through more than five years of emotional distress and mental anguish.

3348.  This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3349.  Fuller has been unable to sleep at night.  He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3350.   Fuller became concerned for his safety and the safety of his family.

3351.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3352.   Fuller cannot escape the knowledge that Mendez is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3353.   Mendez abused the City's unlimited funds and resources to try to destroy Fuller, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3354.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3355.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3356.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3357.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. This alone cost Fuller $5 million.

3358.   **Mendez abused her position and its resources to close in on Fuller**—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3359.   Mendez has acted intentionally and outrageously.

3360.   Mendez's involvement in the harassment campaign has caused severe emotional distress to Fuller.

3361.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3362.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 115
### PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT DOOLEY

3363.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3364.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3365.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3366.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3367.    However, Carollo would not and could not weaponize the City government against Fuller without Dooley's willing assistance.

3368.    Dooley—a licensed attorney admitted to the Florida Bar—bound by an ethical code, abused her position to spearhead frivolous litigation and City policy changes to target Fuller.

3369.    On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3370.    City staff updating ordinances were instructed to **"circle back" to Rachel Dooley.**

3371.    That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3372.    The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3373.    Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3374.    Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3375.    For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3376.   **Dooley architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3377.   The very day Ordinance 13936 was passed, Mendez, the City Manger and the Building Director intentionally used it to revoke LHAB's CU by fabricating a violation before even having any justification.

3378.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3379.   After her attempt to disrupt the historic designation failed, **Dooley architected Ordinance 14118** to target Tower Hotel, Beatstik, and Piedra Villas and allow the City to demolish its buildings despite their historic designations.

3380.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3381.   Nevertheless—**the City used Dooley's Ordinance, Ordinance 13936,** and claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property.

3382.   And **Mendez** blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3383.   Dooley defended an erroneously issued a violation for Calle Siete and only admitted it was **baselessly cited after months of expensive, frivolous litigation**.

3384.   Dooley enabled the City to revoke El Shopping's CU for a mere aesthetics issue pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3385.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3386.   Dooley worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations and asserted facts she knew nothing about.

3387.   **Dooley helped weaponize the City's resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent**.

3388.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3389.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3390.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3391.   Fuller became concerned for his safety and the safety of his family.

3392.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3393.   Fuller cannot escape the knowledge that Dooley is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3394.   The City has unlimited funds and resources to try to destroy Fuller, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3395.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3396.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3397.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3398.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3399.   Dooley abused her position and its resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3400.   Dooley has acted intentionally and outrageously.

3401.   Dooley's participation in the harassment campaign has caused severe emotional distress to Fuller.

3402.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and

his Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3403.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 116**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

</div>

3404.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3405.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3406.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3407.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3408.   However, Carollo would not and could not have been able to weaponize the whole City against Fuller without Marrero's assistance.

3409.   On May 27, 2020—**Marrero met** with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" **and Martin Pinilla and to update policies to shut properties down.**

3410.   That day, Marrero **met with the Chief of Unsafe Structures (Diaz).**

3411.   The very next day, on May 28, 2020, the Chief of Unsafe Structures emailed Marrero a list of properties and property owners affiliate with Fuller and Pinilla.

3412.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3413.   Thereon, Marrero worked to create ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3414.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3415.   **Marrero architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3416.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3417.   **Marrero architected Ordinance 14118** to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3418.   Marrero revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3419.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3420.   Nevertheless—**Marrero using the Ordinance he helped create, Ordinance 13936,** claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

3421.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3422.   Marrero imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3423.   Marrero erroneously issued a violation for Calle Siete and it was only admitted to it being baselessly cited after months of expensive, frivolous litigation.

3424.   Marrero worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3425.   Marrero issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3426.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower

Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3427.   And Marrero reversed its positions regarding LHAB TOO's permits.

3428.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3429.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3430.   Fuller has been unable to sleep at night.  He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3431.   Fuller became concerned for his safety and the safety of his family.

3432.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near their homes or businesses.

3433.   Fuller cannot escape the knowledge that the Marrero is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3434.   Marrero has abused the City's unlimited funds and resources to try to destroy Fuller, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3435.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3436.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

521

3437.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3438.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3439.   Marrero abused his position and its resources to close in on Fuller—targeting any business he appeared in—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3440.   Marrero has acted intentionally and outrageously.

3441.   Marrero's participation in the  harassment campaign has caused severe emotional distress to Fuller.

3442.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3443.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 117**</u>
<u>**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT DIAZ**</u>

3444.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3445.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3446.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3447.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3448.   However, Carollo would not and could not have been able to weaponize the whole City against Fuller without Diaz's assistance.

3449.   On May 27, 2020, Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3450.   That day, the Diaz met with the Building Director.

3451.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3452.   Specifically on this list were:

- Havana Bungalows
- Futurama

- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3453. Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3454. For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3455. **Diaz architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik. The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3456. **Diaz architected Ordinance 14057** to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3457. **Diaz architected Ordinance 14118** was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3458. Diaz revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3459. Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3460. Nevertheless—Diaz claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3461.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3462.   Diaz imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3463.   Diaz "erroneously" issued a violation for Calle Siete and it was only admitted to being baselessly cited after months of expensive, frivolous litigation.

3464.   Diaz worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3465.   Diaz issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3466.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3467.   Diaz reversed its positions regarding LHAB TOO's permits.

3468.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3469.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3470.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3471.   Fuller became concerned for his safety and the safety of his family.

3472.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3473.   Fuller cannot escape the knowledge that Diaz is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3474.   Diaz has the ability to use unlimited City funds and resources to try to destroy Fuller, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3475.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3476.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3477.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3478.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3479.   Diaz abused his position and its resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3480.   Diaz's has acted intentionally and outrageously.

3481.   Diaz's participation in the  harassment campaign has caused severe emotional distress to Fuller.

3482.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3483.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 118**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT ORTIZ**

</div>

3484.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3485.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3486.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3487.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3488.   And Ortiz willingly assisted in Carollo's retaliation campaign.

3489.   Whenever a business or nonprofit related to Fuller appeared before the Code Enforcement Board, Ortiz would instruct the Board Members that Carollo's political enemy is here today and to vote against them, imposing the maximum harm.

3490.   As Carollo would testify, doing this would be absolutely wrong.

3491.   And Ortiz's instructions would be met by the Code Enforcement Board acting dutifully, imposing severe and harsh sanctions atypical for people that appear before it.

3492.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3493.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3494.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3495.   Fuller became concerned for his safety and the safety of his family.

3496.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3497.   Fuller cannot escape the knowledge that Ortiz is willing and able to instruct the Code Enforcement Board with impunity all with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3498.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3499.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3500.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3501.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3502.   Ortiz abused his position and its resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3503.   Ortiz has acted intentionally and outrageously.

3504.  Ortiz's participation in the  harassment campaign has caused severe emotional distress to Fuller.

3505.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3506.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 119**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT BAYONA**

</div>

3507.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3508.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3509.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3510.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3511.   Whenever a property owner related to Fuller appeared before the Code Enforcement Board, Bayona would take instructions from non-board members to vote against Carollo's political enemies.

3512.   Bayona even parroted her "directives" and tried to convince other board members to vote against Carollo's political enemies.

3513.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3514.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3515.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3516.   Fuller became concerned for his safety and the safety of his family.

3517.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3518.   Fuller cannot escape the knowledge that Bayona was willing and able to vote against him on every appeal before the Code Enforcement Board with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3519.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3520.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3521.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3522.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3523.   Bayona abused her position and its resources to close in on Fuller—targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3524.   Bayona has acted intentionally and outrageously.

3525.   Bayona's participation in the  harassment campaign has caused severe emotional distress to Fuller.

3526.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association.

3527.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 120**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT PLASENCIA**

3528.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3529.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3530.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3531.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3532.   However, Carollo would not and could not have weaponized an entire City alone.

3533.   The City has used an Ordinance, **Ordinance 13936**, which was specifically designed to harass Fuller and Pinilla to revoke the CU at LHAB the very same day it was passed.

3534.   The City revoked the CU without justification then realized it needed to have one for when it was inevitably asked.

3535.   Plasencia, as Fire Marshal, made a determination that LHAB needed fire sprinklers based on plans which either never existed or "mysteriously disappeared."

3536.   And Plasencia determined LHAB was not entitled to a "Fire Watcher" to keep the business open simply because LHAB was related to Carollo's political enemies.

3537.   Similarly, Plasencia determined that the staircase at Piedra Villas was not pursuant to Code and in October of 2021, despite not being able to articulate what code the stairs were not compliant with—Plasencia used this to intentionally delay Piedra Villas' permits.

3538.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3539.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3540.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3541.   Fuller became concerned for his safety and the safety of his family.

3542.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3543.   Fuller cannot escape the knowledge that Plasencia is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3544.   The City has unlimited funds and resources to try to destroy Fuller, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3545.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3546.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3547.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3548.   In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3549.   Plasencia abused his position and its resources to close in on Fuller—targeting LHAB and Piedra Villas—all because he supported Carollo's political opponent.

3550.   Plasencia has acted intentionally and outrageously.

3551.   Plasencia's participation in the  harassment campaign has caused severe emotional distress to Fuller.

3552.   Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3553.   Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 121**
**PLAINTIFF FULLER'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT GOLDBERG**

3554.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3555.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3556.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3557.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3558.   However, Carollo would not have and could not have been able to weaponize the City without assistance.

3559.   Goldberg knowing and willingly worked to harass El Shopping because of its relationship with Fuller.

3560.   On May 13, 2021, Goldberg abused his position to intentionally cite El Shopping's parking garage **three times** for the same violation.

3561.   In September of 2021, Goldberg used the fact that El Shopping's parking garage was shut down because of Ordinance 13936, which was specifically created to target Fuller and Pinilla, and shut down all the businesses at El Shopping's adjacent building.

3562.   Every business had its CU revoked merely because "there was not enough parking."

3563.   Fuller has suffered through more than five years of emotional distress and mental anguish.

3564.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3565.   Fuller has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3566.   Fuller became concerned for his safety and the safety of his family.

3567.   On more than one occasion, Fuller called the police department to report suspicious vehicles parked near his home or his businesses.

3568.   Fuller cannot escape the knowledge that Goldberg is willing and able to work extensively with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3569.   Goldberg has abused the City's unlimited funds and resources to try to destroy Fuller, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3570.   Fuller spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3571.   The injury has not only been mental or emotional  Fuller's physical appearance and well-being has changed and his physical health has suffered.

3572.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Fuller for fear of becoming targets of the City.

3573. In fact, one businessman who had committed to a major project with Fuller pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Fuller $5 million.**

3574. Goldberg abused his position and its resources to close in on Fuller—targeting El Shopping, all because he supported Carollo's political opponent.

3575. Goldberg has acted intentionally and outrageously.

3576. Goldberg's participation in the harassment campaign has caused severe emotional distress to Fuller.

3577. Fuller is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Goldberg's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Goldberg's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Goldberg, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Fuller in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Goldberg was, and still is, motivated by an evil intent to drive Fuller out of business and deprive him of his constitutional rights.

3578. Fuller is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 122**</u>
<u>**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**</u>
<u>**AGAINST DEFENDANT THE CITY OF MIAMI**</u>

3579. In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3580. Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3581.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3582.   Pinilla suffered extensively as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3583.   Through the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), and Code Enforcement Board Member (Bayona), the City retaliated against Pinilla.

3584.   Pinilla has rights protected by the First Amendment of the United States Constitution, including the rights to free speech, association, and to redress the government from grievances.

3585.   The City willingly and knowingly, under the color of law, attacked Pinilla for his support of Carollo's political opponent, Alfie Leon.

3586.   In February of 2020, the City Manager (Noriega) met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

3587.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3588.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3589.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3590.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3591.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla. However, the harassment was not confined to those properties listed and extended to all properties and organizations Pinilla was a part of, including El Shopping, and Piedra Villas.

3592.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3593.   **Ordinance 13936** was created to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3594.   The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3595.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3596.   **Ordinance 14118** was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3597.   **Every business Pinilla was engaged in was attacked and uprooted as part of Carollo's vendetta—which the City enabled, empowered, and took part of.**

3598.   The City revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3599.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3600.   Nevertheless—the City claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3601.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3602.   Moreover, the City sought to impede on Gran Fiesta through the City Manager (Noriega) and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3603.   The City imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3604.   The City delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3605.   The City erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3606.   The City worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3607.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3608.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3609.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3610.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3611.   The City reversed its positions regarding LHAB TOO's permits.

3612.   And, the City used its funds to purchase a property LHAB Tres was negotiating on.

3613.   Even during the *Fuller I* trial, the City used its resources to target Pinilla.

3614.   After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators

with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[25]

3615.   And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3616.   The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Pinilla mentally, psychologically, and financially.

3617.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3618.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3619.   Pinilla has been unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3620.   Pinilla became concerned for his safety and the safety of his family.

---

[25] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

3621.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3622.   Pinilla cannot escape the knowledge that the City is willing and able to fabricate evidence, complaints, and violations, all with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3623.   The City has unlimited funds and resources to try to destroy Pinilla, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3624.   Pinilla spent a large part of their lives building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3625.   The injury has not only been mental or emotional.  Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3626.   In addition, his ability to conduct their daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3627.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3628.   The City abused the its resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3629.   The City has acted intentionally and outrageously.

3630.   The City's harassment campaign has caused severe emotional distress to Pinilla.

3631.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 123**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT CAROLLO**

</div>

3632.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3633.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3634.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3635.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3636.   During trial, Carollo continued to attack Pinilla.

3637.   After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators

with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[26]

3638.   And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3639.   The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Pinilla mentally, psychologically, and financially.

3640.   On June 1, 2023, a jury found Carollo liable for targeting Pinilla in retaliation.

3641.   However, despite a $63.5 million judgment against Carollo, he has remained undeterred.

3642.   As the Miami Herald reported, Carollo is "unfazed by [the] $63M beating" and that Carollo promises to be the "last man standing" in his "next fight" with Plaintiffs, which is his false accusation implying that Plaintiffs obtained fraudulent loans from the federal government's Paycheck Protection Program ("PPP") to support their businesses through the COVID pandemic,

---

[26] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

saying: "I'll make a deal. If Mr. Fuller [and Mr. Pinilla] can prove the $6.5 million of federal PPP relief they got was spent appropriately and their employees were paid, I'll resign."[27]

3643.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3644.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3645.   Pinilla continues to be unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3646.   Pinilla became concerned for his safety and the safety of his family.

3647.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3648.   Pinilla cannot escape the knowledge that Carollo is willing and able to fabricate evidence, complaints, and violations, all with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3649.   Carollo abused the City's unlimited funds and resources to try to destroy Pinilla, his businesses, and his family, and to shut down his livelihood and ability to provide for his kids.

3650.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3651.   The injury has not only been mental or emotional. Pinilla's physical appearance and well-being has changed and his physical health has suffered.

---

[27] *See* Linda Robertson, MIAMI HERALD, Miami's political godfather Joe Carollo, unfazed by $63M beating, can't wait for next fight, at http://tinyurl.com/mscs88fv (Dec.20, 2023)

3652.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3653.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3654.   Carollo continues to act intentionally and outrageously.

3655.   Carollo's harassment campaign continues to cause severe emotional distress to Pinilla.

3656.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3657.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 124
## PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM
## AGAINST DEFENDANT NORIEGA

3658.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3659.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3660.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3661.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3662.   However, Carollo would not, nor could he, have been able to weaponize a whole City without Noriega's assistance.

3663.   In February of 2020, Noriega met with Carollo and the City Attorney (Mendez) dozens of times concerning Fuller and Pinilla.

3664.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla to update policies to shut properties down.

3665.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3666.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3667.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho

- Gran Fiesta
- Beatstik

3668.    Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3669.    For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3670.    **Noriega architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3671.    The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3672.    **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3673.    After his attempt to derail their historic designation failed, **Noriega architected Ordinance 14118** to demolish Tower Hotel, Beatstik, and Piedra Villas, despite their designations.

3674.    **Every business Pinilla was engaged in was attacked and uprooted as part of Noriega's willingness, enabling, and empowerment of Carollo's political vendetta.**

3675.    Noriega moved to revoke the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3676.    Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3677.    Nevertheless—the Building Department used **Noriega's Ordinance, Ordinance 13936** and claimed the technicality of Gran Fiesta's staircase being close to the property line was

sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3678.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3679.   Moreover, the Noriega sought to impede on Gran Fiesta through his position as City Manager and Carollo's attempt to claim the property was too close to a church to serve alcohol.

3680.   The Building Department imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3681.   The Building Department delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3682.   The Building Department erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3683.   The Building Department worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3684.   The City issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3685.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3686.   The City worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote, and seeking to pass ordinances to specifically target its shared workspaces.

3687.   The City worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3688.   And, Noriega allowed City funds to purchase a property LHAB Tres was negotiating on.

3689.   **Noriega helped weaponize the City's resources to close in on Pinilla** —targeting any business or non-profit Pinilla appeared in—closing in on everything he worked to create, all because he supported Carollo's political opponent—Alfie Leon.

3690.   Even during the *Fuller I* trial, the City used its resources to target Pinilla.

3691.   After the former Police Chief, Art Acevedo, testified truthfully about Carollo and Noriega, the City (at the direction of an as-yet unknown individual defendant) sent an investigator to follow Acevedo. Acevedo reported the harassment to the police, as reported by the Miami Herald:

> According to the incident report, Donald Blair and Bryan Austin Blair, both licensed investigators, were interviewed by police. When police initially questioned them, according to the report, they said they were investigators

with the Miami-Dade State Attorney's Office. They later retracted that, the report said, saying they do work for 22 South Florida cities.[28]

3692.   And the same investigators who were not honest with police in reporting whom they work for then began leaving voice mail messages with Plaintiffs' former employees, in which they indicate that they were hired by the City of Miami and its law firm:

> Hi Victor, this is Brian Blair, private investigator represented  by City of Miami. I am a private investigator once again and what I am doing is that we are trying to gather all of the former employees who worked for [Plaintiff LHAB's] **Ball and Chain**, at [Plaintiff Gran Fiesta's] **Taquitos Mexicanos and Los Altos**, on a case that is going to Court, Federal Court – Umm- ..and we wanted to see if you would cooperate we have the recorded statements- is not going to take  longer than 10 minutes -if you can meet with me at some time that would be great, again My name is Brian Blair my phone number is 786 447 74 27, that's 786 447 74 27 and you can call me at any time. Thank you and you have a great day.

3693.   The fact that the City has its private investigators following a Police Chief after his testimony is just the tip of the iceberg of the deception and intimidation Carollo has employed in his efforts to destroy Pinilla mentally, psychologically, and financially.

3694.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3695.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3696.   Pinilla has been unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3697.   Pinilla became concerned for his safety and the safety of his family.

---

[28] Charles Rabin, *After testifying against Carollo, fired Miami police chief says private eyes tailed him*, MIAMI HERALD, Apr. 20, 2023, http://tinyurl.com/k9vth3y9 (last accessed Feb. 22, 2024).

3698.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3699.   Pinilla cannot escape the knowledge that Noriega is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3700.   Noriega has abused the City's unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3701.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3702.   The injury has not only been mental or emotional. Pinilla's physical appearance and well-being has changed, and his physical health has suffered.

3703.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3704.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3705.   **Noriega has abused the City's resources to close in on Pinilla** —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3706.   Noriega has acted intentionally and outrageously.

3707.   Noriega's involvement in the harassment campaign has caused severe emotional distress to Pinilla.

3708.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3709.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 125
### PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT MENDEZ

3710.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3711.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3712.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3713.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3714.   However, Carollo would not and could not weaponize the City government against Pinilla without Mendez's willing assistance.

3715.   Mendez—a licensed attorney admitted to the Florida Bar—bound by an ethical code, abused her position to spearhead frivolous litigation and City policy changes to target Pinilla.

3716.   In February of 2020, Mendez met with Carollo and the City Manager (Noriega) dozens of times concerning Fuller and Pinilla but leaving no paper trail.

3717.   On May 27, 2020, the City Manager (Noriega) met with the Building Director (Marrero) and "**almost the entire City Attorney office**" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3718.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3719.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3720.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3721.   Thereon, Mendez helped architect ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3722.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3723.   **Mendez architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3724.   The very day Ordinance 13936 was passed, Mendez, the City Manger, and the Building Director intentionally used it to revoke LHAB's CU by fabricating a violation before even having any justification.

3725.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3726.   After her attempt to disrupt the historic designation failed, **Mendez architected Ordinance 14118** to demolish Tower Hotel, Beatstik, and Piedra Villas despite their historic designations.

3727.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, listed as having no unsafe violations.

3728.   Nevertheless—the City used **Mendez's Ordinance, Ordinance 13936**, to claim the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3729.   In fact, **Mendez** blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3730.   Mendez defended an erroneously issued a violation for Calle Siete and only admitted it was **baselessly cited after months of expensive, frivolous litigation**.

3731.   Mendez enabled the City to revoke El Shopping's CU for a mere aesthetics issue pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3732.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3733.   Mendez worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3734.   **Mendez helped weaponize the City's resources to close in on Pinilla — targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent**.

3735.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3736.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3737.   Pinilla has been unable to sleep at night.  He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3738.   Pinilla became concerned for his safety and the safety of his family.

3739.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3740.   Pinilla cannot escape the knowledge that Mendez is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and

destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3741.   Mendez abused the City's unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3742.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3743.   The injury has not only been mental or emotional  Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3744.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3745.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3746.   **Mendez abused her position and its resources to close in on Pinilla** —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3747.   Mendez has acted intentionally and outrageously.

3748.   Mendez's involvement in the harassment campaign has caused severe emotional distress to Pinilla.

3749.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of

Miami Charter and the United States Constitution. Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3750.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 126**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT DOOLEY**

</div>

3751.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3752.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3753.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3754.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3755.   However, Carollo would not and could not weaponize the City government against Pinilla without Dooley's willing assistance.

3756.   Dooley—a licensed attorney admitted to the Florida Bar—bound by an ethical code, abused her position to spearhead frivolous litigation and City policy changes to target Pinilla.

3757.   On May 27, 2020—the City Manager (Noriega) met with the Building Director (Marrero) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3758.   City staff updating ordinances were instructed to **"circle back" to Rachel Dooley.**

3759.   That day, the Building Director met with the Chief of Unsafe Structures (Diaz).

3760.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3761.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3762.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3763.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3764.   **Dooley architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3765.   The very day Ordinance 13936 was passed, Mendez, the City Manger and the Building Director intentionally used it to revoke LHAB's CU by fabricating a violation before even having any justification.

3766.   **Ordinance 14057** was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3767.   After her attempt to disrupt the historic designation failed, **Dooley architected Ordinance 14118** to target Tower Hotel, Beatstik, and Piedra Villas and allow the City to demolish its buildings despite their historic designations.

3768.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3769.   Nevertheless—**the City used Dooley's Ordinance, Ordinance 13936,** and claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property.

3770.   And **Mendez** blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3771.   Dooley defended an erroneously issued a violation for Calle Siete and only admitted it was **baselessly cited after months of expensive, frivolous litigation**.

3772.   Dooley enabled the City to revoke El Shopping's CU for a mere aesthetics issue pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3773.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3774.   Dooley worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations and asserted facts she knew nothing about.

3775.   **Dooley helped weaponize the City's resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent**.

3776.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3777.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3778.   Pinilla has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3779.   Pinilla became concerned for his safety and the safety of his family.

3780.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3781.   Pinilla cannot escape the knowledge that Dooley is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3782.   The City has unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3783.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3784.   The injury has not only been mental or emotional  Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3785.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3786.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3787.   Dooley abused her position and its resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3788.   Dooley has acted intentionally and outrageously.

3789.   Dooley's participation in the harassment campaign has caused severe emotional distress to Pinilla.

3790.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3791.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 127**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT MARRERO**

</div>

3792.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3793.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3794.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3795.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id.* at 8.

3796.   However, Carollo would not and could not have been able to weaponize the whole City against Pinilla without Marrero's assistance.

3797.   On May 27, 2020—**Marrero met** with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update **policies to shut properties down.**

3798.   That day, Marrero **met with the Chief of Unsafe Structures (Diaz).**

3799.   The very next day, on May 28, 2020, the Chief of Unsafe Structures emailed Marrero a list of properties and property owners affiliate with Fuller and Pinilla.

3800.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho

- Gran Fiesta
- Beatstik

3801.   Thereon, Marrero worked to create ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3802.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3803.   **Marrero architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3804.   Ordinance 14057 was created to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3805.   **Marrero architected Ordinance 14118** to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3806.   Marrero revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3807.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3808.   Nevertheless—**Marrero using the Ordinance he helped create, Ordinance 13936,** claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

3809.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3810.   Marrero imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3811.   Marrero erroneously issued a violation for Calle Siete and it was only admitted to being baselessly cited after months of expensive, frivolous litigation.

3812.   Marrero worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3813.   Marrero issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3814.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3815.   And Marrero reversed its positions regarding LHAB TOO's permits.

3816.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3817.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3818.   Pinilla has been unable to sleep at night.  He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3819.   Pinilla became concerned for his safety and the safety of his family.

3820.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3821.   Pinilla cannot escape the knowledge that the Marrero is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3822.   Marrero has abused the City's unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3823.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3824.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3825.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3826.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3827.   Marrero abused his position and its resources to close in on Pinilla —targeting any business he appeared in—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3828.   Marrero has acted intentionally and outrageously.

3829.   Marrero's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3830.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3831.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 128
### PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT DIAZ

3832.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3833. Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3834. Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3835. Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3836. However, Carollo would not and could not have been able to weaponize the whole City against Pinilla without Diaz's assistance.

3837. On May 27, 2020—Marrero met with the City Manager (Noriega) and "almost the entire City Attorney office" to "**talk[ ] about Bill Fuller**" and Martin Pinilla and to update policies to shut properties down.

3838. That day, the Diaz met with the Building Director.

3839. The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliate with Fuller and Pinilla.

3840. Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3841.   Thereon, the City created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3842.   For instance, on October 22, 2020, the City passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiff.

3843.   **Diaz architected Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.  The very day Ordinance 13936 was passed, the City Manger, the Building Director, and City Attorney intentionally used it to revoke LHAB's CU by fabricating a violation.

3844.   **Diaz architected Ordinance 14057** to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and force them to appear before Carollo.

3845.   **Diaz architected Ordinance 14118** was created to target Tower Hotel, Beatstik, and Piedra Villas, to allow the City to demolish its buildings despite their historic designations.

3846.   Diaz revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3847.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3848.   Nevertheless—Diaz claimed the technicality of Gran Fiesta's staircase being close to the property line was sufficient to shut down the property—yet did not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

3849.   In fact, the City Attorney (**Mendez**) blatantly admitted to the harassment stating "**If [Fuller and Pinilla] would have . . . treated City staff with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today**."

3850.   Diaz imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3851.   Diaz "erroneously" issued a violation for Calle Siete and it was only admitted to being baselessly cited after months of expensive, frivolous litigation.

3852.   Diaz worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

3853.   Diaz issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3854.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the City issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threaten the property with demolition.

3855.   Diaz reversed its positions regarding LHAB TOO's permits.

3856.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3857.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3858.   Pinilla has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3859.   Pinilla became concerned for his safety and the safety of his family.

3860.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3861.   Pinilla cannot escape the knowledge that Diaz is willing and able to fabricate evidence, complaints, and violations, all with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3862.   The City has unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3863.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3864.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3865.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3866.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3867.   Diaz abused his position and its resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3868.   Diaz's has acted intentionally and outrageously.

3869.  Diaz's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3870.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3871.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 129**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT ORTIZ**

</div>

3872.  In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3873.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3874.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3875.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3876.   And Ortiz willingly assisted in Carollo's retaliation campaign.

3877.   Whenever a business or nonprofit related to Pinilla appeared before the Code Enforcement Board, Ortiz would instruct the Board Members that Carollo's political enemy is here today and to vote against them, imposing the maximum harm.

3878.   As Carollo would testify, doing this would be absolutely wrong.

3879.   And Ortiz's instructions would be met by the Code Enforcement Board acting dutifully, imposing severe and harsh sanctions atypical for people that appear before it.

3880.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3881.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3882.   Pinilla has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3883.   Pinilla became concerned for his safety and the safety of his family.

3884.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3885.   Pinilla cannot escape the knowledge that Ortiz is willing and able to instruct the Code Enforcement Board with impunity all with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3886.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3887.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3888.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3889.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3890.   Ortiz abused his position and its resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3891.   Ortiz has acted intentionally and outrageously.

3892.   Ortiz's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3893.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Ortiz, in retaliation against Plaintiffs' Pinilla and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3894.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 130**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT BAYONA**

3895.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3896.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3897.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3898.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3899.   Whenever a property owner related to Pinilla appeared before the Code Enforcement Board, Bayona would take instructions from non-board members to vote against Carollo's political enemies.

3900.   Bayona even parroted her "directives" and tried to convince other board members to vote against Carollo's political enemies.

3901.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3902.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3903.   Pinilla has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3904.   Pinilla became concerned for his safety and the safety of his family.

3905.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3906.   Pinilla cannot escape the knowledge that Bayona was willing and able to vote against him on every appeal before the Code Enforcement Board with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3907.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3908.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3909.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3910.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3911.   Bayona abused her position and its resources to close in on Pinilla —targeting any business he appeared in, targeting any non-profit he worked with—closing in on everything he worked to create, all because he supported Carollo's political opponent.

3912.   Bayona has acted intentionally and outrageously.

3913.   Bayona's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3914.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association.

3915.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 131
### PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM
### AGAINST DEFENDANT PLASENCIA

3916.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3917.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3918.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3919.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3920.   However, Carollo would not and could not have weaponized an entire City alone.

3921.   The City had used an Ordinance, Ordinance 13936, which was specifically designed to harass Fuller and Pinilla to revoke the CU at LHAB the very same day it was passed.

3922.   The City revoked the CU without justification then realized it needed to have one for when it was inevitably asked.

3923.   Plasencia, as Fire Marshal, made a determination that LHAB needed fire sprinklers based on plans which either never existed or "mysteriously disappeared."

3924.   And Plasencia determined LHAB was not entitled to a "Fire Watcher" to keep the business open simply because LHAB was related to Carollo's political enemies.

3925.   Similarly, Plasencia determined that the staircase at Piedra Villas was not pursuant to code and in October of 2021, despite not being able to articulate what code the stairs were not compliant with—Plasencia used this to intentionally delay Piedra Villas' permits.

3926.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3927.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3928.   Pinilla has been unable to sleep at night. He has spent many nights awake. The little sleep he has gotten has been disturbed.

3929.   Pinilla became concerned for his safety and the safety of his family.

3930.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3931.   Pinilla cannot escape the knowledge that Plasencia is willing and able to fabricate evidence, complaints, and violations with the sole purpose of shutting down his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3932.   The City has unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3933.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3934.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3935.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3936.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3937.   Plasencia abused his position and its resources to close in on Pinilla —targeting LHAB and Piedra Villas—all because he supported Carollo's political opponent.

3938.   Plasencia has acted intentionally and outrageously.

3939.   Plasencia's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3940.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech, and his Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3941.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<div align="center">

**COUNT 132**
**PLAINTIFF PINILLA'S 42 U.S.C. § 1983 CLAIM**
**AGAINST DEFENDANT GOLDBERG**

</div>

3942.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3943.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3944.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3945.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3946.   However, Carollo would not have and could not have been able to weaponize the City without assistance.

3947.   Goldberg knowing and willingly worked to harass El Shopping because of its relationship with Pinilla.

3948.   On May 13, 2021, Goldberg abused his position to intentionally cite El Shopping's parking garage **three times** for the same violation.

3949.   In September of 2021, Goldberg used the fact that El Shopping's parking garage was shut down because of Ordinance 13936, which was specifically created to target Fuller and Pinilla, and shut down all the businesses at El Shopping's adjacent building.

3950.   Every business had its CU revoked merely because "there was not enough parking."

3951.   Pinilla has suffered through more than five years of emotional distress and mental anguish.

3952.   This emotional distress and mental anguish has been growing and compounding with each retaliatory act by the Defendants.

3953.   Pinilla has been unable to sleep at night. He has spent many nights awake.  The little sleep he has gotten has been disturbed.

3954.   Pinilla became concerned for his safety and the safety of his family.

3955.   On more than one occasion, Pinilla called the police department to report suspicious vehicles parked near his home or his businesses.

3956.   Pinilla cannot escape the knowledge that Goldberg is willing and able to work extensively with the sole purpose of shutting his businesses and destroying his life, all because he supported Carollo's political opponent and then continued to speak out against the City.

3957.   Goldberg has abused the City's unlimited funds and resources to try to destroy Pinilla, his businesses, and his family and to shut down his livelihood and ability to provide for his kids.

3958.   Pinilla spent a large part of his life building a great business with a great portfolio of properties and developed a stellar reputation in the community.

3959.   The injury has not only been mental or emotional Pinilla's physical appearance and well-being has changed and his physical health has suffered.

3960.   In addition, his ability to conduct daily business has become significantly more difficult due to the City's actions. Potential business partners are reluctant to do business with Pinilla for fear of becoming targets of the City.

3961.   In fact, one businessman who had committed to a major project with Pinilla pulled out at the last minute specifically stating that he wanted to do the deal but could not take the risk of becoming a target of Carollo and the City. **This alone cost Pinilla $5 million.**

3962.   Goldberg abused his position and its resources to close in on Pinilla —targeting El Shopping, all because he supported Carollo's political opponent.

3963.   Goldberg has acted intentionally and outrageously.

3964.   Goldberg's participation in the  harassment campaign has caused severe emotional distress to Pinilla.

3965.   Pinilla is also entitled to punitive damages to punish, penalize, and deter the future recurrence of Goldberg's reprehensible conduct and to deter its future occurrence in an amount to be proven at trial. Goldberg's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Goldberg, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Pinilla in reckless disregard for his First Amendment Rights of Free Speech,

and his Rights of Free Association. And Goldberg was, and still is, motivated by an evil intent to drive Pinilla out of business and deprive him of his constitutional rights.

3966.   Pinilla is also entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>COUNT 133</u>
<u>ALL PLAINTIFFS' CIVIL CONSPIRACY CLAIM</u>
<u>AGAINST DEFENDANT THE CITY OF MIAMI</u>

3967.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

3968.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

3969.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

3970.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

3971.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), Zoning Director (Goldberg) (herein collectively the "Group"), the City is liable for the conspiratorial plot against Plaintiffs.

3972.  **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo), and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

3973.  And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

3974.  And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

3975.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

3976.  Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

3977.  Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

3978.  For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

3979.  **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

3980.   **The very day** Ordinance 13936 was passed, on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

3981.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

3982.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

3983.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

3984.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

3985.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

3986.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

3987.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either

never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

3988.  Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

3989.  Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property— despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

3990.  In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

3991.  The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

3992.  The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

3993.  The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

3994.  The Group worked to delay Beatstik's ability to conduct renovations within the scope of its permit and specifically waited until February 28, 2022 to request documents so that Beatstik would not be able to comply by March 3, 2022.

3995.  The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used

this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

3996.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

3997.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

3998.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

3999.   The Group reversed its position regarding LHAB TOO's permits.

4000.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4001.   Defendant The City of Miami knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy. This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4002.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

<u>**COUNT 134**</u>
<u>**ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY**</u>
<u>**AGAINST DEFENDANT CAROLLO**</u>

4003.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4004.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4005.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4006.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4007.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Carollo is liable for the conspiratorial plot against Plaintiffs.

4008.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4009.   And so, he created a Civil Conspiracy to effectuate his retaliation.

4010.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation

for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4011.  And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4012.  And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4013.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4014.  Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4015.  Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4016.  For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4017.  **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4018.  **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4019.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4020.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4021.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4022.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4023.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4024.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4025.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4026.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4027.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4028.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4029.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4030.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4031.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4032.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4033.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4034.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4035.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4036.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4037.   The Group reversed its positions regarding LHAB TOO's permits.

4038.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4039.   Defendant Carollo knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4040.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4041.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Carollo's reprehensible conduct in an amount to be proven at trial. Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and

Plaintiffs' Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4042.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 135
### ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
### AGAINST DEFENDANT NORIEGA

4043.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4044.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4045.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4046.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4047.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Noriega is liable for the conspiratorial plot against Plaintiffs.

4048.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4049.   Noriega coveted the City Manager position and so he willingly joined the Civil Conspiracy in exchange for Carollo's assistance in securing the position.

4050.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4051.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4052.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4053.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4054.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4055.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4056.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4057.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4058.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4059.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4060.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4061.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4062.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4063.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4064.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4065.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or "mysteriously disappeared" and exceeded its authority in "auditing" Ortus and the property.

4066.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4067.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property— despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4068.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4069.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4070.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4071.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4072.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4073.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4074.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4075.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4076.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4077.   The Group reversed its position regarding LHAB TOO's permits.

4078.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4079.   Defendant Noriega knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy

4080.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4081.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Noriega's reprehensible conduct in an amount to be proven at trial. Noriega's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Noriega, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs Rights of Free Association. And Noriega was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4082.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 136**
**ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY**
**AGAINST DEFENDANT MENDEZ**

4083.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4084.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4085.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4086.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses.

Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4087.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Mendez is liable for the conspiratorial plot against Plaintiffs.

4088.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4089.   Mendez wanted Carollo's protection for and assistance in her family's lucrative business and so she willingly joined the Civil Conspiracy.

4090.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4091.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4092.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4093.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4094.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4095.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4096.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with PlaintiffS.

4097.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4098.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4099.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4100.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4101.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4102.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4103.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4104.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4105.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4106.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4107.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4108.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4109.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4110.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4111.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4112.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4113.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4114.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4115.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4116.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4117.   The Group reversed its position regarding LHAB TOO's permits.

4118.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4119.   Defendant Mendez knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4120.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4121.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Mendez's reprehensible conduct in an amount to be proven at trial. Mendez's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Mendez, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs' Rights of Free Association. And Mendez was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4122.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 137
### ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
### AGAINST DEFENDANT DOOLEY

4123.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4124.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4125.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4126.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4127.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Dooley is liable for the conspiratorial plot against Plaintiffs.

4128.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4129.   It is not exactly clear why Dooley decided to participate in the Civil Conspiracy.

4130.   However, it is abundantly clear that Dooley did decide to willingly participate.

4131.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo), and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4132.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4133.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4134.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4135.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4136.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4137.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4138.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4139.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4140.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking

the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4141.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4142.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4143.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4144.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4145.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4146.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4147.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4148.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4149.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4150.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4151.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4152.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4153.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4154.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4155.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower

Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4156.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4157.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4158.   The Group reversed its position regarding LHAB TOO's permits.

4159.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4160.   Defendant Dooley knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4161.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4162.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Dooley's reprehensible conduct in an amount to be proven at trial. Dooley's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Dooley, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs' Rights of Free Association. And Dooley was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4163.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 138**
**ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY**
**AGAINST DEFENDANT MARRERO**

4164.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4165.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4166.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4167.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4168.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Marrero is liable for the conspiratorial plot against Plaintiffs.

4169.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4170.   After becoming the Building Director, Marrero quickly joined the Civil Conspiracy and has recently been promoted by the City Manager (Noriega).

4171.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo), and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4172.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4173.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4174.    The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4175.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4176.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4177.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4178.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4179.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4180.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4181.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4182.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4183.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4184.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4185.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4186.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or "mysteriously disappeared" and exceeded its authority in "auditing" Ortus and the property.

4187.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4188.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raise any issue for years while Gran Fiesta was working with the City regarding prior permits.

4189.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4190.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4191.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4192.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4193.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4194.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4195.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4196.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4197.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4198.   The Group reversed its position regarding LHAB TOO's permits.

4199.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4200.   Defendant Marrero knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy

4201.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4202.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Marrero's reprehensible conduct in an amount to be proven at trial. Marrero's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Marrero, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs' Rights of Free Association. And Marrero was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4203.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 139
### ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
### AGAINST DEFENDANT DIAZ

4204.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4205.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4206.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4207.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4208.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Diaz is liable for the conspiratorial plot against Plaintiffs.

4209.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4210.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4211.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4212.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4213.   The very next day, **on May 28, 2020, Diaz emailed** the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4214.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho

- Gran Fiesta
- Beatstik

4215.  Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4216.  For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4217.  **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4218.  **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4219.  **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4220.  **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4221.  **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4222.  The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4223.    After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla, **the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4224.    The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4225.    For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4226.    Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4227.    Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property— despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4228.    In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4229.    The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4230.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4231.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4232.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4233.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4234.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4235.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4236.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4237.   The Group reversed its position regarding LHAB TOO's permits.

4238.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4239.   Defendant Diaz knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4240.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4241.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Diaz's reprehensible conduct in an amount to be proven at trial. Diaz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Diaz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs' Rights of Free Association. And Diaz was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4242.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

**COUNT 140**
**ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY**
**AGAINST DEFENDANT PLASENCIA**

4243.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4244.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4245.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4246.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4247.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Plasencia is liable for the conspiratorial plot against Plaintiffs.

4248.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4249.   And so, Carollo created a Civil Conspiracy to effectuate his retaliation.

4250.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo), and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4251.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate

in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4252.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4253.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4254.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4255.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4256.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4257.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4258.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4259.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4260.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4261.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4262.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4263.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4264.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4265.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4266.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4267.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—

despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4268.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4269.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4270.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4271.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4272.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4273.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4274.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4275.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4276.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4277.   The Group reversed its position regarding LHAB TOO's permits.

4278.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4279.   Defendant Plasencia knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4280.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4281.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Plasencia's reprehensible conduct in an amount to be proven at trial. Plasencia's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Plasencia, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs Rights of Free Association. And Plasencia was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4282.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

## COUNT 141
## ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
## AGAINST DEFENDANT ORTIZ

4283.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4284.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4285.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4286.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4287.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Ortiz is liable for the conspiratorial plot against Plaintiffs.

4288.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4289.   And so, Carollo created a Civil Conspiracy to effectuate his retaliation.

4290.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation

for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4291. And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4292. And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4293. The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4294. Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4295. Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4296. For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4297. **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4298. **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4299.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4300.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4301.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4302.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4303.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4304.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4305.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4306.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4307.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4308.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4309.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4310.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4311.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4312.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4313.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4314.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4315.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4316.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4317.   The Group reversed its position regarding LHAB TOO's permits.

4318.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4319.   Defendant Ortiz knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4320.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4321.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Ortiz's reprehensible conduct in an amount to be proven at trial. Ortiz's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Ortiz, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs

Rights of Free Association. And Ortiz was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4322.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 142
### ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
### AGAINST DEFENDANT BAYONA

4323.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4324.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4325.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4326.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4327.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Bayona is liable for the conspiratorial plot against Plaintiffs.

4328.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4329.   And so, Carollo created a Civil Conspiracy to effectuate his retaliation.

4330.   Upon information and belief, Bayona, in exchange for her participation in the Civil Conspiracy, received a free pass to do work on her house without a permit; and the City has extinguished an easement abutting her house to increase her land value.

4331.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo), and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4332.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4333.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4334.    The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4335.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4336.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4337.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4338.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4339.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4340.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4341.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4342.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4343.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4344.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla, **the Group created**

**Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4345.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4346.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4347.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4348.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property—despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4349.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating: "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4350.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4351.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4352.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4353.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4354.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4355.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4356.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4357.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4358.   The Group reversed its position regarding LHAB TOO's permits.

4359.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4360.   Defendant Bayona knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil

Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4361.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4362.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Bayona's reprehensible conduct in an amount to be proven at trial. Bayona's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Bayona, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs' Rights of Free Association. And Bayona was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4363.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

### COUNT 143
### ALL PLAINTIFFS' CLAIM OF CIVIL CONSPIRACY
### AGAINST DEFENDANT GOLDBERG

4364.   In 2017, Carollo announced his campaign for City Commission to serve as Commissioner for District 3.

4365.   Instead of supporting Carollo, Plaintiffs Fuller and Pinilla supported Alfie Leon, another politician campaigning for the same position.

4366.   Carollo became City Commissioner and "used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent." *Fuller I*, DE 631 (Court Order) at 7.

4367.   Plaintiffs suffered economic harm as the retaliatory actions "specifically targeted Plaintiffs' financial vulnerabilities by attempting to shut down their, or their tenants', businesses. Defendant's actions were continuous and unrelenting. And Defendant's actions were intentional and malicious. Further, Defendant's actions continued long after Plaintiffs filed suit." *Id*. at 8.

4368.   Through the Civil Conspiracy among the City Commissioner (Carollo), City Manager (Noriega), City Attorney (Mendez), Assistant City Attorney (Dooley), Building Director (Marrero), City's Fire Marshal (Plasencia), Chief of Unsafe Structures (Diaz), City Personnel (Ortiz), Code Enforcement Board Member (Bayona), and Zoning Director (Goldberg) (herein collectively the "Group"), Defendant Goldberg is liable for the conspiratorial plot against Plaintiffs.

4369.   Carollo sought to retaliate against Plaintiffs for Fuller and Pinilla's support of his political rival, Alfie Leon.

4370.   And so, Carollo created a Civil Conspiracy to effectuate his retaliation.

4371.   **In or by February 2020, the City Attorney (Mendez), City Commissioner (Carollo) and City Manager (Noriega) reached an agreement** to target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent, thereby forming the Civil Conspiracy.

4372.   And **by May 27, 2020, the Building Director (Marrero), Chief of Unsafe Structures (Diaz), and Assistant City Attorney (Dooley) reached an agreement** to participate in the Civil Conspiracy and target Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4373.   And so by May 27, 2020, the Group began updating policies to specifically target Plaintiffs in furtherance of the Civil Conspiracy.

4374.   The very next day, on May 28, 2020, Diaz emailed the Building Director a list of properties and property owners affiliated with Fuller and Pinilla.

4375.   Specifically on this list were:

- Havana Bungalows
- Futurama
- Tower Hotel
- LHAB
- LHAB TOO
- Calle Ocho
- Gran Fiesta
- Beatstik

4376.   Thereon, the Group created ordinances and internal policies to specifically target these properties and property owners, among others related to Fuller and Pinilla.

4377.   For instance, on October 22, 2020, the Group passed **Ordinance 13936** to specifically target properties and property owners affiliated with Plaintiffs.

4378.   **The group created Ordinance 13936** to target LHAB, Gran Fiesta, Piedra Villas, El Shopping, and Beatstik.

4379.   **The very day** Ordinance 13936 was passed on October 22, 2020, the Group intentionally used it to revoke LHAB's CU by fabricating a violation.

4380.   **And at least on or about October 22, 2020, the City's Fire Marshal (Plasencia) agreed to join the Civil Conspiracy** and the Group created a post-hoc justification for revoking the CU at LHAB—asserting that LHAB needed fire sprinklers based on plans which mysteriously disappeared.

4381.   **And at least on or about March 14, 2021, the City's Personnel (Ortiz) and Code Enforcement Board Member (Bayona) agreed to participate in the Civil Conspiracy** and began improperly influencing Gran Fiesta's appeal before the Code Enforcement Board.

4382.   **And at least on or about May 13, 2021, the Zoning Director (Goldberg) agreed to participate in the Civil Conspiracy** and began issuing repetitive citations to El Shopping and sought to magnify the business disruption by revoking CUs for "not enough parking."

4383.   The Group created **Ordinance 14057** and passed it in **March of 2022**, to target Havana Bungalows, Gran Fiesta, and El Shopping by limiting their ability to mitigate fines and forcing them to appear before Carollo.

4384.   After the City Attorney, City Manager, and Assistant City Attorney failed to derail the historic designation process for properties related to Fuller and Pinilla**, the Group created Ordinance 14118** in October of 2022 to target Tower Hotel, Beatstik, and Piedra Villas to allow the City to demolish buildings despite their historic designations.

4385.   The Group used its powers to cause damage to Plaintiffs in retaliation for Fuller and Pinilla's support of Carollo's political opponent.

4386.   For instance, on October 22, 2020, the Group revoked the CU for LHAB's property before having cause and subsequently, in scrambling to create cause, relied on plans which either never existed or mysteriously disappeared and exceeded its authority in "auditing" Ortus and the property.

4387.   Gran Fiesta was listed on the Chief of Unsafe Structure's May 28, 2020, list as having no unsafe violations.

4388.   Nevertheless—the Group used Ordinance 13936 and claimed the technicality that Gran Fiesta's staircase was close to the property line was sufficient to shut down the property— despite not raising any issue for years while Gran Fiesta was working with the City regarding prior permits.

4389.   In fact, the City Attorney (Mendez) blatantly admitted to the harassment stating "If [Fuller and Pinilla] would have . . . treated [the Group] with respect, [Gran Fiesta] would not be in the precarious situation they find themselves in today."

4390.   The Group imposed a baseless citation on Brickell Station claiming work was done without a permit—when in fact the City knew it had been done pursuant to one and denied Brickell Station the right to use a trilateral agreement to address the issue after sale.

4391.   The Group delayed Piedra Villas' opening by stating its staircase was not compliant with code—yet the City was unable to articulate what code it was not compliant with.

4392.   The Group erroneously issued a violation for Calle Siete and only admitted it was baselessly cited after months of expensive, frivolous litigation.

4393.   The Group worked to delay Beatstik's ability to conduct renovations within of its permit and specifically waited until February 28, 2022, to request documents so that Beatstik would not be able to comply by March 3, 2022.

4394.   The Group issued an unsafe structure violation for El Shopping's parking garage despite the "issue" being aesthetics and not related to the structural integrity of the building, used this violation to revoke the Parking Garage's CU pursuant to Ordinance 13936 and then revoked the CU of every tenant in the adjacent building simply because there was not enough parking.

4395.   On May 28, 2020, the City's Chief of Unsafe Structures noted Tower Hotel as doing work under a permit and yet on July 2, 2020, the Group issued a building violation claiming Tower Hotel did work without a permit and proceeded to work to delay Tower Hotel's ability to comply with its compliance agreement and threatened the property with demolition.

4396.   The Group worked to target Futurama, driving away its tenants and prospective tenants, issued a baseless citation and then worked to uphold the violation by instructing the Code Enforcement Board on how to vote.

4397.   The Group worked to target Havana Bungalows by undermining its ability to go to the Code Enforcement Board and appeal its citations.

4398.   The Group reversed its position regarding LHAB TOO's permits.

4399.   And, the Group used its funds to purchase a property LHAB Tres was negotiating on.

4400.   Defendant Goldberg knew that the Group's participants were retaliating against Plaintiffs in violation of Plaintiffs' constitutional rights, agreed to participate in the Civil Conspiracy, and otherwise did not intervene to stop the Group from taking actions in furtherance of this Civil Conspiracy.

4401.   This conspiracy has caused Plaintiffs substantial economic, emotional, and reputational damages.

4402.   All Plaintiffs are also entitled to punitive damages to punish, penalize, and deter the future recurrence of Goldberg's reprehensible conduct in an amount to be proven at trial. Goldberg's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Goldberg, in retaliation against Plaintiffs' Fuller and Pinilla, targeted Plaintiffs in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech and Plaintiffs Rights of Free Association. And Goldberg was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights.

4403.   Plaintiffs are entitled to and hereby demand an award of attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act of 1976 (42 U.S.C. § 1988(b)).

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in the Plaintiff's favor against Defendants and award damages for business disruption, emotional distress, reputational harm, punitive damages, attorneys' fees, enter a permanent injunction against Defendants enjoining them from further retaliation against Plaintiffs, and grant such other relief as this Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial of all claims so triable.

Respectfully submitted,

AXS LAW GROUP PLLC
2121 NW 2nd Avenue
Miami, FL 33127
Tel: (305) 297 – 1878

By: */s/ Samuel Jacob Etkin Kramer*
**JEFFREY W. GUTCHESS**
Florida Bar No. 702641
Jeff@axslawgroup.com
Samuel Jacob Etkin Kramer
Florida Bar No. 1049581
Sam@axslawgroup.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 19, 2024, a true and correct copy of the foregoing was served on all counsel of record via the CM/ECF.

/s/ *Samuel Jacob Etkin Kramer*
Samuel Jacob Etkin Kramer