## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No.: 1:23-cv-24251-FAM

WILLIAM O. FULLER et al.,

      *Plaintiffs*,

     v.

CITY OF MIAMI et al.,

      *Defendants*.

_____/

### PLAINTIFFS' CORRECTED[1] MOTION FOR RECONSIDERATION OR, ALTERNATIVELY, FOR ENTRY OF FINAL JUDGMENT UNDER RULE 54(b)

The Eleventh Circuit has already held that one City employee, Joe Carollo, violated a clearly established right by weaponizing his authority as Commissioner to spearhead a campaign of First Amendment retaliation against disfavored constituents. DE 199 at 9. That same logic necessarily applies to another City employee, Building Department Director Asael Moreno, who served as one of Carollo's primary henchman in carrying out that same unlawful campaign of First Amendment retaliation, and thus violated the same clearly established Constitutional right. This Court's Orders resulting in the dismissal of all claims against Marrero in this case conflict with settled, binding precedent. Accordingly, Plaintiffs respectfully request that this Court reconsider its prior Orders (DE 184 & 199) as necessary to prevent a manifest injustice or, alternatively, enter final judgment as to Marrero under Federal Rule 54(b) because there is no just reason for delay.

In its Order granting Marrero's motion to dismiss on qualified immunity grounds, this Court primarily relied on *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005), to conclude that Carollo's abuse of government authority violated clearly established law, but that Marrero's identical abuse of government authority did not. Although this Court purported to rely on *Bennett* to justify its conclusion on the grounds that the two defendants supposedly had "completely

different" roles in the pattern of unconstitutional First Amendment retaliation, its Order is flatly inconsistent with *Bennett*. *See* DE 199 at 9.

Specifically, the sheriff in *Bennett* (like Carollo in this case), "formed a 'Strike Force' . . . to carry out this process of intimidation" which would not have been possible without the participation of his deputies (like Marrero in this case), who implemented the retaliatory conduct. *Bennett*, 423 F.3d at 1249. And, because it is "clearly established . . . that retaliation against private citizens for exercising their First Amendment rights [i]s actionable," the Eleventh Circuit in *Bennett* held that **none of the government employees** who participated in the retaliation—neither the sheriff nor the deputies—were entitled to qualified immunity. *Id.* at 1255.

There is nothing about the allegations in the complaint in this case that permits a different result. Far from being "not controlling or inapposite," as this Court's Order suggests, *Bennett* arose from a materially indistinguishable set of facts, where the plaintiffs in that case (like the Plaintiffs here) spoke out in opposition to the sheriff (like Carollo here), who enlisted other government employees (like Marrero here) to form a retaliatory "strike force," and whose participation was necessary to carry out the retaliation. DE 199 at 10. And, because the Eleventh Circuit has already determined that Carollo violated clearly established law by weaponizing his government authority to commit First Amendment retaliation, this Court was bound to follow that precedent with respect to Marrero, who weaponized his government authority in the same way as Carollo and as part of the same scheme as Carollo. *See Fuller v. Carollo*, No. 21-11746, at *8 (11th Cir. Feb. 4, 2022).

In every relevant respect, this Court's Order departs from *Bennett*'s repeated emphasis that the qualified immunity analysis requires the record to be construed in the light most favorable to Plaintiffs. *See Bennett*, 423 F.3d at 1250 ("Our procedure in assessing qualified immunity is well-established," and requires the facts to be "taken in the light most favorable to the party

asserting the injury") (cleaned up); *id*. at 1254 ("light most favorable to the plaintiffs"); *id*. at 1256 (same); *accord Morris v. Town of Lexington, Ala.*, 748 F.3d 1316, 1319 n.3 (11th Cir. 2014) (same); *Buress v. City of Miami,* 2024 WL 3666076 (11th Cir. Aug. 6, 2024) (same); *Abella v. Rodriguez*, 824 F. App'x 918, 919–20 (11th Cir. 2020) (on "summary judgment based on qualified immunity . . . [we] view the evidence in the light most favorable to . . . the nonmoving party" and "the law is clearly established that public officials may not retaliate against private citizens for exercising their First Amendment rights[.]"). Here, however, the underpinnings of this Court's Order are incompatible with a reading of the complaint that is construed in the light most favorable to Plaintiffs.

<u>First</u>, contrary to this Court's Order of Dismissal, Marrero's role in the retaliation was not meaningfully different than Carollo's. As another Judge in this District put it, Carollo "weaponize[d] the City government" to retaliate against his "political opponents" by "specifically targeting [their] financial vulnerabilities." *Fuller v. Carollo*, Case No. 1:18-cv-24190 (SDFL), DE 631 at 7. But, Carollo himself insists that he could not carry out the retaliation alone. *See, e.g.*, *Fuller v. Carollo*, 23-12167, DE 40 at 26 ("The Charter does not grant commissioners authority to direct code enforcement actions"). Accordingly, Carollo "weaponized" other City employees to complete his illegal scheme.

Thus, just like the sheriff and his deputies in *Bennett*, one of the most vital City employees that Carollo successfully "weaponized" to retaliate against his political opponents was Marrero, given his uniquely destructive power as the Director of the Building Department. Marrero's leading role in carrying out the retaliation campaign on behalf of Carollo is not a matter of conjecture; it is reflected in writing, including his own, like the following text message that he sent on May 27, 2020:

Just had a lengthy meeting with the manager [Noriega] and almost the entire City Attorney office plus Adele [Valencia] talking about Bill Fuller [and Martin Pinilla]. The Manager wants us to revise and update our policies to be more stringent when it comes to work without permit, clearly define what are unsafe conditions, and shut down all structures that don't comply. . . . I just had a conversation with Rene [Diaz] and asked him to stop by the office tomorrow.

I would like for us to spend the day tomorrow brainstorming about these issues. We need to circle back with Rachel [Dooley] if we need to update any of our ordinances as well as I have a follow up meeting with the manager next week to provide an update on these issues.

DE 129 (Second Amended Complaint) at ¶¶ 349-50.

While this Court notes that Carollo may have been the "motivating force in instigating the unconstitutional retaliation," DE 199 at 10, that does not absolve Marrero for embracing and carrying it out to devastating effect. For example, as alleged in the operative complaint:

90. That day, the Chief of Unsafe Structures (Diaz) had a conversation with the Building Director (Marrero) concerning Plaintiffs.

91. The very next day, on May 28, 2020, the Chief of Unsafe Structures sent the Building Director a list of properties and property owners related to Fuller and Pinilla.

92. On the Chief of Unsafe Structure's list were only property owners related to Fuller and Pinilla, including:

  1. Havana Bungalows – noted as having no unsafe structures;

  2. Futurama – noted as payment pending;

  3. Tower Hotel – noted as being remodeled under permit;

  4. Calle Ocho – noted as no unsafe violations and property remaining secure;

  5. LHAB – noted as having no unsafe violations;

  6. LHAB Too – noted as having work that has been stopped;

  7. Gran Fiesta – noted as having no unsafe violations; and

  8. Beatstik –noted as having permits being processed.

DE 129 at ¶¶ 90-92.

Though the Court inexplicably struck these allegations—among over 150 others—in a *sua sponte* Order, DE 184, Plaintiffs' complaint details many other ways in which Marrero worked with the City Attorney's office to revise ordinances to target Plaintiffs' businesses, while acting as the "final policy maker" to change "the City's policy regarding compliance agreement to prevent Plaintiffs from ever being able to comply with the City code . . . ." *Id*. at ¶ 123. In particular, the complaint pleads in detail how Marrero obstructed Plaintiffs' ability to meet compliance agreement deadlines by either searching for new violations, arbitrarily requiring Plaintiffs to pull obscure permits, or changing the Department's position on whether Plaintiffs' compliance with prior permits and agreements would meet Code.  *See, e.g.*, *Id*. at ¶¶ 964-980, 1727-1740, 1997-2006 (pleading Marrero's bad-faith acts regarding compliance agreements).

To prevent Marrero from using these revised City policies to demolish their buildings, Plaintiffs had to seek an injunction in state court, and pursue that remedy on appeal, where the Third District Court of Appeal held that Plaintiffs had: "submitted the[ir] plans, received approval, and then timely sought permits. . . . the owners timely responded to the City at every opportunity. . . . the City often changed its approvals of certain plans to denials without explanation, and otherwise did not act in good faith. It frustrates the purpose of a mitigation plan if the City can simply fail to act and then seek a draconian remedy of demolition based on nothing more than the owner's inability to comply with a deadline based on the City's own (in)action." DE 130-1 (*Tower Hotel v. City of Miami*, Case No. 3D23-0285, at 9 n.8 (Fla. 3d DCA Apr. 24, 2024)).

Second, this Court's Order is particularly amenable to reconsideration to the extent that it finds—on a motion to dismiss, no less—that it not "every objectively reasonable government official facing the circumstances would know that the official's conduct violated federal law"

merely because it was "within [Marrero's] job function to enforce codes and regulate buildings and structures within the City." DE 199 at 11.

In fact, the Eleventh Circuit has repeatedly explained that, **as a matter of law**, it is "clearly established that retaliation against private citizens for exercising their First Amendment rights [is] actionable." *Bennett*, 423 F.3d at 1255-56 (citing cases). And, the Eleventh Circuit has specifically held that qualified immunity does not exist when government officials retaliate against private citizens by directing "building code inspectors and fire inspectors to conduct frequent inspections . . . and to write numerous and burdensome violations" to "drive [them] out of business." *Espanola Way v. Meyerson*, 690 F.2d 827, 828 (11th Cir. 1982). Accordingly, in a prior case involving the same scheme of retaliation, even Carollo has been forced to admit that the "basic concept of political retaliation" in response to the "'exercise of First Amendment rights'" is "indeed unacceptable" and contrary to "established law." *Fuller, et al. v. Carollo, et al.*, No. 19-12439, Initial Brief at 33 (quoting *Ga. Ass'n of Educators v. Gwinnett County Sch. Dist.*, 856 F.2d 142, 145 (CA11 1988)).

Once again, the complaint—particularly when it is properly construed in the light most favorable to Plaintiffs—leaves no room for doubt that Marrero was on notice that participating in the retaliation violated clearly established law. For instance, the allegations in the complaint mirror the allegations in other, similar cases in which government officials were denied qualified immunity when they "engaged the punitive machinery of government" to punish Plaintiffs for exercising their First Amendment rights through a "campaign of petty harassments." *Bailey v. Wheeler*, 843 F.3d 473, 484 (11th Cir. 2016).

Even if the Eleventh Circuit had not already decided these questions on questions involving indistinguishable facts—including in *Fuller I*, a case involving the very same retaliation

campaign—there is no need to speculate about whether an "objectively reasonable government official" in Marrero's position would know that he was participating in an unconstitutional retaliation campaign. After all, Plaintiffs alleged that several top-ranking City employees publicly disclosed the retaliatory intent motivating Carollo's directives to Marrero and others, while expressing their constitutional concerns in the most strenuous possible terms:

- Then-City Manager Gonzalez publicly stating that Carollo "was trying to terminate [him] because [he] would not weaponize city government against Mr. Fuller."

- Then-Chief of Police Colina writing that "the main focus of the discussion was aimed at one particular business owner in the city. . . . [T]he addresses forwarded in [then City Attorney Mendez's] email targets the particular business owner [i.e., Plaintiff Fuller] which gives the impression that the city is selectively targeting his business . . .. The concern that this request . . . may amount to an **unsanctioned and unlawful exercise of powers** . . . [and] may be **in violation of the code of ethics ordinance**. Furthermore this is selective enforcement against the business owner's properties using city ordinance."

- Then-Deputy City Manager Napoli writing "I am concerned that what the City Attorney [Mendez] is directing our staff to do is . . . targeting [Fuller and Pinilla's] businesses."

- Then-Assistant City Manager Ihekwaba writing "We ought to be enforcing the Code citywide and not just targets[.]"

- Mayor Suarez writing the City was "selectively enforcing or weaponizing code enforcement against particular property owners."

- Former Police Chief testifying that (a) City Manager Noriega "talked very openly about . . . the disdain [Carollo] had for Bill Fuller" and (b) that "It's not speculation, it [was] well known, spoken about openly in the city government about how Joe Carollo has absolute[ ] disdain for Mr. Fuller."

- A former Police Chief, and Carollo's then-Chief of Staff, Blom writing a resignation letter because he was "not comfortable doing this [ ] [ ] research . . . focusing on this one individual [Fuller]."

DE 129 at ¶¶ 75; 77; 78; 79; 80; 85; 141-142.

In other words, it requires an unreasonable inferential leap to construe the complaint as alleging that it was reasonable for Marrero to stand alone in failing to comprehend that public officials who support political retaliation against business owners violates the United States Constitution. But even if Marrero somehow harbored such an irrational subjective belief, it was not objectively reasonable for him to believe that participating in a five-year campaign of political retaliation that caused more than a dozen businesses to shut down did not violate the United States Constitution. And that is particularly true after Miami's City Manager, his two assistant City Managers, Miami's two previous Police Chiefs, its Director of Code Compliance, and two of Carollo's own former Chiefs of Staff (one of whom was a police chief also), protested vehemently to the point of resigning their positions.

Troublingly, this Court dismissed the claims against Marrero on the grounds that he supposedly did not realize he was participating in an unconstitutional retaliation campaign shortly after entering a *sua sponte* Order striking these relevant allegations, along with **the first 165 paragraphs of Plaintiffs' complaint**. *See* DE 184. In the Court's view, these allegations exceeded the "short and plain statement" necessary to state a claim. But the Court would presumably prohibit Plaintiffs from stating the knowledge of a reasonable public official in Marrero's position as a bare legal conclusion. At the same time, however, this Court's *sua sponte* Order struck all of the well-pled facts that support that legal conclusion, including the position of similarly situated public officials, which is particularly disturbing given that Plaintiffs have not yet had the opportunity to conduct any discovery at the motion-to-dismiss stage.

In sum, this Court erred in holding that "Plaintiffs fail[ed] to demonstrate" that Marrero's "conduct violate[d] clearly established law" under "any of the three ways set out by the Eleventh Circuit." DE 199 at 8-9. Not only did Plaintiffs demonstrate the conduct violated clearly

established law, they did so in all three ways set forth by the Eleventh Circuit. *Id*. at 9 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204-05 (11th Cir. 2012) ((1) identifying a "materially similar case that has already been decided"; (2) identifying "a broader, clearly established principle that should control the novel facts of the situation"; or (3) where "conduct involved in the case [ ] so obviously violate the Constitution that prior case law is unnecessary").

However, this Court remarked that a so-called "layer of control" sets this case apart from *Bennett*, *Bailey*, *Fuller I*, and all of the other similar cases prohibiting First Amendment retaliation by government employees. DE 199 at 10. But that assertion is incompatible with the facts in the record, the allegations in the complaint, and even Carollo's own judicial admissions. *See, e.g.*, *Fuller v. Carollo*, No. 23-12167, DE 26 at 57 (11th Cir. May 1, 2024) ("[T]he City Charter expressly withholds from commissioners the power to direct City officials or employees") (emphasis omitted).

Thus, reconsideration is appropriate in order to properly construe the allegations in the complaint in the light most favorable to Plaintiffs. For instance, contrary to this Court's Order of Dismissal, the complaint **does** reflect that Marrero "physically harass[ed] or intimidate[d]" Plaintiffs by threatening to destroy at least six buildings that they own. *See e.g.*, DE 129 at ¶¶ 961-982, 1468-1470, 1985, 2660-2663, 2826-2833.

Likewise, the complaint **does not** reflect that Marrero was somehow "strengthening city policies" by carrying out a retaliation campaign, which another Judge in this District characterized as a "shock to the conscience" and resulted in a unanimous jury awarding over $63 million in actual and punitive damages, DE 199 at 10, consistent with a state court ruling that Carollo and Marrero's confederates in the City and its building departments "did not act in good faith[.]" DE 130-1 (*Tower Hotel*, No. 3D23-0285, at 9 n.8).

Similarly, the complaint **does not** limit Plaintiffs' protected activity to merely two political rallies. Rather, Plaintiffs' protected activity consisted of ongoing political expression for several years beginning in November 2017 which not only included those two political rallies, but also several other forms of political activity, including filing an ethics complaint against Carollo, protesting at the Valentines Day Massacre, exposing Carollo's misconduct to the press, filing other "lawsuits, including lawsuits to stop the demolition of their buildings" under Marrero's purview, and "a federal lawsuit against Carollo[.]" *See e.g.*, DE 129 at ¶ 345 Moreover, former City employees have even testified to the pervasive knowledge of the political retaliation campaign. *See e.g.*, *Id.* at ¶¶ 142, 160 (citing trial testimony); *see also Fuller I*, 04/18/23 Trial Tr. at 107 (Former Police Chief Acevedo testifying the retaliation "was openly known throughout the city. . . . It was in wide open knowledge in Miami that [Fuller and Pinilla were] being targeted."); *Id.*, 04/11/2023 Trial Tr. at 46 (Former City Manager Gonzalez testifying "**my deputy city manager, my assistant city manager, the police chief**, in writing objected that . . . they were very uncomfortable doing this. I also had **other employees and directors** come to me and saying, hey, what's going on? **It's just wrong**. **There's just no way that this is right**." (Emphasis added)).

Nor did Carollo attempt to conceal the blatantness of his political retaliation. *See e.g.*, DE 129 at ¶ 68 (Carollo defaming Plaintiffs at the "Valentine's Day Massacre" on February 14, 2019); *see also Fuller I*, 4/18/2023 Trial Tr. at 28 ("the main focus of the [Valentine's Day Massacre] was aimed at one particular business owner in the city[, Fuller]"); *Id.*, 4/18/2023 Trial Tr. at 105 (Carollo "himself was very open discussing his disdain for Mr. Fuller and his businesses, I learned from him himself"); *Id.*, 04/19/23 Trial Tr. at 120 (Former Commissioner Ken Russell explaining Carollo's presentation at the Valentine's Day Massacre displayed Carollo's "personal animus over the issue"); *Id.*, 4/19/23 Trial Tr. at 180 (Carollo told Fuller's tenant that he would "support [him]

anyplace but not in Bill Fuller's building"); *Id.*, 4/20/23 Trial Tr. at 80 (upon hearing that Mr. Fuller called to congratulate him on winning the election, Carollo "said fuck you, fuck him.").

This Court has the authority and responsibility to hold those who knowingly, willingly, and directly participated in the retaliation accountable for their violations of the United States Constitution. Accordingly, it is necessary and appropriate for this Court to avoid a manifest injustice by reconsidering its Orders striking relevant allegations from Plaintiffs' complaint *sua sponte* (DE 184), and ultimately dismissing Marrero from the case (DE 199). In addition to being manifestly unjust to the Plaintiffs who were victimized by Marrero's malfeasance, this Court's rulings will also demoralize government officials were punished for demonstrating the courage that Marrero lacked in standing up to Carollo's retaliation while sending an equally clear message to government officials that they will be protected—if not rewarded—for abusing their authority like Marrero did. *See e.g.*, *UMG Recordings, Inc. v. Vital Pharm., Inc.*, 2022 WL 19404297, at *1 (S.D. Fla. July 7, 2022) (granting reconsideration to avoid a manifest error); *Infinite Energy Inc. v. Econnergy Energy Co., Inc.*, 2010 WL 11518548, at *4 (N.D. Fla. Oct. 13, 2010) (granting reconsideration "in the interests of justice and to correct clear error"); *Ford v. Gov't Employees Ins. Co.*, 2015 WL 11109374 (N.D. Fla. June 11, 2015) (manifest injustice).

Alternatively, to the extent that this Court is not inclined to reconsider any of its prior Orders, Plaintiffs respectfully request that this Court resolve any doubt as to whether its Order dismissing Marrero from the litigation is immediately appealable by entering a final judgment as to him under Federal Rule 54(b). In the absence of reconsideration, there would be no just reason to delay entering final judgment as to Marrero under the circumstances. To the contrary, a prompt appeal would serve the interests of judicial economy by relieving the substantial hardship associated with piecemeal proceedings and prejudicial delay that would result if the claims against

Marrero are reinstated on appeal after the conclusion of the case as to the remaining defendants.

*See generally Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 722 (11th Cir. 2021).

WHEREFORE, Plaintiffs request this Court reconsider its Orders, striking the first 165 paragraphs of Plaintiffs' complaint, DE 184, and dismissing Defendant Marrero, DE 199; or, in the alternative, enter final judgment under Federal Rule 54(b).

Respectfully submitted,

**AXS LAW GROUP, PLLC**

2121 NW 2nd Avenue, Suite 201
Miami, FL 33127
Tel: 305.297.1878

By: */s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess
Florida Bar No. 702641
jeff@axslawgroup.com
Samuel J. Etkin Kramer
Florida Bar No. 1049581
Sam@axslawgroup.com

*Counsel for Plaintiffs*

---

[1] Plaintiffs file this Corrected Motion For Reconsideration Or For Entry of Final Judgment to clarify that, because of the impending settlement in the case of *The Madroom, LLC d/b/a Ball & Chain v. City of Miami*, Case No. 21-cv-23485-Altman/Reid (SDFL), two Plaintiffs – LHAB and Gran Fiesta – do not join in this Motion because they intend to dismiss their claims in this action in five days, on October 8, 2024, when the settlement takes effect. Once that happens, pursuant to the City of Miami's requests, LHAB and Gran Fiesta have agreed to "strike, delete or amend any allegation . . . that references [The Mad Room, Altos Mexicano, LHAB, or Gran Fiesta] or any alleged actions of the City or any City-Affiliated Person with respect to [The Mad Room, Altos Mexicano, LHAB, or Gran Fiesta] in the *Madroom Suit*, including all facts, Claims, or damages related to the Mad Room Litigation Claims[.]"

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF on counsel of record in this action on this 3rd day of October, 2024.

*/s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

*/s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess